1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
          – and –
6   SAMUEL H. RUDMAN
    MARY K. BLASY (211262)
7   58 South Service Road, Suite 200
    Melville, NY  11747
8   Telephone:  631/367-7100
    631/367-1173 (fax)
9   srudman@rgrdlaw.com
    mblasy@rgrdlaw.com
10         – and –
    ARTHUR C. LEAHY (149135)
11  655 West Broadway, Suite 1900
    San Diego, CA  92101
12  Telephone:  619/231-1058
    619/231-7423 (fax)
13  artl@rgrdlaw.com

14  Attorneys for Plaintiff

15              UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17  SPENCER ABRAMS, Individually and on    )  No.
    Behalf of All Others Similarly Situated, )
18                                          )  CLASS ACTION
                            Plaintiff,      )
19                                          )  COMPLAINT FOR VIOLATION OF THE
          vs.                               )  FEDERAL SECURITIES LAWS
20                                          )
    INTUITIVE SURGICAL, INC., LONNIE M.     )
21  SMITH, GARY S. GUTHART, SALVATORE )
    J. BROGNA, AUGUSTO V. CASTELLO,         )
22  JEROME J. McNAMARA, MARK J.             )
    MELTZER, MARSHALL L. MOHR, COLIN )
23  MORALES and DAVID J. ROSA,              )
                                            )
24                          Defendants.     )
                                            )  DEMAND FOR JURY TRIAL
25  _____ )

26

27

28

Plaintiff Spencer Abrams ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Intuitive Surgical, Inc.'s ("Intuitive" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports and other publicly disclosed reports and information about the defendants.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Intuitive between October 19, 2011 and April 18, 2013, inclusive (the "Class Period"), against Intuitive and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Defendant Intuitive manufactures robotic surgical systems, most notably the da Vinci Surgical System.  The da Vinci Surgical System allows surgery to be performed remotely using robotic manipulators.  The Company's common stock is listed on the Nasdaq and forms part of the Nasdaq-100 and S&P 500 indexes.

3.      In 2000, the same year Intuitive common stock first became publicly listed, the U.S. Food and Drug Administration ("FDA") approved the use of the da Vinci Surgical System for general laparoscopic surgery, which can be used to address gallbladder disease and gastroesophageal disease.  In 2001, the FDA approved use of the system for prostate surgery.  The FDA has subsequently approved the system for thoracoscopic surgery, cardiac procedures performed with adjunctive incisions, and gynecologic procedures.  Intuitive now dominates the robot-surgery field, as it is the only company whose system is cleared in the United States for soft tissue procedures that include general surgery, prostate operations and gynecological surgery.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4. Throughout the Class Period, defendants issued a series of materially false and misleading statements highlighting the purported safety and effectiveness of the Company's da Vinci Surgical System, while concomitantly announcing quarter after quarter of record financial results. Sales of Intuitive's robots, priced at $1.5 million each, have helped make Intuitive one of the hottest stocks in health care, growing 61% since the end of February 2010 to a market value of $21.7 billion by March 2013. Due in large part to what the public has recently learned were disreputable and unsafe sales practices, the number of U.S. procedures done with the robots grew to approximately 367,000 in 2012, up from 292,000 in 2011 and 228,000 in 2010. As a result of defendants' efforts to conceal significant safety and efficacy problems with the da Vinci Surgical System – which were exacerbated by the Company's disreputable sales practices – and false statements concerning the Company's business metrics and financial prospects, Intuitive stock traded at artificially inflated prices during the Class Period, reaching a Class Period high of nearly $595 per share in intraday trading by April 18, 2012. Meanwhile, with the price of Intuitive stock soaring, nearly every senior executive of Intuitive cashed in, collectively selling close to 410,000 shares of their personally held Intuitive stock into the open market at fraud-inflated prices during the Class Period, *reaping more than $218.6 million* in proceeds.

5. The true facts, which were known or recklessly disregarded by defendants but concealed from the investing public during the Class Period, were as follows:

(a) defects in the da Vinci Surgical System had caused a substantial number of patient injuries resulting in adverse incident reports prior to and during the Class Period;

(b) not all of these adverse incident reports were being reported to the FDA, exposing the Company to significant regulatory risk and potential criminal sanctions;

(c) Intuitive knew, based on the receipt and review of adverse incident reports and its executive's knowledge of the then-ongoing discussions with the FDA during the Class Period that

1  there was a substantial risk that the FDA might limit or restrict sales and marketing of the da Vinci

2  Surgical System;

3             (d)      Intuitive was engaging in sales practices that violated community standards

4  and their own protocol agreed upon with the FDA, further exposing the Company to criminal and

5  civil sanctions;

6             (e)      Intuitive was exposed to hundreds of millions of dollars in potential civil

7  liability to injured and deceased patients and their families;

8

9             (f)      Intuitive failed to properly reserve for potential liability to civil litigants; and

10            (g)      as a result, defendants lacked a reasonable basis to make positive statements

11 about the safety and effectiveness of the da Vinci Surgical System, the Company's business metrics

12 and its Class Period financial results and outlook.

13        6.      On February 28, 2013, the FDA sent a letter to surgeons participating in the FDA-

14 sponsored Medical Product Safety Network ("MedSun"), asking them to provide information about

15 medical complications associated with use of the da Vinci Surgical System.  The FDA indicated that

16 the survey was prompted by an "'increase in [the] number of reports'" of "adverse events" involving

17 the da Vinci Surgical System.  On this news, the price of Intuitive stock, which had opened at

18 $573.44 per share that morning, plummeted on unusually high trading volume, closing down more

19 than 10% at $509.89 per share, after trading below $493 per share in intraday trading.

20

21        7.      Then, on March 5, 2013, *Bloomberg* ran an expose disclosing that its review of

22 pleadings in at least ten lawsuits filed against Intuitive during the prior 14 months and FDA adverse

23 incident reports had uncovered that robotic surgical systems made by Intuitive had been linked to at

24 least 70 deaths in informal incident reports sent to the FDA since 2009.  On this news, the price of

25 Intuitive stock, which had closed the previous evening at $541.32 per share, again plummeted on

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 3 -

1  unusually high trading volume, closing down approximately 3% at $525.72 per share, after trading

2  as low as $514 per share in intraday trading.

3         8.    On March 14, 2013, the president of the American Congress of Obstetricians and

4  Gynecologists ("ACOG"), Dr. James Breeden, issued a statement contending that, among other

5  things, "[r]obotic surgery is not the only or the best minimally invasive approach for hysterectomy,"

6  and "there is no good data proving that robotic hysterectomy is even as good as – let alone better –

7  than existing, and far less costly, minimally invasive alternatives."  As reported by *Bloomberg* the

8  next day, March 15, 2013, "Robotic surgery for hysterectomies doesn't improve outcomes and

9  shouldn't be the first choice for most women, a doctors' group said, sending Intuitive Surgical Inc.

10 (ISRG) to its lowest value in almost 14 months," emphasizing that the ACOG, "which represents

11 56,000 U.S. physicians, said expertise with Intuitive's da Vinci robot system is limited and surgeons

12 learning the new technology may have higher rates of complications."  Once again, the price of

13 Intuitive stock, which had closed at $509.33 per share on March 13, 2013, plummeted on unusually

14 high trading volume between March 14th and 15th, closing down approximately 10% at $459.44 per

15 share on March 15, 2013.

16        9.    On March 20, 2013, Massachusetts' Quality and Patient Safety Division of the

17 Executive Office of Health and Human Services issued an advisory, which stated, in part, that

18 "[o]ver the last two years, the Quality and Patient Safety Division . . . has received an increasing

19 number of Safety and Quality Review . . . reports of patient complications associated with robot-

20 assisted surgery."

21        10.   Finally, on April 18, 2013, CNBC's Investigations, Inc. broadcast an expose on the

22 da Vinci Surgical System consisting of interviews with, among others, doctors, lawyers, and patients

23 who have filed lawsuits against Intuitive claiming they suffered injury while being operated on by

24 surgeons using the da Vinci Surgical System.

11.     During the broadcast, CNBC referenced the FDA's MAUDE database, which contains voluntary reports by manufacturers concerning adverse events involving medical devices, including reports of injuries and deaths associated with use of the da Vinci Surgical System.  A former Intuitive employee, interviewed by CNBC during the show on condition of anonymity, stated that she recalled instances of da Vinci-related complications that were not reported in MAUDE, and contended that the MAUDE database is "significantly understated in terms of [da Vinci-related] complications."  Concurring was Dr. Martin Makary, a prominent surgeon with the Johns Hopkins School of Medicine and an international expert on patient safety, who shared with CNBC details of a study he co-authored entitled "Underreporting of Robotic Surgery Complications."  The study contends there is "massive underreporting" of robotic surgery complications.  In particular, the report states that "[i]n the case of Intuitive . . . some incidents [involving the da Vinci system] that have resulted in serious injury and death were never reported or were reported late."

12.     In response to this news, the price of Intuitive stock  closed down $8.62 per share on April 19, 2013.  Indeed, since February 27, 2013, the day before the FDA announced its MedSun survey, Intuitive stock has *fallen nearly 19% – or $110.25 per share –* from its Class Period high on account of the above news, falling from $595 per share to a close of $484.75 per share on April 19, 2013, *resulting in market capitalization losses of over $4.4 billion*.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

14.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company is headquartered in this District and the alleged misconduct was transacted in and emanated from this District.

## PARTIES

15.     Plaintiff Spencer Abrams purchased Intuitive common stock as set forth in the attached Certification, which is incorporated herein by reference, and was damaged thereby.

16.     Defendant Intuitive manufactures robotic surgical systems.

17.     Defendant Lonnie M. Smith ("Smith") is, and was throughout the Class Period, the Chairman of Intuitive's Board of Directors and an executive of the Company.  Defendant Smith previously served as Intuitive's Chief Executive Officer ("CEO") between June 1997 and January 2010.  Defendant Smith sold the following 202,422 shares of Intuitive stock during the Class Period at inflated prices, receiving *more than $106.3 million* in proceeds:

| DATE | NUMBER OF SHARES SOLD | PRICE | SELLING PROCEEDS |
|---|---|---|---|
| 25-Oct-2011 | 15,000 | $419.71 | $6,295,650 |
| 20-Apr-2012 | 17,500 | $575.09 | $10,064,075 |
| 24-Jul-2012 | 5,000 | $473.18 | $2,365,900 |
| 24-Jul-2012 | 12,500 | $473.18 | $5,914,750 |
| 22-Oct-2012 | 17,500 | $543.29 | $9,507,575 |
| 20-Nov-2012 | 23,949 | $536.67 | $12,852,710 |
| 21-Nov-2012 | 13,551 | $534.63 | $7,244,771 |
| 21-Nov-2012 | 2,906 | $534.63 | $1,553,635 |
| 23-Nov-2012 | 20,899 | $536.87 | $11,220,046 |
| 26-Nov-2012 | 21,164 | $534.34 | $11,308,772 |
| 27-Nov-2012 | 25,031 | $528.15 | $13,220,123 |
| 27-Nov-2012 | 1,422 | $528.15 | $751,029 |
| 03-Dec-2012 | 1,000 | $525.98 | $525,980 |
| 04-Mar-2013 | 2,000 | $549.50 | $1,099,000 |
| 04-Mar-2013 | 1,500 | $539.50 | $809,250 |
| 04-Mar-2013 | 634 | $537.50 | $340,775 |
| 04-Mar-2013 | 300 | $543.50 | $163,050 |
| 04-Mar-2013 | 6,800 | $541.50 | $3,682,200 |
| 04-Mar-2013 | 45 | $550.50 | $24,773 |
| 04-Mar-2013 | 6,200 | $542.50 | $3,363,500 |
| 04-Mar-2013 | 2,766 | $536.50 | $1,483,959 |
| 04-Mar-2013 | 500 | $546.50 | $273,250 |
| 04-Mar-2013 | 4,255 | $540.50 | $2,299,828 |
| **TOTAL** | **202,422** | | **$106,364,600** |

18.     Defendant Gary S. Guthart ("Guthart") is, and was throughout the Class Period, Intuitive's President and CEO.  Defendant Guthart sold the following 16,000 shares of Intuitive stock during the Class Period at inflated prices, receiving *more than $8.7 million* in proceeds:

| DATE | NUMBER OF SHARES SOLD | PRICE | SELLING PROCEEDS |
|---|---|---|---|
| 20-Apr-2012 | 1,312 | $575.04 | $754,452 |
| 20-Apr-2012 | 1,500 | $574.98 | $862,470 |
| 20-Apr-2012 | 688 | $575.04 | $395,628 |
| 24-Jul-2012 | 2,000 | $473.47 | $946,940 |
| 26-Jul-2012 | 1,500 | $490.00 | $735,000 |
| 22-Oct-2012 | 1,000 | $545.63 | $545,630 |
| 22-Oct-2012 | 2,000 | $544.48 | $1,088,960 |
| 22-Oct-2012 | 1,500 | $542.98 | $814,470 |
| 25-Jan-2013 | 1,500 | $577.67 | $866,505 |
| 25-Jan-2013 | 1,000 | $578.07 | $578,070 |
| 25-Jan-2013 | 2,000 | $577.57 | $1,155,140 |
| **TOTAL** | **16,000** | | **$8,743,265** |

19.    Defendant Salvatore J. Brogna ("Brogna") is, and was throughout the Class Period, Intuitive's Senior Vice President, Product Development.  Defendant Brogna sold the following 39,042 shares of Intuitive stock during the Class Period at inflated prices, receiving ***more than $18.3 million*** in proceeds:

| DATE | NUMBER OF SHARES SOLD | PRICE | SELLING PROCEEDS |
|---|---|---|---|
| 01-Dec-2011 | 3,000 | $424.67 | $1,274,010 |
| 01-Dec-2011 | 7,656 | $424.67 | $3,251,274 |
| 01-Dec-2011 | 1,250 | $424.67 | $530,838 |
| 01-Dec-2011 | 9,167 | $424.67 | $3,892,950 |
| 01-Mar-2012 | 1,250 | $510.12 | $637,650 |
| 01-Mar-2012 | 1,000 | $510.12 | $510,120 |
| 01-Mar-2012 | 1,094 | $510.12 | $558,071 |
| 01-Mar-2012 | 1,250 | $510.12 | $637,650 |
| 01-Jun-2012 | 1,250 | $511.78 | $639,725 |
| 01-Jun-2012 | 1,094 | $511.78 | $559,887 |
| 01-Jun-2012 | 1,000 | $511.78 | $511,780 |
| 04-Sep-2012 | 1,250 | $490.25 | $612,813 |
| 03-Dec-2012 | 2,187 | $528.75 | $1,156,376 |
| 03-Dec-2012 | 1,250 | $528.75 | $660,938 |
| 03-Dec-2012 | 2,000 | $528.75 | $1,057,500 |
| 01-Mar-2013 | 1,000 | $553.00 | $553,000 |
| 01-Mar-2013 | 1,094 | $553.00 | $604,982 |
| 01-Mar-2013 | 1,250 | $553.00 | $691,250 |
| **TOTAL** | **39,042** | | **$18,340,813** |

20.    Defendant Augusto V. Castello ("Castello") is, and was throughout the Class Period, Intuitive's Senior Vice President, Product Operations.  Defendant Castello sold the following 26,250

shares of Intuitive stock during the Class Period at inflated prices, receiving nearly **$15.1 million** in proceeds:

| DATE | NUMBER OF SHARES SOLD | PRICE | SELLING PROCEEDS |
|---|---|---|---|
| 20-Apr-2012 | 5,000 | $575.13 | $2,875,650 |
| 20-Apr-2012 | 5,000 | $575.34 | $2,876,700 |
| 20-Apr-2012 | 6,250 | $575.17 | $3,594,813 |
| 20-Apr-2012 | 5,000 | $575.21 | $2,876,050 |
| 20-Apr-2012 | 5,000 | $575.29 | $2,876,450 |
| **TOTAL** | **26,250** | | **$15,099,663** |

21. Defendant Jerome J. McNamara ("McNamara") is, and was throughout the Class Period, Intuitive's Executive Vice President, Worldwide Sales and Marketing. Defendant McNamara sold the following 55,625 shares of Intuitive stock during the Class Period at inflated prices, receiving **more than $31.5 million** in proceeds:

| DATE | NUMBER OF SHARES SOLD | PRICE | SELLING PROCEEDS |
|---|---|---|---|
| 21-Oct-2011 | 1,536 | $420.00 | $645,120 |
| 21-Oct-2011 | 231 | $418.50 | $96,674 |
| 20-Apr-2012 | 10,000 | $575.11 | $5,751,100 |
| 20-Apr-2012 | 10,000 | $575.08 | $5,750,800 |
| 20-Apr-2012 | 10,000 | $575.06 | $5,750,600 |
| 20-Apr-2012 | 9,144 | $575.03 | $5,258,074 |
| 22-Oct-2012 | 6,250 | $543.54 | $3,397,125 |
| 28-Jan-2013 | 8,464 | $574.03 | $4,858,590 |
| **TOTAL** | **55,625** | | **$31,508,083** |

22. Defendant Mark Meltzer ("Meltzer") is, and was throughout the Class Period, Intuitive's Senior Vice President, General Counsel. Defendant Meltzer sold the following 27,500 shares of Intuitive stock during the Class Period at inflated prices, receiving **more than $15.2 million** in proceeds:

| DATE | NUMBER OF SHARES SOLD | PRICE | SELLING PROCEEDS |
|---|---|---|---|
| 20-Apr-2012 | 1,500 | $575.30 | $862,950 |
| 20-Apr-2012 | 2,000 | $575.21 | $1,150,420 |
| 24-Jul-2012 | 2,000 | $474.05 | $948,100 |
| 13-Aug-2012 | 2,000 | $510.02 | $1,020,040 |
| 22-Oct-2012 | 2,000 | $543.59 | $1,087,180 |
| 22-Oct-2012 | 5,000 | $550.00 | $2,750,000 |
| 22-Oct-2012 | 375 | $543.88 | $203,955 |

| Date | Number of Shares Sold | Price | Selling Proceeds |
|---|---|---|---|
| 22-Oct-2012 | 2,625 | $543.88 | $1,427,685 |
| 25-Jan-2013 | 1,875 | $577.60 | $1,083,000 |
| 25-Jan-2013 | 5,000 | $577.93 | $2,889,650 |
| 25-Jan-2013 | 125 | $577.60 | $72,200 |
| 25-Jan-2013 | 3,000 | $577.61 | $1,732,830 |
| **TOTAL** | **27,500** | | **$15,228,010** |

23.     Defendant Marshall L. Mohr ("Mohr") is, and was throughout the Class Period, Intuitive's Senior Vice President and Chief Financial Officer ("CFO").  Defendant Mohr sold the following 27,400 shares of Intuitive stock during the Class Period at inflated prices, receiving nearly *$15.3 million* in proceeds:

| Date | Number of Shares Sold | Price | Selling Proceeds |
|---|---|---|---|
| 30-Apr-2012 | 200 | $586.50 | $117,300 |
| 30-Apr-2012 | 500 | $585.50 | $292,750 |
| 30-Apr-2012 | 400 | $583.50 | $233,400 |
| 30-Apr-2012 | 300 | $584.50 | $175,350 |
| 30-Apr-2012 | 1,200 | $583.50 | $700,200 |
| 30-Apr-2012 | 200 | $584.50 | $116,900 |
| 30-Apr-2012 | 400 | $585.50 | $234,200 |
| 30-Apr-2012 | 400 | $584.50 | $233,800 |
| 30-Apr-2012 | 700 | $581.50 | $407,050 |
| 30-Apr-2012 | 700 | $581.50 | $407,050 |
| 30-Apr-2012 | 200 | $582.50 | $116,500 |
| 30-Apr-2012 | 600 | $583.50 | $350,100 |
| 30-Apr-2012 | 300 | $582.50 | $174,750 |
| 30-Apr-2012 | 1,000 | $581.50 | $581,500 |
| 30-Apr-2012 | 400 | $585.50 | $234,200 |
| 30-Apr-2012 | 300 | $580.50 | $174,150 |
| 30-Apr-2012 | 500 | $586.50 | $293,250 |
| 30-Apr-2012 | 400 | $586.50 | $234,600 |
| 30-Apr-2012 | 100 | $580.50 | $58,050 |
| 25-Jul-2012 | 3,300 | $478.58 | $1,579,314 |
| 22-Oct-2012 | 3,300 | $543.22 | $1,792,626 |
| 22-Oct-2012 | 4,000 | $543.02 | $2,172,080 |
| 28-Jan-2013 | 1,200 | $574.57 | $689,484 |
| 28-Jan-2013 | 3,600 | $574.57 | $2,068,452 |
| 28-Jan-2013 | 3,200 | $574.12 | $1,837,184 |
| **TOTAL** | **27,400** | | **$15,274,240** |

24.     Defendant Colin Morales ("Morales") is, and was throughout the Class Period, Intuitive's Senior Vice President, Customer Support Group.  Defendant Morales sold the following 4,760 shares of Intuitive stock during the Class Period at inflated prices, receiving *more than $2.3 million* in proceeds:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 9 -

| DATE | NUMBER OF SHARES SOLD | PRICE | SELLING PROCEEDS |
|---|---|---|---|
| 07-Feb-2012 | 260 | $492.55 | $128,063 |
| 07-Feb-2012 | 4,500 | $492.99 | $2,218,455 |
| **TOTAL** | **4,760** | | **$2,346,518** |

25.     Defendant David J. Rosa ("Rosa"), is and was throughout the Class Period, Intuitive's Senior Vice President, Emerging Technologies and Procedures.  Defendant Rosa sold the following 11,000 shares of Intuitive stock during the Class Period at inflated prices, receiving over ***$5.7 million*** in proceeds:

| DATE | NUMBER OF SHARES SOLD | PRICE | SELLING PROCEEDS |
|---|---|---|---|
| 03-Feb-2012 | 5,000 | $493.59 | $2,467,950 |
| 26-Oct-2012 | 6,000 | $538.70 | $3,232,200 |
| **TOTAL** | **11,000** | | **$5,700,150** |

26.     Defendants Smith, Guthart, Brogna, Castello, McNamara, Meltzer, Mohr, Morales and Rosa are referred to herein as the "Individual Defendants."  The Individual Defendants are liable for the false statements pleaded herein, as those statements are 3"group-published" information for which they are responsible.

## BACKGROUND TO THE CLASS PERIOD

27.     The research that eventually led to the development of the da Vinci Surgical System was performed in the late 1980s at non-profit research institute SRI International ("SRI")(formerly Stanford Research Institute) and was funded by the National Institutes of Health.  Prior to joining Intuitive, defendant Guthart was part of the core team developing foundation technology for computer-enhanced surgery at SRI.

28.     After being rejected by the Guidant Corporation, one of the nation's largest biotechnology development firms, SRI's intellectual property was acquired by various investors and a new company named Intuitive Surgical Devices, Inc. was founded.  Intuitive began marketing the da Vinci Surgical System in Europe in 1999, while awaiting FDA approval in the United States.

29.    The Company raised $46 million in an initial public offering ("IPO") in 2000. That same year, the FDA approved the use of the da Vinci Surgical System for general laparoscopic surgery, which can be used to address gallbladder disease and gastroesophageal disease.  In 2001, the FDA approved the use of the system for prostate surgery.  The FDA has subsequently approved the system for thoracoscopic surgery, cardiac procedures performed with adjunctive incisions, and gynecologic procedures.  Intuitive now dominates the robot-surgery field as it is the only company whose system is cleared in the United States for soft tissue procedures that include general surgery, prostate operations and gynecological surgery.

30.    Sales of Intuitive's robots, priced at $1.5 million each, have helped make Intuitive one of the hottest stocks in health care, growing 61% since the end of February 2010 to a market value of $21.7 billion by March 2013.  The number of U.S. procedures done with the robots grew to approximately 367,000 in 2012, up from 292,000 in 2011 and 228,000 in 2010.  In addition to the costs of acquiring the da Vinci Surgical System, there are ongoing maintenance contracts plus expenditures for instruments used during surgery.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

31.    The Class Period commences on October 19, 2011.  On the prior evening of October 18, 2011, after the close of trading, Intuitive issued a press release announcing its third quarter 2011 financial results for the fiscal quarter ended September 30, 2011.  The press release stated in pertinent part as follows:

> Intuitive Surgical . . . , the industry leader in surgical robotics, today reported third quarter of 2011 revenue of ***$447 million***, ***up 30%*** compared with $344 million for the third quarter of 2010. ***Third quarter of 2011 revenue growth was driven by continued robotic procedure adoption and higher da Vinci Surgical System sales***.

> Third quarter of 2011 instruments and accessories revenue increased 38% to $176 million from $128 million in the third quarter of 2010. The growth in instruments and accessories revenue was primarily driven by growth in da Vinci surgical procedures of approximately 30%. Third quarter of 2011 systems revenue was $199 million, an increase of 25%, compared to $160 million during the third quarter of 2010. The growth in third quarter 2011 systems revenue was driven by

sales of 133 da Vinci Surgical Systems compared to 105 system sales during the same period last year. Third quarter of 2011 services revenue increased 25% to $72 million from $57 million during the third quarter of 2010, reflecting growth in the installed base of da Vinci Surgical Systems.

**Third quarter of 2011 operating income increased 35% to $179 million** from $132 million during the third quarter of 2010. Operating results for the third quarter of 2011 included $35 million of non-cash stock-based compensation expense compared with $30 million for the third quarter of 2010.

**Third quarter of 2011 net income increased 41% to $122 million**, or $3.05 per diluted share, from $87 million, or $2.14 per diluted share for the third quarter of 2010.

\*       \*       \*

**Commenting on the announcement, Dr. Gary Guthart, President and CEO of Intuitive Surgical, said, "We are pleased with the growth in da Vinci procedures and the** performance **of our team in the quarter**."

32.     Later in the day on October 18, 2011, Intuitive held an earnings conference call providing additional positive statements about the safety, efficacy and sales of the Company's da Vinci Surgical System, its third quarter 2011 financial results and raising its guidance for fiscal 2011, stating the Company then saw revenue growth of as much as 23% compared with an earlier target of 21%.

33.     On this news the price of Intuitive stock spiked, closing up 9% to $417.62 per share, the highest price since the Company's June 2000 IPO.

34.     On October 19, 2011, Intuitive filed its third quarter 2011 quarterly financial report on Form 10-Q with the SEC that confirmed the same quarterly financial results. The Form 10-Q was signed by defendant Mohr and certified as to accuracy by defendants Guthart and Mohr. As to "Contingencies," the Form 10-Q stated in pertinent part that though Intuitive was "a party to various . . . legal actions that arose in the ordinary course of its business," "[t]he Company [did] not believe that any of these other legal actions [would] have a material adverse impact on its business, financial position or results of operations." Neither the reported third quarter 2011 financial results nor the Form 10-Q disclosed or properly reserved for Intuitive's potential liability to patients,

1    regulators and investors for civil judgments, criminal/regulatory fines and penalties or related

2    investor losses.

3           35.    On January 19, 2012, Intuitive issued a press release announcing its fourth quarter

4    and fiscal 2011 financial results for the quarter and fiscal year ended December 31, 2011.  The press

5    release stated in pertinent part as follows:

6

7           Intuitive Surgical . . . , the industry leader in surgical robotics, today reported fourth
           quarter of 2011 ***revenue of $497 million, up 28%*** compared with $389 million for
8           the fourth quarter of 2010. ***Fourth quarter of 2011 revenue growth was driven by
           continued robotic procedure adoption and higher da Vinci Surgical System sales***.

9           Fourth quarter of 2011 instruments and accessories revenue increased 30% to
10          $196 million from $151 million in the fourth quarter of 2010. The growth in
           instruments and accessories revenue was primarily driven by growth in *da Vinci*
11          surgical procedures of approximately 27%. Fourth quarter of 2011 systems revenue
           was $225 million, an increase of 27%, compared with $178 million during the fourth
12          quarter of 2010. The growth in fourth quarter 2011 systems revenue was driven by
           sales of 152 *da Vinci* Surgical Systems compared with 124 system sales during the
13          same period last year. Fourth quarter of 2011 service revenue increased 24% to $75
           million from $61 million during the fourth quarter of 2010, reflecting growth in the
14          installed base of *da Vinci* Surgical Systems.

15          ***Fourth quarter of 2011 operating income increased to $200 million*** from
           $154 million in the fourth quarter of 2010. Operating results for the fourth quarter of
16          2011 included $35 million of non-cash stock-based compensation expense compared
           with $30 million for the fourth quarter of 2010.

17                                      *       *       *

18          ***Fourth quarter of 2011 net income was $151 million, or $3.75 per diluted
           share***, compared with $121 million, or $3.02 per diluted share for the fourth quarter
19          of 2010.

20          Revenue for the year ended December 31, 2011 totaled ***$1,757 million,
           increasing 24%*** from $1,413 million for the year ended December 31, 2010. ***Net
21          income for the year ended December 31, 2011 was $495 million, or $12.32 per
           diluted share***, compared to net income of $382 million, or $9.47 per diluted share for
22          the year ended December 31, 2010.

23                                      *       *       *

24          ***Commenting on the announcement, Dr. Gary Guthart, President and CEO
           of Intuitive Surgical, said, "We are pleased with our fourth quarter performance.
25          These results reflect continued da Vinci procedure adoption, highlighted by strong
           growth in our US gynecology business, and a focus on execution by our
26          commercial and product operations teams***."

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                           - 13 -

36.     Later in the day on January 19, 2012, Intuitive held an earnings conference call providing additional positive statements about the safety, efficacy and sales of the Company's da Vinci Surgical System and its fourth quarter and fiscal 2011 financial results.

37.     On February 6, 2012, Intuitive filed its 2011 annual financial report on Form 10-K with the SEC that confirmed the same quarterly and fiscal year financial results reported above.  The Form 10-K was signed by defendants Guthart, Mohr, Smith and each of the Company's directors, and was certified as to accuracy by defendants Guthart and Mohr.  As to "Contingencies," the Form 10-K stated in pertinent part that though Intuitive was "a party to various . . . legal actions that arose in the ordinary course of its business," "[t]he Company [did] not believe that any of these other legal actions [would] have a material adverse impact on its business, financial position or results of operations."  Neither the reported fourth quarter/fiscal year 2011 financial results nor the Form 10-K disclosed or properly reserved for Intuitive's potential liability to patients, regulators and investors for civil judgments, criminal/regulatory fines and penalties or related investor losses.

38.     On March 1, 2012, Intuitive filed its annual proxy statement to shareholders for use in voting at the 2012 annual shareholder meeting.  As to "Board Responsibilities," the 2012 proxy statement stated in pertinent part:

> T*he Board's primary responsibility is to seek to maximize long-term stockholder value. . . .  In fulfilling the Board's responsibilities, directors have full access to the Company's management, external auditors and outside advisors. With respect to the Board's role in risk oversight of the Company, the Board of Directors discusses the Company's risk exposures and risk management of various parts of the business, including appropriate guidelines and policies to minimize business risks and major financial risks and the steps management has undertaken to control them*.

39.     On April 17, 2012, Intuitive issued a press release announcing its first quarter 2012 financial results for the quarter ended March 30, 2012.  The press release stated in pertinent part as follows:

> Intuitive Surgical . . . , the industry leader in surgical robotics, today reported first quarter of 2012 revenue of ***$495 million, up 28%*** compared with $388 million for the

first quarter of 2011. ***First quarter of 2012 revenue growth was driven by continued robotic procedure adoption and higher da Vinci Surgical System sales***.

First quarter of 2012 instruments and accessories revenue increased 32% to $208 million from $157 million in the first quarter of 2011. The growth in instruments and accessories revenue is the result of growth in da Vinci surgical procedures and the introduction of new products. Procedure growth of approximately 29% primarily reflects higher US gynecologic procedures, US general surgery procedures and international urologic procedures.

First quarter of 2012 systems revenue was $207 million, an increase of 24%, compared with $167 million during the first quarter of 2011. The growth in first quarter 2012 systems revenue was driven by sales of 140 da Vinci Surgical Systems compared with 120 system sales during the same period last year. First quarter of 2012 service revenue increased 27% to $81 million from $64 million during the first quarter of 2011, reflecting growth in the installed base of da Vinci Surgical Systems.

***First quarter of 2012 operating income increased to $193 million*** from $148 million in the first quarter of 2011. Operating results for the first quarter of 2012 included $34 million of non-cash stock-based compensation expense compared with $32 million for the first quarter of 2011.

***First quarter of 2012 net income was $144 million, or $3.50 per diluted share***, compared with $104 million, or $2.59 per diluted share for the first quarter of 2011.

Intuitive ended the first quarter of 2012 with $2,371 million in cash, cash equivalents and investments, reflecting an increase of $199 million during the quarter.

***Commenting on the announcement, Dr. Gary Guthart, President and CEO of Intuitive Surgical, said, "In the first quarter, we are pleased with the growing use of da Vinci, the acceptance of our new products and the financial performance that follows***."

40.     Later in the day on April 17, 2012, Intuitive held an earnings conference call providing additional positive statements about the safety, efficacy and sales of the Company's da Vinci Surgical System and its first quarter 2012 financial results.

41.     On April 19, 2012, Intuitive filed its quarterly financial report on Form 10-Q with the SEC that confirmed the same quarterly financial results. The 10-Q was signed by defendant Mohr and certified as to accuracy by defendants Guthart and Mohr. As to "Contingencies," the Form 10-Q stated in pertinent part that though Intuitive was "a party to various . . . legal actions that arose in the ordinary course of its business," "[t]he Company [did] not believe that any of these other legal actions [would] have a material adverse impact on its business, financial position or results of

1    operations." Neither the reported first quarter 2012 financial results nor the Form 10-Q disclosed or

2    properly reserved for Intuitive's potential liability to patients, regulators and investors for civil

3    judgments, criminal/regulatory fines and penalties or related investor losses.

4         42.    On July 19, 2012, Intuitive issued a press release announcing its second quarter 2012

5    financial results for the quarter ended June 30, 2012. The press release stated in pertinent part as

6    follows:

7

8    > Intuitive Surgical . . . , the industry leader in surgical robotics, today reported second
     > quarter of 2012 revenue of *$537 million, up approximately 26%* compared with
9    > $426 million for the second quarter of 2011. *Second quarter of 2012 revenue growth
     > was driven by continued adoption of da Vinci surgery procedures and higher da
10   > Vinci Surgical System sales*.

11   > Second quarter of 2012 instruments and accessories revenue increased 30% to
     > $224 million from $172 million in the second quarter of 2011. The growth in
12   > instruments and accessories revenue is the result of growth in *da Vinci* surgical
     > procedures and the introduction of new products. Procedure growth of approximately
13   > 26% primarily reflects higher US gynecologic procedures, US general surgery
     > procedures and international urologic procedures, partially offset by a decline in US
14   > prostatectomy procedures.

15   > Second quarter of 2012 systems revenue was $229 million, an increase of
     > 23%, compared with $187 million during the second quarter of 2011. The growth in
16   > second quarter 2012 systems revenue was driven by sales of 150 *da Vinci* Surgical
     > Systems compared with 129 system sales during the same period last year. Second
17   > quarter of 2012 service revenue increased 23% to $83 million from $68 million
     > during the second quarter of 2011, reflecting growth in the installed base of *da Vinci*
18   > Surgical Systems.

19   > *Second quarter of 2012 operating income increased to $225 million* from
     > $168 million in the second quarter of 2011. Operating results for the second quarter
20   > of 2012 included $33 million of non-cash stock-based compensation expense
     > compared with $35 million for the second quarter of 2011.

21   > *Second quarter of 2012 net income was $155 million, or $3.75 per diluted
22   > share*, compared with $117 million, or $2.91 per diluted share, for the second quarter
     > of 2011.

23   >                          *      *      *

24   > *Commenting on the announcement, Dr. Gary Guthart, President and CEO
     > of Intuitive Surgical, said, "Our solid second quarter revenue and earnings
25   > performance is the result of robust US gynecologic and general surgery procedure
     > growth offset by pressure in Europe and US prostatectomy*."

26

27

28

43. Later in the day on July 19, 2012, Intuitive held an earnings conference call providing additional positive statements about the safety, efficacy and sales of the Company's da Vinci Surgical System and its second quarter 2012 financial results.

44. On July 23, 2012, Intuitive filed its quarterly financial report on Form 10-Q with the SEC that confirmed the same quarterly financial results. The 10-Q was signed by defendant Mohr and certified as to accuracy by defendants Guthart and Mohr. As to "Contingencies," the Form 10-Q stated in pertinent part that though Intuitive was "a party to various . . . legal actions that arose in the ordinary course of its business," "[t]he Company [did] not believe that any of these other legal actions [would] have a material adverse impact on its business, financial position or results of operations." Neither the reported second quarter 2012 financial results nor the Form 10-Q disclosed or properly reserved for Intuitive's potential liability to patients, regulators and investors for civil judgments, criminal/regulatory fines and penalties or related investor losses.

45. On September 18, 2012, Intuitive filed a Current Report on Form 8-K with the SEC announcing that on September 14, 2012, an article was published in the *Modesto Bee* entitled "More Surgeries at Modesto Hospitals Being Done via Remote Control." Intuitive's Form 8-K stated that the "article contained information about the estimated number of single incision surgeries that have been performed since January, 2012 and cited Intuitive Surgical Inc. ('the Company') as the source of information" and that "[t]his was an unauthorized disclosure by a field employee in violation of Company policy." The Company in no way negated the content of the article, and in so doing adopted the article, which stated in pertinent part as follows:

> ***Fewer complications***
>
> ***Robotic systems are the newest wave, enabling doctors to perform surgeries with smaller incisions and giving them tools to see and work with complex tissues in the body. Proponents say robotic-assisted surgeries result in less blood loss, shorter hospital stays and fewer complications for patients.***
>
> ***Intuitive Surgical, the company that makes the da Vinci robot, said about 4,000 of the single-incision surgeries have been done since the system was***

*launched in January. The newer version of da Vinci makes it possible to remove a gallbladder through the navel because of the flexibility of the rods that hold the forceps and scissors.*

A common laparoscopic procedure for gallbladders leaves the patient with four small scars on the abdomen.

More than 700 robotic-assisted surgeries have been performed at Doctors Medical Center, which purchased a da Vinci surgical system in 2007 and has more than 10 doctors using the system. *Memorial paid $2 million for a newer version of da Vinci that supports single-incision operations and has more advanced imaging*.

\*      \*      \*

At Memorial, seven surgeons use da Vinci for prostate surgery, hysterectomies, colon and general surgeries. And more are going through the training.

Dr. Kathleen Eve said she first thought surgical robots were a gimmick and waste of money, *but she was won over when she started training with the system this year*.

"*For a fact, the surgeon can see much better inside the patient and use the robots' hands like hands are supposed to work*," she said.

During her career, Eve has done laparoscopic procedures in which long instruments and scopes are inserted through small incisions in the patient, eliminating the need for large incisions. Laparoscopy also reduces blood loss and scarring for patients, but some doctors compare it to operating with chopsticks.

***Greater range of motion***

*Advocates say robotic systems give surgeons a sharper view of the patient's anatomy and provide instruments with a greater range of motion to grab, cut and suture tissue*.

\*      \*      \*

The robots don't perform the surgery. Rather, the surgeon sits at a console about eight feet from the operating table. Hovering over the patient is a four-armed robot holding an endoscopic camera and flexible rods with surgical tools at the tips.

Once the camera and rods are inserted through ports in the patient's abdomen, the surgeon looks into the high-resolution viewer and handles the master controls – similar to playing with an Xbox. The system interprets the surgeon's hand movements, translating them into movements of the grabbers and scissors inside the patient.

*Under the surgeon's command, the robot does the cutting and suturing with more precision. The jointed instruments, able to rotate 560 degrees, are far more flexible than the human wrist, making it easier for the surgeon to work in tight spots.*

*Doctors said robotics eliminate some of the physical demands of more conventional surgery*. Eve said the long-shafted instruments used in laparoscopic

surgery are not flexible, so the surgical team sometimes goes into contortions getting the camera in place or making difficult cuts.

"It's like a big game of Twister all over the patient's bedside," she said.

*Gonzalez said it is advantageous to use the robot for "retraction" – or holding tissue aside while he operates deep in the pelvis. Holding retractors during a three-hour operation is physically exhausting, he said.*

*Getting a clearer view*

*One of the benefits for patients is the imaging system that highlights the targeted area when fluorescent dye is injected, said JoAnn Adkins, interim surgical services manager for Memorial.*

*It gives the surgeon a clearer view of nerves and blood vessels to avoid during the operation. Adkins said there are lower rates of incontinence and erectile dysfunction among prostate cancer patients who had robotic surgery. . . .*

\*     \*

*The FDA gave approval for the da Vinci system in 2000, and there now are 2,132 surgical robots in hospitals worldwide for performing cardiac, thoracic, gynecologic, pediatric and general surgeries.* Despite their growing use, robotic-assisted procedures represent a small percentage of surgeries at Doctors in Modesto, which is looking to purchase the newer version of da Vinci, a spokeswoman said.

"*I think it is going to be the wave of the future,*" Gonzalez said. "*There is a lot of technology that will allow us to do surgery that is safer for patients*."

46. On October 16, 2012, Intuitive issued a press release announcing its third quarter 2012 financial results for the quarter ended September 30, 2012. The press release stated in pertinent part as follows:

Intuitive Surgical . . . , the industry leader in surgical robotics, today reported third quarter of 2012 revenue of *$538 million, up approximately 20%* compared with $447 million for the third quarter of 2011. *Third quarter of 2012 revenue growth was driven by continued adoption of da Vinci surgery procedures and higher da Vinci Surgical System sales*.

Third quarter of 2012 instruments and accessories revenue increased 24% to $218 million from $176 million in the third quarter of 2011. The growth in instruments and accessories revenue is the result of growth in *da Vinci* surgical procedures and the introduction of new products. Third quarter procedure growth of approximately 22% reflected US gynecologic and general surgery growth, partially offset by a decline in US prostatectomy procedures and slower growth in European procedures.

Third quarter of 2012 systems revenue was $232 million, an increase of 17%, compared with $199 million during the third quarter of 2011. The growth in third quarter 2012 systems revenue was driven by sales of 155 *da Vinci* Surgical Systems compared with 133 system sales during the same period last year. Third quarter of

2012 service revenue increased 22% to $88 million from $72 million during the third quarter of 2011, reflecting growth in the installed base of *da Vinci* Surgical Systems.

**Third quarter of 2012 operating income increased to $211 million** from $179 million in the third quarter of 2011. Operating results for the third quarter of 2012 included $47 million of non-cash stock-based compensation expense compared with $35 million for the third quarter of 2011.

**Third quarter of 2012 net income was $183 million, or $4.46 per diluted** share, compared with $122 million, or $3.05 per diluted share, for the third quarter of 2011. Included in net income are one-time tax benefits of approximately $38 million, including reserve reversals associated with the lapse of statutes of limitations.

\*         \*         \*

***Commenting on the announcement, Dr. Gary Guthart, President and CEO of Intuitive Surgical, said, "Our third quarter highlighted both market strengths and significant headwinds. Procedures came in below our expectations, driven by conditions in Europe and changes in prostate cancer detection and treatment. On the positive side, acceptance of da Vinci general and gynecologic surgery continues to grow***."

47.     Later in the day on October 16, 2012, Intuitive held an earnings conference call providing additional positive statements about the safety, efficacy and sales of the Company's da Vinci Surgical System and its third quarter 2012 financial results.

48.     On October 18, 2012, Intuitive filed its quarterly financial report on Form 10-Q with the SEC that confirmed the same quarterly financial results.  The 10-Q was signed by defendant Mohr and certified as to accuracy by defendants Guthart and Mohr.  As to "Contingencies," the Form 10-Q stated in pertinent part that though Intuitive was "a party to various . . . legal actions that arose in the ordinary course of its business," "[t]he Company [did] not believe that any of these other legal actions [would] have a material adverse impact on its business, financial position or results of operations."  Neither the reported third quarter 2012 financial results nor the Form 10-Q disclosed or properly reserved for Intuitive's potential liability to patients, regulators and investors for civil judgments, criminal/regulatory fines and penalties or related investor losses.

49.     On January 22, 2013, Intuitive issued a press release announcing its fourth quarter and fiscal year 2012 financial results for the quarter and fiscal year ended December 31, 2012.  The press release stated in pertinent part as follows:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 20 -

Intuitive Surgical . . . , the industry leader in surgical robotics, today reported fourth quarter of 2012 revenue of *$609 million, up approximately 23%* compared with $497 million for the fourth quarter of 2011. *Fourth quarter of 2012 revenue growth was driven by continued adoption of da Vinci surgery procedures and higher da Vinci Surgical System sales*.

Fourth quarter of 2012 instruments and accessories revenue increased 29% to $254 million from $196 million in the fourth quarter of 2011. The growth in instruments and accessories revenue is the result of growth in *da Vinci* surgical procedures and the introduction of new products. *da Vinci* surgical procedures grew approximately 25% in the fourth quarter of 2012 compared to the fourth quarter of 2011, driven primarily by U.S. gynecology and general surgery growth, and partially offset by a decline in U.S. prostatectomy procedures.

Fourth quarter of 2012 systems revenue was $265 million, an increase of 18%, compared with $225 million during the fourth quarter of 2011. The growth in fourth quarter of 2012 systems revenue was driven by sales of 175 *da Vinci* Surgical Systems compared with sales of 152 systems during the same period last year. Fourth quarter of 2012 service revenue increased 20% to $91 million from $75 million during the fourth quarter of 2011, reflecting growth in the installed base of *da Vinci* Surgical Systems.

*Fourth quarter of 2012 operating income increased to $248 million* from $200 million in the fourth quarter of 2011. Operating results for the fourth quarter of 2012 included $38 million of non-cash stock-based compensation expense compared with $35 million for the fourth quarter of 2011.

\*　　　\*　　　\*

*Fourth quarter of 2012 net income was $175 million, or $4.25 per diluted share*, compared with $151 million, or $3.75 per diluted share, for the fourth quarter of 2011.

Revenue for the year ended December 31, 2012 totaled *$2,179 million, increasing 24%* from $1,757 million for the year ended December 31, 2011. *Net income for the year ended December 31, 2012 was $657 million, or $15.98 per diluted share*, compared to net income of $495 million, or $12.32 per diluted share, for the year ended December 31, 2011.

\*　　　\*　　　\*

*Commenting on the announcement, Dr. Gary Guthart, President and CEO of Intuitive Surgical, said, "We are pleased with our fourth quarter procedure performance and revenue growth. Our results reflect expanding da Vinci Surgical System use across a broadening array of procedures and strong execution by our team*."

50.     Later in the day on January 22, 2013, Intuitive held an earnings conference call providing additional positive statements about the safety, efficacy and sales of the Company's da Vinci Surgical System and its fourth quarter and fiscal year 2012 financial results.

51. On February 4, 2013, Intuitive filed its 2012 annual report on Form 10-K with the SEC, which confirmed the same quarterly and fiscal financial results reported above. The Form 10-K was signed by defendants Guthart, Mohr, Smith and each of the Company's directors, and was certified as to accuracy by defendants Guthart and Mohr. As to "Contingencies," the Form 10-K stated in pertinent part that though Intuitive was "a party to various . . . legal actions that arose in the ordinary course of its business," "[t]he Company [did] not believe that any of these other legal actions [would] have a material adverse impact on its business, financial position or results of operations." Neither the reported fourth quarter/fiscal year 2012 financial results nor the Form 10-K disclosed or properly reserved for Intuitive's potential liability to patients, regulators and investors for civil judgments, criminal/regulatory fines and penalties or related investor losses.

52. On March 6, 2013, Intuitive filed its annual proxy statement to shareholder for use in voting at the 2013 annual shareholder meeting. As to "Board Responsibilities," the 2013 proxy statement stated in pertinent part:

> *The Board's primary responsibility is to seek to maximize long-term stockholder value. . . . In fulfilling the Board's responsibilities, directors have full access to the Company's management, external auditors and outside advisors. With respect to the Board's role in risk oversight of the Company, the Board of Directors discusses the Company's risk exposures and risk management of various parts of the business, including appropriate guidelines and policies to minimize business risks and major financial risks and the steps management has undertaken to control them*.

53. On March 13, 2013, Intuitive issued a press release entitled "Intuitive Surgical Comments on Medical Device Reporting Practices." The press release stated in pertinent part as follows:

> In response to general inquiries regarding a recent rise in Medical Device Reports (MDR) filed by Intuitive Surgical, *the company explained that the noted rise does not reflect a change in product performance but rather a change in MDR reporting practices.*
>
> *In September 2012, Intuitive Surgical revised its MDR practices, resulting in increased reports of device malfunction MDRs, the vast majority of which were related to instruments and not to systems. None of these device malfunction MDRs involved reportable injuries or deaths.*

*"We self-identified the reporting issue, notified the FDA and revised our practices," said Dave Rosa, Senior Vice President, Emerging Procedures and Technologies, Intuitive Surgical.*

MDRs can be found in the FDA's MAUDE database, which is updated by FDA regularly. The most common type of report filed under the company's revised MDR practices involves instrument cable breaks. These cable breaks render the instrument non-functional and require an instrument change, which can be accomplished quickly.

*The company also made an administrative change in how MDRs previously reported as adverse events were subcategorized. This change has not increased the total number of adverse event reports.* This will result in an increase in events in the "serious injury" subcategory and a corresponding decrease in the "other" subcategory. *Total adverse event rates have remained low and in line with historical trends.*

54. With the price of Intuitive stock plummeting, on March 20, 2013, the Intuitive Board of Directors authorized the Company to repurchase an additional $1 billion worth of the Company's outstanding common stock in order to buttress the stock price.

55. On April 18, 2013, Intuitive issued a press release announcing its first quarter 2013 financial results for the quarter ended March 30, 2013.  The press release stated in pertinent part as follows:

Intuitive Surgical . . . the industry leader in surgical robotics, today reported first quarter of 2013 revenue of *$611 million, up approximately 23%* compared with $495 million for the first quarter of 2012. *First quarter of 2013 revenue growth was driven by continued growth of da Vinci surgery procedures and higher da Vinci Surgical System sales.*

*First quarter of 2013 net income was $189 million, or $4.56 per diluted share,* compared with $144 million, or $3.50 per diluted share, for the first quarter of 2012.

*"We are pleased with our first quarter revenue and earnings growth. Despite a concerted effort by vocal critics of robotic surgery, support remains strong among patients, surgeons and hospitals," said Dr. Gary Guthart, President and CEO of Intuitive Surgical. "da Vinci Surgery has clinically proven benefits in offering a minimally invasive option to a broader group of patients than traditional technologies."*

First quarter of 2013 instruments and accessories revenue increased 26% to $261 million from $208 million in the first quarter of 2012. The growth in instruments and accessories revenue is the result of growth in *da Vinci* surgical procedures and increased utilization of new products. *da Vinci* surgical procedures grew approximately 18% in the first quarter of 2013 compared to the first quarter of 2012, driven primarily by growth in general surgery, U.S. gynecology and international urology procedures, partially offset by a decline in U.S. prostatectomy

procedures. The first quarter of 2013 contained one fewer surgical operating day due to a Leap Year day in 2012. Excluding the impact of Leap Year, procedure growth was approximately 20%.

First quarter of 2013 systems revenue was $256 million, an increase of 24%, compared with $207 million during the first quarter of 2012. The growth in first quarter of 2013 systems revenue was driven by sales of 164 *da Vinci* Surgical Systems compared with sales of 140 systems during the same period last year. First quarter of 2013 service revenue increased 17% to $94 million from $81 million during the first quarter of 2012, reflecting growth in the installed base of *da Vinci* Surgical Systems.

***First quarter of 2013 operating income increased to $251 million*** from $193 million in the first quarter of 2012. Operating results for the first quarter of 2013 included $38 million of non-cash stock-based compensation expense compared with $34 million for the first quarter of 2012.

56.   As a result of defendants' efforts to conceal significant safety problems with the da Vinci Surgical System and their false statements concerning the Company's business metrics and financial prospects, Intuitive stock traded at artificially inflated prices during the Class Period, reaching a Class Period high of nearly $595 per share in intraday trading by April 18, 2012. Meanwhile, with the Company's stock price soaring, nearly every senior executive of Intuitive cashed in, selling 410,000 shares of their personally held Intuitive stock into the open market at fraud-inflated prices during the Class Period and ***reaping more than $218.6 million*** in proceeds.

57.   The true facts, which were known or recklessly disregarded by defendants but concealed from the investing public during the Class Period, were as follows:

(a)   defects in the da Vinci Surgical System had caused a substantial number of patient injuries resulting in adverse incident reports prior to and during the Class Period;

(b)   not all of these adverse incident reports were being reported to the FDA, exposing the Company to significant regulatory risk and potential criminal sanctions;

(c)   Intuitive knew, based on the receipt and review of adverse incident reports and its executive's knowledge of the then-ongoing discussions with the FDA during the Class Period that there was a substantial risk that the FDA might limit or restrict sales and marketing of the da Vinci Surgical System;

(d)     Intuitive was engaging in sales practices that violated community standards and their own protocol agreed upon with the FDA, further exposing the Company to criminal and civil sanctions;

(e)     Intuitive was exposed to hundreds of millions of dollars in potential civil liability to injured and deceased patients and their families;

(f)     Intuitive failed to properly reserve for potential liability to civil litigants; and

(g)     as a result, defendants lacked a reasonable basis to make positive statements about the safety and effectiveness of the da Vinci Surgical System, the Company's business metrics and its Class Period financial results and outlook.

58.     On February 28, 2013, the FDA sent a letter to surgeons participating in the FDA-sponsored MedSun survey asking them to provide information about medical complications associated with use of the da Vinci Surgical System.  The FDA indicated that the survey was prompted by an "'increase in [the] number of reports'" of "adverse events" involving the da Vinci Surgical System.  On this news, the price of Intuitive stock, which had opened at $573.44 per share that morning, plummeted on unusually high trading volume, closing down more than 10% at $509.89 per share, after trading below $493 per share in intraday trading.

59.     Then, on March 5, 2013, *Bloomberg* ran an expose disclosing that its review of pleadings in at least ten lawsuits filed against Intuitive during the prior 14 months and FDA adverse incident reports had uncovered that robotic surgical systems made by Intuitive had been linked to at least 70 deaths in informal incident reports sent to the FDA since 2009.  On this news, the Company's stock price, which had closed the previous evening at $541.32 per share, again plummeted on unusually high trading volume, closing down approximately 3% at $525.72 per share after trading as low as $514 per share in intraday trading.

60.     On March 14, 2013, the president of the ACOG, Dr. James Breeden, issued a statement contending that, among other things, "[r]obotic surgery is not the only or the best minimally invasive approach for hysterectomy," and "there is no good data proving that robotic hysterectomy is even as good as – let alone better – than existing, and far less costly, minimally invasive alternatives."  As reported by *Bloomberg* the next day, March 15, 2013, "Robotic surgery for hysterectomies doesn't improve outcomes and shouldn't be the first choice for most women, a doctors' group said, sending Intuitive Surgical Inc. (ISRG) to its lowest value in almost 14 months," emphasizing that the ACOG, "which represents 56,000 U.S. physicians, said expertise with Intuitive's da Vinci robot system is limited and surgeons learning the new technology may have higher rates of complications."  Once again, the price of Intuitive stock, which had closed at $509.33 per share on March 13, 2013, plummeted on unusually high trading volume between March 14th and 15th, closing down approximately 10% at $459.44 per share on March 15, 2013.

61.     On March 20, 2013, Massachusetts' Quality and Patient Safety Division of the Executive Office of Health and Human Services issued an advisory, which stated, in part, that "[o]ver the last two years, the Quality and Patient Safety Division . . . has received an increasing number of Safety and Quality Review . . . reports of patient complications associated with robot-assisted surgery."

62.     On March 25, 2013, *The New York Times* ran an expose entitled "Salesmen in the Surgical Suite," which described one of the wrongful death lawsuits presently pending against Intuitive as follows:

> When Fred E. Taylor arrived at Harrison Medical Center in Silverdale, Wash., for a routine prostatectomy, he expected the best medical care new technology had to offer: robotic surgery, billed as safer, less painful and easier on the body than traditional surgery.
>
> The operation, on Sept. 9, 2008, was supposed to take five hours. But it was marred by a remarkable cascade of complications and dragged on for more than 13 hours, leaving Mr. Taylor, who had been an active 67-year-old retiree, incontinent

and with a colostomy bag, and leading to kidney and lung damage, sepsis and a stroke.

Mr. Taylor survived his injuries but died last year. *Now, his wife, Josette, is suing Intuitive Surgical Inc., the company that makes the equipment and trained the surgeon to use it. As it turned out, the surgeon, Dr. Scott Bildsten, had never before used the robotic equipment without supervision*.

"We are the old school, where you trust the doctor," said Mrs. Taylor, who noted that her husband's life was so limited after the operation that he used to cry about being "trapped in this body."

*It is not the first time patients have claimed they were harmed by Intuitive's robotic surgical equipment, called the da Vinci Surgical System. But the Taylor case, set for trial in April, is unusual. Internal company e-mails, provided to The New York Times by lawyers for the Taylor estate, offer a glimpse into the aggressive tactics used to market high-tech medical devices and raise questions about the quality of training provided to doctors before they use new equipment on patients*.

Intuitive, based in Sunnyvale, Calif., declined to comment on the lawsuit but said studies showed that its robotic equipment results in better outcomes than conventional open surgery. "The most objective and therefore best measure of efficacy for all of those involved in training – from Intuitive Surgical, the hospitals, the proctors and the surgeons themselves – is represented in the comparative clinical outcomes of da Vinci surgery," said Angela Wonson, the company's vice president for communications.

According to Intuitive, 1,371 hospitals in the United States have purchased a da Vinci system, and many have purchased two. Nearly half a million procedures worldwide were performed robotically last year, including prostatectomies and hysterectomies, among other operations.

A surgeon using the da Vinci system sits at a console with a camera that provides a high-definition, three-dimensional image of the surgical site. He or she manipulates miniaturized instruments; computer and robotic technology translates and scales the surgeon's hand movements.

Hospitals are responsible for setting the credentialing standards, or training requirements, for physicians who will use the equipment on patients. *But internal company e-mails suggest that Intuitive's sales representatives were intimately involved in the process, presenting themselves as experts and pressing for lower standards in order to ease the training path for busy surgeons, to increase use of the equipment and to drive sales*.

*In an e-mail dated May 31, 2011, a Western regional sales manager for Intuitive noted that area surgeons had used robotic equipment only five times, although the company's goal was to see 36 robotic operations performed by the end of June. He urged sales staff to persuade surgeons to switch upcoming cases to robotic ones*.

"*Don't let proctoring or credentialing*" – shorthand for supervised surgery and hospital certification – "*get in our way*," the e-mail said.

*In December 2009, a sales representative urged a hospital in Billings, Mont., to ease up on its credentialing requirement, saying in an e-mail that requiring surgeons to do five supervised operations using the robot before going solo was "on the high side" and could have "unintended consequences." Hospital officials replied, saying, "We will review and most likely will decrease the 5 down to 3.*"

Ms. Wonson, the Intuitive spokeswoman, said the company does not get involved in determining who is qualified to operate its robotic equipment, which is the responsibility of the hospitals. "We do not make recommendations," she said in an e-mail.

*Dr. Bildsten was one of six doctors given free training by Intuitive, including one day of hands-on training at the company's facility in California. He also had done two practice runs on the equipment with a more experienced surgeon before operating on Mr. Taylor, he said in a legal deposition. Still, he said, no one warned him that a patient like Mr. Taylor, who weighed nearly 300 pounds, was not a good candidate for robotic surgery.*

He did not respond to telephone messages requesting comment.

*Company e-mails submitted in the Taylor case also suggest that members of the sales staff at Intuitive worked diligently to persuade surgeons to choose the da Vinci procedure for patients even when they were planning to use a different method.*

*In one e-mail on June 28, 2010, a clinical sales director urged the sales team – whose compensation was linked to filling a quarterly quota of operations – to "scrub" doctors' schedules and get procedures moved up by a few days in order to make the quarterly goal. "Let's bring it home!" she wrote. "Be sure you scrub all schedules, identify cases on Thursday and Friday that can be moved up."*

*On Aug. 9, 2010, a clinical sales director wrote to his team: "Be proactive in finding cases to convert. Be prepared to challenge each trained surgeon every time you see a lap or open case. Be unsatisfied with the thought of ending a day without a converted case." ("Lap" refers to laparoscopic procedures, an alternate form of minimally invasive surgery.)*

*The sales representatives were often in the operating rooms, where they offered advice to newly trained surgeons who were having technical difficulties with the robot, according to legal depositions in the Taylor case. The representatives also appear to have had access to the operating room schedules and were urged to "partner" with surgical teams "to review and select appropriate cases," according to court documents.*

*On March 3, 2011, a sales representative wrote in an e-mail to his team that he had met with a gynecologic surgeon in Utah who was trained a year earlier but had stopped doing robotic cases. The surgeon subsequently "agreed to convert the next two to da Vinci.*"

In depositions, some Intuitive sales representatives defended their involvement, saying that it was important for surgeons to use the robotic system frequently in order to maintain and improve their skills.

*The Food and Drug Administration allowed the sale of the da Vinci system in 2000 under a controversial process called "premarket notification," often used to bring medical devices to market without the rigorous trials of safety and efficacy typically required of new drugs. Manufacturers are able to exempt devices from the rigorous trials by claiming they are similar to existing devices already on the market.*

*When devices are brought to market this way, the F.D.A. "cannot require training programs as a condition of clearance," said Synim Rivers, an agency spokeswoman.*

*Before allowing this type of market clearance, the agency twice asked Intuitive for more information about how doctors would be trained to use company equipment. Intuitive provided details of a 70-item exam for surgeons and a three-day hands-on training protocol.*

*By 2002, however, the company had revamped its training program, replacing the 70-item exam with a 10-question online quiz and reducing the time spent in hands-on training at Intuitive's facility to one day.*

The largest study to date of robotic hysterectomies has questioned the use of robot-assisted surgery over more conventional forms of minimally invasive surgery. A study published in February in The Journal of the American Medical Association evaluated outcomes in 264,758 women who had laparoscopic or robotically assisted hysterectomy and found no overall difference in complication rates between the two groups.

But the researchers did find that robotically assisted surgery for hysterectomy costs on average about one-third more than laparoscopic surgery.

Last week, Dr. James T. Breeden, the president of the American Congress of Obstetricians and Gynecologists, publicly urged patients "to separate the marketing hype from the reality" when considering a surgical method for hysterectomy. "Just because it's newer and higher technology," he said, "doesn't mean it's better."

63.     Finally, on April 18, 2013, CNBC's Investigations, Inc. broadcast an expose on the da Vinci Surgical System consisting of interviews with, among others, doctors, lawyers, and patients who have filed lawsuits against Intuitive claiming they suffered injury while being operated on by surgeons using the da Vinci Surgical System.

64.     During the broadcast, CNBC referenced the FDA's MAUDE database, which contains voluntary reports by manufacturers concerning adverse events involving medical devices, including reports of injuries and deaths associated with use of the da Vinci Surgical System.

65.     A former Intuitive employee, interviewed by CNBC during the show on condition of anonymity, stated that she recalled instances of da Vinci-related complications that were not reported

in MAUDE, and contended that the MAUDE database is "significantly understated in terms of [da Vinci-related] complications." Concurring was Dr. Martin Makary, a prominent surgeon with the Johns Hopkins School of Medicine and an international expert on patient safety, who shared with CNBC details of a study he co-authored entitled "Underreporting of Robotic Surgery Complications." The study contends there is "massive underreporting" of robotic surgery complications. In particular, the report states that "[i]n the case of Intuitive . . . some incidents [involving the da Vinci system] that have resulted in serious injury and death were never reported or were reported late."

66.     On this news, the price of Intuitive stock closed down $8.62 per share on April 19, 2013. Indeed, since February 27, 2013, the day before the FDA announced its MedSun survey, Intuitive stock has *fallen nearly 19% – or $110.25 per share –* from its Class Period high on account of the above news, falling from $595 per share to a close of $484.75 per share on April 19, 2013, *resulting in market capitalization losses of over $4.4 billion*.

## DEFENDANTS' SCIENTER

67.     Defendants are Intuitive and its top officers and/or directors. Each ran Intuitive as a manager, dealing with important issues facing Intuitive's business, and controlled the false statements concerning Intuitive's Class Period operational and financial status in order to facilitate their sales of hundreds of millions of dollars of their personally held Intuitive stock at artificially inflated prices.

68.     Each of the Individual Defendants, by virtue of their high-level positions with Intuitive, directly participated in the management of Intuitive, was directly involved in the day-to-day operations of Intuitive at the highest levels and was privy to confidential proprietary information concerning Intuitive and its business, operations, adverse incident reports related to the use of the da Vinci Surgical System, and the Company's financial statements and financial condition and was

1  aware of, or deliberately disregarded, that false and misleading statements were being made by and

2  regarding the Company.  Because of their managerial positions with Intuitive, each of the Individual

3  Defendants had access to the adverse information about the da Vinci Surgical System's efficacy and

4  safety and Intuitive's business, financial condition and prospects and knew (or deliberately

5  disregarded) that the adverse facts alleged herein rendered the positive representations made during

6  the Class Period materially false and misleading.

7

8      69.    Each Individual Defendant was personally familiar with the da Vinci Surgical

9  System's significant safety and efficacy problems because they had access to adverse incident

10  reports and repeatedly confirmed during the Class Period that they not only reviewed all incoming

11  data concerning the Company's products, but it has now been disclosed they were in talks with FDA

12  about those adverse incident reports for at least a portion of the Class Period.  As a result of their

13  monitoring, each Individual Defendant was aware of the significant health and safety concerns with

14  the da Vinci Surgical System and the Company's substantial exposure to civil and regulatory

15  judgments, fines and penalties.

16

17      70.    Each of the Individual Defendants knew about but failed to report the da Vinci

18  Surgical System's safety and efficacy problems during the Class Period, the substantial civil,

19  criminal and regulatory exposure the Company faced, and the Company's failure to adequately

20  reserve for such potential liability during the Class Period in order to maintain the artificial inflation

21  in Intuitive's stock price to facilitate the sale of more than $218 million worth of their personally

22  held Intuitive stock at inflated prices.

23

24                      **LOSS CAUSATION/ECONOMIC LOSS**

25      71.    During the Class Period, as detailed herein, defendants engaged in a scheme to

26  deceive the market and a course of conduct that artificially inflated Intuitive's stock price and

27  operated as a fraud or deceit on Class Period purchasers of Intuitive stock by misrepresenting the

28

safety and efficacy of the da Vinci Surgical System and thus the Company's business success and future business prospects.  Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the drug's safety and efficacy and understating the Company's potential liability to civil judgments, fines and penalties.  Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Intuitive stock fell precipitously as the prior artificial inflation came out of Intuitive's stock price.  As a result of their purchases of Intuitive stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e*., damages, under the federal securities laws.

72.    The significant declines in the price of Intuitive stock at the end of the Class Period were a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Intuitive stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

73.    The economic loss, *i.e*., damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Intuitive's stock price and the subsequent significant decline in the value of Intuitive stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

**APPLICATION OF PRESUMPTION OF RELIANCE;
FRAUD ON THE MARKET**

74.    Plaintiff will rely upon the presumption of reliance established by the fraud-on the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

1

(c)     The Company's common stock traded in an efficient market;

2

(d)     The misrepresentations alleged would tend to induce a reasonable investor to

3

misjudge the value of the Company's common stock; and

4

(e)     Plaintiff and other members of the Class purchased Intuitive common stock

5

6

between the time defendants misrepresented or failed to disclose material facts and the time the true

7

facts were disclosed, without knowledge of the misrepresented or omitted facts.

8

75.     At all relevant times, the market for Intuitive common stock was efficient for the

9

following reasons, among others:

10

(a)     As a regulated issuer, Intuitive filed periodic public reports with the SEC; and

11

(b)     Intuitive regularly communicated with public investors via established market

12

13

communication mechanisms, including through regular disseminations of press releases on the major

14

news wire services and through other wide-ranging public disclosures, such as communications with

15

the financial press, securities analysts, and other similar reporting services.

16

**CLASS ACTION ALLEGATIONS**

17

76.     This is a class action on behalf of purchasers of Intuitive common stock during the

18

Class Period (the "Class").  Excluded from the Class are the defendants and their families and the

19

officers and directors of the Company and their families.  Class members are so numerous that

20

joinder of them is impracticable.

21

22

77.     Common questions of law and fact predominate and include: (i) whether defendants

23

violated the 1934 Act; (ii) whether defendants omitted and/or misrepresented material facts;

24

(iii) whether defendants knew or recklessly disregarded that their statements were false; and

25

(iv) whether the price of Intuitive common stock was inflated during the Class Period and the extent

26

of and appropriate measure of damages.

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                - 33 -

78.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violations of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

79.     Plaintiff incorporates by reference ¶¶1-78 herein.

80.     Defendants violated §10(b) and Rule 10b-5 by:

(a)     Employing devices, schemes and artifices to defraud;

(b)     Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of Intuitive common stock.

81.     Class members were damaged as they paid artificially inflated prices for Intuitive common stock in reliance on the integrity of the market.

## COUNT II

### For Violations of §20(a) of the 1934 Act
### Against All Defendants

82.     Plaintiff incorporates by reference ¶¶1-81.

83.     The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the 1934 Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their stock ownership, high-level positions, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control,

directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contend are false and misleading.  Intuitive controlled the Individual Defendants and all of its employees.

84.     By reason of such wrongful conduct, the defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, individually and on behalf of the Class, prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel.

B.     Awarding plaintiff and other members of the Class damages together with interest thereon;

C.     Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.     Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

1          **JURY TRIAL DEMANDED**

2          Plaintiff hereby demands a trial by jury.

3   DATED: April 26, 2013                    ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
4                                            SHAWN A. WILLIAMS

5

6                                            _____

7                                                    SHAWN A. WILLIAMS

8                                            Post Montgomery Center
                                             One Montgomery Street, Suite 1800
                                             San Francisco, CA  94104
9                                            Telephone:  415/288-4545
                                             415/288-4534 (fax)
10

11                                           ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
                                             SAMUEL H. RUDMAN
12                                           MARY K. BLASY
                                             58 South Service Road, Suite 200
13                                           Melville, NY  11747
                                             Telephone:  631/367-7100
14                                           631/367-1173 (fax)

15                                           ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
16                                           ARTHUR C. LEAHY
                                             655 West Broadway, Suite 1900
17                                           San Diego, CA  92101
                                             Telephone:  619/231-1058
18                                           619/231-7423 (fax)

19                                           Attorneys for Plaintiff

20  S:\CptDraft\Securities\Cpt Intuitive.doc

21

22

23

24

25

26

27

28