LABATON SUCHAROW LLP
ERIC J. BELFI (*pro hac vice*)
JONATHAN M. PLASSE (*pro hac vice*)
JAVIER BLEICHMAR (*pro hac vice*)
SERENA P. HALLOWELL (*pro hac vice*)
DANIELLE E. STAMPLEY (*pro hac vice*)
140 Broadway, 34th Floor
New York, NY  10005
Telephone: 212/907-0700
212/818-0477 (fax)
ebelfi@labaton.com
jplasse@labaton.com
jbleichmar@labaton.com
shallowell@labaton.com
dstampley@labaton.com

Counsel for Plaintiffs and the Putative Class

ROBBINS GELLER RUDMAN & DOWD LLP
SHAWN A. WILLIAMS (Bar No. 213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California  94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

Liaison Counsel

[Additional counsel on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPENCER ABRAMS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> INTUITIVE SURGICAL, INC., et al., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 5:13-cv-01920-EJD <br><br> <u>CLASS ACTION</u> <br><br> AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ................................................................................2

II.   JURISDICTION AND VENUE ...........................................................................8

III.  PARTIES ..............................................................................................................9

    A.    Plaintiffs ....................................................................................................9

    B.    Defendant Intuitive ................................................................................10

    C.    The Individual Defendants....................................................................10

IV.   SUBSTANTIVE ALLEGATIONS ...................................................................13

    A.    Background ..............................................................................................13

    B.    Defendants Concealed Da Vinci's Defects And Performance Problems .............14

        1.    Da Vinci's Monopolar Scissors Caused Severe Injuries Due To Defective Tip Covers And Arcing ............................................................14

            a.    The October 2011 Secret "Class II Recall" Of The Tip Covers And Other Concealed Corrective Actions ........................18

            b.    Defendants Violated FDA Regulations By Concealing Modifications To The Tip Covers....................................................19

            c.    Medical Device Reports Also Showed That Defendants Had Notice Of The Defects In The Tip Covers For Years ............20

        2.    Intuitive Systematically Concealed And Underreported  Medical Device Reports To The FDA ....................................................21

            a.    MDRs Reporting Procedures to the FDA Are Strictly Regulated ........................................................................................21

            b.    Intuitive Systematically Violated FDA Reporting Regulations ................................................................................22

            c.    The Number of Medical Device Reports Increased Dramatically After The Change In Reporting In September 2012 Showing That Intuitive Had Systematically Concealed Adverse Events ..........................................................24

        3.    Intuitive Used Aggressive Sales Tactics And Marketing Strategies Disregarding Patients' Safety ..................................................27

    C.    The FDA Takes Strong Regulatory Action ........................................29

Page

    1.     The 2013 FDA Probe: In January 2013 The FDA Began To Uncover Significant da Vinci-Related Defects And FDA Violations ............................................................................... 29

    2.     First Quarter 2013 Results Were Impacted By The FDA Probe And Reclassification Of Serious Injuries ................................................ 30

    3.     The Form 483 Issued In May 2013 Documented Numerous Violations Including The Secret Recall Of Tip Covers In 2011 ............... 32

    4.     Second Quarter 2013 Results Reflected The Full Blown Financial Impact Of The FDA Probe And da Vinci's Safety Concerns ................... 34

    5.     The FDA Warning Letter ................................................................. 36

          a.     On July 16, 2013 The FDA Issued A Warning Letter To Intuitive ............................................................................... 36

          b.     The FDA Warning Letter Caused A Sharp Decline In Intuitive's Stock Price ................................................... 40

V.     ADDITIONAL EVIDENCE OF SCIENTER ................................................. 41

    A.     The Individual Defendants' Stock Sales During The Class Period Were Highly Unusual And Suspicious ................................................ 41

        1.     The Value And Amount Were Highly Unusual ......................... 42

          a.     The Nominal Amount And Percentage Of Holdings Sold Were Extraordinary ................................................ 42

          b.     The Stock Sales Were Inconsistent With Prior Trading Practices ............................................................ 43

          c.     The Timing Of The Stock Sales Was Suspicious ......................... 44

        2.     The Stock Sales Generated Enormous Abnormal Profits ......................... 45

        3.     The Timing Of The 10b5-1 Plans Adopted By The Individual Defendants During the Class Period Is Suspicious ................................... 49

    B.     Defendants Knew, Or Were Deliberately Reckless In Not Knowing, That Intuitive Had Been Violating FDA Regulations ................................... 51

    C.     The Individual Defendants Monitored Reports Of Adverse Events ................. 54

    D.     Imputed Knowledge of Facts Critical To Core Operations ................................... 56

VI.    LOSS CAUSATION AND ECONOMIC LOSS ................................................ 56

VII.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................. 64

Page

A. Defendants Made Materially False And Misleading Statements And Omissions That Concealed Dangerous da Vinci Defects And Performance Problems In Violation of FDA Regulations..............................................................64

1. Intuitive's February 6, 2012 Form 10-K Annual Report (Ending December 31, 2011)..............................................................64

2. Intuitive's April 19, 2012 Form 10-Q (Ending March 31, 2012) ............67

3. Intuitive's July 23, 2012 Form 10-Q (Ending June 30, 2012)..................69

4. Intuitive's October 18, 2012 Form 10-Q (Ending September 30, 2012) ..............................................................70

5. February 4, 2013 Form 10-K Annual Report (Ending December 31, 2012) ..............................................................72

6. Defendants' March 13, 2013 Press Release..............................................74

7. Intuitive's April 18, 2013 Earnings Conference Call ...............................75

8. Intuitive's April 19, 2013 Form 10-Q (Ending March 31, 2013) .............76

B. Defendants Made Materially False And Misleading Statements And Omissions Concerning The Company's Growth, Revenues, Income And Product Liability ..............................................................77

1. Intuitive's February 6, 2012 Form 10-K Annual Report ..........................77

2. Intuitive's April 17, 2012 Form 8-K And Earnings Conference Call........79

3. Intuitive's April 19, 2012 Form 10-Q..............................................................80

4. Intuitive's July 19, 2012 Form 8-K and Earnings Call ............................81

5. Intuitive's July 23, 2012 Form 10-Q..............................................................83

6. Intuitive's October 16, 2012 Form 8-K And Earnings Call......................84

7. Intuitive's October 18, 2012 Form 10-Q ..............................................86

8. Intuitive's January 22, 2013 Form 8-K And Earnings Call ....................87

9. Intuitive's February 4, 2013 Form 10-K Annual Report ..........................88

10. Intuitive's April 18, 2013 Form 8-K And Earnings Call ..........................90

11. Intuitive's April 19, 2013 Form 10-Q..............................................................91

VIII. CLASS ACTION ALLEGATIONS ..............................................................92

IX. PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ....................93

**Page**

X.      THE SAFE HARBOR PROVISION IS INAPPLICABLE ..................................................94

XI.     CAUSES OF ACTION ...........................................................................................................96

      FIRST CAUSE OF ACTION  For Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against All Defendants ...................................96

      SECOND CAUSE OF ACTION  For Violation of Section 20(a) of the Exchange
Act Against Defendants Guthart, Mohr, and Smith.........................................................101

      THIRD CAUSE OF ACTION  For Violation of Section 20A of the Exchange Act
on Behalf of Plaintiffs....................................................................................................102

PRAYER FOR RELIEF ....................................................................................................103

JURY TRIAL DEMAND ...................................................................................................104

1    Lead Plaintiff Movant Employees' Retirement System of the State of Hawaii ("Hawaii

2  ERS"), together with named Plaintiff, Greater Pennsylvania Carpenters' Pension Fund ("Greater

3  Pennsylvania") (together "Plaintiffs"), individually and on behalf of all other persons and entities

4  who purchased or acquired the common stock of Intuitive Surgical, Inc. ("Intuitive" or the

5  "Company") during the period between February 6, 2012 and July 18, 2013, inclusive (the

6  "Class Period"), and who were damaged thereby, hereby allege the following based upon

7  personal knowledge as to themselves and their own acts, and upon information and belief as to

8  all other matters.

9    Plaintiffs' allegations are based on Counsel's investigation, which included, among other

10 things: (i) a review and analysis of Intuitive's public filings with the U.S. Securities and

11 Exchange Commission ("SEC"); (ii) a review and analysis of research reports issued by financial

12 analysts concerning Intuitive; (iii) a review and analysis of other publicly available information

13 concerning Intuitive and its senior officers and directors, including Defendants Gary S. Guthart

14 ("Guthart"), Marshall L. Mohr ("Mohr"), and Lonnie M. Smith ("Smith," collectively, the

15 "Individual Defendants"); and (iv) interviews with former Intuitive employees, each of whom

16 have specific, personal knowledge of the facts alleged herein.  Many of the facts supporting

17 Plaintiffs' allegations are known only by Intuitive and the Individual Defendants (collectively,

18 "Defendants"), or are exclusively within their custody and control.  Plaintiffs believe that

19 substantial additional evidentiary support will be revealed after a reasonable opportunity for

20 discovery.

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 5:13-cv-01920-EJD                                                        - 1 -

## I.  NATURE OF THE ACTION

1.   The focal point of this securities class action is Intuitive's flagship product and source of revenues, a robotic surgery system called da Vinci, and Intuitive's concerted efforts to conceal da Vinci's internally-known defects and the injuries it caused to patients, including death.  Throughout the Class Period, Intuitive received thousands of injury and defect reports related to surgeries using da Vinci.  The most dangerous injuries arose from burns to internal organs caused by the discharge of electricity, usually in the form of sparks, caused by the robot's instruments inside the patient.  Despite the severity and multitude of reports, Intuitive systematically underreported these injuries and their seriousness to the Food and Drug Administration (the "FDA").  As the reports continued to increase, however, the FDA finally initiated an investigation in 2013, which culminated with the issuance of a warning letter on July 16, 2013 (the "FDA Warning Letter" attached hereto as Exhibit A).  The FDA Warning Letter concluded that Intuitive had concealed information from the FDA, secretly recalled defective parts, and ignored known injuries to patients in its design process of critical da Vinci instruments.

2.   Da Vinci is not only Intuitive's flagship product, it is the Company's only product.  Each da Vinci system principally consists of three or four robotic arms, depending on the model, which perform laparoscopic surgeries through tiny incisions.  Sitting at a separate console away from the patient and looking into a viewfinder, the surgeon uses two joystick-like gadgets to control the robotic arms.  Attached to the arms are various types of instruments, including forceps, scissors, and scalpels, as well as tiny cameras and lights.  The instruments can be easily swapped through quick snap-and-release docks at the ends of the robotic arms.  Intuitive sold da Vinci systems to hospitals to perform numerous types of surgeries, including hysterectomies, prostatectomies, and cardiotomies.

3.   Intuitive and the Individual Defendants knew well before the Class Period that da Vinci was causing serious injuries to patients.  After inspecting Intuitive's headquarters in April and May 2013, the FDA reported that Intuitive had received hundreds of complaints and reports

between July 2009 and December 2011.  The vast majority of these reports concerned a little rubber sleeve, inserted at the end of certain da Vinci metal instruments, designed as an insulating device to prevent electricity from radiating out.  The plastic sleeves were referred to as tip covers (the "Tip Cover").  The critical defect consisted **of cracks or slits that prevented the Tip Cover from properly insulating the metal instrument**s and allowed electricity or sparks to escape, an effect known as arcing.  Because the arcing usually occurred outside of the surgeon's camera field of vision, blood vessels and organs were burned without the medical team's knowledge.  Deaths occurred when patients hemorrhaged internally for days while the bleeding remained undetected after the surgery.

4.     Intuitive knew about the defective Tip Covers and secretly sought to take "corrective action" as early as October 2011.  According to the FDA Warning Letter, "[t]his correction was in response to complaints and medical device reports (MDRs) for arcing through damaged tip covers that caused patient injuries."  But Intuitive did not report this corrective action to the FDA as required, which the FDA subsequently classified in the July 2013 FDA Warning Letter as a "Class II Recall."  In addition to the Tip Cover correction, Intuitive initiated two other corrective actions in October 2011, both of which it concealed from the FDA.

5.     Aware of the increase in injuries caused by the defective Tip Covers, and after having concealed the seriousness of the issue from the FDA by failing to report the October 2011 recall, Intuitive also engaged in a concerted effort to falsely and misleadingly minimize the importance of the reports that did reach the FDA.  As set forth in more detail below, stringent FDA regulations require that hospitals report to the manufacturer (*i.e.* Intuitive) serious injuries arising from the use of da Vinci.  In turn, these regulations also require Intuitive to submit these medical device reports, or MDRs, to the FDA.  MDRs filed with the FDA are compiled in the FDA's Manufacturer and User Facility Device Experience ("MAUDE") database.  To hide the da Vinci defects, however, Intuitive consistently underreported MDRs, misclassified them under the innocuous category of "other," even though scores qualified as "serious injury," and added

1  self-serving disclaimers in the filed MDRs concerning the purported lack of evidence linking the

2  injury or harm to a da Vinci defect.

3          6.      In September 2012, the FDA met with Intuitive to address the Company's

4  underreporting and miscategorization of the MDRs.  As a result, Intuitive had to change its

5  reporting policies by (i) reporting MDRs not previously submitted to the FDA, and (ii) upcoding

6  many MDRs previously labeled "other" to "serious injury."

7          7.      It was only after these significant changes to Intuitive's MDR reporting practices,

8  and the material rise in serious MDR reports, that in January 2013 the FDA began a safety probe

9  of the Company.  The FDA probe suggests that, after the FDA realized in September 2012 that

10  Intuitive had been improperly labeling the MDRs, the FDA did not fully trust the Company's

11  role as a middleman between the hospital reports and those that Intuitive submitted to the

12  agency.  The FDA thus sent out a survey directly to hospitals in January 2013 seeking, among

13  other things, information concerning (i) problems or challenges with da Vinci, (ii) complications

14  during surgeries, (iii) problem-causing da Vinci devices, and (iv) surgeons' familiarity with da

15  Vinci recalls and corrective changes.  In addition to this written survey, the safety probe also

16  included one-hour interviews with surgeons.

17          8.      Bloomberg news publicly disclosed the FDA probe on February 28, 2013, only

18  five minutes before the stock market closed.  Investors immediately understood the negative

19  repercussions of the probe and, in those short five minutes, sold substantial amounts of stock.

20  The stock price dropped $63, from about $573 to $510 per share, resulting in the Company

21  losing more than ten percent of its value.

22          9.      Unbeknownst to investors, the Individual Defendants had been heavily selling

23  their Company stock in unusual and suspicious trading.  In November 2012, immediately

24  following the September 2012 meeting with the FDA after which Intuitive knew that MDRs

25  would spike, Defendant Smith sold 100,000-plus shares, pocketing just shy of $70 million.

26  Throughout the entire Class Period, Defendant Smith sold more than $100 million of his

27  Intuitive holdings.  Similarly suspicious was Defendant Guthart's trading.  Guthart had not sold

28

any shares prior to the Class Period since 2008.  He then began selling in earnest starting early in the Class Period, in April 2012, ultimately selling more than $8 million of his Intuitive holdings during the Class Period.  As to Mohr, he continuously liquidated almost all the shares he had at any one point in time, selling over 27,000 shares during the Class Period, or over 16 times his average holdings.

10.     Tellingly, the Individual Defendants made the vast majority of these stock sales at all-time highs exceeding $500 per share, and before the full truth about the true safety and risk profile of the Company emerged.  The stock price had reached these historic highs because Intuitive had become a Wall Street darling propped-up by Defendants' false and misleading statements and omissions.  Defendants misleadingly emphasized the Company's 20%-plus growth in revenues and number of surgeries, while simultaneously touting da Vinci as "a new generation of surgery" that "combine[d] the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision, and dexterity of open surgery." ¶¶ 182, 188, 203. Defendants thus pounced on the perception of robotic surgery as the future, with minimal trauma, and the same (if not greater) benefits as open surgery.  Defendants, however, did not disclose the known defects, patient injuries, and deaths, and their concerted efforts to conceal all this from the FDA and the public.

11.     This concealment, however, was soon to end.  After the FDA launched the safety probe in early 2013, it followed with a lengthy inspection of Intuitive's headquarters between April 1 and May 30, 2013.  At the end of the inspection, the FDA issued a Form FDA-483 ("Form 483") to Defendant Guthart setting forth the objectionable conditions observed (*see infra* ¶¶ 94-100; *see also* Form 483 attached as Exhibit B).  There were four such observations, including the discovery by the FDA that Intuitive had carried out the secret recall of the Tip Covers in October 2011, as discussed above.  In addition, and equally dangerous to patients' health, Intuitive had known since 2010 that surgeons needed to clean da Vinci instruments while inside the patient's bodies, and that to do so they scrubbed one instrument against another.  This had consistently led to tears or holes in the Tip Covers that led to arcing that in turn caused

1   injuries to patients.  FDA regulations thus required Intuitive to address this "user need" through a

2   rigorous and heavily regulated design control process.  Intuitive entirely ignored this user need,

3   did not document it, and never even sought to address this health risk in flagrant violation of

4   FDA regulations.

5        12.    As news of the FDA safety probe, da Vinci's defects, and the risks posed to health

6   began to spread, patients, surgeons, and hospitals started to cut back on da Vinci purchases and

7   the number of procedures.  For the first quarter of 2013, Intuitive thus reported a rare slowdown

8   in the rate of procedure growth.  With only the month of March in the first quarter affected by

9   the disclosure on February 28 of the FDA safety probe, first quarter revenues and sales growth,

10  nevertheless, were tempered.

11       13.    The public disclosure of the FDA probe and the rise in MDRs that prompted it

12  also lead investigative journalists to examine da Vinci's record.  Lengthy news articles revealing

13  tragic injuries caused by da Vinci increasingly began to surface.  On March 5, 2013, for example,

14  Bloomberg published a story titled, "Robosurgery Suits Detail Injuries as Death Reports Rise."

15  One such death was that of a 24 year-old woman who had suffered a lacerated artery while

16  undergoing surgery for cervical cancer.  The burned artery had not been discovered until eleven

17  days later, which was too late.  The autopsy concluded that the patient's death was a "therapeutic

18  complication" resulting in hemorrhage and multi-organ failure.

19       14.    Due to the onslaught of negative reports, in the second quarter ending June 30,

20  2013, the adverse impact on revenues and procedure growth was substantial.  On July 8, 2013,

21  Intuitive reported preliminarily that second quarter 2013 revenues from da Vinci sales had

22  declined six percent to $215 million, compared to $229 million in the second quarter of 2012.

23  Intuitive also had sold only 143 systems, compared with 150 system in the second quarter of

24  2012, and 164 systems in the first quarter of 2013.  The Company thus had gone from rapid

25  growth to a steep decline in only one quarter.

26       15.    Wall Street analyst reports reflected surprise at the unexpected decline and its

27  magnitude.  JP Morgan's report of July 8 called it "shocking": "The severity of the top line

28

1    [revenue] shortfall, with the company posting revenues of $575M vs. consensus of $630 million

2    [$622M JP Morgan] was shocking, and raises more questions than answers."

3        16.    Ten days later, on July 18, Intuitive revealed that it had received the FDA

4    Warning Letter dated July 16, 2013.   A Warning Letter is the most serious agency

5    communication and often the last step prior to seizure, injunction, and/or civil money penalties.

6    The FDA Warning Letter, in large part, formally determined that the observations listed in the

7    Form 483 were violations of the Federal Food, Drug, and Cosmetic Act" ("FDCA"), and thus

8    represented a significant escalation of the FDA's regulatory action.

9        17.    According to the FDA Warning Letter, (i) the Tip Covers constituted "misbranded

10   devices"; (ii) Intuitive knew that the Tip Covers in October 2011 posed a risk to health and, yet,

11   Intuitive proceeded to conduct a secret recall while failing to report this "correction," thereby

12   violating FDA reporting requirements; (iii) Intuitive also knew that the intraoperative cleaning of

13   da Vinci instruments caused the Tip Covers to fail, leading to arcing, and yet ignored the

14   problem, again violating FDA regulations including Current Good Manufacturing Practices; and

15   (iv) after having been notified of these violations pursuant to Form 483, Intuitive had submitted

16   incomplete and inadequate responses to the FDA on June 7, 2013.  Tellingly, the FDA Warning

17   Letter added, "[t]he FDA has previously informed you of your firm's correction and removal

18   violations in an untitled letter dated February 19, 2008, and FDA 483 Inspectional Observations

19   issued on December 20, 2002."   In saying this, the FDA was confirming that failing to report

20   corrections and removals (*i.e.*, the secret recall) was an ongoing, unsolved issue with Intuitive.

21       18.    The public disclosure of the FDA Warning Letter, after the market closed on July

22   18, 2013, marks the end of the Class Period and the dramatic decline suffered in the price of the

23   stock.  The next day, Intuitive closed at $392 per share, falling under $400 for the first in almost

24   two years. Investors and the market understood that the risk posed by da Vinci, and the risk

25   profile of Intuitive's stock, had materially and substantially increased, and that the Company's

26   growth potential had materially and substantially decreased.

27

28

19. Indeed, the material negative change in the Company's risk profile and growth outlook is best exemplified by the degree to which Intuitive concealed the MDRs from the FDA. Nearly twelve months now since Intuitive began properly classifying and reporting MDRs after the September 2012 meeting with the FDA, the figures show that Intuitive had suppressed more than 40 percent of all MDRs.  Indeed, for the prior twelve years, from 2000-2012, there were 5,333 da Vinci-related MDRs filed in total.  This number grew dramatically to over 8,450 MDRs, after a staggering 3,117 da Vinci-related MDRs were filed with the FDA in the nine months from January 1 to September 30, 2013 alone.  This massive cover-up of da Vinci's defects and the extent of patient injuries constitutes securities fraud.

## II.    JURISDICTION AND VENUE

20. The claims asserted herein arise pursuant to §§ 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1(a)) and Rule 10b-5 promulgated under §10 of the Exchange Act (17 C.F.R. § 240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C § 78aa).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

22. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Intuitive resides and transacts business in this District, and maintains its U.S. headquarters in this District at 1266 Kifer Road, Building 101, Sunnyvale, California 94086.  Many of the acts that constitute the violations of law complained of herein, including the preparation and public dissemination of materially false and misleading statements, occurred in substantial part in this District.

23. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities markets, including NASDAQ.

III.     **PARTIES**

   A.     **Plaintiffs**

24.     On June 25, 2013, Hawaii ERS moved to serve as Lead Plaintiff for the Class in this consolidated class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). The motion is unopposed.

25.     Hawaii ERS is a qualified defined benefit public pension plan that was established in 1925. Hawaii ERS, which is governed by an eight-member board of trustees, currently provides retirement, disability, survivor, and other benefits to more than 112,000 members. The members of ERS are retirees, beneficiaries, inactive vested members, and active public employees working for the state and counties of Hawaii, and include teachers, professors, police officers, firefighters, judiciary employees, judges, and elected officials. As of June 30, 2012, the ERS had more than $11.9 billion in assets under management. As set forth in its PSLRA certification attached hereto as Exhibit C, Hawaii ERS purchased a total of 26,048 shares, and sold 12,268 shares of Intuitive common stock on the open market during the Class Period and suffered damages as a result of the securities law violations alleged herein.

26.     Hawaii ERS purchased Intuitive securities contemporaneously with Defendants Smith's, Guthart's, and Mohr's sales of Intuitive stock during the Class Period. Specifically, on November 20, 2012, Hawaii ERS purchased 11,867 shares of Intuitive common stock. On that same date Defendant Smith sold 23,949 shares of Intuitive common stock. On November 26, 2012, Hawaii ERS purchased 6,000 shares of Intuitive common stock. On that same date, Defendant Smith sold 21,164 shares of Intuitive common stock. Additionally, on January 29, 2013, Hawaii ERS purchased 140 shares of Intuitive common stock. Only one day prior, on January 28, 2013, Defendant Mohr sold 8,000 shares of Intuitive common stock; and only one trading day before that, on January 25, 2013, Defendant Guthart sold 4,500 shares of Intuitive common stock.

27.     Greater Pennsylvania is a trustee-administered, multi-employer, defined benefit pension plan for carpenters in Pennsylvania that had more than $800 million in assets as of

1    January 1, 2011.  As set forth in its PSLRA certification attached hereto as Exhibit D, Greater

2    Pennsylvania purchased a total of 2,893 shares, and sold 21 shares of Intuitive common stock on

3    the open market during the Class Period and suffered damages as a result of the securities law

4    violations alleged herein.

5        28.    Greater Pennsylvania purchased Intuitive securities contemporaneously with

6    Defendants Smith's, Guthart's and Mohr's sales of Intuitive stock during the Class Period.

7    Specifically, on October 23, 2012, Greater Pennsylvania purchased 1,825 shares of Intuitive

8    common stock.  On October 22, 2012, Defendants Smith, Guthart and Mohr sold 17,500, 4,500,

9    and 7,300 shares of Intuitive common stock, respectively.

**B.    Defendant Intuitive**

11       29.    Intuitive was founded in 1995 with the purpose of developing technology that

12   would allow minimally invasive surgery to expand to a broader range of procedures.  In January

13   1999, Intuitive introduced its sole product: the da Vinci surgical system ("da Vinci").  Da Vinci

14   was the first robotic surgical system to be cleared by the FDA for general laparoscopic surgery in

15   2000.  Since then, Intuitive has designed, manufactured and marketed updated models of da

16   Vinci and its related instruments and accessories.  In June 2000, Intuitive completed an initial

17   public offering, followed by a second public offering in 2003. Intuitive is incorporated in

18   Delaware.  The Company's common stock is publicly traded on NASDAQ under the ticker

19   symbol "ISRG."

**C.    The Individual Defendants**

21       30.    Defendant Gary S. Guthart ("Guthart") joined Intuitive in 1996, was promoted to

22   President in 2007, and has served as Intuitive's Chief Executive Officer since January 2010.

23   Guthart is also a member of Intuitive's Board of Directors.  Guthart has a B.S. in Engineering, as

24   well as an M.S. and Ph.D. in Engineering Science.  Guthart signed and certified Intuitive's false

25   and misleading Forms 10-K for fiscal 2011 and 2012, and certified Intuitive's false and

26   misleading Forms 10-Q for the quarterly periods ending March 31, 2012, June 30, 2012,

27   September 30, 2012, and March 31, 2013.  Guthart also made false and misleading statements on

28

1  Intuitive Earnings Conference Calls ("Earnings Calls") on April 17, 2012, July 19, 2012,

2  October 16, 2012, January 22, 2013, and April 18, 2013.   Further, Guthart made false and

3  misleading statements in the Forms 8-K dated April 17, 2012, July 19, 2012, October 16, 2012,

4  January 22, 2013, and April 18, 2013.

5      31.    Defendant Marshall L. Mohr ("Mohr") joined Intuitive as Senior Vice President

6  and Chief Financial Officer in March 2006.   Mohr signed and certified Intuitive's false and

7  misleading Forms 10-K for fiscal 2011 and 2012, as well as its false and misleading Forms 10-Q

8  for the quarterly periods ending March 31, 2012, June 30, 2012, September 30, 2012, and March

9  31, 2013.   In addition, Mohr made materially false and misleading statements during the

10  Earnings Calls on July 19, 2012, October 16, 2012, January 22, 2013 and April 18, 2013.  Mohr

11  also signed Intuitive's materially false and misleading Forms 8-K dated April 17, 2012, July 19,

12  2012, October 16, 2012, January 22, 2013, March 14, 2013, and April 18, 2013.

13      32.    Defendant Lonnie M. Smith ("Smith") joined Intuitive as CEO in June 1997.

14  Smith resigned from his position as CEO in January 2010, but remains, and remained during the

15  Class Period, Chairman of the Board as well as an executive officer of the Company.   Smith

16  signed Intuitive's false and misleading Forms 10-K for fiscal 2011 and 2012.

17      33.    Facts that are critical to Intuitive's "core operations" are presumed to be known

18  by its key officers, including each of the Individual Defendants.   In addition, during the Class

19  Period, the Individual Defendants, as senior executive officers and/or directors of Intuitive, were

20  privy to confidential and proprietary information concerning Intuitive, its operations, finances,

21  financial condition, product safety, development and performance, and present and future

22  business prospects.   The Individual Defendants also had access to material adverse, non-public

23  information concerning Intuitive, as discussed in detail below.   The Individual Defendants'

24  positions at Intuitive further gave them access to non-public information about the Company's

25  business, finances, financial condition, product safety, development and performance, and

26  present and future business prospects through access to internal corporate documents,

27  conversations and connections with other corporate officers and employees, attendance at

28

management and/or board of directors meetings and committees thereof, and through reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or were reckless in not knowing, that the adverse facts specified herein were concealed, and thus the Individual Defendants had materially misled investors during the Class Period.

34.   The Individual Defendants are liable as direct participants in the wrongdoing complained of herein.  The Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause Intuitive to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants could, and did, directly or indirectly, control the conduct of Intuitive's business.

35.   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Intuitive's annual reports, quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be materially false and misleading prior to or shortly after their issuance, and thus the Individual Defendants had the ability and opportunity to prevent their issuance or to correct them.  Because of their positions with the Company, and their access to material, non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being fraudulently concealed from, the public.  The Individual Defendants are liable for the materially false and misleading statements and omissions alleged herein.

36.   As officers and controlling persons of a publicly-held company whose shares are registered with the SEC and traded on NASDAQ, the Individual Defendants had a duty to disseminate prompt, accurate and truthful information with respect to Intuitive, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate

1   information.   The Individual Defendants each violated these specific requirements and

2   obligations during the Class Period.

3       37.   The Individual Defendants are liable as participants in a fraudulent scheme and

4   course of business that operated as a fraud or deceit on purchasers of Intuitive common stock by

5   disseminating materially false and misleading statements that concealed material adverse facts

6   concerning the safety of da Vinci, undisclosed recall and corrective actions, violations of FDA

7   disclosure and reporting regulations, and the Company's growth and financial success.   The

8   scheme: (i) deceived the investing public regarding Intuitive's business, operations, management

9   and the value of Intuitive's common stock; (ii) permitted the Individual Defendants to sell stock

10   and engage in insider sales during a period of stock inflation; (iii) concealed da Vinci's defects

11   and true risk profile; (iv) failed to comply with FDA regulations applicable to da Vinci, *i.e.*, the

12   Company's core business; (v) caused Plaintiffs and other members of the Class to purchase

13   Intuitive common stock at artificially inflated prices; and (vi) caused Plaintiffs to suffer damages.

14       **IV.   SUBSTANTIVE ALLEGATIONS**

15           **A.   Background**

16       38.   Intuitive Surgical has been the market leader in robotic-controlled surgery devices

17   before, during, and after the Class Period.   The Company conducted an initial public offering in

18   2000 when the FDA approved its sole product, the da Vinci Surgical System, for laparoscopic

19   surgery. This initial approval was limited to certain procedures, such as gallbladder and

20   gastroesophageal surgery.   In the years following, the FDA approved da Vinci for additional

21   treatments, including thoracoscopic (chest) surgery, cardiac procedures performed with

22   adjunctive incisions, as well as urologic, gynecologic, pediatric, and transoral otolaryngology

23   surgeries.   Intuitive now dominates the robot-surgery field as it is the only company whose

24   system is cleared in the United States for soft tissue procedures, which include prostate and

25   gynecological surgery.

26       39.   As the market leader, the Company has been growing rapidly in the last few

27   years.   As of December 31, 2012, there were 2,585 da Vinci Systems installed in approximately

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 5:13-cv-01920-EJD             - 13 -

2,025 hospitals worldwide.  The number of U.S. procedures performed with these robots grew to approximately 367,000 in 2012, up from 292,000 in 2011, and 228,000 in 2010.  Total revenue rose from $1.41 billion in 2010, to $1.76 billion in 2011, and $2.18 billion in 2012.  Da Vinci system sales rose from 441 da Vinci systems in 2010 to 534 in 2011 and 620 in 2012.

40.     Intuitive's revenue is solely generated from the da Vinci Surgical System.   In 2012, revenues from sales of da Vinci represented about 43% of the overall revenue in 2012. Each unit costs between $1.0 and $2.3 million.  The rest was generated by "recurring revenue," which included sales of da Vinci instruments and accessories (approximately $1,300 to $2,000 per procedure) and sales of da Vinci service agreements.   Annual service agreements range between $100,000 and $170,000 per system.   During 2012, instrument and accessory revenue contributed 41% and service revenue generated 16%.

**B.**     **Defendants Concealed Da Vinci's Defects And Performance Problems**

**1.**     **Da Vinci's Monopolar Scissors Caused Severe Injuries Due To Defective Tip Covers And Arcing**

41.     The da Vinci Surgical System consists of several key components, including (i) an ergonomically designed console equipped with a high-definition 3-dimensional vision system where the surgeon sits while operating, (ii) a patient-side cart where the patient lays during surgery, (iii) three or four interactive robotic arms, (iv) proprietary EndoWrist® instruments that attach to the robotic arms, and (v) a hardware console, which houses the computer operating system and software that controls the robotic arms.  Together, these components allow surgeons to operate by manipulating a suite of tiny computer-assisted remote control tools through a small tube inside a patient.

42.     The EndoWrist Instruments include a number of endoscopic surgical parts used with da Vinci for a wide range of surgical tasks, such as tissue manipulation, suturing, cutting, coagulation, and clamping.  Most instruments have an articulating design at the tips that enter the patient's body, known as a "wrist," and provide various degrees of motion that mimic the human hand and wrist-movements.   Quick-release levers facilitate instrument changes during surgical

1    procedures.  The instruments also have an electronic tag that identifies each specific instrument

2    and limits the number of uses so that the tag "expires" the instrument after a pre-determined

3    number of uses.

4         43.    The most commonly used Endowrist instrument is the Hot Shears Monopolar

5    Curved Scissors ("Monopolar Scissors").  According to a study entitled "Robotic Instrument

6    Insulation Failure: Initial Report of a Potential Source of Patient Injury," co-authored by Adam

7    C. Mues, Geoffrey N. Box, and Ronney Abaza, and published in 2011 in the Journal of Urology,

8    24 surgeons performed 454 robotic procedures between July 2008 and January 2009, and all of

9    the procedures involved the Monopolar Scissors.  The use of the Monopolar Scissors is so

10   prevalent because it allows doctors to both cut and cauterize tissue during surgical procedures.

11   Cauterization occurs through the application of monopolar electricity.

12        44.    To prevent the electricity from spreading to unwanted areas, the Monopolar

13   Scissors requires the use of the Tip Cover, which is also sold by Intuitive.  The Tip Cover is a

14   sleeve, and consists of a silicon or flexible rubber-like material connected to a harder plastic-like

15   tube called an altum.  It is placed over the end of the Monopolar Scissors to insulate the

16   instrument's metal parts and allow only the exposed electrode (the scissor blades) to emit

17   electrical current to the intended area designated by the surgeon.  While the intended use of the

18   current is cauterization, when inadvertently applied to adjacent tissue the current causes harmful

19   burns and other serious injuries.

20                    **Monopolar Scissors with Tip Cover Accessory**

21

22



26

27

28

**Damaged Tip Cover Accessory[1]**



45.     "The Tip Cover plays an important role in the robotic instrument" because it "serves as an insulation for the metallic segment of the EndoWrist and prevents broad dissipation of monopolar electric current," according to an article published in March 2011 by Yonsei University College of Medicine, entitled "Iliac Vein Injury Due to a Damaged Hot Shears Tip Cover During Robot Assisted Radical Prostatectomy."  If the Tip Cover functions properly, the article reported, "[i]t allows safe dissection in proximity to delicate structures such as blood vessels, nerves and bowel."  If the Tip Cover fails, however, electricity can escape the Monopolar Scissors and burn or harm patients.  This is commonly referred to as "arcing" because a visual arc of electricity is formed from the defect in the insulated portion of the Tip Cover to another instrument or tissue.  The tissue is thus burnt and injured.

46.     Even more severe injuries occur when the arcing is not in the field of vision of the surgeon and therefore remains undetected.  Perforation of internal organs and blood vessels causes internal bleeding and severe injuries that are discovered days after the surgery, and only after the patient's condition has deteriorated rapidly for unknown reasons.  One such patient was

---

[1] The images of the Monopolar Scissors and the Tip Cover Accessory were published in "Robotic Instrument Insulation Failure: Initial Report of a Potential Source of Patient Injury." Adam C. Mues, Geoffrey N. Box, and Ronney Abaza, J. of Urology 105 (2011).

Sonya Melton.   In an interview reported by CNBC on March 19, 2013 ("Robotic Surgery: Growing Sales, but Growing Concerns") "[Sonya Melton] said she had become so sick almost immediately after her surgery to remove uterine fibroids that she thought she was going to die. Her condition, she said, puzzled doctors so much that within days they sliced open her stomach to find out why she was in excruciating pain and had developed a full-fledged pneumonia.  What they found, she said, was a perforation in her small intestine."  It turns out, as CNBC reports, Melton's ureters, which carry urine from the kidneys to the bladder, had been "burned."

47.    Other patients have tragically died as a result of undetected burns.  As reported by Bloomberg on March 5, 2013, ("Robosurgery Suits Detail Injuries as Death Reports Rise"), Kimberly McCalla underwent surgery with da Vinci to treat early-stage cervical cancer on August 12, 2010.  "Eleven days after the operation, she was rushed back into surgery, where doctors found a laceration of the iliac artery near the original operation….The doctors sewed the artery up, but it was too late.  After two more emergency operations, Kimberly died on August 25 after suffering [] bowel damage 'incompatible with life,' according to an operative report."

48.    A subsequent lawsuit filed on behalf of Ms. McCalla's estate alleged that "there had been a burn of the right external iliac artery."[2]  The lawsuit also alleged that the burn to the iliac artery was sustained due to a defective device that used "monopolar energy to cut, burn and cauterize tissue," which had "inadequate insulation" thereby "allowing electrical current to pass into tissue outside of the operative field," and ultimately resulting in death to the patient.

49.    The severe injuries suffered by Sonya Melton and Kimberly McCalla as a result of monopolar current are not isolated cases.  Indeed, a review of the MAUDE database shows that there was a substantial and material increase in Tip Cover related MDRs in 2011 and 2012 compared to prior years, and that there has been a corresponding increase in Tip Cover reports

---

[2] Complaint at 6,  *McCalla v. Intuitive Surgical, Inc.*, No. 12-2297 (S.D.N.Y. Apr. 2, 2012), ECF. No. 1.

related specifically to arcing or burning (¶¶ 55-56).  These injuries and defects have also resulted in a notable increase in products liability and/or personal injury lawsuits filed against Intuitive.[3]

          **a.**     **The October 2011 Secret "Class II Recall" Of The Tip Covers And Other Concealed Corrective Actions**

50.     At least as early as October 2011 Defendants knew that the Tip Cover was defective,  did not insulate properly, and allowed electricity to escape.  One of the problems was that it was very difficult to install correctly, in part, because it required a fairly large amount of force to fit the rubber-sleeve Tip Cover over the instrument.[4]   Because the Tip Covers were fragile, when installed incorrectly or after the use of force, they were easily damaged or torn.

51.     On October 10, 2011, Intuitive sent out a letter to hospitals that used da Vinci systems.  The letter corrected the instructions for proper use for Tip Covers and sought to prevent tears and ensure that Tip Covers functioned properly.  Intuitive sent the letter in response to complaints and MDRs reporting arcing through damaged Tip Covers that had caused patient injury, but did not distribute the letter publicly.

52.     The FDA Warning Letter issued in July 2013 subsequently reported that Intuitive's October 2011 letter had constituted a "Class II Recall."  In violation of FDA regulations, the FDA Warning Letter found that Intuitive did not report this recall to the San Francisco District Recall Coordinator, the designated FDA office to receive such reports.  Intuitive concealed this corrective action from the FDA as part of a broader concerted effort to bury and minimize any negative reports about da Vinci.

---

[3] Plaintiffs analyzed publicly available data concerning lawsuits filed against Intuitive between March 2010 and August 2013.  This analysis reveals there were at least 25 such lawsuits, 18 of which included allegations related to insufficient insulation allowing monopolar current to pass onto patient tissue, resulting in inadvertent burns and other injury.  This analysis is further broken down in Section VII (Defendants Made Materially False And Misleading Statements And Omissions).

[4] Diana C.W. Friedman, Thomas S. Lendvay, Blake Hannaford, *Instrument Failures for the da Vinci Surgical System:  a Food and Drug Administration MAUDE Database Study*, Surgical Endoscopy (2013) 27: 1507.

53.     The Company also concealed from the FDA other serious corrective actions.  On October 13, 2011, Intuitive sent out another letter notifying da Vinci hospitals that da Vinci was not cleared for thyroidectomy procedures – *i.e.*, the surgical removal of all or part of the thyroid gland.  Intuitive had previously marketed da Vinci for these procedures and profited from the revenues generated.  Intuitive also did not report this letter to the San Francisco District Recall Coordinator.  The FDA, again, later classified Intuitive's corrective action taken on October 13, 2011 as a "Class II Recall."

54.     On October 17, 2011, Intuitive sent yet a third corrective letter to da Vinci hospitals with information for inspecting instrument cannulas – *i.e.*, a hollow rigid tube inserted into the body that allows the instruments on the robotic arms to access patients' anatomy through the small incisions.  Damaged Tip Covers due to defective cannulas was identified in the Form 483 as "one of the root causes" for arcing that resulted in patient injuries.  This action was also not reported to the San Francisco District Recall Coordinator.  Again, the FDA later classified Intuitive's corrective action taken on October 13, 2011 as a "Class II Recall."

**b.     Defendants Violated FDA Regulations By Concealing Modifications To The Tip Covers**

55.     Pursuant to § 519(g) of the FDCA, 21 U.S.C. § 360i(g), and 21 C.F.R. § 806 of the Reports of Corrections and Removals regulation, companies such as Intuitive are required to provide promptly to the FDA a written report "of any correction or removal of a device initiated by such manufacturer or importer if the correction or removal was initiated [to] . . . reduce a risk to health posed by the device."  21 C.F.R. § 806.10(a).

(a)     The regulation defines a "[c]orrection" as "the repair, modification, adjustment, relabeling, destruction, or inspection (including patient monitoring) of a device without its physical removal from its point of use to some other location."  21 C.F.R. § 806.2(d).

(b)     A "[r]isk to health" is defined as "(1) [a] reasonable probability that use of, or exposure to, the product will cause serious adverse health consequences or death; or (2) [t]hat use of, or exposure to, the product may cause temporary or medically reversible adverse

1    health consequences, or an outcome where the probability of serious adverse health

2    consequences is remote."  21 C.F.R. § 806.2(j).

3            (c)     "Removal" means "the physical removal of a device from its point of use

4    to some other location for repair, modification, adjustment, relabeling, destruction, or

5    inspection."  21 C.F.R. § 806.2(i).

6                         **c.    Medical Device Reports Also Showed That
                                 Defendants Had Notice Of The Defects In The**

7                         **Tip Covers For Years**

8            56.    The main mechanism through which the FDA is apprised of health risks from

9    medical devices, including da Vinci, are MDRs.  The purpose of MDRs is "to protect the public

10   health by helping to ensure that devices are not adulterated or misbranded and are safe and

11   effective for their intended use."  21 C.F.R. § 803.1.

12           57.    MDRs are therefore critical components of the FDA's ability to monitor a

13   device's performance and determine if further FDA actions are necessary, including inspections

14   of facilities and post-market studies.  MDRs filed with the FDA are compiled in the FDA's

15   MAUDE database.

16           58.    Plaintiffs have analyzed the MAUDE database and the results show that there had

17   been a substantial and material increase in Tip Cover-related MDRs in 2011 and 2012 compared

18   to prior years.  (These MDRs reference Tip Cover model number 400180).

19           59.    The number of Tip Cover-related MDRs for each year between 2007 and 2010

20   were, respectively, 19, 60, 77, and 68.  In 2011 and 2012, the MDRs increased to 117 and 104.

21   Accordingly, the annual average between these two periods nearly doubled, from 56 in the 2007-

22   2010 period to 110.5 in 2011 and 2012.

23           60.    Of these MDRs, the average annual Tip Cover incidence that related to arcing or

24   burning more than doubled when comparing the same periods.  Between 2007 and 2010, there

25   were, respectively, 2, 24, 14, and 22 such MDRs.  In 2011 and 2012, those MDRs increased to

26   34 and 38, respectively.  Accordingly, the annual average also more than doubled, from 15.5

27   between 2007 and 2010, to 36 between 2011 and 2012.

28

61.     More recently, issuance of MDRs related to Monopolar Scissors and Tip Covers (model numbers 400180, 400179, 420179) have continued their steep upward trajectory.  In 2013 there has been a 54% increase in reported MDRs related to Monopolar Scissors and Tip Covers, compared to 2012, from 128 in 2012 to 197 in 2013.

### 2.     Intuitive Systematically Concealed And Underreported Medical Device Reports To The FDA

#### a.     MDRs Reporting Procedures to the FDA Are Strictly Regulated

62.     Strict regulations promulgated by the FDA govern MDR reporting procedures, which rely primarily on the manufacturer's reporting obligations since approximately 94% of the MDRs received by the FDA are reported by the manufacturer.[5]  Pursuant to these regulations, when an adverse event related to a serious injury occurs, user facilities, *e.g.* hospitals, are required to report these injuries to the manufacturer: "whenever a device user facility [*e.g.* hospitals] receives or otherwise becomes aware of … information that reasonably suggests that a device has or **may have caused or contributed to … a serious injury to a patient of the facility**… the facility shall … report the information … to the manufacturer."  21 U.S.C. § 360i(b)(1)(B) (emphasis supplied); *see also*  21 C.F.R. §§ 803.30, 803.50.

63.     Manufacturers must then report to the FDA "no later than 30 calendar days after the day that [the manufacturers] receive or otherwise become aware of information, from any source, that reasonably suggests that a device that [the manufacturers] market: (1) [**m**]**ay have caused or contributed to a death or serious injury**; or (2) [h]as malfunctioned and this device or a similar device that [the manufacturers] market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur."  21 C.F.R. § 803.50(a).

---

[5] "Adverse Event Reporting for Medical Devices," Department of Health and Human Services, Office of the Inspector General, Oct. 2009 (finding that 94% of medical device adverse event reports filed with the FDA were submitted by device manufacturers in 2007) https://oig.hhs.gov/oei/reports/oei-01-08-00110.pdf.

64.     The obligations of the manufacturers, such as Intuitive, are not limited to merely reporting adverse events, but also include the obligation to further investigate and understand the underlying causes.  Manufacturers "are also responsible for conducting an investigation of each event and evaluating the cause of the event."  21 C.F.R. § 803.50(b).  If the original report is incomplete, the regulations also require manufacturers to "provide a statement explaining why this information was incomplete and the steps [taken] to obtain the information."  *Id.*  And if the manufacturer later obtains information not available at the time it filed the initial report, the manufacturer must file a supplemental report with the new information.  *Id.*

### b.     Intuitive Systematically Violated FDA Reporting Regulations

65.     Intuitive brazenly violated these FDA regulations by minimizing and underreporting serious injuries and defects arising from da Vinci.  A medical journal study of Intuitive's reporting practices to the FDA concluded that the Company underreported robotic surgery complications between January 2000 and August 2012, and highlighted facts that strongly suggest that Intuitive did so intentionally.  The study ("Underreporting of Robotic Surgery Complications") was published in the Journal for Healthcare Quality in September 2013.[6]  The purpose of the study was to test whether robotic surgery complications may be more common than represented in FDA adverse event reports.

66.     The study cross referenced MDRs in the MAUDE database with legal documents retrieved from LexisNexis and PACER.  Of the 70 events found in the legal databases, eight, or more than 10%, had not been reported to the FDA, including deaths, perforations, and severe injuries.  In five of the cases, no report was ever filed with the FDA.  In two cases, the MDRs were filed only after the *Wall Street Journal* and *Reuters* reported the story – one of the MDRs "disputes the death" and only acknowledged that the patient suffered nerve damage.  In a

_____

[6] Michol A. Cooper, Andrew Ibrahim, Heather Lyu and Martin A. Makary, *Underreporting of Robotic Surgery Complications*, J. for Healthcare Quality (2013).

1  separate instance, even though an Intuitive representative had been present during the surgery

2  and witnessed the patient's death, Intuitive still did not report it to the FDA.

3       67.    In addition to flagrantly failing to report deaths and other serious injuries to the

4  FDA, Intuitive also misclassified the injuries that it actually reported to minimize their import.

5  On March 13, 2013, the Company issued a press release filed on March 14 with the SEC on

6  Form 8-K (the "March 13 Press Release"), admitting that until September 2012 the Company

7  had been improperly classifying serious injuries as "other."  After that date, Intuitive elevated the

8  same events to the category of "serious injury."  Intuitive had thus admitted that until September

9  2012 the Company had been underreporting "serious injuries" arising from da Vinci surgeries.

10  The effect of the reclassification was to almost double the number of serious injuries in 2012 to

11  131.[7]  The Company has provided no explanation to this day for its failure to properly report

12  serious injuries and how serious injuries could possibly have been classified with the innocuous

13  label of "other."

14       68.    The March 13 Press Release further admitted that Intuitive had not been reporting

15  MDRs properly to the FDA.  In a cryptic disclosure, it stated that in September 2012 it had

16  "revised its MDR practices," which had then resulted in "increased reports."  Intuitive again did

17  not explain the nature of the revision.  Simply put, Intuitive had been withholding MDRs from

18  the FDA in an effort to minimize the number and import of any negative adverse events.

19       69.    Defendants' underreporting of MDRs is corroborated by a former Intuitive

20  Regulatory Specialist, who worked at Intuitive from July through September 2012 in Sunnyvale,

21  California (the "Regulatory Specialist"), and was responsible for complaint management and

22  escalation of MDRs.  The Regulatory Specialist was aware of complaints and reports of

23  additional burns related to the Tip Covers, even after Intuitive modified the Tip Cover's design.

24

25

26

27  [7] Suntrust Analyst Report, "ISRG-Thoughts on Updated Reporting Practices," dated March 14, 2013.

28

70.     According to this former Regulatory Specialist, and as also reported by Intuitive in its March 2013 Press Release, Intuitive changed its reporting criteria in September 2012 when the Company began reporting issues that had previously not been reported.  The Regulatory Specialist said that the change occurred after Richard Reeves, the Director of Regulatory Affairs, met with representatives from the local office of the FDA in late August or early September. The Regulatory Specialist's understanding is that Intuitive changed its reporting criteria because of increased scrutiny by the FDA on robotic surgical platforms.

71.     In the midst of changing Intuitive's previously deficient reporting process, but before the rise in MDRs contributed to heightened awareness of da Vinci's problems in the public markets, all three Individual Defendants capitalized on their insider knowledge by selling vast amounts of Intuitive stock.  Collectively, the Individual Defendants sold an extraordinary sum, exceeding $70 million between late October and early December of 2012.  Individually, in late October, Defendants Guthart and Mohr sold 4,500 and 7,300 shares, respectively, reaping proceeds of approximately $2.4 million and $3.9 million respectively.  This was particularly striking for Defendant Guthart, who had refrained from selling since August 2008.  Defendant Smith sold in late October and all throughout November, on no fewer than eight occasions, more than 125,000 shares of Intuitive common stock for almost $70 million.  *See* full discussion of insider trading in section V.A *infra*.

**c.      The Number of Medical Device Reports Increased Dramatically After The Change In Reporting In September 2012 Showing That Intuitive Had Systematically Concealed Adverse Events**

72.     Once Intuitive began accurately classifying and reporting MDRs in September 2012, the number of MDRs in the MAUDE database skyrocketed.[8]  For the prior 12 years, from

---

[8] To evaluate the rise in defects and injuries related to da Vinci, Plaintiffs analyzed the MAUDE database that is publicly available from the FDA website (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm).  This analysis is referenced above and is further broken down in Section VII (Defendants Made Materially False And Misleading Statements And Omissions).  This analysis was only possible after Intuitive

2000-2012, there had been 5,333 da Vinci-related MDRs filed.  This number grew dramatically to over 8,450 MDRs, after a staggering 3,117 da Vinci-related MDRs were filed with the FDA in the nine months from January 1 to September 30, 2013 alone.  This represents an astounding 40 percent increase in 2013 compared to all prior years cumulatively.  In other words, Intuitive had suppressed nearly half of all MDRs.

73.    The extent of Intuitive's cover-up is also evident in the monthly reporting figures. With an average rate of over 400 MDRs a month filed during the first seven months of 2013, this is more than five times higher than any prior period since da Vinci was introduced in 2000.  The chart below, showing the number of MDRs submitted to the FDA on a monthly basis from January of 2000 through today, highlights the stunning increase after the meeting with the FDA in September 2012 left Intuitive no choice but to begin accurate reporting:



started complying with FDA regulations and stopped underreporting and misclassifying MDRs, as reported by Intuitive in March 2013.

74.    Further, not only did the total number of MDRs grow on a large scale, so did those reporting "injuries" and "death."  In August 2013 the number of "injury" and "death" type events swelled to more than 100 – more than triple the rate of any other month.  These 100-plus reports are apparently due to a mass posting of over 70 "injury" or "death" events which are annotated "as part of a legal mediation effort" in the Company's inserted notes.  Altogether there are over 20 such "legal complaint" reports, all "injury" or "death" event types, filed in the last four months, most of which show a time lag between event date and date reported of six months to three or more years.  In other words, the adverse events had taken place years before and not reported by Intuitive to the FDA.

75.    The chart below visually demonstrates the massive increase in MAUDE "death" and "injury" reports:



76.    Equally telling from this chart is the obvious increase in MDRs beginning in November 2012 and the rapid acceleration thereafter.  While "death" and "injury" reports

between August 2011 and August 2012 averaged about 10 per month, from September 2012 through September 2013 they averaged 35,  a more than **three-fold increase** as they continued to rise and exceed 100 by August 2013.  The increase reflects "injuries" and "deaths" that had been concealed by Intuitive and are only being reported now.  Intuitive had thus covered-up hundreds of "injuries" and "deaths."

### 3. Intuitive Used Aggressive Sales Tactics And Marketing Strategies Disregarding Patients' Safety

77.    While Intuitive fiercely sought to conceal and minimize the disclosures regarding the extent and severity of patients' injuries caused by da Vinci, the Company engaged in extremely aggressive marketing practices to sell its only product.  These marketing practices reflect that Intuitive had little regard for the safety of patients; Intuitive and its sales personnel simply wanted to make their numbers.  In order to do this, Intuitive's sales force employed all kinds of stratagems to increase the number of procedures using da Vinci and ultimately the number of sales of da Vinci systems.

78.    For example, according to an article published on March 25, 2013 by *The New York Times*, Intuitive's sales force consistently sought to circumvent or minimize surgeon training requirements designed to ensure patients' safety in order to increase the number of procedures:[9]

> In an [internal Intuitive] e-mail dated May 31, 2011, a Western regional sales manager for Intuitive noted that area surgeons had used robotic equipment only five times, although the company's goal was to see 36 robotic operations performed by the end of June.  He urged sales staff to persuade surgeons to switch upcoming cases to robotic ones.
>
> "Don't let proctoring or credentialing" — shorthand for supervised surgery and hospital certification — "get in our way," the e-mail said.

79.    The effort to increase procedures by disregarding surgeon training also consisted of applying direct pressure on hospitals:

---

[9] *Salesmen In the Surgical Suite*, Roni Caryn Rabin.

1
2
3

In December 2009, a sales representative urged a hospital in Billings, Mont., to ease up on its credentialing requirement, saying in an e-mail that requiring surgeons to do five supervised operations using the robot before going solo was "on the high side" and could have "unintended consequences." Hospital officials replied, saying, "We will review and most likely will decrease the 5 down to 3."

4   80.   In another email cited in the article, a clinical sales director instructed the sales

5   team to "'scrub' doctors' schedules and get procedures moved up by a few days in order to make

6   [Intuitive's] quarterly goal." And in a third email referenced by the *New York Times*, a clinical

7   sales director told the sales team to "[b]e prepared to challenge each trained surgeon every time

8   you see a lap[aroscopic] or open case. Be unsatisfied with the thought of ending a day without a

9   converted case," meaning pressuring a surgeon to use da Vinci instead of operating

10  laparoscopically or with an open incision. In fact, the sales force was so entrenched in the

11  hospital decision-making process and daily routines that Intuitive sales representatives were even

12  present inside the operating rooms during surgery, offering advice to newly trained surgeons if

13  they were having technical difficulties with the robot.

14  81.   Another aggressive tactic employed by Intuitive in marketing da Vinci was the

15  use of seemingly independent medical professors who promoted the device, even in the face of

16  growing safety concerns, without disclosing the financial incentives received from the Company.

17  According to an article published on September 20, 2013 in the *Orange County Register*, "UCI

18  Doctors Downplayed Risks Of Surgical Robot," at least two seemingly independent professors

19  touted da Vinci while reaping undisclosed financial rewards. Specifically, professors Ralph

20  Clayman and Thomas Ahlering provided Intuitive with so-called independent opinions that da

21  Vinci was safe. But undisclosed was the fact that Intuitive had paid professor Ahlering, or his

22  foundation, at least $107,000 since 2002, and that Intuitive also had been a top financial

23  supporter of an academic society co-founded by professor Clayman, which paid him $30,000 per

24  year. The article further reported that Intuitive also had given University of California Irvine, the

25  school where Clayman was dean, nearly $1.5 million in grants and reimbursements. Intuitive

26  was thus able to promote da Vinci as safer than it was, through the use of professors who were

27  viewed as disinterested, but were decidedly not.

28

82.     These sales and marketing techniques were all the more successful because Defendants omitted to tell these doctors and patients (or the FDA) of the growing health risks associated with da Vinci procedures and defects in the da Vinci instruments and accessories.

### C.     The FDA Takes Strong Regulatory Action

#### 1.     The 2013 FDA Probe: In January 2013 The FDA Began To Uncover Significant da Vinci-Related Defects And FDA Violations

83.     On the heels of the September 2012 reclassification of serious injuries, the FDA noted an increase in the number of reports of adverse events.  Given that the Company had previously "down-coded" the adverse reports without providing any justification, the FDA this time leapfrogged Intuitive's role in the reporting chain of custody and went directly to the source, the physicians.   In a letter-survey to physicians, the FDA asked them to provide information about adverse events related to da Vinci directly to the FDA, not Intuitive.   The letter further indicated that the survey would not be limited to a question and answer form, but that agency officials would speak with surgeons for up to an hour.

84.     "What the FDA [was] trying to determine with the survey [was] whether adverse event reports sent to the agency [were] **'a true reflection of problems'** with the robots, or the result of other issues, Synim Rivers, an agency spokeswoman" said in an e-mail reported by Bloomberg.[10]  According to Bloomberg, Ms. Rivers added "[i]t is difficult to know why the reports have increased."   In fact, Bloomberg broke the news of the FDA probe on February 28, 2013, five minutes before the close of the stock market, causing Intuitive's stock price to fall 11 percent by the close to $509.89.

85.     Commenting on the news of the FDA probe, Michael Matson, an analyst with Mizuho Securities in New York, said that a rise in adverse events was a concern because "patients would get scared."   "Part of what's driven this market is people seeking out robotic

---

[10] *Intuitive Surgical Robots Probed by U.S. in Surgeon Survey* (2), February 28, 2013, released at 18:14.

1   surgery – hospitals market it and the patients seem to think it's better."  Matson then concluded

2   that Intuitive's stock was likely going to remain under pressure until the Company could prove

3   that the safety worries were not significant.  *Id*.

4       86.    A further drop on March 5 resulted from related news being reported by

5   Bloomberg on the rise in incident reports, deaths related to da Vinci complications, and

6   allegations of product liability suits pending against the Company as related to complications

7   during robotic surgery.

8       **2.    First Quarter 2013 Results Were Impacted By The FDA
                Probe And Reclassification Of Serious Injuries**

9
10      87.    News of the FDA probe and the increase in serious injuries had an impact in the

11  number of da Vinci procedures in the first quarter ending March 31, 2013.  Analysts surmised

12  that this could happen.  A prior analyst report issued by Canaccord Genuity, dated March 18,

13  2013, revisited the negative headlines associated with Intuitive in the prior months, and

14  concluded that,

15          **the cadence of negative news** over the past several months has **increased the
            risk to ISRG's financial performance**….the pullback in ISRG's share price is
16          warranted given the real possibility, in our mind, that system sales and **procedure
            growth could be impacted** should hospital administrators delay purchasing the
17          robotic system in light of the aforementioned studies and negative press.

18      88.    When Intuitive announced first quarter results on April 18, 2013, "the cadence of

19  negative news" had begun to reduce the number of surgeries using da Vinci.  According to a JP

20  Morgan report dated April 19, 2013, "results were decidedly mixed … [with] the all-important

21  procedure growth number falling short."   JP Morgan also highlighted the importance of

22  procedure growth, stating, "[w]e have consistently argued that procedure growth is the *key*

23  metric for investors, and are not changing our tune."  (emphasis in original).  Other analysts

24  reached the same conclusion.  A report by Leerink Swann that same day was titled, "Solid 1Q

25  Beat Overshadowed by Light Procedure Growth."

26      89.    Wall Street thus understood that, although Intuitive had performed well in terms

27  of revenues and profits in the first quarter of 2013, the future did not portend well given that the

28  use of da Vinci surgeries was stalling.  Indeed, before the end of the first quarter, Intuitive had

1   forecasted procedure growth for all of 2013 to range between 20 and 23 percent.   Procedures

2   during the first quarter had increased only by 18 percent.[11]   Investors agreed with the analysts'

3   dire assessment, causing Intuitive's stock price to drop $8.62 to $484.75 after the announcement.

4        90.     Guthart sought to minimize the negative news and the numerous questions from

5   analysts about the impact of the FDA probe and issues with da Vinci at the earnings conference

6   call that quarter held on April 18, 2013.   Guthart attempted to discredit the negative reports by

7   raising the specter of a conspiracy: "we are in the midst of a concerted effort by critics of robotic

8   surgery to challenge the benefit it brings to patients."   Guthart then effectively denied the validity

9   of safety concerns with da Vinci, further concealing the action the Company had taken to hide

10   the extent of the actual problems.   Guthart stated, "[w]e are confident that those who invest their

11   time in a serious review of the clinical literature on da Vinci will find ample evidence of the

12   benefit it brings to patients, surgeons, hospitals and the medical community at large."

13        91.     Despite Guthart's efforts to preempt the analysts' concerns, the first question on

14   the April 18th earnings call related to the impact of the da Vinci safety issues on the number of

15   procedures.   Evan Lodesen from JP Morgan asked Guthart, "Can you disaggregate the slowdown

16   in benign [hysterectomies] between the seasonal effects that you mentioned such as deductibles

17   and then also the more coordinated efforts that you talked with regards to the robot,

18   specifically?"   Guthart admitted that the negative news had impacted the number of procedures,

19   although he was not able to quantify it: "negative press has some hard-to-measure impact on

20   benign hysterectomy, although it doesn't appear to be large.   It's also probably not zero."

21        92.     Other analysts on the call made similar inquiries.   David Roman from Goldman

22   Sachs asked: "any sort of impact you have had from the recent noise in the marketplace, what is

23   your plan to start to stem that and then how long do you think it might take before we start to see

24   some positive returns from those efforts?"   Guthart responded that it was "hard" to assess.

25

---

26   [11]     Total procedures in 2012 had reached approximately 450,000 compared to about 360,000
27   and 278,000 in 2011 and 2010 respectively.   That represented procedure growth of almost 30%
     in 2011 and 25% in 2012.

28

93.     Amit Hazan, from SunTrust Robinson Humphrey, then asked directly about the FDA probe: "[d]o you know anything about the report [referring to the FDA survey] that might be coming out with what you might be anticipating?" Guthart said, "we have no – nothing to share on that front," stopping himself short of apparently saying "we have no information."

### 3.     The Form 483 Issued In May 2013 Documented Numerous Violations Including The Secret Recall Of Tip Covers In 2011

94.     Between April 1 and May 30, 2013, the FDA inspected Intuitive's headquarters in Sunnyvale, California.   The inspection was conducted under the supervision of FDA investigator, Mary R. Hole.  At the end of the inspection Ms. Hole issued a Form 483 addressed specifically to Defendant Guthart.  An FDA Form 483

> is issued to firm management at the conclusion of an inspection when an investigator(s) has **observed any conditions** that in their judgment **may constitute violations of the [FDCA]** and related Acts....The FDA Form 483 notifies the company's management of objectionable conditions.   At the conclusion of an inspection, the FDA Form 483 is presented and **discussed with the company's senior management**.[12]

95.     The FDA's Form 483 issued to Defendant Guthart on May 30, 2013, reported four observations ("Observation").   Each of these observations detailed a deficiency in Intuitive's FDA reporting practices, and Observation Four further detailed the Company's failure to properly address a design failure related to the Monopolar Scissors.

96.     **Observation One** documented four instances in which Intuitive had effectively conducted a secret recall, or in the regulatory language of the FDA, initiated a "correction or removal, conducted to reduce a risk to health posed by a device, [and] [had] not reported [it] in writing to the FDA."   The first instance was described as follows:

> (i)     On 10/10/2011, Intuitive Surgical, Inc. sent out a letter to da Vinci clients with suggestions and recommendations for the proper use of instruments with **tip covers** for the correct generators that should be used with monopolar instruments.  This action was not reported to the San Francisco District Recall Coordinator.

---

[12] *See* http://www.fda.gov/ICECI/EnforcementActions/ucm250720.htm; http://www.fda.gov/ICECI/EnforcementActions/ucm256377.htm.

This recall of the Tip Covers by Intuitive had been a direct response to "**complaints and MDRs for arcing through damaged tip covers that caused patient injury**." The Form 483 further observed that Intuitive's recall had been in response to 134 complaints, of which 82 resulted in MDRs related to Tip Cover issues.

97. **Observation One** included three additional instances in which Intuitive had effectively conducted a secret recall:

(ii)     On 10/13/2011, Intuitive Surgical, Inc. sent out a letter notifying da Vinci clients that the da Vinci surgical systems are not cleared for thyroidectomy indication. This **action was not reported** to the San Francisco Recall Coordinator. The thyroidectomy indication was promoted by Intuitive Surgical, Inc….Between July 2009 and October 2011, Intuitive Surgical received 13 complaints and filed 5 MDRs related to thyroidectomies performed with the da Vinci system.

(iii)     On 10/17/2011, Intuitive Surgical, Inc. sent out a letter to da Vinci clients with information for inspecting instrument cannulas, proper flushing instruments, and the proper transportation of the da Vinci between buildings. This **action was not reported** to the San Francisco Recall Coordinator….some of these issues have been previously identified as root causes in other complaints that gave rise to MDRs (for example, damage to the integrity of a tip cover due to defective cannulas was identified as one of the root causes for arcing that resulted in patient injuries). As such these issues represent a risk to the health of patients.

(iv)     On 01/24/2013, Intuitive Surgical, Inc. sent out a letter and [a new User Manual Addendum for Transoral Surgery,] (TORS)….the new version [of the manual] warns that da Vinci TORS surgery is not indicated for pediatric patients, therefore the vagueness in the previous version [of the manual] represented a health risk to pediatric patients. (*See* Ex. B at 1-2, attached hereto).

98. **Observation Two** documented an instance in which Intuitive had misleadingly represented to the FDA its "corrective actions" as voluntary, while concealing that they had been the result of adverse event reports. In October 2011, Intuitive withdrew the recommendation that da Vinci be used to conduct thyroidectomies without informing the FDA. Once the FDA began the April-May 2013 inspection, however, Intuitive quickly sought to cover its tracks by reporting the withdrawal of the indication on April 11, 2013. But this belated report, more than 18 months after the fact and prompted by the on-site inspection, was also misleading. The April 2013 report sought to portray the withdrawal as *sua sponte* while concealing that the withdrawal had occurred only after receipt of at least five MDRs and over a dozen complaints.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 5:13-cv-01920-EJD                                                                                          - 33 -

Specifically, Intuitive Surgical, Inc. **failed to report** that there were 5 MDRs associated with the field action taken on 10/13/2011 (Thyroidectomy indication withdrawal).  The 806 report … that was supplied to the San Francisco District Coordinator on 4/11/2013 indicated 0 MDRs….During my inspection of Intuitive Surgical, Inc. 5 MDRs were represented as related to this correction.

99.   **Observation Three** documented that Intuitive had concealed the initial decision to market da Vinci for thyroidectomies.  Intuitive sent a "letter to file" instead of submitting a new premarket notification [510(k)], as required by 21 CFR 807.81(a)(3)(ii) for a major change or modification in the intended use of the device.  Defendants profited from uncleared da Vinci thyroidectomies for more than two years, between July 2009 and October 2011.

Specifically, Intuitive Surgical, Inc. **did not document** the decision to add a thyroidectomy indication to the da Vinci system general laparoscopy clearance 510(k) No. K990144 through Letter to File rather than through the submission of a new 510(k) application.

100.   **Observation Four** documented that Intuitive concealed an additional health risk created by the Monopolar Scissors.  "Intuitive … ha[d] received complaints of arcing of energized surgical instruments as a result of surgeons cleaning off instruments [inside the patient's body] by scraping them across other surgical instruments.  In the case of … the Monopolar [] Scissors … the scraping led to tears or holes in protective tip covers that led to arcing that in turn led to injuries to patients."  This knowledge and awareness of the surgeons' need to clean the instruments inside the patient's body created a duty to design a safe cleaning process, which Intuitive ignored.

### 4. Second Quarter 2013 Results Reflected The Full Blown Financial Impact Of The FDA Probe And da Vinci's Safety Concerns

101.   On July 8, 2013, Intuitive issued a press release pre-announcing second quarter results.  While Defendants had minimized the impact of da Vinci's safety concerns in the first quarter, they could no longer do so in the second quarter as the wheels came unhinged.  The financial results were dismal and the reported number of procedures using da Vinci continued to deteriorate despite prior statements that the first quarter slow down had been temporary.

102.   Revenues from da Vinci sales had declined six percent to $216 million in the second quarter of 2013, compared to $229 million in the same quarter in 2012.  Intuitive had sold

1    only 143 systems compared with 150 system in the second quarter of 2012, and 164 systems in

2    the first quarter of 2013.  And the number of procedures again grew only by 18 percent, so that,

3    after six months, Intuitive's projected growth of 20 to 23 percent was no longer feasible.

4         103.    The analyst reports reflected surprise at the unexpected nature and magnitude of

5    the decline.  JP Morgan's report of July 8 called it "shocking":  "The severity of the top line

6    [revenue] shortfall, with the company posting revenues of $575M vs. consensus of $630 million

7    [$622M JP Morgan] was shocking, and raises more questions than answers."

8         104.    Analysts also remained skeptical that the severe decline was due to the excuse

9    provided by Intuitive.  Intuitive claimed that the negative results were due to economic factors

10   and hospitals cutting capital expenditures, such as the purchase of da Vinci systems.  Morgan

11   Stanley's July 17, 2013 report evidences skepticism: "We are less convinced a material change

12   in the US CapEx [capital expenditure] environment explains the system shortfall in the quarter.

13   Our Q1 and Q2 surveys showed a declining interest in robotics and hesitance to purchase a da

14   Vinci despite a stable broader CapEx environment."  Put simply, hospitals were not reducing

15   expenditures.  They were just not buying da Vinci systems, and one of the reasons was the

16   "safety of robotic surgery," as Morgan Stanley explained in a subsection entitled, "A Review of

17   Recent Pressures on da Vinci Procedures."

18        105.    Canaccord's report dated July 9, 2013 expressed similar views: second quarter

19   "results usurped our most bearish scenario; represented ISRG's worst system performance (-6%

20   [year over year]) since the height of the financial crisis in [the third quarter of 2009]; and most

21   notably, exhibited a significant deviation from historic growth trends – ISRG had reported

22   system sales growth >15% for 9 consecutive quarters."

23        106.    Canaccord also no longer viewed the negative results as cyclical or due to

24   external factors, but systemic.  "What's more, the factors cited by ISRG for the systems miss

25   strike us as more systemic than isolated, thus could take longer to resolve, in our estimation."

26   Canaccord then noted that in the second quarter press release Intuitive had blamed "economic

27   pressures on hospitals which led to some deferred system purchases."  Like Morgan Stanley,

28

1    Canaccord remained skeptical.  "This [the claim that hospitals had cut back] comes just three

2    months after the company reported Q1/13 system sales that were quite strong (+24% Y/Y),

3    making the magnitude and speed with which this negative deviation from historical placement

4    growth trends unprecedented in the company's history….We expect management to provide

5    greater clarity on the factors impacting sales during the Q2 conference call on July 18, but for

6    now we are left with many more questions than answers."

7        107.    On this news, Intuitive's stock price suffered a severe blow.  It dropped $80.78

8    from $500.08 to $419.30, almost 20 percent.  Bloomberg reported that the Company's stock

9    price "**fell the most since 2008** after reporting preliminary results that missed analysts' estimates

10   as sales slowed for its surgical robots, which have faced **safety** and cost-efficiency questions."[13]

11                            **5.    The FDA Warning Letter**

12                            **a.    On July 16, 2013 The FDA Issued A Warning
                                     Letter To Intuitive**

13

14       108.    Intuitive's Form 483 escalated into a Warning Letter in record time, between the

15   end of the inspection on May 30 and July 16, when the FDA issued it.  The FDA Warning Letter

16   was addressed directly to Defendant Guthart.

17       109.    Pursuant to the FDA's Regulatory Procedures Manual ("RPM"), "**Warning**

18   **Letters are issued only for violations of regulatory significance**.  Significant violations are

19   those violations that may lead to enforcement action if not promptly and adequately corrected.  A

20   Warning Letter is the agency's principal means of achieving prompt voluntary compliance with

21   the FDCA."  RPM § 4-1-1.  Accordingly, Warning Letters establish that a violation of the FDCA

22   has occurred.  Importantly, "**[r]esponsible officials in positions of authority** in regulated firms

23   have a legal duty to implement whatever measures are necessary to ensure that their products,

24   practices, processes, or other activities comply with the law.  Under the law, such individuals **are**

25   **presumed to be fully aware of their responsibilities**."  *Id.*

26   _____

27   [13] *Intuitive Surgical Declines on Falling da Vinci Robot's Drop in Sales* (2) issued July 9, 2013
     at 4:36 p.m.

28

110.    The Agency issued the FDA Warning Letter after it received Intuitive's response on June 7, 2013 to the Form 483.  The FDA found that the June 7 response was "incomplete and inadequate," and reached significant findings and conclusions.

111.    First, the FDA Warning Letter concluded that the Tip Cover Accessory and Cannula 8mm Regular were "misbranded devices" under § 502(t)(2) of the FDCA, 21 U.S.C. 352(t)(2).  Intuitive had "failed or **refused to furnish** material or information respecting the device."  This referred to Intuitive's failure to notify the FDA of the changes to the Tip Covers and Cannulas set forth in Observation One of Form 483.

112.    Second, and most importantly, the FDA determined that the four unreported corrections in Observation One of the Form 483 in which Intuitive had concealed changes to the Tip Covers and other procedures from the FDA constituted "Class II recall[s]."  In each of the four instances the FDA Warning Letter stated: "Your report of this recall on April 19, 2013 has been classified by [the] FDA as a Class II recall."  Accordingly, the FDA had determined that Intuitive had carried out four secret recalls, which the Company concealed during the Class Period, including recalling the Tip Covers.

113.    The FDA Warning Letter further explained that Intuitive's belated excuse for not reporting the recalls was unacceptable.  Intuitive claimed that it had changed an internal standard operating procedure so that "corrections, removals and labeling reiterations" (as Intuitive carried out here with respect to the Tip Covers) would be reported to the FDA local district director "**or 3rd party expert**."  This 3rd party expert option was nothing but a subterfuge.  According to the FDA Warning Letter, such an option made it impossible for the FDA to evaluate the information to be provided to the FDA because that option allowed for no information at all to be reported and did not explain Intuitive's basis for choosing between informing the FDA and the supposedly "3rd party expert."

114.    Third, regarding Intuitive's failure to report these four corrections and removals, the FDA Warning Letter added, "[t]**he FDA has previously informed you of your firm's correction and removal violations** in an untitled letter dated February 19, 2008, and FDA 483

1    Inspectional Observations issued on December 20, 2002."  In saying this, the FDA confirmed

2    that failing to report corrections and removals was an ongoing, unsolved issue with Intuitive.

3           115.    Fourth, the FDA Warning Letter found that Intuitive's devices were adulterated

4    under § 501(h) of the FDCA, 21 U.S.C. § 351(h), because Intuitive had failed to fully implement

5    the Quality System regulation regarding Design Control, as required by 21 C.F.R. § 820.30.

6    Specifically, Intuitive knew "of patient injuries" concerning the Monopolar Scissors that required

7    changes to the design of the Tip Covers and Cannulas but completely ignored those injuries and

8    did nothing.  The FDA Warning Letter added, "you informed our investigator that you are **aware**

9    **of patient injuries** associated with intraoperative cleaning of energized instruments such as

10   Monopolar Curved Scissors and Fenestrated Bipolar Scissors evidenced by at least [redacted]

11   complaints and 82 MDRs during calendar years 2010 and 2011, and 15% of the MDRs reviewed

12   by our investigator.   You also informed our investigator that you are aware that cleaning

13   instruments inside patients during surgery is a common practice and have included a label

14   warning in the Instructions-for-Use (IFU) against the practice.  **When our investigator asked**

15   **you to provide the design input documentation and design resolution of this known user**

16   **need you failed to provide the requested documentation**."

17          116.    Intuitive failed to provide the "design input documentation" and "design

18   resolution" to the FDA because it had not even attempted to fix the actual design defect and had

19   limited itself to merely adding a label warning in the IFU.  This "fix" shifted the burden for

20   preventing device related injuries to Intuitive's customers (*i.e.*, surgeons), instead of providing an

21   adequately designed product that would not fail.  It depended on the surgeon reading the changes

22   and adequately modifying their behavior while the problematic devices continued to be

23   distributed.  Intuitive stated that they had adequately considered the cleaning requirement and the

24   risks without going through the design control process.  However, failing to properly determine

25   the root cause of the problem by not following the design control process resulted in continued

26   failure of the device with resulting injuries.  The FDA concluded that this was "inadequate."

27

28

117.   The term inadequate does not sufficiently describe the number and importance of FDA design control regulations that Intuitive violated.   Regulations over the design process required Intuitive to institute procedures "to ensure that the design requirements relating to a device are appropriate and address the **intended use of the device**, **including the needs of the user and patient**." 21 C.F.R. § 820.30(c).   In this case, surgeons needed to clean the accumulated debris off of the Tip Covers during surgery without removing them from the patient.   This recognized need is referred to in the regulations as "design input."   The FDA Warning Letter concluded that Intuitive had never even attempted to address the problem, having never documented the design input.

118.   Failing to even document the design input, Intuitive never continued with the subsequent requisite design process and was thus unable to show the FDA the appropriate "design resolution" documentation.   Under FDA regulations, had Intuitive identified and documented the design input, it would then have had to translate it into a "design output," 21 C.F.R. § 820.30(d).   If the "user need" consisted of cleaning the Monopolar Scissors intraoperatively, as in this instance, then the design output required Intuitive to institute a procedure or a redesign of the equipment to clean intraoperatively without damaging the protective covering in order to prevent arcing.

119.   After implementing a design output, Intuitive was required to document the "design verification," whereby Intuitive would have had to confirm that the design output met the design input requirements. 21 C.F.R. § 820.30(f).   In this instance, if the design input constituted the surgeons' need to clean the Tip Covers, then Intuitive was required to design a fix to the problem that allowed for cleaning the Tip Covers without causing arcing – the design output.   And after verifying the design, Intuitive was required to validate that the Tip Covers worked, *i.e.,* validate that the Tip Covers "conformed to defined user needs and intended uses," or intraoperative cleaning.  21 C.F.R. § 820.30(g) ("design validation").

120.   Intuitive ignored all of these design regulations rendering the Tip Cover Accessory and Cannula 8mm Regular "adulterated devices."   The FDA Warning Letter

admonished that the "**Tip Cover Accessory and Cannula 8mm Regular are adulterated devices** under section 501(h) of the Act, 21 U.S.C. § 351(h), in that the methods used in, or the facilities or controls used for its manufacture, packing, storage, or installation are not in conformity with the Current Good Manufacturing Practice (CGMP) requirements for devices which are set forth in the Quality System regulation," 21 C.F.R. § 820.

121.    The FDA Warning Letter concluded with a stern admonition that the issues identified were not an all-inclusive list.  "Finally, you should know that this letter is not intended to be an all-inclusive list of the violations at your firm's facilities."  The letter further warned that the issues identified could be "symptomatic of serious problems."  "The specific violations noted in this letter and in the Inspectional Observation, FDA 483, issued at the close of the inspection may be symptomatic of serious problems in your firm's manufacturing and quality management systems.  Your firm should investigate and determine the causes of the violations, and take prompt actions to correct the violations and bring the products into compliance."

### b.    The FDA Warning Letter Caused A Sharp Decline In Intuitive's Stock Price

122.    After the July 8 press release announcing preliminary financial results for the second quarter, analysts did not expect any surprises in Intuitive's earnings conference call on July 18 after the market close.  "Due to preannouncement, there should be no surprises in 2Q13 results," said Janney Capital Market's report of July 18.  Yet, there was.  Guthart disclosed that Intuitive had received an FDA Warning Letter.

123.    JP Morgan's July 19 report characterized the confluence of events resulting in the FDA Warning Letter as a "Perfect Storm."  Likewise, an analyst report by Trefis that day said, the "company was dealt another blow in the form of a FDA warning letter, which could hinder approval of new products/procedures going forward."  "The warning letter from the FDA will only worsen conditions as it will make it harder for the company to sell the system," it continued.

124.    A subsequent Bloomberg headline that day also focused on Intuitive's lack of candor with the FDA: "Intuitive Reeling as FDA Cites Lack of Visibility on Problems."  It then summed up the situation, stating: "Intuitive … has lost about $6 billion in value over five months

1   after **disclosures about adverse events** with its products, a recent recall, and now, **a regulatory**

2   **warning it hasn't adequately reported on issues concerning the devices**."   In addition, a

3   "**review of Food and Drug Administration records now shows the reports of injuries**

4   **involving robot procedures have doubled in the first six months of 2013, compared with a**

5   **year earlier**."

6      125.    Intuitive's stock price declined by $28.81 on July 19 to close at $392.67.  It had

7   not dropped below $400 since October 2011, before the beginning of the Class Period.

8   Bloomberg's headline on July 20 said it all: "Intuitive Surgical Declines On Warning Letter

9   From FDA."  The article focused on Intuitive's FDA reporting violations:  "FDA inspections in

10  April and May found a number of deficiencies, **including that the [Sunnyvale, California-**

11  **based] company in some cases hadn't adequately reported device corrections and patient**

12  **adverse events**."

13     126.    A review of the MAUDE database actually reveals that it is far worse than

14  Bloomberg reported.  For the prior 12 years, from 2000-2012, there were 5,333 da Vinci- related

15  MDRs filed.  This number has dramatically grown to over 8,450 MDRs, after a staggering 3,117

16  da Vinci related MDRs were filed with the FDA in the nine months from January 1, 2013 to

17  September 30, 2013 alone.  With an average rate of over 400 MDRs a month filed during the

18  first seven months of 2013, this is more than five times higher than any prior period since da

19  Vinci was introduced.   Until recently, this staggering increase in reported da Vinci-related

20  defects, patient injuries, and deaths in 2013 alone—in comparison to the prior 12 years—was

21  hidden by Intuitive through its dramatic underreporting of MDRs.

22     **V.      ADDITIONAL EVIDENCE OF SCIENTER**

23        **A.    The Individual Defendants' Stock Sales During The Class**
            **Period Were Highly Unusual And Suspicious**
24

25     127.    Each of the Individual Defendants engaged in stock sales during the Class Period

   that were suspiciously timed and dramatically out of line with their prior trading practices.  As a
26
   result of these Class Period trades, the Individual Defendants profited from the artificial inflation
27
   embedded in the trading price of Intuitive stock caused by their false and misleading statements
28

1    and omissions to investors during the Class Period.  Many of these insider sales occurred

2    immediately after the Company's undisclosed discussions with the FDA in September 2012

3    regarding reporting requirements, as detailed above.  Many other sales took place in late January

4    2013, just before the first Corrective Disclosures, while Intuitive stock was trading near Class

5    Period highs, and shortly before substantial declines in the price of the stock.

### 1.    The Value And Amount Were Highly Unusual

7    128.    The Class Period sales of Intuitive stock by Defendants Guthart, Mohr, and Smith

8    were highly unusual and suspicious as measured by (i) the total amount and percentage of shares

9    sold, (ii) the contrast with the Individual Defendants' own prior trading history, and (iii) the

10   timing of the sales.  Such sales therefore raise a strong inference of scienter.

11   129.    To evaluate the Individual Defendants' selling activity, Plaintiffs used the

12   publicly-available trading data that the Individual Defendants are required to report to the SEC

13   on Form 4.  Plaintiffs analyzed the trading by the Individual Defendants during the Class Period

14   and during the equal-length period immediately preceding the Class Period beginning August 26,

15   2010 and ending February 5, 2012 (the "Control Period").  The Form 4s filed during the Class

16   Period and Control Period are hereby incorporated by reference, and a summary of the relevant

17   transactions are set forth in Exhibit E, annexed hereto.

18   130.    To analyze the Individual Defendants' sales, Plaintiffs calculated the total sales by

19   each of the Individual Defendants, together with the cash proceeds from such sales, during the

20   Control and Class Periods.  Those totals were then compared to identify whether Individual

21   Defendant's sales during the Class Period were consistent with their sales during the Control

22   Period.  The Individual Defendants' specific trading dates were also evaluated compared to

23   Corrective Disclosure dates.  All of these analyses reveal that the Individual Defendants' Class

24   Period sales were extremely large, highly unusual, and suspicious.

### a.    The Nominal Amount And Percentage Of Holdings Sold Were Extraordinary

27   131.    The amount and percentage of shares sold during the Class Period by Defendants

28   Mohr, Guthart, and Smith were extraordinarily large.  Defendant Smith's sales during the Class

Period totaled **$100,068,631**, which represented approximately 40% of the total shares he had available for sale during the Class Period.  Defendant Mohr sold 27,400 shares during the Class Period.  He held 1,191 shares at the beginning of the Class Period and 1,242 shares at the end of the Class Period.   Hence, his Class Period sales of 27,400 shares represent approximately **16 times** his average shareholdings.  Mohr practically sold every share that he acquired during the Class Period for proceeds of **$15,274,248**.  Defendant Guthart's sales during the Class Period totaled **$8,743,264**, representing approximately **30%** of the total shares he had available for sale during the Class Period.

### b.     The Stock Sales Were Inconsistent With Prior Trading Practices

132.     The Individual Defendants' Class Period stock sales were not only large in absolute terms, but also inconsistent with the Individual Defendants' own prior selling activity during the Control Period.

133.     Collectively, the Individual Defendants increased their stock sales approximately **three-fold**, from 78,000 shares to more than 230,000 shares.   Separately, each Individual Defendant's sales also increased sharply.  During the Control Period, Defendant Guthart did not sell **a single share** of Company stock.  Yet he sold approximately 16,000 shares, or **one-third** of his entire Intuitive holdings, during the Class Period.  This is an infinite increase over the Control Period.   Defendant Smith more than tripled his sales, from 62,000 to nearly 190,000 shares.  Defendant Mohr's share volume also increased significantly, from 16,000 shares sold during the Control Period to over 27,000 during the Class Period.

134.     The contrast between the Individual Defendants' sales during the Control Period and the Class Period is also striking when measured in dollars.  Collectively, the Individual Defendants' sales increased more than **four-fold** during the Class Period, from approximately $29 million during the Control Period to over $124 million during the Class Period.

135.     Separately, each of the Individual Defendant's individual sales, as measured in dollars, also increased dramatically.  As noted, Defendant Guthart did not sell any shares during the Control Period, in comparison to the nearly $9 million worth of stock that he sold during the

Class Period.  Defendant Smith's trading also increased exponentially, more than **quadrupling** from $23 million during the Control Period to $100 million during the Class Period.   And Defendant Mohr's individual sales **more than doubled** during the Class Period, from $6 million during the Control Period to over $15 million during the Class Period.

**c.      The Timing Of The Stock Sales Was Suspicious**

136.    The Individual Defendants' sales of stock were suspiciously timed in large measure because they sold a vast number of shares after they learned of materially adverse information but before the public disclosure of that same adverse information.

137.    All three Individual Defendants sold massive amounts of stock immediately after the September 2012 meeting with the FDA, which required the Company to begin reporting a substantial increase in MDRs.  Between late October and early December 2012 the Individual Defendants sold an extraordinary sum that exceeded $70 million.  Defendant Smith sold more than 125,000 shares of Intuitive common stock for almost $70 million on no fewer than eight occasions.  Importantly, **none** of these trades were made pursuant to Defendant Smith's 10b5-1 Plan, as discussed further below.  In late October, Defendants Guthart and Mohr sold 4,500 and 7,300 shares, respectively, reaping proceeds of approximately $2.4 and $3.9 million, respectively.  The Individual Defendants thus sold and profited before the impact of the new MDR reporting requirements would be made public and would negatively impact the stock price, as it ultimately did towards the end of the Class Period.

138.    Defendants Guthart and Mohr also sold shares immediately after Intuitive learned of the FDA safety probe on or before January 18, 2013, but before the FDA probe became public.  Defendant Guthart sold 4,500 shares on January 25, 2013, when Intuitive stock was trading at $577.82 per share.  Guthart's sale occurred only 34 days prior to the first Corrective Disclosure date of February 28, 2013, upon which the Company's share price tumbled $63.63 to $509.89.  Defendant Mohr sold around the same time as Defendant Guthart, divesting himself of 8,000 shares on January 28, 2013.  At that time Intuitive stock was trading for $577.93 per share.  Suspiciously, after trading consistently throughout the Class Period, these January 2013

1  transactions by Defendants Guthart and Mohr constituted their final sales of the Class Period and

2  were executed at historic highs.

3      139.    These January 2013 sales are also suspicious because they took place within one

4  trading day of each other, apparently in concert, given the Individual Defendants' regular contact

5  and shared knowledge of undisclosed material information about the Company.  Only three days

6  later, on February 1, 2013, Smith modified his 10b5-1 Plan, as discussed further below.

7  Accordingly, the proximity in time of the last sales by Defendants Guthart and Mohr with the

8  modification by Smith of his 10b5-1 Plan raises a strong inference that they acted in concert and

9  discussed the transactions.

10              **2.    The Stock Sales Generated Enormous Abnormal Profits**

11      140.    Plaintiffs also analyzed whether the Individual Defendants' sales of Intuitive

12  stock during the Class Period generated abnormal (above-average) profits as compared to the

13  Control Period.  Defendants did generate abnormal profits from their stock sales during that time,

14  further suggesting suspicious trading activity that raises a strong inference of scienter.

15      141.    Plaintiffs evaluated abnormal profits by using an event study methodology called

16  the "market-model method," which computes cumulative shareholder returns not explained by

17  the market.  Under this approach, first, a prior period is used to estimate the relation between

18  Intuitive stock and the market index.  Next, this relation is used to estimate the abnormal profits

19  during the relevant Period.  To consider a simple example of the analysis, assume that the

20  sensitivity of Intuitive stock to market index is one (beta is one).  In that case, if an insider buys a

21  share of Intuitive stock, which then increases in price from $100 to $120 (20%), and the market

22  index increases from 1000 to 1010 (1%) during the same period, then the abnormal profit would

23  be 19%.  Similarly, if a company's stock price declines subsequent to a sale by a greater amount

24  than the relevant benchmark index, then the sale enabled the insider to generate an abnormal

25  profit by avoiding the decline.  This methodology is widely-accepted, having been used

26  extensively in academic literature studying the profitability of insider trading.  *See, e.g.*, Fishe,

27  R.P.H. and M.A. Robe, "The Impact of Illegal Insider Trading in Dealer and Specialist Markets:

28

Evidence from a Natural Experiment," Journal of Financial Economics 71, 461-488 (2004). Abnormal profits were calculated using a value-weight index of NYSE, AMEX, and NASDAQ stocks as the market index during the Control Period and Class Period.

142.   To determine whether the unusual profits were the result of random chance, Plaintiffs used equally-rated prediction errors from the market-model method for the 250 trading days before (approximately one year) and the 250 trading days after the day of the trade, and then Plaintiffs equally averaged these residuals across event days for each Individual Defendant. This data was then used to compute a t-statistic to infer the probability that the observed cumulative abnormal profits were due to random chance.

143.   Applying this methodology, it is clear that the Individual Defendants each generated extremely large abnormal profits on their transactions in Intuitive stock during the Class Period, particularly when compared to their trading behavior during the Control Period, as reflected in the following charts:



1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27
28



144.     As shown above, based on the timing of the Individual Defendants' Class Period trades, (i) Mohr generated average annual returns that exceeded the benchmark index by more than **62%** after about one year, (ii) Guthart's profits exceeded the benchmark by more than **81%** after about one year, (iii) and Smith's trades delivered abnormal annual profits of **108%** after about one year.  Further, using the market-model method described above, it is clear that the possibility that these abnormal profits resulted from random chance is extremely remote: the probability of these profits occurring randomly is less than one percent for Defendants Guthart and Smith and less than five percent for Defendant Mohr.  The results are therefore strongly statistically significant.

145.     Collectively, all three Individual Defendants' trades delivered abnormal profits in excess of **76%** after about one year.  The timing and extent of these abnormal profits, as well as the contrast between Control Period and Class Period trades, are reflected graphically in the chart below.  Again, the chart compares trades for the Control and Class Periods for the Individual Defendants, and depicts cumulative abnormal profit (or loss) on all trades occurring during each period, calculated daily for one to 250 days following the day of trade.  As reflected in the chart below, trades during the Class Period immediately generated abnormal profits, demonstrating them to be extraordinarily well-timed and therefore highly suspicious, particularly when compared to the lack of abnormal profits generated during the Control Period.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



### 3.    The Timing Of The 10b5-1 Plans Adopted By The Individual Defendants During The Class Period Is Suspicious

146.    Rule 10b5-1, 17 C.F.R. § 240.10b5-1 provides that a person will be deemed to have traded "on the basis of" material nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.    To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 Plans" or "Plans").    *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, at 51,727-28 (Aug. 24, 2000). Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability **only** if it is entered into by an insider "**[b]efore becoming aware**" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

147.    Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as

1   to a person's good faith."   Thomson West, Corporate Counsel's Guide to Insider Trading and

2   Reporting § 12:26 (2006).   Conversely, the adoption and/or modification of these Plans while in

3   possession of material non-public information is highly suspicious and supports a strong

4   inference of scienter.

5          148.    Although some of the Individual Defendants' stock sales were made pursuant to

6   10b5-1 Plans, the circumstances of those sales are sufficiently suspicious to overwhelm any

7   exculpatory inference that might otherwise have been available to pre-planned sales based on

8   such Plans.   For example, while all of Defendant Guthart's trades during the Class Period were

9   made pursuant to a 10b5-1 Plan, that plan was enacted on March 13, 2012, over a month into the

10  Class Period, and at a time when Defendant Guthart was already in possession of material, non-

11  public information, as alleged herein.   In these circumstances, Defendant Guthart's trades

12  according to a 10b5-1 Plan are highly suspicious and indicative of insider trading behavior.

13         149.    Defendant Mohr's trading suffers from the same deficiency as Defendant

14  Guthart's records.   Defendant Mohr also executed a 10b5-1 Plan after the beginning of the Class

15  Period, on March 13, 2012 (which he amended the next day, on March 14, 2012).   Defendant

16  Guthart's and Mohr's coordinated activity – entering 10b5-1 Plans on exactly the same day

17  during the Class Period, as well as their synchronized trading as discussed above – is further

18  suggestive of suspicious trading activity.

19         150.    Defendant Smith's behavior also appears to have been part of the Individual

20  Defendants' concerted effort to take advantage of their inside information.   Defendant Smith

21  enacted a 10b5-1 Plan only days prior to Defendants Guthart and Mohr, on March 8, 2012,

22  approximately a month after the beginning of the Class Period, and transacted according to the

23  plan on April 20, 2012, July 24, 2012, and October 22, 2012.   As if the enactment of a 10b5-1

24  Plan **after** the start of the Class Period were not suspicious enough, Defendant Smith's trading

25  evidences two other peculiarities: (i) the majority of Defendant Smith's Class Period transactions

26  were **not** pursuant to his 10b5-1 Plan, and in fact those transactions correspond with the FDA's

27

28

1   investigation of Intuitive, as discussed above, and (ii) Defendant Smith modified his 10b5-1 Plan

2   later in the Class Period, on February 1, 2013 (pursuant to which he then sold additional shares).

3         151.    Casting further doubt, none of the Individual Defendants traded later in the Class

4   Period once the Corrective Disclosures came out and Intuitive's stock price started to drop.  This

5   suggests that each Individual Defendant chose to suspend his 10b5-1 Plan to avoid selling at

6   lower prices, after having taken advantage of the Plan to sell stock earlier for higher returns.

7   This manipulation epitomizes the behavior that has prompted regulators to call into question the

8   ethics of these Plans.

9         152.    Indeed, even if the Individual Defendants had entered into 10b5-1 Plans prior to

10   the Class Period and traded within them consistently throughout the Class Period, such plans are

11   under heavy SEC scrutiny in light of a recent *Wall Street Journal* investigation that found that

12   insiders who were trading pursuant to 10b5-1 Plans were still trading at opportune times and

13   reaping better-than-expected results.  According to the November 27, 2012 *Wall Street Journal*

14   article entitled "Executives' Good Luck in Trading Own Stock," executives trading pursuant to

15   10b5-1 Plans are still able to time their trades to avoid losses and increase earnings because

16   trading plans are not public and can be canceled or amended at any time without disclosure.

17         153.    Accordingly, the Individual Defendants' behavior in entering into Class Period

18   Plans, and in some circumstances modifying those Plans or trading outside them, as well as their

19   apparent decisions to suspend their Plans upon the decline of the Company's stock price, further

20   raises a strong inference of suspicious and unusual trading activity.

21            **B.**     **Defendants Knew, Or Were Deliberately Reckless In Not**
                     **Knowing, That Intuitive Had Been Violating FDA Regulations**

22

23         154.    Defendants knew, or were deliberately reckless in not knowing, of Intuitive's

24   FDA violations and the continuous nature of the violations cited herein.  Indeed, the FDA

   reported in its July 2013 FDA Warning Letter to Defendant Guthart and Intuitive:

25

26        The FDA has previously informed you of your firm's correction and removal
           violations in an untitled letter dated February 19, 2008, and FDA 483 Inspection
           Observations issued on December 20, 2002.

27

28

155.   The February 19, 2008, "untitled letter" referenced in the FDA Warning Letter (the "2008 Untitled Letter") was addressed to Defendant Smith.   The FDA issues Untitled Letters to companies for violations of the FDCA.   The letter provides companies with an opportunity to take voluntary and prompt action to correct the violation before FDA initiates an enforcement action.   The FDA will issue either a Warning Letter or an Untitled Letter, depending upon the nature of the violation.[14]

156.   The 2008 Untitled Letter cited Intuitive for its "[f]ailure to submit a written report to FDA within 10 working days of any correction or removal of a device if the correction or removal was initiated to reduce the risk to health posed by the device or to remedy a violation of the act which may present a health risk," including:

(a)     Intuitive's **failure to properly report** to the FDA the removal of a cautery instrument as a "Class II [r]ecall"; and

(b)     Intuitive's **failure to properly report** a field correction of all da Vinci units manufactured from May 2005 through March 2006, also classified by the FDA as a "Class II [r]ecall."

157.   The FDA also took the opportunity in the FDA Untitled Letter to remind Defendant Smith and Intuitive that the Agency had previously informed them of correction and removal violations in the December 20, 2002 Form 483 (the "2002 Form 483").   The 2002 Form 483, addressed to Defendant Smith, cited the Company for "four unreported field corrections and removals."   In addition, it specifically noted that Intuitive had not documented any "justification for not reporting to the agency," and that "[m]anagement reviews [did] not ensure that the quality system satisfie[d] the requirements of part 820," which governs Intuitive's obligation to ensure that a device is designed to meet user requirements.

158.   Separately, but equally significant, the 2002 Form 483 cited Intuitive for failing to implement "[c]omplaint handling procedures for receiving, reviewing, and evaluating

---

[14] *See* http://www.fda.gov/AboutFDA/Transparency/TransparencyInitiative/ucm284105.htm.

complaints."  The 2002 Form 483 observed that Intuitive was turning a blind eye to problems with da Vinci even then:  "Of eleven complaints I reviewed at least five Case Report Forms do not indicate the date of the event being complained about, even though this information is available in two written complaints received from complainants and should have been available from three incidents where a company representative was present at the event."

159.    Together, the 2002 Form 483 and the 2008 Untitled Letter therefore demonstrate that Defendants, including Defendant Smith, knew of Intuitive's precise regulatory violations during the Class Period, including: (i) secretly issuing Class II Recalls without properly reporting those corrections to the FDA (21 C.F.R. § 806.10); and (ii) failing to report, or timely report, complaints or reports of adverse events through the MDR mechanism (21 C.F.R. § 803.50). Defendants' systematic and unresolved misconduct over the years and throughout the Class Period concerning these regulatory violations raises a strong inference of scienter.

160.    This strong inference is further supported by the FDA's own language concerning Form 483s and Warning Letters:

(a)    "The FDA Form 483 **notifies the company's management of objectionable conditions**.  **At the conclusion of an inspection, the FDA Form 483 is** presented and **discussed with the company's senior management**" (¶ 94); and

(b)    "**Responsible officials in positions of authority** in regulated firms have a legal duty to implement whatever measures are necessary to ensure that their products, practices, processes, or other activities comply with the law.  **Under the law, such individuals are presumed to be fully aware of their responsibilities**."  RPM § 4-1-1.

161.    That the FDA considered Defendants Smith and Guthart to be the "responsible officials in positions of authority," pursuant to RPM § 4-1-1, is clear from the Agency's designation of Defendants Smith and Guthart as two of the FDA's primary Intuitive contacts.

162.    Over the last decade and through the Class Period, Defendants Smith and Guthart have been primary contacts for the FDA in communications with Intuitive concerning all regulatory matters, including (i) Form 483s, Warning Letters, and Untitled Letters; (ii) field

1    corrections, and (iii) instrument recalls.  For example, Defendant Guthart was the named

2    recipient of the July 16, 2013 FDA Warning Letter and the May 30, 2013 Form 483; and

3    Defendant Smith was the recipient of the 2008 Untitled Letter, the 2002 Form 483, and an April

4    12, 2001 Warning Letter.  Prior to the Class Period, both Defendants Smith and Guthart were

5    also copied on or were recipients/senders of the following correspondence with the FDA:

6    (i) March 13 and May 9, 2012, FDA letters to Defendant Guthart concerning recalls; (ii) a

7    February 11, 2011, FDA letter to Defendant Smith concerning a recall; (iii) a January 9, 2008,

8    Intuitive letter to the FDA, copying Defendants Smith and Guthart, concerning a field correction;

9    (iv) July 2 and November 20, 2007, FDA letters to Defendant Smith concerning recalls; and (v) a

10   February 14, 2007, Intuitive letter to the FDA, copying Defendant Guthart, concerning a recall.

11        163.    Indeed, Defendants Smith and Guthart have had a long tradition of being at the

12   forefront of all communications with the FDA, commencing with their participation in the open

13   session in the FDA's June 16, 1999 Medical Devices Advisory Committee when seeking initial

14   FDA clearance for da Vinci.

15            **C.    The Individual Defendants Monitored Reports Of Adverse
                      Events**

16

17        164.    The Defendants' knowledge of the rise in MDRs and adverse events is further

18   supported by a former Intuitive Financial Planning and Analysis Manager in Sales and

19   Marketing who worked at the Company from June 2006 until December 2012, reporting to

20   Calvin Darling, the Director of Financial Planning and Analysis (the "FP&A Manager").  The

21   FP&A Manager had access to adverse event reports as part of the vast array of analytical reports

22   under his responsibility.  In addition to the adverse reports that the FP&A Manager had access to,

23   he also created other reports.  His reports included forecasting and budgeting for the Sales and

24   Marketing team.

25        165.    The FP&A Manager frequently interacted with the Individual Defendants, in large

26   part, because he sat next to "executive row" – which included Smith, Guthart, Mohr, Mark

27   Meltzer (General Counsel) and Jim Alecxih (SVP, Sales – Americas/Australia).  Defendant

28   Guthart was three to four offices down from the FP&A Manager and they saw each other daily

1   once Defendant Guthart became CEO.  While Defendant Smith was CEO, the FP&A Manager

2   also saw him daily.  In fact, after the FP&A Manager drafted his reports he often personally

3   handed them to Defendants Guthart and Smith and observed them review the reports.  According

4   to the FP&A Manager, Defendants Guthart and Smith looked at the reports he created frequently,

5   which contained a lot of metrics regarding procedures per system.  He prepared these reports

6   weekly, monthly, and quarterly.

7         166.   In terms of the adverse event reports, the FP&A Manager confirmed that the

8   Company tracked adverse events and categories of adverse events, and compiled the data.  This

9   data was auto-emailed to Intuitive executives.  According to the FP&A Manager, Defendants

10   Smith and Guthart closely monitored reports of adverse events, including specific categories of

11   adverse events, discussed them frequently, and were able to recite the totals including ratios of

12   adverse events to the FP&A Manager.  Defendants Smith and Guthart monitored these adverse

13   event reports during the entire time of the FP&A Manager's employment at Intuitive.  The

14   adverse event data was one of the many data points that Intuitive closely monitored and

15   collected.  Intuitive was very data driven (especially Defendants Guthart and Smith), according

16   to the FP&A Manager, who described Defendant Guthart's management style as far from that of

17   an absentee landlord, and generally as an executive on top of everything at Intuitive.

18         167.   Intuitive's website confirms that the Company had instant access to data from

19   each da Vinci system on every procedure.  According to Intuitive's website, the latest da Vinci

20   model released in 2009 (da Vinci Si) had a system called "OnSite" that allowed Intuitive to

21   remotely monitor da Vinci in "real time," adding that "OnSite automatically upload[ed] system

22   logs to Intuitive Surgical following each procedure."  In effect, "OnSite" was the equivalent of

23   an airplane's "black box."  According to the FP&A Manager, Intuitive executives (including

24   Defendants Guthart, Smith and Mohr) received reports that reflected the information obtained

25   from OnSite.

26         168.   As part of his responsibilities, the FP&A Manager also participated in meetings

27   with each Individual Defendant at which adverse events were discussed during his tenure at

28

1    Intuitive.  Specifically, he attended quarterly meetings with Guthart and Smith, where adverse

2    events were discussed.  He also attended quarterly financial "close meetings," attended by

3    participants, including Defendant Mohr, where different departments within Intuitive discussed

4    their end of the quarter financial results.  Adverse events were discussed at some of these

5    quarterly financial "close meetings."

6    169.    Defendants Guthart and Mohr also attended week-long national sales meetings,

7    which occurred every six months.  Adverse events were discussed at the sales meetings.

8    Defendants Guthart and Mohr were present during these discussions.  The last sales meeting that

9    the FP&A Manager attended was in July 2012.

10   **D.      Imputed Knowledge of Facts Critical To Core Operations**

11   170.    Each of the Individual Defendants was a top executive involved in Intuitive's

12   daily operations and with access to all material information regarding the Company's core

13   operations (¶¶ 30-37).  Therefore, each of the Individual Defendants is presumed to have had

14   knowledge of all material facts regarding Intuitive's core da Vinci business.

15   171.    Here, Intuitive has one product: the da Vinci Surgical System, which generates

16   100% of its revenue. ¶ 40.  Given the centrality of da Vinci to Intuitive's operational and

17   financial success, the Individual Defendants knew and should have known that throughout the

18   Class Period that its only product contained known defects that compromised patient safety, and

19   that Defendants were systematically underreporting to the public and the FDA material

20   information regarding those defects and safety concerns in violation of critical FDA regulations.

21   **VI.     LOSS CAUSATION AND ECONOMIC LOSS**

22   172.    During the Class Period, as detailed herein, Defendants engaged in a course of

23   conduct that artificially inflated the price of Intuitive common stock and operated as a fraud or

24   deceit on the Class Period purchases of Intuitive common stock by making materially false and

25   misleading statements and omissions concerning (i) the fact that Intuitive had been

26   systematically violating FDA reporting and other regulations and ignoring significant

27   objectionable conditions existing since at least 2010, as noted in the Form 483 and the FDA

28

1   Warning Letter issued to Intuitive, and (ii) the health risks and design defects in the da Vinci

2   device, that posed previously unknown safety concerns for the public.

3          173.    When Defendants' prior materially false and misleading statements and omissions

4   began to be disclosed and became known to the market, the price of Intuitive common stock

5   declined precipitously as the prior artificial inflation was removed from the price of Intuitive

6   common stock. As a result of their purchases of Intuitive common stock at artificially inflated

7   prices during the Class Period, Plaintiffs and other members of the Class suffered a substantial

8   economic loss (*i.e.*, damages under the federal securities laws) as the truth was revealed. For

9   purposes of alleging loss causation, the price decline in Intuitive common stock, as detailed

10   herein, was a direct result of the nature and extent of materially false and misleading statements

11   and omissions revealed to investors and the market, as follows:

12         174.   **On February 28, 2013**, five minutes before the market closed, Bloomberg

13   reported that the FDA had initiated a probe over the safety of Intuitive's products. According to

14   Bloomberg, regulators had commenced a survey of surgeons asking them to list any

15   complications they may have seen with Intuitive's robots, causing the stock price to immediately

16   drop by more than 10%. As reported by Marketwatch on the same day, Intuitive shares "plunged

17   by more than $63 a share, or 11% right before the close Thursday after Bloomberg News

18   published a report that said U.S. regulators were surveying doctors on the viability of the

19   company's robotic surgical tools."

20         (a)    Commenting on the FDA probe, Michael Matson, an analyst with Mizuho

21   Securities in New York, said that a rise in adverse event reports caused concern that "patients

22   would get scared." "Part of what's driven this market is people seeking out robotic surgery –

23   hospitals market it and the patients seem to think it's better," he added.[15] Matson then concluded

24   that Intuitive's stock was likely going to remain under pressure until the Company could prove

25   that the safety worries were not significant. *Id.*

26

27   [15] Bloomberg, *Intuitive Surgical Robots Probed by U.S. in Surgeon Survey* (2), February 28,
28   2013, released at 18:14.

1    (b)    Intuitive's common stock closing price fell from $573.52 on February 27,

2    2013 to $509.89 on February 28, 2013.  Trading volume exceeded 900,000 shares, more than

3    five times the prior day's volume of just over 168,000, and more than double the average daily

4    Class Period trading volume of approximately 400,000 shares.

5    175.  **On March 5, 2013**, another Bloomberg article entitled "Robosurgery Suits Detail

6    Injuries as Death Reports Rise" reported that incident reports sent to U.S. regulators linked the

7    da Vinci to at least 70 deaths since 2009.  The report lent credence to the allegations of product

8    liability suits pending against the Company, in particular that complications during robotic

9    surgery caused serious injuries and, in some cases, death.  Moreover, the article quoted a surgeon

10   at John Hopkins Hospital in Baltimore, Martin Makary, saying that he was concerned that some

11   complaints may not have been reaching the public because they were being kept quiet by

12   hospitals, which often had been using the machines as a draw to gain additional customers.  "No

13   one knows the numbers now," said Makary.  According to the Bloomberg article, at least one

14   product-liability lawsuit pending against Intuitive at the time alleged that da Vinci instruments

15   had insufficient insulation, which resulted in electrical burns.  The report also noted that as the

16   number of robotic surgery procedures increased, injury reports involving da Vinci had increased

17   from 24 in 2009 to at least 115 in 2012.

18   (a)    On the same day, an analyst at Janney Capital Markets issued a report

19   detailing Intuitive shares being under pressure as a result of "business journal articles

20   continue[ing] to harp on potential safety concerns on da Vinci."

21   (b)    Intuitive's share price dropped $22.78, approximately 3%, from a closing

22   price of $541.32 on March 4, 2013 to a closing price of $525.72 on March 5, 2013.  Trading

23   volume almost doubled from the prior day, as it exceeded one million shares, more than double

24   the average daily Class Period trading volume of approximately 400,000 shares.

25   176.  **On April 18, 2013**, Intuitive reported its 1Q 2013 financial results after the

26   market closed.  Intuitive reported procedure growth of 18%, below consensus expectations of

27   21%, and guided total 2013 procedure growth to the lower end of its range.

28

(a)     Analysts focused on the news concerning weak procedure growth in the first quarter of 2013.  As part of Leerink Swann's April 19th analyst report titled, "Solid 1Q Beat Overshadowed by Light Procedure Growth," analyst Richard Newitter reported, "light procedures and a more cautious 2013 procedure outlook could overshadow the strong 1Q performance—especially given recent negative press/journal articles/lawsuit attention that, in our view, have heightened investor sensitivity around da Vinci's utilization."  In reports dated April 19, 2013, other analysts also attributed the troubling lack of procedure growth to the recent "negative press," including Janney Capital Markets and Suntrust Robinson Humphrey.

(b)     Bloomberg Businessweek issued a headline on April 19, 2013 stating that, "Intuitive Surgical Slumps on da Vinci Growth."  The article reported that "Shares of Intuitive Surgical Inc. slumped Friday [April 19] after the company reported slower growth than expected in surgical procedures performed with its da Vinci robotic system."

(c)     Intuitive's common stock fell by $8.62, approximately 3%, from a closing price of $493.37 on April 18, 2013 to a closing price of $484.75 on April 19, on trading volume exceeding 1.5 million shares, approximately double the prior day's trading volume, almost four times the average daily Class Period trading volume of approximately 400,000 shares.

177.   **On July 8, 2013**, Intuitive reported preliminary 2Q 2013 financial results after the market closed.  Intuitive's preliminary Q2 2013 results fell well below expectations, reflected in part by weaker-than-expected da Vinci system sales.  Intuitive's announced revenue of $575 million was far short of the Street's $629.6 million projection and analysts' estimates of growth.

(a)     The new revelations about the financial results were described by Bloomberg as leading to the largest single day stock price decline "since 2008 after reporting preliminary results that missed analysts' estimates as sales slowed for its surgical robots, which have faced safety and cost-efficiency questions."  According to Bloomberg, the results caused at

1    least four analysts to initiate downgrades, including Raymond James, JMP Securities, Goldman

2    Sachs and Canaccord Genuity.[16]

3            (b)     Analyst reports reflected surprise at the unexpected nature of the

4    magnitude of the decline.  JP Morgan's report of July 8 called it "shocking":  "The severity of

5    the top line [revenue] shortfall, with the company posting revenues of $575M vs. consensus of

6    $630 million [$622M JP Morgan] was shocking, and raises more questions than answers."

7            (c)     Other analysts remained skeptical that the severe decline was due to

8    economic factors and hospitals cutting capital expenditures, such as the purchase of da Vinci

9    systems.    According to Morgan Stanley's July 17, 2013 report: "We are less convinced a

10   material change in the US CapEx [capital expenditure] environment explains the system shortfall

11   in the quarter.  Our Q1 and Q2 surveys showed a declining interest in robotics and hesitance to

12   purchase a da Vinci despite a stable broader CapEx environment."  Customers were simply not

13   buying da Vinci, and one of the reasons was the "safety of robotic surgery," as Morgan Stanley

14   explained in a subsection entitled, "A Review of Recent Pressures on da Vinci Procedures."

15           (d)     Similar views were expressed by Canaccord Genuity's report dated July 9,

16   2013, and entitled "Q2 Results Deviate Disconcertingly From Trend Line; Downgrade To Hold."

17   The Canaccord analysts reported second quarter "results usurped our most bearish scenario;

18   represented ISRG's worst system performance (-6% [year over year]) since the height of the

19   financial crisis in [Q3 2009]; and most notably, exhibited a significant deviation from historic

20   growth trends – ISRG had reported system sales growth >15% for 9 consecutive quarters."

21           (e)     Canaccord also no longer viewed the negative results as cyclical or due to

22   external factors, but systemic.  "What's more, the factors cited by ISRG for the systems miss

23   strike us as more systemic than isolated, thus could take longer to resolve, in our estimation."

24   Canaccord then noted that in the second quarter press release Intuitive had blamed "economic

25

26   _____

27   [16] Bloomberg, *Intuitive Surgical Falls on da Vinci's Robot's Drop in Sales* (2), July 9, 2013,
     issued at 16:36.

28

1    pressures on hospitals which led to some deferred system purchases."  Like Morgan Stanley,

2    Canaccord remained skeptical.  "This [the claim that hospitals had cut back] comes just three

3    months after the company reported Q1/13 system sales that were quite strong (+24% Y/Y),

4    making the magnitude and speed with which this negative deviation from historical placement

5    growth trends unprecedented in the company's history....We expect management to provide

6    greater clarity on the factors impacting sales during Q2 conference call on July 18, but for now

7    we are left with many more questions than answers."

8         (f)    The media was also skeptical about the Company's stated reasons for the

9    slowed da Vinci sales.  On July 9th, in response to Company statements claiming that the decline

10   in U.S. system sales was due to reduced hospital budgets, *Benzinga* reported that,

> [w]hat the company failed to mention were the lawsuits filed where patients alleged they were injured during surgeries with the device. It also failed to mention that U.S. regulators were surveying surgeons about the use of the system after 70 deaths were reported since 2009 and a rise in adverse events was reported in conjunction with the system.
>
> Then there are doctors who question the need for the machine. Robotic surgery costs significantly more than traditional surgeries and doctors point out that there is a lack of large-scales studies to prove the benefits of the system.
>
> **All of this** has caused the stock to plummet more than 17 percent in early morning trading Thursday and 30 percent since late January.[17]

16        (g)    On July 9, 2013, in response to the negative news, Intuitive's share price

18   dropped $80.78, or almost 20%, from a closing price of $500.08 on July 8, 2013, to a closing

20   price of $419.30 on July 9, 2013.  Trading volume in excess of  5.5 million shares was the largest

21   figure in almost four years (since July 23, 2009) and was almost 14 times the prior day's volume

22   of just over 400,000 shares, also almost 14 times the average daily Class Period trading volume

23   of approximately 400,000 shares.

---

[17]    *Benzinga*, "Intuitive Surgical Plunging after Negative Pre-Announcement (ISRG)" 2013 WLNR 16668188 (July 9, 2013). *Benzinga* is an internet based financial media outlet. www.benzinga.com.

178.   **On July 18, 2013**, after the market close, Intuitive reported 2Q 2013 financial results consistent with its July 8, 2013 pre-announcement and also disclosed an FDA Warning Letter received as a result of an FDA onsite audit of the Company conducted during the quarter and related to observations in a Form 483.

(a)   Analysts focused on the reporting of the FDA Warning Letter and its ramifications.  On July 19th, Morningstar reported that the FDA warning letter, combined with the pending litigation and claims of inadequate surgeon training "holds the potential to disrupt the company's operations."  JP Morgan characterized the confluence of events resulting in the FDA Warning Letter as a "Perfect Storm" in its July 19 report.  Likewise, on the same day, Trefis issued an analyst report reporting that the "company was dealt another blow in the form of a FDA warning letter, which could hinder approval of new products/procedures going forward." Trefis added: "[t]he warning letter from the FDA will only worsen conditions as it will make it harder for the company to sell the system."

(b)   Media reports also attributed Intuitive's immediate common stock price drop to the FDA Warning Letter.  For example, on July 19th, the MotleyFool reported "it wasn't the numbers that sent Intuitive's stock nuclear on Thursday after the closing bell.  The FDA has picked and prodded at the robotic surgical device maker for some time, but regulators' investigations came to a big climax that culminated in a gut-wrenching one-two punch for investors."  The article further warned that "the slump in system sales means that the increasing talk regarding safety and legal issues at the company are catching up to Intuitive's financials – and investors.  Thursday's warning [letter] by the FDA may only exacerbate that trend."

(c)   On the same day, a subsequent Bloomberg article, "Intuitive Reeling as FDA Cites Lack of Visibility on Problems," reported: "Intuitive … has lost about $6 billion in value over five months after disclosures about adverse events with its products, a recent recall, and now, a regulatory warning it hasn't adequately reported on issues concerning the devices." In addition, a "review of Food and Drug Administration records now shows the reports of

1    injuries involving robot procedures have doubled in the first six months of 2013, compared with

2    a year earlier."

3             (d)     Intuitive's common stock price fell by $28.80 per share, approximately

4    7%, from a closing price of $421.47 on July 17, 2013 to a closing price of $392.67 on July 19,

5    2013.  Trading volume exceeded 4.6 million shares, which was 6 times the prior day's volume,

6    almost 12 times average daily Class Period trading volume of approximately 400,000 shares.

7             (e)     Bloomberg's headline on July 20 said it all: "Intuitive Surgical Declines

8    On Warning Letter From FDA."   The article focused on Intuitive's FDA reporting violations:

9    "FDA inspections in April and May found a number of deficiencies, **including that the**

10   **[Sunnyvale, California-based] company in some cases hadn't adequately reported device**

11   **corrections and patient adverse events**."

12        179.   A recent article published in Seeking Alpha on October 6, 2013, and entitled

13   "Wait For The Next Shoe To Drop Before Buying Intuitive Surgical," succinctly summed up the

14   impact of the FDA regulatory actions on Intuitive's common stock price:

15            Intuitive Surgical (ISRG), the dominant manufacturer of robotic surgical devices,
          has had a difficult 2013 and its troubles may continue. . . . **ISRG's woes are**
16        **directly and almost exclusively due to the** Food and Drug Administration
          ("FDA") **warning letter and the related investigation into the efficacy, safety**
17        **and use of the company's "da Vinci" surgical robot**, which the company
          disclosed last quarter.

18
          . . . the **company's development shall be stunted until the conclusion of FDA**
19        **scrutiny**.  **Hospitals will refrain from purchasing new da Vinci robots**,
          whether or not they want or can afford them, while this overhanging regulatory
20        concern persists.

21        **Hospital** administrators are effectively handcuffed, which will **restrict ISRG's**
          **near-term growth rates**.
22
          180.   Each of the declines discussed above in the Company's common stock price was
23
     statistically significant at a high level after taking into account changes on the same days in the
24
     overall securities market and in relevant industry indices.  Furthermore, as set forth above, each
25
     of the price declines in Intuitive common stock is attributable to the disclosure of previously
26
     concealed information relating to the materially false and misleading statements and omissions
27
     alleged herein.  The timing and magnitude of Intuitive's common stock price declines negate any
28

inference that the losses suffered by Plaintiffs and other Class members were caused by other changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  As the truth about Defendants' fraud was revealed, the Company's common stock price declined, the artificial inflation came out of the price of the common stock, and Plaintiffs and other members of the Class suffered damages.

## VII.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

181.   Throughout the Class Period Defendants made materially false and misleading statements and omissions about the safety of da Vinci and Intuitive's compliance with FDA regulations.  These statements and omissions were false and misleading because they failed to disclose (i) Intuitive's regulatory violations, including the failure to report MDRs, adverse reports, design defects, recalls, and to follow design protocols, (ii) da Vinci's defects and performance problems resulting in injury and death, and (iii) the material rise in da Vinci adverse events.  These false and misleading statements and omissions thereby concealed the severity and likelihood of the risks to health posed by da Vinci.  The ultimate public disclosure of the true severity and likelihood of the risks to health had a negative and material impact in procedure growth, the financial results, and the Company's stock price.

### A.   Defendants Made Materially False And Misleading Statements And Omissions That Concealed Dangerous da Vinci Defects And Performance Problems In Violation of FDA Regulations

#### 1.   Intuitive's February 6, 2012 Form 10-K Annual Report (Ending December 31, 2011)

182.   On February 6, 2012, Intuitive filed its Form 10-K for the year ending December 31, 2011 (the "2011 Form 10-K"), Defendants stated:

(a)   "[w]e believe that this new generation of surgery, which we call da Vinci Surgery, combines the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision and dexterity of open surgery;" and

(b)   "The **da Vinci Surgical System enables surgeons to extend the benefits of MIS** to many patients typically receiving open surgery by using computational, robotic and

1   imaging technologies to overcome many of the limitations of conventional minimally invasive

2   surgery."

3          183.   In touting the benefits of the "da Vinci Surgical System," Defendants concealed

4   that far from "extend[ing] the benefits of MIS," da Vinci was causing serious patient injuries and

5   deaths as a direct result of performance problems and dangerous defects resulting in (i) Intuitive

6   instituting three secret recalls in October 2011 to reduce risks to health posed by da Vinci (¶¶ 11,

7   17, 96-97); (ii) the issuance of 508 MDRs and complaints reporting material health risks to

8   patients as a result of da Vinci in 2011 alone, including **ten** death-related reports and a material

9   increase in Tip Cover-related MDRs in 2011 compared to prior years (¶¶ 57, 58, 72-76); and

10  (iii) at least four personal injury and/or product liability lawsuits filed against Intuitive between

11  March 18, 2010 and December 31, 2011 (¶ 49).

12         184.   Defendants also warned against **potential** defects even while they knew that da

13  Vinci **exhibited, and had exhibited for some time**, dangerous defects:

> ***If defects*** are discovered in our products, we ***may*** incur additional unforeseen
> costs, hospitals may not purchase our products and our reputation may suffer.
>
> . . . . Because our products are designed to be used to perform complex surgical
> procedures, we expect that our customers will have an increased sensitivity to
> such defects.  In the past, we have voluntarily recalled certain products as a result
> of performance problems.  We cannot assure that our products will not experience
> component aging, errors or ***performance problems in the future***.
>
> *    *    *
>
> "There is also the ***possibility that defects*** in the design or manufacture of our
> products ***might necessitate a product recall***."

21         185.   Defendants' 2011 Form 10-K representations were materially false and

22  misleading because they failed to disclose that (i) da Vinci posed a present material health risk to

23  patients (¶¶ 45-54); (ii) da Vinci already had known defects (¶¶ 50-54, 60-61); (iii) Intuitive had

24  violated FDA regulations by failing to report to the FDA corrective actions taken by Intuitive to

25  reduce health risks posed by da Vinci (¶¶ 51-54, 94-100, 108-116, 120); and (iv) Intuitive had

26  already undertaken three secret field actions in October 2011 to reduce risks to health posed by

27  da Vinci that constituted Class II Recalls, as determined by the FDA Warning Letter (¶¶ 52-54,

28

1   108-116, 120).  According to the FDA Warning Letter and Form 483, Intuitive had undertaken

2   these recalls after receiving over 166 complaints and 87 MDRs since July 2009, the vast majority

3   of which concerned the Tip Covers.  The FDA Warning Letter further determined that Intuitive

4   ignored design deficiencies in violation of CGMP even though it was aware of patient injuries in

5   2010 and 2011 due to the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100, 115-118).

6          186.    Intuitive's 2011 Form 10-K further set forth the specific regulations the Company

7   was required to follow in connection with da Vinci and its accessories, including, but not limited

8   to: (i) "the QSR, which requires manufacturers to follow elaborate design, testing, control

9   documentation and other quality assurance procedures during the manufacturing process;"

10  (ii) "the Medical Device Reporting regulation, which requires that manufacturers report to the

11  FDA if their device may have caused or contributed to a death or serious injury or malfunctioned

12  in a way that would likely cause or contribute to a death or serious injury if it were to recur"

13  (21 C.F.R. § 803.50); and (iii) "the reporting of Corrections and Removals, which requires that

14  manufacturers report to the FDA recalls and field corrective actions taken to reduce a risk to

15  health or to remedy a violation of the FDCA [Federal Food, Drug, and Cosmetic Act] that may

16  pose a risk to health" (21 C.F.R. § 806.10).

17          (a)    Intuitive further highlighted the severe penalties that it risked for

18  non-compliance with these regulations:

19          We are subject to inspection and marketing surveillance by the FDA to determine
            our compliance with regulatory requirements.  If the FDA finds that we have
20          failed to comply, it can institute a wide variety of enforcement actions, ranging
            from a regulatory letter to a public Warning Letter to more severe civil and
21          criminal sanctions including the seizure of our products and equipment or ban on
            the import or export of our products. Our failure to comply with applicable
22          requirements could lead to an enforcement action that may have an adverse effect
            on our financial condition and results of operations.
23
                              *       *       *
24
            The QSR also requires maintenance of extensive records which demonstrate
25          compliance with FDA regulation, the manufacturer's own procedures,
            specifications and testing as well as distribution and postmarket experience.
26          Compliance with the QSR is necessary to receive FDA 510(k) clearance or
            approval to market new products and is necessary for a manufacturer to be able to
27          continue to market cleared or approved product offerings in the United States.

28

(b)     Intuitive also acknowledged that it was subject to "extensive and rigorous regulation by the FDA" with which it kept current and in compliance: "Our products and operations are subject to **extensive and rigorous regulation by the FDA**, the State of California and countries or regions in which we market our products .... We must continually keep abreast of these standards and requirements and **integrate compliance** to these with the development and regulatory documentation for our products."

187.    At the time this 2011 Form 10-K was filed, these statements were materially false and misleading because they failed to disclose that according to the FDA Warning Letter, Defendants had already systematically violated FDA regulations by: (i) secretly issuing corrections starting in October 2011 related to defects without properly reporting those corrections to the FDA, in violation of 21 C.F.R. § 806.10 (¶¶ 51-54, 94-100, 108-116, 120); and (ii) by significantly deviating from the Current Good Manufacturing Practice (CGMP) requirements for devices, as set forth in the Quality System regulation (21 C.F.R. § 820) (¶¶ 11, 100, 115-118).

(a)     Intuitive's statements were further materially false and misleading because they failed to disclose Defendants' failure to report, or timely report, adverse events through the MDR mechanism, as required by 21 C.F.R. § 803.50 (¶¶ 62-76).

(b)     The 2011 Form 10-K was signed by the Individual Defendants.  Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants Guthart and Mohr signed a certification that was false and misleading because it stated that the 2011 Form 10-K did not contain false and misleading statements.

## 2.     Intuitive's April 19, 2012 Form 10-Q (Ending March 31, 2012)

188.    On April 19, 2012, Intuitive filed its first quarter Form 10-Q for the period ending March 31, 2012 (the "1Q12 Form 10-Q"), which detailed that da Vinci surgery represents "a new generation of surgery" that "combines the ***benefits*** of minimally invasive surgery (MIS) for patients with the ease of use, precision and dexterity of open surgery."

189.    In touting the benefits of "da Vinci Surgery," Defendants concealed that far from "combin[ing] the benefits of [MIS]" (including shorter recovery times and fewer complications) with those of open surgery, da Vinci was causing serious patient injuries and deaths as a direct result of performance problems and dangerous defects, resulting in (i) Intuitive instituting three secret recalls in October 2011 to reduce risks to health posed by da Vinci (¶¶ 11, 17, 96-97); (ii) the issuance of a substantial number of MDRs and complaints reporting material health risks to patients as a result of da Vinci, including **eight** death-related reports in the three month period between December 31, 2011 and March 31, 2012 (¶¶ 57, 58, 72-76); and (iii) at least five personal injury and/or product liability lawsuits  filed against Intuitive between March 18, 2010 and March 31, 2012 (¶ 49).

190.    The 1Q12 Form 10-Q also stated "[t]here have been no changes to the Risk Factors discussed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2011."  The risk factors in the 2011 Form 10-K included warnings concerning possible product defects and their potential impact, **possible** "performance problems **in the future**," and the "**possibility** that defects in the design or manufacture of our products **might necessitate a product recall**."

191.    The 1Q12 Form 10-Q representations were materially false and misleading because they failed to disclose that (i) da Vinci posed a material health risk to patients (¶¶ 45-54); (ii) da Vinci already had known defects (¶¶ 50-54, 60-61); (iii) Intuitive had violated FDA regulations by failing to report to the FDA corrective actions taken by Intuitive to reduce health risks posed by da Vinci (¶¶ 51-54, 94-100, 108-116, 120); (iv) Intuitive had failed to report, or timely report, adverse events through the MDR mechanism, as required by 21 C.F.R. § 803.50 (¶¶ 62-76); (v) Intuitive had violated Current Good Manufacturing Practice (CGMP) requirements, as set forth in the Quality System regulation (21 C.F.R. § 820) (¶¶ 11, 100, 115-118); and (vi) Intuitive had already undertaken three secret field actions in October 2011 to reduce risks to health posed by da Vinci that constituted Class II Recalls, as determined by the FDA in its Warning Letter (¶¶ 52-52, 108-116, 120).  According to the FDA Warning Letter and

Form 483, Intuitive had undertaken these recalls after receiving over 166 complaints and 87 MDRs since July 2009, the vast majority of which concerned the Tip Covers. The FDA Warning Letter further determined that Intuitive ignored design deficiencies in violation of CGMP even though it was aware of patient injuries in 2010 and 2011 due to the intraoperative cleaning of Monopolar Scissors.

192. The 1Q12 Form 10-Q was signed by Mohr. Pursuant to § 302 of the Sarbanes-Oxley Act of 2002, Defendants Guthart and Mohr signed a certification that was false and misleading because it stated that the Form 10-Q did not contain false and misleading statements.

### 3. Intuitive's July 23, 2012 Form 10-Q (Ending June 30, 2012)

193. On July 23, 2012, Intuitive filed its second quarter Form 10-Q for the period ending June 30, 2012 (the "2Q12 Form 10-Q"). In the 2Q12 Form 10-Q Defendants repeated the representations from Intuitive's 1Q12 Form 10-Q, set forth *supra* in paragraph 188, describing, *inter alia*, the da Vinci as a "a new generation of surgery" which "combines the **benefits** of [MIS]" with those of open surgery.

194. In touting the benefits of "da Vinci Surgery," Defendants concealed that far from "combin[ing] the benefits of [MIS]" (including shorter recovery times and fewer complications) with those of open surgery, da Vinci was causing serious patient injuries and deaths as a direct result of performance problems and dangerous defects present in da Vinci, resulting in (i) Intuitive instituting three secret recalls in October 2011 to reduce risks to health posed by da Vinci (¶¶ 11, 17, 96-97); (ii) the issuance of a substantial number of MDRs and complaints reporting material health risks to patients as a result of da Vinci, including **11** death-related reports in the three months between March 31, 2012 and June 30, 2012 (¶¶ 57, 58, 72-76); and (iii) at least eight personal injury and/or product liability lawsuits against Intuitive filed between March 18, 2010 and June 30, 2012, at least three of which allege injuries associated with Microcracks/insufficient insulation - Monopolar current (¶ 49).

195. The 2Q12 Form 10-Q also repeated "[t]here have been no changes to the Risk Factors discussed in our Annual Report on Form 10-K for the fiscal year ended December 31,

2011."  The risk factors in the 2011 Form 10-K included warnings concerning possible product defects and their potential impact, **possible** "performance problems **in the future**," and the "**possibility** that defects in the design or manufacture of our products **might necessitate a product recall**."

196.    The 2Q12 Form 10-Q representations were materially false and misleading because they failed to disclose that (i) da Vinci posed a material health risk to patients (¶¶ 45-54); (ii) da Vinci already had known defects (¶¶ 50-54, 60-61); (iii) Intuitive had violated FDA regulations by failing to report to the FDA corrective actions taken by Intuitive to reduce health risks posed by da Vinci (¶¶ 51-54, 94-100, 108-116, 120); (iv) Intuitive had failed to report, or timely report, adverse events through the MDR mechanism, as required by 21 C.F.R. § 803.50 (¶¶ 62-76); (v) Intuitive had violated Current Good Manufacturing Practice (CGMP) requirements, as set forth in the Quality System regulation (21 C.F.R. § 820) (¶¶ 11, 100, 115-118); and (vi) Intuitive had already undertaken three secret field actions in October 2011 to reduce risks to health posed by da Vinci that constituted Class II Recalls, as determined by the FDA in its Warning Letter (¶¶ 52-54, 108-116, 120).  According to the FDA Warning Letter and Form 483, Intuitive had undertaken these recalls after receiving over 166 complaints and 87 MDRs since July 2009, the vast majority of which concerned the Tip Covers.  The FDA Warning Letter further determined that Intuitive ignored design deficiencies in violation of CGMP even though it was aware of patient injuries in 2010 and 2011 due to the intraoperative cleaning of Monopolar Scissors.

197.    The 2Q12 Form 10-Q was signed by Mohr.  Pursuant to § 302 of the Sarbanes-Oxley Act of 2002, Defendants Guthart and Mohr signed a certification that was false and misleading because it stated that the Form 10-Q did not contain false and misleading statements.

### 4.    Intuitive's October 18, 2012 Form 10-Q (Ending September 30, 2012)

198.    On October 18, 2012, Intuitive filed its third quarter Form 10-Q for the period ending September 30, 2012 (the "3Q12 Form 10-Q").  In the 3Q12 Form 10-Q, Intuitive made

1   the same representations set forth *supra* in paragraph 188 describing da Vinci as a "a new

2   generation of surgery" which "combines the benefits of [MIS]" with those of open surgery.

3        199.    In touting the benefits of "da Vinci Surgery," Defendants concealed that far from

4   "combin[ing] the benefits of [MIS]" (including shorter recovery times and fewer complications)

5   with those of open surgery, da Vinci was causing serious patient injuries and deaths as a direct

6   result of performance problems and dangerous defects present in da Vinci, resulting in

7   (i) Intuitive instituting three secret recalls in October 2011 to reduce risks to health posed by da

8   Vinci (¶¶ 11, 17, 96-97); (ii) the issuance of a substantial number of MDRs and complaints

9   reporting material health risks to patients as a result of da Vinci, including **six** death-related

10  reports in the three months between June 30, 2012 and September 30, 2012 (¶¶ 57, 58, 72-76);

11  and (iii) at least **12** personal injury and/or product liability lawsuits against Intuitive were filed

12  between March 18, 2010 to September 30, 2012, five of which alleged injuries associated with

13  Microcracks/insufficient insulation - Monopolar current (¶ 49).

14       200.    The 3Q12 Form 10-Q also repeated, "[t]here have been no changes to the Risk

15  Factors discussed in our Annual Report on Form 10-K for the fiscal year ended December 31,

16  2011."  The risk factors in the 2011 Form 10-K included warnings concerning possible product

17  defects and their potential impact, **possible** "performance problems **in the future**," and the

18  "**possibility** that defects in the design or manufacture of our products **might necessitate a**

19  **product recall**."

20       201.    The 3Q12 Form 10-Q representations were materially false and misleading

21  because they failed to disclose that (i) da Vinci posed a material health risk to patients (¶¶ 45-

22  54); (ii) da Vinci already had known defects (¶¶ 50-54, 60-61); (iii) Intuitive had violated FDA

23  regulations by failing to report to the FDA corrective actions taken by Intuitive to reduce health

24  risks posed by da Vinci (¶¶ 51-54, 108-116, 120); (iv) Intuitive had failed to report, or timely

25  report, adverse events through the MDR mechanism, as required by 21 C.F.R. § 803.50

26  (¶¶ 62-76); (v) Intuitive had violated Current Good Manufacturing Practice (CGMP)

27  requirements, as set forth in the Quality System regulation (21 C.F.R. § 820) (¶¶ 11, 100,

28

1   115-118); and (vi) Intuitive had already undertaken three secret field actions in October 2011 to

2   reduce risks to health posed by da Vinci that constituted Class II Recalls, as determined by the

3   FDA in its Warning Letter (¶¶ 52-54, 108-116, 120).  According to the FDA Warning Letter and

4   Form 483, Intuitive had undertaken these recalls after receiving over 166 complaints and

5   87 MDRs since July 2009, the vast majority of which concerned the Tip Covers.  The FDA

6   Warning Letter further determined that Intuitive ignored design deficiencies in violation of

7   CGMP even though it was aware of patient injuries in 2010 and 2011 due to the intraoperative

8   cleaning of Monopolar Scissors.

9        202.    The Form 10-Q was signed by Mohr.  Pursuant to Section 302 of the Sarbanes-

10  Oxley Act of 2002, Defendants Guthart and Mohr signed a certification that was false and

11  misleading because it stated that the Form 10-Q did not contain false and misleading statements.

12              **5.    February 4, 2013 Form 10-K Annual Report (Ending**
                       **December 31, 2012)**

13

14       203.    On February 4, 2013, Intuitive filed its Form 10-K for the year ending December

15  31, 2012 (the "2012 Form 10-K").  In its 2012 Form 10-K, Intuitive repeated the representations

16  in paragraphs 182 and 182(a) calling the "da Vinci Surgical Systems . . . a new generation of

17  surgery" and touting it as "combin[ing] the benefits of minimally invasive surgery ("MIS") for

18  patients with the ease of use, precision and dexterity of open surgery."   Intuitive further

19  represented that "[o]ver the past two decades, **MIS ha[d] reduced trauma to the patient** by

20  allowing selected surgeries to be performed through small ports rather than large incisions, often

21  **resulting in shorter recovery times, fewer complications** and reduced hospitalization costs."

22       204.    In touting the benefits of the "da Vinci Surgical System," Defendants concealed

23  that far from "extend[ing] the benefits of MIS" (including shorter recovery times and fewer

24  complications), da Vinci was causing serious patient injuries and deaths as a direct result of

25  performance problems and dangerous defects, resulting in (i) Intuitive instituting three secret

26  recalls in October 2011 to reduce risks to health posed by da Vinci (¶¶ 11, 17, 96-97);

27  (ii) issuance of 1,597 MDRs, including **32** death-related reports, being filed in 2012 related to da

28  Vinci, reflecting a **disproportionate 214 percent increase** from 2011(¶¶ 57, 58, 72-76); (iii) at

least **14** personal injury and/or product liability lawsuits filed against Intuitive between March 18, 2010 and December 31, 2012, half of which alleged injuries associated with Microcracks/insufficient insulation – Monopolar current (¶ 49); and (iv) the FDA commencing a safety probe in January 2013 in response to the increase in number of da Vinci-related MDR reports (¶¶ 12-13, 174, 177(f)).

205.   Intuitive also repeated the statements from Intuitive's 2011 Form 10-K set forth in paragraph 184, warning against possible product defects and their potential impact, **possible** "performance problems **in the future**," and the "**possibility** that defects in the design or manufacture of our products **might necessitate a product recall**."

206.   Defendants' 2012 Form 10-K representations were materially false and misleading because they failed to disclose that (i) da Vinci posed a material health risk to patients (¶¶ 45-54); (ii) da Vinci already had known defects (¶¶ 50-54, 60-61); (iii) Intuitive had violated FDA regulations by failing to report to the FDA corrective actions taken by Intuitive to reduce health risks posed by da Vinci (¶¶ 51-54, 94-100, 108-116, 120); and (iv) Intuitive had already undertaken three secret field actions in October 2011 to reduce risks to health posed by da Vinci that constituted Class II Recalls, as determined by the FDA in its Warning Letter (¶¶ 52-54, 108-116, 120). According to the FDA Warning Letter and Form 483, Intuitive had undertaken these recalls after receiving over 166 complaints and 87 MDRs since July 2009, the vast majority of which concerned the Tip Covers.  The FDA Warning Letter further determined that Intuitive ignored design deficiencies in violation of CGMP even though it was aware of patient injuries in 2010 and 2011 due to the intraoperative cleaning of Monopolar Scissors.

207.   At the time this 2012 Form 10-K was filed, these statements were materially false and misleading because they failed to disclose that, according to the FDA Warning Letter issued by the FDA on July 16, 2013, Defendants had systematically violated FDA regulations by: (i) secretly issuing corrections starting in October 2011 related to defects without properly reporting those corrections to the FDA in violation of 21 C.F.R. § 806.10; and (ii) significantly

1   deviating from the Current Good Manufacturing Practice (CGMP) requirements for devices, as

2   set forth in the Quality System regulation (21 C.F.R. § 820).

3          (a)    Intuitive's statements were further materially false and misleading because

4   they failed to disclose Defendants' failure to report, or timely report, reports of adverse events

5   through the MDR mechanism, as required by 21 C.F.R. § 803.50.

6          (b)    The 2012 Form 10-K was signed by the Individual Defendants.  Pursuant

7   to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants Guthart and Mohr signed a

8   certification that was false and misleading because it stated that the 2012 Form 10-K did not

9   contain false and misleading statements.

10                  **6.     Defendants' March 13, 2013 Press Release**

11         208.    The March 13 Press Release stated: "[i]n response to general inquiries regarding a

12   recent rise in Medical Device Reports (MDR) filed by Intuitive Surgical, the company explained

13   that the noted rise [did] not reflect a change in product performance but rather a change in MDR

14   reporting practices."

15         209.    Intuitive further characterized the change in reporting practices as an

16   "administrative change in how MDRs previously reported as adverse events were

17   subcategorized.  This change has not increased the total number of adverse event reports. This

18   will result in an increase in events in the 'serious injury' subcategory and a corresponding

19   decrease in the 'other' subcategory.  **Total adverse event rates have remained low and in line**

20   **with historical trends**."

21         210.    Intuitive's statements were materially false and misleading because they failed to

22   disclose that (i) in 2012 there had been a 214% increase in MDRs related to product performance

23   compared to 2011, which exceeded "historical trends" and the increasing use of the da Vinci

24   products; and (ii) that this increase in MDRs had caused the FDA to initiate a safety probe to find

25   the root cause for the increase and evaluate product performance.

26

27

28

### 7.     Intuitive's April 18, 2013 Earnings Conference Call

211.    During Intuitive's April 18, 2013 earnings conference call (the "April 18th Earnings Call"), Defendant Guthart stated:

> As you know, we are in the midst of a concerted effort by critics of robotic surgery to challenge the benefit it brings to patients…[w]e are confident that those who invest their time in a serious review of the clinical literature on da Vinci will find ample evidence of the benefit it brings to patients, surgeons, hospitals and the medical community at large.

(a)     Defendant Guthart further stated that "**da Vinci surgery has proven safety, efficacy, economic and ergonomic benefits** when compared to the open surgical procedures it is replacing."

212.    Defendant Guthart's statements were materially false and misleading because they denied the validity of the safety issues even though Defendant Guthart knew and failed to disclose that, (i) da Vinci posed a material health risk to patients (¶¶ 45-54); (ii) da Vinci already had known defects (¶¶ 50-54, 60-61); (iii) Intuitive had violated FDA regulations by failing to report to the FDA corrective actions taken by Intuitive to reduce health risks posed by da Vinci (¶¶ 51-54, 94-100, 108-116, 120); (iv) Intuitive had already undertaken three secret field actions in October 2011 to reduce risks to health posed by da Vinci that constituted Class II Recalls, as determined by the FDA in its Warning Letter (¶¶ 52-54, 108-116, 120); (v) the issuance of a substantial number of MDRs and complaints reporting material health risks to patients as a result of da Vinci in the three months between January 1, 2013 and March 31, 2013 (¶¶57, 58, 72-76); (vi) Intuitive had failed to report, or timely report, adverse events through the MDR mechanism, as required by 21 C.F.R. § 803.50 (¶¶ 62-72); (vii) Intuitive had violated Current Good Manufacturing Practice (CGMP) requirements, as set forth in the Quality System regulation (21 C.F.R. § 820) (¶¶ 11, 100, 115-118); (viii) at least **16** personal injury and/or product liability lawsuits had been filed against Intuitive between March 18, 2010 and April 18, 2013, nine of which alleged injuries associated with Microcracks/insufficient insulation – Monopolar current (¶49); (ix) the FDA had commenced a safety probe in January 2013 in response to the increase in number of da Vinci-related MDR reports (¶¶ 7, 12-13, 174, 177(f)); and (x) the FDA had

commenced an inspection of Intuitive's facilities on April 1, 2013 during which numerous safety related violations were found (¶¶ 94-100).

### 8. Intuitive's April 19, 2013 Form 10-Q (Ending March 31, 2013)

213. On April 19, 2013, Intuitive filed its first quarter 2013 form 10-Q for the period ending March 31, 2013 (the "1Q13 Form 10-Q"). In the 1Q13 Form 10-Q, Intuitive,

(a) repeated the representations in Intuitive's 3Q12 Form 10-Q, set forth *supra* in paragraph 188, describing da Vinci as a "a new generation of surgery" and touting its advantages of combining the benefits of both open surgery and MIS; and

(b) reported that "during the first quarter of 2013, there have been articles published and papers written questioning patient safety and efficacy associated with *da Vinci* Surgery…We believe that **da Vinci Surgery continues to be a safe and effective surgical method…**"

214. The 1Q 2013 Form 10-Q representations were materially false and misleading because they failed to disclose that, (i) da Vinci posed a material health risk to patients (¶¶ 45-54); (ii) da Vinci already had known defects (¶¶ 50-54, 60-61); (iii) Intuitive had violated FDA regulations by failing to report to the FDA corrective actions taken by Intuitive to reduce health risks posed by da Vinci (¶¶ 51-54, 94-100, 108-116, 120); (iv) Intuitive had already undertaken three secret field actions in October 2011 to reduce risks to health posed by da Vinci that constituted Class II Recalls, as determined by the FDA in its Warning Letter (¶¶ 52-54, 108-116, 120); (v) Intuitive had failed to report, or timely report, adverse events through the MDR mechanism, as required by 21 C.F.R. § 803.50 (¶¶ 62-76); (vi) Intuitive had violated Current Good Manufacturing Practice (CGMP) requirements, as set forth in the Quality System regulation (21 C.F.R. § 820) (¶¶ 11, 100, 115-118); (vii) the issuance of a substantial number of MDRs and complaints reporting material health risks to patients as a result of da Vinci, including **six** death-related reports in the three months between January 1, 2013 and March 31, 2013 (¶¶ 57, 58, 72-76); (viii) at least **16** personal injury and/or product liability lawsuits had been filed against Intuitive between March 18, 2010 and April 18, 2013, nine of which alleged injuries

1   associated with Microcracks/insufficient insulation – Monopolar current (¶ 49); (ix) the FDA had

2   commenced a safety probe in January 2013 in response to the increase in number of da Vinci-

3   related MDR reports (¶¶ 7, 12-13, 174, 177(f)); and (x) the FDA had commenced an inspection

4   of Intuitive's facilities on April 1, 2013 during which numerous safety related violations were

5   found (¶¶ 94-100).

6        215.   The 1Q 2013 Form 10-Q was signed by Mohr.  Pursuant to § 302 of the Sarbanes-

7   Oxley Act of 2002, Defendants Guthart and Mohr signed a certification that was false and

8   misleading because it stated that the Form 10-Q did not contain false and misleading statements.

9        **B.   Defendants Made Materially False And Misleading Statements
         And Omissions Concerning The Company's Growth,**

10       **Revenues, Income And Product Liability**

11            **1.   Intuitive's February 6, 2012 Form 10-K Annual Report**

12       216.   On February 6, 2012 Intuitive filed its 2011 Form 10-K with the SEC.

13            (a)   The Company's Form 10-K represented that,

14   Our business exposes us to significant risks of product liability claims.  The
     medical device industry has historically been litigious, and we face financial

15   exposure to product liability claims if the use of our products were to cause injury
     or death.  There is also the possibility that defects in the design or manufacture of

16   our products might necessitate a product recall.  Any weaknesses in training and
     services associated with our products may also be subject to product liability

17   lawsuits. . . .If a patient is harmed during a da Vinci surgical procedure, even in
     the absence of any alleged system malfunction or defect, we can be exposed to

18   negligence claims based on alleged inadequacies in our surgeon training, our
     training of Intuitive personnel, or in our proctoring programs.  A negligence

19   claim, regardless of its merit or eventual outcome, could result in significant legal
     defense costs.  Negligence claims have been made against us in the past.

20
         (b)   The 2011 Form 10-K also stated that, "[f]rom time to time, we may be

21   involved in a variety of claims, lawsuits, investigations and proceedings relating to securities

22   laws, product liability, patent infringement, contract disputes and other matters relating to

23   various claims that arise in the normal course of our business."

24       217.   These statements were materially false and misleading because they failed to

25   disclose that,

26       (a)   as of February 6, 2012, at least four lawsuits alleged that patients had been

27   harmed due to da Vinci (¶ 49), and

28

1    (b)    it was highly likely that additional suits would be filed in the future

2    because (i) da Vinci posed a material health risk to patients  (¶¶ 45-54); (ii) Intuitive had taken

3    corrective actions to reduce health risks in October 2011, but hundreds of thousands of surgeries

4    had been performed with da Vinci already before that date (¶¶ 39, 50-54, 89, 94-100, 108-116);

5    (iii) there had been a substantial number of MDRs and complaints reporting material health risks

6    to patients (¶¶ 57, 58, 72-76); ; and (iv) Intuitive had failed to report, or timely report, complaints

7    or reports of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

8    218.    The 2011 Form 10-K also reported 2011 financial results as follows: (i) Total

9    revenue of $1,757.3 million for 2011 had increased by 24% and 34% during the years ended

10    December 31, 2011 and 2010, respectively, compared to the same periods in 2010 and 2009,

11    reflecting "continued adoption of da Vinci"; (ii) "Approximately 360,000 da Vinci procedures

12    were performed during the year ended December 31, 2011, up approximately 29% from last

13    year"; (iii) "System revenue increased 18% to $777.8 million during the year ended December

14    31, 2011 from $660.3 million during the year ended December 31, 2010"; and (iv) Intuitive sold

15    "534 da Vinci Surgical Systems during the year ended December 31, 2011, compared with 441

16    for the year ended December 31, 2010."

17    219.    These financial results reported in the 2011 Form 10-K were materially false and

18    misleading because Defendants failed to disclose that da Vinci, which was solely responsible for

19    the Company's sales and revenue growth, would be materially impacted by the following:

20    (i) da Vinci posed a material health risk to patients (¶¶ 45-54); (ii) Intuitive had violated FDA

21    regulations by failing to properly report corrective actions taken by Intuitive to reduce health

22    risks posed by da Vinci (¶¶ 51-54, 94-100, 108-116, 120); (iii) Intuitive had instituted three

23    secret recalls in October 2011 to reduce risks to health posed by da Vinci (¶¶ 52-54, 108-116,

24    120); (iv) Intuitive was in violation of CGMP, in part, due to critical missing design inputs

25    necessary to address the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100, 115-118);

26    (v) there had been a substantial number of MDRs and complaints reporting material health risks

27    to patients (¶¶ 57, 58, 72-76), all of which when disclosed would adversely impact the

28

Company's business; and (vi) Intuitive had failed to report, or timely report, complaints or reports of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

220.    The Form 10-K was signed by the Individual Defendants.  Pursuant to § 302 of the Sarbanes-Oxley Act of 2002, Guthart and Mohr signed a certification that was false and misleading because it stated that the Form 10-K did not contain false and misleading statements.

### 2.    Intuitive's April 17, 2012 Form 8-K And Earnings Conference Call

221.    On April 17, 2012 Intuitive filed with the SEC a Form 8-K attaching a press release announcing the Company's 1Q 2012 results (the "April 17th Press Release").  Defendant Guthart commented as follows:  "In the first quarter, we are pleased with the growing use of da Vinci, the acceptance of our new products and the financial performance that follows."

222.    The April 17th Press Release also reported that (i) first quarter revenues were $495 million, which reflected an increase of 28% compared to the first quarter of 2011, and "revenue growth was driven by continued robotic procedure adoption and higher da Vinci Surgical System sales"; (ii) "[p]rocedure growth of approximately 29% primarily reflects higher US gynecologic procedures, US general surgery procedures and international urologic procedures"; and (iii) first quarter 2012 system revenues totaled $206.6 million compared to $167.1 million in first quarter of 2011.

223.    During the April 17, 2012 Q1 2012 earnings release conference call (the "April 17th Earnings Call") with investors, Defendant Guthart reported that Intuitive had "sold 140 da Vinci Surgical Systems, up from 120 during the first quarter of last year," and that "[t]otal revenue was $495 million, up 28% over last year."  Defendant Guthart further stated that "[w]ith regard to procedures, we experienced strong growth in general surgery and gynecology, leading to year-over-year procedure growth of approximately 29%."

224.    Defendants' statements in the April 17th Press Release and April 17th Earnings Call were materially false and misleading because Defendants failed to disclose that da Vinci, which was solely responsible for Intuitive's sales and revenue growth, would be materially impacted by the following: (i) da Vinci posed a material health risk to patients (¶¶ 45-54);

1   (ii) Intuitive had violated FDA regulations by failing to properly report its corrective actions to

2   reduce health risks posed by da Vinci (¶¶ 51-54, 94-100, 108-116, 120); (iii) Intuitive had

3   instituted three secret recalls in October 2011 to reduce risks to health posed by da Vinci

4   (¶¶ 52-54, 108-116, 120); (iv) Intuitive was in violation of CGMP, in part, due to critical missing

5   design inputs necessary to address the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100,

6   115-118); (v) there had been a substantial number of MDRs and complaints reporting material

7   health risks to patients (¶¶ 57, 58, 72-76), all of which when disclosed would adversely impact

8   the Company's business; and (vi) Intuitive had failed to report, or timely report, complaints or

9   reports of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

10                    **3.      Intuitive's April 19, 2012 Form 10-Q**

11          225.    On April 19, 2012, Intuitive filed with the SEC its 1Q12 Form 10-Q.

12                  (a)     The Form 10-Q contained a section entitled "Risk Factors," which stated

13   that there had been "no changes to the Risk Factors discussed in our Annual Report on

14   Form 10-K for the fiscal year ended December 31, 2011," filed on February 6, 2012.   In

15   Intuitive's 2011 Form 10-K, Defendants had represented that "the use of our products could

16   result in product liability and negligence claims that could be expensive, divert management's

17   attention and harm our business."  The Form 10-K further stated:

18          Our business exposes us to significant risks of product liability claims. The
19          medical device industry has historically been litigious, and we face financial
            exposure to product liability claims if the use of our products were to cause injury
20          or death. There is also the possibility that defects in the design or manufacture of
            our products might necessitate a product recall. Any weaknesses in training and
21          services associated with our products may also be subject to product liability
            lawsuits. Although we maintain product liability insurance, the coverage limits of
22          these policies may not be adequate to cover future claims. Particularly as sales of
            our products increase, we may be unable to maintain product liability insurance in
23          the future at satisfactory rates or in adequate amounts. A product liability claim,
            regardless of its merit or eventual outcome, could result in significant legal
24          defense costs. Product liability claims have been made against our company in the
            past. A product liability or negligence claim or any product recalls could also
25          harm our reputation or result in a decline in revenues.

26                  (b)     The 1Q 2012 Form 10-Q also represented that "[f]rom time to time, we

27   may be involved in a variety of claims . . . relating to securities laws, product liability, patent

28

1    infringement, contract disputes and other matters relating to various claims that arise in the

2    normal course of our business."

3        226.    These statements were materially false and misleading because they failed to

4    disclose that,

5            (a)    as of April 19, 2012, at least seven lawsuits were filed against Intuitive

6    concerning da Vinci defects, at least two of which alleged that patients had been harmed due to

7    arcing caused by Microcracks/insufficient insulation - Monopolar current (¶ 49), and

8            (b)    it was highly likely that additional suits would be filed in the future

9    because (i) da Vinci posed a material health risk to patients  (¶¶ 45-54); (ii) Intuitive had taken

10   corrective actions to reduce health risks in October 2011, but hundreds of thousands of surgeries

11   had been performed with da Vinci already before that date  (¶¶ 39, 50-54, 89, 04-100, 108-116,

12   120); (iii) Intuitive was in violation of CGMP, in part, due to missing critical design inputs

13   necessary to address the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100, 115-118);

14   (iv) there had been a substantial number of MDRs and complaints reporting material health risks

15   to patients (¶¶ 57, 58, 72-76 ); and (v) Intuitive had failed to report, or timely report, complaints

16   or reports of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

17       227.    The Form 10-Q reiterated the financial results announced in the April 17th Press

18   Release and April 17th Earnings Call (¶¶ 221-223).  These financial results were materially false

19   and misleading for the same reasons set forth in ¶ 224.

20       228.    The Form 10-Q was signed by Defendant Mohr.  Pursuant to Section 302 of the

21   Sarbanes-Oxley Act of 2002, Defendants Guthart and Mohr signed a certification that was false

22   and misleading because it stated that the Form 10-Q did not contain false and misleading

23   statements.

24           **4.    Intuitive's July 19, 2012 Form 8-K and Earnings Call**

25       229.    On July 19, 2012, Intuitive filed with the SEC a Form 8-K attaching a press

26   release announcing the Company's 2Q 2012 financial results (the "July 19th Press Release").

27   Defendant Guthart commented that the "solid second quarter revenue and earnings performance

28

1    is the result of robust US gynecologic and general surgery procedure growth offset by pressure in

2    Europe and US prostatectomy." The July 19th Press Release also reported that total revenue for

3    2Q 2012 of $537 million was up 26% compared with $426 million for 2Q 2011, which was

4    "driven by continued adoption of da Vinci surgery procedures and higher da Vinci Surgical

5    System sales."

6         230.    Defendants made similarly materially false and misleading statements on the

7    July 19, 2012, earnings call ("July 19th Earnings Call") with investors.

8              (a)    According to Defendant Guthart, "our team has delivered a solid

9    performance, driven by robust growth in both our US gynecology business and our emerging

10   general surgery business." He also added that "for 2012, Intuitive is focused on . . . continuing

11   our growth in gynecology and urology worldwide, through outstanding execution in the field."

12             (b)    As to quantitative results, Defendant Guthart reported that, "[p]rocedures

13   grew approximately 26% over the second quarter of 2011. We sold 150 da Vinci Surgical

14   Systems, up from 129 during the second quarter of last year. Total revenue was $537 million; up

15   26% over last year."

16             (c)    Defendant Mohr also reported second quarter 2012 systems revenue of

17   "$229 million, increased 23% compared with $187 million for the second quarter of 2011."

18        231.    Defendants' statements in the July 19, 2012 July 19th Press Release and July 19th

19   Earnings Call were materially false and misleading because Defendants failed to disclose that da

20   Vinci, which was solely responsible for the Company's sales and revenue growth, would be

21   materially impacted by the following: (i) da Vinci posed a material health risk to patients

22   (¶¶ 45-54); (ii) Intuitive had violated FDA regulations by failing to properly report corrective

23   actions it took to reduce health risks posed by da Vinci (¶¶ 50-54, 60-61); (iii) Intuitive had

24   instituted three secret recalls in October 2011 to reduce risks to health posed by da Vinci

25   (¶¶ 52-54, 108-116, 120); (iv) Intuitive was in violation of CGMP, in part, due to critical missing

26   design inputs necessary to address the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100,

27   115-118); (v) there had been a substantial number of MDRs and complaints reporting material

28

health risks to patients (¶¶57, 58, 72-76), all of which when disclosed would adversely impact Intuitive's business; and (vi) Intuitive had failed to report, or timely report, complaints or reports of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

### 5.   Intuitive's July 23, 2012 Form 10-Q

232.   On July 23, 2012 Intuitive filed with the SEC its 2Q12 Form 10-Q.

(a)   The Form 10-Q contained a section entitled "Risk Factors," which stated that there had been "no changes to the Risk Factors discussed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2011," filed on February 6, 2012.  In Intuitive's 2011 Form 10-K Defendants had represented that "the use of our products could result in product liability and negligence claims that could be expensive, divert management's attention and harm our business."  The Form 10-K further stated:

> Our business exposes us to significant risks of product liability claims. The medical device industry has historically been litigious, and we face financial exposure to product liability claims if the use of our products were to cause injury or death. There is also the possibility that defects in the design or manufacture of our products might necessitate a product recall. Any weaknesses in training and services associated with our products may also be subject to product liability lawsuits. Although we maintain product liability insurance, the coverage limits of these policies may not be adequate to cover future claims. Particularly as sales of our products increase, we may be unable to maintain product liability insurance in the future at satisfactory rates or in adequate amounts. A product liability claim, regardless of its merit or eventual outcome, could result in significant legal defense costs. Product liability claims have been made against our company in the past. A product liability or negligence claim or any product recalls could also harm our reputation or result in a decline in revenues.

(b)   The 2Q 2012 Form 10-Q also represented that "[f]rom time to time, we may be involved in a variety of claims . . . relating to securities laws, product liability, patent infringement, contract disputes and other matters relating to various claims that arise in the normal course of our business."

233.   These statements were materially false and misleading because they failed to disclose that:

(a)   as of July 23, 2012, at least ten lawsuits had been filed against Intuitive concerning da Vinci defects, including at least four of which alleged that patients had been

1   harmed due to arcing caused by Microcracks/insufficient insulation - Monopolar current (¶ 49),

2   and

3          (b)    it was highly likely that additional suits would be filed in the future

4   because (i) da Vinci posed a material health risk to patients (¶¶ 45-54); (ii) Intuitive had taken

5   corrective actions to reduce health risks in October 2011, but hundreds of thousands of surgeries

6   had been performed with da Vinci already before that date  (¶¶ 39, 50-54, 89, 194-100, 108-116,

7   120); (iii) Intuitive was in violation of CGMP, in part, due to  missing critical design inputs

8   necessary to address the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100, 115-118);

9   (iv) there had been a substantial number of MDRs and complaints reporting material health risks

10  to patients (¶¶ 57, 58, 72-76); and (vi) Intuitive had failed to report, or timely report, complaints

11  or reports of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

12          234.   The 2Q 2012 Form 10-Q reiterated the financial results announced in the July

13  19th Press Release and the July 19th Earnings Call (¶¶ 229-230).  These financial results were

14  materially false and misleading for the same reasons set forth in ¶ 231.  The Form 10-Q was

15  signed by Defendant Mohr.  Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002,

16  Defendants Guthart and Mohr signed a certification that was false and misleading because it

17  stated that the Form 10-Q did not contain false and misleading statements.

### 6.    Intuitive's October 16, 2012 Form 8-K And Earnings Call

18

19

20          235.   On October 16, 2012 Intuitive filed with the SEC a Form 8-K attaching a press

21  release announcing the Company's financial results for Q3 2012 (the "October 16th Press

22  Release").  Defendant Guthart stated in the press release that "acceptance of da Vinci general and

23  gynecologic surgery continues to grow."  The release also reported that, (i) total revenues had

24  reached $538 million for Q3 2012 compared to $447 million for Q3 2011; (ii) "[t]hird quarter of

25  2012 revenue growth was driven by continued adoption of da Vinci surgery procedures and

26  higher da Vinci Surgical System sales;" and (iii) "procedure growth of approximately 22%

27  reflected US gynecologic and general surgery growth, partially offset by a decline in US

28  prostatectomy procedures and slower growth in European practices."

236.    On the October 16, 2012 Q3 2012 earnings call (the "October 16th Earnings Call"), Defendants made similarly misleading statements.

(a)    Defendant Guthart stated that "acceptance of da Vinci surgery in general and gynecologic surgery continues to grow in complex cancer procedures, benign procedures, and in single-port robotic surgery."

(b)    With regard to financial results, Defendant Mohr stated that,

> Our third-quarter revenue was $538 million, up 20% compared with $447 million for the third quarter of 2011, and up slightly compared to the $536 million last quarter.   Third-quarter revenues by product category were as follows. Third-quarter instrument accessory revenue was $218 million, up 24% compared with $176 million for the  third quarter of 2011, and down 3% compared with $224 million in the second quarter of 2012. The year-over-year increase in I&A was driven by procedure growth of approximately 22% in sales of our new instrument and accessory products, including Single-Site, Vessel Sealer and Firefly. The year-over-year procedure growth was led by US gynecologic procedures and US general surgery growth, partially offset by lower growth in Europe and a decrease in US dVP's.

(c)    Defendant Mohr summarized the first nine months of 2012 results:

> Procedures grew by 25%. Total revenue was $1,570,000,000, up 25% compared with $1,261,000,000 last year. The revenue increase included recurring revenue growth of 27% and an increase in systems revenue of 21%.

Also according to Defendant Mohr, systems revenue for third quarter 2012 totaled $232 million, compared with $199 million for third quarter of 2011.

237.    Defendants' statements in the October 16th Press Release and October 16th Earnings Call were materially false and misleading because Defendants failed to disclose that da Vinci, which was solely responsible for Intuitive's sales and revenue growth, would be materially impacted by the following: (i) da Vinci posed a material health risk to patients (¶¶ 45-54); (ii) Intuitive had violated FDA regulations by failing to properly report corrective actions it took to reduce health risks posed by da Vinci (¶¶ 50-54, 94-100, 108-116, 120); (iii) Intuitive had instituted three secret recalls in October 2011 to reduce risks to health posed by da Vinci (¶¶ 52-54, 108-116, 120); (iv) Intuitive was in violation of CGMP, in part, due to missing critical design inputs necessary to address the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100, 115-118); (v) there had been a substantial number of MDRs and complaints

1  reporting material health risks to patients (¶¶ 57, 58, 72-76), all of which when disclosed would

2  adversely impact Intuitive's business; and (vi) Intuitive failed to report, or timely report,

3  complaints of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

4  **7.   Intuitive's October 18, 2012 Form 10-Q**

5  238.   On October 18, 2012 Intuitive filed with the SEC its 3Q 2012 Form 10-Q, which

6  contained a section entitled "Risk Factors," stating that there had been "no changes to the Risk

7  Factors discussed in our Annual Report on Form 10-K for the fiscal year ended December 31,

8  2011," filed on February 6, 2012.  In the 2011 Form 10-K, Defendants represented that "the use

9  of our products could result in product liability and negligence claims that could be expensive,

10  divert management's attention and harm our business."  The Form 10-K further stated:

11  > Our business exposes us to significant risks of product liability claims. The
12  > medical device industry has historically been litigious, and we face financial
   > exposure to product liability claims if the use of our products were to cause injury
13  > or death. There is also the possibility that defects in the design or manufacture of
   > our products might necessitate a product recall. Any weaknesses in training and
14  > services associated with our products may also be subject to product liability
   > lawsuits. . . . .A product liability or negligence claim, regardless of its merit or
15  > eventual outcome, could result in significant legal defense costs. Product liability
   > claims have been made against our company in the past. A product liability claim
16  > or any product recalls could also harm our reputation or result in a decline in
   > revenues.

17  (a)   The 3Q 2012 Form 10-Q also represented that "[f]rom time to time, we

18  may be involved in a variety of claims . . . relating to securities laws, product liability, patent

19  infringement, contract disputes and other matters relating to various claims that arise in the

20  normal course of our business."

21  239.   These statements were materially false and misleading because they failed to

22  disclose that,

23  (a)   as of October 18, 2012, at least five lawsuits filed against Intuitive alleged

24  that patients had been harmed by Microcracks/insufficient insulation –  Monopolar current

25  (¶ 49), and

26  (b)   it was highly likely that additional suits would be filed in the future

27  because (i) da Vinci posed a material health risk to patients  (¶¶ 45-54); (ii) Intuitive had taken

28

1   corrective actions to reduce health risks in October 2011, but hundreds of thousands of surgeries
2   had been performed with da Vinci already before that date  (¶¶ 39, 50-54, 89, 94-100, 108-116,
3   120); (iii) Intuitive was in violation of CGMP, in part, due to missing critical design inputs
4   necessary to address the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100, 115-118);
5   (iv) there had been a substantial number of MDRs and complaints reporting material health risks
6   to patients (¶¶ 57, 58, 72-76); and (vi) Intuitive had failed to report, or timely report, complaints
7   or reports of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

8       240.    The 3Q 2012 Form 10-Q reiterated the financial results announced in the October
9   16th Press Release and October 16th Earnings Call (¶¶ 235-236).  These financial results were
10  materially false and misleading for the same reasons set forth in ¶ 237.

11      241.    The Form 10-Q was signed by Mohr.  Pursuant to § 302 of the Sarbanes-Oxley
12  Act of 2002, Defendants Guthart and Mohr signed a certification that was false and misleading
13  because it stated that the Form 10-Q did not contain false and misleading statements.

14          **8.     Intuitive's January 22, 2013 Form 8-K And Earnings
                     Call**
15

16      242.    On January 22, 2013 Intuitive filed with the SEC a Form 8-K attaching a press
17  release announcing Q4 2012 financial results (the "January 22nd Press Release").  Defendant
18  Guthart stated in the release that the "results reflect expanding da Vinci Surgical System use
19  across a broadening array of procedures and strong execution by our team."  The release also
20  reported, (i) revenue of $609 million for Q4 2012, up approximately 23% compared with
21  $497 million in Q4 2011, driven by "continued adoption of da Vinci surgery procedures and
22  higher da Vinci Surgical System sales;" and (ii) "da Vinci surgical procedures grew
23  approximately 25% in the fourth quarter of 2012 compared to the fourth quarter of 2011, driven
24  primarily by U.S. gynecology and general surgery growth, and partially offset by a decline in
25  U.S. prostatectomy procedures."

26      243.    During the January 22, 2013 conference call (the "January 22nd Earnings Call")
27  discussing Q4 2012 results  Defendant Guthart also stated that,

28

(a)     "[y]ear-over-year growth in procedures finished at 25%, led by continued uptake in gynecology and growing use of da Vinci in General Surgery"; and

(b)     "Looking back at the full year 2012, our operating highlights are as follows. Worldwide procedures grew by approximately 25%. We sold 620 da Vinci Surgical Systems in the year, up from 534.  Total revenue grew to $2.178 billion, up 24% over 2011. . . . Turning to operating highlights for the fourth quarter, procedures grew approximately 25% over the fourth quarter of last year. We sold 175 da Vinci surgical systems, up from 152 in the fourth quarter of 2011.  Total revenue for the quarter was $609 million, up 23% from the fourth quarter of 2011."

244.     Defendant Mohr reported during the call that fourth quarter 2012 systems revenue totaled "$265 million, and had increased 18% compared with $225 million for the fourth quarter of 2011."

245.     Defendants' statements in the January 22nd Press Release and January 22nd Earnings Call were materially false and misleading because Defendants failed to disclose that da Vinci, which was solely responsible for the Company's sales and revenue growth, would be materially impacted by the following: (i) da Vinci posed a material health risk to patients (¶¶ 45-54); (ii) Intuitive had violated FDA regulations by failing to properly report corrective actions it took to reduce health risks posed by da Vinci (¶¶ 50-54, 94-100, 108-116, 120); (iii) Intuitive had instituted three secret recalls in October 2011 to reduce risks to health posed by da Vinci (¶¶ 52-54, 108-116, 120); (iv) Intuitive was in violation of CGMP, in part, due to critical missing design inputs necessary to address the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100, 115-118); (v) there had been a substantial number of MDRs and complaints reporting material health risks to patients (¶¶ 57, 58, 72-76), all of which when disclosed would adversely impact the Company's business; and (vi) Intuitive had failed to report, or timely report, complaints of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

### 9.     Intuitive's February 4, 2013 Form 10-K Annual Report

246.     On February 4, 2013 Intuitive filed its 2012 Form 10-K with the SEC.

(a)      The Company's Form 10-K represented that,

> Our business exposes us to significant risks of product liability claims. The medical device industry has historically been litigious, and we face financial exposure to product liability claims if the use of our products were to cause injury or death. There is also the possibility that defects in the design or manufacture of our products might necessitate a product recall. Any weaknesses in training and services associated with our products may also be subject to product liability lawsuits. . . . If a patient is harmed during a da Vinci surgical procedure, even in the absence of any alleged system malfunction or defect, we can be exposed to negligence claims based on alleged inadequacies in our surgeon training, our training of our personnel, or in our proctoring programs. A negligence claim, regardless of its merit or eventual outcome, could result in significant legal defense costs. Negligence claims have been made against us in the past.

(b)      The Form 10-K also stated that "[f]rom time to time, we may be involved in a variety of claims, lawsuits, investigations and proceedings relating to securities laws, product liability, patent infringement, contract disputes and other matters relating to various claims that arise in the normal course of our business."

(c)      With respect to product liability actions specifically, the Form 10-K stated "[w]e are aware of increasing efforts by plaintiff's attorneys to solicit da Vinci patients for product liability lawsuits against the Company.  The Company cannot yet estimate the impact of these solicitations."

247.    These statements were materially false and misleading because they failed to disclose that,

(a)      as of February 4, 2013, at least eight product liability lawsuits alleged that patients had been harmed by Microcracks/insufficient insulation - Monopolar current (¶ 49), and

(b)      it was highly likely that additional suits would be filed in the future because (i) da Vinci posed a material health risk to patients  (¶¶ 45-54); (ii) Intuitive had taken corrective actions to reduce health risks in October 2011, but hundreds of thousands of surgeries had been performed with da Vinci already before that date  (¶¶ 39, 50-54, 89, 94-100, 108-116, 120); (iii) Intuitive was in violation of CGMP, in part, due to critical missing design inputs necessary to address the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100, 115-118); (iv) there had been a substantial number of MDRs and complaints reporting material health risks

1  to patients (¶¶ 57, 58, 72-76); and (v) Intuitive had failed to report, or timely report, complaints

2  or reports of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

3      248.    The Form 10-K reiterated the financial results announced in the January 22nd

4  Press Release and January 22nd Earnings Call (¶¶ 242-244).   These financial results were

5  materially false and misleading for the same reasons set forth in ¶ 245.

6      249.    The Form 10-K was signed by the Individual Defendants.  Pursuant to §302 of the

7  Sarbanes-Oxley Act of 2002, Guthart and Mohr signed a certification that was false and

8  misleading because it stated that the Form 10-K did not contain false and misleading statements.

9          **10.    Intuitive's April 18, 2013 Form 8-K And Earnings Call**

10      250.    On April 18, 2013, Intuitive filed with the SEC a Form 8-K attaching a press

11  release announcing the Company's Q1 2013 financial results (the "April 18th Press Release").

12  In the release, Guthart commented: "We are pleased with our first quarter revenue and earnings

13  growth.  Despite a concerted effort by vocal critics of robotic surgery, support remains strong

14  among patients, surgeons and hospitals . . . .  da Vinci Surgery has clinically proven benefits in

15  offering a minimally invasive option to a broader group of patients than traditional

16  technologies." The release also reported that (i) revenue of $611 million for Q1 2013, up 23%

17  compared with $495 million in Q1 2012, was "driven by continued growth of da Vinci surgery

18  procedures and higher da Vinci Surgical System sales;" and (ii) "da Vinci surgical procedures

19  grew approximately 18% in the first quarter of 2013 compared to the first quarter of 2012, driven

20  primarily by growth in general surgery, U.S. gynecology and international urology procedures,

21  partially offset by a decline in U.S. prostatectomy procedures."

22      251.    During the April 18, 2013 earnings call (the "April 18th Earnings Call")

23  discussing Q1 2013 results, Defendant Guthart also stated that,

24          (a)    "we experienced strong growth in general surgery, slower growth in

25  gynecology and a return to stability in urology.  This resulted in an 18% procedure growth over

26  2012.  The first quarter of 2013 had one fewer surgery day than 2012. Taking this into account,

27  normalized procedure growth improves to approximately 20%"; and

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 5:13-cv-01920-EJD                                                     - 90 -

1         (b)    "[t]otal revenue was $611 million, up 23% over last year."

2       252.    Also during the call, Defendant Mohr reported that first quarter 2013 systems

3 revenue totaled $256 million, an increase of 24% compared with $207 million for the first

4 quarter of 2012.

5       253.    Defendants' statements in the April 18th Press Release and April 18th Earnings

6 Call were materially false and misleading because Defendants failed to disclose that da Vinci,

7 which was solely responsible for the Company's sales and revenue growth, would be materially

8 impacted by the following: (i) da Vinci posed a material health risk to patients  (¶¶ 45-54);

9 (ii) Intuitive had violated FDA regulations by failing to properly report corrective actions it took

10 to reduce health risks posed by da Vinci (¶¶ 50-54, 94-100, 108-116, 120); (iii) Intuitive had

11 instituted three secret recalls in October 2011 to reduce risks to health posed by da Vinci

12 (¶¶ 52-54, 108-116, 120); (iv) Intuitive was in violation of CGMP, in part, due to critical missing

13 design inputs necessary to address the intraoperative cleaning of Monopolar Scissors (¶¶ 11, 100,

14 115-118); (v) there had been a substantial number of MDRs and complaints reporting material

15 health risks to patients (¶¶ 57, 58, 72-76), all of which when disclosed would adversely impact

16 the Company's business; and (vi) Intuitive had failed to report, or timely report, complaints or

17 reports of adverse events through the MDR mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

18       **11.    Intuitive's April 19, 2013 Form 10-Q**

19       254.    On April 19, 2013, Intuitive filed with the SEC its 1Q 2013 Form 10-Q.  The

20 Form 10-Q reiterated the financial results announced in the April 18th Press Release and

21 April 18th Earnings Call (¶¶ 250-252).  These financial results were materially false and

22 misleading for the same reasons set forth in ¶ 253.

23       255.    The 1Q 2013 Form 10-Q was signed by Defendant Mohr.  Pursuant to Section

24 302 of the Sarbanes-Oxley Act of 2002, Defendants Guthart and Mohr signed a certification that

25 was false and misleading because it stated that the Form 10-Q did not contain false and

26 misleading statements.

27

28

1

## VIII.   CLASS ACTION ALLEGATIONS

2        256.   Plaintiffs brings this action on behalf of themselves and as a class action pursuant

3   to Federal Rule of Civil Procedure 23(a) and (b)(3), consisting of all persons and entities who

4   purchased or acquired Intuitive common stock between February 6, 2012 and July 18, 2013,

5   inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are:

6   (a) Defendants; (b) members of the immediate families of the Individual Defendants; (c) the

7   subsidiaries and affiliates of Defendants; (d) any person who is an officer, director or controlling

8   person of Intuitive; (e) any entity in which any Defendant has a controlling interest;

9   (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or

10   subsidiaries thereof; (g) the Company's employee retirement and benefit plan(s); and (h) the

11   legal representatives, heirs, successors or assigns of any such excluded party.

12        257.   The members of the Class are so numerous that joinder of all members is

13   impracticable.   Throughout the Class Period, Intuitive stock was actively traded on the

14   NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and

15   can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands

16   of members in the proposed Class.   Record owners and other members of the Class may be

17   identified from records maintained by Intuitive or its transfer agent and may be notified of the

18   pendency of this action by mail, using a form of notice similar to that customarily used in

19   securities class actions.

20        258.   Plaintiffs' claims are typical of the claims of the members of the Class as all

21   members of the Class are similarly affected by Defendants' wrongful conduct in violation of

22   federal law complained of herein.

23        259.   Plaintiffs will fairly and adequately protect the interests of the members of the

24   Class and have retained counsel competent and experienced in class and securities litigation.

25   Plaintiffs have no interests that are adverse or antagonistic to the Class.

26

27

28

260.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   Whether the SEC filings, press releases, reports and other public statements disseminated to Intuitive's investors during the Class Period contained materially false and misleading statements or omissions;

(c)   Whether and to what extent the market price of the Company's common stock was artificially inflated during the Class Period due to the non-disclosures and/or false and misleading statements complained of herein;

(d)   Whether Defendants acted with scienter;

(e)   Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

(f)   Whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and, if so, the proper measure thereof.

261.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this case as a class action.

## IX.   PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

262.   Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are primarily predicated upon omissions of material fact for which there was a duty to disclose.

263.    Plaintiffs are also entitled to a presumption of reliance under the fraud on the market doctrine on Defendants' material misrepresentations and omissions for the following reasons:

- Intuitive's common stock was actively traded in an efficient market on NASDAQ during the Class Period;

- As a regulated issuer, Intuitive filed periodic public reports with the SEC;

- Intuitive regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

- The market reacted promptly to public information disseminated by Intuitive;

- Intuitive was covered by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace; and

- Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased Intuitive stock between the time Defendants failed to disclose material facts and the time the true facts were disclosed.

264.    In addition to the foregoing, Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding da Vinci's defects throughout the Class Period.

## X.    THE SAFE HARBOR PROVISION IS INAPPLICABLE

265.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pled in this complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Defendants are

1    liable for those false and misleading forward-looking statements because at the time each of

2    those forward-looking statements was made, the particular speaker knew that the particular

3    forward-looking statement was false and misleading, and/or the forward-looking statement was

4    authorized and/or approved by an executive officer of Intuitive who knew that those statements

5    were false and misleading when made.

6        266.  For example, Intuitive is not entitled to the safe harbor provision based on its

7    warnings that "if defects are discovered in our products, we may incur additional unforeseen

8    costs, hospitals may not purchase our products and our reputation may suffer" and "[w]e cannot

9    assure that our products will not experience component aging, errors or performance problems in

10    the future" because throughout the Class Period, Defendants were aware that da Vinci in fact

11    already had suffered from defects related to, among other things, faulty tip covers and

12    Monopolar Scissors that presented a significant risk to patient health.

13        267.  Intuitive is likewise not entitled to the safe harbor provision based on its warning

14    that the "use of [its] products could result in product liability and negligence claims that could be

15    expensive, divert management's attention and harm [the Company's] business" because

16    throughout the Class Period, Defendants were aware that Intuitive was already subject to

17    numerous product liability and negligence lawsuits alleging injuries due to arcing as a result of

18    insufficient insulation of monopolar current, and that the cause of the arcing, faulty tip covers

19    and microcracks in the Monopolar Scissors, had not been corrected, thereby creating an

20    increased risk of additional injuries and lawsuits.  In addition, it was highly likely that additional

21    suits would be filed in the future because (i) da Vinci posed a material health risk to patients

22    (¶¶ 45-54); (ii) Intuitive had taken corrective actions to reduce health risks in October 2011, but

23    hundreds of thousands of surgeries had been performed with da Vinci already before that date

24    (¶¶ 39, 50-54, 89, 94-100, 108-116, 120); (iii) Intuitive was in violation of CGMP, in part, due to

25    critical missing design inputs necessary to address the intraoperative cleaning of Monopolar

26    Scissors (¶¶ 11, 100, 115-118); (iv) there had been a substantial number of MDRs and

27    complaints reporting material health risks to patients (¶¶ 57, 58, 72-76); and (v) Intuitive had

28

1   failed to report, or timely report, complaints or reports of adverse events through the MDR

2   mechanism (21 C.F.R. § 803.50) (¶¶ 62-76).

3         268.   Nor is Intuitive entitled to safe harbor based on its warnings that: (i) "We are

4   subject to inspection and marketing surveillance by the FDA to determine our compliance with

5   regulatory requirements. If the FDA finds that we have failed to comply, it can institute a wide

6   variety of enforcement actions, ranging from a regulatory letter to a public Warning Letter to

7   more severe civil and criminal sanctions including the seizure of our products and equipment or

8   ban on the import or export of our products.  Our failure to comply with applicable requirements

9   could lead to an enforcement action that may have an adverse effect on our financial condition

10   and results of operations"; and (ii) "We also cannot assure that the FDA will not find other

11   observations in our compliance with the QSR and other postmarket regulations."

12         269.   These warnings are insufficient because throughout the Class Period Defendants

13   were aware that they had concealed from the FDA corrective actions dating back to

14   October 2011, which the Company had initiated in response to serious health risks, and that

15   those unreported corrective actions violated FDA regulations, thereby subjecting the Company to

16   FDA enforcement actions.  Defendants were also aware throughout the Class Period of the need

17   for surgeons to clean their instruments intraoperatively without damaging the Tip Covers, but

18   failed to address that design need in accordance with FDA regulations.  Furthermore, Defendants

19   were aware throughout the Class Period that the Company was mischaracterizing and

20   underreporting adverse events associated with da Vinci, contrary to FDA regulations.

21   **XI.    CAUSES OF ACTION**

22                **FIRST CAUSE OF ACTION**

23         **For Violation of Section 10(b) of the Exchange Act and**
                  **Rule 10b-5 Promulgated Thereunder**

24                  **Against All Defendants**

25         270.   Plaintiffs repeat and reallege each and every allegation contained above as if fully

26   set forth herein.

27

28

271.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain inflated the market price of Intuitive common stock; and (iii) cause Plaintiffs and other Class members to purchase Intuitive common stock at artificially inflated prices.

272.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.  Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Intuitive's common stock in violation of §10(b) of the Exchange Act and SEC Rule 10b-5.  All of the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

273.    Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about da Vinci's defects, Intuitive's corrective action related to those defects, and the Company's failure to comply with applicable disclosure and reporting laws and regulations.

274.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to falsely and misleadingly assure investors of da Vinci's safety and continued substantial growth, which included the making of, or the participation in making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about da Vinci and Intuitive's compliance with applicable disclosure and reporting laws and regulations, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in

1    transactions, practices and a course of business which operated as a fraud and deceit upon the

2    purchasers of Intuitive common stock during the Class Period.

3        275.    Defendants' Guthart, Mohr, and Smith's primary liability, and controlling person

4    liability as set forth in Count II, arises from the following facts: (i) they were each senior

5    executives and/or directors during the Class Period and members of the Company's management

6    team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and

7    activities as a high-level executive and/or director of the Company, was privy to and participated

8    in the creation, development, and reporting of the Company's internal budgets, plans, projections

9    and/or reports; (iii) each of these Defendants was advised of, and had access to, other members

10   of the Company's management team, internal reports, and other data and information about da

11   Vinci and Intuitive's compliance with applicable disclosure and reporting laws and regulations;

12   and (iv) each of these Defendants was aware of the Company's concealment of information from

13   the investing public, which they knew or recklessly disregarded was materially false and

14   misleading.

15       276.    Defendant Guthart signed and certified Intuitive's materially false and misleading

16   Forms 10-K for fiscal 2011 and 2012, and certified the Company's materially false and

17   misleading Forms 10-Q for the quarterly periods ending March 31, 2012, June 30, 2012,

18   September 30, 2012, and March 31, 2013.  Defendant Guthart also made materially false and

19   misleading statements and omissions on Intuitive Earnings Calls on April 17, 2012, July 19,

20   2012, October 16, 2012, January 22, 2013, and April 18, 2013.  Further, Defendant Guthart made

21   materially false and misleading statements and omissions in the April 17, 2012, July 19, 2012,

22   October 16, 2012, January 22, 2013, and April 18, 2013 Forms 8-K.

23       277.    Defendant Mohr signed and certified Intuitive's materially false and misleading

24   Forms 10-K for fiscal 2011 and 2012, as well as its materially false and misleading Forms 10-Q

25   for the quarterly periods ending March 31, 2012, June 30, 2012, September 30, 2012, and March

26   31, 2013.  Defendant Mohr also signed Intuitive's materially false and misleading Forms 8-K

27   filed on April 17, 2012, July 19, 2012, October 16, 2012, January 22, 2013, March 14, 2013, and

28

1   April 18, 2013.  Defendant Mohr also made materially false and misleading omissions during the

2   Earnings Calls on July 19, 2012, October 16, 2012, January 22, 2013, and April 18, 2013.

3        278.   Defendant Smith signed Intuitive's materially false and misleading Forms 10-K

4   for fiscal 2011 and 2012.

5        279.   In addition to the duties of full disclosure imposed on Defendants as a result of

6   making affirmative statements and reports, or participation in the making of affirmative

7   statements and reports to the investing public, they had a duty to promptly disseminate truthful

8   information that would be material to investors, including truthful, complete and accurate

9   information with respect to the Company's operations and performance so that the market prices

10  of the common stock would be based on truthful, complete and accurate information.

11       280.   Defendants had actual knowledge of the false and misleading statements and

12  omissions of material facts set forth herein, or acted with reckless disregard for the truth in that

13  they failed to ascertain and disclose such facts, even though such facts were available to them.

14  Defendants' materially false and misleading statements and omissions were done knowingly or

15  recklessly and for the purpose and effect of concealing Intuitive's true financial condition from

16  the investing public and supporting the artificially inflated price of its common stock.  As

17  demonstrated by Defendants' materially false and misleading statements and omissions about da

18  Vinci and Intuitive's compliance with applicable disclosure and reporting laws and regulations,

19  Intuitive and the Individual Defendants, if they did not have actual knowledge of the materially

20  false and misleading statements and omissions alleged, were reckless in failing to discover such

21  materially false and misleading statements and omissions by deliberately refraining from taking

22  those steps necessary to discover the facts concealed.

23       281.   As a result of the materially false and misleading statements and omissions, as set

24  forth above, the market price of Intuitive's common stock was artificially inflated during the

25  Class Period.  Unaware that the market price of Intuitive common stock was artificially inflated,

26  and relying directly or indirectly on the materially false and misleading statements made by

27  Defendants, or upon the integrity of the market in which the common stock traded, and/or on the

28

1   absence of material adverse information that was known to, or recklessly disregarded by,

2   Defendants but not disclosed publicly during the Class Period, Plaintiffs and the other members

3   of the Class purchased or otherwise acquired Intuitive common stock during the Class Period at

4   artificially inflated prices and were damaged thereby.

5          282.   At the time of said omissions, Plaintiffs and other members of the Class were

6   unaware of the concealed information.  Had Plaintiffs and the other members of the Class and

7   the marketplace known the truth regarding da Vinci and Intuitive's compliance with applicable

8   disclosure and reporting laws and regulations, Plaintiffs and other members of the Class would

9   not have purchased or otherwise acquired Intuitive common stock, or, if they had acquired such

10  stock during the Class Period, they would not have done so at the artificially inflated prices

11  which they paid.

12         283.   By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act,

13  and Rule 10b-5 promulgated thereunder.

14         284.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

15  the other members of the Class suffered damages in connection with their respective purchases

16  and sales of the Company's common stock during the Class Period.

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND CAUSE OF ACTION**

**For Violation of Section 20(a) of the Exchange Act**
**Against Defendants Guthart, Mohr, and Smith**

285.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

286.    Defendants Guthart, Mohr, and Smith acted as controlling persons of Intuitive within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, substantial participation in and/or awareness of the Company's operations and/or intimate knowledge of the materially false and misleading financial statements filed by the Company with the SEC and disseminated to the investing public, these Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including its omissions, which Plaintiffs contend were materially false and misleading.  These Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

287.    In particular, Guthart, Mohr, and Smith each had direct and supervisory involvement in the day-to-day operations of the Company, particularly with respect to da Vinci, the Company's sole product, and, therefore, are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

288.    As set forth above, Intuitive violated §10(b) and Rule 10b-5 by the acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Intuitive's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD CAUSE OF ACTION**

**For Violation of Section 20A of the Exchange Act
on Behalf of Plaintiffs**

289.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

290.    This claim is asserted against Defendants Guthart, Mohr, and Smith and is brought on behalf of Plaintiffs and members of the Class who purchased Intuitive common stock contemporaneously with the Individual Defendants and who sold Intuitive common stock at inflated prices during the Class Period.

291.    On November 20, 2012, Hawaii ERS purchased 11,867 shares of Intuitive common stock.   On that same date, while in possession of material, adverse nonpublic information, Defendant Smith sold 23,949 shares of Intuitive common stock.

292.    On November 26, 2012, Hawaii ERS purchased 6,000 shares of Intuitive common stock.   On that same date, while in possession of material, adverse nonpublic information, Defendant Smith sold 21,164 shares of Intuitive common stock.

293.    On January 25, 2013, while in possession of material, adverse nonpublic information, Defendant Guthart sold 4,500 shares of Intuitive common stock.  One trading day later, on January 28, 2013, Defendant Mohr, while also in possession of material, adverse nonpublic information, sold 8,000 shares of Intuitive common stock.  On January 29, 2013, merely two trading days after Defendant Guthart's sale and only one day after Defendant Mohr's, Hawaii purchased 140 shares of Intuitive common stock.

294.    In addition, on October 23, 2012, Pennsylvania Carpenters purchased 1,825 shares of Intuitive common stock.  On October 22, 2012, while in possession of material, adverse nonpublic information, Defendants Smith, Guthart, and Mohr sold 17,500, 4,500, and 7,300 shares of Intuitive common stock, respectively.

295.    Defendants Guthart, Mohr, and Smith violated §10(b) of the Exchange Act, as described herein.

296.    As a result of the foregoing, Defendants Guthart, Mohr, and Smith violated §20A of the Exchange Act and are each liable to Plaintiffs and other Class members who purchased shares of Intuitive common stock contemporaneously with the Individual Defendants' insider sales, and who seek disgorgement of the Individual Defendants' profits and avoided losses from their transactions in Intuitive common stock.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as co-class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: October 15, 2013

/s/ *Danielle S. Myers*
_____

| | |
|---|---|
| ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>ARTHUR C. LEAHY<br>DANIELLE S. MYERS<br>SUSANNAH R. CONN<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: 212/231-1058<br>619/231-7423 (fax)<br>artl@rgrdlaw.com<br>dmyers@rgrdlaw.com<br>sconn@rgrdlaw.com | LABATON SUCHAROW LLP<br>ERIC J. BELFI (*pro hac vice*)<br>JONATHAN M. PLASSE (*pro hac vice*)<br>JAVIER BLEICHMAR (*pro hac vice*)<br>SERENA P. HALLOWELL (*pro hac vice*)<br>DANIELLE E. STAMPLEY (*pro hac vice*)<br>140 Broadway, 34th Floor<br>New York, NY 10005<br>Telephone: 212/907-0700<br>212/818-0477 (fax)<br>ebelfi@labaton.com<br>jplasse@labaton.com<br>jbleichmar@labaton.com<br>shallowell@labaton.com<br>dstampley@labaton.com |
| Liaison Counsel for Plaintiffs and the<br>Putative Class | Counsel for Plaintiffs and the Class |
| | ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>SHAWN A. WILLIAMS<br>Post Montgomery Center<br>One Montgomery Street, Suite 1800<br>San Francisco, CA 94104<br>Telephone: 415/288-4545<br>415/288-4534 (fax)<br>shawnw@rgrdlaw.com |
| | Liaison Counsel for Plaintiffs and the Putative<br>Class |

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on October 15, 2013, I authorized the electronic filing of the

3   foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4   such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I

5   hereby certify that I caused to be mailed the foregoing document or paper via the United States

6   Postal Service to the non- CM/ECF participants indicated on the attached Manual Notice List.  I

7

8   certify under penalty of perjury under the laws of the United States of America that the foregoing

9   is true and correct.  Executed on October 15, 2013.

10

11                                                    /s/ *Danielle S. Myers*
                                                      DANIELLE S. MYERS
12                                                    655 West Broadway, Suite 1900
                                                      San Diego, CA 92101
13                                                    Telephone:  212/231-1058
                                                      619/231-7423 (fax)
14                                                    Email: dmyers@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:13–cv–01920–EJD

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Mary K. Blasy**
  mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Javier Bleichmar**
  jbleichmar@labaton.com,lmehringer@labaton.com,electroniccasefiling@labaton.com

- **Michael D. Celio**
  mdc@kvn.com,gpeterson@kvn.com,efiling@kvn.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Serena Hallowell**
  shallowell@labaton.com,mrusso@labaton.com,efarber@labaton.com,dstampley@labaton.com

- **Arthur Charles Leahy**
  artl@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Reid Patrick Mullen**
  rmullen@kvn.com,efiling@kvn.com,sharmison@kvn.com,pal@kvn.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com,sconn@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Jonathan M. Plasse**
  jplasse@labaton.com,electroniccasefiling@labaton.com

- **Danielle Elizabeth Stampley**
  dstampley@labaton.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,nnewton@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)