1  KEKER & VAN NEST LLP
   MICHAEL D. CELIO - # 197998
2  mcelio@kvn.com
   JO W. GOLUB - # 246224
3  jgolub@kvn.com
   REID P. MULLEN - # 270671
4  rmullen@kvn.com
   633 Battery Street
5  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
6  Facsimile:    415 397 7188

7  Attorneys for Defendants INTUITIVE SURGICAL, INC.,
   LONNIE M. SMITH, GARY S. GUTHART, SALVATORE J.
8  BROGNA, AUGUSTO V. CASTELLO, JEROME J.
   McNAMARA, MARK J. MELTZER, MARSHALL L. MOHR,
9  COLIN MORALES, and DAVID J. ROSA

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                   SAN JOSE DIVISION

13                                    Case No. 5:13-CV-01920 EJD

14                                    **NOTICE OF MOTION AND MOTION TO**
   IN RE INTUITIVE SURGICAL         **DISMISS AMENDED CLASS ACTION**
15  SECURITIES LITIGATION            **COMPLAINT AND MEMORANDUM OF**
                                     **POINTS AND AUTHORITIES IN**
16                                   **SUPPORT THEREOF**

17                                    Date:       May 9, 2014
                                     Time:       9:00 a.m.
18                                   Judge:      Hon. Edward J. Davila
                                     Courtroom: 4
19
                                     Date Filed:  April 26, 2013
20

21

22

23

24

25

26

27

28

795112

---

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 9, 2014 at 9:00 a.m., or as soon thereafter as this matter may be heard in the courtroom of the Honorable Edward J. Davila, located at 280 S. First Street, San Jose, California 95113, Defendants will and hereby do move this Court for an Order dismissing Plaintiffs' Amended Class Action Complaint.

This motion is brought pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the Amended Class Action Complaint fails to plead fraud with particularity and to state a claim upon which relief may be granted.  This Motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Request for Judicial Notice ("RJN") filed herewith, the Declaration of Reid P. Mullen in support thereof, all files and records in this action, oral argument, and such additional matters as may be judicially noticed by the Court or may come before the Court prior to or at the hearing on this matter.

## ISSUES TO BE DECIDED (Civil Local Rule 7-4(a)(3))

1.     Have Plaintiffs adequately specified "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" as required by 15 U.S.C. § 78u–4(b)(1)(B)?

2.     Have Plaintiffs sufficiently alleged that Defendants failed to disclose material information that it had a duty to report to its investors?

3.     Have Plaintiffs alleged with particularity facts giving rise to a strong inference that Defendants acted with scienter as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4?

Dated:  December 16, 2013                                  KEKER & VAN NEST LLP


                                                    By:     /s/ Michael D. Celio
                                                          MICHAEL D. CELIO
                                                          JO W. GOLUB
                                                          REID P. MULLEN

                                                          Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..............................................................................................1

II.  STATEMENT OF MATERIAL FACTS AND ALLEGATIONS .......................2

    A.   Intuitive Surgical and the *da Vinci* Surgical System ...............................2

    B.   FDA Regulation .......................................................................................2

    C.   Intuitive's Securities Litigation................................................................4

III. ARGUMENT ...................................................................................................5

    A.   Plaintiffs face an exceptionally exacting legal standard. .........................5

    B.   The statements quoted in the Complaint were neither false nor misleading. .........6

        1.   Plaintiffs fail to adequately allege that Intuitive spoke falsely. ...................6

            a.   Plaintiffs improperly force the Court to untangle the "puzzle" of their undifferentiated allegations. ...................6

            b.   Intuitive's financial results are not alleged to be false....................8

            c.   Expressions of corporate optimism are not actionable. ..................9

        2.   None of Intuitive's alleged omissions are actionable. ...............................9

            a.   Intuitive immediately disclosed the FDA Warning Letter............10

            b.   Intuitive disclosed all required information about MDRs. ............11

            c.   Intuitive had no obligation to disclose additional information about pending lawsuits................................13

            d.   The remaining allegations of omitted information are meritless. .............14

    C.   Plaintiffs fail to allege scienter. ............................................................15

        1.   Plaintiffs do not even attempt to allege scienter as to the specific, individual statements. ...................16

        2.   The "core operations" inference does not apply........................................17

         3.   The allegations derived from a confidential witness are also insufficient to establish scienter................................18

        4.   Defendants' stock sales do not support a strong inference of scienter. ...................20

NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:13-CV-01920 EJD

795112

a.   The percentage of shares sold during the Class Period undermines any argument for scienter. ...........................................20

b.   The timing of the sales does not support scienter. .........................21

c.   Intuitive's stock repurchase program negates scienter. .................23

5.   The 2002 and 2008 FDA communications offer no support to allegations of scienter in 2012 and 2013. ....................................................23

D.   Because the Section 10(b) claim fails, Plaintiffs' claims under Sections 20(a) and 20A also should be dismissed. ...............................................................24

IV.   CONCLUSION ......................................................................................................................25

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*Anderson v. Abbott Labs*
. 140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269
5
F.3d 806 (7th Cir. 2001) ......................................................................................... 11, 13

6

*Basic, Inc. v. Levinson*
485 U.S. 224 (1988) ...................................................................................................... 9

7

8

*Brody v. Transitional Hospitals Corp.*
280 F.3d 997 (9th Cir. 2002) ................................................................... 6, 10, 11, 14, 15

9

*DSAM Global Value Fund v. Altris Software, Inc.*
288 F.3d 385 (9th Cir. 2002) ...................................................................................... 16

10

11

*Gaines v. Guidant Corporation*
2004 WL 2538374 (S.D. Ind. Nov. 8, 2004) ............................................................. 12

12

*Glazer Capital Mgmt., LP v. Magistri*
549 F.3d 736 (9th Cir. 2009) ...................................................................................... 17

13

14

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*
352 F.3d 367 (9th Cir. 2003) ........................................................................................ 9

15

*Gompper v. VISX*
298 F.3d 893 (9th Cir. 2002) ...................................................................................... 16

16

17

*Heliotrope General, Inc. v. Ford Motor Co.*
189 F.3d 971 (9th Cir. 1999) ...................................................................................... 14

18

*Hollinger v. Titan Capital Corp.*
914 F.2d 1564 (9th Cir. 1990) .................................................................................... 16

19

20

*In re Apple Computer Sec. Litig.*
886 F.2d 1109 (9th Cir. 1989) .................................................................................... 21

21

*In re Autodesk, Inc. Sec. Litig.*
132 F. Supp. 2d 833 (N.D. Cal. 2000) .......................................................................... 8

22

23

*In re Bank of America AIG Disclosure Sec. Litig.*
__ F. Supp. 2d __, 2013 WL 5878814 (S.D.N.Y. Nov. 1, 2013) ............................... 14

24

*In re Bare Escentuals, Inc. Sec. Litig.*
745 F. Supp. 2d 1052 (N.D. Cal. 2010) ........................................................................ 5

25

26

*In re Boston Scientific Corp. Sec. Litig.*
708 F. Supp. 2d 110 (D. Mass. 2010) ......................................................................... 22

27

*In re Bridgepoint Educ., Inc. Sec. Litig.*
No. 3:12-CV-1737 JM (WMC), 2013 WL 5206216 (S.D. Cal. Sept. 13, 2013).............. 20, 24

28

795112

*In re Cisco Sys. Sec. Litig.*
  2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ................................................................. 7, 23

*In re Conner Peripherals, Inc.*
  1996 WL 193811 (N.D. Cal. Jan. 18, 1996) ........................................................................ 7

*In re Convergent Technologies Sec. Litig.*
  948 F.2d 507 (9th Cir. 1991) ............................................................................................ 8, 9

*In re Daou Sys.*
  411 F.3d 1006 (9th Cir. 2005) ......................................................................................... 18, 19

*In re FVC.COM Sec. Litig.*
  136 F. Supp. 2d 1031 (N.D. Cal. 2000) ............................................................................ 22

*In re Genzyme*
  2012 WL 1076124 (D. Mass. Mar. 30, 2012) ........................................................ 11, 13, 15, 24

*In re Gilead Sciences Securities Litig.*
  536 F.3d 1049 (9th Cir. 2008) ...................................................................................... 5, 13

*In re GlenFed, Inc. Sec. Litig.*
  42 F.3d 1541 (9th Cir. 1994) (en banc), *aff'd in part, rev'd in part on other grounds*,
  60 F.3d 591 (9th Cir. 1995) .............................................................................................. 7

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*
  554 F. Supp. 2d 1083 (C.D. Cal. 2008) ............................................................................. 9

*In re Keyspan Corp. Sec. Litig.*
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ............................................................................... 14

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................................................... 14

*In re NVIDIA Corp. Sec. Litig.*
  No. C 08–4260 RS, 2010 WL 4117561 (N.D. Cal. Oct.19, 2010) ...................................... 23

*In re Rigel Pharm., Inc. Sec. Litig.*
  697 F.3d 869 (9th Cir. 2012) .......................................................................................... 2, 8

*In re Silicon Graphics, Inc. Sec. Litig.*
  183 F.3d 970 (9th Cir. 1999) .............................................................................. 16, 20, 21, 24

*In re Silicon Storage Tech., Inc.*
  No. C 05-0295 PJH, 2006 WL 648683 (N.D. Cal. Mar. 10, 2006) ...................................... 19

*In re Sofamor Danek*
  123 F.3d 394 (6th Cir. 1997) ............................................................................................ 8

*In re Splash Tech. Holdings, Inc. Sec. Litig.*
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) ............................................................................. 7

*In re Tibco Software, Inc.*
  No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) .................................... 23

795112

NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:13-CV-01920 EJD

*Lipton v. Pathogenesis Corp.*
  284 F.3d 1027 (9th Cir. 2002) ...................................................................... 22, 25

*Matrixx Initiatives, Inc. v. Siracusano*
  131 S. Ct. 1309 (2011)...................................................................... 10, 11, 12, 15

*Matthews v. Centex Telemanagement, Inc.*
  No. C-92-1837-CAL, 1994 WL 269734 (N.D. Cal. 1994)...................................... 23

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*
  320 F.3d 920 (9th Cir. 2003) ............................................................................. 20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*
  ("*Police Retirement I*"), No. 10-CV-03451-LHK, 2011 WL 3501733(N.D. Cal. Aug. 10, 2011) ........................................................................................................... 9

*Police Ret. Sys of St. Louis v. Intuitive Surgical, Inc.*
  ("*Police Retirement II*"), No. 10-CV-03451-LHK, 2012 WL 1868874 (N.D. Cal. May 22, 2012) ..................................................................................................... *passim*

*Primo v. Pacific Biosciences of California, Inc.*
  940 F.Supp.2d 1105 (N.D. Cal. 2013) ................................................................ 16

*Ronconi v. Larkin*
  253 F.3d 423 (9th Cir. 2001) ............................................................................... 5

*South Ferry LP, No. 2 v. Killinger*
  542 F.3d 776 (9th Cir. 2008) ....................................................................... 17, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
  551 U.S. 308 (2007)..................................................................................... 16, 23

*Wenger v. Lumisys, Inc.*
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................................. 12

*Zucco Partners, LLC v. Digimarc Corp.*
  552 F.3d 981 (9th Cir. 2009) ........................................................... 5, 18, 19, 24

**Federal Statutes**

15 U.S.C. § 78u-4 ................................................................................... 1, 6, 16

**Federal Rules**

Federal Rule of Civil Procedure Rule 9(b) ...................................................... 1, 5

**Federal Regulations**

17 C.F.R. § 240.10b-5(b) .................................................................................. 10

21 C.F.R. § 803 ................................................................................................... 2

21 C.F.R. § 806.10 ............................................................................................ 11

795112

**<u>Other Authorities</u>**

FDA Regulatory Procedures Manual § 4-1-1 .......................................................................... 11, 13

NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:13-CV-01920 EJD

795112

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Amended Class Action Complaint (the "Complaint") before this Court is a perfect example of the "sue-first-and-figure-out-why-later" style of litigation that the Private Securities Litigation Reform Act of 1995 (the "PSLRA" or the "Reform Act"), 15 U.S.C. § 78u-4, was meant to extinguish.  Intuitive Surgical, Inc. ("Intuitive") is the manufacturer of the *da Vinci* robotic surgical system.  The *da Vinci* has been an immense success, and has been used to perform millions of successful surgeries.  But surgery, whether performed robotically or otherwise, is an inherently risky endeavor.  Much of the Complaint concerns allegations that there are product defects that have led to lawsuits and to a regulatory dispute with the Food and Drug Administration.  Intuitive disputes this and certainly no such finding has ever been made in any court.  But this is not a product liability case, nor is it an FDA regulatory action.  The issue in *this* case is whether Intuitive said anything on these topics that misled its investors.  To proceed in this case, allegations of product defects or regulatory actions are irrelevant unless, as the Reform Act requires, Plaintiffs can plead particularized facts showing that Intuitive made materially false or misleading statements and did so with the intent to defraud its investors.  Plaintiffs cannot plead any such facts because none exist.

The Complaint fails for two independent reasons.  ***First***, Plaintiffs have failed to allege with the required specificity why any of the statements quoted in the Complaint were false, nor have they identified any legally required statement that was omitted.  Though Plaintiffs label dozens of statements "materially false and misleading," they do not identify a single fact showing that any of the statements were inaccurate when made as required by 15 U.S.C. § 78u–4(b)(1)(B). ***Second***, Plaintiffs fail to plead the highly particularized allegations of scienter required by the Reform Act and Rule 9(b) of the Federal Rules of Civil Procedure.  Either of these flaws would doom this Complaint, but taken together they make clear that the Complaint must be dismissed.

## II.   STATEMENT OF MATERIAL FACTS AND ALLEGATIONS[1]

### A.   Intuitive Surgical and the *da Vinci* Surgical System

Intuitive designs, manufacturers, and sells the *da Vinci* Surgical System.  Compl. ¶ 29.
The *da Vinci* Surgical System is a state-of-the-art, robotic surgical system that uses 3-D computer
enhanced technology to translate the natural hand motions of a surgeon sitting at a remote console
into precise micro-movements performed by laparoscopic[2] instruments positioned inside the
patient.  *Id.* ¶ 41.  Intuitive invented the *da Vinci* technology, and it makes money by selling the
system, and related accessories and services, to hospitals worldwide.  *Id.* ¶¶ 38–41.

The *da Vinci* system has been an immense success.  In 2000, it became the first robotic
surgical system to be cleared by the FDA for general laparoscopic surgery.  *Id.* ¶ 29.  Since that
time, the *da Vinci* has been cleared by the FDA for several other procedures.  *Id.* ¶ 38.  As of
December 31, 2012, there were 2,585 *da Vinci* systems installed in 2,025 hospitals worldwide.
*Id.* ¶ 39.  The number of procedures performed with the *da Vinci* system has risen steadily since
its introduction, topping 367,000 procedures in the United States alone in 2012.  *Id.* ¶ 39.

### B.   FDA Regulation

As a manufacturer of medical devices, Intuitive is heavily regulated by the FDA.  *Id.* ¶
186.  The FDA monitors the performance of medical devices through "medical device reports" or
"MDRs."  Essentially, MDRs are reports of "adverse events" related to a medical device, and all
of the procedures relating to the MDRs are controlled by federal regulation.  *Id.* ¶¶ 62–63.  For
example, the MDR reporting regulation, 21 C.F.R. § 803, requires that device manufacturers like
Intuitive submit a report to the FDA when they become aware of information that "reasonably
suggests" that a device may have caused or contributed to a serious injury or death, or has
malfunctioned in a way that likely would cause or contribute to serious injury or death.  *Id.* ¶¶ 62–
63.  MDRs are stored in a publicly available database maintained by the FDA, known as

---

[1]  For purposes of this motion only, Defendants "accept as true all well-pleaded allegations in the
complaint."  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 875 (9th Cir. 2012).  Should this
case proceed, Defendants expect to prove that virtually everything pleaded in the Complaint is
false.

[2]  "Laparoscopic" surgery is surgery performed through very small incisions in the body.  It is
commonly referred to as "minimally invasive surgery" or "MIS."

"Manufacturer and User Device Facility Device Experience" or "MAUDE." *Id.* ¶¶ 57–58.

The mere existence of an MDR in the MAUDE database, however, does not constitute a determination by the FDA that a device actually caused an injury.  Declaration of Reid P. Mullen In Support of Defendants' Request for Judicial Notice ("Mullen Decl."), Ex. A (MAUDE homepage).  To the contrary, the FDA itself cautions that: "Confirming whether a device actually caused a specific event can be difficult based solely on information provided in a given report.  Establishing a cause-and-effect relationship is especially difficult if circumstances surrounding the event have not been verified or the device in question has not been directly evaluated." *Id.*  The FDA also states on the MAUDE homepage that: "MDR data alone cannot be used to establish rates of events, evaluate change of event rates over time or compare event rates between devices." *Id.*  Significantly, the FDA cautions that "[t]he number of reports cannot be interpreted or used in isolation to reach conclusions about the existence, severity, or frequency of problems associated with devices." *Id.*

The FDA also inspects manufacturers like Intuitive.  Compl. ¶ 57.  For example, the FDA inspected Intuitive's facilities in April and May 2013, after which the FDA sent Intuitive a Form 483 (a notice of "inspectional observations"), and, on July 16, 2013, a Warning Letter (a notice of intended enforcement action). *Id.* ¶¶ 3, 16.  Intuitive disclosed the FDA Warning Letter to the public on July 18, 2013, almost immediately after receiving it. *Id.* ¶ 16.  In the Warning Letter, the FDA took the position that Intuitive had initiated four "field corrections" without notifying the FDA, as it claims is required by federal regulations. *Id.*, Ex. A.  These "field corrections" were four letters that Intuitive had sent to the 2,000-plus hospitals who use the *da Vinci* system— three of which letters had been sent two years earlier, in 2011. *Id.*  The letters notified the hospitals of restrictions on use of the *da Vinci* system and included recommendations for the proper use of the system. *See id.*  In other words, the FDA's concern was *not* concealment.  The FDA did not contend that Intuitive had concealed anything from doctors or patients; rather, it was concerned that the issues that Intuitive had been very public about for almost two years had not *also* been reported to the FDA in the manner it believed its regulations required.

The possibility that the FDA might take action impacting Intuitive could not have been a

795112

surprise to anyone.  For years, Intuitive has cautioned investors about the specific risks it faced from FDA regulatory action.  For example, in its February 4, 2012 10-K filing Intuitive wrote: "A company's facilities, records, and manufacturing processes are subject to periodic scheduled or unscheduled inspections by the FDA, which may issue . . . notices of inspectional observations . . . .  If the observations are sufficiently serious or the manufacturer fails to respond appropriately, the FDA may issue Warning Letters, which are notices of intended enforcement actions against the manufacturer."  Mullen Decl., Ex. B (February 2012 10-K) at 13; *see also* Compl. ¶ 186(a).

### C.    Intuitive's Securities Litigation

Despite being explicitly advised of the relevant risks, Plaintiffs now claim they were defrauded into buying Intuitive stock at "inflated" prices because Intuitive made "materially false and misleading" statements in a variety of SEC filings and analyst calls discussing those filings. This is the second time in less than three years that Intuitive and its senior officers have come before this Court having been falsely accused of committing securities fraud.  Judge Lucy Koh dismissed the prior case with prejudice on May 22, 2012, holding that the Reform Act barred the plaintiffs' claims.  *See Police Ret. Sys of St. Louis v. Intuitive Surgical, Inc.* ("*Police Retirement II*"), No. 10-CV-03451-LHK, 2012 WL 1868874 (N.D. Cal. May 22, 2012).  Judge Koh held that the plaintiffs had not pled scienter with the particularity required by the Reform Act, nor had they alleged the particularized facts required to demonstrate that any defendant made a misleading statement.  *See id.*

Plaintiffs filed their first complaint in this action on April 26, 2013.  *See* Original Complaint [Dkt. 1].  Plaintiffs then filed this Amended Complaint on October 15, 2013, which included vastly different allegations and expanded the Class Period to a period of nearly 18 months, from February 6, 2012 to July 18, 2013.  *See* Compl. [Dkt. 48].  It also eliminated several defendants named in the Original Complaint.[3]  Plaintiffs' sprawling new Complaint focuses most

---

[3] Plaintiffs initially sued nine Intuitive executives.  [Dkt. 1.]  The Amended Complaint makes no mention whatsoever of six of the nine original defendants: Salvator J. Brogna, Augusto V. Castello, Jerome J. McNamara, Mark J. Meltzer, Colin Morales, and David J. Rosa.  *Id.*  It must be dismissed as to those six defendants on that basis alone.

1    directly on the language of the FDA's Warning Letter, which was issued after the filing of the

2    Original Complaint (on July 16, 2013).  *See id.*

### III.    ARGUMENT

The Complaint should be dismissed for two independent reasons.  ***First***, despite filing a

Complaint that exceeds 100 pages, Plaintiffs have not alleged an actionable misstatement.  To the

extent that it is possible to discern precisely what Plaintiffs are challenging, it is clear that none of

those statements were false, nor were they misleading because they omitted material information.

***Second***, Plaintiffs fail to plead the highly particularized allegations of scienter required by the

PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure.

### A.    Plaintiffs face an exceptionally exacting legal standard.

The Ninth Circuit sets a high bar for a plaintiff at the pleading stage in the securities-fraud

context, and Plaintiffs' allegations here fail to clear it.  Congress passed the PSLRA "to establish

uniform and stringent pleading requirements for securities fraud actions, and to put an end to the

practice of pleading 'fraud by hindsight.'"  *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d

1052, 1074 (N.D. Cal. 2010).  As the Ninth Circuit has observed, the PSLRA sets forth an

unusually high pleading standard: "[i]n few other areas are motions to dismiss for failure to state

a claim . . . so powerful."  *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).  To survive a

motion to dismiss, Plaintiffs must plead their allegations with particularity, pursuant to the

heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) ***and*** the "more

exacting pleading requirements of the PSLRA."  *Zucco Partners, LLC v. Digimarc Corp.*, 552

F.3d 981, 990 (9th Cir. 2009).  Specifically, to plead securities fraud under Section 10(b) of the

1934 Act or Rule 10b–5, plaintiffs must plead facts demonstrating: "(1) a material

misrepresentation or omission of material fact, (2) scienter, (3) a connection with the purchase or

sale of a security, (4) transaction and loss causation, and (5) economic loss."  *In re Gilead

Sciences Securities Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  As demonstrated below,

Plaintiffs fail to meet these exacting standards; they fail to plead facts sufficient to establish either

the first or the second elements of the test laid out in *Gilead*.  Either failure would, standing alone,

doom the Complaint.

**B.      The statements quoted in the Complaint were neither false nor misleading.**

Most securities class actions attack statements that turn out to be false in hindsight—for example, an overly optimistic revenue projection that later proves to be false.  Not so here.  This Complaint lumbers on for more than 60 pages without mentioning what Intuitive *actually said* that is supposedly fraudulent—which must, after all, form the basis of a securities fraud suit. After dozens of pages about alleged product defects and regulatory disputes, one might expect to find statements from Intuitive that are at least arguably inconsistent with what Plaintiffs allege to be the "true facts."  But no such statements are to be found.  Indeed, when one finally gets to what Intuitive actually said, those statements have virtually nothing to do with what Plaintiffs complain about.  To the extent that it is possible to discern precisely what it is that Plaintiffs are challenging (a fatal problem in itself), it becomes clear that the vast majority of the quoted statements are either unchallenged statements of historical fact (*e.g.*, financial results) or subjective statements of corporate optimism.  Neither type of statement can form the basis of a claim under the Reform Act.  What few statements remain are plainly not false, and, as discussed further in Section III.B.2 (below), are not misleading.

Instead, Plaintiffs appear to be complaining about what Intuitive did *not* say.  But in challenging Intuitive's alleged omissions, Plaintiffs shoulder an exceptional burden, for a public company has no obligation to speak on every topic.  To survive a motion to dismiss, a plaintiff must allege an omission that "*affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists.*"  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis added).  Plaintiffs here fail to do so.

**1.      Plaintiffs fail to adequately allege that Intuitive spoke falsely.**

**a.      Plaintiffs improperly force the Court to untangle the "puzzle" of their undifferentiated allegations.**

At the outset, Plaintiffs' Complaint fails for a simple reason: it does not set forth what it claims was misleading in a clear, coherent manner.  To state a claim for securities fraud, a complaint must specify "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1)(B).  The law requires a

1  plaintiff to do so because a "complaint is not a puzzle." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d

2  1541, 1554 (9th Cir. 1994) (en banc), *aff'd in part, rev'd in part on other grounds*, 60 F.3d 591,

3  592–93 (9th Cir. 1995). Courts in this District have long recognized that prolix complaints

4  challenging dozens of statements for dozens of reasons do not satisfy this standard. Indeed,

5  "neither the Court nor opposing counsel should be required to expend time and effort searching

6  through large masses of conclusory, argumentative, evidentiary and other extraneous allegations

7  in order to discover whether the essentials of claims asserted can be found in such a mélange." *In*

8  *re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1074–75 (N.D. Cal. 2001)

9  (Armstrong, J.) (internal quotation marks omitted); *see also In re Conner Peripherals, Inc*., 1996

10  WL 193811, at *1 (N.D. Cal. Jan. 18, 1996) (Patel, J.) ("Judicial resources are too scarce and

11  worthy cases too pressing for a court to spend its time rooting around in bloated complaints

12  drafted by experienced lawyers for a handful of actionable allegations.").

13      Plaintiffs here fail this basic pleading requirement because their 104-page Complaint

14  relies upon an enormous puzzle of block quotations followed by a general mélange of allegations.

15  *See, e.g.*, Compl. ¶ 186 (quotation of risk disclosures regarding FDA regulations); *id.* ¶ 216

16  (quotation of risk disclosure regarding lawsuits); *id.* ¶ 218 (quotation of annual financial results).

17  In an attempt to clarify what Plaintiffs are actually challenging, attached to this memorandum as

18  Exhibit A is a chart listing each statement challenged in the Complaint. As shown in that chart,

19  Plaintiffs challenge 64 different statements and repeatedly claim that those statements were false

20  and misleading for up to ten reasons—reasons set forth in dozens of different paragraphs

21  throughout the Complaint. *See, e.g.*, *id.* ¶¶ 214, 219, 224 231, 237 (listing reasons for alleged

22  falsity). In other words, Plaintiffs want Defendants—and this Court—to address *more than 600*

23  permutations of their claims—a classic example of throwing allegations against the wall in the

24  hopes that something will stick. The Reform Act requires more; dismissal is required because

25  "plaintiffs have failed to craft a complaint in such a way that a reader can, without undue effort,

26  divine precisely which statements (or portions of statements) are alleged to be false or misleading,

27  and the reason or reasons why each statement is false or misleading." *Splash Technologies,* 160

28  F. Supp. 2d at 1075 (dismissing complaint); *see also In re Cisco Sys. Sec. Litig.*, 2013 WL

1  1402788, at *5–6 (N.D. Cal. Mar. 29, 2013) (Armstrong, J.) (dismissing complaint); *In re*

2  *Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842, 846 (N.D. Cal. 2000) (Hamilton, J.)

3  (dismissing complaint).

4                **b.**     **Intuitive's financial results are not alleged to be false.**

5        To the extent Defendants can puzzle out what Plaintiffs are challenging, it is clear that no

6  facts are pleaded suggesting that Defendants' statements were false, even in hindsight.  Even a

7  brief review of the 64 challenged statements (set forth in Exhibit A) makes clear that many of the

8  allegedly fraudulent statements were nothing more than reports of Intuitive's past financial

9  performance, such as its yearly revenues, its quarterly system sales, or its procedure volume

10 relative to past years or quarters.  There is no allegation anywhere in the Complaint that such

11 statements were inaccurate, even in hindsight.

12       For example, Plaintiffs complain about factual statements like, "'Approximately 360,000

13 *da Vinci* procedures were performed during the year ended December 31, 2011, up approximately

14 29% from last year'" (Compl. ¶ 218 (quoting Intuitive's 2011 Form 10-K)); and "'System

15 revenue increased 18% to $777.8 million during the year ended December 31, 2011 from $660.3

16 million during the year ended December 31, 2010.'"  *Id.*; *see also id.*, Ex. A.  Beyond quoting

17 these statements in the Complaint, however, Plaintiffs do nothing to explain what was inaccurate

18 about them or how they are actionable.

19       "[A] violation of federal securities laws cannot be premised upon a company's disclosure

20 of accurate historical data."  *In re Sofamor Danek*, 123 F.3d 394, 401 n.3 (6th Cir. 1997) (citing

21 *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 512–13 (9th Cir. 1991)).  To prove that

22 a company's disclosure of historical data was inaccurate, a plaintiff must do more than ***say*** a

23 statement is "false"; he must ***show*** why or how the statement is actually false.  *See, e.g.*, *In re*

24 *Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876–77 (9th Cir. 2012).

25       Plaintiffs here do not even attempt to meet this burden.  They generally allege that

26 statements like "total revenue was $495 million," and "[w]e sold 150 *da Vinci* Surgical Systems,"

27 are false, but they offer no explanation of why or how the statements were inaccurate as written

28 or spoken.  True statements of historical financial results are (by definition) not false, and they

795112

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
CASE NO. 5:13-CV-01920 EJD

1  cannot be misleading as a matter of law.  *See Convergent Technologies*, 948 F.2d at 507.  These

2  statements are not actionable.  *See Police Retirement II*, 2012 WL 1868874, at *15–16 (finding

3  Intuitive's statements of historical fact were not actionable).

4          **c.**      **Expressions of corporate optimism are not actionable.**

5        Plaintiffs also quote several statements that amount to nothing more than vague and

6  subjective expressions of corporate optimism, including, for example, statements that *da Vinci*

7  surgery has "benefits" for patients; that financial performance was "solid"; or that the Company is

8  "pleased."  For example, Plaintiffs complain about the statement: "'We believe that this new

9  generation of surgery, which we call *da Vinci* Surgery, combines the benefits of minimally

10  invasive surgery (MIS) for patients with the ease of use, precision and dexterity of open

11  surgery.'"  Compl. ¶ 182(a) (quoting Intuitive's 2011 Form 10-K).

12        These statements, and many more like them in the Complaint (set forth in full in Exhibit

13  A), are nothing more than vague, optimistic statements that are immune from challenge.

14  "[V]ague, generalized assertions of corporate optimism or statements of 'mere puffing' are not

15  actionable material misrepresentations under federal securities laws."  *In re Impac Mortgage*

16  *Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Entm't,*

17  *Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)).  Because such statements are

18  "essentially 'feel good monikers' that hope springs eternal," they cannot be "false" and thus "do

19  not amount to securities violations."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*

20  ("*Police Retirement I*"), No. 10-CV-03451-LHK, 2011 WL 3501733, at *11 (N.D. Cal. Aug. 10,

21  2011) (finding Intuitive's statements of corporate optimism not actionable).  Many of the

22  statements quoted in the Complaint fit this description exactly; they are thus not actionable.

23        **2.**      **None of Intuitive's alleged omissions are actionable.**

24        Plaintiffs seem to recognize that nothing Intuitive actually said was false.  As a result, they

25  allege that Intuitive committed fraud by *not* speaking.  The standard for alleging fraud by

26  omission, however, is exceptionally high: It is black-letter securities law that "[s]ilence, absent a

27  duty to disclose, is not misleading under Rule 10b-5."  *Basic, Inc. v. Levinson*, 485 U.S. 224, 238,

28  239 & n.17 (1988).  A company is not required to speak on every topic that the public might find

interesting.  *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321–22 (2011).  Rather, affirmative disclosure of information is required "only when necessary 'to make [] statements [already] made, in the light of the circumstances under which they were made, not misleading.'"  *Id.* at 1321–22 (quoting 17 C.F.R. § 240.10b-5(b)).  As the Ninth Circuit has explained: "No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.  To be actionable under the securities laws, an omission must be misleading; in other words it must *affirmatively create* an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody*, 280 F.3d at 1006 (emphasis added).  Plaintiffs fail to satisfy this standard.

### a.       Intuitive immediately disclosed the FDA Warning Letter.

The vast majority of the allegations in Plaintiffs' Complaint focus on the FDA Warning Letter dated July 16, 2013.  But Plaintiffs do not (and cannot) allege that Intuitive "concealed" the Warning Letter, because *Intuitive disclosed the letter just two days after receiving it.*  Compl. ¶ 16.  So Plaintiffs instead attempt to bootstrap the Warning Letter into a fraud-by-hindsight claim by alleging that Intuitive should have disclosed the information in the Warning Letter before it received that letter.  Specifically, Plaintiffs allege that the Warning Letter establishes that Intuitive issued three "secret recalls" in October 2011.  But Plaintiffs' own Complaint demonstrates that they have not alleged an actionable fraud.

*First*, there was nothing "secret" about the conduct described in the Warning Letter.  In October 2011, Intuitive had sent three different letters to the roughly 2,000 hospitals using a *da Vinci* surgical system.  *Id.* ¶¶ 39, 51–54.  The first letter gave instructions for proper use of instrument tip covers.  *Id.* ¶ 51.  The second letter reminded hospitals that *da Vinci* was not cleared for use in thyroidectomy procedures.  *Id.* ¶ 53.  The third letter gave information for inspecting instrument cannulas.[4]  *Id.* ¶ 54.  These letters went out to *every hospital using a da Vinci* system.  They were anything but "secret."  The FDA's concern was not that something was concealed from doctors or patients (much less investors), but rather that Intuitive had not reported

---

[4] Cannulas are rigid hollow tubes that allow surgical instruments on the system's robotic arms to access patients' anatomy through small incisions.  Compl. ¶ 54.

10

these letters to the FDA according to federal regulations, 21 C.F.R. § 806.10.  *See id.*, Ex. A.  The conduct underlying the Warning Letter could not alter the "total mix" of information already available to investors because it was *already* public.  *See Matrixx*, 131 S. Ct. at 1318.  Nor did Intuitive say anything about the customer letters that "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists."  *See Brody*, 280 F.3d at 1006.  Rather, Intuitive truthfully told *everyone who used the da Vinci* about them.  It is a strange "fraud" that is disclosed to every single customer of a product.

*Second*, the FDA Warning Letter does not "establish" anything.  The FDA itself says as much in its Regulatory Procedures Manual: "A Warning Letter is informal and advisory.  It communicates the agency's position on a matter, but it does not commit FDA to taking enforcement action.  For these reasons, FDA does not consider Warning Letters to be final agency action on which it can be sued."  Mullen Decl., Ex. C (FDA Regulatory Procedures Manual § 4-1-1); *see also Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 902 (N.D. Ill. 2001) ("There is nothing magical about the warning letter. Although the language sounds ominous, it really is rather boilerplate."), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001).

*Third*, and most fundamentally, the fact that the FDA later—in July 2013—classified the three letters as "Class II recalls" has no bearing on what Intuitive was obligated to disclose in October 2011.  To hold otherwise would be to allow the exact "fraud by hindsight" approach that the Reform Act sought to prevent, as the court held in *In re Genzyme*, 2012 WL 1076124, *10 (D. Mass. Mar. 30, 2012).  There, the Court instructed that "[t]he fact that Genzyme eventually received the Warning Letter from the FDA does not change things.  The receipt of the Warning Letter one and a half years into the class period does not establish Genzyme 'knew' that it was out of compliance with CGMPs, or that the company, through its directors, intended to deceive investors with respect to Lumizyme approval."  *Id.*  Plaintiffs cannot state a securities fraud claim by simply parroting the FDA's *tentative* position in its Warning Letter that Intuitive violated FDA regulations.

### b.   Intuitive disclosed all required information about MDRs.

Plaintiffs use a similar fraud-by-hindsight approach to their allegations regarding

795112

Intuitive's reporting of MDRs (medical device reports).  Plaintiffs claim that Intuitive omitted MDR figures from its SEC filings and that it "admitted" that it had underreported MDRs to the FDA during the Class Period.  *See* Compl. ¶¶ 67–71, 208–21.  Plaintiffs again fail to allege an actionable omission, for four reasons.

*First*, Intuitive had no obligation to report MDR figures in its SEC filings because they were already public.  Intuitive reports MDRs to the FDA.  *Id*. ¶ 63.  The FDA stores MDRs in the publicly accessible MAUDE database and website.  *Id*. ¶¶ 5, 49, 57.  Anyone who has access to a computer can view MDRs housed in the MAUDE database.  Because this information was already available to Plaintiffs, repeating the information would not have significantly altered what was publicly available about Intuitive.  *Matrixx*, 131 S. Ct. at 1321.  Intuitive was under no obligation to summarize in a press release the information available in the public MAUDE database or in publicly available news sources.  *See, e.g.*, *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1246 (N.D. Cal. 1998) (noting that the federal securities laws create no duty to "educate the public about publicly known facts").  Indeed, the Complaint itself makes clear that the public was aware of what Intuitive's MDRs were disclosing, as it concedes that by March 2013 several news outlets had already reported on the spike in *da Vinci*-related MDRs.  Compl. ¶¶ 84–86.

*Second*, the United States Supreme Court has held that "the mere existence of reports of adverse events" is not material information required to be disclosed to investors.  *Matrixx*, 131 S. Ct. at 1321.  "Adverse event reports are daily events in the pharmaceutical industry," for example, but "[t]he fact that a user of a drug has suffered an adverse event, standing alone, does not mean that the drug caused that event."  *Id.*; *see also Gaines v. Guidant Corporation*, 2004 WL 2538374, at *10 (S.D. Ind. Nov. 8, 2004) ("We take judicial notice of the fact that medical procedures can and do sometimes present complications.").  There is no obligation to disclose MDRs in SEC filings.

*Third*, nothing that Intuitive said in its SEC filings about MDRs affirmatively created an impression that was misleading.  The only statements Plaintiffs identify were nothing more than general disclosures regarding the existence of MDR reporting regulations.  In other words, the statements were "nothing more than a boilerplate statement of what the government regulates and

1   what sanctions it can impose." *Abbott Labs.*, 140 F. Supp. 2d at 905.

2       **Fourth**, the March 13, 2013 press release quoted in the Complaint was not an "admission"

3   by Intuitive that it had "brazenly violated" FDA regulations by underreporting MDRs during the

4   Class Period. *See id.* ¶ 65. This is classic fraud-by-hindsight pleading—but in this case, the

5   supposed "hindsight" is contradicted by the facts pleaded in the Complaint. In that press release,

6   Intuitive simply acknowledged the "recent rise" in the overall volume of MDRs and explained

7   that the "noted rise does not reflect a change in product performance *but rather a change in MDR*

8   *reporting practices*," which Intuitive had self-identified and reported to the FDA. *Id.* ¶ 208

9   (emphasis added); *see also* Mullen Decl., Ex. D (press release). Intuitive's decision to change the

10  way in which it attempted to comply with complex MDR reporting requirements does not mean

11  that its prior practice was incorrect, much less that it was fraudulent. *Cf. Genzyme*, 2012 WL

12  1076124, at *10 (holding that FDA warning letter did not establish that company was out of

13  compliance with regulatory requirements); *cf. also* Mullen Decl., Ex. C (FDA Regulatory

14  Procedures Manual § 4-1-1). It is axiomatic that Plaintiffs cannot base a securities claims on

15  allegations that Intuitive failed to disclose a "fact" that did not (and does not) exist.[5]

16          **c.**      **Intuitive had no obligation to disclose additional information**
                        **about pending lawsuits.**

17

18      Plaintiffs' next omission claim is that Intuitive should have disclosed more information

19  about product liability suits it has faced or is facing. *See, e.g.*, Compl. ¶¶ 212, 214, 233. This

20  claim fails just as the previous claims do. As an initial matter, Intuitive has always made clear

21  that product liability actions are a fact of life in the medical device field. For example, in its

22  February 2012 10-K, Intuitive stated that "[o]ur business exposes us to significant risks of product

23  liability claims," and that "[t]he medical device industry has historically been litigious." *Id.* ¶

24  216. Investors were told that Intuitive would face product liability litigation.

25      Plaintiffs allege, however, that Intuitive should have disclosed the exact number of

26  _____

27  [5] "[T]he court need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit' or 'allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.'" *Police Retirement II*, 2012 WL 1868874, at *8 (quoting *In*

28  *re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)).

795112

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
CASE NO. 5:13-CV-01920 EJD

1   lawsuits that had been filed and that it was "highly likely" more lawsuits would be filed in the

2   future.  *See, e.g.*, *id.* ¶¶ 184, 217.  First, Intuitive made no statements about litigation that

3   "affirmatively create[d] an impression of a state of affairs that differs in a material way from the

4   one that actually exists."  *Brody*, 280 F.3d at 1006.  It disclosed that it faced litigation, and that

5   such litigation was likely to occur again in its "highly litigious" industry.  No omitted fact renders

6   Intuitive's statements misleading.

7        In any event, Intuitive had no duty to disclose information that is already "in the public

8   domain," including past or pending litigation.  Because each of the lawsuits was a matter of

9   public record, there can be no duty to disclose information about them as such disclosure would

10  not have changed the "total mix" of information already publicly available to the investors.

11  *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 976–77 (9th Cir. 1999) (finding public

12  information already part of "total mix" so further disclosure irrelevant); *see also In re Bank of*

13  *America AIG Disclosure Sec. Litig.*, __ F. Supp. 2d __, 2013 WL 5878814 (S.D.N.Y. Nov. 1,

14  2013) (granting a motion to dismiss where plaintiffs had alleged omissions based on failures to

15  disclose pending litigation).  "Where allegedly undisclosed material information is in fact readily

16  accessible in the public domain, . . . a defendant may not be held liable for failing to disclose this

17  information."  *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003); *In re*

18  *Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249–250 (S.D.N.Y.

19  2003) ("[T]he Defendants cannot be held liable for failing to disclose . . . publicly available

20  information.").

21                    **d.      The remaining allegations of omitted information are meritless.**

22        Finally, Plaintiffs assert a grab bag of purported omissions, but none come close to stating

23  a claim.  For example, Plaintiffs repeatedly claim that Intuitive committed fraud by failing to

24  disclose that "*da Vinci* posed a present material health risk to patients."  *See, e.g.*, Compl. ¶¶ 185,

25  191, 196.  For support, Plaintiffs rely on the same three October 2011 hospital letters and the

26  procedures discussed in them.  *See id.* ¶¶ 45–54.  For the reasons discussed above, these letters do

27  not in any way suggest (much less prove) that the *da Vinci* presents a risk to patients.  Nor does

28  the FDA's issuance of the Warning Letter create an actionable claim where none otherwise exists.

1   *Genzyme*, 2012 WL 1076124, at *10.

2           Similarly, Plaintiffs accuse Intuitive of fraudulent omissions because it allegedly failed to

3   disclose that it had "violated Current Good Manufacturing Practice (CGMP) requirements" (*see,

4   e.g.*, Compl. ¶¶ 196, 201, 212) and that "Intuitive was in violation of CGMP, in part, due to

5   critical missing design inputs necessary to address the intraoperative cleaning of Monopolar

6   Scissors." *Id*. ¶ 224.  In support, Plaintiffs rely solely upon the Warning Letter.  *See id*. ¶¶ 115–

7   18.  Again, as the court found in *Genzyme*, the receipt of a Warning Letter months into the Class

8   Period does not support a claim of securities fraud.  *See Genzyme*, 2012 WL 1076124, at *10.

9           Plaintiffs also allege that Intuitive fraudulently concealed that the FDA launched a "safety

10  probe" in January 2013—*i.e.*, a letter survey to *da Vinci* physicians and hospitals—concerning the

11  *da Vinci* system.  *See* Compl. ¶¶ 212, 214.  The FDA's letter survey was not a secret, nor was it a

12  finding that Intuitive had done anything wrong.  Indeed, it was not even a communication that

13  Intuitive itself was a party to—it was a communication between the FDA and certain Intuitive

14  customers.  Intuitive remained silent about it as was its right; it had no obligation to comment on

15  it in SEC filings because no comment was necessary to correct a misleading impression.  *See*

16  *Matrixx*, 131 S. Ct. at 1318; *Brody*, 280 F.3d at 1006.  It is simply not an actionable omission.[6]

17                        *       *       *

18          In short, Plaintiffs have failed to identify a single, actionable material misrepresentation or

19  omission.  Without such a misrepresentation or omission, their case can go no further.

20      **C.      Plaintiffs fail to allege scienter.**

21          Even if the Complaint's allegations had been enough to establish material

22  misrepresentations, the Complaint fails for an independent reason: Plaintiffs have not alleged

23  facts sufficient to support their allegations of scienter.  Under the Reform Act, Plaintiffs must

24  establish, with respect to ***each*** allegedly false or misleading statement, a "strong inference" that

25  ***each*** defendant acted with scienter, the "nefarious mental state necessary to constitute securities

26  _____

27  [6] Plaintiffs also assert that Intuitive committed fraud by failing to disclose that the "FDA had
    commenced an inspection of Intuitive's facilities on April 1, 2013."  *See* Compl. ¶¶ 212, 214.  An
28  inspection is a routine event which occasionally—but not always—leads to issuance of a warning
    letter.  In itself, it has no legal significance.

fraud." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002); *see also* 15 U.S.C. § 78u-4(b)(2). Plaintiffs must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). Recklessness entails "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990). Scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Accordingly, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gomper v. VISX*, 298 F.3d 893, 897 (9th Cir. 2002).

Plaintiffs attempt to shoulder their burden by: (1) claiming that the allegations in the Complaint relate to Intuitive's "core operations" and that therefore the Defendants "must have known" about it; (2) claiming that certain unnamed witnesses (who are not alleged to have had any contact with the individual Defendants) can somehow supply what the Complaint otherwise lacks; (3) pointing to stock sales by certain Intuitive officers; and (4) dredging up ancient FDA communications on tangential topics. None of these sets of allegations demonstrates scienter, either individually or as a whole.

### 1. Plaintiffs do not even attempt to allege scienter as to the specific, individual statements.

As an initial matter, Plaintiffs' scienter allegations fail because Plaintiffs fail to demonstrate scienter as to each alleged misrepresentation or omission, and as to each Defendant. A complaint must, "with respect to ***each act or omission alleged*** . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis added); *see also Primo v. Pacific Biosciences of California, Inc.*, 940 F.Supp.2d 1105, 1126–30 (N.D. Cal. 2013) (conducting a scienter analysis as to each, separate alleged misrepresentation or omission). Here, Plaintiffs have only made generalized scienter allegations, divorced from the specific misrepresentations the Defendants are alleged to

have made.  The Complaint must allege *what* a particular defendant knew that suggests scienter and *when* they knew it.  Plaintiffs do not even attempt to meet this burden.  Accordingly, the Complaint's scienter allegations fail at the very outset.

### 2. The "core operations" inference does not apply.

Implicitly acknowledging their failure to plead scienter on a statement-by-statement basis, Plaintiffs claim that they should be absolved of that duty based on the "core operations inference."  They claim that Defendants Gary S. Guthart, Marshall L. Mohr, and Lonnie M. Smith[7] ("the Individual Defendants") are "presumed to have had knowledge of all material facts regarding Intuitive's core *da Vinci* business" because each of them "was a top executive involved in Intuitive's daily operations and . . . [had] access to all material information regarding the Company's core operations."  Compl. ¶ 170.  They claim that because *da Vinci* is "central" to Intuitive's operational and financial success, the Defendants must have known about its alleged defects.  *Id*. ¶ 171.  But the "core operations inference" does not apply here.  Indeed, Judge Koh considered and rejected this very argument in the prior case.  This Court should do the same.

It is settled law that "[w]here a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard" for scienter.  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  "As a general matter, corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter."  *Id*. at 784–85 (internal quotation and citation omitted).  As the Ninth Circuit has made clear, "[i]n the securities fraud context, general allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient to create a strong inference of scienter."  *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 746 (9th Cir.

---

[7] Defendant Smith retired as CEO in January 2010.  Compl. ¶ 32.

2009); *see also In re Daou Sys.*, 411 F.3d 1006, 1022 (9th Cir. 2005).  Thus, it is a "rare circumstance" where scienter will be imputed "without accompanying particularized allegations" as to individual corporate officers.  *South Ferry*, 542 F.3d at 786.

Here, Plaintiffs rely on the precise type of claim rejected in *South Ferry*.  The Complaint does not contain a single "detailed allegation[] about the defendants' actual exposure to information" and thus "fall[s] short of the PSLRA standard."  *South Ferry*, 542 F.3d at 784.  The bare assertions that Defendants generally had "access" to certain information cannot establish the requisite scienter.  *See Police Retirement II*, 2012 WL 1868874, at *18–19 (Koh, J.) (rejecting plaintiffs' core-operations arguments).

### 3.   The allegations derived from a confidential witness are also insufficient to establish scienter.

Plaintiffs also rest their scienter allegations on information derived from an unnamed former Intuitive employee whose statements fall far short of meeting the PSLRA's requirements. Compl. ¶¶ 164–69.  Plaintiffs state that this anonymous witness (who was not even employed by Intuitive throughout the Class Period) worked only a few offices away from the Defendants and that part of his job was to generate various reports (***not*** including adverse-event reports) that he sometimes gave to the Defendants by hand.  *Id.* ¶ 165.  Plaintiffs also assert that the Defendants could quote data to this individual regarding adverse-event reports and that the anonymous former employee attended meetings that included Defendants, at which adverse-event reports were discussed.  *Id.* ¶¶ 166, 168–69.

A complaint relying on statements from confidential witnesses to establish scienter, however, must pass two hurdles to satisfy the PSLRA's pleading requirements: (1) "the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge"; and (2) the statements "[that] are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Zucco Partners*, 552 F.3d at 995. Plaintiffs' reliance on this witness's information fails both prongs of the test.

***First***, Plaintiffs have not established the witness's reliability or personal knowledge.  The

Complaint "must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report . . . [W]e look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco*, 552 F.3d at 995 (citing *Daou*, 411 F.3d at 1015–16) (internal quotations and citations omitted).  Here, while Plaintiffs assert that this individual "worked at the Company from June 2006 until December 2012, reporting to Calvin Darling, the Director of Financial Planning and Analysis," (Compl. ¶ 164), Plaintiffs fail to explain how that gives the witness any personal knowledge of the Individual Defendants, other than the proximity of his office to theirs and his presence in some of their meetings (*id*. ¶¶ 164–69).[8]  Moreover, this lone confidential witness bases his knowledge largely on hearsay, "which is not enough to satisfy *Daou*'s reliability standard," and which *"*may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration under *Daou*." *Zucco*, 552 F.3d at 997 & n.4.

    ***Second***, even if the witness were reliable or had personal knowledge, none of the statements reported by him can "themselves be indicative of scienter."  This confidential witness's statements allege, in essence, that Defendants monitored adverse-event reports during some undefined period of time; that they were able to quote some unidentified data from some of those reports at some undefined time; and that they discussed some unidentified adverse event reports at some unspecified meetings.  The witness does not state or even describe what the reports showed, or whether or how they were inconsistent with publicly filed MDRs.  Courts have found exactly these types of allegations to be insufficient to show scienter.  *See, e.g.*, *Silicon Storage Tech.*, 2006 WL 648683, at *11 ("[T]he [complaint] alleges that one of the informants provided at least two of the defendants with 'excess inventory reports,' and that at least two of the informants attended 'meetings' at which the participants discussed issues relating to the amount

---

[8] The fact that the informant did not work at Intuitive throughout the Class Period also weighs against a finding of scienter.  *See In re Silicon Storage Tech., Inc.*, No. C 05-0295 PJH, 2006 WL 648683, *11 (N.D. Cal. Mar. 10, 2006).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
CASE NO. 5:13-CV-01920 EJD

and type of products held in inventory. . . .  These allegations are insufficient . . . .").  *See also Police Retirement II*, 2012 WL 1868874, at *19–22 (Koh, J.) (rejecting plaintiffs' confidential-witness arguments and dismissing the case against Intuitive).

**4.     Defendants' stock sales do not support a strong inference of scienter.**

Plaintiffs' next argument for scienter focuses on Defendants' stock sales.  Plaintiffs claim the stock sales were so unusual and suspicious that the sales alone prove scienter.  *See* Compl. ¶¶ 127–153.  A review of the facts—and especially the holes in the Plaintiffs' telling of them—reveals that these stock sales do not support a finding of scienter.  Unusual or suspicious insider stock sales *may* support a finding of scienter, but only if the sales are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003) (citing *Silicon Graphics*, 183 F.3d at 986).  In determining whether insider stock sales are suspicious, courts consider: (1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) consistency with prior trading history.  *Id.*  This information, however, must be presented in context.  Where "the Plaintiff has not set forth allegations regarding the amount of stock that Defendants held prior to the commencement of the Class Period, the percentage of shares sold prior to the Class Period, or the amount of stock that Defendants received as compensation prior to and during the Class Period," the court "has little context to analyze allegations regarding Defendants' trading activity."  *Bridgepoint*, 2013 WL 5206216, at *27.  "This backdrop would be highly relevant in establishing whether Defendants' sales were truly inconsistent with past trading activity."  *Id.*

**a.     The percentage of shares sold during the Class Period undermines any argument for scienter.**

The Complaint provides a flurry of allegations to the Court, tossing around large dollar amounts and trading numbers in support of the argument that Defendants' trading of Intuitive shares proves scienter.  *See, e.g.*, Compl. ¶ 131.  But these distractions only serve to mask the bare truth: According to Plaintiffs' own sources—namely, Defendants' Form 4s filed with the SEC—at the end of the Class Period two of the three defendants held as many or more shares

795112

than they had at the beginning; the third still held the vast majority of his shares.[9]  *See* Mullen Decl., ¶ 14.  Given these percentages, the Individual Defendants' sales during the Class Period cannot be considered "suspicious."  *See Silicon Graphics*, 183 F.3d at 987–88 (finding sales of 2.6 to 6.9 percent not suspicious, and 43.6–75.3 percent "somewhat suspicious," but insufficient to give rise to a strong inference of deliberate recklessness because stock sold made up an insignificant portion of the total allegedly suspicious sales).

Plaintiffs would have the Court believe that because the sold shares garnered proceeds in the millions, that alone is an indication of scienter.  *See* Compl. ¶ 131.  That argument fails under the law.  *See, e.g.*, *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) (holding that, despite sales of $84 million in shares, the defendants still retained such a large percentage of their holdings—92 percent—that an inference of scienter was functionally negated); *Silicon Graphics*, 183 F.3d at 987–88 (no scienter where, despite over $13.8 million in stock sales, the defendants still retained over 90 percent of their holdings).  Because Defendants still retained (respectively) 100%, 104.28%, and 93.35% of their holdings at the end of the Class Period, any inference of scienter based on the dollar figures of their sales is negated.  *See* Mullen Decl., ¶ 14.  No inference of scienter—much less a strong one—can be drawn from these facts.

### b.    The timing of the sales does not support scienter.

Plaintiffs also argue that Defendants' sales were "suspiciously timed" for three reasons:  (1) the Defendants sold "massive amounts of stock immediately after the September 2012 meeting with the FDA"; (2) Guthart and Mohr sold shares "immediately after Intuitive learned of the FDA safety probe on or before January 18, 2013, but before the FDA probe became public" on February 28, 2013; and (3) Guthart and Mohr sold shares in January 2013 "within one trading day of each other, apparently in concert."  Compl. ¶¶ 136–39.  Each of these allegedly suspicious

---

[9] Defendants computed these figures by analyzing the Form 4s relied upon by Plaintiffs in their Complaint.  *See* Compl. ¶ 129.  For example, Defendant Guthart's last relevant Form 4 before the Class Period indicates that he owned 37,653 shares of common stock as of December 14, 2010.  *See* Mullen Decl., Ex. E (Table I, col. 5).  His last relevant Form 4 before the end of the Class Period indicates that he still owned 37,653 shares as of January 28, 2013.  *See id.*, Ex. F.  Thus, Guthart ended the Class Period with 100% of the shares reported on his Form 4 at the beginning of the Class Period.  For a full explanation of this method applied to each Defendant, see Mullen Decl. ¶ 14.

795112

1    sales is easily explained, and any inference of scienter is negated.

2         Regarding the "massive amounts of stock" that Defendants supposedly sold

3    "immediately" after the September 2012 meeting with the FDA, Plaintiffs use a broad

4    interpretation of "immediately" in order to include stock sales extending into December.  In

5    reality, the only trades that were arguably close in time to the September 2012 meeting were

6    trades that occurred on October 22, 2012, shortly after Intuitive announced financial results.  On

7    October 16, 2012, Intuitive filed its 8-K and held an earnings call.  *Id.* ¶¶ 235–37.  On October

8    18, 2012, Intuitive filed its third-quarter 2012 10-Q.  *Id.* ¶ 238.  The October 22 trades are the

9    only trades that occurred "immediately" after the September 2012 meeting, and there is nothing

10   suspicious about executives selling stock shortly after the company publicly announces financial

11   results.  *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) ("Officers of

12   publicly traded companies commonly make stock transactions following the public release of

13   quarterly earnings and related financial disclosures.").  The other trades, in November and

14   December 2012, were only made by a single defendant (Smith) and were too removed in time to

15   be characterized as having happened "immediately" after a meeting in September.  There simply

16   is not anything suspicious about the timing of these sales.  *See In re Boston Scientific Corp. Sec.*

17   *Litig.*, 708 F. Supp. 2d 110, 126–27 (D. Mass. 2010).

18        Further, Guthart's and Mohr's January 2013 trades[10] are not suspicious.  They occurred

19   on January 25 and 28, 2013, the third and fourth trading days after Intuitive filed its January 22,

20   2013 8-K and held an earnings call.  *See* Compl. ¶ 242.  There is nothing suspicious about this; it

21   is routine for corporate officers to sell stock after making a positive earnings announcement.  *See*

22   *Lipton*, 284 F.3d at 1037; *cf. In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031, 1040 (N.D. Cal.

23   2000) (insider selling after positive earnings announcements is routine and not indicative of

24   scienter).  There is no "cogent and compelling" inference of scienter that is "strong in light of

25

26

27

28   _____
     [10] Smith did not trade at that time.  *See* Compl., Ex. E. at 9.

22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
CASE NO. 5:13-CV-01920 EJD

1  other explanations." *Tellabs*, 551 U.S. at 324.[11]

2              **c.**    **Intuitive's stock repurchase program negates scienter.**

3        Even if Plaintiffs' stock-sale allegations had established any indication of scienter, it

4  would be negated by Intuitive's stock repurchase program.  From January 1, 2013 to June 30,

5  2013, Intuitive bought back 800,000 of its shares at an average share price of $491.  *See* Mullen

6  Decl., Ex. K (April 2013 10-Q).  Further, "[o]n March 20, 2013, the Company's Board of

7  Directors . . . authorized an additional $1.0 billion of stock repurchases.  As of June 30, 2013, the

8  remaining amount of share repurchases authorized by the Board was approximately $0.9 billion."

9  *Id*.  These stock repurchases, which took place during the Class Period, "actually ***negate*** a finding

10  of scienter."  *In re Tibco Software, Inc.*, No. C 05-2146 SBA, 2006 WL 1469654, at *21 (N.D.

11  Cal. May 25, 2006) (emphasis in original); *see also In re Cisco Sys. Inc. Sec. Litig.*, Case No. 11–

12  1568, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013) (finding that a repurchase plan

13  undermined any inference of scienter because it was illogical that the defendant "would have

14  been repurchasing its shares had it been aware of facts that would indicate the price would fall");

15  *In re NVIDIA Corp. Sec. Litig.*, No. C 08–4260 RS, 2010 WL 4117561, at * 11 (N.D. Cal. Oct.19,

16  2010) (same); *Matthews v. Centex Telemanagement, Inc*., No. C-92-1837-CAL, 1994 WL

17  269734, at *8 (N.D. Cal. 1994) ("It would have made no sense to purchase that stock if

18  defendants knew the prices to be inflated.").

19       **5.**    **The 2002 and 2008 FDA communications offer no support to allegations of scienter in 2012 and 2013.**

20

21        Finally, Plaintiffs claim that an "untitled letter" from 2008 and an FDA form from 2002

22  somehow support their allegations of Defendants' intent in 2012 and 2013.  *See* Compl. ¶¶ 154–

23  63.  The 2002 form discussed complaints received during that period and the Company's response

24

25  [11] Plaintiffs also argue that the timing of the Defendants' 10b5-1 plans is suspicious.  *See* Compl. ¶¶ 146–53.  But the trades themselves are not suspicious, so there is no reason to look to the
26  plans.  Plaintiffs contend that "enactment of a 10b5-1 Plan after the start of the Class Period" by itself is suspicious.  *Id*. ¶ 150.  But this reasoning defies logic.  The Plaintiffs ***themselves*** defined
27  the Class Period, and they did it with the benefit of hindsight and the knowledge of when the 10b5-1 plans were enacted.  It would turn reason on its head to allow Plaintiffs to create scienter
28  merely by defining a Class Period so that it begins before trading plans are enacted.

1  to them.  *See id.* ¶ 158.  The 2008 letter discussed events in 2005 and 2006.  *See id.* ¶ 156.  And

2  yet, Plaintiffs assert, without explaining, that these documents somehow "demonstrate that

3  Defendants . . . knew of Intuitive's precise regulatory violations *during the Class Period.*"  *Id.* ¶

4  159 (emphasis added).  Plaintiffs also attempt to translate Defendants Smith and Guthart's receipt

5  of letters from the FDA many years ago into a conclusion that they—and, inexplicably,

6  Defendant Mohr as well—had the requisite scienter, based solely on Smith and Guthart's "long

7  tradition of being at the forefront of all communications with the FDA."  *Id.* ¶¶ 162–63.

8      This reasoning fails both as to logic and the law.  It does not follow that because the FDA

9  raised unrelated issues in the decade before the Class Period began—and Intuitive resolved them

10  without receiving a warning letter of any kind—Intuitive was doing anything improper in 2008,

11  much less in 2012.  *See In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 3:12-CV-1737 JM (WMC),

12  2013 WL 5206216 (S.D. Cal. Sept. 13, 2013).  It is no secret that Intuitive, like all medical device

13  companies, is in regular communication with the FDA.  The fact of that communication, standing

14  alone, demonstrates nothing whatsoever—especially given the significant passage of time

15  between the letters and the Class Period.  *See Genzyme*, 2012 WL 1076124, at *10.  They

16  certainly do not provide "facts that constitute strong circumstantial evidence of deliberately

17  reckless or conscious misconduct" during the Class Period in 2012 and 2013, nor any "extreme

18  departure from the standards of ordinary care."  *Silicon Graphics*, 183 F.3d at 974.

19                      *       *       *

20      In sum, Plaintiffs fail to sufficiently allege scienter, either through individual allegations

21  or even taking all the allegations as a whole.[12]  Thus the Complaint should be dismissed.

22      **D.    Because the Section 10(b) claim fails, Plaintiffs' claims under Sections 20(a)**
23      **       and 20A also should be dismissed.**

24      Plaintiffs also assert Section 20 claims against the Individual Defendants.  Because the

25  ───────────────────
    [12] "[I]f no individual [scienter] allegations are sufficient," the Court must "conduct a 'holistic'
26  review of the same allegations to determine whether the insufficient allegations combine to create
    a strong inference of intentional conduct or deliberate recklessness."  *Zucco Partners*, 552 F.3d at
27  992.  The Court "must also take into account plausible opposing inferences that could weigh
    against a finding of scienter."  *Id.* at 1006 (internal quotation and citation omitted).  Here,
28  Plaintiffs' scienter allegations fail even under this holistic review.

Complaint does not adequately allege a primary violation under Section 10(b) for the reasons set forth above, the claim for control person liability must be dismissed.  *See Lipton*, 284 F.3d at 1035 n.15.  Accordingly, because Plaintiffs have failed to allege a viable claim under Section 10(b), these remaining two claims also should be dismissed.

## IV.  CONCLUSION

For all of the foregoing reasons, this motion should be granted.

Dated:  December 16, 2013                              KEKER & VAN NEST LLP


                                                By:    /s/ *Michael D. Celio*
                                                       MICHAEL D. CELIO
                                                       JO W. GOLUB
                                                       REID P. MULLEN
                                                       Attorneys for Defendants INTUITIVE
                                                       SURGICAL, INC., LONNIE M. SMITH,
                                                       GARY S. GUTHART, SALVATORE J.
                                                       BROGNA, AUGUSTO V. CASTELLO,
                                                       JEROME J. McNAMARA, MARK J.
                                                       MELTZER, MARSHALL L. MOHR,
                                                       COLIN MORALES, and DAVID J. ROSA

795112

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
CASE NO. 5:13-CV-01920 EJD

EXHIBIT A

*In re Intuitive Surgical Securities Litigation*, No. 5:13-CV-01920-EJD

Exhibit A: Chart Summarizing Challenged Statements and Grounds Supporting Their Dismissal

| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
|---|---|---|---|---|---|
| February 6, 2012 10-K | | | | | |
| 1 | 182(a) | 2/6/2012 | Intuitive | "[w]e believe that this new generation of surgery, which we call da Vinci Surgery, combines the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision and dexterity of open surgery" | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 2 | 182(b) | 2/6/2012 | Intuitive | "The da Vinci Surgical System enables surgeons to extend the benefits of MIS to many patients typically receiving open surgery by using computational, robotic and imaging technologies to overcome many of the limitations of conventional minimally invasive surgery." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 3 | 184 | 2/6/2012 | Intuitive | "If defects are discovered in our products, we may incur additional unforeseen costs, hospitals may not purchase our products and our reputation may suffer. . . . Because our products are designed to be used to perform complex surgical procedures, we expect that our customers will have an increased sensitivity to such defects. In the past, we have voluntarily recalled certain products as a result of performance problems. We cannot assure that our products will not experience component aging, errors or performance problems in the future." | • Not false or misleading<br>• No scienter |
| 4 | 184 | 2/6/2012 | Intuitive | "There is also the possibility that defects in the design or manufacture of our products might necessitate a product recall." | • Not false or misleading<br>• No scienter |
| 5 | 186 | 2/6/2012 | Intuitive | Intuitive's 2011 Form 10-K further set forth the specific regulations the Company was required to follow in connection with da Vinci and its accessories, including, but not limited to: (i) "the QSR, which requires manufacturers to follow elaborate design, testing, control documentation and other quality assurance procedures during the manufacturing process;" (ii) "the Medical Device Reporting regulation, which requires that manufacturers report to the FDA if their device may have caused or contributed to a death or serious injury or malfunctioned in a way that would likely cause or contribute to a death or serious injury if it were to recur" (21 C.F.R. § 803.50); and (iii) "the reporting of Corrections and Removals, which requires that manufacturers report to the FDA recalls and field corrective actions taken to reduce a risk to health | • Not false or misleading<br>• No scienter |

| | | | | or to remedy a violation of the FDCA [Federal Food, Drug, and Cosmetic Act] that may pose a risk to health" (21 C.F.R. § 806.10). | |
|---|---|---|---|---|---|
| 6 | 186(a) | 2/6/2012 | Intuitive | "We are subject to inspection and marketing surveillance by the FDA to determine our compliance with regulatory requirements. If the FDA finds that we have failed to comply, it can institute a wide variety of enforcement actions, ranging from a regulatory letter to a public Warning Letter to more severe civil and criminal sanctions including the seizure of our products and equipment or ban on the import or export of our products. Our failure to comply with applicable requirements could lead to an enforcement action that may have an adverse effect on our financial condition and results of operations." | • Not false or misleading<br>• No scienter |
| 7 | 186(a) | 2/6/2012 | Intuitive | "The QSR also requires maintenance of extensive records which demonstrate compliance with FDA regulation, the manufacturer's own procedures, specifications and testing as well as distribution and postmarket experience. Compliance with the QSR is necessary to receive FDA 510(k) clearance or approval to market new products and is necessary for a manufacturer to be able to continue to market cleared or approved product offerings in the United States." | • Not false or misleading<br>• No scienter |
| 8 | 186(b) | 2/6/2012 | Intuitive | "Our products and operations are subject to extensive and rigorous regulation by the FDA, the State of California and countries or regions in which we market our products. . . . We must continually keep abreast of these standards and requirements and integrate compliance to these with the development and regulatory documentation for our products." | • Not false or misleading<br>• No scienter |
| 9 | 216(a) | 2/6/2012 | Intuitive | "Our business exposes us to significant risks of product liability claims. The medical device industry has historically been litigious, and we face financial exposure to product liability claims if the use of our products were to cause injury or death. There is also the possibility that defects in the design or manufacture of our products might necessitate a product recall. Any weaknesses in training and services associated with our products may also be subject to product liability lawsuits. . . . If a patient is harmed during a *da Vinci* surgical procedure, even in the absence of any alleged system malfunction or defect, we can be exposed to negligence claims based on alleged inadequacies in our surgeon training, our training of Intuitive personnel, or in our proctoring programs. A negligence claim, regardless of its merit or eventual outcome, could result in significant legal defense costs. Negligence claims have been made" | • Not false or misleading<br>• No scienter |

| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
|---|---|---|---|---|---|
| | | | | against us in the past." | |
| 10 | 216(b) | 2/6/2012 | Intuitive | "[f]rom time to time, we may be involved in a variety of claims, lawsuits, investigations and proceedings relating to securities laws, product liability, patent infringement, contract disputes and other matters relating to various claims that arise in the normal course of our business." | • Not false or misleading<br>• No scienter |
| 11 | 218 | 2/6/2012 | Intuitive | The 2011 Form 10-K also reported 2011 financial results as follows: (i) Total revenue of $1,757.3 million for 2011 had increased by 24% and 34% during the years ended December 31, 2011 and 2010, respectively, compared to the same periods in 2010 and 2009, reflecting "continued adoption of da Vinci"; (ii) "Approximately 360,000 da Vinci procedures were performed during the year ended December 31, 2011, up approximately 29% from last year"; (iii) "System revenue increased 18% to $777.8 million during the year ended December 31, 2011 from $660.3 million during the year ended December 31, 2010"; and (iv) Intuitive sold "534 da Vinci Surgical Systems during the year ended December 31, 2011, compared with 441 for the year ended December 31, 2010." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| | | | | **April 17, 2012 8-K** | |
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 12 | 221 | 4/17/2013 | Guthart | "In the first quarter, we are pleased with the growing use of *da Vinci*, the acceptance of our new products and the financial performance that follows." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 13 | 222 | 4/17/2012 | Intuitive | The April 17th Press Release also reported that (i) first quarter revenues were $495 million, which reflected an increase of 28% compared to the first quarter of 2011, and "revenue growth was driven by continued robotic procedure adoption and higher da Vinci Surgical System sales"; (ii) "[p]rocedure growth of approximately 29% primarily reflects higher US gynecologic procedures, US general surgery procedures and international urologic procedures"; and (iii) first quarter 2012 system revenues totaled $206.6 million compared to $167.1 million in first quarter of 2011. | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| | | | | **April 17, 2012 Earnings Call** | |
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 14 | 223 | 4/17/2012 | Guthart | During the April 17, 2012 Q1 2012 earnings release conference call (the "April 17th Earnings Call") with investors, Defendant Guthart | • Not false or misleading<br>• Accurate statement of historical |

|  |  |  |  | reported that Intuitive had "sold 140 da Vinci Surgical Systems, up from 120 during the first quarter of last year," and that "[t]otal revenue was $495 million, up 28% over last year." Defendant Guthart further stated that "[w]ith regard to procedures, we experienced strong growth in general surgery and gynecology, leading to year-over-year procedure growth of approximately 29%." | • results<br>• Mere expression of corporate optimism<br>• No scienter |
|---|---|---|---|---|---|
| | | | | **April 19, 2012 10-Q** | |
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 15 | 188 | 4/19/2012 | Intuitive | On April 19, 2012, Intuitive filed its first quarter Form 10-Q for the period ending March 31, 2012 (the "1Q12 Form 10-Q"), which detailed that da Vinci surgery represents "a new generation of surgery" that "combines the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision and dexterity of open surgery." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 16 | 190 | 4/19/2012 | Intuitive | "There have been no changes to the Risk Factors discussed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2011." | • Not false or misleading<br>• No scienter |
| 17 | 225(b) | 4/19/2012 | Intuitive | "[f]rom time to time, we may be involved in a variety of claims . . . relating to securities laws, product liability, patent infringement, contract disputes and other matters relating to various claims that arise in the normal course of our business." | • Not false or misleading<br>• No scienter |
| 18 | 227 | 4/19/2012 | Intuitive | The Form 10-Q reiterated the financial results announced in the April 17th Press Release and April 17th Earnings Call (¶¶ 221-223). | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| | | | | **July 19, 2012 8-K** | |
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 19 | 229 | 7/19/2012 | Guthart | "solid second quarter revenue and earnings performance is the result of robust US gynecologic and general surgery procedure growth offset by pressure in Europe and US prostatectomy." | • Not false or misleading<br>• Accurate statement of historical results<br>• Mere expression of corporate optimism<br>• No scienter |
| 20 | 229 | 7/19/2012 | Intuitive | The July 19th Press Release also reported that total revenue for 2Q 2012 of $537 million was up 26% compared with $426 million for 2Q 2011, which was "driven by continued adoption of da Vinci | • Not false or misleading<br>• Accurate statement of historical results |

| | | | | surgery procedures and higher da Vinci Surgical System sales." | • No scienter |
|---|---|---|---|---|---|
|  | **July 19, 2012 Earnings Call** |

| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
|---|---|---|---|---|---|
| 21 | 230(a) | 7/19/2012 | Guthart | "our team has delivered a solid performance, driven by robust growth in both our US gynecology business and our emerging general surgery business." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 22 | 230(a) | 7/19/2012 | Guthart | "for 2012, Intuitive is focused on . . . continuing our growth in gynecology and urology worldwide through outstanding execution in the field." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 23 | 230(b) | 7/19/2012 | Guthart | "[p]rocedures grew approximately 26% over the second quarter of 2011. We sold 150 da Vinci Surgical Systems, up from 129 during the second quarter of last year. Total revenue was $537 million; up 26% over last year." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| 24 | 230(c) | 7/19/2012 | Mohr | Defendant Mohr also reported second quarter 2012 systems revenue of "$229 million, increased 23% compared with $187 million for the second quarter of 2011." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
|  | **July 23, 2012 10-Q** |
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 25 | 193 | 7/23/2012 | Intuitive | In the 2Q12 Form 10-Q Defendants repeated the representations from Intuitive's 1Q12 Form 10-Q, set forth supra in paragraph 188, describing, inter alia, the da Vinci as a "a new generation of surgery" which "combines the benefits of [MIS]" with those of open surgery. | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 26 | 195<br>232(a) | 7/23/2012 | Intuitive | "[t]here have been no changes to the Risk Factors discussed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2011." | • Not false or misleading<br>• No scienter |
| 27 | 232(b) | 7/23/2012 | Intuitive | "[f]rom time to time, we may be involved in a variety of claims . . . relating to securities laws, product liability, patent infringement, contract disputes and other matters relating to various claims that arise in the normal course of our business." | • Not false or misleading<br>• No scienter |
| 28 | 234 | 7/23/2012 | Intuitive | The 2Q 2012 Form 10-Q reiterated the financial results announced in the July 19th Press Release and the July 19th Earnings Call (¶¶ 229-230). | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |

| | | | | October 16, 2012 8-K | |
|---|---|---|---|---|---|
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 29 | 235 | 10/16/2012 | Guthart | "acceptance of da Vinci general and gynecologic surgery continues to grow." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 30 | 235 | 10/16/2012 | Intuitive | (i) total revenues had reached $538 million for Q3 2012 compared to $447 million for Q3 2011; (ii) "[t]hird quarter of 2012 revenue growth was driven by continued adoption of da Vinci surgery procedures and higher da Vinci Surgical System sales;" and (iii) "procedure growth of approximately 22% reflected US gynecologic and general surgery growth, partially offset by a decline in US prostatectomy procedures and slower growth in European practices." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| | | | | October 16, 2012 Earnings Call | |
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 31 | 236(a) | 10/16/2012 | Guthart | "acceptance of da Vinci surgery in general and gynecologic surgery continues to grow, in complex cancer procedures, benign procedures and in single port robotic surgery." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 32 | 236(b) | 10/16/2012 | Mohr | "Our third-quarter revenue was $538 million, up 20% compared with $447 million for the third quarter of 2011, and up slightly compared to the $536 million last quarter. Third-quarter revenues by product category were as follows. Third quarter instrument accessory revenue was $218 million, up 24% compared with $176 million for the third quarter of 2011, and down 3% compared with $224 million in the second quarter of 2012. The year-over-year increase in I&A was driven by procedure growth of approximately 22% in sales of our new instrument and accessory products, including Single-Site, Vessel Sealer and Firefly. The year-over-year procedure growth was led by US gynecologic procedures and US general surgery growth, partially offset by lower growth in Europe and a decrease in US dVPs." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| 33 | 236(c) | 10/16/2012 | Mohr | "Procedures grew by 25%. Total revenue was $1,570,000,000, up 25% compared with $1,261,000,000 last year. The revenue increase included recurring revenue growth of 27% and an increase in systems revenue of 21%." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| 34 | 236 | 10/16/2012 | Mohr | Also according to Defendant Mohr, systems revenue for third | • Not false or misleading |

|  |  |  |  | quarter 2012 totaled $232 million, compared with $199 million for third quarter of 2011. | • Accurate statement of historical results<br>• No scienter |
|---|---|---|---|---|---|

| October 18, 2012 10-Q ||||||
|---|---|---|---|---|---|
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 35 | 198 | 10/18/2012 | Intuitive | In the 3Q12 Form 10-Q, Intuitive made the same representations set forth supra in paragraph 188 describing da Vinci as a "a new generation of surgery" which "combines the benefits of [MIS]" with those of open surgery. | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 36 | 200 | 10/18/202 | Intuitive | On October 18, 2012 Intuitive filed with the SEC its 3Q 2012 Form 10-Q, which contained a section entitled "Risk Factors," stating there had been "no changes to the Risk Factors discussed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2011." | • Not false or misleading<br>• No scienter |
| 37 | 238(a) | 10/18/2012 | Intuitive | "[f]rom time to time, we may be involved in a variety of claims . . . relating to securities laws, product liability, patent infringement, contract disputes and other matters relating to various claims that arise in the normal course of our business." | • Not false or misleading<br>• No scienter |
| 38 | 240 | 10/18/2012 | Intuitive | The 3Q 2012 Form 10-Q reiterated the financial results announced in the October 16th Press Release and October 16th Earnings Call (¶¶ 235-236). | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |

| January 22, 2013 8-K ||||||
|---|---|---|---|---|---|
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 39 | 242 | 1/22/2013 | Guthart | "results reflect expanding da Vinci Surgical System use across a broadening array of procedures and strong execution by our team." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 40 | 242 | 1/22/2013 | Intuitive | The release also reported, (i) revenue of $609 million for Q4 2012, up approximately 23% compared with $497 million in Q4 2011, driven by "continued adoption of da Vinci surgery procedures and higher da Vinci Surgical System sales;" and (ii) "da Vinci surgical procedures grew approximately 25% in the fourth quarter of 2012 compared to the fourth quarter of 2011, driven primarily by U.S. gynecology and general surgery growth, and partially offset by a decline in U.S. prostatectomy procedures." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |

| January 22, 2013 Earnings Call ||||||
|---|---|---|---|---|---|
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |

| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
|---|---|---|---|---|---|
| 41 | 243(a) | 1/22/2013 | Guthart | "[y]ear-over-year growth in procedures finished at 25%, led by continued uptake in gynecology and growing use of da Vinci in General Surgery." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| 42 | 243(b) | 1/22/2013 | Guthart | "Looking back at the full year 2012, our operating highlights are as follows. Worldwide procedures grew by approximately 25%. We sold 620 da Vinci Surgical Systems in the year, up from 534. Total revenue grew to $2.178 billion, up 24% over 2011. . . . Turning to operating highlights for the fourth quarter, procedures grew approximately 25% over the fourth quarter of last year. We sold 175 da Vinci surgical systems, up from 152 in the fourth quarter of 2011. Total revenue for the quarter was $609 million, up 23% from the fourth quarter of 2011." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| 43 | 244 | 1/22/2013 | Mohr | Defendant Mohr reported during the call that fourth quarter 2012 systems revenue totaled "$265 million, and had increased 18% compared with $225 million for the fourth quarter of 2011." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| February 4, 2013 10-K | | | | | |
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 44 | 203 | 2/4/2013 | Intuitive | In its 2012 Form 10-K, Intuitive repeated the representations in paragraphs 182 and 182(a) calling the "da Vinci Surgical Systems . . . a new generation of surgery" and touting it as "combin[ing] the benefits of minimally invasive surgery ("MIS") for patients with the ease of use, precision and dexterity of open surgery." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 45 | 203 | 2/4/2013 | Intuitive | "[o]ver the past two decades, MIS has reduced trauma to the patient by allowing selected surgeries to be performed through small ports rather than large incisions, often resulting in shorter recovery times, fewer complications and reduced hospitalization costs." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 46 | 205 | 2/4/2013 | Intuitive | Repeated statements challenged in ¶ 184 regarding risk of product defects. | • Not false or misleading<br>• No scienter |
| 47 | 205 | 2/4/2013 | Intuitive | Repeated statements challenged in ¶ 184 regarding risk of product recalls. | • Not false or misleading<br>• No scienter |
| 48 | 246(a) | 2/4/2013 | Intuitive | "Our business exposes us to significant risks of product liability claims. The medical device industry has historically been litigious, and we face financial exposure to product liability claims if the use of our products were to cause injury or death. There is also the possibility that defects in the design or manufacture of our products might necessitate a product recall. Any weaknesses in training and | • Not false or misleading<br>• No scienter |

| | | | | services associated with our products may also be subject to product liability lawsuits. Although we maintain product liability insurance, the coverage limits of these policies may not be adequate to cover future claims. Particularly as sales of our products increase, we may be unable to maintain product liability insurance in the future at satisfactory rates or in adequate amounts. A product liability claim, regardless of its merit or eventual outcome, could result in significant legal defense costs. Product liability claims have been made against us in the past. A product liability or negligence claim or any product recalls could also harm our reputation or result in a decline in revenues. If a patient is harmed during a *da Vinci* surgical procedure, even in the absence of any alleged system malfunction or defect, we can be exposed to negligence claims based on alleged inadequacies in our surgeon training, our training of Intuitive personnel, or in our proctoring programs. A negligence claim, regardless of its merit or eventual outcome, could result in significant legal defense costs. Negligence claims have been made against us in the past." | |
|---|---|---|---|---|---|
| 49 | 246(b) | 2/4/2013 | Intuitive | "[f]rom time to time, we may be involved in a variety of claims, lawsuits, investigations and proceedings relating to securities laws, product liability, patent infringement, contract disputes and other matters relating to various claims that arise in the normal course of our business." | • Not false or misleading<br>• No scienter |
| 50 | 246(c) | 2/4/2013 | Intuitive | "[w]e are aware of increasing efforts by plaintiff's attorneys to solicit *da Vinci* patients for product liability lawsuits against the Company. The Company cannot yet estimate the impact of these solicitations." | • Not false or misleading<br>• No scienter |
| 51 | 248 | 2/4/2013 | Intuitive | The Form 10-K reiterated the financial results announced in the January 22nd Press Release and January 22nd Earnings Call (¶¶ 242-244). | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |
| | | | | **March 13, 2013 Press Release** | |
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 52 | 208 | 3/13/2013 | Intuitive | "[i]n response to general inquiries regarding a recent rise in Medical Device Reports (MDR) filed by Intuitive Surgical, the company explained that the noted rise does not reflect a change in product performance but rather a change in MDR reporting practices." | • Not false or misleading<br>• No scienter |
| 53 | 209 | 3/13/2013 | Intuitive | Intuitive further characterized the change in reporting practices as | • Not false or misleading |

| | | | | an "administrative change in how MDRs previously reported as adverse events were subcategorized. This change has not increased the total number of adverse event reports. This will result in an increase in events in the 'serious injury' subcategory and a corresponding decrease in the 'other' subcategory. Total adverse event rates have remained low and in line with historical trends." | • No scienter |

| April 18, 2013 8-K | | | | | |
|---|---|---|---|---|---|
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 54 | 250 | 4/18/2013 | Guthart | "We are pleased with our first quarter revenue and earnings growth. Despite a concerted effort by vocal critics of robotic surgery, support remains strong among patients, surgeons and hospitals." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 55 | 250 | 4/18/2013 | Guthart | "*da Vinci* Surgery has clinically proven benefits in offering a minimally invasive option to a broader group of patients than traditional technologies." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 56 | 250 | 4/18/2013 | Intuitive | The release also reported that (i) revenue of $611 million for Q1 2013, up 23% compared with $495 million in Q1 2012, was "driven by continued growth of da Vinci surgery procedures and higher da Vinci Surgical System sales;" and (ii) "da Vinci surgical procedures grew approximately 18% in the first quarter of 2013 compared to the first quarter of 2012, driven primarily by growth in general surgery, U.S. gynecology and international urology procedures, partially offset by a decline in U.S. prostatectomy procedures." | • Not false or misleading<br>• Accurate statement of historical results<br>• No scienter |

| April 18, 2013 Earnings Call | | | | | |
|---|---|---|---|---|---|
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 57 | 211 | 4/18/2013 | Guthart | "As you know, we are in the midst of a concerted effort by critics of robotic surgery, to challenge the benefited range of patients . . . [w]e are confident that those who invest their time in a serious review of the clinical literature on da Vinci will find ample evidence, and the benefit it brings to patients, surgeons, hospitals, and the medical community of ours." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 58 | 211(a) | 4/18/2013 | Guthart | "da Vinci Surgery has proven safety, efficacy, economic and ergonomic benefits when compared to the open surgical procedures it is replacing." | • Not false or misleading<br>• Mere expression of corporate optimism<br>• No scienter |
| 59 | 251(a) | 4/18/2013 | Guthart | "we experienced strong growth in general surgery, slower growth | • Not false or misleading |

| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
|---|---|---|---|---|---|
| | | | | in gynecology and a return to stability in urology. This resulted in an 18% procedure growth over 2012. The first quarter of 2013 had one fewer surgery day than 2012. Taking this into account, normalized procedure growth improves to approximately 20%." | • Accurate statement of historical results <br> • Mere expression of corporate optimism <br> • No scienter |
| 60 | 251(b) | 4/18/2013 | Guthart | "[t]otal revenue was $611 million, up 23% over last year." | • Not false or misleading <br> • Accurate statement of historical results <br> • No scienter |
| 61 | 252 | 4/18/2013 | Mohr | Also during the call, Defendant Mohr reported that first quarter 2013 systems revenue totaled $256 million, an increase of 24% compared with $207 million for the first quarter of 2012. | • Not false or misleading <br> • Accurate statement of historical results <br> • No scienter |
| | | | | April 19, 2013 10-Q | |
| No. | ¶ | Date | Speaker | Challenged Statement | Why Not Actionable |
| 62 | 213(a) | 4/19/2013 | Intuitive | In the 1Q13 Form 10-Q, Intuitive repeated the representations in Intuitive's 3Q12 Form 10-Q, set forth supra in paragraph 188, describing da Vinci as a "new generation of surgery" and touting its advantages of combining the benefits of both open surgery and MIS. | • Not false or misleading <br> • Mere expression of corporate optimism <br> • No scienter |
| 63 | 213(b) | 4/19/2013 | Intuitive | "during the first quarter of 2013, there have been articles published and papers written questioning patient safety and efficacy associated with da Vinci Surgery…We believe that da Vinci Surgery continues to be a safe and effective surgical method…" | • Not false or misleading <br> • Mere expression of corporate optimism <br> • No scienter |
| 64 | 254 | 4/19/2013 | Intuitive | On April 19, 2013, Intuitive filed with the SEC its 1Q 2013 Form 10-Q. The Form 10-Q reiterated the financial results announced in the April 18th Press Release and April 18th Earnings Call (¶¶ 250-252). | • Not false or misleading <br> • Accurate statement of historical results <br> • No scienter |