LABATON SUCHAROW LLP
ERIC J. BELFI (*pro hac vice*)
JONATHAN M. PLASSE (*pro hac vice*)
JAVIER BLEICHMAR (*pro hac vice*)
SERENA P. HALLOWELL (*pro hac vice*)
DANIELLE E. STAMPLEY (*pro hac vice*)
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
ebelfi@labaton.com
jplasse@labaton.com
jbleichmar@labaton.com
shallowell@labaton.com
dstampley@labaton.com

*Counsel for Lead Plaintiff and the Class*

ROBBINS GELLER RUDMAN & DOWD LLP
SHAWN A. WILLIAMS (Bar No. 213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

*Liaison Counsel*

[*Additional counsel on signature page*.]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| IN RE INTUITIVE SURGICAL SECURITIES LITIGATION | No. 5:13-cv-01920-EJD |
| | OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT |
| | Date: May 9, 2014 |
| | Time: 9:00 a.m. |
| | Judge: Hon. Edward J. Davila |
| | Courtroom: 4 |
| | Date Filed: January 30, 2014 |

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF MATERIAL FACTS ........................................................... 2

   A.  Intuitive Knew About Thousands Of MDRs That It Concealed From The
       FDA's Public MAUDE Database, Doctoring Da Vinci's Safety Record ..................... 3

   B.  Intuitive Knew In 2011 About Da Vinci's Defects ......................................... 7

   C.  The FDA Found That Intuitive Knew Since 2011 About Da Vinci's Defects .............. 8

       1.  The FDA Form 483 Concluded That Intuitive Hid Da Vinci's Defects ................ 8

       2.  The FDA's Warning Letter Also Concluded That Intuitive Knew In 2011
           About Da Vinci's Defects ................................................................ 8

   D.  The Public Disclosure Of Da Vinci's Real Dangers Revealed That Intuitive's
       Safety And Profitability Profile Was False And Misleading ...................... 10

III. ARGUMENT ................................................................................................... 11

   A.  Under *Matrixx*, Plaintiffs Have Plausibly Alleged That Defendants Made
       Materially Misleading Statements And Omissions ................................... 11

       1.  Defendants' Concealment Of Da Vinci's Defects, MDRs, And Corrective
           Actions Created A Materially Misleading Impression ............................ 11

       2.  Defendants' Statements Reporting Intuitive's Financial Results Were
           Materially Misleading ................................................................... 15

       3.  The Concealed Defects And MDRs Were Not Public ............................. 17

       4.  Defendants' False And Misleading Statements Are Not Puffery ............... 19

   B.  Plaintiffs Have Alleged A Strong Inference Of Scienter ........................... 21

       1.  Plaintiffs Raise A Strong Inference Of Scienter Under *Matrixx* ............... 22

           (a)  Defendants Had Actual Knowledge ........................................... 22

           (b)  Core Operations: The Importance Of Da Vinci To Intuitive's
                Financial Success Raises A Strong Inference Of Scienter .................... 24

       2.  Defendants' Insider Selling Raises A Strong Inference Of Scienter ......... 25

           (a)  Defendants' Insider Sales During The Class Period Were Suspicious
                In Terms Of Amount And Percentages ....................................... 26

           (b)  Defendants' Class Period Sales Were Suspiciously Timed And
                Inconsistent With Their Prior Trading Histories ........................... 27

(c)   The Stock Repurchase Program Does Not Weaken The Strong
Inference of Scienter ................................................................................ 29

C.   The Complaint Is Not A Puzzle Pleading ................................................................. 29

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Page(s)**

3

**Cases**

4

*In re Able Labs. Sec. Litig.*,
   2008 WL 1967509 (D.N.J. Mar. 24, 2008).......................................................22

5

6

*Affiliated Ute v. U.S.*,
   406 U.S. 128 (1972)...........................................................................................19

7

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...............................................15, 18, 19

8

9

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ...........................................................................19

10

11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................11

12

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009).............................................................27

13

14

*Basic v. Levinson*,
   485 U.S. 224 (1989)...........................................................................................19

15

16

*Batwin v. Occam Networks, Inc.*,
   2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008) ...................................27

17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................11

18

19

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ...........................................................12, 13, 24, 25

20

21

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) ...............................................................19

22

*In re Bus. Objects S.A. Sec. Litig.*,
   2005 WL 1787860 (N.D. Cal. July 27, 2005).....................................................30

23

24

*In re Cisco Sys. Inc. Sec. Litig.*,
   2013 WL 1402788 (N.D. Cal. Mar. 29, 2013)....................................................30

25

26

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) .............................................................................13

27

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) .............................................................................15

28

*In re Cornerstone Propane Partners, L.P.*,
    355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...................................................29

*In re Countrywide Deriv. Litig.*,
    588 F. Supp. 2d 1044 (C.D. Cal. 2008) ...................................................21, 28, 29

*In re Cryolife, Inc.*,
    2003 WL 24015055 (N.D. Ga. May 27, 2003)...................................................9, 21

*In re Daou Sys, Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ...................................................11, 24, 25, 28

*In re Dura Pharm., Sec. Litig.*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006)...................................................20

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................21, 28

*In re Genzyme Corp.*,
    2012 WL 1076124 (D. Mass. Mar. 30, 2012)...................................................9

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) ...................................................29

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011)................................................... *passim*

*McGuire v. Dendreon Corp.*,
    2008 WL 5130042 (W.D. Wash. Dec. 5, 2008) ...................................................15

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ...................................................15

*New Mexico State Inv. Council v. Ernst & Young LLP*,
    641 F.3d 1089 (9th Cir. 2011) ...................................................23

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ...................................................19, 25, 26

*Nursing Home Pension Fund v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ...................................................28

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ...................................................17, 18

*Public Pension Fund Grp. v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) ...................................................15, 22

*In re Questcor Sec. Litig.*,
    2013 WL 5486762 (C.D. Cal. October 1, 2013)................................................... *passim*

*S. Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008) ..........................................................24

*In re Scholastic Corp. Sec. Litig.,*
    252 F.3d 63 (2d Cir. 2001)...........................................................24

*In re Sepracor, Inc. Sec. Litig.,*
    308 F. Supp. 2d 20 (D. Mass. 2004) .............................................20

*Shapiro v. UJB Corp.,*
    964 F.2d 272 (3d Cir. 1992)...........................................................21

*In re Silicon Graphics Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) .........................................................28

*In re Silicon Storage Tech., Inc.,*
    2006 WL 648683 (N.D. Cal. Mar. 10, 2006)..................................24

*Siracusano v. Matrixx Initiatives, Inc.,*
    585 F.3d 1167 (9th Cir. 2009) ............................................... *passim*

*In re Splash Tech. Holdings, Inc. Sec. Litig.,*
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) .....................................19, 29

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) .......................................................12

*In re STEC Inc. Sec. Litig.,*
    2011 WL 2669217 (C.D. Cal. June 17, 2011) ...........................11, 12

*Stephenson v. Deutsche Bank AG,*
    282 F. Supp. 2d 1032 (D. Minn. 2003)..........................................30

*Tellabs, Inc. v. Makor,*
    551 U.S. 308 (2007)........................................................................25

*In re Thoratec Corp. Sec. Litig.,*
    2006 WL 1305226 (N.D. Cal. May 11, 2006) ................................18

*In re UTStarcom, Inc. Sec. Litig.,*
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ...........................................26

*In re Vivendi Universal, S.A.,*
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ............................................30

*In re Williams Sec. Litig.,*
    339 F. Supp. 2d 1242 (N.D. Okla. 2003)........................................30

*Yanek v. Staar Surgical Co.,*
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) ..........................................15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Statutes**

15 U.S.C. § 78u-4 ...................................................................................................12

15 U.S.C. § 78u-4(b)(2)(A).....................................................................................21

**Other Authorities**

21 C.F.R. § 807.81(a)(3)(ii).......................................................................................8

21 C.F.R. § 820 .........................................................................................................9

Fed. R. Civ. P. 9(b)..................................................................................................29

Fed. R. Civ. P. 12(b)(6).......................................................................................11, 12

1

## STATEMENT OF ISSUES TO BE DECIDED

2     1.     Under *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011) and

3   *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), does the Complaint

4   plausibly allege that Defendants made materially misleading statements and omissions, where it

5   particularly alleges Defendants' concealment of (i) thousands of da Vinci-related adverse events

6   from the FDA and the public; (ii) the true severity of hundreds of adverse events reported to the

7   FDA as "other" instead of "serious injury"; and (iii) product defects and related product liability

8   lawsuits?

9     2.     Does the Complaint give rise to a strong inference of scienter, where it alleges

10   that (i) the FDA investigated and determined that Defendants had actual knowledge of da Vinci's

11   undisclosed product defects; (ii) such defects plagued the Company's only product; (iii)

12   Defendants intentionally concealed thousands of adverse events and the true number of serious

13   injuries caused by da Vinci; and (iv) Defendants engaged in massive insider trading during the

14   Class Period that was inconsistent with prior trading and suspiciously timed to avoid the

15   inevitable stock drop after the truth about da Vinci and Intuitive was revealed?

16     3.     Does the Complaint plead with particularity where it alleges each specific

17   material misstatement and omission, the identity of the speaker, the date and circumstances of

18   each statement and omission, and the specific reasons why such statements or omissions were

19   materially false and misleading?

20

21

22

23

24

25

26

27

28

## I.      INTRODUCTION

This securities class action centers on a robotic surgery system, called da Vinci, which accounted for 100% of the revenues of Defendant Intuitive Surgical, Inc. ("Intuitive").  The principal allegation in this case is that Defendants misleadingly represented that da Vinci was safe.[1]  It was hardly so.  Da Vinci caused hundreds of serious injuries and deaths.   In a systematic, concerted and wide-ranging effort, Defendants consistently concealed from investors, the public, and the Food & Drug Administration ("FDA"), deadly defects and thousands of adverse events caused by da Vinci.  In doing so, Defendants materially and misleadingly altered da Vinci's public safety profile, as well as investors' perception of da Vinci's and Intuitive's profitability.  Defendants fueled this misimpression by misleadingly touting da Vinci's safety and Intuitive's strong financial growth while remaining silent about the known risks and thousands of unreported adverse events.  When the FDA finally discovered that Intuitive had been concealing and manipulating da Vinci's safety record, it issued a scathing Warning Letter documenting Defendants' wrongdoing as far back as 2011.

In light of the strength of these allegations, Defendants concede all the elements of the claim except whether they made materially false statements and scienter.  Defendants, however, ignore that controlling Ninth Circuit and Supreme Court precedent squarely support the material falsity of the alleged statements.  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1312 (2011) ("*Matrixx II*"), and *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1177 (9th Cir. 2009) ("*Matrixx I*," together "*Matrixx*").

*Matrixx* also involved the concealment of adverse event reports resulting from the use of Matrixx's leading revenue-generating drug.  *Matrixx II*, at 1311.  The false statements alleged in *Matrixx* are nearly identical to those alleged in this action.  Matrixx trumpeted its drug's "**benefits**," that it was "poised for **growth**," and its positive financial results, such as net sales increases of 163%.  *Matrixx I*, at 1171.  Similarly here, Defendants misleadingly stated that "da Vinci has proven **safety**…**benefits**" (¶ 211), that Intuitive's economic success "was being driven

---

[1] The Defendants are Intuitive, Gary S. Guthart ("Guthart"), Marshall L. Mohr ("Mohr") and Lonnie M. Smith ("Smith"). ¶¶ 30-32 .

1   by continued **growth** of da Vinci" (¶ 213(b)), and that "we are pleased with the growing use of

2   da Vinci … and the financial performance that follows" (¶ 221).[2]   Both sets of defendants thus

3   touted their respective leading products in terms of safety, efficacy, and positive economic

4   growth, but concealed known safety risks.  Thus, under *Matrixx*, Plaintiffs have easily pled that

5   the alleged statements were materially false.

6        Plaintiffs' allegations of scienter are even stronger.  The FDA's Warning Letter to

7   Defendant Guthart in 2013 shows that Intuitive knew as of 2011 about defects causing serious

8   injury and death, and concealed them from shareholders and the FDA.  Plaintiffs' scienter

9   allegations are thus backed by documentary evidence from the federal government.  Even more

10  damning are the Individual Defendants' massive insider sales of stock, which exceeded

11  **$120 million**.  No matter how the stock sales are analyzed, whether by dollar value, timing,

12  number of shares sold, or statistical significance, the conclusion is the same.  The insider sales

13  are deeply suspicious and raise a strong inference of scienter.  ¶¶ 127-153.

14       The most telling fact is that the vast majority of the sales took place after Defendants

15  knew, but the public did not, that the FDA and Defendants had met in September 2012 because

16  Intuitive was not accurately reporting adverse events.  Before September 2012, Intuitive had

17  concealed thousands of such adverse event reports from the FDA's public database.  Defendants

18  thus knew in late September 2012 that it was only a question of time before the real number of

19  adverse reports would begin appearing in the FDA's public database, and the public would learn

20  of the true health risks posed by da Vinci.  In a classic tell-tale sign of securities fraud, the

21  Individual Defendants sold a fortune in stock and left investors holding the bag.  For all these

22  reasons, the Court should sustain the Complaint.

23  **II.    STATEMENT OF MATERIAL FACTS**

24       Intuitive manufactures only one product, da Vinci, which is responsible for all revenues

25  and profits.  ¶¶ 40, 171.  Concerned that fears over da Vinci's safety would immediately ground

26  Intuitive's skyrocketing growth, Defendants systematically and methodically concealed from the

27
28       [2] Citations to "¶ _" refer to the Amended Class Action Complaint or "Complaint" (ECF No. 48).  Citations to "Def. __" refers to Defendants' Motion to Dismiss (ECF No. 53).  Citations, footnotes and internal quotation marks are omitted, and emphasis is added unless noted.

FDA and investors precise data showing that Da Vinci was unsafe and dangerous.  Defendants doctored and manipulated nearly every piece of information that raised questions about da Vinci's safety.  The Complaint alleges in precise detail every single data point concealed, how it was concealed, the relevance to safety, and the FDA's conclusion that Intuitive violated "significant" FDA regulations.  ¶¶ 38-126.

Defendants carried out this broad concerted effort to conceal the danger to health posed by da Vinci by hiding two general categories of information.  First, Defendants concealed thousands of adverse medical device reports ("MDRs"), including injuries and deaths, from the FDA's Manufacturer and User Facility Device Experience database ("MAUDE") that compiles and publicly makes available da Vinci's safety record.  Put simply, Defendants doctored da Vinci's public safety record.  Second, Defendants concealed critical da Vinci defects that they knew caused injury and death, and related lawsuits.  The concealed data showed that da Vinci's risk profile was materially different and far more dangerous than otherwise publicly known.

### A.   Intuitive Knew About Thousands Of MDRs That It Concealed From The FDA's Public MAUDE Database, Doctoring Da Vinci's Safety Record

Federal regulations required Intuitive to report MDRs to the FDA.  ¶¶ 62-64 (citing regulations).  In the normal course, the FDA does not independently gather safety data and is therefore dependent on medical device manufacturers like Intuitive for such information.  *Id*.  In fact, 94% of MDRs received by the FDA are reported by manufacturers such as Intuitive.  ¶ 62.

Similarly, hospitals and surgeons using da Vinci are required by regulation to report adverse events to Intuitive as the manufacturer.  Intuitive then is obligated to issue reports to the FDA on the basis of this information.  ¶¶ 62-63.  Defendants thus knew that Intuitive was the central information hub for all MDRs and that Intuitive controlled the information flow.  The detailed facts set forth in the Complaint allege that Intuitive underreported and misclassified thousands of MDRs so that it was impossible for anyone outside Intuitive to know the severity and extent of the safety dangers posed by da Vinci.  ¶¶ 7, 65-67.  Defendants' main argument contests these factual allegations.  Def. 10-15.  This, on a motion to dismiss, Defendants cannot do, and merely evidences the weakness of their position.

The FDA met with Intuitive in September 2012. ¶ 70.  As a result of the meeting, Intuitive began to (i) report MDRs not previously submitted to the FDA, and (ii) upcode to "serious injury" MDRs that somehow had been innocuously labeled as "other."  ¶ 6.  Once Intuitive began to accurately report all MDRs in September 2012, the number of MDRs in the MAUDE database skyrocketed.  ¶ 72.  By the end of the Class Period,[3] the results show that Intuitive had suppressed nearly half of all MDRs, so that the MAUDE database reflected only about half of the real injuries and adverse events.  ¶¶ 72-76.  Specifically, between 2000 and 2012, Intuitive had filed 5,333 da-Vinci related MDRs.  ¶ 72.  But in the first nine months of 2013, this number grew by 3,117, to over 8,450 MDRs. *Id*.  The chart below, showing the number of MDRs submitted to the FDA on a monthly basis, from 2000 through September 2013, highlights the stunning increase after the meeting with the FDA in September 2012.



_____

[3] Class Period: February 6, 2012-July 18, 2013.

Not only did the total number of MDRs dramatically increase, but so too did the severity of the injuries reported.  Until September 2012, Intuitive had misclassified "serious injuries" under the misleading and innocuous label of "other."  ¶ 67.  After September 2012, however, "death" or "injury" related MDRs began to consistently increase monthly, nearly doubling from the low teens to more than twenty.  ¶ 74.  Even more revealing of Intuitive's prior manipulation is the spike in August and September 2013, when "deaths" and "injuries" swelled to more than 100 each month as reflected in the chart below.  *Id.*



The spike in August and September 2013 demonstrates that Intuitive had falsely underreported the number of deaths and injuries in prior years.  These 100-plus jumps were due to a mass posting of injuries or deaths that the Company admitted were being disclosed in mid-2013 as "part of a legal mediation effort," but that had occurred at least six months to three years before the mid-2013 disclosure.  ¶ 74.  These deaths and injuries had taken place long ago and

were concealed from the FDA, investors, and the public. *Id.*[4]

To this day, Intuitive has not even attempted to provide a non-fraudulent explanation (because there is none) for how it could have possibly misclassified "serious injuries" under the innocuous category of "other."  ¶ 67.  In a press release issued on March 13, 2013, the Company is tellingly silent, and simply states the facts: that Intuitive elevated MDRs previously classified as "other" to "serious injury" as of September 2012.  The press release also cryptically admitted that Intuitive had underreported MDRs by stating that Intuitive had "revised its MDR practices" in September 2012, which had then resulted in "increased reports" by March 2013. ¶¶ 67-68.  Intuitive did not explain how it had "revised its MDR practices."

In addition to the concealed MDRs, Intuitive also did not disclose the rapid escalation in the number of lawsuits due to injuries caused by da Vinci.  ¶¶ 183, 189, 194, 199, 212.  Intuitive's boilerplate SEC disclosures only warned generally that medical device manufacturers like Intuitive risk being sued – a self-evident proposition.  ¶¶ 216, 225.  But those filings did not disclose the already existing lawsuits, nor the internally evident escalation as the Class Period progressed: (a) **four** in February 2012 (¶¶ 182, 183(iii)); (b) **five** in April 2012 (¶¶ 188, 189(iii)); **eight** in July 2012 (¶¶ 193, 194(iii)); **12** in October 2012 (¶¶ 198, 199(iii)); **14** in February 2013 (¶¶ 203, 204(iii)); **16** in April 2013 (¶¶ 211, 212(viii)); and **25** in August 2013 (¶ 49 n.3).

Accordingly, the hard data alleged shows that investors, the public, and the FDA were all deceived by Defendants with respect to the actual risk profile of da Vinci during the Class Period.  Da Vinci was significantly more dangerous in the frequency and severity of adverse events than anyone, other than Defendants, previously knew.  On this procedural posture, based on these detailed allegations, Defendants are not entitled to contest the facts and provide an alternative factual scenario claiming that da Vinci's risks  were properly disclosed.  They can make that factual argument to the jury – or at summary judgment – but not now.

---

[4] A study that analyzed MDRs through August 2012 by cross referencing it with legal documents retrieved from LexisNexis and PACER also concluded that Intuitive underreported MDRs. ¶ 65 (citing Underreporting of Robotic Surgery Complications, J. for Healthcare Quality, Sept. 2013).  The study highlighted facts suggesting that Intuitive did so intentionally.  *Id.*

1

### B.   Intuitive Knew In 2011 About Da Vinci's Defects

2        Defendants also failed to report to the FDA **known** defects that caused serious injury and

3   death as required under FDA regulations.  ¶ 55.  One of the most dangerous defects concealed by

4   Defendants caused internal burns, bleeding, and death.  ¶¶ 41-61.  Specifically, da Vinci's most

5   commonly used instrument is a pair of special scissors, called monopolar scissors, which

6   cauterize tissue through a targeted electric discharge.  ¶¶ 43-44.  The scissors, however, often

7   malfunction, sparking and burning internal tissue and organs – referred to as "arcing."  To try to

8   prevent arcing, Intuitive developed a rubber tip cover (the "Tip Cover").  ¶¶ 44-45.

9        The Tip Covers were defective.  They were too fragile, tore easily, and required surgeons

10  to use significant force to fit them properly, causing more tears and fractures.  ¶¶ 11, 17, 50-51,

11  115.  Patients thus still suffered severe internal burns, bleeding, and death, from arcing.  ¶ 47.

12       Intuitive knew that the Tip Covers were defective as of October 2011 (months before the

13  Class Period), but concealed it from investors and the FDA.  ¶¶ 50-52.  On October 10, 2011,

14  Intuitive sent a letter to hospitals that used da Vinci correcting the instructions for the use of Tip

15  Covers to address arcing-related injuries.  Two more customer letters followed in October,

16  including one sent to address defective "cannulas" (*i.e.*, tubes used to insert da Vinci instruments

17  inside the body).  ¶¶ 53-54.  The defective cannulas also contributed to damaging the Tip Covers

18  and subsequent arcing.  None of the letters were publicly disclosed.  ¶¶ 52-54.  Indeed, no one

19  knew about them other than Intuitive and individual customer hospitals.  Critically, Intuitive did

20  not disclose the letters to the FDA, violating FDA regulations.  ¶ 55 *et seq*. (*quoting* regulations).

21       Intuitive further improperly concealed additional da Vinci health risks.  For example,

22  Intuitive had received complaints of arcing caused by surgeons cleaning off instruments inside

23  the patient by scraping them against other surgical instruments.  ¶ 100.  The scraping led to tears

24  in the Tip Covers.  *Id.*  This awareness of the surgeons' need to clean the instruments inside the

25  patient created a duty under FDA regulations to design a safe, FDA-approved, cleaning process,

26  that both addressed user need and did not damage the Tip Covers.  ¶¶ 100, 115.  Intuitive ignored

27  this regulatory duty and never informed the FDA of the known danger, nor fixed the defect.

28       Similarly, Intuitive ignored FDA regulations by not informing the FDA that it had added

1  thyroidectomies to the da Vinci list of indicated procedures, as required by 21 C.F.R.

2  § 807.81(a)(3)(ii).  ¶ 99.  After numerous thyroidectomy-related MDRs, Intuitive withdrew the

3  indication.  ¶¶ 97-98.  When the FDA discovered the thyroidectomy indication and withdrawal in

4  2013, Intuitive falsely told the FDA that there were no related MDRs.  ¶ 98.  This was false, as

5  the FDA discovered during an inspection of Intuitive's facilities in 2013.  ¶¶ 97-98.  This lack of

6  candor with the FDA (even when caught) is the consistent theme in Intuitive's conduct.

7  **C.     The FDA Found That Intuitive Knew Since 2011 About Da Vinci's Defects**

8  **1.     The FDA Form 483 Concluded That Intuitive Hid Da Vinci's Defects**

9  The FDA first learned that Intuitive had been concealing Da Vinci's risks after inspecting

10  Intuitive's headquarters between April 1 and May 30, 2013.  At the conclusion of the inspection,

11  the FDA issued a Form 483 addressed to Defendant Guthart.  *See* Complaint Ex. B.  A Form 483

12  "is issued to firm management at the conclusion of an inspection when an investigator(s) has

13  **observed any conditions that** . . . **may constitute violations of the [FD&C] Act**....The FDA

14  Form 483 notifies the company's management of **objectionable conditions**."  ¶ 94.  A Form 483

15  thus is the first step taken by the FDA seeking to rectify perceived regulatory violations before

16  engaging additional resources to more coercively force compliance. The Form 483 listed the

17  multiple instances in which Intuitive concealed its actions from the FDA, including the October

18  2011 letters and the failure to address the need to internally clean instruments while knowing that

19  scraping instruments further damaged already defective Tip Covers.  ¶¶ 94-100.

20  **2.     The FDA's Warning Letter Also Concluded That Intuitive Knew In
        2011 About Da Vinci's Defects**

21

22  Intuitive's Form 483 escalated into a Warning Letter rapidly, between the end of the

23  inspection on May 30 and July 16, 2013, when the letter was issued.  ¶¶ 108-121 (Complaint Ex.

24  A).  "**Warning Letters are issued only for violations of regulatory significance**," according to

25  the FDA's Regulatory Procedures Manual ("RPM") § 4-1-1.  ¶ 109.

26  The Warning Letter concluded that Intuitive knew in 2011 about the defects that caused

27  serious injury and death, but concealed them.  The multiple instances of concealment constituted

28  significant FDA violations.  First, and most importantly, Intuitive did not disclose its attempts to

1    fix the defects in the Tip Covers in 2011.  These fixes were not minor, but were later determined

2    by the Warning Letter to have risen to the level of a formal "Class II recall." ¶ 112.  In other

3    words, Intuitive had conducted recalls, and had done so in secret by not reporting it to the FDA.[5]

4          Second, the Warning Letter concluded that, in light of the failure to notify the FDA of the

5    defects Intuitive had identified and tried to correct in the Tip Covers and cannulas in 2011, they

6    were "misbranded devices" under FDA regulations.  ¶ 111; Complaint Ex. A.

7          Third, the Warning Letter determined that the manufacturing process for the Tip Covers

8    and cannulas violated Current Good Manufacturing Practice requirements, 21 C.F.R. § 820.

9    ¶115; Complaint Ex. A.  The manufacturing process was defective because even though Intuitive

10   knew that surgeons scraped instruments intra-surgically, causing Tip Cover damage, Intuitive

11   never sought to fix the known design defect.  ¶¶ 115-120.  The Warning Letter thus concluded

12   that the Tip Covers and cannulas were "adulterated devices" under FDA regulations.  ¶ 120.

13         All these violations were even more egregious because Intuitive had previously engaged

14   in similar improper conduct and had been warned that taking corrective action without informing

15   the FDA violated regulations.  The Warning Letter stated "[t]he FDA has previously informed

16   you of your firm's **correction and removal violations**" in 2008 and late 2002. ¶ 114.  By 2011,

17   Defendants had thus been warned, twice, that sending a letter to the hospitals to fix the Tip

18   Covers (*i.e.*, taking corrective action) without informing the FDA constituted an FDA violation –

19   Defendants did it anyway.  ¶ 16.  Defendants' scienter with respect to the violation of FDA

20   regulations in 2011 is thus based on the 2002 and 2008 notifications, not the 2013 Warning

21   Letter as Defendants would like this Court to believe.  Def. 15.

22         [5] Defendants' contention (at 11) that the Warning Letter determined in 2013, not 2011, that
     Intuitive *violated* FDA regulations misses the point.  The Warning Letter establishes that the Tip
23   Covers were defective in 2011 and *Defendants knew about the defects in 2011*; indeed, that is
     precisely the reason Defendants sought to superficially fix the Tip Covers in 2011. Accordingly,
24   the Warning Letter establishes Defendants' knowledge in 2011 about the Tip Cover defects,
     which is the relevant fact for scienter, not knowledge of the violation.  *In re Cryolife, Inc.*, 2003
25   WL 24015055, *10 (N.D. Ga. May 27, 2003). ("Since some of the problems noted by the FDA
     in its [2002] warning letter dated back to 1999, drawing all reasonable inferences in favor of the
26   plaintiffs, the court finds … misleading" defendants' 2000 and 20001 statements).
         *In re Genzyme Corp.*, 2012 WL 1076124, *11 (D. Mass. Mar. 30, 2012) (Def. 11) is
27   distinguishable.  The warning letter issued to Genzyme during the class period did not point to
     any specific facts that defendants knew beforehand ("plaintiffs fail to identify specific facts to
28   support the requisite inference").

### D. The Public Disclosure Of Da Vinci's Real Dangers Revealed That Intuitive's Safety And Profitability Profile Was False And Misleading

Once the falsity of da Vinci's risk profile was revealed, and the real and actual dangers concealed by Intuitive became publicly known, Intuitive's entire risk profile dramatically changed.  Throughout the Class Period the stock price had averaged about $520 per share.  The high stock price reflected rapid growth in sales of da Vinci and number of procedures.  ¶ 39.  But this Wall Street wonder story was largely predicated on the perception that robotic surgery was safe.  "Part of what's driven this market is people seeking out robotic surgery – hospitals market it and the patients seem to think it's better," said Michael Matson, an analyst with Mizuho Securities, on February 28, 2013.  ¶ 174(a).  However, according to Matson, a rise in adverse event reports concerned Wall Street because "patients would get scared."  *Id.*

That is exactly what happened.  Between February 28 and July 18, 2013, news of the FDA's focus on da Vinci's safety trickled out to the public, along with revelations of the concealed defects causing injury and death.  ¶¶ 174-179.  On February 28, Bloomberg reported publicly for the first time that the FDA was "prob[ing]" da Vinci's safety.  ¶ 174.  On March 5, an analyst at Janney Capital Markets said that Intuitive shares were under pressure as a result of "business journal articles continu[ing] to harp on potential safety concerns on da Vinci," following the revelation of the FDA probe. ¶ 175(a).  By April, Intuitive began publicly reporting that patients were not electing to use da Vinci as rapidly as before.  *Id.*  Wall Street analysts attributed the lack of procedure growth to the then-recent "negative press."  ¶ 176(a).

By the end of the Class Period in July, Intuitive's earnings fully reflected that patients were scared.  ¶ 177.  The number of procedures, units sold, and revenues had all collapsed, leading JP Morgan to call it "shocking."  ¶ 177(b)-(c).  The Motley Fool reported on July 19, 2013 that the "slump in system sales means that the increasing talk regarding safety and legal issues at the company are catching up to Intuitive's financials – and investors.  Thursday's warning [letter] by the FDA may only exacerbate that trend."  ¶ 178(b).  Also that day, a Bloomberg article entitled "Intuitive Reeling as FDA Cites Lack of Visibility on Problems" reported "Intuitive…has lost about $6 billion in value over five months after disclosures about

1    adverse events with its products, a recent recall, and now, **a regulatory warning [that Intuitive]**

2    **hasn't adequately reported on issues concerning the devices**." ¶ 178(c).  Further, a "review

3    of [FDA] records [i.e., the MAUDE database] now shows the reports of injuries involving robot

4    procedures have doubled in the first six months of 2013." *Id.*

5          Investors and the public finally learnt the truth.  Da Vinci caused serious injury and

6    deaths.  Intuitive had concealed the safety defects and incidence of adverse events in an effort to

7    stem fears about the robot.  Da Vinci was much riskier than previously known by the public and

8    so was Intuitive's stock.  As a result, the stock price has averaged about $380 per share since the

9    end of the Class Period, compared to $520 before.  This re-pricing of Intuitive's value and risk,

10   based on concealed safety information that Defendants knew, is the essence of a securities fraud.

11   ## III.   ARGUMENT

12         The elements of Section 10(b) include, "(1) a material misrepresentation or omission of

13   fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss

14   causation, and (5) economic loss."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005).  In

15   deciding a Rule 12(b)(6) motion to dismiss, courts must sustain the complaint if, treating the

16   facts alleged as true and construing all reasonable inferences in favor of Plaintiffs, the complaint

17   "state[s] a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

18   547, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that

19   allows the court to draw the reasonable inference that the defendant is liable for the misconduct

20   alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

21        **A.    Under *Matrixx*, Plaintiffs Have Plausibly Alleged That Defendants Made**
             **Materially Misleading Statements And Omissions**
22

             **1.    Defendants' Concealment Of Da Vinci's Defects, MDRs, And**
23                **Corrective Actions Created A Materially Misleading Impression**

24        "Rule 10b-5(b) prohibits the telling of material lies and prohibits the telling of material

25   half-truths, where the speaker 'omit[s] to state a material fact necessary in order to make the

26   statements made, in light of the circumstances under which they were made, not misleading.'"

27   *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, *5 (C.D. Cal. June 17, 2011) (quoting *U.S. v.*

28   *Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010)).  An omission is thus actionable if it creates an

1  "impression of a state of affairs that differs in a material way from the one that actually exists."

2  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  Whether a statement

3  creates a materially misleading impression is a function of whether the statement "could [be]

4  reasonably interpreted to misrepresent" the true facts.  *See STEC*, 2011 WL 2669217, at *7.  This

5  determination must consider Defendants' statements in context, not in isolation.  *Id.*

6      Applying this standard, in the Ninth Circuit, "[i]f there are two alternative explanations,

7  one advanced by defendant and the other advanced by plaintiff, both of which are plausible,

8  plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).  Plaintiff's complaint

9  may be dismissed only when defendant's plausible alternative is so convincing that plaintiff's

10  explanation is **implausible**."  *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011).  **The**

11  **PSLRA does not alter the plausibility standard for pleading falsity**.[6]  *See Matrixx II*, at 1323.

12      Throughout the Class Period, Defendants created a misleading impression that da Vinci

13  was safe and well-positioned for significant growth through a series of half-truths and omissions.

14  Long after Defendants had (i) sent secret recall letters to hospitals in October 2011 to "reduce a

15  risk to health posed by the device" (¶ 55), (ii) received injury reports alerting them to da Vinci's

16  defects and design flaws (¶¶ 96-97), (iii) concealed thousands of MDRs, (iv) concealed the

17  severity of MDRs that had been submitted to the FDA (¶¶ 72-75), and (v) known of numerous

18  product liability lawsuits being filed against Intuitive alleging arcing-related injuries (¶ 204),

19  Defendants continued to deceive investors.  For example, Defendants misleadingly stated that (a)

20  da Vinci represented a "new generation of surgery" with "proven **safety**, efficacy, [and]

21  economic … **benefits**" (¶¶ 82, 88, 193, 199, 203); (b) "da Vinci Surgery **continues to be a safe**

22  **and effective surgical method**"  (¶¶ 211, 213(b)); and (c) Intuitive's economic success was

23  "**driven by continued growth of da Vinci [] procedures**" and "[s]ystem sales."  ¶ 250.  These

24  half-truths misleadingly concealed the pervasive risks to health posed by da Vinci.

25      Despite the misleading impression created by their omissions, Defendants argue that they

---

26  [6] Particularity does not change the plausibility standard for falsity.  It only requires Plaintiff
27  to plead the who, what, when, where, how, and why of each false statement, and need only
   "'raise a reasonable expectation that discovery will reveal evidence' satisfying [falsity]" and
28  "allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct
   alleged." *Matrixx II*, at 1323.

---

had no duty to disclose da Vinci's defects and risks.  Def. 9-10.  They are wrong.  Having chosen to tout da Vinci's safety, efficacy, and promise as the future of surgery, Defendants were obligated to do so truthfully and fully.  *Berson*, 527 F.3d at 987 ("[O]nce defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors").   "A duty to affirmatively disclose may arise when . . . , as relevant to this case, an inaccurate, incomplete or misleading prior disclosure" is made.  *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005).  Such is the case when the "omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Matrixx II*, at 1312.[7]

　　　　*Matrixx I* and *II* are controlling.  The alleged false statements were nearly identical to those here.  "[*Matrixx*] principally arises out of statements that Matrixx made during the class period relating to **revenues** and **product safety**."  *Matrixx II*, at 1314.  In *Matrixx*, like here, plaintiffs alleged that defendants had received adverse event reports, which had not been disclosed.  *Id*. at 1315-1316.  Specifically, Matrixx had concealed the risk of a loss of the sense of smell (*i.e.* anosmia) after use of Zicam Cold Remedy.  Zicam accounted for 70% of Matrixx's sales.  The *Matrixx* plaintiffs alleged that defendants made misleading statements substantially similar to those made here, including: touting the "**benefit**" of Zicam, the product being "**poised for growth**," the company having "**very strong momentum**," defendants' "**optimism about the future**," and the expectation that revenues would be up "**driven by [] sales of . . . Zicam**."  *Id*. at 1315; *Matrixx I*, at 1171-72, 1181.  These statements were false in *Matrixx* because defendants, as here, "received information that plausibly indicated a reliable causal link between Zicam and anosmia," jeopardizing Zicam's success, but did not disclose it.  *Matrixx II*, at 1322.

　　　　Similarly, Matrixx, like Intuitive, misleadingly cautioned that product liability lawsuits "may" cause significant costs for the company in hypothetical fashion and without disclosing already existing lawsuit, nor the known adverse events.  *Id.* at 1172.  The Ninth Circuit sustained the material falsity of the statements because Matrixx failed to disclose that a lawsuit had already

---

[7] Because Defendants' duty to disclose the concealed da Vinci information arises from their affirmative statements touting da Vinci, Defendants' argument that the Warning Letter issued in July 2013 does not create a duty to disclose is irrelevant and can be rejected.  Def. 11.

1   been filed and that "it was highly likely that additional suits would be filed in the future." *Id.*

2        The allegations here are no different. By October 2011 Defendants knew that the Tip

3   Covers and other da Vinci defects were causing serious injuries and death. Yet, Defendants

4   concealed the severity of those events from investors and the FDA. ¶¶ 47-48, 58-60. 65-66, 74-

5   75. Defendants also concealed the total number of MDRs. ¶¶ 59, 65-70, 72. Even after the

6   FDA launched a probe into the safety of da Vinci in early 2013, Defendants continued to obscure

7   the true depth of the harm caused by da Vinci, maintaining that "da Vinci surgery has proven

8   safety, efficacy, economic and ergonomic benefits;" emphasizing that the Company's economic

9   success was "driven by continued growth of da Vinci surgery procedures and higher da Vinci

10  Surgical System sales" (¶ 250, April 18, 2013); and assuring that "[t]otal adverse event rates

11  have remained low and in line with historical trends" (¶209, March 13, 2013).

12       In response, Defendants contend that "the mere existence of reports of adverse events is

13  not **material**[8] information required to be disclosed to investors." Def. 12 (quoting *Matrixx II*, at

14  1321). Defendants are just as wrong as defendants in *Matrixx*. Although Defendants were not

15  obligated to disclose the "mere existence" of adverse events without more, they were required to

16  disclose facts that would significantly alter the "total mix" of available information. *Matrixx II*,

17  at 1312. Concealing almost 50% of all MDRs, misclassifying adverse events as "other" instead

18  of as "serious injuries," and concealing Tip Cover defects causing serious injuries and deaths,

19  altered the "total mix" of information concerning da Vinci's safety and profitability. Indeed, the

20  extent and seriousness of Defendants' deceit resulted in a scathing FDA Warning Letter finding

21  "significant violations"[9] and patients abandoning use of da Vinci in droves. This false

22

23       [8] Defendants' challenge to the alleged statements straddles the elements of falsity and
    materiality – even though Defendants mainly couch it in terms of falsity. Defendants' argument,
    however, is equally defective regardless of the label. At bottom, Plaintiffs allege that
24  Defendants' statements concerning da Vinci were false and misleading because Defendants
    concealed material information about da Vinci's risks. Although *Matrixx* focuses on materiality,
25  it is illustrative of the close connection between materiality and falsity and concludes that the
    information concealed about adverse events was material and thus rendered false the alleged
26  statements about revenue and safety – like here. "Assuming the facts to be true, these were
    material facts 'necessary in order to make the statements made, in light of the circumstances
27  under which they were made, not misleading.'" *Matrixx*, at 1323.
       [9] Defendants' claim that the Warning Letter is not a final agency determination of an FDA
28  violation is inapposite and has been rejected before by courts in this Circuit. Def. 11. *See*

impression of da Vinci's safety and efficacy misleadingly fueled investor and patient confidence.

### 2.    Defendants' Statements Reporting Intuitive's Financial Results Were Materially Misleading

Defendants further argue that their statements about Intuitive's revenue growth, da Vinci's sales, and additional financial results are not actionable because they were literally true. Def. 8-9. But even "literally accurate" statements are materially misleading and actionable where, as here, "through their context and manner of presentation" they gave investors a false impression. *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991); *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008). "For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Amgen*, 544 F. Supp. 2d at 1034.

*Matrixx* concerned similarly misleading statements about financial performance. In that case, plaintiffs alleged that Matrixx's statements about its sales growth and financial success were materially false and misleading. For example, Matrixx had said that net sales had increased by 163%, and that revenues would "be up in excess of 50% and that earnings per share for the full year [would] be in the 25 to 30 cent range." *Matrixx I*, at 1171. As here, there was no argument that the financial statements were not literally true. Yet, the information that Matrixx knew suggesting a link between its core product and anosmia was sufficient to allege materially misleading omissions in the Ninth Circuit. *Id.* at 1179. The Supreme Court agreed, highlighting that "Matrixx told the market that revenues were going to rise 50 and then 80 percent…., however, Matrixx had information indicating a significant risk to its leading revenue-generating

---

*McGuire v. Dendreon Corp.*, 2008 WL 5130042, at *6 n.4 (W.D. Wash. Dec. 5, 2008); *see also Public Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 981-82 (8th Cir. 2012) (rejecting argument that final agency determination by FDA is necessary to plead falsity). Further, on this procedural posture, the Warning Letter **plausibly** raises the reasonable inference that a violation occurred. *Matrixx*, at 1320-21 (statistical significance not necessary to render misleading statements concealing adverse reports); *see also Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1130 (C.D. Cal 2005) ("while Defendants note that the Form 483 did not represent a final FDA determination regarding STAAR's compliance…the nature of those problems (e.g., failure to report serious injuries and other incidents attributed to STAAR products, and failure to perform 'root cause analysis' for incident reports) raises a strong inference that STAAR had actual knowledge that these problems could delay or jeopardize the ICL's approval").

---

1  product," and evidence of a link between anosmia and its product.  *Matrixx II*, at 1323.

2         Defendants' representations about Intuitive's revenue growth, systems sales growth, and

3  total system sales cannot be distinguished from those in *Matrixx* and were likewise misleading.

4  Defendants touted Intuitive's financial results, attributing them to the market's "continued

5  adoption of da Vinci."  ¶ 218; *see also*, *e.g.*, ¶¶ 221-223, 227, 229, 230, 234, 235, 236, 240, 242-

6  244, 248, 250-252, 254.  Defendant Guthart publicly assured investors that he and the Company

7  "[were] pleased with the growing use of da Vinci, the acceptance of our new products **and the**

8  **financial performance that follows**."  ¶ 221.  At no point did Guthart or the other Defendants

9  warn that this "financial performance" was in jeopardy because of the shocking increase in da

10  Vinci-related MDRs and corresponding lawsuits arising out of undisclosed da Vinci defects.

11  Yet, Defendants had evidence in their possession of defects and design flaws resulting in injuries

12  caused by da Vinci, serious enough to trigger an FDA investigation, and ultimately a Warning

13  Letter.  ¶¶ 50-54, 67-75, 83-86, 94-100, 112-116.  Under these circumstances, Defendants'

14  misleading positive statements about da Vinci's contribution to Intuitive's financial success raise

15  a **plausible** inference of a materially misleading impression.  No more is required under *Matrixx*.

16         Cases post-*Matrixx* have found no trouble sustaining the alleged falsity of financial

17  results, even if accurate, when the underlying scientific evidence and risks were not fully

18  disclosed. In *In re Questcor Sec. Litig.*, 2013 WL 5486762 (C.D. Cal. October 1, 2013),

19  defendants made false and misleading statements about Questcor's sole product, a drug called

20  Acthar.  The *Questcor* court rejected defendants' argument that the financial results were not

21  actionable because they were accurate, finding them materially misleading:

22         As Questcor's share prices rose throughout the Class Period, Defendants reported
           annual revenues and earnings that were almost entirely based on the sale of
23         Acthar. . . . **Plaintiffs do not contend that the statements themselves were false**
           **when made, but rather that they were misleading because Defendants**
24         **concealed the true causes of the increased sales and financial success**.

                                    *       *       *
25         [B]y touting Acthar's success in the market, Defendants were "bound to do so in a
           manner that wouldn't mislead investors."  . . . Thus, to the extent Plaintiffs
26         have adequately pleaded that Questcor's statements about the scientific support for
           Acthar were misleading, so too were its statements about the company's financial
27         success arising out of Acthar's sales.  *Id.*, at *14.

28

### 3.    The Concealed Defects And MDRs Were Not Public

Defendants next make a number of related points predicated on the factually erroneous premise that the concealed information was public.  Def. 12.  This is a factual argument and can be rejected outright on a motion to dismiss.  Even worse, it is factually wrong.  Defendants first incorrectly argue that Intuitive had no obligation to disclose MDRs in SEC filings because purportedly the MDRs were already public.  Def. 12.  They miss the point.  Plaintiffs are not alleging that Defendants needed to report MDRs in Intuitive's SEC filings that had been **listed already** in the MAUDE database.  Plaintiffs allege that Defendants **failed to even list** thousands of MDRs in that database in violation of FDA regulations.  **In other words, thousands of MDRs were improperly kept secret by Defendants and were unknown to anyone other than Defendants – whether through the publicly available MAUDE database or SEC filings.**

Moreover, even the many MDRs that were filed on the MAUDE database were misclassified under "other" instead of "serious injury."  The overall result was the carefully crafted misimpression that da Vinci was safer than it actually was.  ¶¶ 65-76.  Accordingly, Defendants misled investors, not by failing to disclose a few adverse event reports, but by concealing massive amounts of data showing that its only product was unsafe—data which would have significantly altered the "total mix" of information.  *Matrixx II*, at 1312.

Just as flawed is Defendants' contention that Intuitive's October 2011 letters to customer hospitals notifying them of health risks related to da Vinci was **publicly known information**.  Def. 10-11.  This argument is belied by the fact that **the FDA did not know**.  Had these letters been **remotely** public, the FDA would not have waited almost two years before citing Intuitive in its July 2013 Warning Letter for Defendants concealment from the FDA and related regulatory violations.  ¶¶ 94-100, 108-121.  Indeed, Defendants do not contend that the hospitals receiving those letters forwarded them or made them known to anyone else, certainly not the market, investors, or the FDA.  To this day, the letters are not available to the public.  Plaintiffs have not seen them and only know of their content based on their description in the Warning Letter.

Defendants' argument really amounts to a truth-on-the-market affirmative defense for which "[D]efendants bear a heavy burden of proof."  *Provenz v. Miller*, 102 F.3d 1478, 1492-93

1    (9th Cir. 1996).  "As a general rule, the truth-on-the-market defense is intensely fact-specific, so

2    courts rarely dismiss a complaint on this basis."  *Amgen*, 544 F. Supp. 2d at 1025.  Under this

3    theory, a defendant's failure to disclose material information may be excused where the

4    information was made credibly available to the market by other sources.  *Id*.  However, before

5    the "truth-on-the-market" doctrine can be applied, Defendants "must prove that the information

6    that was withheld or misrepresented was transmitted to the public with a degree of intensity and

7    credibility sufficient to effectively counterbalance any misleading impression created by

8    insider's one-sided representations."  *Provenz*, 102 F.3d at 1492-93.  That is a far cry from this

9    case.  Even assuming that Defendants' argument was factually accurate and the letters to

10   hospitals had trickled out to the public (which was not the case), Defendants still had a duty to

11   disclose the letters in order to make their statements about da Vinci not misleading.  *Matrixx I*, at

12   1181 ("By choosing to speak about the safety of [their drug] Defendants assumed a duty to

13   disclose material information regarding adverse events").[10]

14         For this reason, Defendants' point has been repeatedly rejected.  In *Amgen*, plaintiffs

15   alleged that the public was misled about the FDA's level of concern over one of its drugs when

16   Amgen said that an FDA advisory committee meeting had not focused on the drug.  544 F. Supp.

17   2d at 1025.  In response, defendants asserted what amounted to a truth-on-the-market affirmative

18   defense, noting that the meeting had, in fact, focused on the drug as reflected in the agenda that

19   was "publicly available" in the *Federal Register* – the event also had been public and attended by

20   the press.  *Id*.  *Amgen* gave the argument short shrift because the "degree of intensity" of

21   Amgen's alleged false statements minimizing concern over the drug was stronger than the

22   supposedly publicly available information buried in the *Federal Register*. *Id*.

23         Defendants' analogous argument here is much weaker than the version rejected in

24   *Amgen*.  Defendants cannot dispute that the October 2011 letters were circulated to only

25

26        [10] The letters are not before the Court and whether they sufficiently establish truth-on-the-market would depend on, *inter alia*, the specific language and who specifically received them.

27   Accordingly, the letters alone cannot serve as a basis for a truth-on-the-market determination given the factually intensive nature of the inquiry.  *See In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at *4 (N.D. Cal. May 11, 2006) (rejecting request to take judicial notice of FDA

28   approval orders to support truth-on-the-market defense).

1    Intuitive's clients, not the general public, and certainly did not appear in the *Federal Register*.

2    Def. 10-11.  Nor do Defendants suggest, as in *Amgen*, that analysts or the media received these

3    letters or even reported them.  *See id.*; *see also Amgen* 544 F. Supp. 2d at 1025.  "[C]orporate

4    insiders are not relieved of their duty to disclose material information where that information has

5    received only brief mention in a few poorly-circulated or lightly-regarded publications.  The

6    investing public justifiably places heavy reliance on the statements and opinions of corporate

7    insiders." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989).

8         More importantly, Defendants' argument misses the critical distinction between sending

9    letters to hospitals, whether it be 2 or 2,000, and making the letters and their content public such

10   that the information is disseminated to shareholders, analysts, and media and incorporated into

11   Intuitive's stock price.  *Basic v. Levinson*, 485 U.S. 224 (1989).  Just like the letters were

12   concealed from the FDA, there are no analyst reports or contemporaneous news article publicly

13   disclosing the existence of the letters or their contents.  It is the market's ignorance of the letters

14   that precludes the letters from being incorporated into the price of the stock that matters in a

15   securities case, such as this one, predicated on the fraud-on-the-market doctrine and presumption

16   of reliance on omissions under *Affiliated Ute v. U.S.*, 406 U.S. 128 (1972).  ¶¶ 262, 263.

17        **4.    Defendants' False And Misleading Statements Are Not Puffery**

18        Defendants argue that "several statements" alleged in the Complaint amount to "nothing

19   more than vague and subjective expressions of corporate optimism," *i.e.*, puffery.  Def. 9.

20   Puffery is inherently fact-intensive, and dismissals on this ground at the motion to dismiss stage

21   are rare.  *See Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 n.11 (D. Mass. 2006).

22   Moreover, "[o]ptimistic statements may constitute a basis for a claim under section 10(b)."

23   *Amgen*, 544 F. Supp. 2d at 1027.  A misstatement amounts to "puffery" only when it is "so

24   'exaggerated' or 'vague' that no reasonable investor would rely on it when considering the total

25   mix of available information."  *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d

26   1059, 1076 (N.D. Cal. 2001); *see also No. 84 Employer-Teamster Joint Council Pension Trust*

27   *Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934-35 (9th Cir. 2003) ("*America West*").

28        Defendants fail, however, to establish that any statements alleged in the Complaint are so

exaggerated or vague that no reasonable investor would rely on them.  Rather than identify the

statements Defendants contend are puffery within the confines of their 25-page memorandum,

they attach Exhibit A, which purports to indicate in a conclusory manner, with no explanation,

each instance of puffery.[11]  However, Defendants' representations about the acceptance of

da Vinci and the resulting "financial performance," are not vague or exaggerated.  ¶¶ 221, 235,

236(a).  They convey concrete information about the market's reception of Intuitive's only

product and the impact that reception had on Intuitive's success.  Certainly, investors would

consider statements that acceptance was waning or in decline to be material in valuing Intuitive's

shares.  *See In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 33 (D. Mass. 2004) (finding

actionable optimistic statements such as "[w]ith its expected product characteristics, SOLTARA

has the potential to be an important new entrant in [the] fast-growing allergy marketplace").

       Here, the statements Defendants assert to be puffery are no different than those found

actionable in *Matrixx*.  For example, Defendants stated "[w]e are **pleased** with our first quarter

revenue and earnings growth," (¶ 250 (i)), while in *Matrixx* defendants similarly expressed

"**enthusiasm** for the most recently completed quarter" and "**optimism** about the future."  585

F.3d at 1171.  Likewise, Defendants said, "we are pleased with the growing use of da Vinci, the

acceptance of our new products and the financial performance that follows," (¶ 221), which was

echoed in *Matrixx*, which also falsely "attribut[ed] the company's positive results to Zicam and

project[ed] further growth."  *Matrixx I*, at 1181 (other alleged false statements in *Matrixx I*,

include "the product being "poised for growth," the company having "very strong momentum").

*See In re Dura Pharm., Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) (rejecting

puffery for, "sales and demand for Ceclor CD were '***strong***;'" defendants were "***pleased***" with

---

[11] Among the statements identified are: (i) "In the first quarter, we are pleased with the growing use of da Vinci, the acceptance of our new products and the financial performance that follows." (¶ 221); (ii) "[D]a Vinci surgery represents 'a new generation of surgery' that 'combines the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision and dexterity of open surgery.'" ¶¶ 188, 193, 198, 213(a); (iii) "[A]cceptance of da Vinci general and gynecologic surgery continues to grow." ¶¶ 235, 236(a) (substantially the same); (iv) "We are pleased with our first quarter revenue and earnings growth.  Despite a concerted effort by vocal critics of robotic surgery, support remains strong among patients, surgeons and hospitals." ¶ 250; (v) "We believe that da Vinci Surgery continues to be safe and effective surgical method." ¶ 213(b).  *See* Def. Ex. A.

1   financial results; and product was "**well received**"); *Cryolife,* 2003 WL 24015055, at *5 ("doing

2   well" and "highest standards of quality control" not puffery).

3   　　　Further, statements about a product's safety and benefits are statements of fact that can be

4   disproved, subject to verification, and are thus not puffery.  *See Cryolife,* 2003 WL 24015055, at

5   *5; *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010) (finding

6   statements about quality of assets and source of growth actionable misstatements of existing

7   facts, not puffery).  Indeed, Defendants' statements were here are disproved by the undisclosed

8   spike in MDRs and lawsuits, and concealed defects.  *See In re Countrywide Deriv. Litig.*, 588 F.

9   Supp. 2d 1044, 1144 (C.D. Cal. 2008); *see also Shapiro v. UJB Corp.*, 964 F.2d 272, 282 (3d

10  Cir. 1992) (management practices that are "adequate," "cautious," and "solid" are not puffery).[12]

11  　　**B.　　Plaintiffs Have Alleged A Strong Inference Of Scienter**

12  　　　A securities fraud complaint must "state with particularity facts giving rise to a strong

13  inference that the defendant acted with" scienter. 15 U.S.C. § 78u-4(b)(2)(A). To establish

14  scienter, "a complaint must allege that the defendants made false or misleading statements either

15  intentionally or with deliberate recklessness." *Matrixx I*, 585 F.3d at 1180.  Recklessness is "an

16  extreme departure from the standards of ordinary care, and which presents a danger of

17  misleading buyers or sellers that is either known to the defendant or is so obvious that the actor

18  must have been aware of it." *Id*.  A complaint adequately pleads scienter  when "a reasonable

19  person would deem the inference of scienter cogent and at least as compelling as any opposing

20  inference one could draw from the facts alleged." *Id*.  In making this determination, the court

21  must review all of the allegations holistically. *Id*.

22  　　　Viewed holistically, this is one of those rare cases in which Plaintiffs allege virtually all

23  the types of facts that raise a strong inference of scienter – knowledge and motive.  Plaintiffs

24  allege that Defendants knew (i) that thousands of MDRs had been improperly concealed from the

25

26  　　　[12] Defendants' argument that Plaintiffs rely only on the Warning Letter to allege that
    Intuitive failed to disclose FDA violations is wrong. Def. 15.  The Warning Letter stated "[t]he
    FDA has previously informed you of your firm's **correction and removal violations**" in 2008
27  and late 2002.  ¶ 114.  By 2011, Defendants had thus been warned in 2008 and 2002 that sending
    a letter to the hospitals to fix the Tip Covers (*i.e.*, taking corrective action) without informing the
28  FDA constituted an FDA violation – Defendants did it anyway.  ¶ 16.

1    FDA and the public, (ii) the defects in 2011 that caused serious injury and death, as set forth in

2    the Warning Letter, and (iii) that the FDA met with Intuitive in September 2012 to change its

3    MDR reporting practices, which caused the MDRs to soar.  Defendants then sold massive

4    amounts of stock, precisely at the propitious time before the spike in MDRs, reaping millions of

5    dollars in profits.  And all of these concealed facts impacted Intuitive's sole product, responsible

6    for 100% of its revenues, placing this case squarely within the core operations doctrine.

7              **1.        Plaintiffs Raise A Strong Inference Of Scienter Under *Matrixx***

8                     **(a)        Defendants Had Actual Knowledge**

9              The allegations raising a strong inference of scienter are overwhelming.  First, the FDA

10   concludes in its Warning Letter and Form 483, both addressed to Defendant Guthart, that he

11   knew in 2011 about da Vinci-related injuries, violations and concealment of serious defects:

12   •   "you informed our investigator that ***you are aware of patient injuries*** associated
         with intraoperative cleaning of energized instruments such as Monopolar Curved
13        Scissors . . . ***evidenced by . . . complaints and [] MDRs during . . . 2010 and
         2011***" and "***you are aware that cleaning instruments*** inside patients…*is a
14        **common practice***" (¶ 115).

15             The FDA is, thus, on record stating that Guthart knew of injuries and defects in 2010 and

16   2011. The Warning Letter is conclusive for pleading purposes.  Defendants are entitled to contest

17   the FDA's conclusion at summary judgment and trial.  At this stage, the Warning Letter, from a

18   United States Agency, raises a strong inference of scienter.  *KV Pharm.*, 2013 WL 1831427, at

19   *2 (FDA complaint alleging defendants' actual knowledge supports strong inference of scienter).

20             Second, the Warning Letter provides evidence that Defendants knew of the defective Tip

21   Covers by showing that Intuitive sought to fix the Tip Cover defects in 2011 by sending the

22   letters to the hospitals, before the Class Period. *See* Warning Letter, Ex. A to Complaint; ¶ 96.

23             Third, the Warning Letter concludes that Defendants had engaged in this same improper

24   conduct in the past, hiding from the FDA defects and attempts to correct them.  After citing

25   Defendants for "significant deviations" from FDA regulations including "correction or removal"

26   violations, the Warning Letter further concluded that "**the FDA has previously informed you of**

27   **your firm's correction and removal violations** in an untitled letter dated February 19, 2008,

28   and FDA 483 [] issued on December 20, 2002." *In re Able Labs. Sec. Litig.*, 2008 WL 1967509,

1   at *15 n.20 (D.N.J. Mar. 24, 2008) (prior warning letters, even if on different issues than final

2   warning letter, is sufficient to put Defendants on notice and establish recklessness).

3       Fourth, under the law, Defendants are presumed to know about the defects and underreported

4   MDRs, **even absent a Warning Letter** (¶ 109; Mullen Decl. Ex. C, p.4-2):

5       ***Responsible officials in positions of authority*** in regulated firms have a ***legal
        duty*** to implement …measures …to ensure that their products . . . or other

6       activities comply with the law. ***Under the law such individuals are presumed
        to be fully aware of their responsibilities***...[and] ***should not assume that they

7       would receive a Warning Letter*** … before FDA initiates enforcement action.

8   Although not determinative for purposes of a securities claim, that Defendants had a legal duty to

9   know the concealed information supports a strong inference of scienter. *New Mexico State Inv.*

10  *Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) (recklessness found "where

11  defendants 'failed to review or check information that they had a duty to monitor'").

12      Fifth, the systematic concealment and consistent failure to report defects and corrective

13  actions to the FDA raise a strong inference of scienter. **There is no plausible justification for**

14  **this systematic concealment other than an intent to deceive**.  Concealing thousands of MDRs,

15  together with the failure to reveal the Tip Cover defects, make it unfathomable that it was

16  coincidence.  The stronger inference is that it was intentional. *Matrixx II*, at 1324 (concealing

17  use of Zicam in public medical conference on anosmia supports scienter).

18      Sixth, with respect to the systematic misclassification of MDRs as "other" rather than

19  "serious injury," and the failure to report to the FDA thousands of MDRs, the Complaint alleges

20  that the FDA met with Intuitive in September 2012 resulting in changes to Intuitive's reporting

21  practices.  ¶ 70.  The stronger inference is that Defendants thus knew that the MDRs would

22  skyrocket after September 2012.  This is supported by the fact that the Individual Defendants

23  immediately sold huge amounts of stock, as set forth below.

24      Seventh, the Individual Defendants' knowledge of the rise in MDRs and adverse events

25  that were hidden from the public and the FDA is also supported by allegations that Defendants

26  Smith and Guthart closely monitored adverse event reports.  ¶¶ 164-69.  According to Intuitive's

27  Former Financial Planning and Analysis Manager in Sales and Marketing ("FP&A Manager"),

28  Defendants Smith and Guthart closely monitored reports of adverse events during his

1    employment at Intuitive (June 2006 until December 2012), discussed them frequently, and were

2    able to recite the totals including ratios of adverse events to the FP&A Manager.  ¶¶ 165-166.

3    The FP&A Manger also attended various meetings that included the Individual Defendants, at

4    which adverse event reports were discussed.[13] ¶¶ 168-169.

5         These allegations raising a strong inference of scienter are also similar to those in *Matrixx

6    II*.  *Matrixx II* relied on corrective actions taken by Defendants, finding that Matrixx had

7    investigated whether Zicam caused anosmia by "hir[ing] a consultant to review the product" and

8    "convened a panel of physicians and scientists."  *Id*. at 1324.  The fact that the *Matrixx*

9    defendants took proactive actions evidenced knowledge of the underlying concealed information

10   (*i.e*., the risk that Zicam caused anosmia).  Here too, the stronger inference is that the letters to

11   hospitals seeking to correct the defects in the Tip Covers show that Defendants knew about the

12   defects.  In *Matrixx*, defendants also sought to conceal the information showing that Zicam

13   caused anosmia by shutting down the use of Zicam's name in a public presentation regarding

14   anosmia.  *Id*.  Once again, the stronger inference is that concealing information supports scienter:

15   "taken collectively, [the scienter allegations,] give rise to a cogent and compelling inference that

16   Matrixx elected not to disclose the reports of adverse events not because it believed they were

17   meaningless but because it understood their likely effect on the market."  *Id*. at 1324-25.

18        **(b)    Core Operations: The Importance Of Da Vinci To Intuitive's**
                  **Financial Success Raises A Strong Inference Of Scienter**

19

20        "[W]here the nature of the relevant fact is of such prominence that it would be 'absurd' to

     suggest that management was without knowledge of the matter," scienter may be inferred.

21   *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008); *see also Berson*, 527 F.3d at

22

23        [13] Contrary to Defendants' arguments (Def. 18-19), the Complaint describes the FP&A
     Manager's position and duties with more than enough detail to "'support the probability that a
24   person in the position occupied by the source would possess the information alleged.'" *Daou
     Sys.*, 411 F.3d at 1015; ¶¶ 164-169.  Further, Defendants' argument that the FP&A Manager
25   needed to have worked at Intuitive "**throughout** the Class Period" (Def. 19, n.8), to support an
     inference of scienter ignores his employment during 10 months of the 17-month Class Period and
26   is belied by the law. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (data from
     outside class period serves "to confirm what a defendant should have known during the class
27   period").  *In re Silicon Storage Tech., Inc.*, 2006 WL 648683 (N.D. Cal. Mar. 10, 2006), does not
     require that confidential witnesses were employed throughout the Class Period to infer scienter.
28   Plaintiffs need only allege the basis for the witness's knowledge.

987-89 (it would be "absurd to suggest" that top management did not know facts involving loss of tens of millions of dollars on the company's largest contract); *see also America West*, 320 F.3d 920 (involving facts so important to the company that it was "absurd to suggest that the Board of Directors [including outside directors] would not discuss" them); *Matrixx I*, at 1181 (the "inference that high-level executives…would know that the company was being sued in a product liability action is sufficiently strong to survive a motion to dismiss").

This case falls squarely within these precedents. The facts here involve pervasive safety issues with the one product that generates 100% of Intuitive's revenue. ¶¶ 40, 171; *Matrixx I*, at 1182-83 (finding scienter in part because Zicam was responsible for 70% of sales). The defects and adverse reports were not merely episodic, anecdotal, and minor, but rather systemic, pervasive, and major, causing serious injury and death due to electrical burns and lacerations. *Matrixx II*, at 1322 ("[t]his is not a case about a handful of anecdotal reports"). In addition, the Individual Defendants are the top executives involved in Intuitive's daily operations and Defendants Smith and Guthart were at the forefront of communications with the FDA concerning Intuitive's compliance issues. ¶¶ 30-37, 160-163. The Warning Letter merely underscores the prior violations' severity and high level nature. Given these allegations, and like in *Berson*, *America West*, and *Matrixx*, it would be absurd to suggest that the Individual Defendants were not aware of the severe safety problems with Intuitive's sole product, and the resulting impact those issues would have on profitability. *See, e.g., Berson*, 527 F.3d at 987-88.

### 2.   Defendants' Insider Selling Raises A Strong Inference Of Scienter

"[P]ersonal financial gain may weigh heavily in favor of a scienter inference." *Tellabs, Inc. v. Makor*, 551 U.S. 308, 325 (2007). "'Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter.'" *Daou Sys.*, 411 F.3d at 1022-1025. "In determining whether insider stock sales are suspicious, courts consider: (i) the amount and percentage of shares sold; (ii) the timing of the sales; and (iii) consistency with prior trading history." *Questcor*, 2013 WL 5486762, at *15. Plaintiffs allege each of these factors in extreme detail, and statistically compare the sales during the Class Period with a Control Period. ¶¶ 9-10, 127-153. Tellingly, the Individual Defendants do not dispute

that their sale of more than 233,000 shares for proceeds in excess of **$124 million** during the Class Period, 424% of their Control Period sales, was wholly inconsistent with their prior trading history. *Cf.* ¶¶ 132-135, 140-145 with Def. 20-22.  Unable to credibly challenge these well-pled facts, the Individual Defendants instead attempt to portray the insider trading allegations as "distractions" consisting of "a flurry of allegations" that "toss[] around large dollar amounts." Def. 20.  That is hardly so.  Rarely are insider selling allegations as compelling as here.

**(a)     Defendants' Insider Sales During The Class Period Were Suspicious In Terms Of Amount And Percentages**

In *America West*, the Ninth Circuit found that scienter had been adequately alleged based upon insider trading where, "[f]or each defendant, Plaintiffs outlined the individual's holdings, his class period sales, when the sales occurred, the percentage of owned shares that were sold, and the total proceeds that were generated from the sale." 320 F.3d at 939.  The Complaint here alleges this exact information.  *See* ¶¶ 9, 131, Complaint Ex. E.

Specifically, the Complaint alleges that defendant Mohr sold more than $15 million (or 27,400) of his shares, which was **more than 20 times (2206-2300%) his holdings** at either the beginning (1,191) or end (1,242) of the Class Period.  ¶¶ 131, 133.  Defendants Guthart's and Smith's sales likewise yielded proceeds of more than $108 million and represented 29.4% and 44% of their shares, respectively, compared to their holdings at the beginning of the Class Period, and 29.4% and 79%, respectively, of their holdings as of the end of the Class Period.  *See id*.  These amounts are "substantial."  *See Questcor*, 2013 WL 5486762, at *16 (sales of 30-60% of holdings together with profits of $101 million were also substantial and supported scienter).

Nonetheless, Defendants misleadingly contend that there can be no inference of scienter because the Individual Defendants owned roughly the same number of shares before and after the Class Period.  Def. 21 & n.21.  This argument disregards the Individual Defendants' sale of more than 230,000 shares **during** the Class Period, totaling **$124 million** in proceeds.  ¶¶ 131, 133.  If anything, the fact that Defendant Mohr "practically sold every share that he acquired during the Class Period" amplifies the inference of scienter.  *See* ¶ 131; *America West* 320 F.3d at 939 (finding sale of 100% of stock "suspicious"); *In re UTStarcom, Inc. Sec. Litig.* 617 F.

Supp. 2d 964, 976 (N.D. Cal. 2009) (finding sale of over 98% of stock holdings during class period supports inference of scienter).[14]  Defendants' feeble challenge to the amount of shares sold and illicit profits gained is meritless.[15]

> **(b)**   **Defendants' Class Period Sales Were Suspiciously Timed And Inconsistent With Their Prior Trading Histories**

Not only does the Complaint allege Defendants' substantial sale of stock, "[t]he timing of the sales also raises suspicions." *Questcor*, 2013 WL 5486762, at *17.  Indeed, the Complaint alleges that **"[a]ll three Individual Defendants sold massive amounts of stock immediately after the September 2012 meeting with the FDA, which required the Company to begin reporting a substantial increase in MDRs."** ¶ 137.  In fact, "[b]etween late October and early December 2012 the Individual Defendants sold an extraordinary sum that exceeded $70 million." *Id*.  In addition, the Complaint alleges that within one trading day of each other "Defendants Guthart and Mohr also sold shares immediately after Intuitive learned of the FDA safety probe on or before January 18, 2013, but before the FDA probe became public." ¶¶ 138-139.  Notably, these sales were executed at historic highs.  ¶ 138.

These facts easily support the inference that Defendants' sale of more than 233,000 shares of Intuitive stock for $124 million was "suspicious."  *See Backe v. Novatel Wireless, Inc*., 642 F. Supp. 2d 1169, 1190-91 (S.D. Cal. 2009) (timing suspicious because sales occurred when the company was making optimistic statements and near the stock's class period high and before dramatic drop); *Batwin v. Occam Networks, Inc*., 2008 U.S. Dist. LEXIS 52365, at *44-45 (C.D. Cal. July 1, 2008) ("stock sales are suspicious" where defendants sold stock before restatement).

Unable to challenge these allegations, Defendants quibble that the October and November 2012 sales "were too removed in time" to the September 2012 meeting with the FDA to qualify as "immediate" sales.  Def. 22.  Semantics aside, it is axiomatic that stock sales are "suspicious" when made "at times calculated to maximize the personal benefit from undisclosed

---

[14] Similarly, Guthart's and Smith's  Forms 4 demonstrate that they both sold slightly more than 100% of every share they acquired during the Class Period.

[15] Defendants' argument that Plaintiffs began the Class Period on February 6, 2012 to maximize insider sales is baseless.  Def. 23 n.11.  The Class Period begins on February 6, 2012 because Intuitive announced financial results that day for the first time since Intuitive had sent out the hospital letters in October 2011, marking the inception of scienter.

inside information." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999);

*Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (finding

stock sales "suspicious" because defendant sold shares "prior to … report of lower-than-expected

sales"). This is precisely what the Complaint alleges here, *i.e.*, that the Individual Defendants

sold shares before bad news was reported to the market – before the number of MDRs reported

by MAUDE skyrocketed after the September 2012 meeting between the FDA and Intuitive.

¶¶ 9-10, 136-139. Defendants do not (because they cannot) suggest otherwise.[16]

Insider sales are even more "suspicious" when they are "dramatically out of line with

prior trading practices." *Oracle*, 380 F.3d at 1232. Here, "the Individual Defendants increased

their stock sales approximately three-fold, from 78,000 shares to more than 230,000 shares"

during the Class Period. ¶ 133. **Even more significantly, during the Control Period**

**immediately prior to the Class Period, "Defendant Guthart did not sell a single share of**

**Company stock," yet during the Class Period, Guthart "sold approximately 16,000 shares."**

*Id.* Faced with these facts, Defendants cannot (and do not) suggest that the insider sales were

anything but inconsistent with their prior trading histories.

Further, the insider sales were well-timed: the Individual Defendants made statistically

abnormal profits of about 27% during the 90 days immediately following their insider

transactions. ¶ 145 (chart); *see also* ¶¶ 140-45. This value is statistically significant at the 1%

level. *Id.* Thus, "the Complaint adequately pleads that the Class Period sales are dramatically

inconsistent with prior trading history." *Questcor*, 2013 WL 5486762, at *18.[17]

---

[16] Defendants' attempt to discredit the import of the January 2013 sales fares no better. Def. 22. Sales that "correspond perfectly" with stock price increases "that immediately followed [defendants'] false statements and reports" are hardly innocent. *Daou Sys.*, 411 F.3d at 1024.

[17] Defendants cannot hide behind their 10b5-1 plans. The protection afforded by 10b5-1 plans is undermined by (i) the timing and coordination of Guthart, Mohr and Smith's adoption of 10b5-1 plans at the beginning of the Class Period (¶¶ 148-150); (ii) the concentration of stock sales after meeting with the FDA in September 2012 and before the public disclosure of the FDA probe in February 2013 (¶¶ 137-139); (iii) Smith's trading outside of his plan and modification of his plan in February 2013 (¶ 150); and (iv) the Individual Defendants' apparent suspension of their plans as the truth about da Vinci trickled out (¶ 151). *Countrywide*, 554 F. Supp. 2d at 1068 (amendment of plans to take advantage of high stock prices undermined 10b5-1 plan); *see also Freudenberg*, 712 F. Supp. 2d at 201 ("[t]rading plans are not a cognizable defense to scienter allegations on a motion to dismiss where . . . they were adopted during the Class Period").

### (c)   The Stock Repurchase Program Does Not Weaken The Strong Inference of Scienter

Defendants' argument that Intuitive's stock repurchase program negates any inference of scienter because Intuitive would not have repurchased its shares at inflated prices is not persuasive.  Def. 23.  First, the Company, not the Individual Defendants, repurchased Intuitive shares using shareholder money.  Second, repurchase initiatives tend to drive up company stock prices, which would only benefit the Individual Defendants.  Third, in 2012, equity represented approximately 80% of executive target compensation.  *See* March 6, 2013 Proxy (incorporated by reference into 2012 Form 10-K dated Feb. 4, 2013).  In other words, the Individual Defendants' compensation was primarily stock options, incentivizing the Individual Defendants to support Intuitive's repurchase programs.  Finally, "the repurchase program could properly be viewed as an attempt to keep the ball rolling—*i.e.* to propel the Company forward (steadying the stock price, or sending it upward) for a period of time before the weight of [the alleged fraudulent] practices began taking its toll on the Company's operations and the value of its stock." *Countrywide*, 554 F. Supp. 2d at 1068.

### C.   The Complaint Is Not A Puzzle Pleading

Defendants argue that they are confronted with a "puzzle" pleading because "it does not set forth what it claims was misleading in a clear, coherent manner" and because it includes an "enormous puzzle of block quotations."  Def. 6-8.  These arguments fail.  The Complaint is carefully organized; alleges each specific material misstatement and related omission without inclusion of large quotations, including date and circumstances of its making and the speaker or signatory thereof; and after each misstatement, provides the reasons why those specific statements were materially false and misleading when made.[18]  *See In re Cornerstone Propane*

---

[18] Defendants' cited cases are inapposite.  In *Splash*, 160 F. Supp. 2d at 1074–75, the court found that the complaint (i) failed to allege specific misstatements, instead identifying "generally those *types of* statements" alleged as misleading, (ii) failed to allege reasons why specific statements were false; and (iii) failed to specify which defendant made the statement or the date and circumstance of the statement.  *Id*. at 1073.  These facts are inapposite as the instant Complaint does not fall into any of those pitfalls.  In *In re GlenFed, Inc. Sec. Litig*., 42 F.3d 1541, 1554 (9th Cir. 1994) (*en banc*), *aff'd in part, rev'd in part on other grounds*, 60 F.3d 591, 592-93 (9th Cir. 1995), the court actually finds that relevant parts of the pleading satisfy Rule 9(b).  Further, unlike *GlenFed* where broad and general allegations were found to be made

---

1   *Partners, L.P.*, 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005) (rejecting puzzle pleading after

2   concluding that the plaintiff "identified specific statements alleged to be false," putting

3   defendants on notice of claims' "true substance"); *In re Bus. Objects S.A. Sec. Litig.*, 2005 WL

4   1787860, at *4 (N.D. Cal. July 27, 2005) ("declin[ing] to take the drastic step of dismissal based

5   on the form of the pleading");  *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 170-71

6   (S.D.N.Y. 2003) (refusing to dismiss complaint as "puzzle pleading"); *In re Williams Sec. Litig.*,

7   339 F. Supp. 2d 1242, 1261 (N.D. Okla. 2003) (same).

8           The Complaint's allegations are sufficiently particularized to provide Defendants with

9   fair notice.  Indeed, Defendants' merits arguments demonstrate that they are not "puzzled."

10  Instead, Defendants appear to use this argument as an excuse for adding Exhibit A, which

11  improperly summarizes the challenged statements, divorces the statements from the reasons they

12  are false and misleading, and adds to them conclusory reason(s) for which Defendants contend

13  that they are not actionable.  This Court should ignore Exhibit A as yet another example of

14  Defendants trying to rewrite the well-pled allegations of the Complaint.  Exhibit A further shows

15  how Defendants are not "puzzled" by this pleading because Defendants were able to identify the

16  date of the statement, the speaker, the statement itself, and the specific SEC filing or earnings

17  call in which it was made.  *See Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1075

18  (D. Minn. 2003) (refusing to dismiss complaint as "puzzle" pleading because it was "well-

19  written, well-organized, and – if the motions to dismiss are any indication – effectively alerted

20  Defendants of the claims against them").  Nothing more is required.[19]

21  DATED: January 30, 2014                     RESPECTFULLY SUBMITTED

22

23

---

24  without specificity and "long stretches of material" was quoted from public statements, the
    Complaint here is detailed and specific and includes short and concise excerpts of public
    statements alleged to be false by omission.  *See, e.g.*, ¶¶ 188-192, 208-212.  Finally, in *In re*

25  *Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *2 (N.D. Cal. Mar. 29, 2013), the statements
    alleged to be false by omission were "set forth in lengthy block-quotes . . . several paragraphs

26  long" and did not "match each [] misleading statement with the specific facts demonstrating that
    the statement was false when made."  *Cf.* ¶¶ 188-192, 208-212.

27  [19] Defendants contest the Section 20 claims only on the basis that the underlying Section
    10(b) claim should be dismissed.  Def. 24-25.  Because those arguments fail, the Court should

28  sustain all claims.

---

1
2

s/ Susannah R. Conn
SUSANNAH R. CONN

3

ROBBINS GELLER RUDMAN
  & DOWD LLP

4

ARTHUR C. LEAHY
DANIELLE S. MYERS

5

SUSANNAH R. CONN

6

655 West Broadway, Suite 1900
San Diego, CA 92101

7

Telephone: 212/231-1058
619/231-7423 (fax)

8

artl@rgrdlaw.com
dmyers@rgrdlaw.com

9

sconn@rgrdlaw.com

10

*Liaison Counsel*

11
12

LABATON SUCHAROW LLP
ERIC J. BELFI (*pro hac vice*)
JONATHAN M. PLASSE (*pro hac vice*)

13

JAVIER BLEICHMAR (*pro hac vice*)
SERENA P. HALLOWELL (*pro hac vice*)

14

DANIELLE E. STAMPLEY (*pro hac vice*)

15

140 Broadway, 34th Floor
New York, NY 10005

16

Telephone: 212/907-0700
212/818-0477 (fax)

17

ebelfi@labaton.com
jplasse@labaton.com

18

jbleichmar@labaton.com

19

shallowell@labaton.com
dstampley@labaton.com

20

*Counsel for Lead Plaintiff and the Class*

21
22

ROBBINS GELLER RUDMAN
  & DOWD LLP

23

SHAWN A. WILLIAMS
Post Montgomery Center

24

One Montgomery Street, Suite 1800
San Francisco, CA 94104

25

Telephone: 415/288-4545
415/288-4534 (fax)

26

shawnw@rgrdlaw.com

27

*Liaison Counsel*

28

---

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on January 30, 2014, I authorized the electronic filing of the

3

foregoing with the Clerk of the Court using the CM/ECF system which will send notification

4

of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I

5

hereby certify that I caused to be mailed the foregoing document or paper via the United States

6

Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on January 30, 2014.

9

10

s/ Susannah R. Conn
SUSANNAH R. CONN

11

12

ROBBINS GELLER RUDMAN
& DOWD LLP

13

655 West Broadway, Suite 1900

14

San Diego, CA  92101-3301
Telephone:  619/231-1058

15

619/231-7423 (fax)

16

E-mail:  sconn@rgrdlaw.com

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:13-cv-01920-EJD In re Intuitive Surgical Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Mary K. Blasy**
  mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Javier Bleichmar**
  jbleichmar@labaton.com,lmehringer@labaton.com,electroniccasefiling@labaton.com

- **Michael D. Celio**
  mdc@kvn.com,gpeterson@kvn.com,efiling@kvn.com,ehrlich@kvn.com

- **Susannah Ruth Conn**
  SConn@rgrdlaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Serena Hallowell**
  shallowell@labaton.com,mrusso@labaton.com,efarber@labaton.com,dstampley@labaton.com

- **Arthur Charles Leahy**
  artl@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Reid Patrick Mullen**
  rmullen@kvn.com,efiling@kvn.com,sharmison@kvn.com,pal@kvn.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,e_file_sd@rgrdlaw.com,sconn@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Jonathan M. Plasse**
  jplasse@labaton.com,electroniccasefiling@labaton.com

- **Danielle Elizabeth Stampley**
  dstampley@labaton.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,nnewton@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)