1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE INTUITIVE SURGICAL SECURITIES LITIGATION | Case No.: 5:13-CV-01920-EJD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br><br>**[Re: Docket No. 53]** |

## I.     BACKGROUND

Presently before the court in this securities fraud litigation is corporate Defendant Intuitive Surgical Inc. ("Intuitive") and individual Defendants Gary S. Guthart ("Guthart"), Marshall L. Mohr ("Mohr"), and Lonnie M. Smith's ("Smith") (collectively, "Defendants") Motion to Dismiss lead Plaintiff Employees' Retirement System of the State of Hawaii's ("Plaintiff") Amended Class Action Complaint.  Def. Mot. to Dismiss, Docket Item No. 53.  The court previously determined that this motion was suitable for decision without oral argument and vacated the hearing pursuant to Civil Local rule 7-1(b).  Having fully reviewed the parties' papers, and for the following reasons, the court will GRANT in part and DENY in part Defendants' motion.

1

**United States District Court**
For the Northern District of California

### a.  Factual and Procedural History

Intuitive is a biomedical corporation that designs, manufactures, and sells da Vinci Surgical Systems ("da Vinci"), its sole product and primary source of revenue.  Am. Class Action Compl. ("CAC") ¶¶ 29, 40, Docket Item No. 48.  Intuitive common stock is publicly traded on NASDAQ under the ticker symbol "ISRG."  Id. ¶ 29.  Plaintiff purchased or otherwise acquired Intuitive stock during the period between February 6, 2012 and July 18, 2013, inclusive (the "Class Period").  Id. ¶ 25.  Individual Defendants Guthart, Mohr and Smith were employed with Intuitive during the Class Period.  Id. ¶¶ 30-32.  Guthart has served as Intuitive's CEO since January 2010. Id. ¶ 30.  Mohr has served as Intuitive's Senior Vice President and Chief Financial Officer since March 2006.  Id. ¶ 31.  Smith served as Intuitive's Chairman of the Board and as an executive officer during the Class Period.  Id. ¶ 32.

The da Vinci Surgical System is a robotic surgical system that uses three-dimensional computer technology to allow surgeons to remotely operate a suite of tiny computer-assisted tools through a small tube inside a patient.  Id. ¶ 41.  Because da Vinci is the only robotic surgical system in the United States approved by the Food and Drug Administration ("FDA") for soft tissue procedures, Intuitive enjoyed rapid growth during the Class Period.  Id. ¶¶ 38-39.  Total revenue rose from $1.41 billion in 2010, to $1.76 billion in 2011, to $2.18 billion in 2012.  Id. ¶ 39.  By December 31, 2012, there were 2,585 da Vinci systems installed in 2,025 hospitals worldwide.  Id. As a result of Intuitive's financial success, stock prices also began to rise, reaching all-time highs exceeding $500 per share during the Class Period.  Id. ¶ 10.

One of da Vinci's most commonly used tools is the Hot Shears Monopolar Curved Scissors ("monopolar scissors").  Id. ¶ 43.  The monopolar scissors are a convenient tool for physicians because they are used to both cut normally and to cauterize tissue through the application of monopolar electricity via an electrode.  Id.  To ensure that the electricity is only channeled through that electrode, the metal parts of the scissors are covered with insulating rubber sleeves ("tip covers").  Id. ¶ 44.  According to Plaintiff, the tip covers were prone to tiny cracks or slits that prevented them from properly insulating the metal instruments, thus allowing electricity to escape

2

into the patient's body, damaging tissue and internal organs.  Id. ¶¶ 44-46.  Given this serious

defect, Plaintiff alleges that these tip covers greatly jeopardized the safety of the monopolar

scissors and the da Vinci system in general.

According to Plaintiff, Intuitive became aware of this defect via medical device reports

("MDRs").  Pursuant to FDA regulations, if an adverse event (death or serious injury) occurs at a

hospital, and the hospital receives or otherwise becomes aware of information that reasonably

suggests that a medical device may have caused or contributed to that event, the hospital must

report that information to the manufacturer through an MDR.  Id. ¶ 62; see also 21 U.S.C.

§360i(b)(1)(B); 21 C.F.R. §§ 803.30, 803.50.  If the hospital's report reasonably suggests that the

device may have contributed to a serious injury or death, or malfunctioned in such a way that it

could have caused serious injury or death, then the manufacturer must also report the MDR to the

FDA.  Id. ¶ 63; see also 21 C.F.R. § 803.50(a).  Plaintiff alleges that, instead of reporting the

MDRs to the FDA, Intuitive responded to them by issuing a "secret recall" in October 2011,

wherein Intuitive issued a letter that corrected the instructions for proper use of the monopolar

scissors in order to avoid damaging the tip covers.  Id. ¶ 51.  Intuitive later issued two other letters,

which Plaintiff alleges also constituted secret recalls, addressing other issues: one clarified that da

Vinci was not, at the time, cleared for thyroidectomies, and the other gave instructions for proper

instrument inspection.  Id. ¶¶ 52-54.  Intuitive did not report to the FDA that it had sent these

letters, which the FDA later determined to be a violation of 21 C.F.R. § 806.10 .  Id. ¶¶ 53, 159.

Plaintiff further alleges that Defendants misclassified and/or failed to report the MDRs that

it received.  Id. ¶ 5.  In September 2012, the FDA met with Intuitive to address its underreporting

and miscategorization of the MDRs.  Id. ¶ 6.  As a result of this meeting and the increased scrutiny,

Intuitive was left with "no choice," according to Plaintiff, but to change its reporting policies by (i)

reporting MDRs not previously submitted to the FDA, and (ii) upcoding many MDRs previously

labeled "other" to "serious injury."  Id. ¶ 73.  This change in reporting led to an increased number

of "serious injury" MDRs reported by Intuitive after September 2012.  Id. ¶ 209.  Plaintiff alleges

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS

1    that the 40% increase in <u>total</u> number of MDRs reported by Intuitive after this meeting

2    demonstrates that Defendants had been previously suppressing MDRs from the FDA.  <u>Id.</u> ¶ 73.

3          The change in MDR reporting practices set the wheels in motion for a number of events

4    that would ultimately have an adverse effect on Intuitive's stock price.  Due to the aforementioned

5    increase in MDRs, the FDA began a safety probe of Intuitive in January 2013 by sending

6    confidential surveys to da Vinci customers in order to determine "whether adverse event reports

7    sent to the agency [were] 'a true reflection of problems' with the robots, or the result of other

8    issues."  <u>Id.</u> ¶ 84.  When news of this probe became public, it had an immediate impact on the stock

9    price.  On February 28, 2013, Bloomberg broke the news of this FDA probe to the public.  <u>Id.</u> ¶ 84.

10   That day, Intuitive's stock price fell 11 percent by the close of the market, to $509.89.  <u>Id.</u>  On

11   March 5, 2013, another Bloomberg article reported that MDRs sent to U.S. regulators linked da

12   Vinci to at least 70 deaths since 2009.  <u>Id.</u> ¶ 175.  That day, Intuitive's share price dropped $22.78,

13   approximately 3%, from a closing price of $541.32 on March 4, 2013 to a closing price of $525.72.

14   <u>Id.</u> ¶ 175(b).  Plaintiff alleges that the news of the investigation and possible safety concerns also

15   had a detrimental effect on Intuitive's 2013 first quarter financial report and preliminary second

16   quarter financial report, which caused Intuitive stock to continue to dip, falling to $484.75 after the

17   announcement. <u>Id.</u> ¶¶ 176-177.

18         As a result of the precipitous drop in the stock price, two securities fraud class action lawsuits

19   were brought in this district on behalf of persons who purchased or otherwise acquired publicly-traded

20   Intuitive securities during the purported class period:  <u>Abrams v. Intuitive Surgical, Inc., et al.</u>, No. 13-

21   CV-01920, filed April 26, 2013 and <u>Adel v. Intuitive Surgical, Inc., et al.</u>, No. 13-CV-02365, filed May

22   24, 2013.  Plaintiffs in both suits alleged that Defendants violated Sections 10(b) and 20(a) of the

23   Securities Exchange Act ("Exchange Act") and Securities and Exchange Commission Rule 10b-5 by

24   making numerous materially false and misleading statements and omissions regarding the safety of the

25   da Vinci system and Intuitive's compliance with FDA regulations.  On June 25, 2013, Plaintiff and

26   Darien Adel each filed a Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff,

27   and Approval of Selection of Lead Counsel in the instant action. Dkt. Nos. 14, 23. Adel subsequently

28

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS

**United States District Court**
For the Northern District of California

withdrew his motion and voluntarily dismissed his case without prejudice. Dkt. Nos. 33, 39.  While those motions were pending, on July 19, 2013, Intuitive publicly released a Warning Letter issued by the FDA, citing Intuitive's failure to adequately report recalls and adverse events.  Id. ¶ 178. That same day, Intuitive's stock price declined by $28.81 and closed at $392.67—the first time the stock had dropped below $400 since before the beginning of the Class Period.  Id.  On October 15, 2013, Plaintiff and a second named plaintiff, Greater Pennsylvania Carpenters' Pension Fund, filed the CAC, supplementing their allegations with the FDA Warning Letter.  See Dkt No. 53.  On November 18, 2013, the court granted Plaintiff's Motion for Appointment as Lead Plaintiff.  See Docket Item No. 50.  The CAC remains the operative complaint in this action, as Plaintiff did not file an amended complaint after its appointment as Lead Plaintiff.

In the CAC, Plaintiff alleges that during the Class Period, Defendants made numerous materially false and misleading statements and omissions regarding the safety of the da Vinci system and Intuitive's compliance with FDA regulations.  CAC ¶¶ 182-269, Dkt. No. 48.  These statements spanned fourteen months and arose within Intuitive's public filings with the SEC, press releases, and quarterly earnings call with investors.  Id.  Plaintiff alleges that these statements and omissions were false and misleading because they failed to disclose (i) Intuitive's alleged regulatory violations, including the failure to report MDRs, adverse reports, design defects, recalls, and failure to follow design protocols, (ii) da Vinci's defects and performance problems resulting in injury and death, and (iii) the material rise in da Vinci adverse events.  Id. ¶ 181.  Of these alleged false or misleading statements, many are financial statements made in Intuitive's quarterly or yearly financial reports, which provide a retrospective accounting on everything from total revenue, to numbers of da Vinci procedures, to da Vinci system sales.  Id. ¶¶ 182-269.  Other challenged statements from the SEC filings, press releases, and earnings calls include:

- Assertions that da Vinci represents a "new generation of surgery," combining the benefits of minimally invasive surgery ("MIS") for patients with the ease of use, precision, and dexterity of open surgery."  Id. ¶ 182(a)(b).

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

- Warnings regarding potential "Risk Factors," specifically warnings that "[i]f defects are discovered in our products, we may incur additional unforeseen costs, hospitals may not purchase our products and our reputation may suffer. … Because our products are designed to be used to perform complex surgical procedures, we expect that our customers will have an increased sensitivity to such defects.  In the past, we have voluntarily recalled certain products as a result of performance problems.  We cannot assure that our products will not experience component aging, errors or performance problems in the future."[1]  Id. ¶ 184.

- Statements acknowledging the FDA regulations that Intuitive was required to follow, including, but not limited to, quality assurance procedures, the MDR reporting procedures, and the "the reporting of Corrections and Removals, which requires that manufacturers report to the FDA recalls and field corrective actions taken to reduce a risk to health or to remedy a violation of the FDCA [Federal Food, Drug, and Cosmetic Act] that may pose a risk to health." Id. ¶ 186.  Intuitive further acknowledged that it was subject to FDA surveillance to determine compliance, noting that if the FDA found Intuitive failed to comply "it can institute a wide variety of enforcement actions, ranging from a regulatory letter to a public Warning Letter to more severe civil and criminal sanctions." Id. ¶ 186(a).

- Statements that Intuitive may from time to time be involved in "a variety of claims, lawsuits, investigations and proceedings relating to securities laws, product liability, patent infringement, contract disputes" and other matters that may arise in the normal course of business.  Id. ¶¶ 216(b), 225(b), 232(b), 238(a), 246(b).

- Warnings with regard to Intuitive's potential financial exposure from product liability lawsuits that may be brought against it, and the possibility of product recalls necessitated by a design or manufacturing defect.  Id. ¶ 246(a).  Intuitive acknowledged that such a claim or product recall could "harm our reputation or

---

[1] Intuitive continued to maintain thereafter that these "Risk Factors" remained unchanged.  Id. ¶¶ 190-238

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1    result in a decline in revenues" and admitted that "[n]egligence claims have been

2    made against us in the past." Id.

3    •    Statements in a March 13, 2013 press release addressing "general inquiries

4    regarding a recent rise in [MDRs]" that the rise did not "reflect a change in product

5    performance but rather a change in MDR reporting practices." Id. ¶ 206.  Intuitive

6    characterized the change in practice as an "administrative change" that "has not

7    increased the total number of adverse event reports," and noted that the change

8    would result "in an increase in events in the 'serious injury' subcategory and a

9    corresponding decrease in the 'other' subcategory." Id.

10   •    A statement that Intuitive was "in the midst of a concerted effort by critics of

11   robotic surgery, to challenge the benefitted range of patients" but that "[Intuitive

12   was] confident that those who invest their time in a serious review of the clinical

13   evidence on da Vinci" would find ample evidence of the device's benefits.  Id. ¶

14   211.

15   •    A statement that "during the first quarter of 2013, there have been articles published

16   and papers written questioning patient safety and efficacy associated with da Vinci

17   Surgery … we believe that da Vinci Surgery continues to be a safe and effective

18   surgical method …" Id. ¶ 213(a).

19   ## II.    LEGAL STANDARDS

20        Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain short and plain

21   statements showing the pleader is entitled to relief.  See Fed R. Civ. P. 8(a)(2).  A motion brought

22   under Rule 12(b)(6) "tests the legal sufficiency" of these allegations.  Navarro v. Block, 250 F.3d

23   729, 732 (9th Cir. 2001); see Fed R. Civ. P. 12(b)(6).  The court may dismiss a claim due to "the

24   lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

25   theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).  The court accepts

26   as true all of the plaintiff's allegations and construes them in the light most favorable to the

27   plaintiff.  In re Gilead Sciences Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).  However, the

28

United States District Court
For the Northern District of California

7

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS

1    court is not bound to accept as true "a legal conclusion couched as a factual allegation." Bell Atl.

2    Corp. v. Twombly, 550 U.S. 544, 555 (2007).

3        To survive a motion to dismiss, a plaintiff does not need to plead detailed factual

4    allegations, but must allege "sufficient factual matter, accepted as true, to 'state a claim to relief

5    that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550

6    U.S. at 570). A facially plausible allegation will allow the court to "draw the reasonable inference

7    that the defendant is liable for the misconduct alleged." Id. "The plausibility standard is not akin

8    to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted

9    unlawfully." Id. (internal quotation marks omitted).

10       In addition to Rule 8's requirements, fraud cases are also governed by the heightened

11   pleading standard of Rule 9(b). A plaintiff averring fraud or mistake must plead with particularity

12   the circumstances constituting fraud, but malice, intent, knowledge and other conditions of the

13   mind may be averred generally. See Fed. R. Civ. P. 9(b). Particularity under Rule 9(b) requires

14   the plaintiff to plead the "who, what, when, where, and how" of the misconduct alleged. Kearns v.

15   Ford Motor Co., 567 F.3d 1120 (9th Cir. 2009). In the context of a securities litigation case, Rule

16   9(b) requires the particular circumstances indicating falseness of the defendant's statements to be

17   pled, specifically, "an explanation as to why the statement or omission complained of was false or

18   misleading." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994), superseded by

19   statute on other grounds as stated in Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F.

20   Supp. 1297 (C.D. Cal. May 21, 1996) .

21       The Rule 9(b) requirement "has long been applied to securities complaints." Zucco

22   Partners LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009) (citing Semegen v. Weidner,

23   780 F.2d 727, 729, 734–35 (9th Cir. 1985)). In accordance with that rule, courts in the past

24   required plaintiffs in securities fraud cases to plead falsity with particularity, while allowing

25   scienter to be alleged generally. Id. However, in 1995 Congress enacted the Private Securities

26   Litigation Reform Act (PSLRA), which "significantly altered pleading requirements in securities

27   fraud cases." Id. (quoting Gompper v. VISX, Inc., 298 F.3d 893, 895 (9th Cir. 2002)). Under the

28

United States District Court
For the Northern District of California

8

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS

PSLRA, to survive a motion to dismiss, a plaintiff must now plead both falsity <u>and</u> scienter with particularity. <u>In re Daou Sys., Inc.</u>, 411 F.3d 1006, 1014 (9th Cir. 2005).

### III.    DISCUSSION

#### 1.   "Puzzle Pleading" under Rule 8

Defendants first argue that Plaintiff's "puzzle-like complaint" violates the most basic of pleading standards: Rule 8's requirement of "short and plain statements." Def. Mot. to Dismiss 6, Dkt. No. 53. A "puzzle pleading" is a complaint that forces the defendants and/or court to sort out the alleged statements and match them with the corresponding adverse facts in order to "solve the puzzle of interpreting Plaintiff's claims." <u>In re Splash Tech. Holdings, Inc. Sec. Litig.</u>, 160 F. Supp. 2d 1059, 1074-75 (N.D. Cal. 2001); <u>see also</u> <u>In re GlenFed</u>, 42 F.3d at 1553 (describing the plaintiffs' puzzle-like complaint as "rambl[ing] through long stretches of material quoted from defendants' public statements … unpunctuated by any specific reasons for falsity"). In <u>Splash</u>, the court noted that the puzzle-like structure of the complaint rendered it "exceedingly difficult to discern precisely which statements are alleged to be misleading." 160 F. Supp. 2d at 1073.

Plaintiff's CAC is indisputably cumbersome, surpassing one hundred pages in length. In thirty of those pages, Plaintiff recites boilerplate corporate statements made by Defendants and allege that the each statement was rendered false or misleading because Defendants failed to disclose a number of alleged material facts. However, the breadth of the CAC alone does not create the type of "puzzle-like" complaint that warrants dismissal. <u>See</u> <u>In re Cornerstone Propane Partners, L.P.</u>, 355 F. Supp. 2d 1069, 1081 (N.D. Cal. 2005) (finding that puzzle-pleadings "abuse the principles of Rule 8 not because they are not short" but because they are not plain). Plaintiff here has precisely detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why each statement was false or misleading. Plaintiff generally avoids lengthy quotations in favor of highlighting problematic portions of statements. As evidenced by Exhibit A to their Motion to Dismiss, Defendants can parse out with relative ease the statements at issue and the reasons as to why they are alleged to be false and misleading. As such,

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1  Plaintiff's CAC fulfills the purpose of Rule 8 by putting Defendants on notice of the true substance

2  of the claims against them.  See Splash, 160 F. Supp. 2d at 1074.

3  **2.  Sufficiency of the Allegations Under the PSLRA**

4  In their motion to dismiss, Defendants argue that Plaintiff has failed to state any claim

5  under Section 10(b) of the Securities and Exchange Act ("Exchange Act") or under SEC Rule 10b-

6  5 that satisfies the PSLRA's heightened pleading standards.  Section 10(b) of the Securities and

7  Exchange Act ("Exchange Act") provides that it shall be unlawful for any person "to use or

8  employ, in connection with the purchase or sale of any security … any manipulative or deceptive

9  device or contrivance in contravention of such rules and regulations."  15 U.S.C. § 78(b).  SEC

10  Rule 10(b)(5) implements this provision by making it unlawful for any person "to make any untrue

11  statement of a material fact or to omit to state a material fact necessary in order to make the

12  statements made, in the light of the circumstances under which they were made, not misleading" in

13  connection with the purchase or sale of a security.  17 C.F.R. §240.10b-5(b).

14  Plaintiff alleges that Defendants engaged in a scheme to defraud investors by representing

15  that da Vinci was a safe and viable alternative to open surgery, when in fact Defendants knew that

16  da Vinci had been experiencing defects that, when discovered, would seriously impair its

17  marketability.  To adequately state such a claim, Plaintiff must allege facts sufficient to establish:

18  "(1) a material representation or omission by the defendant, (2) scienter, (3) a connection between

19  the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the

20  misrepresentation, (5) economic loss, and (6) loss causation."  Matrixx Initiatives, Inc. v.

21  Siracusano, 131 S. Ct. 1309, 1317 (2011) (quoting Stoneridge Inv. Partners LLC v. Scientific-

22  Atlanta, Inc., 552 U.S. 148, 157 (2008)).  Defendants have challenged the sufficiency of the

23  allegations as to the elements of material misstatements and scienter.  The court will first address

24  the sufficiency of the material misstatements, taking each set of statements in turn.  Then the court

25  will address whether Plaintiff has sufficiently pled scienter as to any of the sufficiently pled

26  material misstatements.

27

28

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS

United States District Court
For the Northern District of California

### a.  False or Misleading Statements

Defendants first contend that Plaintiff has failed to identify any statement in the CAC which is false or misleading under the PSLRA.  To sufficiently allege a material misstatement for a Section 10(b) claim, the plaintiff must specify each statement alleged to have been misleading and the reason(s) why that statement is misleading; if those allegations are made on information and belief, the plaintiff must also allege all facts on which that belief is formed.  Daou, 411 F.3d at 1014; see also 15 U.S.C. § 78u–4(b)(1).  For an omission to be misleading, "it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  Brody v. Transitional Hosp. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).  A material omission is one that a reasonable investor would consider to significantly alter the total mix of information.  Matrixx, 131 S. Ct. at 1317.  "Silence, absent a duty to disclose is not misleading under Rule 10b-5."  Basic v. Levinson, 485 U.S. 224, 238, 239 & n.17.  A duty to disclose exists only "to … make statements in light of the circumstances under which they were made not misleading."  17 C.F.R. § 240.10b-5(b)

In the CAC, Plaintiff alleges that sixty-four separate statements made by Defendants were false and misleading because, in making them, Defendants failed to disclose various regulatory violations, da Vinci's defects regarding the monopolar scissors and faulty tip covers, and the material rise in da Vinci adverse events and products liability suits that resulted from these defects. The set of challenged statements can be categorized as follows: (i) statements made regarding da Vinci's safety and efficacy, (ii) financial accounting reports, (iii) warnings of potential risks the company may face, and (iv) statements regarding the FDA regulations the Company faced.  The court will address each category of statements in turn.

### i.  Statements Regarding da Vinci's Safety and Efficacy

Defendants first assert that Plaintiff's claims as to statements made by Intuitive and the individual Defendants regarding da Vinci's safety and efficacy should be dismissed because, as alleged, these statements are not materially misleading.  Plaintiff argues that the statements alleged satisfies its pleading burden under the PSLRA because it has plausibly and with particularity

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1    identified statements made by Defendants regarding da Vinci's safety that, in light of the factual

2    circumstances alleged, may have misled the reasonable investor as to da Vinci's market viability.

3    Throughout the Class Period, Defendants made numerous statements via their SEC filings and

4    press releases pronouncing da Vinci was a beneficial, safe and effective alternative to traditional

5    surgery.  These statements include (i) repeated assertions that it believes that da Vinci represents "a

6    new generation of surgery" that "combines the benefits of minimally invasive surgery (MIS) for

7    patients with the ease of use, precision, and dexterity of open surgery" (CAC ¶¶ 188, 133, 198,

8    213(a), Dkt. No. 48); (ii) a statement that despite questions posed by recent news articles, Intuitive

9    believed "that da Vinci Surgery continues to be a safe and effective surgical method …" and that

10   "da Vinci surgery has proven safety, efficacy, economic and ergonomic benefits when compared to

11   the open surgical procedures it is replacing" (Id. ¶ 213(a)); and "[a] statement that Intuitive was in

12   the midst of a concerted effort by critics of robotic surgery, to challenge the benefitted range of

13   patients" but that "[Intuitive was] confident that those who invest their time in serious review of the

14   clinical evidence on da Vinci" will find ample evidence of the device's benefits (Id. ¶ 211).

15   Plaintiff alleges that Intuitive's failure to disclose (i) additional unreported adverse event reports

16   and its failure to report those to the FDA, (ii) the number and nature of products liability claims

17   brought against the company during the Class Period, and (iii) three "secret recalls" that took place

18   in October, 2011 rendered these statements false or misleading.  Briefly, the court finds that all of

19   the above alleged statements and omissions are sufficient to state a claim under the PSLRA, and

20   will address the classes of omissions in turn.

21       First, according to Plaintiff, Intuitive both misclassified numerous adverse event reports of

22   serious injury under the "other" category instead of in the "serious injury" category and

23   categorically suppressed thousands MDRs by failing to report them to the FDA database.  CAC ¶

24   65, Dkt. No. 48.  In the CAC, Plaintiff points to the significant spike in both serious injury MDRs

25   and overall MDRs that occurred shortly after the September 2012 meeting with the FDA.[2]  Id. ¶¶

26   73, 75.  Meanwhile, at the same time Intuitive was allegedly receiving and suppressing these

27   _____

28   [2] This meeting, according to Plaintiffs, took place at the behest of the FDA in order to bring Intuitive MDR reporting practices into compliance.

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

1   numerous MDRs, Defendants were making the aforementioned statements praising da Vinci's

2   safety and efficacy.  Because da Vinci is Intuitive's sole product, and the success of da Vinci relied

3   in large part on the perceived safety benefits as a medical device, Plaintiff alleges that these

4   omissions created a materially false impression of da Vinci's market power.

5          The baseline to determine whether an undisclosed adverse report is material "remains

6   whether a <u>reasonable</u> investor would have viewed the non-disclosed information as having

7   <u>significantly</u> altered the total mix of information made available."  <u>Matrixx</u>, 131 S.Ct. at 1321

8   (emphasis in original).  Defendants had a duty to disclose this material information if their

9   statements created a state of affairs that differed in a material way from the one that actually

10  existed.  <u>Brody</u>, 280 F.3d at 1006.  While the "total mix" standard "does not mean that …

11  manufacturers must disclose all reports of adverse events," Plaintiff here has alleged with

12  particularity that thousands of MDRs went unreported or misclassified. <u>Matrixx</u>, 131 S.Ct. at 1321.

13  Taking Plaintiff's contentions as true, the court concludes that it is plausible that the reasonable

14  investor would find the existence of these numerous unreported MDRs to significantly alter the

15  total mix of information available and that Defendants' statements created an impression of da

16  Vinci's safety that materially differed from reality.  Therefore, the omission of the MDRs plausibly

17  rendered Defendants' statements as to the safety and efficacy of da Vinci false or misleading.

18         Second, Plaintiff asserts that Defendants' statements were false or misleading because they

19  did not disclose either the existence or the nature of the corrective letters sent out to da Vinci

20  hospitals in October 2011.  In the CAC, Plaintiff alleges with particularity the circumstances

21  behind the corrective letters (the tip cover defect and serious injuries that resulted), and the

22  circumstances stemming therefrom (namely, the FDA Warning Letter).  Plaintiff has therefore

23  plausibly alleged an omission that the reasonable shareholder may find to significantly alter the

24  total mix of information available with regard to da Vinci's safety.  Intuitive's alleged failure to

25  disclose these recalls gives rise to a plausible inference that the statements regarding da Vinci

26  safety created an impression that differed materially from the one that actually existed.

27

28

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS

**United States District Court**
For the Northern District of California

1        Third, Plaintiff asserts that Defendants' failure to disclose specific information about the

2 number and nature of product liability suits it faced during the Class Period rendered Intuitive's

3 statements false or misleading because the omission of this information gave a false impression of

4 da Vinci's safety.  See CAC ¶ 189, Dkt. No. 48.  Defendants contend that they were under no duty

5 to reveal this information because the "Risk Factors" section already stated that Intuitive may be

6 subject to products liability suits from time to time.  However, Plaintiff plausibly alleges that these

7 statements were misleading because they lacked specificity as to these lawsuits, their growing

8 number, and their severe nature.  See id. ¶¶ 189, 194, 199, 204, 214.  For similar reasons as with

9 the previous two omissions, the court finds this omission, as alleged, sufficient to raise a plausible

10 inference that Defendants' statements regarding Intuitive safety were misleading under the PLSRA.

11        Defendants' corporate puffery argument does not alter the court's conclusion.  A statement

12 of corporate puffery is "so exaggerated or vague that no reasonable investor would rely upon it

13 when considering the total mix of information available."  Splash, 160 F. Supp. 2d at 1076 (internal

14 quotation marks omitted); see also No. 84 Employer-Teamster Joint Council Pension Trust Fund v.

15 Am. W. Holding Corp., 320 F.3d 920, 934-35 (9th Cir. 2003).  Such statements are "not capable of

16 objective verification" and "lack a standard against which a reasonable investor could expect them

17 to be pegged."  In re Impac Mortg. Holdings, Inc. Sec. Litig., 554 F. Supp. 2d 1083, 1096 (C.D.

18 Cal. 2008) (internal quotation marks and citation omitted).  Here, Intuitive's repeated statements

19 regarding da Vinci's safety, ergonomic benefits, and efficacy could be objectively assessed through

20 safety reports such as the MDRs or peer reviewed studies.  It is plausible that a reasonable investor

21 would reasonably rely on these assertions of safety coming from the company when considering

22 the total mix of information available.  Accordingly, as alleged, these statements plausibly exceed

23 mere expressions of corporate optimism.[3]  In sum, the statements made regarding da Vinci's safety

24 and benefits are sufficient to state a claim under the PSLRA pleading requirements.

25

26 _____

[3] Even if these statements amount only to corporate puffery, they may still be plausibly actionable.  See In re Apple
27 Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir. 1989) (holding that "projections and general expressions of
optimism may be actionable under the federal securities laws" if the speaker is aware of any underlying facts that
28 seriously undermine the statement.)

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS

1

### ii.      Financial Accounting Reports

2          The next set of statements Plaintiff challenges are Intuitive's annual and quarterly

3  accounting reports on everything from total revenue to system sales.  Defendants contend that these

4  sets of statements are accurate historical data and Plaintiff has failed to explain why they are

5  inaccurate or how they are actionable.  Historical financial reports are actionable if plaintiffs can

6  plead with particularity facts showing that, by failing to disclose other information, the reports

7  "conveyed a false or misleading impression."  In re Convergent Tech. Sec. Litig., 948 F.2d 507,

8  512 (9th Cir. 1991).  "[T]he disclosure required by the securities laws is measured not by literal

9  truth, but by the ability of the material to accurately inform rather than mislead prospective

10  buyers."  Id.; see also Brody, 280 F.3d at 1006 (noting that the plaintiffs had correctly asserted that

11  "a statement that is literally true can be misleading and thus actionable under securities law").

12  Thus, Plaintiff's pleading burden with regard to these literally accurate historical statements is

13  fundamentally the same as its burden on other categories of statements.  Plaintiff must specify each

14  financial statement alleged to have been misleading and the reason(s) why that financial statement

15  was misleading.

16          Examples of the challenged statements of historical financial data include reports that

17  "[a]pproximately 360,000 da Vinci procedures were performed during the year ended December

18  31, 2011, up approximately 29% from last year" and "[s]ystem revenue increased 18% to $777.8

19  million during the year ended December 31, 2011 from $660.3 million during the year ended

20  December 31, 2010."  Plaintiff does not dispute the accuracy of the numbers reported; instead it

21  argues that these statements were misleading when made because Defendants failed to disclose

22  information that may have warned investors that this financial performance was in jeopardy.  See

23  CAC ¶ 231, Dkt. No. 48.  In essence Plaintiff argues that these historical statements are misleading

24  because they do not account for or otherwise disclaim the potential forward-looking implications

25  presented by the MDRs and product liability lawsuits.  But because Defendants' statements are

26  literally true backward-looking financial reports, the type of which are typically included in SEC

27  filings, the court finds these statements, as alleged, would not plausibly mislead a reasonable

28

15

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS

investor as to the future state of Intuitive's market success.  Therefore, Plaintiff has failed to state a claim for securities fraud as to these statements under the PSLRA's pleading standard.

### iii.     Risk Factors Disclosures

Next, Plaintiff alleges that a number of the statements made in the "Risk Factors" portion of Defendants' SEC filings were rendered false or misleading because Defendants failed to disclose material information regarding da Vinci's defects, the MDRs, products liability suits, and recalls. Defendants contend that they were under no duty to disclose this information because the statements Plaintiff points to did not give a false or misleading impression of the risks Intuitive faced.  Examples of these statements include: (i) declarations that Intuitive may from time to time be involved in "a variety of claims, lawsuits, investigations and proceedings relating to securities laws, product liability, patent infringement, contract disputes" and other matters that may arise in the normal course of business (CAC  ¶¶ 216(b), 225(b), 232(b), 238(a), 246(b), Dkt. No. 28); (ii) warnings with regard to potential financial exposure from product liability lawsuits, and the possibility of product recalls necessitated by a design or manufacturing defect (Id. ¶ 246(a)); and (iii) warnings that "[i]f defects are discovered in our products, we may incur additional unforeseen costs, hospitals may not purchase our products and our reputation may suffer. … Because our products are designed to be used to perform complex surgical procedures, we expect that our customers will have an increased sensitivity to such defects" (Id. ¶ 184).  Plaintiff argues that the ambiguous nature of these statements, such as the suggestion that da Vinci may "possibly" be subject to defects and that "from time to time" Intuitive may face products liability suits, render them misleading.

Plaintiff has specifically alleged that, far from the stated "from time to time," Intuitive faced a growing number of personal injury/products liability lawsuits and received an abundance of information in the form of MDRs showing that Intuitive was highly likely to face additional suits in the future.  However, that the statements were not wholly complete does not necessarily render them misleading to the reasonable investor.  For example, in Brody, the plaintiffs complained that the defendant company's general statements that it had received "expressions of interest" from

16

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

potential acquirers were false and misleading because the company did not specifically disclose that it had received actual proposals from three different parties. 280 F.3d at 1007. The Ninth Circuit disagreed with this characterization of the defendants' statements, noting that the information the company did provide was entirely consistent with the more detailed explanation of the merger process that the plaintiffs argued the press release should have included. Id. The court held that Rule 10b-5 does not contain a "freestanding completeness requirement" because "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." Id. at 1006.

Here, while the disclosures may have been incomplete for failing to disclose the exact number of lawsuits, they were not plausibly misleading because Intuitive made it explicitly clear through them that products liability lawsuits can and will continue to be a risk to its future revenues. Defendants continually warned that they faced significant risk of product liability claims and that, in fact, products liability claims had been made against them in the past. Therefore, omitting specific details such as the number of products liability lawsuits made against them was not an omission that "affirmatively created an impression of a state of affairs that differs in a material way from the one that actually exists." Brody, 280 F.3d at 1006. Because the omissions of the specific number of products liability lawsuits faced did not plausibly render any of Intuitive's risk factors disclosures misleading, these statements are not sufficient to state a claim for securities fraud.

### iv. FDA Regulatory Procedures

Finally, Plaintiff challenges statements made by Defendants in their SEC filings that listed out their duties pursuant to FDA regulations, including quality assurance procedures, the MDR regulations, and the "reporting of Corrections and Removals." CAC ¶ 185(a), Dkt. No. 48. Intuitive further specified that it was subject to FDA authority to determine compliance, noting that if the FDA found Intuitive failed to comply "it can institute a wide variety of enforcement actions, ranging from a regulatory letter to a public Warning Letter to more severe civil and criminal sanctions." Id. In the CAC, Plaintiff contends that these statements were materially false and

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

misleading because they failed to disclose that Defendants had already systematically violated FDA regulations by issuing recalls without reporting them to the FDA, in violation of 21 C.F.R. § 806.10.

Because the statements of these regulations are literally accurate, Plaintiff must plead facts showing that Defendants' statements "conveyed a false or misleading impression." Convergent, 948 F.2d at 512. Even taking as true Plaintiff's allegations that Defendants violated FDA regulations, Plaintiff has failed to plead any facts showing how these violations render statements regarding the FDA requirements themselves false or misleading. Therefore, the court finds that Plaintiff has not adequately pled its security fraud claims to the extent those claims depend on these statements.

### v.      Determination

In sum, the court finds that statements made by Intuitive with respect to da Vinci's safety benefits are sufficient to state a claim for securities fraud under the PSLRA pleading standard. Plaintiff pled these statements with particularity and specified why they could be misleading to a reasonable investor. In contrast, Plaintiff has failed to plausibly allege how Defendants' financial accounting reports, risk factor disclosures, and FDA regulation statements are false or misleading to the satisfaction of the PSLRA.

### b.  Scienter

Defendants contend that even if Plaintiff has sufficiently alleged false or misleading statements, the CAC must nevertheless be dismissed because Plaintiff failed to properly plead facts giving rise to a strong inference of scienter. In addition to sufficiently alleging falsity, plaintiffs in securities fraud actions must state with particularity facts evidencing "the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs Inc. v. Makor, 551 U.S. 308, 313 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 at n.12 (1976)). The facts alleged must give rise to a strong inference that the defendant acted with the requisite state of mind. 15 U.S.C. §§ 78u-4(b)(2). Plaintiff must "plead, in great detail, facts that constitute strong circumstantial evidence of

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

deliberately reckless or conscious misconduct." In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999).

Because "[t]he strength of an inference cannot be decided in a vacuum," the court must engage in a comparative evaluation, considering all competing inferences. Tellabs, 551 U.S. at 313. The court must evaluate scienter in the context of the entirety of the complaint. Id. at 323. A strong inference of scienter will be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314. Here, Plaintiff must allege facts showing that Defendants intended to deceive investors by touting the safety benefits of Intuitive while failing to disclose the product recalls, defects, and MDRs.

### i.   Individual Defendants' Knowledge of Potential Defects

Plaintiff alleges that the individual Defendants knew about da Vinci related injuries, FDA violations, and the concealment of serious defects and thus knew that their statements regarding the safety benefits of da Vinci were false or misleading. To support this allegation, Plaintiff first relies on statements from a confidential witness, Intuitive's former Financial Planning and Analysis Manager in Sales and Marketing ("FP&A Manager"). As the Ninth Circuit explained in Zucco, to satisfy the PSLRA's pleading requirements, a plaintiff relying on statements from confidential witnesses to establish scienter must describe the confidential witnesses "with sufficient particularity to establish their reliability and personal knowledge" and the witness's statements "must themselves be indicative of scienter." 552 F.3d at 995.

The FP&A Manager had access to adverse event reports but only created sales and marketing reports. Plaintiff alleges that he "frequently interacted" with the individual Defendants and knew that Intuitive tracked adverse events and categories of adverse events, and that he compiled that data. According to the FP&A Manager, Defendants Smith and Guthart closely monitored these reports and could even recite the numbers. Plaintiff here has sufficiently described the relationship and employment of the FP&A Manager to satisfy the first factor, and have pled statements that are indicative of scienter. Thus, taking as true the factual allegation that Defendants Smith and Guthart were acutely aware of the numerous adverse effects da Vinci was

19

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1   imposing on patients while continuing to tout da Vinci's safety benefits and financial performance,

2   while downplaying the risk factors, Plaintiff has sufficiently pled a strong inference of scienter.

3   See Iqbal, 556 U.S. at 678 (finding that for purposes of a motion to dismiss, the court must take all

4   factual allegations in the complaint as true, but disregard any asserted legal conclusions).

### ii.   Defendants' Stock Sales

6       Plaintiff also alleges that Defendants' stock sales were so unusual and suspicious that they

7   too give rise to a strong inference of scienter.  While "[p]ersonal financial gain may weigh heavily

8   in favor of a scienter inference," such gain must still be weighed against all other inferences and

9   remain "cogent" in light of those other inferences.  Tellabs, 551 U.S. at 325.  The Ninth Circuit has

10  found that scienter can be adequately alleged from unusual or suspicious insider stock sales when

11  "[f]or each defendant, Plaintiffs outlined the individual's holdings, his class period sales, when the

12  sales occurred, the percentage of owned shares that were sold, and the total proceeds that were

13  generated from the sale."  America West, 320 F.3d at 938.  Unusual or suspicious insider stock

14  sales may support a finding of scienter if the sales are "dramatically out of line with prior trading

15  practice at times calculated to maximize the personal benefit from undisclosed inside information."

16  Id.  In determining whether a trading pattern is suspicious, the "relevant factors to consider are: (1)

17  the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether

18  the sales were consistent with the insider's prior trading history."  Id.

19      Here, Plaintiff has alleged with particularity each individual Defendant's holdings, class

20  period sales, timing, percentage of owned shares sold, and the proceeds generated.  See CAC ¶

21  131, Exs. C-E, Dkt. No. 48.  Plaintiff also pleads facts sufficient to support a strong inference of

22  scienter under the America West factors.  First, Plaintiff alleges that the individual Defendants sold

23  a combined 223,000 shares for proceeds in excess of $124 million during the Class Period.  CAC

24  ¶¶ 132-135; 140-145, Dkt. No. 48.  Second, Plaintiff alleges that Defendants sold their shares at

25  times after Intuitive learned of information that would adversely affect Intuitive stock, but before

26  the public learned the information, such as after the September 2012 meeting with the FDA but

27  before acknowledging their change in MDA reporting practices to the public in March 2013.  Id. ¶¶

28

United States District Court
For the Northern District of California

20

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

1   137, 208.  Finally, Plaintiff alleges that these trading practices were inconsistent with past history,

2   particularly, Defendant Guthart's massive stock sales during the Class Period compared with his

3   complete inaction in the Control Period.[4]  Id. ¶ 133.  Defendants argue that there are other,

4   innocuous inferences that can be made from these facts, for example, chalking up the timing of the

5   trades as correlating with quarterly earnings calls.  Even so, taking all of Plaintiff's allegations as

6   true, the facts pled remain cogent and give rise to a strong inference of scienter.

### iii.    Holistic Review of Scienter Claims

8   Pursuant to Tellabs, the court must engage in a holistic approach to determine whether all

9   of the facts alleged, taken collectively, give rise to a strong inference of scienter."  551 U.S. at 323.

10  Plaintiff has pled facts that, when taken as true, show that Defendants knew that their statements

11  regarding da Vinci's safety benefits were false or misleading when said, and that Defendants had

12  financial motivation to maintain a misleading impression of da Vinci's safety.  Taken together,

13  these facts support a strong inference of scienter which remains cogent even in light of competing

14  inferences.  Therefore, Plaintiff has pled scienter with sufficient particularity to support their

15  Section 10(b) and Rule 10b-5 claims as to statements made regarding da Vinci safety benefits.

### 3.    Section 20(a) Claim

17  To prevail on its claim under Section 20(a) of the Act, Plaintiff must demonstrate "a

18  primary violation of federal securities law" and that "the defendant exercised actual power over the

19  primary violator."  Zucco, 552 F.3d at 990 (quoting America West, 320 F.3d at 945).  Section 20(a)

20  claims may be dismissed if a plaintiff "fails to adequately plead a primary violation of section

21  10(b)."  Id.  Defendants do not dispute the Section 20(a) claim on grounds other than its viability

22  under Section 10(b).  Having found that Plaintiff has adequately alleged a Section 10(b) claim, the

23  court finds that Plaintiff has also adequately alleged their Section 20(a) claim.

---

[4] Plaintiffs analyzed the trading by the individual Defendants during the Class Period and during the equal-length period immediately preceding the Class Period beginning August 26, 2010 and ending February 5, 2012 (the "Control Period").

21

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

United States District Court
For the Northern District of California

1

## IV.    CONCLUSION

2        For the reasons stated above, the court GRANTS in part and DENIES in part Defendants'

3   Motion to Dismiss.  Plaintiff's claims are DISMISSED with leave to amend to the extent they are

4   premised on statements made by Defendants regarding financial data, risk factors disclosures, and

5   FDA compliance procedures.

6        Any amended complaint must be filed within fifteen days of the date of this Order.

7   Plaintiff is advised that it may not add new claims or parties without first obtaining Defendants'

8   consent or leave of court pursuant to Federal Rule of Civil Procedure 15.

9   **IT IS SO ORDERED**

10   Dated: August 21, 2014

11



EDWARD J. DAVILA

12   United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 5:13-CV-01920-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO
DISMISS

United States District Court
For the Northern District of California