# EXHIBIT 32

# PART 1 OF 9

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE INTUITIVE SURGICAL SECURITIES LITIGATION | ) | **Case No.: 5:13-CV-01920-EJD** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

# EXPERT REPORT OF KENNETH M. LEHN

## October 15, 2015

## I.        Qualifications

1.        I am the Samuel A. McCullough Professor of Finance in the Joseph M. Katz School of Business at the University of Pittsburgh.  I teach undergraduate and graduate level courses in finance, including courses on business valuation, corporate restructuring, and corporate governance.  I also am an affiliated professor of law at the University of Pittsburgh.  I have published 50 scholarly papers, primarily in the field of corporate finance.  I have served on the editorial boards of several scholarly journals and am a founding editor of the Journal of Corporate Finance.

2.        I was chief economist of the Securities and Exchange Commission ("SEC") from 1987 to 1991 and deputy chief economist from 1984 to 1985.  During my time at the SEC, my staff and I assisted the SEC's division of enforcement on dozens of matters involving alleged violations of U.S. securities laws.  Much of this work involved event study analysis that examined how securities prices reacted to the release of information.  Since leaving the SEC, I have been retained by various parties in litigation, including both plaintiffs and defendants, to opine on, among other issues, price impact, materiality, loss causation and damages.  On multiple occasions, I have submitted reports and provided testimony on issues related to class certification.

3.        I received a B.A. in economics from Waynesburg College in 1975, an M.A. in economics from Miami University in 1976, and a Ph.D. in economics from Washington University in 1981.  My curriculum vitae, which lists my publications and recent testimony, is attached hereto as **Exhibit A**.

## II.    Introduction, assignment, and summary of conclusions

4.      Intuitive Surgical, Inc. ("Intuitive" or the "Company") designs, manufactures, and markets da Vinci Surgical Systems ("da Vinci") and related instruments and accessories.[1]  The da Vinci consists of a surgeon's console, a patient-side cart, and a high performance vision system.[2]  I understand that one of da Vinci's instruments is the monopolar curved scissors, which doctors use to cut and cauterize tissue by applying monopolar current through an electrode.[3]  I further understand that the metal parts of the scissors are covered with insulating sleeves ("tip covers") to ensure that electricity is channeled only through the electrode.[4]  In 2011, the da Vinci was used in approximately 360,000 procedures, including 146,000 da Vinci Hysterectomy and 113,000 da Vinci Prostatectomy procedures.[5]  Intuitive's common stock is traded on the NASDAQ Global Select Market.[6]

5.      In its SEC filings, Intuitive disclosed that the Company is subject to inspection and marketing surveillance by the U.S. Food and Drug Administration ("FDA") to ensure compliance with regulatory requirements.[7]  Among other things, Intuitive's SEC filings disclose that the Company is subject to (i) Medical Device Reporting regulation,

---

1.  Intuitive Form 10-K for fiscal year ended December 31, 2011, filed February 6, 2012 ("2011 10-K"), at 3.
2.  *Id*.
3.  Order Granting in Part and Denying in Part Defendants' Motion to Dismiss ("Order"), August 21, 2014, at 2.
4.  *Id.*
5.  2011 10-K, at 39.  Of the 146,000 hysterectomy procedures, 39,000 were for treatment of cancer and 107,000 related to benign conditions.  *Id*.
6.  2011 10-K, at cover.
7.  See, e.g., *Id*., at 29-30.

which requires manufacturers to report to the FDA if their devices may have caused or contributed to a death or serious injury or malfunctioned in a way that would likely cause or contribute to a death or serious injury if it were to recur (through so called Medical Device Reports or "MDRs"), and (ii) reporting of Corrections and Removals, which requires that manufacturers report to the FDA recalls and field corrective actions taken to reduce a risk to health or to remedy a violation of the Federal Food, Drug, and Cosmetic Act ("FFDCA") that may pose a risk to health.[8]

6.      In October 2011, Intuitive sent three letters to each hospital that used the da Vinci system (the "Letters").[9]  The first letter, dated October 10, 2011, reiterated the system's instructions for use regarding the tip cover and generators that should be used with monopolar instruments.[10]  The second letter, dated October 13, 2011, reminded da Vinci customers that the da Vinci system had not been cleared for thyroidectomies.[11]  The third letter, dated October 17, 2011, provided da Vinci clients with information for inspecting instrument cannulas, proper flushing of instruments, and the proper transportation of the da Vinci between buildings.[12]

7.      In September 2012, the Company identified a reporting issue with respect to MDRs, notified the FDA about the issue, and subsequently revised its MDR

8.  See, e.g., *Id.*, at 29.
9.  FDA Form 483, May 30, 2013, at 1.  Plaintiffs refer to these Letters as "secret recalls."
10. *Id.*; and October 10, 2011 letter from Todd Owen, Sr. Manager, Technical Support, at Intuitive.
11. FDA Form 483, May 30, 2013, at 1; and October 13, 2011 letter from Richard W. Reeves, Vice President - Regulatory, at Intuitive.
12. FDA Form 483, May 30, 2013, at 1; and October 17, 2011 letter from Todd Owen, Sr. Manager, Technical Support, at Intuitive.

reporting practices.[13]  I understand that the FDA Manufacturer and User Facility Device Experience ("MAUDE") database, which includes MDRs, was retroactively updated through January 2012 to reflect the Company's revised MDR reporting practices.  I understand that the FDA never has concluded that the Company's reporting of MDRs prior to or after September 2012 violated FDA regulations.

8.      On December 12, 2012, the American Association of Gynecologic Laparoscopists ("AAGL") published a position statement in *The Journal of Minimally Invasive Surgery* claiming that the use of robotic assisted laparoscopic surgery in benign gynecologic procedures was more time consuming, more expensive, and did not improve clinical outcomes when compared with conventional laparoscopic techniques.[14]  An article published in the *Journal of the American Medical Association* ("JAMA") on February 20, 2013 reported similar findings: "while robotic assistance was associated with increased use of minimally invasive surgery for hysterectomy, when compared with laparoscopic hysterectomy, the robotic procedure offers little short-term benefit and is accompanied by significantly greater costs."[15]

9.      Five minutes before the market close on February 28, 2013, Bloomberg released four articles disclosing that a U.S. regulator was conducting a safety

---

13. Intuitive Press Release, March 13, 2013.
14. "AAGL Position Statement: Robotic-Assisted Laparoscopic Surgery in Benign Gynecology," *Journal of Minimally Invasive Gynecology*, December 20, 2012, 2-9, at 7.
15. Wright et al., "Robotically Assisted vs Laparoscopic Hysterectomy Among Women With Benign Gynecologic Disease," *Journal of the American Medical Association*, February 20, 2013, 689-698, at 697; and "Study Raises Doubts Over Robotic Surgery," *The Wall Street Journal Online*, February 19, 2013, 4:30 p.m.

probe of the da Vinci surgical system.[16]  After market close, Bloomberg released two more articles identifying the FDA as the U.S. regulator, stating that, in response to the recent rise in MDRs, the FDA sent a survey to surgeons at key hospitals asking them to (i) list complications they have seen with the da Vinci, (ii) list the surgeries the da Vinci might be most and least suited for, and (iii) discuss their training.[17]  One article further disclosed that the FDA "is trying to determine whether a rise seen in incident reports sent to the agency are 'a true reflection of problems' with robots, or the results of other issues" because it found it "difficult to know why the reports have increased."[18]  I understand that the FDA issued a report summarizing the findings of the survey in November 2013 and concluded that, among other things, all 11 respondents "report fewer patient complications and shorter hospital stays as a benefit of surgery with the system."[19]

---

16. "Intuitive Surgical's Robots Probed for Safety by U.S. Regulator," *Bloomberg News*, February 28, 2013, 3:55 p.m.; "Doctors Surveyed about Safety of Intuitive's Robots for Surgery," *Bloomberg News*, February 28, 2013, 3:55 p.m.; "Regulators Safety Review of Intuitive Revealed in Doctor Survey," *Bloomberg News*, February 28, 2013, 3:56 p.m.; and "Intuitive Surgical's Robots Probed for Safety by U.S. Regulator," *Bloomberg News*, February 28, 2013, 3:57 p.m.
17. "MORE:  ISRG Robots Probed by FDA After Increase in Adverse Events," *Bloomberg News*, February 28, 2013, 4:51 p.m.; and "Intuitive Surgical Robots Probed by U.S. in Surgeon Survey (2)," *Bloomberg News*, February 28, 2013, 6:14 p.m.
18. "Intuitive Robot Probe Threatens Trend Setting Surgeries:  Health", *Bloomberg News*, March 1, 2013, 4:05 p.m.
19. Center for Devices and Radiological Health (CDRH), Office of Surveillance and Biometrics (OSB), Medical Product Safety Network (MedSun), Small Sample Survey – Final Report, Topic: da Vinci Surgical System, November 2013.  Available at http://www.fda.gov/downloads/MedicalDevices/ProductsandMedicalProcedures/Surgery andLifeSupport/ComputerAssistedRoboticSurgicalSystems/UCM374095.pdf.

10.     On March 5, 2013, after market close, Bloomberg released an article titled "Robosurgery Suits Detail Injuries as Death Reports Rise:  Health."[20]  The article noted that the da Vinci is "linked to at least 70 deaths in informal incident reports sent to the U.S. regulators since 2009, according to a review by Bloomberg News" and that "[a]s the popularity of robot surgery has grown, injury reports involving the procedures jumped to at least 115 in 2012 from 24 in 2009, while deaths rose to 30 from 11."[21]  The article also stated that there were at least 10 lawsuits filed in the previous 14 months.[22]

11.     On March 13, 2013, after market close, Intuitive issued a press release responding to general inquiries regarding the recent increase in MDRs.[23]  The Company explained that the increase reflected a change in reporting practices in September 2012 as opposed to a change in product performance.[24]  The Company also noted that its revision in reporting practices resulted in: (i) an increase in reports of device malfunction MDRs that related mostly to instruments and not systems and did not involve reportable injuries or deaths, and (ii) a change in how previously reported MDRs were subcategorized, which did not change the total number of MDRs, but increased the number of events in the "serious injury" subcategory and decreased, by the same amount, the number of events in

---

20. "Robosurgery Suits Detail Injuries as Death Reports Rise: Health," *Bloomberg News*,
     March 5, 2013, 4:05 p.m.
21. *Id.*
22. *Id.*
23. Intuitive Press Release, March 13, 2013.
24. *Id*.

the "other" subcategory.[25]  The Company further disclosed that "[t]otal adverse event rates have remained low and in line with historical trends."[26]

12.     On the afternoon of March 14, 2013, Dr. James Breeden, the President of the American College of Obstetricians and Gynecologists ("ACOG"), published a statement discouraging the use of robotic systems in hysterectomies.[27]  Among other things, Dr. Breeden noted that "[t]here is no good data proving that robotic hysterectomy is even as good as – let alone better – than existing, and far less costly, minimally invasive alternatives."[28]

13.     On April 18, 2013, the Company announced Q1 2013 financial results.[29]  For the quarter, the Company beat consensus estimates on revenues, systems sold, and earnings but missed consensus estimates on procedure growth because of slower growth in benign hysterectomy volume.[30]  The Company attributed the slowdown in the number of benign gynecology procedures to increased sensitivity to seasonality because of its large market share in gynecology procedures, a greater than expected decline in patient admissions, and negative press that "has some hard to measure impact on benign

---

25. *Id*.
26. *Id*.
27. "Robot Surgery Isn't Most Cost-Efficient Hysterectomy, Group Says," *Bloomberg News*, March 14, 2013, 2:51p.m.; and http://www.acog.org/About-ACOG/News-Room/News-Releases/2013/Statement-on-Robotic-Surgery.
28. http://www.acog.org/About-ACOG/News-Room/News-Releases/2013/Statement-on-Robotic-Surgery.
29. Intuitive Press Release, April 18, 2013.
30. See, e.g., "1Q13 Review: When Is a Beat Not a Beat? Something Here for Everyone; Reiterate Overweight," J.P. Morgan, April 19, 2013; and "Overall Strong Q1 Results, But Procedure Growth Light; Buy," Canaccord Genuity, April 19, 2013.

hysterectomy, although it doesn't appear to be large, it's also probably not zero."[31]  The

Company also revised upward revenue guidance to the higher end of the previous target and

decreased procedure guidance to the lower end of the previous target.[32]

        14.    On May 30, 2013, the FDA issued a Form 483 to the Company in

which the FDA concluded, among other things, that (i) the Company had sent the Letters in

October 2011 in response to complaints and MDRs, (ii) the Letters were not reported to the

San Francisco District Recall Coordinator, and (iii) the Company failed to report five MDRs

related to the October 13, 2011 Letter to the San Francisco District Recall Coordinator.[33]

On June 25, 2013, the FDA posted the Form 483 issued to Intuitive on its website.[34]

        15.    On July 8, 2013, the Company pre-announced Q2 2013 financial

results.[35]  Revenues, earnings, and the number of da Vinci systems sold were below

consensus estimates.[36]  The Company attributed the decline in U.S. system sales to

---

31. "Intuitive Surgical's CEO Discusses Q1 2013 Results – Earnings Call Transcript," April 18, 2013.

32. *Id*.

33. Intuitive FDA Form 483, May 30, 2013.

34. See Intuitive FDA Form 483, May 30, 2013 and posting date available at http://www.fda.gov/AboutFDA/CentersOffices/OfficeofGlobalRegulatoryOperationsand Policy/ORA/ORAElectronicReadingRoom/default.htm (search term Intuitive). See, e.g., "Intuitive Surgical (ISRG - OUTPERFORM): 483s Are a Non-Event; Reiterate OUTPERFORM," Wedbush, June 26, 2013 ("Yesterday (Tuesday), the FDA posted on its website that Intuitive Surgical received four 483s during an FDA manufacturing inspection conducted from April 1, 2013-May 30, 2013.").

35. Intuitive Press Release, July 8, 2013.

36. *Id*.;  See also "Definitely Not What the Doctor Ordered," JPMorgan, July 8, 2013;  "Q2 Results Deviate Disconcertingly from Trend Line; Downgrade to Hold; Lower Target to $444 from $527," Canaccord Genuity, July 9, 2013;  "Pre-announcement Hints at Potentially Fundamental, Long-term Issues; Downgrading to Market Perform," JMP Securities, July 9, 2013; and "Disappointing 2Q13 Pre-Announcement for Both System Placements and Procedures," Stifel, July 9, 2013.

increased economic pressure on hospitals and moderating growth in benign hysterectomy

procedures.[37]  Procedure growth of 18 percent was slightly below consensus estimate of

18.4 percent because of slower growth in benign hysterectomy procedures.[38]  The Company

attributed the slower growth in hysterectomy procedures to "reduced hospital admissions

and a trend by payers toward encouraging conservative management and treatment in

outpatient settings." [39]

        16.     On July 18, 2013, the Company reiterated financial results for Q2

2013, issued new guidance below its prior guidance for the remainder of the year and

disclosed that it had received an FDA Warning Letter related to its previously issued Form

483 in connection with the Company's reporting and documentation.[40]

        17.     Plaintiffs propose to bring this action "individually and on behalf of

all other persons and entities who purchased or acquired the common stock of Intuitive []

during the period between February 6, 2012 and July 19, 2013, inclusive, (the "Class

---

37. *Id*. See also "Definitely Not What the Doctor Ordered," JPMorgan, July 8, 2013;  "Q2
    Results Deviate Disconcertingly from Trend Line; Downgrade to Hold; Lower Target to
    $444 from $527," Canaccord Genuity, July 9, 2013;  "Pre-announcement Hints at
    Potentially Fundamental, Long-term Issues; Downgrading to Market Perform," JMP
    Securities, July 9, 2013; and "Surprisingly Poor U.S. da Vinci Placements, But Decent
    Procedure Growth; Maintain OUTPERFORM," Wedbush, July 9, 2013.
38. "Near-term hysterectomies look very rocky; longer-term trajectory seems better; BUY,"
    Lazard Capital Markets, July 8, 2013.
39. Intuitive Press Release, July 8, 2013.
40. *Id*.  Q2 2013 Intuitive Earnings Conference Call, July 18, 2013.  See also,  "Q2 As
    Preannounced; Guidance Reset Amid Uncertain Outlook; Lowering PT; Maintain
    Hold," Canaccord Genuity, July 19, 2013; "Perfect Storm – Guidance Slashed,
    Additional Japan Reimbursement Unlikely in 2014, and FDA Warning Letter
    Received," J.P. Morgan, July 19, 2013; and "Intuitive Surgical Disappoints On All
    Fronts," Trefis, July 19, 2013.

Period"), and who were damaged thereby."[41]  I understand that the only remaining alleged misrepresentations at issue are those related to da Vinci's safety and efficacy.[42] Specifically, Plaintiffs allege that the Company's statements were false and misleading because they failed to disclose (i) either the existence or nature of the Letters sent in October 2011 ("Letters Claim"), (ii) that the Company misclassified or failed to report to the FDA numerous MDRs ("MDRs Claim"), and (iii) specific information about the number and nature of product liability claims brought against the Company during the Class Period ("Product Liability Claim" and together with the other two claims "Claims").[43]

18.     Plaintiffs allege that misrepresentations occurred on the following eight dates: after market close on February 3, 2012, April 18, 2012, July 20, 2012, October 18, 2012, February 4, 2013, March 13, 2013, and April 18, 2013, and during market hours on April 19, 2013.[44]  Plaintiffs claim that the alleged misrepresentations "artificially inflated the price of Intuitive common stock and operated as a fraud or deceit on the Class Period

---

41. Amended Complaint, at 1.
42. Order, at 11-14.
43. *Id.*  I understand that the other alleged misrepresentations in this matter have been dismissed.  Order, at 15-18.
44. Amended Complaint, ¶¶ 182-215.  2011 10-K (www.sec.gov, February 3, 2012, 7:13 p.m.); Intuitive Form 10-Q for the quarterly period ending March 31, 2012 (www.sec.gov, April 18, 2012, 6:49 p.m.); Intuitive Form 10-Q for the quarterly period ending June 30, 2012 (www.sec.gov, July 20, 2012, 7:51 p.m.); Intuitive Form 10-Q for the quarterly period ending September 30, 2012 ("Q3 2012 10-Q") (www.sec.gov, October 18, 2012, 4:10 p.m.); Intuitive Form 10-K for the fiscal year ending December 31, 2012 ("2012 10-K") (www.sec.gov, February 4, 2013, 4:09 p.m.); Intuitive Press Release, March 13, 2013; Intuitive Form 8-K (www.sec.gov, 4/18/13, 4:06 p.m.); Intuitive Earnings Conference Call for Q1 2013. (Thomson Reuters, 4/18/13, 4:30 p.m.); and Intuitive Form 10-Q for quarterly period ending March 31, 2013 ("Q1 2013 10-Q") (ww.sec.gov, 4/19/13, 12:48 p.m.).

purchases of Intuitive common stock" and that "[w]hen Defendants' prior materially false and misleading statements and omissions began to be disclosed and became known to the market, the price of Intuitive common stock declined precipitously as the prior artificial inflation was removed from the price of Intuitive common stock."[45]  Plaintiffs further claim that "[a]s a result of their purchases of Intuitive common stock at artificially inflated prices during the Class Period, Plaintiffs and other members of the Class suffered a substantial economic loss (*i.e.*, damages under the federal securities laws) as the truth was revealed."[46] Plaintiffs claim that the truth was revealed to the market five minutes before market close on February 28, 2013 and after market close on March 5, 2013, April 18, 2013, July 8, 2013, and July 18, 2013.[47]

19.     Plaintiffs have retained Chad Coffman to "examine and opine on whether the market for Intuitive [] common stock [] was efficient during the Class Period" and "whether damages in this matter are subject to a common methodology under Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 adopted thereunder…."[48]

20.     Coffman states that in an efficient market "security prices adjust to new publicly available information rapidly and in an unbiased fashion" and that "all publicly available information is reflected in a security's current market price."[49]  Based in

---

45. Amended Complaint, ¶¶ 172-173.  I understand that the only remaining false and misleading statements pertain to the "misleading statements and omissions that concealed da Vinci defects and performance problems in violation of FDA regulations." *Id.*, ¶¶ 182-215.
46. *Id.*, ¶ 173.
47. *Id.*, ¶¶ 174-178.
48. Expert Report of Chad Coffman, CFA, September 1, 2015 ("Coffman Report"), ¶ 1.
49. *Id.*, ¶ 16.

part on his event study analysis of Intuitive's stock price, Mr. Coffman opines that the market for Intuitive's common stock was efficient throughout the Class Period.[50]

21.     Mr. Coffman also opines that "[a]lthough I have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters, and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole."[51]

22.     I have been retained by Counsel for the Defendants to offer opinions on three issues.

23.     First, Counsel has asked me to evaluate whether the information that Intuitive allegedly omitted to disclose regarding the Claims was publicly available prior to the end of Plaintiffs' proposed Class Period.

24.     Second, Counsel has asked me to evaluate whether there is a reliable basis to conclude, based on an analysis of Intuitive's stock price on the dates of the alleged misrepresentations and/or the alleged corrective disclosures, that the alleged misrepresentations had an impact on Intuitive's stock price during the Class Period.

25.     Finally, Counsel has asked me to evaluate whether Mr. Coffman has set forth a well-settled common methodology that can be used to estimate damages in this matter.

---

50. *Id.*, ¶ 6.
51. *Id.*, ¶ 73.

26.     I have been assisted by Compass Lexecon's professional staff.
**Exhibit B** lists the materials I have relied on.  I am being compensated at a rate of $1,050 per hour.  I also expect to receive compensation from Compass Lexecon for my work in this matter.  My compensation is not contingent on the outcome of this case.

27.     Based on my review and analysis, as well as my general background and expertise, I have reached the following principal conclusions:

1.  The information that Intuitive allegedly omitted to disclose regarding the Claims was publicly available prior to the end of Plaintiffs' proposed Class Period.

    a.  The allegedly omitted information regarding the Letters Claim was disclosed by no later than June 25, 2013 when the FDA posted a Form 483 on its website that explained the existence and nature of the Letters.

    b.  The allegedly omitted information regarding the MDRs Claim was disclosed by no later than March 13, 2013 when the Company discussed a revision to its MDR reporting practices.  The Form 483 published on June 25, 2013 noted that the FDA had found that the Company had incorrectly documented five MDRs.

    c.  Allegedly omitted information regarding the Product Liability Claim was disclosed throughout the Class Period as information about federal product liability lawsuits is publicly available information (as Plaintiffs acknowledge).  The allegedly omitted information regarding the Product Liability Claim also was disclosed by Intuitive by no later than April 18, 2013, when the Company disclosed in its Q1 2013 Form 10-Q that it was subject to 26 federal and state product liability lawsuits.

2.  Based on an analysis of Intuitive's stock price on the dates of the alleged misrepresentations and the alleged corrective disclosures, there is no reliable basis to support the conclusion that the alleged misrepresentations had an impact on the price of Intuitive's common stock (i.e., a "price impact").

    a.  Insofar that Plaintiffs allege that Defendants made *affirmative* misrepresentations, there is no reliable basis to conclude that the misrepresentations had a price impact.

        i.  Five of the alleged misrepresentations repeat information that had been disclosed previously.  If the market for Intuitive's stock is efficient, as Mr. Coffman claims it is, then there is no scientific

13

basis to conclude that the repetition of an alleged affirmative misrepresentation would have a price impact on these five dates.

ii.  Event study analysis shows that there was not a statistically significant change in Intuitive's stock price on six of the seven dates on which alleged misrepresentations were made.  On the one date in which there was a statistically significant increase in Intuitive's stock price, there is no reliable basis to conclude that it was caused by an alleged affirmative misrepresentation because the alleged misrepresentation repeats information that was disclosed previously.

b.  Insofar that Plaintiffs allege that the alleged misrepresentations are alleged *omissions*, event study analysis of the alleged corrective disclosures does not demonstrate price impact:

i.  The alleged corrective disclosure on February 28, 2013 is not associated with a statistically significant decline in Intuitive's stock price.  Moreover, the information revealed by the alleged corrective disclosure is substantively different from the allegedly misrepresented information, and the information revealed by this alleged corrective disclosure could not possibly have been revealed on all but one of the prior alleged misrepresentation dates.

ii.  The alleged corrective disclosure on March 5, 2013 is not associated with a statistically significant decline in Intuitive's stock price. Moreover, the information about product liability lawsuits revealed by the alleged corrective disclosure was already publicly available prior to this date.  In addition, the alleged disclosure referenced an increase in lawsuits against Intuitive from 2011 to 2012, which could not have been disclosed by Defendants on all but perhaps one of the prior alleged misrepresentation dates.

iii.  The alleged corrective disclosure on April 18, 2013 is not associated with a statistically significant decline in Intuitive's stock price.  Moreover, (i) the alleged corrective disclosure does not reveal information about the three Claims, and (ii) the information revealed by the alleged corrective disclosure could not have been disclosed by Defendants as of the dates of the prior alleged misrepresentations.

14

      iv.  The information in the alleged corrective disclosure on July 8, 2013 that supposedly "corrected" the alleged misrepresentations regarding the three Claims had been previously disclosed.  Hence, if the market for Intuitive's stock is efficient then there is no scientific basis to conclude that the alleged corrective disclosure had an impact on Intuitive's stock price on this date. Moreover, the alleged corrective disclosure regarding Intuitive's Q2 2013 earnings could not have been disclosed by Defendants as of the dates of the prior alleged misrepresentations.

      v.  The information in the alleged corrective disclosure on July 18, 2013 that supposedly "corrected" the alleged misrepresentations regarding the three Claims had been disclosed previously.  Hence, if the market for Intuitive's stock is efficient then there is no scientific basis to conclude that the alleged corrective disclosure had an impact on Intuitive's stock price on this date.  Moreover, the information about the FDA Warning Letter released on this date could not have been disclosed by Defendants on the prior alleged misrepresentation dates.

3. Mr. Coffman does not demonstrate that alleged class-wide damages can be calculated in this matter subject to a common and reliable methodology consistent with Plaintiffs' claims.

    a.  For the same reasons that the alleged corrective disclosures cannot be used to demonstrate price impact, they cannot be used to establish loss causation and damages.

    b.  Mr. Coffman's proposed methodology does not isolate the impact of each alleged misrepresentation on Intuitive's stock price. As a result, Mr. Coffman has not proposed a methodology that allows him to adjust his estimate of damages if the Court finds Defendants liable for some but not all of the alleged misrepresentations.

    c.  Mr. Coffman does not provide a methodology for disentangling the effect of confounding information about Intuitive released on the alleged corrective disclosure dates from the effects of the alleged corrective disclosure.

    d.  Mr. Coffman does not provide a reliable methodology for distinguishing the effect of the alleged corrective disclosure from the effect of the alleged misrepresentation on April 18, 2013.

28.    I elaborate upon and provide the bases for my opinions in the remainder of this report.

**III.     The allegedly omitted information was publicly available prior to the end of Plaintiffs' proposed Class Period**

29.     Plaintiffs allege that the "truth was revealed" by alleged corrective disclosures on February 28, 2013, March 5, 2013, April 18, 2013, July 8, 2013, and July 18, 2013.  However, the allegedly omitted information regarding each of the three Claims was publicly available prior to the end of the proposed Class Period and prior to several of the alleged corrective disclosures identified by Plaintiffs.

**A.  Letters Claim**

30.     The allegedly omitted information about the existence and nature of the Letters was publicly available by no later than June 25, 2013.  I understand that two of the three letters (namely, the October 10, 2011 and October 17, 2011 Letters) had been posted on the website of the Medicines and Healthcare Products Regulatory Agency ("MHRA"), a U.K. regulator similar to the FDA, in October 2011.[52]  Hence, the existence and nature of the two letters was publicly available prior to the Class Period.  Furthermore, the existence and nature of all three Letters were disclosed on June 25, 2013 when the FDA

_____

52. See, e.g., http://webarchive.nationalarchives.gov.uk/20111114231258/http://www.mhra.
gov.uk/Safetyinformation/Safetywarningsalertsandrecalls/fieldsafetynotices/CON13202
9.  I understand that the October 10, 2011 letter was resent on October 17, 2011.  As a
result, both letters on the MHRA website are dated October 17, 2011.  However, the
content of one is the same as the original letter sent October 10.

posted a Form 483 on its website.[53]  *See* **Exhibit C**.  The Form 483 disclosed that the Company had sent the three Letters in October 2011, provided a description of the content of and reason for the Letters, and noted that the Company had failed to notify the San Francisco District Recall Coordinator about the Letters.[54]

31.     The FDA Warning Letter disclosed by the Company on July 18, 2013, which Plaintiffs allege is a corrective disclosure related to the Letters Claim, does not contain new information about the existence and nature of the Letters.  Instead, the Warning Letter states that the Company's response to the Form 483 was incomplete and inadequate for two of the four items identified on the Form 483.[55]   Analysts acknowledged that some information in the Warning Letter had been previously disclosed and that the new information in the Warning Letter was not significant.  For example, a SunTrust Robinson Humphrey analyst report comments that: "[t]he new FDA warning letter is tied to the already known 483s, and the two issues still open are benign to us."[56]  Similarly, a William Blair report states that the Warning Letter "related to the previously reported facility inspection and Form 483 observations" and that it does not "believe that the letter represents

---

53. See Intuitive FDA Form 483, May 30, 2013 and posting date available at http://www.fda.gov/AboutFDA/CentersOffices/OfficeofGlobalRegulatoryOperationsand Policy/ORA/ORAElectronicReadingRoom/default.htm (search term Intuitive); "Form 483 Benign, Handled– Buy," Canaccord Genuity, June 26, 2013; "The Latest FDA Warning Letter Does Not Appear to be Significant, In Our View Any Materially Negative Reaction Could Imply A Short-term Buying Opportunity," Janney Capital Markets, June 26, 2013; and "Intuitive Surgical (ISRG - OUTPERFORM): 483s Are a Non-Event; Reiterate OUTPERFORM," Wedbush, June 26, 2013.
54. Intuitive FDA Form 483, May 30, 2013.
55. FDA Warning Letter, July 16, 2013.
56. "On the Operating Room Table; 2Q Analysis," SunTrust Robinson Humphrey, July 19, 2013.

a serious issue given the *previously* discussed details of the observations, and should be

resolved reasonably soon."[57]

### B.  MDRs Claim

32.      The allegedly omitted information about the classification and

reporting of MDRs was disclosed before the end of the proposed Class Period.  On March

13, 2013, the Company disclosed it had revised its MDR reporting practices:

> Intuitive Surgical revised its MDR practices, resulting in increased reports of
> device malfunction MDRs, the vast majority of which were related to
> instruments and not to systems.  None of these device malfunction MDRs
> involved reportable injuries or deaths….
>
> MDRs can be found in the FDA's MAUDE database, which is updated by
> FDA regularly. The most common type of report filed under the company's
> revised MDR practices involves instrument cable breaks. These cable breaks
> render the instrument nonfunctional and require an instrument change, which
> can be accomplished quickly.
>
> The company also made an administrative change in how MDRs previously
> reported as adverse events were subcategorized.  This change has not
> increased the total number of adverse event reports.  This will result in an
> increase in events in the "serious injury" subcategory and a corresponding
> decrease in the "other" subcategory. Total adverse event rates have remained
> low and in line with historical trends. [58]

33.      Furthermore, because the MAUDE database is publicly available,

market participants were aware of the impact on the number and type of MDRs resulting

from the revision in the Company's MDRs reporting practices.  For example, SunTrust

Robinson Humphrey issued a report on June 4, 2013 discussing the number of Intuitive's

MDRs on the MAUDE database as of January 2013, March 2013, May 1, 2013, and May

---

57. "Second-Quarter Results in Line With Preannouncement, but Weak Guidance," William
    Blair, July 19, 2013 (italics added).
58. Intuitive Press Release, March 13, 2013.

31, 2013.[59]  *See* **Exhibit D**.  The report shows that for the year 2012, the total number of

MDRs reported on the MAUDE database increased from 629 as of January 2013, to 1595 as

of May 1, 2013, and 1597 as of May 31, 2013.  Between January 2013 and May 31, 2013,

the number of MDRs categorized as "Death" remained the same, the number of MDRs

categorized as "Injury" increased from 79 to 133, the number of MDRs categorized as

"Malfunction" increased from 310 to 1271, and the number of MDRs categorized as

"Other" decreased from 199 to 142.[60]  As of October 2, 2015, the MAUDE database

included 1597 MDRs for Intuitive for 2012, the same number of MDRs as of May 31, 2013

as noted in the SunTrust Robinson Humphrey report.[61]

---

59. "Monopolar Shipments Resume; MAUDE/MedSun Update Too," SunTrust Robinson
    Humphrey, June 4, 2013.
60. Plaintiffs also allege that when the Company discussed the reasons for the recent rise in
    MDRs on March 13, 2013, it failed to disclose that "in 2012 there had been a 214%
    increase in MDRs related to product performance compared to 2011, which exceeded
    'historical trends' and the increasing use of da Vinci products" and that "this increase in
    MDRs had caused the FDA to initiate a safety probe to find the root cause for the
    increase and evaluate product performance."  Amended Complaint, ¶ 210.  This
    information also was publicly disclosed and discussed by analysts prior to the end of the
    Class Period.  Regarding the increase in MDRs, a SunTrust Robinson Humphrey report
    issued on June 4, 2013 shows that the number of MDRs increased from 508 in 2011 to
    1597 on May 31, 2013, an increase of 214 percent.  "Monopolar Shipments Resume;
    MAUDE/MedSun Update Too," SunTrust Robinson Humphrey, June 4, 2013.
    Regarding Plaintiffs' claim that the "increase in MDRs had caused the FDA to initiate a
    safety probe," this information was previously disclosed by *Bloomberg News* on
    February 28, 2013.  See, e.g., "Intuitive Surgical Robots Probed by U.S. in Surgeon
    Survey (2)," *Bloomberg News*, February 28, 2013, 6:14 p.m.
61. FDA Manufacturer and User Facility Device Experience (MAUDE) database,
    https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm, accessed
    October 2, 2015.  (Search terms: Manufacturer is "Intuitive" and Date Report Received
    between January 1, 2012 and December 31, 2012); and "Monopolar Shipments Resume;
    MAUDE/MedSun Update Too," SunTrust Robinson Humphrey, June 4, 2013.

34.     Finally, the Form 483 publicly released on June 25, 2013 disclosed that the FDA had found that the Company had incorrectly documented five MDRs.[62]

## C.  Product Liability Claim

35.     The allegedly omitted information about the number and nature of product liability claims brought against the Company during the Class Period was disclosed on the federal government's Public Access to Court Electronic Records ("PACER") system throughout the Class Period and by the Company in its Q1 2013 Form 10-Q issued after market close on April 18, 2013.[63]

36.     The PACER system is described on its website as "an electronic public access service that allows users to obtain case and docket information online from federal appellate, district, and bankruptcy courts, and the PACER Case Locator."[64]  It further states that PACER "is provided by the Federal Judiciary in keeping with its commitment to providing public access to court information via a centralized service."[65] Since PACER began in 1988, information about federal lawsuits brought against Intuitive was publicly available throughout the proposed Class Period.  Plaintiffs acknowledge that information about federal product liability lawsuits against the Company was publicly available on the PACER system, stating that they "analyzed *publicly available data* concerning lawsuits filed against Intuitive between March 2010 and August 2013" and that

---

62. FDA Form 483, May 30, 3013.
63. Q1 2013 10-Q, at 9.  Prior Company SEC filings included risk factors describing the risks of product liability litigation.  See, e.g., 2011 10-K, at 21.
64. www.pacer.gov.
65. *Id.*

"there were at least 25 such lawsuits, 18 of which included allegations related to insufficient insulation allowing monopolar current to pass onto patient tissue, resulting in inadvertent burns and other injury."[66]  Furthermore, equity analysts cited the PACER system in discussing product liability lawsuits brought against Intuitive during the proposed Class Period.[67]

37.     Furthermore, Intuitive disclosed that it was a defendant in 26 lawsuits in both federal and state courts in its Q1 2013 10-Q, filed after market close on April 18, 2013:

> The Company is currently a defendant in approximately 26 individual product liability lawsuits filed in various state and federal courts by plaintiffs who allege that they underwent surgical procedures that utilized the *da Vinci* Surgical System and sustained a variety of personal injuries and, in some cases, death as a result of such surgery.

The 10-Q filing summarizes the allegations and causes of action in the lawsuits:

> The cases raise a variety of allegations including, to varying degrees, that their injuries resulted from purported defects in the *da Vinci* Surgical System and/or failure on the part of the Company to provide adequate training resources to the healthcare professionals who performed plaintiffs' surgeries. The cases further allege that the Company failed to adequately disclose and/or misrepresented the potential risks and/or benefits of the *da Vinci* Surgical System. Plaintiffs also assert a variety of causes of action, including for example, strict liability based on purported design defects, negligence, fraud, breach of express and implied warranties, unjust enrichment, and loss of consortium.[68]

---

66. Amended Complaint, n. 3 (emphasis added).
67. See, e.g., "Procedure Expansion Driven by Quality of Outcomes and Safety," William Blair, February 6, 2013; and "Recent Concerns Misplaced; Positive Catalysts Coming Post Q4," Bank of America Merrill Lynch, January 6, 2013.
68. Q1 2013 10-Q, at 9 (emphasis in original).

The 10-Q filing also indicates that plaintiffs were seeking recovery for their alleged personal injuries, that they also were seeking punitive damages, and the cases generally were in an early stage.  The 10-Q filing then provides details about a specific case:

> On December 17, 2009, a product liability action entitled Josette Taylor, as Personal Representative of the Estate of Fred E. Taylor, deceased; and on behalf of the Estate of Fred E. Taylor; and Josette Taylor v. Intuitive Surgical, Inc., No. 09-2-03136-5, was filed in Washington State Superior Court for Kitsap County against the Company and the healthcare providers and hospital involved in decedent's surgery. In Taylor, plaintiffs assert wrongful death and product liability claims against the Company, generally alleging that the decedent died four years after surgery as a result of injuries purportedly suffered during the surgery, which was conducted with the use of the *da Vinci* Surgical System.  The plaintiffs in Taylor assert that such injuries were caused, in whole or in part, by the Company's purported failure to properly train, warn, and instruct the surgeon. The lawsuit seeks unspecified damages for past medical expenses, pain and suffering, loss of consortium as well as punitive damages.  A trial commenced in the action on April 15, 2013.[69]

The 10-Q filing describes efforts by plaintiffs' attorneys to solicit potential clients:

> Plaintiffs' attorneys are engaged in growing and well-funded national advertising campaigns soliciting clients who have undergone *da Vinci* surgery and claim to have suffered an injury.  The Company has seen a substantial increase in these claims, however it has only received detailed information regarding a small number of them.[70]

The 10-Q filing also describes tolling agreements that the Company has entered into with some plaintiffs' counsel:

> In an effort to provide an orderly process for evaluating claims before they result in costly litigation, we have entered into tolling agreements with certain plaintiff's counsel acting on behalf of such claimants.  The tolling agreements provide that the statute of limitations for each individual will be

---

69. *Id*.
70. *Id*., at 10 (emphasis in original).

tolled for a period of three to six months in exchange for the individual's agreement that, if he or she ultimately files a lawsuit, it will be filed in certain agreed upon venues.  The tolling agreements provide the parties and their legal counsel with additional time to evaluate the claims, to explore whether the claims have merit and whether they can be resolved without litigation.[71]

Finally, the 10-Q filing states that Intuitive "does not currently know how many of such individuals will ultimately file lawsuits, nor is it able at this time to estimate the financial implications of their claims or predict the final disposition of such claims" and that "the Company intends to vigorously defend lawsuits that are ultimately filed."[72]

### IV.  There is no reliable basis to conclude that the alleged misrepresentations had an impact on Intuitive's stock price

38.    To examine whether there is a reliable basis to conclude that the alleged misrepresentations had an impact on Intuitive's stock price ("price impact") during the proposed Class Period, I conducted an event study analysis of Intuitive's stock price on the dates of the alleged misrepresentations and the alleged corrective disclosures.[73]  Event study analysis of Intuitive's stock price on the dates of the alleged misrepresentation is appropriate for testing whether the alleged misrepresentations had a price impact if it is alleged that *affirmative* misrepresentations were made on these dates.[74]  If the alleged

---

71. *Id.*
72. *Id.*
73. Several of the alleged misrepresentations and alleged corrective disclosures were made after market close.  In these cases, I conducted event study analysis of Intuitive's stock price on the next trading day.  See **Appendix A** for a description of the event study methodology that I used.
74. This assumes that the alleged affirmative misrepresentation reveals information that had not been disclosed previously.  Also, a properly conducted event study must use a reliable methodology to take into account the effects on Intuitive's stock price of confounding information released concurrently.

misrepresentation involves an alleged omission, then it is appropriate to conduct event study analysis of Intuitive's stock price on the dates of the alleged corrective disclosures.[75]

39.     Event study analysis of Intuitive's stock price on the dates of both the alleged misrepresentations and alleged corrective disclosures, combined with a review of information released on these days, provides no reliable basis to conclude that the alleged misrepresentations, whether they be alleged affirmative misrepresentations or alleged omissions, had a price impact.  A discussion of the results follows.

### A.     Alleged misrepresentations dates

40.     Plaintiffs allege that Intuitive made false and misleading statements on the following eight dates: after market close on February 3, 2012, April 18, 2012, July 20, 2012, October 18, 2012, February 4, 2013, March 13, 2013, and April 18, 2013, and during market hours on April 19, 2013.[76]  *See* **Exhibit E**.  On the first five dates (February 3, 2012, April 18, 2012, July 20, 2012, October 18, 2012, and February 4, 2013), the alleged misrepresentation repeats information that had been disclosed previously (see the non-italicized text in **Exhibit E**).[77]  If the market for Intuitive's common stock is efficient, as

---

75. This assumes that the alleged corrective disclosure reveals information that allegedly was omitted previously.  Also, a properly conducted event study must use a reliable methodology to take into account the effects on Intuitive's stock price of confounding information concurrently.

76. Plaintiffs allege that the Company made false and misleading statements on eight dates.  On most of these dates, the alleged misrepresentations were made after market close, in which case I conducted event study analysis of Intuitive's stock price on the next trading day.  There are seven dates on which I conducted my event study analysis – these dates are reported in **Exhibit E** under the header "Stock Price Reaction Date."

77. These *exact* same statements were made verbatim in Intuitive's 2011 10-K, at 3-4.

Mr. Coffman opines it is, then previously disclosed information was already reflected in Intuitive's stock price as of the dates of the alleged misrepresentations.  Hence, insofar that Plaintiffs allege that Defendants made affirmative misrepresentations on any or all of these five dates, there is no scientific basis to conclude that the alleged misrepresentations had a price impact.

41.      Furthermore, event study analysis shows that the residual return on Intuitive's stock price is not associated with a statistically significant stock price increase on six of the seven alleged misrepresentation dates, including the two dates (March 14, 2013 and April 19, 2013) on which Defendants allegedly made false and misleading statements that were not previously disclosed.[78]  Hence, there is also no reliable basis to conclude that the alleged misrepresentations on those two dates had an impact on Intuitive's stock price.

**B.      Alleged corrective disclosure dates**

42.      Plaintiffs identify five dates on which alleged corrective disclosures were made: February 28, 2013, March 5, 2013, April 18, 2013, July 8, 2013, and July 18, 2013.  See **Exhibit F**.  Plaintiffs allege that Intuitive's stock price declined following the five alleged corrective disclosures and that the declines were "statistically significant at a high level after taking into account changes on the same days in the overall securities

---

78. The residual return on Intuitive's stock price is positive and statistically significant on October 19, 2012.  On this date, in its Q3 2012 10-Q, Intuitive described the da Vinci as a "new generation of surgery" which "combines the benefits of [MIS]" with those of open surgery which Plaintiffs allege was false and misleading.  Q3 2012 10-Q, at  6. However, Defendants made identical statements in its 2011 10-K.  2011 10-K, at 3. Accordingly, there is no scientific basis to conclude that the repetition of a prior alleged misrepresentation could have had a price impact on October 19, 2012.

market and in relevant industry indices" and that "each of the price declines in Intuitive

stock is attributable to the disclosure of previously concealed information relating to the

materially false and misleading statements and omissions."[79]  Plaintiffs further allege that

the "timing and magnitude of Intuitive's common stock price declines negate any inference

that the losses suffered by Plaintiffs and other Class members were caused by other changed

market conditions, macroeconomic or industry factors, or Company-specific facts unrelated

to Defendants' fraudulent conduct."[80]  Contrary to Plaintiffs' claims, the declines in

Intuitive's stock price, if any, on the alleged corrective disclosure dates do not demonstrate

price impact as explained below.

### 1. The alleged corrective disclosure on February 28, 2013 does not demonstrate price impact

43.     Plaintiffs allege that the information in a *Bloomberg News* article

published five minutes before market close on February 28, 2013 – which disclosed that the

"FDA had initiated a probe over the safety of Intuitive's products" – constitutes a corrective

disclosure.[81]

44.     Event study analysis does not support the conclusion that the alleged

corrective disclosure had an impact on Intuitive's stock price.  Because the *Bloomberg News*

articles were released only five minutes before market close on February 28, 2013, and the

more extensive *Bloomberg News* articles were published after market close on February 28,

2013, it is appropriate to conduct event study analysis of Intuitive's stock price over a two-

---

79. Amended Complaint, ¶ 180.
80. *Id*.
81. *Id*., ¶ 174.

day window consisting of both February 28, 2013 and March 1, 2013.  My analysis finds that the two-day residual return on Intuitive's stock price is -3.73 percent with a t-statistic of -1.08, indicating that the two-day residual return is not statistically significant at the conventional 95 percent level.[82]

45.    Moreover, analyst commentary following the release of the *Bloomberg News* articles provides additional evidence that market participants discounted the alleged corrective disclosure.  Of the 12 analyst reports I reviewed, only one changed its earnings forecast, and none changed its target stock prices for Intuitive.[83]  The report that reduced its 2013 earnings estimate stated that it did not view the FDA actions "as indicative

_____

82. The two-day residual return is calculated by compounding the residual returns on February 28, 2013 and March 1, 2013.  The two-day t-statistic is equal to the sum of the t-statistics divided by the square root of two. While I have not been able to replicate Mr. Coffman's event study analysis, his results for the two-day event study appear to be consistent with my results.  In particular, he finds that Intuitive had a residual return of -11.02 percent on February 28, 2013 and 7.95 percent on March 1, 2013, and a two-day residual return of -3.07 percent.  Coffman Report, Appendix C, at 12.  Based on the t-statistics for those dates, the root mean squared error in Mr. Coffman's model is approximately 1.37.  *Id.*  Therefore, the t-statistic associated with the two-day residual return from his analysis is -1.58, also below the standard 95 percent significance level.

83. "Quick Thoughts on FDA Survey Headlines – ALERT," JPMorgan, February 28, 2013; "FDA Survey of Surgeons for Data on da Vinci Routine; Recommend Purchase on Weakness," William Blair, February 28, 2013"; "FDA Actions Mischaracterized in Our View; Reiterate Buy," Bank of America Merrill Lynch, March 1, 2013; "FDA Probe Reaction Way Overdone; Upgrading to BUY and Raising PT to $575," Cantor Fitzgerald, March 1, 2013; "Not without risk, but dislocation provides attractive entry point; Buy," Goldman Sachs, March 1, 2013; "The Street May Have Over-reacted on da Vinci: A Key Opinion Leader Says There Is No FDA Investigation on da Vinci," Janney Capital Markets, March 1, 2013; "News of Routine Post-marketing Survey Likely to Increase Volatility," JMP Securities, March 1, 2013; "MAUDE Analysis Raises No Red Flags," Mizuho, March 1, 2013; "Tempest in a Teapot," Morgan Stanley, March 1, 2013; "New Regulatory Scrutiny of da Vinci Procedures?," Stifel, March 1, 2013; and "Smoke, But No Fire," SunTrust Robinson Humphreys, March 1, 2013;

of any increased safety risk associated with da vinci."[84]  Furthermore, analysts were generally dismissive of the information in the *Bloomberg News* articles.  For example, a Janney Capital Markets report states that "[c]ontrary to Bloomberg's report, it appears that the FDA has not launched any formal investigation or probe into da Vinci safety issues."[85] A Bank of America Merrill Lynch report comments that the "Bloomberg headline mischaracterizes routine FDA actions."[86]  Several reports commented that the decline in Intuitive's stock price immediately prior to the close on February 28, 2013 was overdone and recommended to purchase the stock on weakness.[87]

46.     In short, the event study analysis, as well as analyst commentary, provides no reliable basis to conclude that the alleged corrective dsclosure on February 28, 2013 demonstrates price impact.

47.     There are two additional reasons why the alleged corrective disclosure on February 28, 2013 does not demonstrate price impact.

---

84.  "FDA actions mischaracterized in our view; Reiterate Buy," Bank of America Merrill Lynch, March 1, 2013.  The analyst also did not indicate that he lowered his earnings forecast because of the alleged corrective disclosure.

85. "The Street May Have Over-reacted on da Vinci: A Key Opinion Leader Says There Is No FDA Investigation on da Vinci," Janney Capital Markets, March 1, 2013.

86.  "FDA actions mischaracterized in our view; Reiterate Buy," Bank of America Merrill Lynch, March 1, 2013.

87. See, e.g., "FDA Surveys of Surgeons for Data on da Vinci Routine; Recommend Purchase on Weakness," William Blair, February 28, 2013.  "FDA Probe Reaction Way Overdone; Upgrading to BUY and Raising PT to $575," Cantor Fitzgerald, March 1, 2013.  "The Street May Have Over-reacted on da Vinci: A Key Opinion Leader Says There Is No FDA Investigation on da Vinci," Janney Capital Markets, March 1, 2013.

48.     First, the information revealed by the alleged corrective disclosure on February 28, 2013 is substantively different from the alleged misrepresentations.  As discussed in ¶ 9, several *Bloomberg News* articles were released before and after market close on February 28, 2013.  Contrary to Plaintiffs' assertion, the FDA is not mentioned in any of the articles until after the market close on this date.  *See* **Exhibit G.**  None of the *Bloomberg News* articles contains information regarding the Letters and Product Liability Claims.

49.     Although the articles mention MDRs, the information in the articles is substantively different from the information that was allegedly concealed.  The alleged corrective disclosure is the *fact* that, in response to the recent rise in MDRs, the FDA sent a survey to surgeons at key hospitals to (i) list complications they have seen with the da Vinci, (ii) list surgeries the da Vinci might be most and least suited for, and (iii) discuss their training, and that the FDA "is trying to determine" whether the increase in "adverse incident reports sent to the agency are 'a true reflection of problems' with robots, or result of other issues" because it found it "difficult to know why the reports have increased."[88]  In contrast, the allegedly concealed information was the existence of unreported or misclassified MDRs, and the alleged misrepresentations involve statements that, at most, might have affected investors' assessment of the *probability* that the FDA might send a survey to surgeons at a later date.

_____

88. "Intuitive Surgical Robots Probed by U.S. in Surgeon Survey (2)," *Bloomberg News*, February 28, 2013, 6:14 p.m.

50.     Moreover, the information contained in the alleged corrective disclosure on February 28, 2013 could not have been disclosed by Defendants as of the dates of the prior alleged misrepresentations, with one exception – the alleged misrepresentation on February 4, 2013.   The *Bloomberg News* article states that the FDA sent surveys to surgeons in January 2013.  Hence, it was not possible for Defendants to have disclosed this information prior to January 2013, since the event itself had not even occurred.   Therefore, with the exception of the alleged misrepresentation on February 4, 2013, the information revealed by the alleged corrective disclosure on February 28, 2013 could not have been disclosed on the prior alleged misrepresentation dates.[89]

51.     For the aforementioned reasons, the alleged corrective disclosure on February 28, 2013 does not demonstrate price impact.

### 2.  The alleged corrective disclosure on March 5, 2013 does not demonstrate price impact

52.     Plaintiffs allege that a *Bloomberg News* article titled "Robosurgery Suits Detail Injuries as Deaths Reports Rise" published after market close on March 5, 2013 constitutes a corrective disclosure.[90]   The article discussed that the da Vinci is "linked to at least 70 deaths in informal incident reports sent to the U.S. regulators since 2009, according

---

89. Also, Plaintiffs do not allege that the FDA indicated that they would send surveys prior to January 2013.

90. "Robosurgery Suits Detail Injuries as Death Reports Rise," *Bloomberg News*, March 5, 2013, 4:05 p.m..  The only *Bloomberg News* article discussing the events Plaintiffs allege in the Amended Complaint ¶ 175 I am aware of was published after market close. Hence, to test whether the alleged corrective disclosure was followed by a statistically significant decline in Intuitive's stock price it is appropriate to conduct an event study of Intuitive's stock price on March 6, 2005.

to a review by *Bloomberg News*" and that "[a]s the popularity of robot surgery has grown, injury reports involving the procedures jumped to at least 115 in 2012 from 24 in 2009…."[91] The *Bloomberg News* article also states that there were at least 10 lawsuits filed in previous 14 months and that one product liability lawsuit alleged that the da Vinci instruments had insufficient insulation resulting in burns.[92]  Plaintiffs claim that the *Bloomberg News* article "lent credence to the allegations of product liability suits pending against the Company, in particular that complications during robotic surgery caused serious injuries and, in some cases, death."[93]  Contrary to Plaintiffs' claim, however, there is no reliable basis to conclude that the alleged corrective disclosure on March 5, 2013 does not demonstrate price impact.

53.     Because the alleged corrective disclosure on March 5, 2013 was released after market close on this date, it is appropriate to conduct an event study of Intuitive's stock price on March 6, 2013 to test whether the alleged corrective disclosure was associated with a decline in Intuitive's stock price.  Event study analysis of Intuitive's stock price on March 6, 2013 shows that Intuitive's residual return on this date is -1.10 percent, with a t-statistic of -0.61, indicating that the return is not statistically signficant at the 95 percent confidence level.[94]  Hence, there is no scientific basis to conclude that the alleged corrective disclosure on March 5, 2013 had an effect on Intuitive's stock price.

---

91. *Id.*
92. *Id.*
93. Amended Complaint, ¶ 175.
94. Mr. Coffman also finds that the residual return on March 6, 2013 of -1.33 percent with a t-statistic of -0.84 is not statistically significant at the 95 percent confidence level. Coffman Report, Appendix C, at 12.

54.     There are two additional reasons why the alleged corrective disclosure on March 5, 2013 does not demonstrate price impact.

55.     First, the information revealed by the alleged corrective disclosure on March 5, 2013 contains no information about the Letters.  Although the article mentions a number of lawsuits and discusses one in particular, information about federal lawsuits was already publicly available on the PACER system, as discussed above.  Analysts had already commented on the product liability lawsuits against Intuitive prior to March 5, 2013, suggesting that the information contained in the alleged corrective disclosure was reflected in Intuitive's stock price prior to March 5, 2013.

56.     For example, a Bank of America Merrill Lynch report dated January 6, 2013 states "we note that in this industry there is inherent litigation risk, we view a class action against ISRG as unlikely. This is primarily because all of the current liability claims are based on complications from robotic hysterectomies, but the published clinical data has repeatedly shown that robotic hysterectomies have lower complication rates relative to open hysterectomies…."[95]

57.     Similarly, a William Blair report dated February 6, 2013 explicitly addressed the topic of the product liability lawsuits against Intuitive and the increase in the number of lawsuits in 2012: "we … completed a general search of the … PACER … system.  While we found that the number of civil and appellate cases has increased in 2012

---

95. "Recent concerns misplaced; positive catalysts coming post Q4," Bank of America
    Merrill Lynch, January 6, 2013.

compared with 2011 … our review of several of the historical cases … suggests that the company's exposure is manageable given the likelihood of success on the merits of many of the cases."[96]  The William Blair report goes on to state that "unfortunately, patient injuries and even deaths do occur in the practice of medicine, and the search for blame usually extends across the hospital, physicians and vendors … that desire to broadly assign blame and financial responsibility, however, does not suggest that actual culpability exists or that a case can be proven in court."[97]

58.     Similarly, while the *Bloomberg News* article mentions "informal incident reports," which presumably are MDRs, these data already were publicly available and, therefore, already reflected in Intuitive's stock price (assuming that the market for Intuitive's stock is efficient).

59.     Second, the information revealed by the alleged corrective disclosure could not have been disclosed by Defendants as of the dates of the prior alleged misrepresentations except perhaps for February 4, 2013 when the Company filed its 2012 10-K.  The *Bloomberg News* article discusses lawsuits and MDRs that occurred in 2012 and lawsuits filed in the "last 14 months," neither of which the Company could have disclosed on the alleged misrepresentation dates prior to the end of 2012.

60.     For the aforementioned reasons, the alleged corrective disclosure on March 5, 2013 does not demonstrate price impact.

---

96. "Procedure expansion driven by quality of outcomes and safety," William Blair, February 6, 2013.
97. *Id.*

### 3. The alleged corrective disclosure on April 18, 2013 does not demonstrate price impact

61.     Plaintiffs allege that the Company's announcement of Q1 2013 financial results constitutes a corrective disclosure.  Specifically, Plaintiffs point to the Company's disclosure that procedure growth of 18 percent was below consensus expectations of 21 percent and that Company revised procedure growth for 2013 to the lower end of the previously disclosed range of 20 to 23 percent.[98]  Plaintiffs quote an analyst at Leerink Swann noting that "light procedures and a more cautious outlook could overshadow the strong 1Q performance – especially given recent negative press/journal articles/lawsuit attention that, in our view, have heightened investor sensitivity around da Vinci's utilization.[99]  Plaintiffs further state that "other analysts also attributed … lack of procedure growth to the recent 'negative press.'"[100]

62.     Event study analysis shows that Intuitive's residual return on April 19, 2013 is -2.59 percent, with a t-statistic of -1.41, indicating that the return is not statistically signficant at the 95 percent confidence level.[101]  Contrary to the Plaintiffs' assertion, the alleged corrective disclosure on this date cannot be used to demonstrate price impact.

63.     The information revealed by the alleged corrective disclosure on April 18, 2013 is substantively different from the alleged misrepresentations.  *Nothing* in

---

98. Amended Complaint, ¶ 176.
99. *Id*.
100.    *Id*.
101.    Mr. Coffman finds that the residual return on April 19, 2013 is -3.15 percent with a t-statistic of -1.78, statistically significant at the 95 percent confidence level for a one-tailed test.  Coffman Report, Appendix C, at 13.

this alleged corrective disclosure pertains to the allegedly misrepresented information about the three Claims.  Information regarding the Letters Claim was not publicly disclosed on April 18, 2013 and therefore could not be expected to affect the Company's stock price on this date.  Insofar the previous disclosures of information regarding MDRs and product liability lawsuits had caused investors to conclude that there was increased risk of a shortfall in procedures growth, then, at most, the announcement of lower than expected procedure growth on April 18, 2013 represents the materialization of a known risk.

64.      The information revealed by the alleged corrective disclosure also could not have been disclosed by Defendants as of the dates of the prior alleged misrepresentations.  Plaintiffs do not allege that the Company misrepresented its prior guidance of procedure growth or that the Company should have disclosed its procedure growth prior to April 18, 2013.  The Company could not have disclosed how "negative news" as Plaintiffs allege would have affected Q1 2013 prior to the end of the quarter, or March 31, 2013, and certainly not as of the beginning of the Class Period.

65.      For the aforementioned reasons, the alleged corrective disclosure on April 18, 2013 does not demonstrate price impact.

### 4. The alleged corrective disclosure on July 8, 2013 does not demonstrate price impact

66.      Plaintiffs allege that the Company's announcement of preliminary Q2 2013 financial results constitutes a corrective disclosure.  Specifically, Plaintiffs point to the Company's disclosure that Q2 2013 results were below expectations in part because of

weaker-than-expected da Vinci system sales.[102]  Plaintiffs claim that "analysts remained skeptical that the severe decline was due to economic factors and hospitals cutting capital expenditures."[103]  Contrary to Plaintiffs' claim, the decline in Intuitive's stock price on this date does not demonstrate price impact.

67.     Event study analysis finds a residual return of -16.24 percent on Intuitive's stock price on this date, with a t-statistic of -8.82, indicating that the return is statistically significant at the 95 percent level.  However, there is no reliable basis to conclude that the decline in Intuitive's stock price on this date is attributable to the alleged corrective disclosure, as opposed to other information about Intuitive that was released on this day.

68.     First, as discussed in ¶¶ 30-37 above, the information regarding the three Claims had already been disclosed prior to July 8, 2013.  Therefore, insofar that the market for Intuitive's stock is efficient, the allegedly concealed information was fully reflected in Intuitive's stock price prior to July 8, 2013 and could not be expected to have a further impact on Intuitive's stock price on July 8, 2013.

69.     Second, the information in the alleged corrective disclosure about Intuitive's Q2 2013 financial results could not have been disclosed by Defendants as of the dates of the prior alleged misrepresentations.  Plaintiffs do not allege that the Company misrepresented its prior guidance or that the Company should have disclosed its Q2 2013

---

102.    Amended Complaint, ¶ 177.
103.    *Id.*

financial results prior to July 18, 2013.  Even if, hypothetically, one assumes that the allegedly concealed information contributed to Intuitive's shortfall in Q2 2013 earnings, this could not have been disclosed before the Defendants learned of the Company's Q2 2013 financial results.  If, hypothetically, the allegedly concealed information might have increased the risk of such an earnings shortfall, the announcement of the shortfall on July 8, 2013 reflects a materialization of the risk.  And, as stated above, because the allegedly concealed information had been disclosed prior to July 8, 2013, this risk, if it existed at all, would have been a *known* risk to the market prior to July 8, 2013.

70.     For the aforementioned reasons, the alleged corrective disclosure on July 8, 2013 does not demonstrate price impact.

### 5. The alleged corrective disclosure on July 18, 2013 does not demonstrate price impact

71.     Plaintiffs allege that the Company's disclosure of the FDA Warning Letter constitutes a corrective disclosure.[104]  Contrary to Plaintiffs' claim, there is no reliable basis to conclude that the alleged corrective disclosure on this date demonstrates price impact.  Event study analysis reveals that the residual return on Intuitive's stock price on July 18, 2013 was -6.69 percent and statistically significant at the 95 percent level. However, there is no reliable basis to conclude that the decline in Intuitive's stock price on

---

104.    Amended Complaint, ¶ 178.  Plaintiffs also mention that "Intuitive reported Q2 2013 financial results consistent with its July 8, 2013 pre-announcement" but do not allege that that information constituted a corrective disclosure.  Plaintiffs also do not allege that the lower than expected guidance by the Company constitutes a corrective disclosure.

this date is attributable to the alleged corrective disclosure, as opposed to other information about Intuitive that was released on this day.

72.      First, the information revealed in the FDA Warning Letter on July 18, 2013 contained no new information regarding the Claims.  Instead, the FDA Warning Letter reiterated information about the Claims that was previously disclosed in the Form 483 released on June 25, 2013.  The only new information in the FDA Warning Letter, which referenced the Form 483, is distinct from the alleged misrepresentations regarding the three Claims.  Analysts recognized that the FDA Warning Letter repeated information that had been previously disclosed in the Form 483.  For example, a SunTrust Robinson Humphrey report states that "the new FDA warning letter is tied to the already known 483s."[105] Similarly, a William Blair report states "The FDA yesterday issued a warning letter to Intuitive related to the previously reported facility inspection and Form 483 observations."[106]  Insofar that the market for Intuitive's stock is efficient, there is no scientific basis to conclude that the allegedly corrective information released on this date had an impact on Intuitive's stock price.

73.      Second, information released about the FDA Warning Letter on July 18, 2013 could not have been disclosed by Defendants as of the dates of the prior alleged misrepresentations.  On the alleged misrepresentation dates, the Company could have disclosed at most that there was a risk that the FDA would issue a Warning Letter at a later

---

105.   "On the Operating Room Table; 2Q Analysis," SunTrust Robinson Humphrey, July 19, 2013.
106.   "Second-Quarter Results in Line With Preannouncement, but Weak Guidance," William Blair, July 19, 2013.

date, but not the *fact* that FDA would issue a Warning Letter.  Yet, this risk was publicly disclosed when the FDA published the Form 483 on its website on June 25, 2013.  Hence, the information regarding the FDA Warning Letter released on July 18, 2013 represents the materialization of a known risk, not the disclosure of an allegedly concealed risk.

74.     For the aforementioned reasons, the alleged corrective disclosure on July 18, 2013 does not demonstrate price impact.

## V.     Mr. Coffman does not demonstrate that alleged class-wide damages can be calculated subject to a well-settled common methodology consistent with Plaintiffs' remaining claims

75.     Mr. Coffman opines that "it is clear that damages in this matter can be calculated using a methodology common to the class.  Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the 'out-of-pocket' method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale…."[107]  Mr. Coffman further claims that "the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations.  This analysis, and the evidence supporting it, would be common to the class."[108]  However, the "most common methodology" by itself cannot account for the facts and circumstances in this case for several reasons as explained below.  Consequently, Mr. Coffman does not demonstrate that

---

107.    Coffman Report, ¶ 72.
108.    *Id.*, ¶ 73.

alleged class-wide damages can be calculated in this matter subject to a well-settled and common methodology consistent with Plaintiffs' remaining claims.

76.     As explained above, there is no reliable basis to conclude that event study analysis of Intuitive's stock price on the alleged misrepresentation and alleged corrective disclosure demonstrates price impact.  For the same reasons, the event study methodology proposed by Mr. Coffman does not provide a reliable estimate of the alleged inflation, if any, in Intuitive's stock price during the Class Period that is due to the alleged misrepresentations.  As a result, Mr. Coffman does not establish that he has a reliable methodology to estimate the alleged artificial inflation in Intuitive's stock price and class-wide damages in this matter.

77.     Moreover, Plaintiffs claim multiple alleged misstatements regarding the alleged safety of the da Vinci during the Class Period.  Mr. Coffman's methodology does not isolate the effect of each alleged misstatement on Intuitive's stock price.  As a result, Mr. Coffman has not proposed a methodology that would allow him to adjust his estimate of alleged inflation if the Court finds Defendants liable for some but not all of the alleged misstatements.  As presently described Mr. Coffman's estimate of per share inflation is identical regardless of whether the Court finds Defendants liable for one, some, or all of the alleged misstatements.  Similarly, Mr. Coffman's estimate of per share inflation is identical regardless of whether the Court finds Defendants liable for one or more of the Claims.

78.     Mr. Coffman does not provide a reliable methodology for disaggregating the effects on Intuitive's stock price of confounding information released on

the alleged corrective disclosure dates from the effects, if any, of the alleged corrective

disclosures.  This is particularly relevant for the alleged corrective disclosures on April 18,

2013, July 8, 2013, and July 18, 2013 when confounding negative information about

Intuitive was released concurrently with the alleged corrective disclosure.

79.     Plaintiffs claim that the news of the FDA survey and possible safety

concerns impacted Intuitive's Q1 2013 financials as announced on April 18, 2013 and its

preliminary Q2 2013 financials as announced on July 8, 2013, which in turn allegedly

impacted Intuitive's stock price.[109]  Even if one hypothetically assumes that Plaintiffs'

allegations are true, in order to estimate the artificial inflation in Intuitive's stock price

caused by the alleged misrepresentations, Mr. Coffman must show how he will reliably

estimate (1) the impact on the Company's financials from the allegedly concealed

information as opposed to other factors (seasonality, lower admission rates, lower capital

expenditure spending by hospitals, and so forth), (2) the impact on the Company's financials

from the revelation of the alleged fraud as opposed to other "negative news" (e.g., AAGL,

JAMA, ACOG), and (3) the impact of the resulting change in the Company's financials on

the Company's stock price.  An event study, as proposed by Mr. Coffman, by itself cannot

be used to analyze any of these three issues in a reliable way.

80.     Similarly, Mr. Coffman's proposed event study cannot be used to

assess what portion of the stock price decline on July 19, 2013, if any, was caused by the

Company's disclosure that it had received an FDA Warning Letter as opposed to other news

_____

109.    Order, at 4.

released by the Company, namely lower than expected guidance and reimbursement issues in Japan.  In fact, as discussed in the previous section, analyst commentary suggests that most, if not all, of the decline on that day was caused by the Company's lowered guidance, which Plaintiffs do not allege is a corrective disclosure.

Intuitive Surgical (ISRG) reported 2Q13 results that were inline with the negative pre-announcement [], but significantly cut guidance and suggested that the pressure on system placements will continue into 2H. Along with the guidance cut, management also commented that they do not expect additional procedures to gain reimbursement in Japan during the April 2014 insurance revision, a clear negative, given that many investors view Japan as one of the primary growth drivers in the future (and since reimbursement can only be obtained every other year, ISRG is unlikely to see additional procedures covered until 2016).[110]

Lowered Guidance Reflects Persisting Procedure/System Headwinds. Bottom Line: ISRG's lowered 2013 sales growth outlook, though anticipated (following last week's preannouncement), was even lower than we and the Street had expected. While we could gradually begin to get more constructive on ISRG following yet another expectation (and stock price) "re-set," for now we stay at MP pending greater clarity: (1) slowing system trends are more macro/transient vs. structural in nature, and/or (2) that increased adoption into key general surgery applications can begin to offset incremental headwinds in benign dvH. Our valuation reduces to $410 (vs. $560).[111]

Last night, Intuitive Surgical provided updated guidance that now reflects a meaningfully weaker system placement outlook for the remainder of 2013. Sales and net income for 2Q13 were largely in-line with the lower-than-expected preliminary results announced earlier this month, reflecting soft GYN growth that drove weaker-than-expected procedure volumes and lower y/y U.S. unit placement. Guidance now calls for 2013 sales growth to be flat

---

110.   "Perfect Storm – Guidance Slashed, Additional Japan Reimbursement Unlikely in 2014, and FDA Warning Letter Received," J.P. Morgan, July 19, 2013.

111.   "Lowered Guidance Reflects Persisting Procedure/System Headwinds," Leerink Partner*s*, July 19, 2013.

to +7% versus the prior "high-end" of 16-19% range, reflecting declining system sales in 2H13. We expect estimates to move lower to reflect the revised 2013 outlook but we are inclined to think management's new outlook reflects a conservative view for the remainder of the year that to us seems achievable, possibly beatable….Updated guidance now reflects a lower and wider range given uncertainty around benign GYN growth and the resulting impact to U.S. system placements.[112]

81.     Mr. Coffman's proposed methodology also does not describe how he plans to address the fact that both an alleged misrepresentation as well an alleged corrective disclosure were made on April 18, 2013.[113]  According to Plaintiffs' claims, the alleged corrective disclosure had a negative effect on Intuitive's stock price, whereas the alleged misrepresentation had the effect of either adding artificial inflation to Intuitive's stock price or maintaining some amount of the alleged inflation in Intuitive's stock price.  Given that there was not a statistically significant decline in Intuitive's stock price on April 19, 2013, Plaintiffs' claim must be that but for the alleged misrepresentation on this date Intuitive's stock price would have declined further.  But Mr. Coffman has not described a reliable methodology for parsing the alleged countervailing effects of the alleged corrective disclosure and the alleged misrepresentation on Intuitive's stock price on April 19, 2013, nor am I aware of a reliable methodology that is capable of doing this.

82.     Mr. Coffman also provides no reliable basis to assume that the impact of any alleged misrepresentations regarding any of the Claims would have been the same at the start of the Class Period as it was at the end of the Class Period or at any point in

---

112.    "ISRG: Lowered 2013 Guidance Appears Conservative," Wallach Beth Capital, July 19, 2013.

113.    Amended Complaint, ¶¶  176, 211-215.

between.   This appears important because the number of lawsuits and negative public press

distinct from the allegations, i.e., the statements by AAGL and ACOG and the study in

JAMA, was substantially more prevalent during the period of the alleged corrective

disclosures as opposed to at the beginning of the Class Period.

83.     In sum, Mr. Coffman has failed to demonstrate a reliable

methodology for calculating class-wide damages in this matter.


_____

Kenneth M. Lehn

# Appendix A

# Appendix A
# Description of Event Study Methodology

1.      Event study analysis is a method commonly used in financial economics to estimate the relation between releases of new information and changes in a company's security prices.[1] Event study analysis takes into account the association between a company's stock returns and the corresponding returns on market and/or industry indices on the relevant event dates.  This is typically done by using regression analysis to estimate the historical relation between a company's stock returns and the corresponding returns on the market index and/or industry index.  Parameters from the regression model are then used along with the actual performance of the market index and/or industry index on the day in question to estimate an expected return.  The expected return is then subtracted from the actual return to estimate a residual return (sometimes referred to as an "abnormal return" or "market-adjusted return") on the relevant event date.

2.      In event study analysis, it is conventional to test the "null hypothesis" that the residual return is zero against either the alternative hypothesis that the residual return is different from zero, or the alternative hypothesis that the residual has a particular sign (i.e., it is positive, or it is negative).[2]  If the null hypothesis cannot be rejected at conventional levels of significance, then the residual returns are not considered to be statistically significant, i.e., they are not considered to be significantly different from zero.  Under these circumstances, one cannot conclude that the observed residual return on the relevant date is attributable to the firm-specific information released on that date.

---

1.  See, e.g., A.Craig MacKinlay, "Event Studies in Economics and Finance," 35 Journal of Economic Literature (March 1997), 13-39.
2.  See, e.g., John Y. Campbell, Andrew W. Lo, & A. Craig MacKinlay, The Econometrics of Financial Markets, (Princeton University Press, 1997), at 160-66; A. Craig MacKinlay, "Event Studies in Economics and Finance," 35 Journal of Economic Literature (March 1997), 13-39; G. William Schwert, "Using Financial Data to Measure Effects of Regulation," 24 Journal of Law and Economics (1981), 121-57; Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 The Business Lawyer (1982), 1-20, at 19.

3.      In event studies, the statistical significance of the residual returns is assessed by calculating a standardized measure of the size of the residual return known as a "t-statistic."  A t-statistic with an absolute value of 1.96 or greater denotes statistical significance at the five percent level of significance (a conventional level at which such assessments are made) in a "two-tailed" test of statistical significance.[3]  In a two-tailed test, the null hypothesis is that the residual return is zero, and the alternative hypothesis is that the residual return is different from zero (i.e., either positive or negative).  A t-statistic with an absolute value of 1.65 or greater denotes statistical significance at the 5 percent level of significance in a "one-tailed" test of statistical significance.[4]  In a one-tailed test, the null hypothesis is that the residual return is zero, and the alternative hypothesis is that the residual return has a particular sign (e.g., it is positive).

4.      I tested various market and industry indices in order to determine the combination that provided the highest explanatory power for Intuitive's stock price returns during the Class Period.[5]  I analyzed the market indices to which Intuitive compared itself, as listed in Intuitive's Form 10-K filings: the S&P 500 Total Return Index and the NASDAQ Composite Index.  I also analyzed the following market indices: equal- and value-weighted versions of the CRSP NYSE/AMEX/NASDAQ, and CRSP NASDAQ Return indices.  For peer indices, I analyzed the S&P Healthcare Index (identified in Intuitive's Form 10-K filings) excluding Intuitive's common stock price movements.  Finally, I also counted the number of times that analysts who covered Intuitive during the Class Period mentioned comparable companies.  I constructed equal- and value-weighted

---

3.  See, *e.g*., W. Mendenhall, J.E. Reinmuth & R.J. Beaver, Statistics for Management and Economics (Duxbury Press, 1993), at 346-47.

4.  Id.

5.  I excluded alleged misrepresentation and alleged corrective disclosure dates from my regression analysis, *i.e*., the following dates were excluded: February 6, 2012, April 19, 2012, July 23, 2012, October 19, 2012, February 5, 2013, March 14, 2013, April 19, 2013, February 28, 2013, March 1, 2013, March 6, 2013, July 9, 2013, and July 19, 2013.

indices consisting of firms that were mentioned by one or more analysts, two or more analysts, three or more analysts, four or more analysts, five or more analysts, and six or more analysts.[6]

     5.     Based on the model with the highest explanatory power (i.e., adjusted R-squared), I determined that there was one structural break during the Class Period, resulting in two different estimation periods within the Class Period.  For each estimation period, I again regressed Intuitive's stock price returns on each combination of market and industry returns to assess which model had the highest explanatory for each estimation period.[7]  I used those models to estimate Intuitive's residual return on the alleged misrepresentation dates and alleged corrective disclosure dates.  My results are reported in the table below.

---

6.  The comparable companies mentioned by equity analysts are: Abbott Laboratories, Accuray Inc., Agilent Technologies, Allergan, Arthrocare, Baxter International Inc., Becton, Dickinson and Company, Boston Scientific, CareFusion, Covidien, CR Bard Inc., Dentsply, Edwards Lifesciences, Given Imaging, Haemonetics, Hansen Medical, Hill-Rom Holdings, Inc., Hologic, Inc., Hospira, Integra Lifesciences, Johnson & Johnson, Life Technologies, Mako Surgical, Masimo, Medtronic, Mindray Medical, Natus Medical, Nuvasive Inc., ResMed, Sirona, Smith & Nephew, Sterotaxis Inc., Steris, St. Jude Medical, Stryker Corp., Thermo Fisher Scientific, Thoratec Corp., Varian, Volcano, Zimmer Holdings, Tornier NV, Cardionet Inc., Abiomed, and Globus Medical.

7.  For the period February 6, 2012 through December 12, 2012, the regression model in which the (i) CRSP NASDAQ Value-Weighted Return index and (ii) an equal-weighted industry index consisting of firms that one or more analysts considered to be comparable to Intuitive served as independent variables had the highest adjusted R-squared (i.e., the most explanatory power).  For the period December 13, 2012 through July 19, 2013, the regression model in which the (i) CRSP NASDAQ Value-Weighted Return index and (ii) an value-weighted industry index consisting of firms that four or more analysts considered to be comparable to Intuitive served as independent variables had the highest adjusted R-squared (i.e., the most explanatory power).

# Intuitive Surgical

|  | Model 1[1] | Model 2[2] |
|---|---|---|
| Intercept | 0.00 | 0.00 |
|  | (0.44) | (-0.35) |
| Market Index | 0.63 | 0.52 |
|  | (4.09) | (1.91) |
| Industry Index | 0.50 | 0.27 |
|  | (3.32) | (1.06) |
| Adjusted $R^2$ | 0.46 | 0.53 |

Notes:

T-statistics in parentheses.  T-statistics with an absolute value greater than 1.96 denote statistical significance at the 95 percent confidence level.

[1] Residual returns and t-Statistics are from the regression of Intuitive Surgical, Inc. stock returns on the CRSP NASDAQ value-weighted return w/divs and an equal-weighted portfolio consisting of firms that were compared to Intuitive by one or more analysts during the class period. The model is estimated from February 6, 2012 to December 12, 2012. Dates on which alleged misrepresentations and alleged corrective disclosures were made are removed from the estimation period.

[2] Residual returns and t-Statistics are from the regression of Intuitive Surgical, Inc. stock returns on the CRSP NASDAQ value-weighted return w/divs and a value-weighted portfolio consisting of firms that were compared to Intuitive by four or more analysts during the class period. The model is estimated from December 13, 2012 to July 19, 2013. Dates on which alleged misrepresentations and alleged corrective disclosures were made are removed from the estimation period.

Sources: Bloomberg, LP; CRSP 1962 US Stock and Indexes Database ©2015 The University of Chicago on behalf of its Center for Research in Security Prices (CRSP®) at Chicago Booth.

# Exhibit A

**October 2015**

**Kenneth Lehn**
**Curriculum Vitae**

Katz Graduate School of Business
University of Pittsburgh
278-B Mervis Hall
Pittsburgh, Pa. 15260
phone: (412) 648-2034
fax:    (412) 624-2875
e-mail: lehn@katz.pitt.edu

**Education**

Ph.D., Washington University, 1981 (Economics)
M.A., Miami University, 1976 (Economics).
B.A., Waynesburg College, 1975 (Economics).

**Employment**

Samuel A. McCullough Professor of Finance, March 1999-present; Professor of Business
Administration, September 1991-March 1999; Katz Graduate School of Business, University of
Pittsburgh.

Affiliated Professor of Law, School of Law, University of Pittsburgh, September 1997-present.

Director, Center for Research on Contracts and the Structure of Enterprise, University of
Pittsburgh, 1991-2001.

Chief Economist, U.S. Securities and Exchange Commission, June 1987-July 1991.

Adjunct Professor of Law, Georgetown University, 1990-1991.

Assistant Professor of Business and Public Policy, School of Business Administration,
Washington University, 1981-1987.

Research Associate, Center for the Study of American Business, Washington University, 1986-
1987.

Visiting Assistant Professor of Economics, University of California, Los Angeles, 1986.

Deputy Chief Economist, U.S. Securities and Exchange Commission,  1984-1985.

Instructor of Economics, Miami University, 1976-1977.

**Courses Taught**

Corporate Finance (MBA)
Applied Corporate Finance (MBA)
Valuation (MBA)
Creating Value through Restructuring (MBA)
Organization of Securities Markets (Undergraduate)
Business and Public Policy (Undergraduate, MBA, Executive)
Corporate Governance (Doctoral)
Finance for Lawyers (Law)

**Teaching Awards**

MBA Teacher of the Year (Pittsburgh), nine times.
MBA Teacher of the Year (Washington U.), 1987.
Undergraduate Teacher of the Year (Washington U.), 1981.

**Publications**

**Books**

*Modernizing U.S. securities regulation: economic and legal perspectives*, ed. with Robert W. Kamphuis, Jr., Homewood, Ill.: Business-One Irwin, 1993.

**Published Papers**

"Employee-management trust and M&A activity," with Leonce Bargeron and Jared Smith, *Journal of Corporate Finance*, forthcoming.

"Limited liability and share transferability: an analysis of California firms, 1920-1940," with Leonce Bargeron, *Journal of Corporate Finance*, forthcoming, May 2015.

"Disagreement and the informativeness of stock returns: the case of acquisition announcements," with Leonce L. Bargeron, Sara B. Moeller, and Frederik P. Schlingemann, *Journal of Corporate Finance*, April 2014, 155-172..

"Financing the business firm," with Leonce Bargeron in *The Oxford Handbook in Managerial Economics*, edited by William Shughart and Christopher Thomas, Oxford University Press, 2013.

3

"Sarbanes-Oxley and corporate risk-taking," with Leonce Bargeron and Chad Zutter, *Journal of Accounting and Economics*, February 2010, 34-52.

"Determinants of the size and structure of corporate boards: 1935-2000," with Sukesh Patro and Mengxin Zhao, *Financial Management*, Winter 2009, 747-780.  Received Pearson/Prentice-Hall Award for second best paper published in *Financial Management* during 2008-2010.

"The subprime crisis and systemic risk: evidence from U.S. securities markets," with Leonce Bargeron and Mehmet Yalin, *Globalization and Systemic Risk*, edited by Douglas D. Evanoff, David S. Hoelscher, and George G. Kaufman, World Scientific Publishing, 2009, 299-312.

"The CISG: perspectives from an economist," *The CISG and the business lawyer*, edited by Ronald Brand, Harry Flechtner, and Mark Walter, Oxford University Press, 2007, 261-265.

"Governance indexes and valuation: which causes which?," with Sukesh Patro and Mengxin Zhao, *Journal of Corporate Finance* 13 (December 2007), 907-928.

 "The rise of the private equity market," with Thomas Boulton and Steven Segal, *New financial instruments and institutions: opportunities and policy challenges*, edited by Yasuyuki Fuchita and Robert Litan, Brookings Institution Press, 2007, 141-161.

"CEO turnover after acquisitions: are bad bidders fired?," with Mengxin Zhao, *Journal of Finance* (August 2006), 1759-1811. Reprinted in *Mergers and acquisitions*, ed. by J. Harold Mulherin, Edward Elgar Publishing, 2012.

"Corporate governance in the deregulated telecommunications industry," *Telecommunications Policy* (May-June 2002), 225-242.

"Growth opportunities and corporate debt policy: the case of the U.S. defense industry, 1980-1995," with Vidhan Goyal and Stanko Racic, *Journal of Financial Economics* (April 2002), 35-59.

"Decentralization, incentives, and value creation: the case of JLG Industries," with Heidi E. Treml, *Journal of Applied Corporate Finance* (Fall 2000), 60-70.  Reprinted in Donald H. Chew and Stuart L. Gillan, *Corporate governance at the crossroads*, McGraw-Hill Irwin, 2005.

"Workforce integration and the dissipation of value in mergers: the case of USAir's acquisition of Piedmont Aviation," with Stacey Kole, *Mergers and productivity*, edited by Steven Kaplan, National Bureau of Economic Research, University of Chicago Press, 2000, 239-279.

"Comment on 'Financial regulatory structure and the resolution of conflicting goals' by Larry D. wall and Robert A. Eisenbeis," *Journal of Financial Services Research,* (September/December 1999), 247-248.

4

"Some observations on Henry Manne's contributions to financial economics," *Case Western Law Review*, (Winter 1999), 263-268.

"Deregulation and the adaptation of governance structures: the case of the U.S. airline industry," with Stacey Kole, *Journal of Financial Economics* (April 1999), 79-118.  Won Second Jensen Prize for Corporate Finance and Organizations in 1999 *JFE* Best Paper Contest.  Reprinted in J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

"The causes and consequences of accounting fraud," with Mason Gerety, *Managerial and Decision Economics* (November-December 1997), 587-599.

"Antitrust franchise relocation in professional sports: an economic analysis of the *Raiders* case," with Michael Sykuta, *Antitrust Bulletin* (Fall 1997), 541-564.

"EVA, accounting profits, and CEO turnover," with Anil Makhija, *Journal of Applied Corporate Finance*, (Summer 1997), 90-97.

"Investor behavior in mass privatization: the case of the Czech voucher scheme," with Archana Hingorani and Anil Makhija, *Journal of Financial Economics* (1997), 349-396.  Reprinted in Diane Denis and John McConnell, *Governance: an international perspective*, Edward Elgar Publishing Ltd., forthcoming 2005.

"Deregulation, the evolution of governance structure, and survival," with Stacey Kole, *American Economic Review Papers and Proceedings* (May 1997), 421-425.

"EVA and MVA as performance measures and signals for strategic change," with Anil Makhija, *Strategy and Leadership* (May/June 1996), 34-38.

"The effect of entry in the local telephone market on the equity values of the Regional Bell Operating Companies," with Kevin Green, *Managerial and Decision Economics*, (July--August 1995), 469-477.

"The SEC's Market 2000 Report," with Corinne Bronfman and Robert A. Schwartz, 19 *Journal of Corporation Law*, 3 (Spring 1994), 523-551.  Modified versions are published in *Financial Review* (published by Ministry of Finance in Japan), Summer 1994, and "U.S. Securities Markets Regulation: Regulatory Structure," in Benn Steil, ed., *International financial market regulation*, (New York: John Wiley and Sons), 1994, 37-74.

"The market for marketplaces: reflections on the SEC's Market 2000 Report," in Robert A. Schwartz, editor, *Global equity markets: technological, competitive and regulatory challenges*, Irwin Professional, 1994.

5

"Regulation of going private transactions," with Jeffry Davis in *Modernizing U.S. securities regulation: economic and legal perspectives*, Kenneth Lehn and Robert W. Kamphuis, Jr., eds., Homewood, Ill.: Business-One Irwin, 1993.

"Information asymmetries, Rule 13e-3, and premiums in going private transactions," with Jeffry Davis, 70 *Washington University Law Quarterly*, (l992), 587-6ll.

"Contractual resolution of bondholder-stockholder conflicts in leveraged buyouts," with Annette Poulsen, *Journal of Law and Economics*, (October l99l), 645-674.  Reprinted in Roberta Romano, *Foundations of corporate law*, Oxford University Press, 1993.

"Institutional ownership of equity: effects on stock market liquidity and corporate long-term investments," with Jonathan Jones and J. Harold Mulherin, in Arnold W. Sametz, ed., *Institutional investors: challenges and responsibilities*, (Homewood, Ill.: Dow-Jones Irwin), 1991, 115-127.

"The case for indexing," in *The effect of index investment policies on corporate governance*, 1991 Annual Colloquium on Corporate Law and Social Policy, University of Toledo Law School, 1991.

"Comment on 'Globalization of financial markets' by Clifford W. Smith, Jr.," in 34 *Carnegie-Rochester Conference Series on Public Policy* (Spring 1991), 97-103.

"Securities regulation during the Reagan Administration: corporate takeovers and the 1987 stock market crash," with Jeffry Davis, in Anandi P. Sahu and Ronald L. Tracy, eds., *The economic legacy of the Reagan years: euphoria or chaos?*, (New York: Praeger Publishers), 1991, 129-140.

"Comment on 'The record of LBO performance' by William Long and David Ravenscraft," in Arnold W. Sametz, ed., *The battle for corporate control*, (Homewood, Ill.: Dow-Jones Irwin), 1991, 547-553.

"The choice between dual class recapitalizations and going private transactions," with Jeffry Netter and Annette Poulsen, 27 *Journal of Financial Economics*, (October 1990), 557-580. Reprinted in J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

"Do bad bidders become good targets?," with Mark L. Mitchell, 98 *Journal of Political Economy* (April 1990), 372-398; reprinted, with some modifications, in 3 *Journal of Applied Corporate Finance* (Summer 1990), 60-69; Donald H. Chew, Jr., ed., *The new corporate finance: where theory meets practice*, New York: McGraw-Hill, 1993, 52-61; Michael J. Brennan, ed.,  *Empirical corporate finance*, Edward Elgar, 2000; and J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

6

"The economics of event risk: the case of bondholders in leveraged buyouts," with Annette Poulsen, 15 *Journal of Corporation Law* (Winter 1990), 199-217.

 "The view from the SEC," in *Proceedings of the 1989 Annual Conference of the Garn Institute of Finance*, University of Utah, 1990, 167-170.

"Public policy towards corporate restructuring," 25 *Business Economics* (April 1990), 26-31.

"Commentary on 'An economic analysis of the Brady Report' by David Haddock," in Gerald P. Dwyer, Jr. and Rik W. Hafer, eds., *The stock market: bubbles, volatility, and chaos*, (Boston, Mass.: Kluwer Academic Publishers), 1990, 197-201.

"View from Washington on leveraged buyouts," in Edward I. Altman, ed., *The high yield debt market*, (Homewood, Ill.: Dow-Jones Irwin), 1990, 154-160.

"Free cash flow and stockholder gains in going private transactions," with Annette Poulsen, 44 *Journal of Finance* (July 1989), 771-787.

"Comment on 'The danger of regulatory overreaction to the October 1987 crash' by Lawrence Harris," 7 *Cornell Law Review* (July 1989), 948-952.

"Leveraged buyouts: wealth created or wealth redistributed?" with Annette Poulsen, in Murray L. Weidenbaum and Kenneth Chilton, eds., *Public policy towards corporate takeovers* (New Brunswick, N.J.: Transaction Publishers), 1988, 46-62.

"Majority-minority relationships -- an economic perspective," 13 *Canada-U.S. Law Journal* (1988), 135-141.

"The economics of leveraged takeovers," with David Blackwell and Wayne Marr, 65 *Washington University Law Quarterly* (1987), 163-191.

"The structure of corporate ownership: causes and consequences," with Harold Demsetz, 93 *Journal of Political Economy* (December 1985), 1155-1177.

"Information asymmetries in baseball's free agent market," *Economic Inquiry* (January 1984), 37-44; reprinted in Brian Goff and Robert D. Tollison, eds., *Sportometrics*, Texas A&M University Press, 1990, 253-261.

"Property rights, risk-sharing, and player disability in major league baseball," 25 *Journal of Law and Economics* (October 1982), 343-356; reprinted in Brian Goff and Robert D. Tollison, eds., *Sportometrics*, Texas A&M University Press, 1990, 35-58.

7

**Other Articles**

"Private insecurities," *The Wall Street Journal*, February 15, 2006.

"How to clean up after corporate scandals," *The Pittsburgh Post-Gazette*, October 6, 2002.

"Soaring labor costs may ground airline merger," *The Wall Street Journal*, May 25, 2000, A26.

"Some observations on the Shad-Johnson accord and SEC-CFTC jurisdiction disputes," in Charles W. Smithson, *Managing financial risk: a guide to derivative products, financial engineering, and value maximization*, McGraw-Hill, 1998.

"Hostile takeovers: some empirical observations," *Corporations, Securities and Antitrust News* (Fall 1996), 1, 10-11.

 "The lessons of Marriott," *The Wall Street Journal*, March 11, 1993.

"A Coase for rejoicing," *The Wall Street Journal*, October 17, 1991.

"Agency evaluates bust-up takeovers," with Mark Mitchell, *National Law Journal* (November 6, 1989), S1, S3-S4; reprinted in the *New York Law Journal* (December 4, 1989).

"Market correction of bad acquisitions," with Mark Mitchell, 3 *Institutional Investor: Global Capital Markets Forum* (April 1989), 53.

"Are takeovers hostile to economic performance?," with John Pound and Gregg Jarrell, *Regulation* (September-October 1986).

"Takeovers don't crimp long-term planning," with Gregg Jarrell, *The Wall Street Journal*, May 1, 1985.

**Policy Reports**

"Institutional ownership, tender offers, and long-term investments," with Gregg Jarrell and Wayne Marr, Office of the Chief Economist, U.S. Securities and Exchange Commission, April 19, 1985.

"Noninvestment grade debt as a source of tender offer financing," Office of the Chief Economist, U.S. Securities and Exchange Commission, 1986.

"The post-offering price performance of closed-end funds," with Kathleen Weiss and David Malmquist, Office of Economic Analysis, U.S. Securities and Exchange Commission, 1989.

8

"Estimating the value of federal deposit insurance," with William C. Dale, Jeffry L. Davis, David Malmquist, and Hank McMillan, Office of Economic Analysis, U.S. Securities and Exchange Commission, 1991.

Letter to Jonathan Katz, Secretary, U.S. Securities and Exchange Commission, on Regulation of Credit Rating Agencies, December 5, 1994.

Testimony concerning disclosure of accounting policies for derivatives and disclosures of quantitative and qualitative information about market risk inherent in market risk sensitive instruments, Subcommittee on Securities, U.S. Senate Committee on Banking, Housing and Urban Affairs, 105th Congress, 1st Session, March 4, 1997.

**Consulting**

Retained by counsel for various firms and government agencies, including Akin Gump; Arnold & Porter; Arthur Cox; Australian Taxation Office; Baker Botts; Barber & Bartz; Bass, Berry & Sims; Bryan Cave; Buchanan Ingersoll; Cadwalader, Wickersham & Taft; Clifford Chance; Cornell & Gollub; Covington & Burling; Cravath, Swaine and Moore; Crowell & Moring; Davis Graham & Stubbs; Davis Polk & Wardwell; Dechert; DLA Piper; Dorsey & Whitney; Gibson, Dunn, & Crutcher; Fried, Frank, Harris, Shriver & Jacobson; Fulbright & Jaworski; Heller Ehrman; Hogan & Hartson;  Howrey, Hughes Hubbard & Reed; Irell & Manella; Jones Day; King & Spalding; Kirkland & Ellis; K&L Gates; Kramer Levin Naftalis & Frankel; Latham & Watkins; Lowenstein Sandler; Mayer Brown; McDermott, Will, & Emery; McGuireWoods; Milbank, Tweed, Hadley & McCoy; Morgan, Lewis, & Bockius; Morris, Nichols Arsht & Tunnel; Morrison & Foerster; Nossaman; O'Melveny & Myers; Orrick; Paul, Weiss, & Rifkind; Pepper Hamilton; Pillsbury Winthrop Shaw & Pitman; Proskauer & Rose; Quarles & Brady; Richards, Layton & Finger; Segal McCambridge Singer & Mahoney; Shearman & Sterling; Shook, Hardy & Bacon; Sidley; Simpson Thacher, & Bartlett; Skadden, Arps, Slate, Meagher, & Flom; Steptoe & Johnson; Sullivan & Cromwell; U.S. Securities and Exchange Commission; U.S. Department of Justice; Wachtell, Lipton, Rosen & Katz; Weil Gotshal; Williams & Connolly; Willkie Farr & Gallagher; WilmerHale; Wilson Sonsini; and Winston & Strawn.

Retained as Independent Distribution Consultant for Pilgrim Baxter & Associates, Federated Investors, Hartford Financial, Wachovia Corp. and GAMCO.

**Recent Expert Witness Testimony**

Peggy Roif Rofstain, et al. on behalf of themselves and all others similarly situated v. Trustmark National Bank, et al., U.S. District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:09-CV-02384-N-BG, deposition testimony, New York, N.Y., October 14, 2015.

9

In Re HP Securities Litigation, U.S. District Court, Northern District of California, San Francisco Division, Master File No. c-12-5980-CRB, deposition testimony, New York, N.Y., January 19, 2015.

Mary K. Jones, et al. v. Pfizer, Inc., et al., U.S. District Court, Southern District of New York, No. 10-cv-3864 (AKH), deposition testimony, New York, NY, October 2014.

In Re: Activision Blizzard, Inc. Stockholder Litigation, Court of Chancery of the State of Delaware, Consolidated C.A. No. 8885-VCL, deposition testimony, New York, NY, October 2014.

Sue Ann Hamm, In Re the Marriage of, v. Harold Hamm, District Court Of Oklahoma County, State Of Oklahoma, FD-2012-2048, trial testimony, Oklahoma City, OK, September 2014.

In Re: Adelphia Communications Corporation Securities and Derivative Litigation, relating to Island Partners, et al. v. Deloitte & Touche LLP, U.S. District Court, Southern District of New York,  05-CV-2770, deposition testimony, Philadelphia, PA, September 2014.

In Re: Lehman Brothers Securities and Erisa Litigation, U.S. District Court, Southern District of New York, 09-MD-2017 (LAK), deposition testimony, New York, N.Y., June 2014.

Sue Ann Hamm, In Re the Marriage of, v. Harold Hamm, District Court Of Oklahoma County, State Of Oklahoma, FD-2012-2048, deposition testimony, Oklahoma City, OK, June 2014.

Sandalwood Debt Fund A, Sandalwood Debt Fund B, and Hudson Investment Partners v. BDO USA LLP and BDO Seidman LLP, Superior Court of New Jersey, Law Division, Essex County, Docket No. L-9016-11, deposition testimony, Short Hills, N.J., April 2014.

Bettina M. Whyte, as Trustee of the Semgroup Litigation Trust, vs. PriceWaterhouseCoopers, LLP, District Court In and For Tulsa County, State of Oklahoma, Case No. CJ-2010-04042, Daubert hearing, Tulsa, OK, January 2014.

Louis Pagnotti, Inc., et al. vs. Deloitte and Touche, LLP, Court of Common Pleas of Luzerne County, 104-CV-04967-JMF, deposition testimony, New York, N.Y., October 2013.

Securities and Exchange Commission vs. Life Partners, Inc., et al., United States District Court for the Western District of Texas, Austin Division, 1-12-CV-00033-JRN, deposition testimony, New York, N.Y., August 2013.

Bettina M. Whyte, as Trustee of the Semgroup Litigation Trust, vs. PriceWaterhouseCoopers, LLP, District Court In and For Tulsa County, State of Oklahoma, CJ-2010-04042, deposition testimony, July 2013.

10

Raymond M. Pfeil, et al. v. State Street Bank & Trust Company, United States District Court Eastern District Of Michigan, Southern Division, 2:09-CV-12229-DPH-VMM, deposition testimony, New York, N.Y., March 2013.

CMMF, LLC v. J. P. Morgan Investment Management, Inc. and Ted C. Ufferfilge, Supreme Court Of The State Of New York, County Of New York, 09-601924, trial testimony, New York, N.Y., January 2013.

CMMF, LLC v. J. P. Morgan Investment Management, Inc. and Ted C. Ufferfilge, Supreme Court Of The State Of New York, County Of New York, 09-601924, deposition testimony, New York, N.Y., September 2012.

In Re Refco Securities Litigation, United States District Court Southern District of New York, 07-MD-1902 (GEL), deposition testimony, New York, N.Y., September 2012.

Securities and Exchange Commission v. Michael W. Perry and A. Scott Keys, United States District Court Central District Of California, 11-1309-R (JCx), deposition testimony, Washington, D.C., May 2012.

Lissa Rohlik vs. I-Flow Corporation, United States District Court, Eastern District of North Carolina (Southern Division), 7:10-CV-00173-FL, deposition testimony, Pittsburgh, Pa., May 2012.

City of Livonia Employees' Retirement System, et al. vs. Wyeth et al., United States District Court Southern District Of New York, 07-CV-10329-RJS, deposition testimony, New York, N.Y., February 2012.

In Re Delphi Financial Group Shareholder Litigation, Court of Chancery of the State of Delaware, 7144-VCG, deposition testimony, Wilmington, Delaware, February 2012.

Alaska Electrical Pension Fund et al. v. Pharmacia Corporation et al., United States District Court, District of New Jersey, 03-1519 (AET), deposition testimony, New York, N.Y., October 2011.

Securities and Exchange Commission v. Rajnish Das and Stormy Dean, United States District Court For The District Of Nebraska, 8:10-CV-00102, deposition testimony, Denver, Col., July 2011.

Securities and Exchange Commission v. Lisa Berry, United States District Court, Northern District of California, San Jose Division, C07-04431 RMW, deposition testimony, San Francisco, Ca., May 2011.

11

Joel Krieger, et al., v. Wesco Financial Corporation, et al, Court of Chancery of the State of Delaware, 6176-VCL, deposition testimony, New York, N.Y., April 2011.

Eric Silverman, et al.,v. Motorola, Inc., et al., United States District Court for the Northern District of Illinois, Eastern Division, 07-C-04507, deposition testimony, Washington, D.C., January 2011.

NACCO Industries Inc., et al. v. Applica Inc., et al., United States District Court Northern District of Ohio, CA-2541-VCL, deposition testimony, New York, N.Y., December 2010.

In Re Le-Nature's Inc. Commercial Litigation, United States Judicial Panel on Multidistrict Litigation, MDL 2021, arbitration testimony, Pittsburgh, Pa., December 2010.

Securities and Exchange Commission v. Raj Sabhlok and Michael Pattison, United States District Court, Northern District of California, San Francisco Division, C-08-4238 EMC, trial testimony, San Francisco, Ca., September 2010.

Securities and Exchange Commission v. Angelo Mozilo, David Sambol and Eric Sieracki, United States District Court, Central District of California, CV09-03394 JFW (MANx), deposition testimony, Chicago, Ill., July 2010.

In Re Le-Nature's Inc. Commercial Litigation, United States Judicial Panel on Multidistrict Litigation, MDL 2021deposition testimony, New York, N.Y., June 2010.

In Re John Q. Hammons Hotels Inc. Shareholder Litigation, Court of Chancery of the State of Delaware, 758-CC, trial testimony, Georgetown, Del., June 2010.

In Re John Q. Hammons Hotels Inc. Shareholder Litigation, Court of Chancery of the State of Delaware, 758-CC, deposition testimony, New York, N.Y., April 2010.

Securities and Exchange Commission v. Raj Sabhlok and Michael Pattison, United States District Court, Northern District of California, San Francisco Division, C-08-4238 EMC, deposition testimony, San Francisco, Ca., December 2009.

LDK Solar Securities Litigation, U.S. District Court, Northern District of California, C-07-05182-WHA, deposition testimony, San Francisco, Ca., December 2009.

Makor Issues & Rights Ltd. v. Tellabs, Inc., Supreme Court of United States, 06-484, deposition testimony, Chicago, Ill., October 2009.

David Rogers et al. v. Baxter International, Inc., et al., United States District Court, Northern District Of Illinois, Eastern Division, 06-3241, deposition testimony, Chicago, Ill., September 2009.

12

Mainstay High Yield Corporate Bond Fund v. Heartland Partners et al., United States District Court Eastern District of Michigan, 07-10542, deposition testimony, New York, N.Y., September 2009.

In Re Metropolitan Securities Litigation, United States District Court, Eastern District of Washington, CV-04-25-FVS, deposition testimony, New York, N.Y., September 2009.

27001 Partnership, et al. v. BT Securities Corporation, et al., Circuit Court Of The State Of Alabama,  In And For The County Of Jefferson, CV-04-7487-JLB, deposition testimony, New York, N.Y., August 2009.

Securities and Exchange Commission v. Biovail Corporation et al., United States District Court, Southern District of New York, CIV-02979 (LAK), deposition testimony, New York, N.Y., July 2009.

Eric Silverman, et al.,v. Motorola, Inc., et al., United States District Court for the Northern District of Illinois, Eastern Division, 07-C-04507, deposition testimony, Washington, D.C., June 2009.

Brieger, et al. v. Tellabs, Inc. et al., United States District Court, Northern District of Illinois, Eastern Division, 06-C-1882, trial testimony, Chicago, Ill., May 2009.

DVI Inc. Securities Litigation, United States District Court, Eastern District of Pennsylvania, 03-CV-5336, deposition testimony, Philadelphia, Pa., February 2009.

Brieger, et al. v. Tellabs, Inc. et al., United States District Court, Northern District of Illinois, Eastern Division, 06-C-1882, deposition testimony, Chicago, Ill., January 2009.

Kingsway Financial Services, Inc., et al. v. PriceWaterhouseCoopers, et al., United States District Court, Southern District of New York, 03-C-5560 RMB (HBP), deposition testimony, New York, N.Y., January 2009.

**Board and Committee Memberships**

Economist Intelligence Unit, Advisory Board, 2015–present.
NASD ATC Advisory Committee, 2006-2007.
Shadow Financial Regulatory Committee, 2003-2007.
Allegheny Institute, 2005-2014.
Aristech Receivables, 1998-2001.
Weirton Receivables, 1993-2001.
Borden Receivables, 1994-1996.
Carbide/Graphite Group Receivables, 1993-1996.

13

Economic Advisory Board, The Nasdaq Stock Market, 1996-1998.
Academic Advisory Council, Turnaround Management Association, 2000–present.
Advisory Board, Mobot Inc., 2000.

**Journal and Other Refereeing**

*American Economic Review*, *Economic Inquiry*, *Economic Journal*, *Financial Management*, *Harvard Business School Press*, *Irwin Publishing*, *Journal of Accounting, Auditing and Finance*, *Journal of Business*, *Journal of Comparative Economics*, *Journal of Corporate Finance*, *Journal of Economics and Management Strategy*, *Journal of Finance*, *Journal of Financial Economics*, *Journal of Financial and Quantitative Analysis*, *Journal of Law and Economics*, *Journal of Law, Economics, and Organization*, *Journal of Managerial Accounting Research*, *Journal of Political Economy*, *Management and Decision Economics*, *National Research Council Canada*, *National Science Foundation*, *Quarterly Journal of Economics*, *Rand Journal of Economics*, *The Accounting Review*, *The Financial Review*, *University of Chicago Press*.

**University Service**

Committee on Business School Centers (chair), 2011-2012.
Dean Search Committee for Katz School of Business, 2005-2006.
Promotion and Tenure Committee, Katz Graduate School of Business, 2004-2006., 2008-present.
Distinguished Faculty Committee, 2003-2005.
Executive Committee, Katz Graduate School of Business, 1994-1995 (co-chair); 1998-2001 (co-chair, 2000); 2008-2011; 2013-present.
Appeals Panel for Grievance over Denial of Tenure (chair), 1999.
Steering Committee for University's Reaccreditation with Middle States Association, 1999.
Promotion and Tenure Committee, Katz Graduate School of Business, 1999-2001.
Dean Search Committee for Katz Graduate School of Business, 1995.
Internal Review Committee for Economics Department (chair), 1994.
Faculty Appointment Committee, Katz Graduate School of Business, 1993-1994.
MBA Curriculum Committee, Katz Graduate School of Business, 1993.
Retirement Subcommittee, 1992-1993.
Doctoral Policy Committee, Katz Graduate School of Business, 1991-1993; 2003-2005.

**Other Professional Service**

Founding Editor, *Journal of Corporate Finance*, 1992-2001.
Associate Editor, Investment Management and Financial Innovations, 2004-2006.
Associate Editor, *Journal of Financial Research*, 1999-2005.
Associate Editor, *The Financial Review*, 1998-2003.
Associate Editor, *Asia-Pacific Journal of Accounting & Economics*, 2000-2003.
Associate Editor, *International Journal of the Economics of Business Economics*, 1994-present.
Associate Editor, *Pacific-Basin Finance Journal*, 1992-1996.

14

Editorial Board, *Investment Management and Financial Innovations*, 2004-2006.
Advisory Board, *Financial Economics Network*, 1994-present.
Advisory Board, *Journal of Financial Abstracts*, 1994-present.
Advisory Board, *Corporate, Securities, and Finance Law Abstracts*, 1996-present.
Advisory Board, *The Financier*, 1994-2003.
Advisory Board, *The Arbitrageur*, 1998-2003.
Program Committee, 1992, 1993 Pacific Basin Conferences.
Program Committee, 1992 Western Finance Association Meetings.
Program Committee, 1992, 1996, 2007 Financial Management Association Meetings.

**Seminar and Conference Presentations**

AEI-Brookings Joint Center for Regulatory Studies, Allegheny County Bankruptcy Symposium, American Appraisal Association, American Economic Association, American Enterprise Institute, American Finance Association, American Management Association, American Society of Appraisers, Arizona State University, Baruch College, Boston College, California Polytechnic University, Canadian Law and Economics Association, Clemson University, Columbia University, U.S. Department of Justice, DePaul University, Drexel University, Duquesne University, Federal Reserve Bank of Atlanta, Federal Reserve Bank of Chicago, Federal Reserve Bank of New York, Federal Reserve Bank of San Francisco, George Mason University, Georgetown University, Georgia Institute of Technology, Harvard University, Hofstra University, Indiana University, Massachusetts Institute of Technology, Michigan State University, National Bureau of Economic Research, Networks Financial Institute, North Carolina State University, Northeastern University, Northwestern University, Oberlin College, Ohio State University, Ohio University, Pennsylvania State University, Professional Liability and Underwriting Society, Purdue University, Queens University, Southern Methodist University, Texas A&M University, Tulane University, U.S. Chamber of Commerce, U.S. Department of Justice, U.S. Federal Trade Commission, U.S. Securities and Exchange Commission University of California (Los Angeles), University of California (Santa Barbara), University of Chicago, University of Delaware, University of Florida, University of Illinois, University of Kansas, University of Maryland, University of Michigan, University of Missouri, University of Missouri (St. Louis), University of North Carolina, University of Notre Dame, University of Oregon, University of Pennsylvania, University of Rhode Island, University of Rochester, University of South Carolina, University of Southern California, University of Texas, University of Texas (Dallas), University of Utah, University of Virginia, Washington University (St. Louis).

# Exhibit B

**Materials Relied Upon**

**Case Documents and Court Filings**

Amended Class Action Complaint for Violations of the Federal Securities Laws, Spencer Abrams, Individually and on Behalf of All Others Similarly Situated v. Intuitive Surgical, Inc., el al., Case No. 5:13-cv-01920-EJD, October 15, 2013

Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, August 21, 2014

**Expert Reports**

Expert Report of Chad Coffman, CFA, September 1, 2015

**Conference Call Transcripts**

Intuitive Surgical, Inc. Earnings Conference Call, April 18, 2013

Intuitive Surgical, Inc. Earnings Conference Call, July 18, 2013

**Public Filings**

Intuitive Surgical, Inc., Form 10-K for fiscal year ended December 31, 2011

Intuitive Surgical, Inc., Form 10-Q for the quarterly period ended March 31, 2012

Intuitive Surgical, Inc., Form 10-Q for the quarterly period ended June 30, 2012

Intuitive Surgical, Inc., Form 10-Q for the quarterly period ended September 30, 2012

Intuitive Surgical, Inc., Form 10-K for fiscal year ended December 31, 2012

Intuitive Surgical, Inc., Form 10-Q for the quarterly period ended March 31, 2013

Intuitive Surgical, Inc., Form 8-K, April 18, 2013

**Press Releases**

"Study Raises Doubts Over Robotic Surgery," *The Wall Street Journal*, February 19, 2013

"Doctors Surveyed About Safety of Intuitive's Robots for Surgery," *Bloomberg News*, February 28, 2013, 3:55 p.m.

"Intuitive Surgical's Robots Probed for Safety by U.S. Regulator," *Bloomberg News*, February 28, 2013, 3:55 p.m.

"Regulators Safety Review of Intuitive Revealed in Doctor Survey," *Bloomberg News*, February 28, 2013, 3:56 p.m.

"Intuitive Surgical's Robots Probed for Safety by U.S. Regulator," *Bloomberg News*, February 28, 2013, 3:57 p.m.

"MORE: ISRG Robots Probed by FDA After Increase in Adverse Events," *Bloomberg News*, February 28, 2013, 4:51 p.m.

"Intuitive Surgical Robots Probed by U.S. in Surgeon Survey (2)," *Bloomberg News*, February 28, 2013, 6:14 p.m.

"Intuitive Surgical sees last-minute dive on report; Shares drop 11% in final moments of trading on talk of U.S. probe," *MarketWatch*, February 28, 2013, 7:09 p.m.

"Intuitive Robot Probe Threatens Trend Setting Surgeries: Health", *Bloomberg News*, March 1, 2013, 4:05 p.m.

"Robosurgery Suits Detail Injuries as Death Reports Rise," *Bloomberg News*, March 5, 2013, 4:05 p.m.

Intuitive Press Release, March 13, 2013

"Robot Surgery Isn't Most Cost-Efficient Hysterectomy, Group Says," *Bloomberg News*, March 14, 2013, 2:51 p.m.

Intuitive Press Release, April 18, 2013

"Intuitive Surgical Slumps on Da Vinci Growth," *Bloomberg News*, April 19, 2013, 11:25 a.m.

Intuitive Press Release, July 8, 2013

"Intuitive Surgical Falls on da Vinci Robot's Drop in Sales," *Bloomberg News*, July 9, 2013, 4:36PM

"Fear Infects Intuitive Surgical's Future," *The Motley Fool*, July 19, 2013

"Intuitive Reeling as FDA Cites Lack of Visibility on Problems," *Bloomberg News*, July 19, 2013, 9:53 a.m.

"Intuitive Surgical Declines on Warning Letter from FDA," *Bloomberg News*, July 19, 2013, 11:01 p.m.


**Analyst Reports**

"SAGES meeting key for ISRG; Adjusting ests for Japan," Bank of America Merrill Lynch, March 5, 2012

"SAGES meeting an incremental positive for ISRG," Bank of America Merrill Lynch, March 14, 2012

"ISRG: 1Q12 Preview – Raising Estimates; Raising Price Target to $620," Think Equity, April 12, 2012

"Q1 should beat acquiescent consensus, but valuation leaves no room for hiccup," Canaccord Genuity, April 16, 2012

"Strong Q1 as expected; raising price target but still see full valuation; equal weight," Canaccord Genuity, April 17, 2012

"Growth Momentum Continued in 1Q12," Mizuho Securities, April 17, 2012

"ISRG beats again; Invokes Buffet Rule," Bank of America Merrill Lynch, April 18, 2012

"ISRG: Another blowout quarter; A+; significant beat on all metrics; guidance increased; shares up moderately; NEUTRAL," Lazard Capital Markets, April 18, 2012

"ISRG: 1Q12 Review – We See More Room for Upside; Raising Target Price Again," Think Equity, April 18, 2012

"Da Vinci in general surgery: a survey of 56 docs," Bank of America Merrill Lynch, May 23, 2012

"ISRG: Oh Europe; NEUTRAL," Lazard Capital Markets, July 19, 2012

"European Woes Tarnish An Otherwise Solid Quarter," Mizuho Securities, July 19, 2012

"ISRG beats again but lots of moving parts," Bank of America Merrill Lynch, July 20, 2012

"ISRG: Management Reaffirms Our Bullish View on Procedure Volume Growth," Think Equity, August 15, 2012

"3Q12 Recap: As Expected, Some Gives and Takes, but General Surgery is Starting to Drive Growth," JPMorgan, October 16, 2012

"Mixed 3Q12 Results as General Surgery and Japan Offset Prostatectomies and Europe," Mizuho Securities, October 16, 2012

"ISRG: Procedures were surprisingly weak due to US Prostate and Europe; Japan is a bright spot; NEUTRAL," Lazard Capital Markets, October 16, 2012

"Highlights from Management Meeting," Mizuho Securities, November 12, 2012

"Recent Concerns Misplaced; Positive Catalysts Coming Post Q4," Bank of America Merrill Lynch, January 6, 2013

"ISRG: Bear raid creates opportunity; UPGRADING to BUY and establishing a $600 price target," Lazard Capital Markets, January 14, 2013

"A Strong Finish to 2012 as da Vinci General Surgery Gains Ground," Mizuho Securities, January 22, 2013

"ISRG's Q4 answers the critics," Bank of America Merrill Lynch, January 23, 2013

"ISRG 4Q12 Review: Street's Conservative Stance Positions ISRG for a Potentially Big 2013," Janney Capital Markets, January 23, 2013

"Procedure Expansion Driven by Quality of Outcomes and Safety," William Blair, February 6, 2013

"FDA Surveys of Surgeons for Data on da Vinci Routine; Recommend Purchase on Weakness," William Blair, February 28, 2013

"Quick Thoughts on FDA Survey Headlines – ALERT," JPMorgan, February 28, 2013

"The Street May Have Over-reacted on da Vinci: A Key Opinion Leader Says There Is No FDA Investigation on da Vinci," Janney Capital Markets March 1, 2013

"FDA Probe Reaction Way Overdone; Upgrading to BUY and Raising PT to $575," Cantor Fitzgerald, March 1, 2013

"FDA actions mischaracterized in our view; Reiterate Buy," Bank of America Merrill Lynch, March 1, 2013

"MAUDE Analysis Raises No Red Flags," Mizuho Securities, March 1, 2013

"Not without risk, but dislocation provides attractive entry point; Buy," Goldman Sachs, March 1, 2013

"News of Routine Post-marketing Survey Likely to Increase Volatility," JMP Securities, March 1, 2013

"Tempest in a Teapot," Morgan Stanley, March 1, 2013

"New Regulatory Scrutiny of da Vinci Procedures?" Stifel, March 1, 2013

"Smoke, But No Fire," SunTrust Robinson Humphreys, March 1, 2013

"ISRG Volatility Is Potential Boon to Buyers: The Change of da Vinci Having Safety Issues Is Remote," Janney Capital, March 5, 2013

"Erratum: Slower Procedure Growth Mars an Otherwise Spectacular Quarter," Mizuho Securities, April 18, 2013

"ISRG: The debate is likely to continue; BUY," Lazard Capital Markets, April 18, 2013

"1Q13 Review: When Is a Beat Not a Beat? Something Here for Everyone; Reiterate Overweight," JPMorgan, April 19, 2013

"Overall Strong Q1 Results, But Procedure Growth Light; Buy," Canaccord Genuity, April 19, 2013

"1Q Review: Will Overhangs Linger? We Believe ISRG Could Weather the Legal Storm," Janney Capital Markets, April 19, 2013

"Solid 1Q Beat Overshadowed By Light Procedure Growth," Leerink Swann, April 19, 2013

"Feeding the Bears and the Bulls; 1Q Analysis," Suntrust Robinson Humphrey, April 19, 2013

"Monopolar Shipments Resume; MAUDE/MedSun Update Too," SunTrust Robinson Humphrey, June 4, 2013

"Intuitive Surgical (ISRG - OUTPERFORM): 483s Are a Non-Event; Reiterate OUTPERFORM," Wedbush, June 26, 2013

"FORM 483 BENIGN, HANDLED – BUY," Canaccord Genuity, June 26, 2013

"The Latest FDA Warning Letter Does Not Appear to be Significant, In Our View; Any Materially NeMay gative Reaction Could Imply A Short-Term Buying Opportunity," Janney Capital Markets, June 26, 2013

"Near-term hysterectomies look very rocky; longer-term trajectory seems better; BUY," Lazard Capital Markets, July 8, 2013

"Definitely Not What the Doctor Ordered," J.P. Morgan, July 8, 2013

"Q2 Results Deviate Disconcertingly from Trend Line; Downgrade to Hold; Lower Target to $444 from $527," Canaccord Genuity, July 9, 2013

"Pre-announcement Hints at Potentially Fundamental, Long-term Issues; Downgrading to Market Perform," JMP Securities, July 9, 2013

"Disappointing 2Q13 Pre-Announcement for Both System Placements and Procedures," Stifel, July 9, 2013

"Surprisingly Poor U.S. da Vinci Placements, But Decent Procedure Growth; Maintain OUTPERFORM," Wedbush, July 9, 2013

"Intuitive Surgical Plunging after Negative Pre-Announcement (ISRG)," Benzinga, July 9, 2013

"Surprising Q2 miss: implications for ISRG & group," Bank of America Merrill Lynch, July 9, 2013

"Disappointing 2Q13 Preannouncement: Long-term Fundamentals Remain Intact; Expected Weakness Could Be A Buying Opportunity," Janney Capital Markets, July 9, 2013

"It's Still About Procedures," Morgan Stanley, July 17, 2013

"Challenges emerge in Intuitive's core procedures," Morningstar, July 19, 2013

"Q2 As Preannounced; Guidance Reset Amid Uncertain Outlook; Lowering PT; Maintain Hold," Canaccord Genuity, July 19, 2013

"Q313 Review: Too Early to Throw in the Towel, Near-term Expectations Are Lowered, but Long-Term Fundamentals Remain Intact," Janney Capital Markets, July 19, 2013

"Perfect Storm – Guidance Slashed, Additional Japan Reimbursement Unlikely in 2014, and FDA Warning Letter Received," J.P. Morgan, July 19, 2013

"On the Operating Room Table; 2Q Analysis," SunTrust Robinson Humphrey, July 19, 2013

"Lowered Guidance Reflects Persisting Procedure/System Headwinds," Leerink Partners, July 19, 2013

"Intuitive Surgical Disappoints On All Fronts," Trefis, July 19, 2013

"ISRG: Lowered 2013 Guidance Appears Conservative," Wallach Beth Capital, July 19, 2013

"Second-Quarter Results in Line with Preannouncement, but Weak Guidance," William Blair, July 19, 2013

"ISRG: Conservatism, uncertainty, or kitchen sinking it? BUY PT to $450 from $480," Lazard Capital Markets, July 19, 2013

## Published Literature

A.C. MacKinlay, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (March 1997)

"AAGL Position Statement: Robotic-Assisted Laparoscopic Surgery in Benign Gynecology," *Journal of Minimally Invasive Gynecology*, December 20, 2012

Center for Devices and Radiological Health (CDRH), Office of Surveillance and Biometrics (OSB), Medical Product Safety Network (MedSun), Small Sample Survey – Final Report, Topic: da Vinci Surgical System, November 2013

A. Craig MacKinlay, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature* (March 1997)

Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *The Business Lawyer* (1982)

G. William Schwert, "Using Financial Data to Measure Effects of Regulation," 24 *Journal of Law and Economics* (1981)

John Y. Campbell, Andrew W. Lo, & A. Craig MacKinlay, *The Econometrics of Financial Markets*, (Princeton University Press, 1997)

W. Mendenhall, J.E. Reinmuth & R.J. Beaver, *Statistics for Management and Economics* (Duxbury Press, 1993)

Wright et al., "Robotically assisted vs laparoscopic hysterectomy among women with benign gynecologic disease," *Journal of the American Medical Association*, February 20, 2013

## Data Sources

FDA Manufacturer and User Facility Device Experience (MAUDE) database

Bloomberg, L.P.

CRSP 1962 US Stock and Indexes Database ©2015 The University of Chicago on behalf of its Center for Research in Security Prices (CRSP®) at Chicago Booth

Factiva

MAUDE – Manufacturer and User Facility Device Experience,
https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm

Public Access to Court Electronic Records, www.pacer.gov

**Other**

"Statement on Robotic Surgery by ACOG President James T. Breeden, MD," ACOG, March 14,
    2013

FDA Form 483, May 30, 2013, available at ORA FOIA Electronic Reading Room,
http://www.fda.gov/AboutFDA/CentersOffices/OfficeofGlobalRegulatoryOperationsandPolicy/
ORA/ORAElectronicReadingRoom/default.htm

FDA Warning Letter, July 17, 2013

October 10, 2011 letter from Todd Owen, Sr. Manager, Technical Support at Intuitive

October 13, 2011 letter from Richard W. Reeves, Vice President - Regulatory, at Intuitive

October 17, 2011 letter from Todd Owen, Sr. Manager, Technical Support at Intuitive

Weekly list of Field Safety Notices, 24-28 October 2011,
http://webarchive.nationalarchives.gov.uk/20111114231258/http://www.mhra.gov.uk/Safetyinfor
mation/Safetywarningsalertsandrecalls/fieldsafetynotices/CON132029

All other documents and data cited in the report

# Exhibit C

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
### FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 1431 Harbor Bay Parkway | 04/01/2013 - 05/30/2013* |
| Alameda, CA  94502-7070 | FEI NUMBER |
| (510) 337-6700  Fax:(510) 337-6702 | 3001675293 |
| Industry Information: www.fda.gov/oc/industry | |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED

TO:  Gary S. Guthart, President and Chief Executive Officer

| FIRM NAME | STREET ADDRESS |
|---|---|
| Intuitive Surgical, Inc. | 1266 Kifer Rd Bldg 100 |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Sunnyvale, CA  94086-5304 | Medical Device Manufacturer |

This document lists observations made by the FDA representative(s) during the inspection of your facility. They are inspectional observations, and do not represent a final Agency determination regarding your compliance. If you have an objection regarding an observation, or have implemented, or plan to implement, corrective action in response to an observation, you may discuss the objection or action with the FDA representative(s) during the inspection or submit this information to FDA at the address above. If you have any questions, please contact FDA at the phone number and address above.

*The observations noted in this Form FDA-483 are not an exhaustive listing of objectionable conditions. Under the law, your firm is responsible for conducting internal self-audits to identify and correct any and all violations of the quality system requirements.*

**DURING AN INSPECTION OF YOUR FIRM I OBSERVED:**

**OBSERVATION 1**

A correction or removal, conducted to reduce a risk to health posed by a device, was not reported in writing to FDA.

Specifically, Intuitive Surgical, Inc. undertook four field actions on 10/10/2011, 10/13/2011, 10/17/2011, and 01/24/2013 without notifying the San Franciso District Recall Coordinator of these actions.

On 10/10/2011, Intuitive Surgical, Inc. sent out a letter to da Vinci clients with suggestions and recommendations for the proper use of instruments with tip covers and for the correct generators that should be used with monopolar instruments. This action was not reported to the San Franciso District Recall Coordinator. This correction was in response to complaints and MDRs for arcing through damaged tip covers that caused patient injury. Between January 2010 and December 2011, Intuitive Surgical, Inc. received 134 complaints and filed 82 MDRs related to tip cover issues.

On 10/13/2011, Intuitive Surgical, Inc. sent out a letter notifying da Vinci clients that the da Vinci surgical systems are not cleared for thyroidectomy indication. This action was not reported to the San Franciso District Recall Coordinator. The thyroidectomy indication was promoted by Intuitive Surgical Inc. after the firm filed a "Letter to File" under the da Vinci general surgery clearance (K990144) but after questions from CDRH, the firm (b) (4) ████████████████ (b) (4) ██████████████████████ Between July 2009 and October 2011, Intuitive Surgical received 13 complaints and filed 5 MDRs related to thyroidectomies performed with the da Vinci system.

On 10/17/2011, Intuitive Surgical, Inc. sent out a letter to da Vinci clients with information for inspecting instrument cannulas, proper flushing of instruments, and the proper transportation of the da Vinci between buildings. This action was not reported to the San Franciso District Recall Coordinator. Between January 2010 and September 2011, Intuitive Surgical Inc. received 2 complaints related to instrument flush ports and 17 complaints related to cannulas. There were no MDRs directly associated with these complaints, however some of these issues had been previously identified as root causes in other

### AMENDMENT 1

| | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| **SEE REVERSE OF THIS PAGE** | Mary R. Hole, Investigator | | 05/30/2013 |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | **INSPECTIONAL OBSERVATIONS** | PAGE 1 OF 4 PAGES |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 1431 Harbor Bay Parkway<br>Alameda, CA  94502-7070<br>(510) 337-6700  Fax:(510) 337-6702<br>Industry Information: www.fda.gov/oc/industry | 04/01/2013 - 05/30/2013*<br><br>FEI NUMBER<br>3001675293 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED

**TO:** Gary S. Guthart, President and Chief Executive Officer

| FIRM NAME | STREET ADDRESS |
|---|---|
| Intuitive Surgical, Inc. | 1266 Kifer Rd Bldg 100 |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Sunnyvale, CA  94086-5304 | Medical Device Manufacturer |

complaints that gave rise to MDRs (for example, damage to the integity of a tip cover due to defective cannulas was identified as one of the root causes for arcing that resulted in patient injuries). As such these issues represent a risk to the health of patients.

On 01/24/2013, Intuitive Surgical, Inc. sent out a letter and "da Vinci, da Vinci S, and da Vinci Si Surgical Systems User Manual Addendum for Transoral Surgery (TORS) P/N 552003-02 Rev.B 2012.09" to da Vinci clients to replace "da Vinci, da Vinci S, and da Vinci Si Surgical Systems User Manual Addendum for Transoral Surgery (TORS) P/N 552002-01 Rev.C 2011.04". The letter sent to clients clarified the types of patients and conditions for which daVinci TORS is indicated. For example, the new version of the IFU warns that da Vinci TORS surgery is not indicated for pediatric patients, therefore the vagueness in the previous version of the IFU represented a health risk to pediatric patients.

## OBSERVATION 2

Illnesses or injuries that have occurred with use of devices subject to corrections or removals have not been reported.

Specifically, Intuitive Surgical, Inc. failed to report that there were 5 MDRs associated with the field action taken on 10/13/2011 (Thyroidectomy indication withdrawal). The 806 report No. 2955842-101311-004 that was supplied to the San Francisco District Coordinator on 04/11/2013, indicated 0 MDRs in Section 8 on page 3 of 7 of the report. During my inspection of Intuitive Surgical, Inc. 5 MDRs were represented as related to this correction. Intuitive Surgical Inc. failed to report these 5 MDRs on the 806 report provided to the San Francisco District Coordinator on 04/11/2013.

## OBSERVATION 3

Procedures for design change have not been adequately established.

Specifically, Intuitive Surgical, Inc. did not document  the decision to add a thyroidectomy indication to the da Vinci system general laparoscopy clearance 510(k) No. K990144 through Letter to File rather than through the submission of a new 510(k) application. At the time that this decision was made there were no procedures in place to document this design change issue. Effective as of 04/02/2012, Intuitive Surgical, Inc. has such a procedure in place as illustrated by Section 6.8.4 of Design Control SOP, Document: 854005, that requires that regulatory decisions for design changes be documented using DOP 853226 - Global Regulatory Asessment. However there was no retrospective analysis done to determine how to prevent this error from reoccuring, or to assess if the decision to add a thyroidectomy indication to the da Vinci system general laparoscopy clearance 510(k) No. K990144 through Letter to File, or any other regulatory decisions made for any other design changes done before the addition of this section, should have been reassessed utilizing a DOP 853226 - Global Regulatory Assessment to determine if new regulatory submissions should have been filed for those design changes.

## AMENDMENT 1

| | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| **SEE REVERSE OF THIS PAGE** | Mary R. Hole, Investigator | | 05/30/2013 |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 2 OF 4 PAGES |

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 1431 Harbor Bay Parkway<br>Alameda, CA  94502-7070<br>(510) 337-6700  Fax:(510) 337-6702<br>Industry Information: www.fda.gov/oc/industry | 04/01/2013 - 05/30/2013*<br>FEI NUMBER<br>3001675293 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED

| TO:  Gary S. Guthart, President and Chief Executive Officer | |
|---|---|
| FIRM NAME<br>Intuitive Surgical, Inc. | STREET ADDRESS<br>1266 Kifer Rd Bldg 100 |
| CITY, STATE, ZIP CODE, COUNTRY<br>Sunnyvale, CA  94086-5304 | TYPE ESTABLISHMENT INSPECTED<br>Medical Device Manufacturer |

The promotion of the da Vinci thyroidectomy was questioned by the Center for Devices and Radiologic Health, and Intuitive Surgical, Inc. (b) (4)

(b) (4)

## OBSERVATION 4

Design input requirements were not adequately documented.

Specifically, the user need for intrasurgical cleaning of surgical instruments was not part of the user needs included in the design of surgical instruments, such as Intuitive Surgical, Inc. Fenestrated Bipolar Forceps Part No. 400205/420205 that are commonly known to need cleaning during surgery. Intuitive Surgical, Inc. has received complaints of arcing of energized surgical instruments as a result of surgeons cleaning off instruments intrasurgically by scraping them across other surgical instruments. In the case of energized surgical instruments, such as Intuitive Surgical, Inc. Monopolar Curved Scissors (MCS) Part No. 420179/400179, the scraping led to tears or holes in protective tip covers that led to arcing that in turn led to injuries to patients.

## AMENDMENT 1

| | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| **SEE REVERSE OF THIS PAGE** | Mary R. Hole, Investigator | | 05/30/2013 |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 3 OF 4 PAGES |

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 1431 Harbor Bay Parkway<br>Alameda, CA  94502-7070<br>(510) 337-6700  Fax:(510) 337-6702<br>Industry Information: www.fda.gov/oc/industry | 04/01/2013 - 05/30/2013*<br><br>**FEI NUMBER**<br>3001675293 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED

**TO:**  Gary S. Guthart, President and Chief Executive Officer

| FIRM NAME | STREET ADDRESS |
|---|---|
| Intuitive Surgical, Inc. | 1266 Kifer Rd Bldg 100 |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Sunnyvale, CA  94086-5304 | Medical Device Manufacturer |

### Observation Annotations

Observation 1:   Reported corrected, not verified.   Observation 2:   Reported corrected, not verified.
Observation 3:   Reported corrected, not verified.   Observation 4:   Reported corrected, not verified.

**\* DATES OF INSPECTION:**
04/01/2013(Mon), 04/02/2013(Tue), 04/03/2013(Wed), 04/04/2013(Thu), 04/05/2013(Fri), 04/08/2013(Mon), 04/09/2013(Tue), 04/10/2013(Wed), 04/11/2013(Thu), 04/18/2013(Thu), 04/19/2013(Fri), 04/22/2013(Mon), 04/24/2013(Wed), 04/29/2013(Mon), 05/02/2013(Thu), 05/03/2013(Fri), 05/08/2013(Wed), 05/10/2013(Fri), 05/13/2013(Mon), 05/14/2013(Tue), 05/15/2013(Wed), 05/16/2013(Thu), 05/17/2013(Fri), 05/29/2013(Wed), 05/30/2013(Thu)

| | EMPLOYEE(S) SIGNATURE | DATE ISSUED |
|---|---|---|
| **SEE REVERSE OF THIS PAGE** | Mary R. Hole, Investigator | 05/30/2013 |

FORM FDA 483 (09/08)       PREVIOUS EDITION OBSOLETE       **INSPECTIONAL OBSERVATIONS**       PAGE 4 OF 4 PAGES

# Exhibit D