# EXHIBIT 10

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE INTUITIVE SURGICAL SECURITIES LITIGATION | Case No.: 5:13-CV-01920-EJD |

**<u>EXPERT REBUTTAL REPORT OF CHAD COFFMAN, CFA</u>**

## Table of Contents

**Page**

I.     **INTRODUCTION** ........................................................................................................4

II.    **SUMMARY OF OPINIONS** ....................................................................................5

III.    **DR. LEHN DOES NOT DISPUTE THAT ALL TEN FACTORS ANALYZED IN THE COFFMAN REPORT SUPPORT A FINDING OF MARKET EFFICIENCY** ..........................13

IV.    **DR. LEHN'S OPINION THAT THE ALLEGED FRAUD WAS FULLY CORRECTED PRIOR TO THE END OF THE CLASS PERIOD RESTS ON A VIEW OF PLAINTIFFS' CLAIMS THAT IS TOO NARROW AS A MATTER OF ECONOMICS.** ..................................15

V.    **DR. LEHN FAILS TO ESTABLISH A LACK OF PRICE IMPACT. INDEED, THERE IS STRONG EVIDENCE SUPPORTING PRICE IMPACT IN THIS MATTER** ....................19

VI.    **FEBRUARY 28, 2013** .............................................................................................22

    A.    EVENT STUDY ANALYSIS DEMONSTRATES A CLEAR PRICE IMPACT IN RESPONSE TO THE NEWS ON FEBRUARY 28, 2013.................................. 23

    B.    THE NEWS RELEASED ON FEBRUARY 28, 2013 WAS NEW ........................... 30

    C.    THE NEWS RELEASED ON FEBRUARY 28, 2013 WAS CORRECTIVE AND RELATED TO PLAINTIFFS' ALLEGATIONS ................................................ 31

VII.    **MARCH 5, 2013** ....................................................................................................**32**

    A.    ANALYSTS AND ARTICLES CLEARLY SHOW UNEXPECTED COMPANY-SPECIFIC NEWS WAS RELEASED PRIOR TO THE OPEN ON MARCH 5, 2013, AND DR. LEHN'S OWN EVENT STUDY SHOWS THAT THE ISRG STOCK PRICE DROPPED IN REACTION TO THE NEWS........ 33

    B.    THE NEWS ON MARCH 5, 2013 WAS CORRECTIVE AND RELATED TO PLAINTIFFS' ALLEGATIONS ................................................................... 35

VIII.    **APRIL 19, 2013** ....................................................................................................**36**

    A.    ANALYSTS AND ARTICLES CLEARLY SHOW UNEXPECTED COMPANY-SPECIFIC NEWS WAS RELEASED ON APRIL 19, 2013, AND DR. LEHN'S OWN EVENT STUDY SHOWS THAT THE ISRG STOCK PRICE DROPPED IN REACTION TO THE NEWS........................................ 36

    B.    THE NEWS ON APRIL 19, 2013 WAS CORRECTIVE AND RELATED TO PLAINTIFFS' ALLEGATIONS ................................................................... 38

IX.    **JULY 8, 2013** ........................................................................................................**39**

    A.    ANALYSTS AND ARTICLES CLEARLY SHOW UNEXPECTED COMPANY-SPECIFIC NEWS WAS RELEASED ON JULY 8, 2013, AND

DR. LEHN'S OWN EVENT STUDY SHOWS THAT THE ISRG STOCK PRICE DROPPED IN REACTION TO THE NEWS .......................................... 39

B.  THE NEWS ON JULY 8, 2013 WAS CORRECTIVE AND RELATED TO PLAINTIFFS' ALLEGATIONS ........................................................... 40

**X.  JULY 18, 2013 ................................................................................................42**

A.  THE FDA WARNING LETTER PUBLICLY DISCLOSED ON JULY 18, 2013 WAS NEW INFORMATION ............................................................ 42

B.  THE NEWS ON JULY 18, 2013 WAS CORRECTIVE AND RELATED TO PLAINTIFFS' ALLEGATIONS ........................................................... 44

**XI.  DR. LEHN DOES NOT CALL INTO QUESTION THE EXISTENCE OF A CLASS-WIDE DAMAGES METHODOLOGY. IN FACT, DR. LEHN CONFIRMS THAT THE WELL-ACCEPTED OUT-OF-POCKET METHOD IS APPROPRIATE ...................................46**

## I.    INTRODUCTION

1.      On September 1, 2015, I submitted an expert report in this matter (the "Coffman Report" or my "Report") in which I opined that the market for Intuitive Surgical, Inc. ("ISRG" or the "Company")[1] common stock was efficient throughout the Class Period and that damages could be calculated subject to a class-wide formula and methodology consistent with Lead Plaintiffs' claims.[2] Following the submission of my Report, counsel for Lead Plaintiffs provided me with the Expert Report of Kenneth M. Lehn (the "Lehn Report") in support of Defendants' Opposition to Class Certification filed October 15, 2015 ("Def. Brief"), and asked me to review and respond to the Lehn Report contentions that (1) all of the information that Plaintiffs allege Defendants concealed from the market was disclosed prior to the alleged last corrective disclosure date;[3] (2) there is no evidence of price impact on the alleged corrective disclosure dates listed in the Complaint;[4] and (3) I have not set forth a "well-settled common methodology"[5] to calculate class-wide damages that is consistent with Lead Plaintiffs' claims.[6] My responses to the Lehn Report are set forth below (the "Coffman Rebuttal Report" or "Rebuttal Report").

2.      In formulating my opinions set forth in this Rebuttal Report, I have relied upon my opening Report and my knowledge, experience, and formal training in economics, finance, and statistics in addition to the allegations and facts set forth in this lawsuit. In performing the

---

[1] Unless otherwise defined here, all capitalized terms shall have the meanings given to them in the Coffman Report.

[2] As a reminder, the Class Period is February 6, 2012 through July 18, 2013.

[3] Lehn Report ¶ 27.1.

[4] Lehn Report ¶ 27.2.

[5] Coffman Report ¶ 73.

[6] Lehn Report ¶ 27.3.

4

analyses set forth in this Rebuttal Report, I also considered: (1) the Lehn Report; (2) data,

analyses, and back-up materials provided by Dr. Lehn to counsel for Lead Plaintiffs that Dr.

Lehn claims to have considered in connection with his analyses; and (3) other relevant materials

and information. I also performed additional analyses to test certain assertions made in the Lehn

Report. All of the materials that I relied upon and considered in reaching my opinions in this

Rebuttal Report are identified in the attached **Appendix A** and a similar Appendix A to my

opening Report.

3.    In summary, nothing in the Lehn Report disturbs my opinions that the market for

ISRG Common Stock was efficient during the Class Period and that damages in this matter can

be calculated subject to a well-settled common methodology on a class-wide basis consistent

with Lead Plaintiffs' claims. In addition, I demonstrate that using my event study or Dr. Lehn's

event study, there was indeed price impact on multiple dates as alleged in the Complaint,

contrary to Dr. Lehn's claim and Defendants' attempted rebuttal of the presumption of reliance.

## II.    SUMMARY OF OPINIONS

4.    In my prior report, I empirically analyzed a total of ten factors to evaluate the

market efficiency of ISRG Common Stock, all of which supported a finding of market

efficiency.[7] Dr. Lehn does not address any of my analyses or conclusions regarding market

efficiency for ISRG Common Stock. In fact, his analysis and conclusions are dependent on the

market efficiency of ISRG Common Stock.[8] Thus, there is no dispute that all of the factors I

---

[7] Coffman Report § VII.

[8] For instance, Lehn Report ¶ 27.2.a.i. ("If the market for Intuitive's stock is efficient, as Mr. Coffman claims it is, then there is no scientific basis to conclude that the repetition of an alleged affirmative misrepresentation would have a price impact on these five dates."). Similar statements can be found throughout: Lehn Report ¶¶ 27.2.b.iv., 27.2.b.v., 40, 58, 68, and 72).

analyzed in my Report support a finding that the market for ISRG Common Stock was efficient during the Class Period.

5.      Dr. Lehn asserts that the information fully correcting Plaintiffs' allegations was disclosed prior to the end of the Class Period.[9] This opinion is fundamentally flawed because it rests on a view of Plaintiffs' allegations that is far too narrow as a matter of economics. In particular, Dr. Lehn fails to appreciate that all or part of the unexpectedly negative financial information revealed on April 19, July 8, and July 18, 2013, which was caused at least in part by the newly revealed safety and efficacy issues, would have occurred earlier but-for the alleged misstatements and omissions. As a result, investors who purchased during the time of the alleged misstatements and omissions paid an artificially inflated market price that failed to incorporate these price impacts.

6.      Dr. Lehn also asserts there is no evidence of price impact from the alleged corrective disclosures.[10] However, under my event study (or the Lehn Report event study), a number of alleged corrective disclosure events are associated with statistically significant stock price movements in reaction to Company-specific news released to the market.[11] The contemporaneous release of news that allegedly corrects the fraud and a statistically significant negative price reaction is evidence of price impact. More specifically, Dr. Lehn's opinion is flawed and unreliable for a number of reasons:

---

[9] Lehn Report ¶ 27.1.

[10] Lehn Report ¶ 27.2.b.

[11] For example, even under Dr. Lehn's analysis, four of Plaintiffs' alleged corrective disclosure events are associated with statistically significant price movements: February 28, March 5, July 8, and July 18, 2013.

**i. February 28, 2013:**

a. Contrary to Dr. Lehn's opinion, there *was* a statistically significant negative price reaction to the alleged corrective disclosure on February 28, 2013. First, Dr. Lehn's own event study shows a statistically significant price decline on February 28, 2013, which is evidence of price impact. Moreover, Dr. Lehn's opinion that the market price response over the two days of February 28 and March 1, 2013 is not significant rests on errors in the design of his event study. In particular, Dr. Lehn's opinion is reliant on (1) inappropriately specifying an event window that includes nearly a full day *prior* to the event occurring, thereby inappropriately and unnecessarily diminishing the power of his statistical test; and (2) using a measure of variance that incorporates higher volatility events such as the earnings dates and higher volatility observed *after* the event of interest. Once these obvious errors are corrected, the price decline is statistically significant.

b. Dr. Lehn concedes that the information released on February 28, 2013 was new and could have been revealed earlier and does not dispute it would be corrective if Plaintiffs' allegations are correct.[12] Moreover, under Supreme Court precedent I understand the causal link between the allegedly corrective information and the earlier alleged misstatements and/or omissions does not need to be established at this time. Nevertheless, Plaintiffs have articulated a plausible loss causation theory whereby the information released on February 28, 2013 could be causally connected to the alleged misrepresentations and/or omissions. In particular, the revelation of an FDA probe into the safety and efficacy of a product could

---

[12] Lehn Report ¶ 27.2.b.i.

partially reveal the relevant truth obscured by misstatements and omissions regarding the safety and efficacy of the same product.

### ii. March 5, 2013

a. Contrary to Dr. Lehn's opinion, there *was* a statistically significant negative price reaction to the alleged corrective disclosure on March 5, 2013. Dr. Lehn's opinion is based on an error in the design of his event study. Dr. Lehn erroneously concludes that the alleged corrective information released on March 5, 2013 came out after market hours, and as a result, he erroneously analyzes March 6, 2013 as the event window for price impact. However, I provide definitive evidence that the information alleged to be corrective reached the market prior to market hours on March 5, 2013. I find there is a statistically significant negative stock price reaction on March 5, 2013, thereby providing evidence of price impact. Dr. Lehn's backup materials confirm he found a statistically significant negative stock price movement on March 5, 2013.

b. Dr. Lehn asserts that the information contained in the alleged corrective disclosure on March 5, 2013 was already publicly available and therefore could not have had a price impact. It is not unreasonable, however, to believe that the general market viewed Bloomberg's investigative report regarding the da Vinci product as new, value-relevant information. In other words, analysts or investigative journalists, by performing analysis of a topic using resources that are public, may provide new insights about an issue that influence the views of

8

investors regarding the value of a company.[13] On March 5, 2013 there is news clearly related to the safety and efficacy of the da Vinci product and a statistically significant negative abnormal return, together providing evidence of price impact. Difference of opinions among analysts on the importance of the new information does not preclude price impact. Dr. Lehn's arguments are focused on loss causation, not price impact.

c. Bloomberg's reporting regarding the number of deaths and patterns of injuries potentially tied to use of the da Vinci system could reasonably partially correct the alleged misstatements and omissions.

### iii. April 18, 2013

a. Dr. Lehn concedes that some information relevant to Plaintiffs' claims was disclosed on April 18, 2013.[14] Dr. Lehn claims that the alleged corrective disclosure on April 18, 2013 did not result in a statistically significant stock price decline. However, my analysis finds that it is significant at the 90% confidence level which is a benchmark often used for drawing inferences in the academic literature of financial economics. Dr. Lehn also opines that the alleged corrective disclosure does not reveal any information related to Plaintiffs' claims, but this is the result of Dr. Lehn's narrow interpretation of Plaintiffs' claims. As described above (¶ 5), Dr. Lehn fails to appreciate that the negative financial information revealed on April 19, 2013, which was caused at least in part by the newly

---

[13] For example, it is well established that analysts play an important role in interpretation of publicly released information. *See* Joshua Livnat & Yuan Zhang, *Information Interpretation or Information Discovery: Which Role of Analysts Do Investors Value More*, 17 REV. ACCT. STUD. 612 (2012).

[14] Lehn Report ¶ 27.1.c.

9

revealed safety and efficacy issues, would have occurred earlier but-for the alleged misstatements and omissions. As a result, investors who purchased during the time of the alleged misstatements and omissions paid an artificially inflated market price that failed to incorporate these price impacts.

### iv. July 8, 2013 and July 18, 2013

a. Despite his own event study finding statistically significant abnormal returns in reaction to the Company-specific news released on these dates, Dr. Lehn asserts that neither of these days provides evidence of price impact due to his first opinion, that all the corrective information had been previously disclosed.[15] Again, Dr. Lehn fails to appreciate that the negative financial information revealed on April 19, July 8, and July 18, 2013, caused, at least in part, by the newly revealed safety and efficacy issues, would have occurred earlier but-for the alleged misstatements and omissions. As a result, investors who purchased during the time of the alleged misstatements and omissions paid an artificially inflated market price that failed to incorporate these price impacts. Moreover, Dr. Lehn's dismissal of the FDA warning letter as something that could not have been disclosed earlier misses the point that the FDA warning letter may have provided the market further information about the Company's ability to assuage government regulators about the safety and efficacy of the da Vinci product – information which Plaintiffs allege is corrective of the fraud.

7. The Lehn Report raises speculative questions about how Lead Plaintiffs: (1) would ultimately analyze and prove loss causation in the event that the finder of fact determined there

---

[15] Lehn Report ¶ 27.2.b.iv, 27.2.b.v.

was no liability for certain misrepresentations or omissions;[16] (2) would ultimately "disaggregate" certain "confounding information" on certain corrective disclosures;[17] and/or (3) would need to disaggregate the effect of the alleged corrective disclosure from the alleged misrepresentation on April 18, 2013.[18] However, the Lehn Report does not dispute the general damages framework/methodology that is universally used in securities class action matters to calculate "out-of-pocket" damages on a class-wide basis. More specifically:

a. Dr. Lehn does not dispute that out-of-pocket damages in a class action securities litigation can be computed based upon the artificial inflation in the stock price at the time of purchase minus the artificial inflation at time of sale (or just the inflation at the time of purchase if the share is not sold prior to revelation of the fraud, subject to the statutory limit on damages).[19]

b. Dr. Lehn does not dispute that the event study methodology is a reliable approach to isolate the price impact of new company-specific information for a given stock, and thus, identify the potential inflation per share.[20]

c. Dr. Lehn asserts that I should have proposed a methodology that would implicitly assume Plaintiffs do not establish liability for certain individual alleged misrepresentations and omissions.[21] I understand this proposed exercise is unnecessary and would certainly be speculative and premature.

---

[16] Lehn Report ¶ 27.3.b.

[17] Lehn Report ¶ 27.3.c.

[18] Lehn Report ¶ 27.3.d.

[19] Coffman Report ¶ 72.

[20] Coffman Report ¶ 73.

[21] Lehn Report ¶ 27.3.b.

11

d. Dr. Lehn's objections regarding confounding news do not relate to whether the general out-of-pocket damages methodology can be applied uniformly and formulaically in this matter using common proof on a class-wide basis. Instead, his objections relate to whether certain adjustments would ultimately be necessary at the merits stage to address the asserted presence of confounding information on the corrective disclosure events. This would require a detailed loss causation analysis, which I understand is not required at this stage of the litigation.

8.   Indeed, these more detailed issues regarding loss causation (i.e., "disaggregating" the effect of confounding information) are present in virtually every securities class action matter and are regularly the subject of discovery during the merits phase of the litigation. These loss causation issues are also potentially dependent on information obtained during discovery and are determined based upon proof that is common to all class members. For example:

a. In almost every case there is a dispute about whether the newly released information that is alleged to be corrective is confounded by other newly released, company-specific information unrelated to the fraud.

b. In almost every case there is a battle of the experts at the merits stage regarding what information is confounding and how to reasonably estimate the value of the potentially confounding information.

c. The only necessary input to the class-wide damages model to adjust for confounding information is calculating the percentage of the abnormal return from the event study that was caused by the confounding information, as opposed to the corrective information, which requires a detailed loss causation analysis.

d. I further understand that once a loss causation analysis is performed during the merits phase of the litigation, the percentage of confounding information (if any) does not need to be measured with precision, but only needs to be a reasonable approximation based on all relevant information, potentially including information obtained in discovery. I also understand that proving loss causation only requires that the alleged misconduct be a substantial factor in causing the abnormal price changes on corrective disclosure dates, not that it be the sole factor (i.e., 100%) of the abnormal stock declines.

e. Whatever percentage of confounding information is determined to be reasonable, it can be applied on a class-wide basis within the general damages methodology already described in my Report.

f. It is not uncommon for there to be simultaneous partial corrective disclosures and further alleged misstatements and/or omissions. Such a circumstance can be easily and appropriately addressed by the standard model described in my Report.

9. The remainder of this Report details the bases for my opinions.

## III. DR. LEHN DOES NOT DISPUTE THAT ALL TEN FACTORS ANALYZED IN THE COFFMAN REPORT SUPPORT A FINDING OF MARKET EFFICIENCY

10. Dr. Lehn does not dispute that my empirical analysis of ten well-established factors supports a finding of market efficiency throughout the entire Class Period. In particular, my Report demonstrates that: (1) the weekly trading volume of ISRG Common Stock easily surpasses the *Cammer* threshold level of average weekly trading volume with an average *daily* volume of over 375,000 shares, which represents 4.8% turnover per week. Not only does this easily exceed the *Cammer* threshold, it compares favorably against other exchange-traded

securities (*Cammer* Factor 1);[22] (2) a large number of securities analysts followed ISRG (at least 190 reports from 18 different firms during the Class Period), and there was also substantial press coverage and other sources of publicly available information regarding the Company (*Cammer* Factor 2);[23] (3) ISRG traded on the NASDAQ at all times during the Class Period, and thus satisfies the "market maker" factor (*Cammer* Factor 3);[24] and (4) ISRG filed several Forms S-3 before the Class Period and met the important eligibility criteria and was apparently eligible to file Form S-3 during the Class Period (*Cammer* Factor 4).[25] The analysis in my Report demonstrates that (5) ISRG's market capitalization was higher than the majority of NASDAQ stocks during the Class Period, a factor associated with larger institutional ownership, greater analyst following, and is therefore correlated with a finding of market efficiency;[26] (6) ISRG also had one of the lowest bid-ask spreads when compared to a random sample of 100 other common stocks on the NYSE and NASDAQ. This metric indicates that ISRG Common Stock traded in a well-developed market and that costs to transact in ISRG Common Stock were relatively low, also indicating an efficient market.[27] My Report analysis further shows that (7) ISRG was traded by sophisticated traders, with over 87% of its public float held by institutions during the Class Period on average;[28] (8) there was no evidence of autocorrelation for ISRG Common Stock;[29] and (9) there was considerable option trading during the Class Period, which is associated with

---

[22] Coffman Report ¶¶ 24-29.

[23] Coffman Report ¶¶ 30-35.

[24] Coffman Report ¶¶ 36-39.

[25] Coffman Report ¶¶ 40-42.

[26] Coffman Report ¶¶ 61-64.

[27] Coffman Report ¶¶ 65-66.

[28] Coffman Report ¶ 67.

[29] Coffman Report ¶¶ 68-70.

the underlying stock trading in an efficient market.[30] Finally, (10) there was a strong cause-and-effect relationship between new Company-specific information and the market price of ISRG Common Stock during the Class Period.[31]

11.     Taken together, these metrics provide overwhelming and undisputed evidence that support a conclusion that ISRG Common Stock traded in an efficient market throughout the entire Class Period. Dr. Lehn does not offer a single criticism of any of my analysis or conclusions regarding the market efficiency of ISRG Common Stock.

## IV.   DR. LEHN'S OPINION THAT THE ALLEGED FRAUD WAS FULLY CORRECTED PRIOR TO THE END OF THE CLASS PERIOD RESTS ON A VIEW OF PLAINTIFFS' CLAIMS THAT IS TOO NARROW AS A MATTER OF ECONOMICS.

12.     Dr. Lehn's first opinion is that, "[t]he information that Intuitive allegedly omitted to disclose regarding the Claims was publicly available prior to the end of Plaintiffs' proposed Class Period."[32] To support this opinion, Dr. Lehn engages in an effort to summarize Plaintiffs' claims into three categories and then describes how, in his view, each of the three claims is fully disclosed prior to the end of the Class Period. The fundamental flaw in Dr. Lehn's approach is that he mechanically construes the alleged fraud as a series of isolated statements and then looks for the "fact for fact" correction of those alleged misstatements and omissions. This approach fails to identify an important category of economic harm caused by the alleged misrepresentations and omissions.

13.     In particular, Dr. Lehn fails to appreciate that the unexpectedly negative financial information revealed on April 19, July 8, and July 18, 2013, which was indisputably caused at

---

[30] Coffman Report ¶ 71.

[31] Coffman Report § VII.F.

[32] Lehn Report ¶ 27.1.

least in part by the reaction of hospitals, doctors, and patients to the delayed disclosure of safety and efficacy issues related to the da Vinci product, would also have occurred earlier (at least in part) but-for the alleged misstatements and omissions. As a result, investors who purchased in reliance on the alleged misstatements and omissions paid an artificially inflated market price that failed to incorporate these price impacts. Therefore, the price reaction to the negative financial information caused by the revised perception of da Vinci's safety and efficacy is properly considered part of the but-for economic harm caused by the alleged misstatements and omissions.

14.    To understand why, recall that assets are valued based upon the discounted present value of expected future cash flows.[33] As a result, ISRG's stock price reflects the consensus of market participants' evaluation of the present value of future cash flows that will be generated for equity owners of the firm. The perceived safety and efficacy of the Company's product is intimately related to those expected future cash flows.[34] ISRG's future profitability is clearly dependent on hospitals', doctors', and patients' willingness and desire to use the da Vinci product. If the product is perceived as unsafe or ineffectual, then sales and profits will be lower, and the market price of the stock will react downward when the market learns that the earning power of the Company is impaired relative to expectations.

15.    Plaintiffs' claims recognize this linkage, as did the Court when it summarized Plaintiffs' claims in its Order Granting In Part And Denying In Part Defendants' Motion to Dismiss ("Order"): "Plaintiff alleges that Defendants engaged in a scheme to defraud investors

---

[33] Richard A. Brealey, Stewart C. Myers, & Franklin Allen, *Principles of Corporate Finance*, Ch. 2 (10th ed. 2011).

[34] Intuitive Surgical 2012 SEC Form 10-K, pp. 14-17, 19, 22 ("If defects are discovered in our products, we may incur additional unforeseen costs, hospitals may not purchase our products, and our reputation may suffer.").

16

by representing that da Vinci was a safe and viable alternative to open surgery, when in fact Defendants knew that da Vinci had been experiencing defects that, **when discovered, would seriously impair its marketability.**"[35]

16.    Likewise, the Court further summarized: "Because da Vinci is Intuitive's sole product, and the success of da Vinci relied in large part on the perceived safety benefits as a medical device, **Plaintiff alleges that these omissions created a materially false impression of da Vinci's market power**."[36]

17.    In other words, the relevant truth that was withheld is not limited to the specific pieces of information focused on by Dr. Lehn, but the overall economic import of the safety and efficacy of the product. That full truth was not available until the market became aware of how the revelations regarding safety and efficacy impacted the use of the product. Defendants acknowledged in their public statements that the adverse information regarding the safety and efficacy of the product was potentially affecting the rates at which the product was being used:

> Second, our MCS notification and negative press occurred in the quarter and may have pressured growth in utilization, although estimating their impact on procedure volume is difficult.[37]

18.    Analysts agreed:

> Possible explanations [of the decline in procedure growth] include fallout from negative media attention as well as hospitals altering treatment plans in response to the uptick in adverse events and resulting lawsuits;[38]

---

[35] Order at 10 (emphasis added).

[36] Order at 13 (emphasis added).

[37] "Q2 2013 Intuitive Surgical Earnings Conference Call," Thomson Reuters Streetevents, July 18, 2013, 8:30PM.

[38] "Benign dVH, US Systems Drive 2Q Miss; Estimates, PT Under Review but Reiterate Buy," *Cantor Fitzgerald*, July 9, 2013 (emphasis added).

> However, light procedures and a more cautious 2013 procedure outlook could overshadow the strong 1Q performance--especially given recent negative press/journal articles/lawsuit attention that, in our view, have heightened investor sensitivity around da Vinci's utilization.[39]

19.    Economic logic would dictate that this negative effect would have also occurred earlier absent the alleged misrepresentations and omissions. In other words, if the market, hospitals, doctors, and patients had been made aware of the safety and efficacy problems earlier, then the adoption of the product would have been affected earlier and generated the lower than expected financial performance earlier. Therefore, the price declines associated with negative financial reports in the wake of the safety and efficacy disclosures were also delayed by the alleged misrepresentations and omissions. As a result, the investment losses suffered by Class Period purchasers that held through the events which revealed the ultimate financial impact are no less tied to the fraud than the correction of the safety reporting itself. In both cases, the investment loss was delayed and, if Plaintiffs prove liability, the price declines observed on those dates provide evidence of artificial inflation in the stock price that would not have existed but-for the fraud.

20.    Dr. Lehn's "fact for fact" approach inappropriately sidesteps these critical economic linkages. As a result, his opinion that the full truth was known to the market before the end of the putative Class Period rests upon too narrow a view of the alleged fraud as a matter of economics. As will be discussed later, Dr. Lehn acknowledges that ISRG's stock price declined by a statistically significant amount in response to the new information on July 8 and July 18, which included information about the negative financial consequences of the safety and efficacy

---

[39] "Solid 1Q Beat Overshadowed by Light Procedure Growth," *Leerink Swann*, Apr. 19, 2013.

concerns.[40] While Dr. Lehn identifies some potential confounding information on these events, he does not opine that the market response was unrelated to the information Plaintiffs allege was corrective. Instead, his opinion rests entirely on his own misconception of how narrow Plaintiffs' claims should be interpreted as a matter of economics.[41]

## V.    DR. LEHN FAILS TO ESTABLISH A LACK OF PRICE IMPACT. INDEED, THERE IS STRONG EVIDENCE SUPPORTING PRICE IMPACT IN THIS MATTER.

21.    As reflected in the Lehn Report, establishing a lack of price impact would require showing *both* that: (1) there is no evidence of the market reacting to the alleged misstatements and/or omissions; *and* (2) there is no evidence of the market reacting to the alleged corrective disclosures.[42]

22.    In this case there is no reason to expect that the alleged misstatements and/or omissions, which were positive statements about the safety and efficacy of the da Vinci product, would surprise the market and cause a statistically significant price movement. As in many cases, the fraud allegedly had a price impact by preventing the stock from falling to the level it would have traded had the relevant truth been disclosed.

23.    If a public misrepresentation provides only expected information, the price of the security will not materially react at that time. Likewise, if new unexpected materially adverse non-public information is withheld, that omission will also not cause the price to react at that time. In such a circumstance, as in this case, price impact should be evaluated by determining if there was a market price reaction to the alleged corrective disclosures.

---

[40] Lehn Report ¶¶ 67, 71, Exhibit F.

[41] Lehn Report ¶¶ 27.2.b.iv-v, 69-70, 72-74.

[42] Lehn Report ¶¶ 27.2, 38.

24.     Therefore, the remainder of my rebuttal focuses on the second prong of Dr. Lehn's analysis, the evaluation of price movements on the alleged corrective disclosure events. In my opinion, there is strong evidence of price impact in this matter as a result of statistically significant price reactions to the alleged corrective disclosures. In fact, Dr. Lehn's own event study regression shows a negative statistically significant abnormal return on four of the dates Plaintiffs' allege as corrective disclosure events: February 28, March 5, July 8, and July 18, 2013.

| Date | Market Date | Abnormal Return | t-statistic |
|---|---|---|---|
| 2/28/2013 | 2/28/2013 | -11.13% | -6.11** |
| 3/5/2013 | 3/5/2013 | -3.82% | -2.13* |
| 7/8/2013 | 7/9/2013 | -16.24% | -8.82** |
| 7/18/2013 | 7/19/2013 | -6.69% | -3.59** |
| *Statistically significant at the 95% confidence level **Statistically significant at the 99% confidence level | | | |

25.     It is my understanding that this combination of statistically significant price movements in conjunction with Plaintiffs' allegations regarding corrective information released to the market is evidence of price impact. That such statistical evidence is provided by the Lehn Report may be enough to end the inquiry regarding price impact. Nonetheless, for completeness, I respond in detail to the arguments in the Lehn Report.

26.     While Dr. Lehn's opinions regarding price impact for each individual corrective disclosure rest upon several faulty analyses, the most direct evidence to demonstrate price impact can be summarized as follows:

27.     There are statistically significant negative stock price reactions at the 95% confidence level on at least four alleged corrective disclosures.[43] Dr. Lehn's assertions that the market price reactions to the alleged corrective information released on February 28, 2013 and March 5, 2013 were not statistically significant are based upon fundamental errors in his analysis. For March 5, 2013, Dr. Lehn simply chose the wrong day to analyze, and once corrected, the market reaction is clearly significant even under his own methodology. For February 28, 2013, Dr. Lehn commits two errors that lead him to the wrong conclusion. First, Dr. Lehn inappropriately incorporates almost a full day prior to the release of the allegedly corrective information into his event window. Second, Dr. Lehn's test for statistical significance is biased by incorporating *post-event* volatility into his statistical test. And finally, there is no dispute that the market price reactions on the alleged corrective events of July 8 and July 18, 2013 are statistically significant and negative.

28.     The only other explanations provided by Dr. Lehn to support his opinion regarding price impact require the Court to find either that (1) none of the information revealed on the alleged corrective disclosures was new, or (2) none of the information revealed on the alleged corrective disclosures was corrective.

29.     As will be discussed below, setting aside whether the information was corrective, there is no genuine dispute over whether the allegedly corrective information released on February 28, April 18, July 8, or July 18, 2013 provided new information to the market regarding the safety and efficacy of the product or how the perceived safety and efficacy concerns were

---

[43] There is statistical significance at the 90% confidence level for the fifth alleged corrective disclosure.

impacting the financial results of the Company.[44] Thus, the only remaining pillar of Dr. Lehn's argument is that the announcements were not corrective. I understand that Plaintiffs at this stage are not required to prove loss causation and therefore are entitled to the presumption that the alleged disclosures were corrective.

30.    With that overview in mind, I now provide an analysis of price impact on each alleged corrective disclosure.

## VI.    FEBRUARY 28, 2013

31.    As described by Dr. Lehn, "Five minutes before the market close on February 28, 2013, Bloomberg released four articles disclosing that a U.S. regulator was conducting a safety probe of the da Vinci surgical system."[45] According to Bloomberg, the contemporaneous headlines released were:

> 3:55:34pm - "Intuitive Surgical's Robots Probed for Safety by U. S. Regulator" (Only a headline)
>
> 3:55:41pm - "Doctor's Surveyed About Safety of Intuitive's Robots for Surgery" (Only a headline with "Story to Follow")
>
> 3:56:09pm - "Regulators Safety Review of Intuitive Revealed in Doctor Survey" (Only a headline with "Story to Follow")
>
> 3:57:02pm - "Intuitive Surgical's Robots Probed for Safety by U.S. Regulator" which also included the sentence: "Intuitive Surgical's robots probed for safety by U.S. regulator after doctors survey. Shrs fall 7.8%."[46]

32.    Dr. Lehn further observes that the FDA was not specifically named as the "Regulator" referenced in the news headlines above until after market reports, implying that the

---

[44] As discussed below, while I disagree with Dr. Lehn that the information revealed on March 5, 2013 was already public in a manner that the market would have necessarily impounded the import of the information, I acknowledge that there is at least a genuine dispute about whether the information was new because the important underlying facts were ascertainable through research via public sources.

[45] Lehn Report ¶ 9.

[46] Bloomberg. Also found in Lehn Report Exhibit G.

22

full, relevant news was not fully released until after the market closed.[47] For instance, two articles released after the close of the market on February 28, 2013 on Bloomberg provided more detail. The first article at 4:51:52pm names the FDA as the regulator looking into reports from patients, medical professionals and companies. In that article, ISRG was also quoted as saying that the number of deaths and injuries had not been increasing. The article further reports that shares had fallen 11% by the close but had risen 1.6% post-market.[48] The second article mentions that regulators had asked surgeons at key hospitals for feedback, and the article provides more detail, including quotes from the Company, doctors, and analysts. It also states that the 11% decline in shares was ISRG's "biggest single-day slide since November 2008." [49]

33.    Dr. Lehn claims this event does not result in a statistically significant change in the market price of ISRG. He is wrong.

### A.    EVENT STUDY ANALYSIS DEMONSTRATES A CLEAR PRICE IMPACT IN RESPONSE TO THE NEWS ON FEBRUARY 28, 2013

34.    First, it is important to consider the exact timing of what occurred. **Exhibit 1** provides an intraday price chart from the closing price on February 27, 2013 (the day before the event), the day of the event, February 28, through the close of the next trading day, March 1, 2013. **Exhibit 1** shows that the market price of ISRG was relatively steady from the close on February 27 through February 28 at 3:54pm, the minute before the disclosure of the regulator probe. Then, within two minutes of the first Bloomberg release, ISRG's stock price falls nearly

---

[47] Lehn Report ¶ 48.

[48] "MORE: ISRG Robots Probed by FDA after Increase in Adverse Events," Bloomberg, Feb. 28, 2013, 4:51:52pm.

[49] "Intuitive Surgical Robots Probed by U.S. in Surgeon Survey (2)," Bloomberg, Feb. 28, 2013, 6:14:38pm.

8%,[50] and between the minute of the disclosure of the probe at 3:55pm and the close of regular market trading at 4:00pm, ISRG's stock price declines from roughly $570 per share to close at $510 per share. This is a decline of $60 (or a decline of 11.1%) in the span of five minutes. The results of both Dr. Lehn's and my event study indicate that a decline of that size over an entire day, let alone five minutes, is already statistically significant. Therefore, there is clear and direct evidence of price impact on February 28, 2013.

35.    **Exhibit 1** also shows that given more than five minutes to interpret the news, the market rebounds, but not fully, as of the open on March 1. The price then remains relatively steady for the remainder of the day until the close of trading. Dr. Lehn argues that the partial rebound on March 1 should ultimately be taken into account when assessing the total net impact of the alleged disclosure.[51] Regardless, that does not change the compelling evidence, even from the first five minutes, that the market considered the disclosure important new value-relevant information that had an immediate impact on price.

36.    Even if one accepts Dr. Lehn's position that the partial rebound on March 1, 2013 should be considered, a proper "event window" to analyze this event should run from just before the release of the news at 3:55pm on February 28, 2013, through market close on the next trading day, March 1, 2013.

37.    Dr. Lehn does not choose the time of the event through the close of trading on March 1, 2013 as his event window. Instead, Dr. Lehn's calculations assume a full two-day event window from the closing price on February 27, 2013, through the closing price on March 1,

---

[50] "Intuitive Surgical's Robots Probed for Safety by U.S. Regulator" Bloomberg, Feb. 28, 2013 3:57:02pm.

[51] Lehn Report ¶ 44.

2013.[52] **Exhibit 2** displays the difference between these event windows. As **Exhibit 2** exemplifies, Dr. Lehn's event window calculation incorporates almost a full day *before the event occurs*. This is problematic because incorporating a substantial amount of time before the event inappropriately biases against finding statistical significance.

38.    Because the price does not move substantially between the close of market on February 27 and the minute prior to the relevant 3:55pm event itself, Dr. Lehn's inappropriately chosen event window does not affect the magnitude of the unexpected price movement that is measured by our respective event studies. Indeed, **Exhibit 3** shows that Dr. Lehn's "abnormal" return for his two-day window is -3.73%,[53] which is within rounding error of the -3.73% I find using my regression over the period from 3:55pm on February 28 to the end of trading on March 1. In other words, we do not substantially disagree about the magnitude of the abnormal price movement.

39.    However, the major problem with Dr. Lehn's approach comes in calculating whether the observed price movement is statistically significant. The test for significance is performed by calculating a t-statistic. The t-statistic is calculated by taking the observed abnormal return and dividing by the square root of the variance for the relevant event window.[54] Here is where Dr. Lehn errs. Because of the inappropriately long event window he uses, Dr. Lehn effectively divides his abnormal return by the variance of a full two-day period, which is more than 40% higher than the variance in a one day period[55] and much higher than the proper variance for an event window that is only one day and five minutes long. For example, if I divide

---

[52] Lehn Report Exhibit F.

[53] Lehn Report ¶ 44.

[54] *See* Coffman Report ¶¶ 50-53.

[55] The square root of 2 is approximately 1.4. *See* Lehn Report ¶ 44 n.82.

either Dr. Lehn's or my own estimate of the abnormal return by the one day variance (from either event study model)[56] the resulting t-statistic is clearly statistically significant (*see* **Exhibit 4**). Obviously an event window of one day and five minutes is much closer to a one day window than a two day window, and therefore the one-day calculation is a better approximation of the correct t-statistic (as well as being grounded in the facts of the case and aligning with the timing of the alleged corrective information).

40.     Notwithstanding that obvious point, I empirically tested whether explicitly accounting for the extra five minutes would impact the result. To do this, I reran my event study analysis, but instead of using daily returns, I used the returns from 3:54 on day t through the end of the day on day t+1. This allows me to directly observe the degree of variance in the returns over a "one day plus five minute" window. The variance over the one day plus five minute window is statistically indistinguishable from the one day variance. The results are displayed on the chart below:

---

[56] Based on replicating the Lehn Report event study, Dr. Lehn's one-day RMSE is approximately .0181.



41.    The chart above clearly indicates that what is driving Dr. Lehn's "insignificant" result is that he is using a much higher "variance" measure when calculating the t-statistic as shown by the red bar on the far right of the chart above. His higher variance is the combined result of using (1) a higher one day variance than suggested by my model (comparing the third bar to either of the first two) and (2) a two-day event window (the red bar) instead of the proper event window. This is the key to his finding that the event did not cause a statistically significant decline.

42.    As noted by the chart above, Dr. Lehn's one day variance of 1.81% is higher than the my one day variance of 1.37% (over 35% higher). I have investigated how and why Dr. Lehn estimates a higher variance for his event study and found that his variance is higher because (1)

he fails to exclude earnings announcements from his regression model, and (2) his estimation window extends beyond the event itself and therefore incorporates higher future volatility.[57]

43.    In other words, Dr. Lehn's methodology assumes the proper measure of volatility as of the events of interest is one that incorporates the higher volatility caused by the events themselves.[58] This methodology is often avoided, as confirmed by the first article Dr. Lehn cites in the first sentence of his Appendix A "Description of Event Study Methodology." That article states:

> Given the selection of a normal performance model, the estimation window needs to be defined. **The most common choice, when feasible, is using the period prior to the event window for the estimation window.** For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. **Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.**[59]

44.    As indicated above, a more standard way to measure volatility (the RMSE) in an event study regression,[60] so long as the data allow (as is true in this case), is to calculate the observed volatility using data available leading up to the events of interest.[61] Doing so prevents

---

[57] In other words, ISRG experiences a number of negative events that raise uncertainty about the Company which causes the stock to become more volatile, but Dr. Lehn uses this higher volatility period to assess whether an event is significant during a much lower volatility period. Such a methodology is biased toward not finding statistical significance (*See* Damodar N. Gujarati, *Basic Econometrics*, Ch. 5 (3d ed. 1995).

[58] Lehn Report Appendix A.

[59] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13, 15 (1997) (emphasis added).

[60] The term "volatility" technically refers to the squared value of the RMSE, but here I use it to talk generally about the magnitude of the RMSE.

[61] *See e.g.*, A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13, 15 (1997): "For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."; David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19 at 5, *Litigation Services Handbook, The Role of the Financial Expert* (3d ed., 2001).

the events themselves or other exogenous events that occur after the events of interest from influencing the expectations that existed as of the events of interest, or as MacKinlay stated, "to prevent the event from influencing the normal performance model parameter estimates." [62] My methodology, as described in my Report, is to estimate the variance over the 120 trading days *before* an event so as not to have events in the future affect how the market would have viewed the normal volatility at the time.[63]

45. The degree of variance, as measured by the standard deviation of the abnormal returns in Dr. Lehn's event study models for the entire Class Period through December 12, 2012 is approximately 1.1%. The increased variance due to the turmoil caused by the alleged corrective disclosures later in the Class Period should not be considered in estimating the effects of events that occurred *prior* to the disclosures themselves.

46. I consider a number of possible ways to "correct" the variance based on Dr. Lehn's regression model. This includes looking at the standard deviation of the abnormal returns:

　　　　1. Over the entire Class Period prior to his event;

　　　　2. Over the 120 trading days prior to the event;

　　　　3. Using my event study variance;

　　　　4. Using the one day plus five minute event study variance.

47. As shown on **Exhibit 5**, under each and every iteration, the regression result implies a statistically significant negative abnormal return over the proper event window. This robustness demonstrates that Dr. Lehn's conclusion for finding a statistically insignificant price reaction to the news released at the end of the trading day on February 28 is directly caused by

---

[62] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13, 15 (1997).

[63] Coffman Report ¶ 48.

his importing the volatility generated by unpredictable future events into his evaluation of variance as of February 28. This biases his statistical test and leads to the wrong conclusion.[64]

48.    The event study presented in my Report shows that there is a statistically significant negative abnormal return of -11.02% with a t-statistic of -8.02, indicating that it is statistically significant at well above the 99% confidence level. Dr. Lehn's backup materials show that this day is highly statistically significant at well beyond the 95% confidence level. Therefore, there is evidence from the Lehn Report, the Coffman Report, and the analysis provided here to show that there is a statistically significant negative price response whether looking at February 28 independently, or when looking from the time of the event (3:55pm on February 28) through March 1, 2013. The *only* way Dr. Lehn found an insignificant result was to incorrectly specify the test.

49.    Thus, there is no dispute that there was news released during market hours that caused the ISRG stock price to fall on February 28. These statistics, in combination with the clear visual evidence of swift price reaction to the news, provide strong evidence of price impact.

**B.    THE NEWS RELEASED ON FEBRUARY 28, 2013 WAS NEW**

50.    There is no dispute from Dr. Lehn that the information released on this date was new, Company-specific information. Dr. Lehn does not argue that any of the news Plaintiffs claim affected ISRGs stock price was previously known to the market and in fact analyzes it as new news within the context of his own report.

---

[64] Damodar N. Gujarati, *Basic Econometrics*, Ch. 5 (3d ed. 1995).

## C.    THE NEWS RELEASED ON FEBRUARY 28, 2013 WAS CORRECTIVE AND RELATED TO PLAINTIFFS' ALLEGATIONS

51.    Dr. Lehn attempts to sever the link between the news released on this day and the statistically significant price impact by arguing that the alleged corrective information does not correct a misstatement. For instance, Dr. Lehn says that if the corrective action is the survey, it can only tie to an omission that might have affected investors' assessment of the probability that the FDA might survey doctors at some later time.[65] This "fact for fact" interpretation of Plaintiffs' claims is too narrow, as I argued earlier.[66]

52.    Putting aside my understanding that Dr. Lehn's arguments are premature loss causation attacks, the news regarding the FDA's focus on problems with da Vinci is clearly linked to Plaintiffs' allegations regarding the information withheld from the market. Analysts and the market understood that FDA involvement could have implications for the financial health of the Company. For instance, one analyst stated,

> However, we see headline risk that the FDA survey, which seeks to determine what the surgical robot does best and does worst, may drive some prospective patients toward more standard laparoscopic surgeries in the near term until its safety is better understood. If so, this might cause some hospitals to delay da Vinci purchases.[67]

53.    Dr. Lehn also posits that the specific information disclosed on February 28 could not have been disclosed on any of the earlier misrepresentation dates with the exception of February 4, 2013.[68] However, this concedes that the information revealed to the market on this

---

[65] Lehn Report ¶¶ 48-49.

[66] Coffman Rebuttal Report § IV.

[67] "S&P Keeps Hold Recommendation on Shares of Intuitive Surgical," March 1, 2013, quoted in *S&P Capital IQ*, July 19, 2013.

[68] Lehn Report ¶ 50.

31

event could have been revealed earlier. Whether there is a causal relationship with earlier alleged misrepresentations or omissions is a loss causation question, not one of price impact.

54.    Putting aside the fact that Dr. Lehn's arguments are premature loss causation attacks, Dr. Lehn's attempt to rebut price impact on this event fails. The intraday analysis shows a swift and significant market reaction to news Plaintiffs contend is corrective. There is no dispute that it is new information to the market.

## VII.    MARCH 5, 2013

55.    Soon after midnight, the morning of March 5, 2013, Bloomberg released an article discussing injuries caused by the da Vinci system, including that it was "linked to at least 70 deaths" since 2009 and that there had been at least ten lawsuits added in the past fourteen months. This is the same information that Plaintiffs' allege caused the price decline on March 5, 2013.[69] However, Dr. Lehn asserts that the alleged corrective information released by the same source, Bloomberg, on March 5, 2013 came out after the market closed and therefore the relevant event window is the March 6, 2013 return.[70] Dr. Lehn is wrong. **Appendix B** contains a copy of the relevant news that was released *prior to* market hours on March 5, 2013. The only difference between the two articles is that the release focused upon by Dr. Lehn incorporates the closing price of ISRG stock on March 5, 2013, and therefore there is no new information in that version to warrant an investigation of March 6, 2013 (*see* **Appendix C**).

56.    As a result, the unequivocally appropriate day to evaluate is March 5, 2013, which is statistically significant under both Dr. Lehn's (-3.82% abnormal return with a t-statistic

---

[69] Complaint ¶ 175.

[70] Lehn Report ¶¶ 52-53; Complaint ¶ 175.

of -2.11) and my event study (abnormal return of -4.03%, t-statistic of -2.54).[71] Because Dr.

Lehn does not discuss his event study for this day, he has not rebutted price impact for March 5,

2013 on the basis of a lack of significant price movement.

> **A.** **ANALYSTS AND ARTICLES CLEARLY SHOW UNEXPECTED COMPANY-SPECIFIC NEWS WAS RELEASED PRIOR TO THE OPEN ON MARCH 5, 2013, AND DR. LEHN'S OWN EVENT STUDY SHOWS THAT THE ISRG STOCK PRICE DROPPED IN REACTION TO THE NEWS**

57.    Dr. Lehn asserts that the news released on March 5, 2013 could not have a price

impact because: (1) the existence of lawsuits regarding da Vinci was already known and

discussed by analysts; (2) he speculates that the "informal incident reports" are MDRs that were

already public; and (3) he simply assumes these are the only value-relevant pieces of information

in the article.[72] Dr. Lehn's assertions are conclusory and not supported by the evidence.

58.    First, an analyst report cited in the Complaint and released prior to market open on

March 5, 2013 indicated that the Bloomberg article was likely to be received as new, negative

information by the market, stating: "ISRG shares could be under pressure this morning for the

second straight days as business journal articles continue to harp on safety concerns on da

Vinci."[73]

59.    Second, the Lehn Report, without supporting documentation, simply assumes that

the existence of lawsuits and the reference to incident reports was the only new information that

revealed information about the safety and efficacy of the da Vinci product. In fact, the article

contained more.

---

[71] Lehn Report backup material and Coffman Report Appendix C.

[72] Lehn Report ¶¶ 55-58.

[73] "ISRG Volatility is Potential Boon to Buyers. The Chance of da Vinci Having Safety Issues is Remote," *Janney Capital Markets*, Mar. 5, 2013 (Complaint ¶ 175).

60.   For example, the article raised the possibility that the incident reports might understate the problem:

> Martin Makary, a surgeon at the Johns Hopkins Hospital in Baltimore, said he is concerned that some complaints may not reach the public because they're kept quiet by hospitals, which often use the machines as a draw to gain additional [customers]. "No one knows the numbers now," said Makary, who has studied how hospitals market the robots, in a telephone interview. "But we have all seen or heard of cases of inadvertent injuries."[74]

61.   The article also interviewed an attorney who claimed to be investigating additional cases:

> The safety issue, though, isn't likely to go away soon, according to Paul Rheingold, a New York-based lawyer who represents the father of a woman who died 13 days after undergoing surgery with an Intuitive robot. Rheingold is in the process of investigating other potential cases, he said in a telephone interview.[75]

Dr. Lehn fails to analyze whether this information was new.

62.   Moreover, the Lehn Report does not specifically analyze in detail whether all the information provided in the article about specific cases or lawsuits had been previously released to the public. Therefore, Dr. Lehn has insufficient analysis and basis to assert that there was no new value-relevant information contained in the March 5, 2013 Bloomberg article.

63.   Finally, even if filed lawsuits are available to the public and could be counted if one were to investigate and search for them, journalists, analysts, and other third parties can provide value-relevant information to the market by piecing together and analyzing information that is not necessarily obvious or well understood by investors.[76] The event study analyses, which both

---

[74]"Robosurgery Suits Detail Injuries as Death Reports Rise: Health," Bloomberg, Mar. 5, 2013, 12:00:01am.

[75] *Id.*

[76] Joshua Livnat & Yuan Zhang, *Information Interpretation or Information Discovery: Which Role of Analysts Do Investors Value More*, 17 REV. ACCT. STUD. 612, 617 (2012).

show a statistically significant stock price reaction on March 5, 2013 also supports that the market interpreted the Bloomberg article as containing new value-relevant information. In sum, Dr. Lehn's assertion that there was no new information in the March 5, 2013 Bloomberg article is conclusory and not supported by the evidence.

**B.    THE NEWS ON MARCH 5, 2013 WAS CORRECTIVE AND RELATED TO PLAINTIFFS' ALLEGATIONS**

64.    Dr. Lehn does not argue that the information released on March 5, 2013 is not related to Plaintiffs' claims, only that the information was publicly available. News to investors about an increase in incident reports, injuries, deaths and lawsuits is clearly tied to Plaintiffs' allegations.

65.    Although Dr. Lehn contends that the March 5, 2013 information could not have been disclosed earlier than the February 4, 2013 alleged misrepresentation/omission date,[77] this also concedes that the information released on March 5, 2013 could have been revealed as of an earlier misrepresentation. Further, Dr. Lehn's contention regarding when the information on March 5, 2013 could have been revealed is simply his too narrow "fact for fact" matching between corrective and concealed information.[78] Regardless, this is an argument regarding loss causation and damages (how far back to carry inflation), but is irrelevant with regard to price impact.

66.    Dr. Lehn has failed to rebut the presumption of price impact on this date. He does not address March 5, 2013 directly, instead improperly focusing on March 6, 2013. Nevertheless,

---

[77] Lehn Report ¶ 59.

[78] Coffman Rebuttal Report § IV.

both his event study and my event study show statistically significant price movements to

Company-specific news released on March 5, thus supporting price impact.

## VIII.  APRIL 19, 2013

### A. ANALYSTS AND ARTICLES CLEARLY SHOW UNEXPECTED COMPANY-SPECIFIC NEWS WAS RELEASED ON APRIL 19, 2013, AND DR. LEHN'S OWN EVENT STUDY SHOWS THAT THE ISRG STOCK PRICE DROPPED IN REACTION TO THE NEWS

67.    The earnings release on April 19, 2013 contained new, Company specific

information. Much of it was positive, but the growth in procedures using the da Vinci product

was surprisingly negative:

> Intuitive posted another strong top- and bottom-line beat, **although these results were overshadowed by a slight miss in procedure growth** caused by soft benign hysterectomy volumes (on calendar quirks and weak hospital volumes). A more obvious culprit, we believe, may be the rising tide of negative media attention, which is both hard to quantify and unlikely to fade in the near term.[79]

> **Intuitive beat every metric this quarter except procedure growth.** While the reasons for that miss are understandable and the company indicated it can still achieve the low end of its 20-23% procedure growth target for the year (we were at 22.4%), sentiment is likely to stay negative as investors wait to see whether benign dVH weakens so much that it overwhelms the likely upside in general surgery.[80]

68.    Many analysts reviewed the earnings report as a "mixed bag" with offsetting

positive and negative financial metrics.[81] A number of analyst reports documented the positive

surprises from the Company on sales and EPS:

---

[79] "Procedure Growth Shortfall Mars Otherwise Strong Quarter; Reiterate BUY and $575 PT," *Cantor Fitzgerald*, Apr. 18, 2013 (emphasis added).

[80] "Procedure Weakness Offsets Broader Upside; We Believe the 20% Procedure Growth Guidance is Achievable," *William Blair*, Apr. 18, 2013 (emphasis added).

[81] "1Q13 Review: When is a Beat not a Beat? Something Here for Everyone; Reiterate Overweight," *JP Morgan*, Apr. 19, 2013.

> ISRG reported strong Q1/13 revenue of $611 million, up 23% versus $495 million in Q1/12, which was better than both our estimate of $581.9 million and the consensus of $583 million. EPS also came in strong at $4.56, up from $3.50 in Q1/12 which was better than both our estimate of $4.00 and the consensus of $3.98. Management expects CY/13 revenue growth to come in at the higher end of its range of 16-19% versus CY/12.[82]

> ISRG reported Q1 sales and earnings that blew past Street expectations, but reported procedure growth (+18%) that was a bit light…[83]

69.    My event study shows that the market responded negatively to this news, with a -3.15% abnormal return and t-statistic of -1.78, meaning that this reaction is statistically significant at the 90% level. In the financial economics literature, the 90% confidence level is often used for drawing statistical inferences.[84]

70.    Because this earning report contained both positive unexpected news and negative unexpected news, the lack of statistical significance at the 95% confidence level may be a function of the mix of information, not an indication of a lack of price impact. Without the confounding influence of other positive earnings news, it is quite possible that the stock price reaction to the alleged corrective information would have been statistically significant at the 95% confidence level. This result certainly does not preclude a finding of price impact. In fact, the combination of new Company-specific news and such a large abnormal return is evidence of price impact, especially in light of all the positive confounding news that was released that day.

---

[82] "Guidance Maintained; Adding ISRG to Our Best Ideas List," *Barrington Research*, Apr. 19, 2013.

[83] "Overall Strong Q1 Results, but Procedure Growth Light; Buy," *Canaccord Genuity*, Apr. 19, 2013.

[84] Richard A. DeFusco, Dennis W. McLeavey, Jerald E. Pinto & David E. Runkle, *Quantitative Methods for Investment Analysis,* 292 (2001); Damodar N. Gujarati, *Basic Econometrics*, 131-32 (3d ed. 1995).

**B.    THE NEWS ON APRIL 19, 2013 WAS CORRECTIVE AND RELATED TO PLAINTIFFS' ALLEGATIONS**

71.    Dr. Lehn asserts that there is no basis to conclude that there is price impact. This is due to his opinion (which I have already rebutted), that all the corrective information had been previously disclosed.[85] Dr. Lehn fails to appreciate that the negative financial information revealed on April 18, 2013 (lower than expected procedure growth), would have occurred earlier but-for the alleged misstatements and omissions. A surprise decline in procedure growth is precisely the kind of corrective information that can result from concealing safety and efficacy problems with da Vinci.

72.    This link was also described by analysts following this event:

> However, light procedures and a more cautious 2013 procedure outlook could overshadow the strong 1Q performance--especially given recent negative press/journal articles/lawsuit attention that, in our view, have heightened investor sensitivity around da Vinci's utilization. "Headline risk" still remains an overhang in our view, which could keep the stock volatile nearer-term."[86]

> Even management acknowledged some slowdown in benign hysterectomy volume, **raising the possibility that recent negative press may have contributed to such weakness. While management resisted such possibility, its credibility was pushed to the limit when the annual case volume growth outlook was lowered from 20-23% (implied growth of 21.5%) to "low-end" of the range (implied growth of 20-21%).**[87]

73.    The evidence presented here along with the market reaction show that the market learned of and reacted to new information regarding how da Vinci's safety and efficacy problems that had been allegedly concealed from the market would affect utilization and growth prospects for the Company.

---

[85] Coffman Rebuttal Report § IV.

[86] "Solid 1Q Beat Overshadowed by Light Procedure Growth" *Leerink Swann*, Apr. 19, 2013.

[87] "1Q13 Review: Will Overhangs Linger? We Believe ISRG Could Weather the Legal Storm", *Janney Capital Markets*, Apr. 19, 2013 (emphasis added).

## IX.    JULY 8, 2013

### A.    ANALYSTS AND ARTICLES CLEARLY SHOW UNEXPECTED COMPANY-SPECIFIC NEWS WAS RELEASED ON JULY 8, 2013, AND DR. LEHN'S OWN EVENT STUDY SHOWS THAT THE ISRG STOCK PRICE DROPPED IN REACTION TO THE NEWS

74.    There is no dispute in the Lehn Report that there was new, Company-specific news released after-market on July 8, 2013 related to sales of and procedures using the da Vinci system, and there is no dispute that this news caused a statistically significant negative abnormal price impact on ISRG Common Stock.

75.    On July 8, 2013, after market close, Intuitive Surgical preannounced its Q2 earnings as below Company and analysts' expectations, with revenues declining to $215 million or 6% from the prior-year quarter of $229 million, surprising the market.[88] Analysts agreed that the revenue shortfall was new and surprising information. For example:

> Obviously, the results were surprising and disappointing as there was no indication that the company could fall short of expectations by such a margin after management raised overall revenue growth expectations during 1Q13 conference call.[89]

> Intuitive Surgical Inc. (ISRG) recently preannounced significantly lower-than-expected revenue and earnings due to a combination of weak system sales and lower-than expected growth of hysterectomy procedures in the U.S.[90]

> While there was already an expectation of softness in the quarter, the magnitude of the miss (-$50M, or 8%) is worrisome, in our view.[91]

---

[88] "Benign dVH, US Systems Drive 2Q Miss; Estimates, PT Under Review but Reiterate Buy," *Cantor Fitzgerald*, July 9, 2013; "Intuitive Surgical Plunges Over 15% As da Vinci Sales Decline Unexpectedly," *Trefis*, July 10, 2013; Lehn Report ¶ 66.

[89] "Disappointing 2Q13 Preannouncement Long-term Fundamentals Remain Intact; Expected Weakness Could Be A Buying Opportunity," *Janney Capital Markets*, July 9, 2013.

[90] "Q2/13 Results to be Significantly Below Expectations; Risk/Reward from Current Levels is Attractive; Maintaining OUTPERFORM Rating," *Barrington Research*, July 10, 2013.

[91] "Pre-announcement Hints at Potentially Fundamental, Long Term Issues," *JMP Securities*, July 9, 2013.

"However, Q2 results usurped our most bearish scenario;"[92]

76.    The event studies in the Lehn Report and the Coffman Report find a large statistically significant and negative abnormal return on this date in reaction to the alleged corrective disclosure event. Dr. Lehn's event study shows a large abnormal return of -16.24% with a t-statistic of -8.82 while the Coffman Report results are similar (-16.63% with a t-statistic of -9.30).[93]

77.    The Coffman Report regression results indicate a statistically significant negative abnormal return of 16.63%, a t-statistic of -9.30 and an $83.15 negative abnormal dollar return.

78.    Thus, there is no argument in the Lehn Report to dispute that new, Company-specific news related to the da Vinci system sales and utilization was released on July 8, 2013 and was accompanied by a severe negative market reaction.

### B.    THE NEWS ON JULY 8, 2013 WAS CORRECTIVE AND RELATED TO PLAINTIFFS' ALLEGATIONS

79.    Analyst reports indicate that at least some if not all of the worse than expected performance metrics was linked to da Vinci safety concerns. Although the Company attributed the losses to other reasons such as hospital budgets, some analysts were skeptical:

> While management indicated that the US hospital environment is feeling pressure to spend less, it is hard for us to believe that the fall-off could be so sudden, when the macro drivers have generally remained steady over the past six months.[94]

80.    Analysts considered that hospitals and payers were responding to the negative information regarding da Vinci's safety and efficacy:

---

[92] "Q2 Results Deviate Disconcertingly from Trend Line," *Canaccord Genuity*, July 9, 2013.

[93] Lehn Report Exhibit F.

[94] "Disappointing 2Q13 Preannouncement Long-term Fundamentals Remain Intact; Expected Weakness Could Be A Buying Opportunity," *Janney Capital Markets*, July 9, 2013.

> When ISRG posted 18% procedure growth in 1Q:13, it cited greater sensitivity to GYN seasonality and weaker overall surgical volumes (as well as two fewer selling days). While the press release contained few details, the company noted that continued benign dVH weakness was the main culprit. **Possible explanations include fallout from negative media attention as well as hospitals altering treatment plans in response to the uptick in adverse events and resulting lawsuits**; we expect far more color from management on next week's conference call.[95]

> While the procedure volume short-fall could be attributed to scissor tip recall during 2Q, the system sales were off by 20+ systems.[96]

81.    Despite his own event study finding a statistically significant abnormal return in reaction to the Company-specific news released on this date, Dr. Lehn asserts that there is no basis to conclude that there is price impact. This is due to his opinion (which I have already rebutted), that all the corrective information had been previously disclosed.[97] The analyst reports and market reaction show that the market learned of and reacted to new information regarding how da Vinci's safety and efficacy problems were affecting its utilization and growth prospects.

82.    Dr. Lehn fails to appreciate that the negative financial information revealed on July 8, 2013, caused at least in part by the newly revealed safety and efficacy issues, would have occurred earlier but-for the alleged misstatements and omissions.

83.    In sum, there is no dispute that the market price declined significantly in reaction to the July 8, 2013 disclosure. There is also no dispute that news released on this date was a surprise to the market. Dr. Lehn says that there may have been confounding news released on this date that caused the price decline.[98] However, Dr. Lehn does not describe any confounding

---

[95] "Benign dVH, US Systems Drive 2Q Miss; Estimates, PT Under Review but Reiterate Buy," *Cantor Fitzgerald*, July 9, 2013 (emphasis added).

[96] "Disappointing 20132Q13 Preannouncement Long-Term Fundamentals Remain Intact; Expected Weakness Could Be a Buying Opportunity," *Janney Capital Markets*, July 9, 2013.

[97] Coffman Rebuttal Report § IV above.

[98] Lehn Report ¶ 67.

news released or cite to any source indicating that the severe price reaction was fully explained by confounding information. Therefore, the Lehn Report cannot serve as economic evidence that precludes price impact on this date.

## X.    JULY 18, 2013

### A.    THE FDA WARNING LETTER PUBLICLY DISCLOSED ON JULY 18, 2013 WAS NEW INFORMATION

84.    During the ISRG conference call that followed its Q2 2013 earnings release, the Company informed the market that it had received an FDA warning letter.[99] There is no dispute that the FDA warning letter was not previously released, and was therefore, new. Dr. Lehn disputes whether the warning letter provided new information to the market.[100] It does.

85.    A number of analysts characterized the FDA warning letter as new information:

> The actual [earnings] results were not a surprise of course, but news of an FDA warning letter, no additional reimbursements in Japan in 2014 ( the Ministry of Health could be raising the bar for approvals), lower than expected guidance, and tangible lack of visibility did little to satiate the need for clarity.[101]

86.    Further, there is academic support that FDA discipline in general and FDA warning letters specifically are informative and value relevant to the market, and are associated with negative and statistically significant price impacts on companies.[102]

87.    Moreover, there is a clear distinction and material difference between Form 483 and a warning letter, contrary to Dr. Lehn's contention that the market learned nothing new.[103]

---

[99] "Q2 2013 Intuitive Surgical Earnings Conference Call," Thomson Reuters Streetevents, July 18, 2013 8:30PM.

[100] Lehn Report ¶¶ 71-72.

[101] "Broken, For Now; Downgrading to Market Underperform," *JMP Securities*, July 19, 2013.

[102] Jean-Claude Bosch & Insup Lee, *Wealth Effects of Food and Drug Association (FDA) Decisions*,15 MANAGERIAL & DECISION ECON., 589 (1994) (finding a 6% decline associated with warning letters, similar to what is found here).

Specifically, Form 483 is used to document a problem that is still being investigated and not necessarily part of a company's permanent record, whereas a warning letter is an indication that the company reply to the Form 483 has been insufficient to explain or solve the issues in question. If the response to a Form 483 is convincing, the issues in question are deleted, and therefore Form 483 items "do not represent a final Agency determination regarding"[104] a company's compliance. On the other hand, an FDA warning is only issued after Form 483 is issued **and** the inspector completes the Establishment Inspection Report **and** an FDA official (ranking above the inspector) reviews the Form 483 and believes that a serious violation may exist.[105]

88.    Such is the case here. In the FDA warning letter issued to ISRG, the FDA clearly states that ISRG's response to prior Forms 483 was incomplete and inadequate.[106] The warning letter indicated that unless ISRG took prompt action to correct the violations discussed, the FDA would initiate regulatory action "without further notice. These actions include, but are not limited to, seizure, injunction and/or civil money penalties."[107] No such penalty is indicated with Form 483.[108] The FDA warning is confirmation of the violations raised in the observations in Form 483 and ISRG's failure to address the issues to the satisfaction of the FDA. Based on these

---

[103] Lehn Report ¶ 72.

[104] Intuitive Surgical FDA Form 483, May 30, 2013 (Lehn Report Exhibit C).

[105] Richard M. Cooper & John R. Fleder, *Responding to a Form 483 or Warning Letter: A Practical Guide*, 60 FOOD AND DRUG LAW J., 479 (2005); T. Winchell, *FDA Warning Letter: Avoidance and Advice*, 14 QUALITY ASSURANCE J., 76 (2011); FDA Regulatory Procedures Manual located at: http://www.fda.gov/ICECI/ComplianceManuals/RegulatoryProceduresManual/default.htm

[106] FDA Warning Letter, July 17, 2013

[107] FDA Warning Letter, July 17, 2013.

[108] Intuitive Surgical FDA Form 483, May 30, 2013 (Lehn Report Exhibit C).

distinctions, the warning letter provides new information to the market directly related to Plaintiffs' allegations.

89. Dr. Lehn's event study shows a statistically significant negative price reaction to this news, with a large abnormal return of -6.69% and a large t-statistic of -3.59.[109] The Coffman Report event study also finds a statistically significant abnormal negative price reaction to the news. These event study statistics combined with new, Company-specific news in the form of the FDA warning letter are highly supportive of price impact. Dr. Lehn offers no alternative explanation for ISRG stock's large abnormal price decline on this day.

**B.    THE NEWS ON JULY 18, 2013 WAS CORRECTIVE AND RELATED TO PLAINTIFFS' ALLEGATIONS**

90. The next trading day, the market and analysts reacted negatively to the new information provided by the issuance of the FDA warning letter. For example:

> On July 19th, Morningstar reported that the FDA warning letter, combined with the pending litigation and claims of inadequate surgeon training "holds the potential to disrupt the company's operations." [110]

> [T]he company was dealt another blow in the form of a FDA warning letter, which could hinder approval of new products/procedures going forward. Owing to these concerns, Intuitive Surgical's stock price has crashed by 15% to a new 52-week low of $360…[t]he warning letter from the FDA will only worsen conditions as it will make it harder for the company to sell the system.[111]

> Guidance well below Street, FDA Warning Letter disclosed, and Japan reimbursement for non-dVP delayed – these are the reasons for price pressure at the open.[112]

91. News articles also tie the alleged fraud with the corrective information on this day:

---

[109] Lehn Report Exhibit F.

[110] Complaint ¶ 178(a).

[111] "Intuitive Surgical Disappoints on All Fronts," *Trefis*, July 19, 2013.

[112] "On the Operating Room Table; 2Q Analysis," *SunTrust Robinson Humphrey*, July 19, 2013.

Intuitive Surgical Inc. fell 12 percent in extended trading after the maker of robotic surgical devices said it received a Food and Drug Administration warning letter following facility inspections in April and May. An FDA inspection report dated May 30 found the Sunnyvale, California-based company in some cases hadn't adequately reported device corrections and patient adverse events to the agency and hadn't established adequate design change procedures.[113]

[T]he slump in system sales means that the increasing talk regarding safety and legal issues at the company are catching up to Intuitive's financials – and investors. Thursday's warning [letter] by the FDA may only exacerbate that trend.[114]

Intuitive … has lost about $6 billion in value over five months after disclosures about adverse events with its products, a recent recall, and now, a regulatory warning it hasn't adequately reported on issues concerning the devices.[115]

92.   Dr. Lehn's dismissal of the FDA warning letter as not providing any new, value-relevant information ignores the message that an FDA warning letter provides the market, including the Company's inability to assuage government regulators about the safety and efficacy of the da Vinci product. The news and analyst reports recognized that the FDA warning letter was a negative event for ISRG.[116]

93.   In spite of these facts, Dr. Lehn contends that there is no price impact on this date due to his first opinion (which addresses loss causation and which I have already rebutted), that all the corrective information had been previously disclosed.[117] Dr. Lehn fails to appreciate that

---

[113] "Intuitive Surgical Declines After Getting FDA Warning Letter (1)," Bloomberg, July 18, 2013, 7:35:43pm.

[114] Complaint ¶ 178(b), citing *The Motley Fool*, also quoted in Lehn Exhibit F.

[115] Complaint ¶ 178(c), citing a Bloomberg article titled "Intuitive Reeling as FDA Cites Lack of Visibility on Problems" also quoted in Lehn Exhibit F.

[116] Even though the Lehn Report includes analyst reports minimizing the impact of the letter, it is telling that they all felt the need to discuss it as new Company-specific information, often placed in the report headlines.

[117] Lehn Report ¶¶ 27.2.b.v., 73; Coffman Rebuttal Report § IV. Dr. Lehn's argument that the FDA warning letter could not have been disclosed and until it was issued fails for the same reasons.

45

the negative market reaction to the FDA warning letter revealed on July 18, 2013 provides

specific new information about the safety and efficacy of the da Vinci product.

94.    Dr. Lehn's other arguments, such as whether other information was released on this

date[118] or how the corrective information relates to the various omissions and misstatements,[119]

do not pertain to the issue of price impact, but to loss causation.

95.    Based on analyst reports and news media reaction, there can be no dispute that the

FDA warning letter was new information to the market. In addition, both my event study and Dr.

Lehn's event study analysis indicate that the market reacted to the news with a statistically

significant abnormal and negative return, evidence of price impact. Whether all or part of the

abnormal price reaction this day was due to what Plaintiffs allege was new material news and

whether that news corrects omissions/misstatements stemming from the start of the Class Period

are loss causation questions.

## XI.    DR. LEHN DOES NOT CALL INTO QUESTION THE EXISTENCE OF A CLASS-WIDE DAMAGES METHODOLOGY. IN FACT, DR. LEHN CONFIRMS THAT THE WELL-ACCEPTED OUT-OF-POCKET METHOD IS APPROPRIATE

96.    In the Coffman Report, I describe the common and well-accepted method for

computing damages in a Rule 10(b)-5 matter such as this. In particular, I stated:

> the standard and well-settled formula for assessing damages for each class
> member under Section 10(b) is the "out-of-pocket" method which measures
> damages as the artificial inflation per share at the time of purchase less the
> artificial inflation at the time of sale (or, if the share is not sold before full
> revelation of the fraud, the artificial inflation at the time of purchase, subject
> to the PSLRA's "90-day lookback" provision, a formulaic limit on damages
> that also can be applied class wide).[120]

---

[118] Lehn Report ¶ 71.

[119] Lehn Report ¶ 73.

[120] Coffman Report ¶ 72.

46

> In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class.[121]

97.     Dr. Lehn does not dispute that the methodology described above is the proper method for computing damages. Instead, Dr. Lehn's claim that I have not demonstrated that class-wide damages can be calculated in this matter subject to a well-settled and common methodology is not focused on whether or not there is a methodology that can be employed, but instead his argument is focused on detailed aspects of loss causation, namely whether there is confounding information released concurrent with the corrective disclosures and how the inflation may have evolved over the Class Period.[122]

98.     In fact, as Dr. Lehn concedes, the foundation for applying the out-of-pocket damages methodology (that is universally accepted in securities class actions such as this one) is to conduct an event study and regression analysis that isolates the impact of new, company-specific information on ISRG's Common Stock price on the alleged corrective disclosure events while controlling for market and industry effects.[123] As detailed in my opening Report, I already conducted an event study that demonstrates statistically significant abnormal stock price declines on all alleged corrective disclosure dates (February 28, 2013, March 5, 2013, April 19, 2013, July 9, 2013, and July 19, 2013) that were concurrent with the release of allegedly adverse

---

[121] Coffman Report ¶ 73.

[122] Lehn Report ¶¶ 27.3, 75-82.

[123] In fact, Dr. Lehn conducts his own event study. *See* Lehn Report Appendix A.

ISRG-specific information connected to the defects associated with the da Vinci product-related claims in this case.[124]

99.    The quantification of the ISRG-specific, statistically significant stock price declines observed on these alleged corrective disclosures effectively identifies a potential measure of artificial inflation and potentially recoverable out-of-pocket damages in this matter. Furthermore, the analysis described above follows the primary framework/methodology described in my Report and provides inputs to the out-of-pocket damages model that I have described in my Report. Dr. Lehn does not dispute that the damages formula outlined above is the well-accepted methodology for calculating out-of-pocket damages in a securities class action matter like this one. Nor does Dr. Lehn dispute that I have already performed an event study that isolates the impact of new Company-specific information on the alleged corrective disclosure events. There is simply no genuine dispute in this matter about the general methodology or the primary inputs (i.e., the event study) for calculating damages.

100.    Dr. Lehn claims that the event study methodology that I have proposed "does not provide a reliable estimate of the alleged inflation."[125] However, as I'm sure Dr. Lehn would agree, any estimate of artificial inflation in this matter would appropriately involve an event study to assess the degree of price movement at the time of the alleged corrective disclosures. Dr. Lehn is simply making the obvious point that the analysis does not end there.

101.    As he suggests, such an analysis would need to address any potential confounding information,[126] would also require a tying of the alleged corrective information to the alleged

---

[124] Coffman Report ¶54, Exhibit 7, and Appendix C.

[125] Lehn Report ¶ 76.

[126] Lehn Report ¶¶ 78-81.

misrepresentations and/or omissions,[127] and would have to address how the inflation may have changed over time.[128] These loss causation issues are ubiquitous in securities litigation.

102. Dr. Lehn's implication that Plaintiffs' model would have to be able to disaggregate across different types of misstatements[129] is not necessarily true, and certainly is not true at this stage. If the artificial inflation per share was appropriately determined for Plaintiffs' claims as a whole and Defendants are found liable for each of Plaintiffs' claims, then I see no economic rationale for having to prove an ability to further separate the damages by misstatement. Damages using the out-of-pocket methodology can be applied to the aggregate level of artificial inflation. Dr. Lehn's criticism seems to suggest that Plaintiffs are required at this stage of the litigation to describe with precision how inflation would be calculated across all the possible permutations of Plaintiffs' eventual merits showing. I understand this is not necessary, and indeed, would be speculative.

103. Determining the precise proportion of a price decline following a corrective disclosure that is due to corrective versus confounding factors requires a detailed loss causation analysis that may potentially be impacted by information revealed in discovery. My understanding is that loss causation (including disaggregation) need not be proven at class certification as a matter of law.[130] Even if this were ultimately necessary at the merits phase, such a loss causation analysis would apply in the same manner for all class members, and thus the class would rise or fall together.

---

[127] Lehn Report ¶ 77.

[128] Lehn Report ¶¶ 77 and 82.

[129] Lehn Report ¶ 77.

[130] *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (holding that securities fraud plaintiffs need not prove loss causation in order to obtain class certification).

104. In any event, many securities class action cases involve disputes about whether the newly released information that is alleged to be corrective is confounded by other information released at the same time that is unrelated to the fraud. In many cases, plaintiffs dispute that there is any confounding information and attribute the entire abnormal return from the event study to the dissipation of artificial inflation. In the same cases, defendants dispute this loss causation analysis and argue that some, if not all, of the new information is confounding rather than corrective. In other cases, plaintiffs and their expert(s) may acknowledge that there is some confounding information and attribute some percentage (or a reasonable range of percentages based upon alternative assumptions) that should be applied based upon a loss causation analysis. Even in these cases, defendants' expert(s) may offer their own estimate or range of the appropriate percentage after merits discovery has closed and full loss causation/damages reports are exchanged. These types of factual disputes require detailed loss causation analyses that should be performed after full merits discovery.

105. No matter the circumstances, however, what is important at this juncture is that regardless of how the finder of fact ultimately weighs the evidence and determines the appropriate percentage of the abnormal returns to be applied as artificial inflation resulting from the release of corrective versus confounding information, that percentage can be mechanically incorporated easily into the standard damages model already identified using a common out-of-pocket formula. For example, assume that an event study analysis determines that there was a $1.00 decline in the share price on a day in which corrective information was released. Further assume there was some non-culpable (i.e., "non-corrective" or "confounding") information released at the same time. Further assume that plaintiffs present a loss causation analysis that suggests 80% of the price movement, or $0.80 per share, is due to the corrective information.

Under a constant dollar back-casting methodology, that would imply that $0.80 per share of artificial inflation existed on each day of the class period prior to this corrective disclosure. Now assume defendants present a loss causation analysis suggesting that only 30% or $0.30 per share of the price reaction is due to corrective information. Under a constant dollar back-casting methodology, that would imply that artificial inflation for each preceding day of the class period was $0.30 per share. No matter how the finder of fact weighs the evidence, whether they agree with 80%, 30%, or determine that based upon weighing the evidence it is some other percentage (e.g., 40%), the result can easily be applied to any daily inflation table. Indeed, the percentage inflation results of a loss causation/disaggregation analysis or a fact finder's determination could easily and mechanically be converted to per-share inflation on each day of a given class period.

106.  I further understand that an actual class-wide damages calculation conducted during the merits phase of the litigation, as opposed to merely identifying a proper methodology at the class certification phase, needs only to be "reasonable" as opposed to calculated with absolute mathematical precision. Furthermore, I am not aware of any securities class action case where out-of-pocket damages could not be calculated during the merits phase of the litigation solely due to the difficulty of disaggregation between corrective and confounding information. In any event, even if Dr. Lehn were to provide a loss causation opinion after merits discovery that disaggregation is impossible on a particular alleged corrective disclosure date and the jury accepted his opinion, the out-of-pocket model could easily handle that outcome on a class-wide basis by assigning 0% inflation to this alleged corrective information.

107.  Determining how to most properly back-cast the inflation revealed on the corrective disclosures is an issue in nearly every certified class action securities litigation, but can be evaluated on a class-wide basis and may be influenced by information learned in discovery.

108. Whether constant dollar inflation, or some other alternative, is the appropriate inflation assumption, the relevant inputs depend on the facts and evidence that existed and were concealed and what could have/should have been disclosed at different points in time. This is the essence of what the parties investigate during discovery and the finder of fact is asked to determine. The role of a damages expert is to assist the finder of fact in determining inflation/damages based upon those findings. It is premature to specify these details before conducting a loss causation analysis on the merits and knowing what the evidence will ultimately show.

109. Who knew what, when they knew it, and what should have been disclosed are at the heart of what the finder of fact is asked to determine based upon what is presented to it after the process of discovery. It is premature at this class certification stage (1) to assert that the evidence will show something different from what Plaintiffs allege, or (2) to attempt to specify how these details would impact the future damages model without actually knowing what the evidence will show.

110. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 16, 2015.

Chad Coffman

52



**Exhibit 1**
**ISRG Intraday Price and Volume**
**End of Day February 27, 2013 through March 1, 2013**

Source: TICK Data, Bloomberg.

## Exhibit 2
## ISRG Intraday Event Window Comparison
### End of Day February 27, 2013 through March 1, 2013



Source: TICK Data, Bloomberg, Lehn Report.

**Exhibit 3**
**Comparison of Coffman and Lehn Event Study Results**
**for February 28, 2013 Disclosure when Incorporating**
**Partial Rebound on March 1, 2013**

| Event Window | [1] Abnormal Return | [2] Standard Deviation of Errors | [3]= [1] / [2] T-Statistic |
|---|---|---|---|
| **Coffman Abnormal Return Time of Event (3:55 PM on Feb. 28) through Market Close on March 1** | -3.73% | 0.0134 | -2.78 |
| **Lehn Abnormal Return Market Close on February 27 through Market Close on March 1 (two full days)** | -3.73%[1] | 0.0256[2] | -1.08[3] |
| **Relative Difference between Coffman and Lehn Event Study Results[4]** | **-0.1%** | **90.9%** | **-61.1%** |

Notes:

1. Lehn Report ¶ 44.

2. Imputed from Lehn Report event study and backup materials. One day standard deviation is .0181. Two day standard deviation is .0181 multiplied by the square root of 2, equal to .0256.

3. Lehn Report ¶ 44. To calculate the t-statistic of -1.08, Dr. Lehn uses the additive method, using -2.73% in the numerator instead of the compound abnormal return of -3.73%.

4. Lehn Statisitc / Coffman Statistic - 1

Sources:
TICK data, Bloomberg, and Lehn Report and backup materials.

**Exhibit 4**
## Coffman and Lehn Event Study Results Under Alternative Variance Assumptions for February 28, 2013 Disclosure when Incorporating Partial Rebound on March 1, 2013

| | [1]<br>Abnormal Return | [2]<br>Standard<br>Deviation of Errors | [3]= [1] / [2]<br>T-Statistic | [4]<br>Statistically<br>Significant at 95%? |
|---|---|---|---|---|
| **Coffman Abnormal Return with Coffman One Day Standard Deviation** | -3.73% | 0.0137 | -2.72 | YES |
| **Coffman Abnormal Return with Lehn One Day Standard Deviation** | -3.73% | 0.0181 | -2.06 | YES |
| **Coffman Abnormal Return with Coffman One Day Plus Five Minute Standard Deviation** | -3.73% | 0.0134 | -2.78 | YES |
| **Lehn Abnormal Return with Coffman One Day Standard Deviation** | -3.73% | 0.0137 | -2.71 | YES |
| **Lehn Abnormal Return with Lehn One Day Standard Deviation** | -3.73% | 0.0181 | -2.06 | YES |
| **Lehn Abnormal Return with Coffman One Day Plus Five Minute Standard Deviation** | -3.73% | 0.0134 | -2.78 | YES |

Sources:
TICK data, Bloomberg, and Lehn Report and backup materials.

**Exhibit 5**
**Correction of Lehn Event Study Results Using Alternative Variance Assumptions**
**for February 28, 2013 Disclosurewhen Incorporating**
**Partial Rebound on March 1, 2013**

| | [1]<br>Abnormal Return | [2]<br>Standard Deviation<br>of Errors | [3]= [1] / [2]<br>T-Statistic | [4]<br>Statistically<br>Significant at 95%? |
|---|---|---|---|---|
| **Lehn Abnormal Return<br>with Alternative Standard Deviation of the Errors<br>Based on Lehn Abnormal Returns from Class Period start<br>until February 27, 2013** | -3.73% | 0.0138 | -2.71 | YES |
| **Lehn Abnormal Return<br>with Alternative Standard Deviation of the Errors Based<br>on Lehn Abnormal Returns 120 Days Prior to Event<br>(September 4, 2012 until February 27, 2013)** | -3.73% | 0.0159 | -2.35 | YES |
| **Lehn Abnormal Return<br>with Coffman One Day Standard Deviation** | -3.73% | 0.0137 | -2.71 | YES |
| **Lehn Abnormal Return<br>with Coffman One Day Plus Five Minute Standard<br>Deviation** | -3.73% | 0.0134 | -2.78 | YES |

Sources:
TICK data, Bloomberg, and Lehn Report and backup materials.

# Appendix A
# Documents Considered

## Court Documents

- Amended Class Action Complaint for Violations of the Federal Securities Laws, *Spencer Abrams vs. Intuitive Surgical, Inc.*, dated October 15, 2013.
- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, *In Re Intuitive Surgical Securities Litigation*, filed August 21, 2015.
- Expert Report of Chad Coffman, CFA, *In Re Intuitive Surgical Securities Litigation*, filed September 1, 2015.
- Expert Report of Kenneth M. Lehn, *In Re Intuitive Surgical Securities Litigation*, filed October 15, 2015.

## Court Decisions and Securities Law

- *Erica P. John Fund v. Halliburton, Inc.*, 573 U.S., 134 S. Ct. 2398 (2014).

## Forms

- SEC 10-K Annual filings submitted to the SEC during the Class Period:
  - Intuitive Surgical, Inc. 10-K for the Fiscal Year End 2012, filed February 4, 2013.
  - Intuitive Surgical, Inc. 10-K for the Fiscal Year End 2013, filed February 3, 2014.
- FDA filings and communication during the Class Period, and other FDA sources:
  - Intuitive Surgical, Inc. FDA Form 483, filed May 30, 2013.
  - FDA Warning Letter, dated July 17, 2013.
  - FDA Regulatory Procedures Manual (located at http://www.fda.gov/ICECI /ComplianceManuals/RegulatoryProceduresManual/default.htm)

## Data

- Historical data for Intuitive Surgical Common Stock, ISRG stock options, the S&P 500 Healthcare Index, and the S&P 500 Total Return Index were obtained from Bloomberg.
- Trade and quote data for Intuitive Surgical during the Class Period and one hundred random companies trading on the New York Stock Exchange and NASDAQ for November 2012 were obtained from Tick Data, see www.tickdata.com.
- All other data produced in connection with the Expert Report of Chad Coffman, CFA, dated September 1, 2015.
- Dr. Lehn's backup materials.

**ISRG News**

- Intuitive Surgical, Inc. news headlines and select articles downloaded from Factiva for the Class Period.
  - News was obtained by executing a search via Factiva for "All Sources" with the company field "Intuitive Surgical, Inc." for the period "February 6, 2012 – July 18, 2013." The Factiva search yielded 786 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- News also downloaded from Bloomberg's Company News Function (CN) for the Class Period.
  - News was obtained by executing a function CN (Company News) on Bloomberg for ISRG (Intuitive Surgical's common stock) for the period "February 6, 2012 – July 18, 2013."

**ISRG Analyst Reports**

- Intuitive Surgical, Inc. analyst reports supplied by Investext via Thomson Reuters for the period January 1, 2012 to December 31, 2013.
- Analyst reports include, but are not limited to:
  - "ISRG Volatility is Potential Boon to Buyers. The Chance of da Vinci Having Safety Issues is Remote," *Janney Capital Markets*, Mar. 5, 2013.
  - "Procedure Growth Shortfall Mars Otherwise Strong Quarter; Reiterate BUY and $575 PT," *Cantor Fitzgerald*, Apr. 18, 2013.
  - "Procedure Weakness Offsets Broader Upside; We Believe the 20% Procedure Growth Guidance is Achievable," *William Blair*, Apr. 18, 2013.
  - "Solid 1Q Beat Overshadowed by Light Procedure Growth," *Leerink Swann*, Apr. 19, 2013.
  - "1Q13 Review: When is a Beat not a Beat? Something Here for Everyone; Reiterate Overweight," *JP Morgan*, Apr. 19, 2013.
  - "Guidance Maintained; Adding ISRG to Our Best Ideas List," *Barrington Research*, Apr. 19, 2013.
  - "Overall Strong Q1 Results, but Procedure Growth Light; Buy," *Canaccord Genuity*, Apr. 19, 2013.
  - "1Q13 Review: Will Overhangs Linger? We Believe ISRG Could Weather the Legal Storm", *Janney Capital Markets*, Apr. 19, 2013.
  - "Disappointing 2Q13 Preannouncement Long-term Fundamentals Remain Intact; Expected Weakness Could Be A Buying Opportunity," *Janney Capital Markets*, July 9, 2013.
  - "Benign dVH, US Systems Drive 2Q Miss; Estimates, PT Under Review but Reiterate Buy," *Cantor Fitzgerald*, July 9, 2013.

- o "Systems Come Up Short; Early 2Q Analysis," *SunTrust Robinson Humphrey*, July 9, 2013.
- o "Q2/13 Results to be Significantly Below Expectations; Risk/Reward from Current Levels is Attractive; Maintaining OUTPERFORM Rating," *Barrington Research*, July 10, 2013.
- o "Q2 2013 Intuitive Surgical Earnings Conference Call," *Thomson Reuters Streetevents*, July 18, 2013.
- o "Broken, For Now; Downgrading to Market Underperform," *JMP Securities*, July 19, 2013.
- o "Intuitive Surgical Disappoints on All Fronts," *Trefis*, July 19, 2013.
- o "On the Operating Room Table; 2Q Analysis," *SunTrust Robinson Humphrey*, July 19, 2013.

## Academic Articles/Texts

- Jean-Claude Bosch & Insup Lee, *Wealth Effects of Food and Drug Association (FDA) Decisions*, 15 MANAGERIAL & DECISION ECON., 589 (1994).
- Richard A. Brealey, Stewart C. Myers, & Franklin Allen, *Principles of Corporate Finance*, (10th ed. 2011).
- Richard M. Cooper & John R. Fleder, *Responding to a Form 483 or Warning Letter: A Practical Guide*, 60 FOOD AND DRUG LAW J., (2005).
- Richard A. DeFusco, Dennis W. McLeavey, Jerald E. Pinto & David E. Runkle, *Quantitative Methods for Investment Analysis*, (2001).
- Damodar N. Gujarati, *Basic Econometrics*, (3d ed. 1995).
- Joshua Livnat & Yuan Zhang, *Information Interpretation or Information Discovery: Which Role of Analysts Do Investors Value More*, 17 REV ACCT. STUD., (2012).
- A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economics Literature*, Volume 35 (1), March 1997.
- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, (3d ed., 2001).
- T. Winchell, *FDA Warning Letter: Avoidance and Advice*, 14 QUALITY ASSURANCE J., 76 (2011).

All documents and data referenced in this report not otherwise explicitly listed in this Appendix A.

# Appendix B

download
Wire: Bloomberg News (BN) Date: <mark>Mar 5 2013</mark> <mark>0:00:01</mark>
Robosurgery Suits Detail Injuries as Death Reports Rise: Health


By Robert Langreth
     March 5 (Bloomberg) -- After Michelle Zarick complained of excessive vaginal bleeding, her doctor found growths in her uterus that needed to be removed. One option: robot surgery, described by her gynecologist as "the latest, greatest" technique available.
     With nimble robotic instruments doing the delicate work usually performed by doctors hands-on, there would be less pain and bleeding, she was told.
     "In my mind, there was no alternative but to use this fabulous technology," she recalls thinking.
     Five weeks later, she wished she hadn't. That's when Zarick felt something pop while she was in the bathroom, looked down and saw her intestine protruding from her vagina. Now, four years later, the 41-year-old Zarick has a hip-to-hip scar from corrective surgery, constipation from damaged rectal muscles and a diminished sex life, she said in an interview.
     "It didn't help me one bit, the robot," said Zarick, who lives in Lincoln, California and filed suit in December against Intuitive in regard to her hysterectomy. "It forever changed my life for the worse."
     Robot systems made by Intuitive Surgical Inc. are linked to at least 70 deaths in informal incident reports sent to U.S. regulators since 2009, according to a review by Bloomberg News. Now, lawsuits like Zarick's, one of at least 10 filed in the last 14 months, are adding new details about dangerous complications involving the da Vinci robots made by Intuitive.

## Dominant Company

     Intuitive, based in Sunnyvale, California, dominates the robot-surgery field. It's the only company whose system is cleared in the U.S. for soft tissue procedures that include general surgery, prostate operations and gynecological surgery, said Angela Wonson, a company spokeswoman.
     The robots, priced at $1.5 million each, have helped make Intuitive one of the hottest stocks in health care, growing 61 percent since the end of February 2010 to a market value of $21.7 billion. The number of U.S. procedures done with the robots has grown to about 367,000 in 2012, compared with 292,000 in 2011 and 228,000 in 2010, according to a company filing.
     While more than half of last year's total involved gynecological treatments, the robots also are used for prostate and gall bladder removals, as well as heart surgery. The benefits include a better camera system, robot arms that can precisely mimic natural hand movements inside the body, and improved surgeon ergonomics to reduce fatigue, according to a regulatory filing by the company.

## Surgical Costs

     Still, tough new questions about safety raised in lawsuits and in adverse incident reports to U.S. regulators may threaten the company's growth. They come as the technology is already facing criticism for raising surgical costs at a time when few large, randomized trials document significant health benefits for the robots, compared with standard less-invasive operations.
     In robot surgery, a physician sits at a video-game style console several feet from the patient and peers into a high-

download
definition display. Foot pedals and hand controls maneuver mechanical arms equipped with tools, guided by a 3-D camera that shows the work as it is done inside a patient. This differs from other minimally-invasive operations in which doctors stand over the patient and manually manipulate instruments and a tiny camera through multiple small incisions.

"Part of what's driven this market is people seeking out robotic surgery; hospitals market it and the patients seem to think it's better," said Michael Matson, an analyst with Mizuho Securities USA in New York, in a telephone interview. The threat to the company is "that the patients would get scared."

## Public View

Martin Makary, a surgeon at the Johns Hopkins Hospital in Baltimore, said he's concerned that some complaints may not reach the public because they're kept quiet by hospitals, which often use the machines as a draw to gain additional costumers.

"No one knows the numbers now," said Makary, who has studied how hospitals market the robots, in a telephone interview. "But we have all seen or heard of cases of inadvertent injuries."

Intuitive remains confident the robots are "extremely safe," according to Myriam Curet, the company's chief medical adviser. An "extraordinarily small" percentage of deaths and injuries "hasn't grown" over time, Curet said in a telephone interview.

The safety issue, though, isn't likely to go away soon, according to Paul Rheingold, a New York-based lawyer who represents the father of a woman who died 13 days after undergoing surgery with an Intuitive robot. Rheingold is in the process of investigating other potential cases, he said in a telephone interview.

## FDA Reports

A review of adverse incident reports sent to the Food and Drug Administration since 2009 shows an increase. As the popularity of robot surgery has grown, injury reports involving the procedures jumped to at least 115 in 2012 from 24 in 2009, while deaths rose to 30 from 11.

The increases have already spurred the FDA to survey surgeons in January about potential complications, training and the procedures they may be most and least suited for, Bloomberg News reported on Feb. 28.

The reports, from doctors, patients and companies, don't necessarily mean the robots caused any deaths, only that they were involved in procedures in which deaths occur. They're largely unverified by the agency, and can be incomplete or misleading, the FDA has said. Yet they have served in the past as a valuable early-warning system in the past on problems involving medical devices.

## Vaginal Wound

The type of complication that Zarick experienced, which can occur when the vaginal wound fails to properly heal after a hysterectomy, is among a variety of injuries cited in the lawsuits, two of which outline deaths allegedly connected to robosurgeries.

In one of the 10 cases against Intuitive Surgical, for instance, the liver and spleen of a Michigan man were allegedly punctured during a heart valve repair, leading to 15 hours of

Page 2

download

internal bleeding. In another, an Alabama man suffered damage to his rectum and bowel after prostate surgery.

Angela Wonson, an Intuitive spokeswoman, said it was company policy not to comment on individual litigation. Some large population studies have found that robotic prostate surgery has "lower complication and mortality rates than open surgery," she said in an e-mail.

Vaginal wound complications have been researched in a limited number of studies, none of which are definitive.

## Mayo Clinic

In 2009, the Mayo Clinic in Phoenix, Arizona found the complication in 21 of 510 robot hysterectomies done between 2004 and 2008, according to a study. The lead author of that report, Rosanne Kho, a gynecologic surgeon at the clinic, said in a telephone interview that while changes in surgeon techniques have lessened instances of the complication since, she has always used non-robotic methods for most hysterectomy cases.

In 2011, an analysis published in the American Journal of Obstetrics & Gynecology found the complication occurs in almost two percent of robot hysterectomies, or more than twice the rate seen in conventional, less invasive surgery.

Intuitive's Curet disputes the 2011 finding. The study examined "a much smaller subset of patients and surgeons for robotic surgery, so the data is less robust and may account for the lower rates in laparoscopy," she said. Minimally invasive surgery in general has higher rates of the vaginal-wound complications, not just with the robots, Curet said.

While the complication has been debated, Zarick said in an interview that no one advised her that her intestines could fall out before she began the robot procedure.

## Hospital Website

Zarick's surgery was performed at the Mercy San Juan Medical Center in Carmichael, California. The center's website says the da Vinci system brings "extraordinary" patient benefits, including "precision, control and dexterity traditional surgeries simply can't match."

Scars are "drastically reduced," the web site says. "And pain and the potential for complications are minimized."

"Our highest priority is providing the best care for our patients," said Melissa Jue, a spokeswoman for the hospital, in an e-mailed statement responding to questions. "We respect the privacy of our patients and legally cannot discuss the specifics of their care."

Zarick said she didn't realize the robot might be at fault until she visited a new gynecologist last fall. He called her problem a "textbook" example of a side effect increasingly being seen with robot surgery, Zarick said in an interview.

"People are being wheeled into operating rooms every day without the full knowledge that they are putting their lives at risk in the hands of a robot," she said in an interview in the Los Angeles offices of her attorney, Mark J. Geragos.

## Allegations Denied

Intuitive Surgical "denies each and every allegation" in Zarick's lawsuit, the company said in a February court filing.

Zarick's injuries were caused by "events that were extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from

Page 3

download
Intuitive Surgical's conduct or control," the filing said.

Gilmore McCalla of the Bronx in New York, whose daughter Kimberley died at age 24 after robot surgery, said he didn't even know the machine was being used in Kimberley's case.

His daughter underwent the procedure at Montefiore Medical Center on Aug. 12, 2010 after being diagnosed with early-stage cervical cancer, the hotel maintenance worker said in a telephone interview. It was supposed to be a straightforward operation to remove her uterus and other reproductive organs that would get her out of the hospital a day later. She never left the hospital, he said.

## Lacerated Artery

Eleven days after the operation, she was rushed back into surgery, where doctors found a laceration of the iliac artery near the original operation, according to hospital documents provided by Rheingold, McCalla's attorney.

The doctors sewed the artery up, but it was too late. After two more emergency operations, Kimberley died on August 25 after suffering small bowel damage "incompatible with life," according to an operative report.

An autopsy found the death was a "therapeutic complication," resulting in hemorrhage and multi-organ failure.

In a product-liability lawsuit against Intuitive Surgical filed in Federal District Court in New York, McCalla contends the robot deserves blame. The suit contends the robot tools didn't have adequate insulation, which can result in electrical burns to surrounding tissue.

McCalla has also filed a separate malpractice lawsuit in New York state court contending that Montefiore and Kimberley's doctors failed to quickly recognize the problem.

## 'Useful, Desirable'

Intuitive, in court papers, rejects the charges. "Intuitive denies that the da Vinci Surgical System proximately caused Plaintiff's Decedent's alleged injuries, including her death," the company said in a court filing. "The medical device in question is useful and desirable, and any risk claimed by the Plaintiff with its use and the alleged injury, to the extent it exists, is unavoidable."

Montefiore "is unable to comment on any pending litigation," said Mariann Caprino, a spokeswoman for the hospital. The center, which has done thousands of procedures since 2005 with robotic equipment, performs less invasive operations widely as they are "safe, effective, and result in a faster and more comfortable recovery."

A 2011 study in the American Journal of Obstetrics & Gynecology, done in a laboratory, found that certain types of insulation failed on the robot at as much as four times the rate of conventional minimally-invasive surgery equipment.

## Real World

Intuitive, though, says the finding doesn't represent real-world practices. The voltages used "are well outside of anything that would be used clinically," said David Rosa, an Intuitive senior vice president, in a telephone interview.

Last August, researchers from Memorial-Sloan Kettering Cancer Center reported three cases of blood vessel burns caused by insulation failures with the robot, all of which were caught and fixed before they caused major complications.

download

Rare cases of burns from electrosurgical equipment are "nothing new that is specific to the robot," said Sloan-Kettering's Leitao, who was involved with the research. A key part of the insulation has been improved, he said.

"Everything we use in life doesn't work 100 percent of the time," Leitao said.

Many patients have been happy with their robot surgeries. Colleen Marasco, an ultrasound technician in Manalapan, New Jersey, sought out the robot in 2009 to treat uterine fibroids after reading about it on the Internet. She wanted to avoid the long recovery time and big scar she experienced with a previous earlier fibroid surgery.

### 'Easier Recovery'

She had a fertility-sparing robot operation at Hackensack University Medical Center in December 2009 and was home the next day. The pain was far less than the first surgery, and she gave birth to her first child less than two years later.

"It lived up to what they had promised," said Marasco, who gave birth to her first child less than two year later. "It was a much easier recovery."

Intuitive officials say the company isn't competing with doctors already comfortable with minimally invasive surgery. Instead, the robot helps to expand minimally invasive operations to new areas that are especially complex, said Sherry Wren, a Stanford University surgery professor who performed an early trial of the robot in gall bladder surgery.

Robot arms offer greater flexibility, Wren said.

"It really does shorten your learning curve," she said.

Zarick, meanwhile, said she believes she would have been better off without any robot surgery at all.

"If given the opportunity, I would take back all of the symptoms of the multiple fibroid tumors," she said. "If I could just have my life back it would be worth it."

The case is Zarick v. Intuitive Surgical, Inc., 12-cv-237723, Superior Court, Santa Clara County, California.

For Related News and Information:
Top Stories: TOP <GO>
Health stories from the U.S.: TNI US HEA BN <GO>
Stories on new research: TNI MEDICAL SCIENCE BN <GO>
Intuitive Surgical analysis: ISRG US <Equity> FA <GO>

--With assistance from Sharon L. Lynch in New York and David Voreacos in Newark. Editors: Reg Gale, Rick Schine.

To contact the reporter on this story:
Robert Langreth in New York at +1-212-617-1886 or rlangreth@bloomberg.net

To contact the editor responsible for this story:
Reg Gale at +1-212-617-2563 or rgale5@bloomberg.net

[TAGINFO]

ISRG US <Equity>
3400398Z US <Equity>

NI HOS

```
                                    download
NI  SCIENCE
NI  EXCLUSIVE
NI  HHS
NI  UROILL
NI  MINSURG
NI  HCP
NI  FDA
NI  ROBOT
NI  COS


#<602341.3448800.2.3.0.0.25>#
-0- Mar/05/2013 05:00 GMT

------------------------------==============================------------------------------
                     Copyright (c) 2015, Bloomberg, L. P.

############################# END OF STORY 1 #############################
```

Wire: Bloomberg News (BN) Date: Mar 5 2013  16:05:57
Robosurgery Suits Detail Injuries as Death Reports Rise: Health


(Updates with closing share price in eighth paragraph.)

By Robert Langreth

March 5 (Bloomberg) -- After Michelle Zarick complained of excessive vaginal bleeding, her doctor found growths in her uterus that needed to be removed. One option: robot surgery, described by her gynecologist as "the latest, greatest" technique available.

With nimble robotic instruments doing the delicate work usually performed by doctors hands-on, there would be less pain and bleeding, she was told.

"In my mind, there was no alternative but to use this fabulous technology," she recalls thinking.

Five weeks later, she wished she hadn't. That's when Zarick felt something pop while she was in the bathroom, looked down and saw her intestine protruding from her vagina. Now, four years later, the 41-year-old Zarick has a hip-to-hip scar from corrective surgery, constipation from damaged rectal muscles and a diminished sex life, she said in an interview.

"It didn't help me one bit, the robot," said Zarick, who lives in Lincoln, California and filed suit in December against Intuitive in regard to her hysterectomy. "It forever changed my life for the worse."

Robot systems made by Intuitive Surgical Inc. are linked to at least 70 deaths in informal incident reports sent to U.S. regulators since 2009, according to a review by Bloomberg News. Now, lawsuits like Zarick's, one of at least 10 filed in the last 14 months, are adding new details about dangerous complications involving the da Vinci robots made by Intuitive.

### Dominant Company

Intuitive, based in Sunnyvale, California, dominates the robot-surgery field. It's the only company whose system is cleared in the U.S. for soft tissue procedures that include general surgery, prostate operations and gynecological surgery, said Angela Wonson, a company spokeswoman.

Intuitive fell 2.9 percent to $525.72 at the close in New York. The shares have gained 2.4 percent in the past 12 months.

The robots, priced at $1.5 million each, have helped make Intuitive one of the hottest stocks in health care, growing 61 percent since the end of February 2010 to a market value of $21.7 billion. The number of U.S. procedures done with the robots has grown to about 367,000 in 2012, compared with 292,000 in 2011 and 228,000 in 2010, according to a company filing.

While more than half of last year's total involved gynecological treatments, the robots also are used for prostate and gall bladder removals, as well as heart surgery. The benefits include a better camera system, robot arms that can

precisely mimic natural hand movements inside the body, and improved surgeon ergonomics to reduce fatigue, according to a regulatory filing by the company.

### Surgical Costs

Still, tough new questions about safety raised in lawsuits and in adverse incident reports to U.S. regulators may threaten the company's growth. They come as the technology is already facing criticism for raising surgical costs at a time when few large, randomized trials document significant health benefits for the robots, compared with standard less-invasive operations.

In robot surgery, a physician sits at a video-game style console several feet from the patient and peers into a high-definition display. Foot pedals and hand controls maneuver mechanical arms equipped with tools, guided by a 3-D camera that shows the work as it is done inside a patient. This differs from other minimally-invasive operations in which doctors stand over the patient and manually manipulate instruments and a tiny camera through multiple small incisions.

"Part of what's driven this market is people seeking out robotic surgery; hospitals market it and the patients seem to think it's better," said Michael Matson, an analyst with Mizuho Securities USA in New York, in a telephone interview. The threat to the company is "that the patients would get scared."

### Public View

Martin Makary, a surgeon at the Johns Hopkins Hospital in Baltimore, said he's concerned that some complaints may not reach the public because they're kept quiet by hospitals, which often use the machines as a draw to gain additional costumers.

"No one knows the numbers now," said Makary, who has studied how hospitals market the robots, in a telephone interview. "But we have all seen or heard of cases of inadvertent injuries."

Intuitive remains confident the robots are "extremely safe," according to Myriam Curet, the company's chief medical adviser. An "extraordinarily small" percentage of deaths and injuries "hasn't grown" over time, Curet said in a telephone interview.

The safety issue, though, isn't likely to go away soon, according to Paul Rheingold, a New York-based lawyer who represents the father of a woman who died 13 days after undergoing surgery with an Intuitive robot. Rheingold is in the process of investigating other potential cases, he said in a telephone interview.

### FDA Reports

A review of adverse incident reports sent to the Food and Drug Administration since 2009 shows an increase. As the popularity of robot surgery has grown, injury reports involving the procedures jumped to at least 115 in 2012 from 24 in 2009,

while deaths rose to 30 from 11.

The increases have already spurred the FDA to survey surgeons in January about potential complications, training and the procedures they may be most and least suited for, Bloomberg News reported on Feb. 28.

The reports, from doctors, patients and companies, don't necessarily mean the robots caused any deaths, only that they were involved in procedures in which deaths occur. They're largely unverified by the agency, and can be incomplete or misleading, the FDA has said. Yet they have served in the past as a valuable early-warning system in the past on problems involving medical devices.

### Vaginal Wound

The type of complication that Zarick experienced, which can occur when the vaginal wound fails to properly heal after a hysterectomy, is among a variety of injuries cited in the lawsuits, two of which outline deaths allegedly connected to robosurgeries.

In one of the 10 cases against Intuitive Surgical, for instance, the liver and spleen of a Michigan man were allegedly punctured during a heart valve repair, leading to 15 hours of internal bleeding. In another, an Alabama man suffered damage to his rectum and bowel after prostate surgery.

Angela Wonson, an Intuitive spokeswoman, said it was company policy not to comment on individual litigation. Some large population studies have found that robotic prostate surgery has "lower complication and mortality rates than open surgery," she said in an e-mail.

Vaginal wound complications have been researched in a limited number of studies, none of which are definitive.

### Mayo Clinic

In 2009, the Mayo Clinic in Phoenix, Arizona found the complication in 21 of 510 robot hysterectomies done between 2004 and 2008, according to a study. The lead author of that report, Rosanne Kho, a gynecologic surgeon at the clinic, said in a telephone interview that while changes in surgeon techniques have lessened instances of the complication since, she has always used non-robotic methods for most hysterectomy cases.

In 2011, an analysis published in the American Journal of Obstetrics & Gynecology found the complication occurs in almost two percent of robot hysterectomies, or more than twice the rate seen in conventional, less invasive surgery.

Intuitive's Curet disputes the 2011 finding. The study examined "a much smaller subset of patients and surgeons for robotic surgery, so the data is less robust and may account for the lower rates in laparoscopy," she said. Minimally invasive surgery in general has higher rates of the vaginal-wound complications, not just with the robots, Curet said.

While the complication has been debated, Zarick said in an interview that no one advised her that her intestines could fall

out before she began the robot procedure.

### Hospital Website

Zarick's surgery was performed at the Mercy San Juan Medical Center in Carmichael, California. The center's website says the da Vinci system brings "extraordinary" patient benefits, including "precision, control and dexterity traditional surgeries simply can't match."

Scars are "drastically reduced," the web site says. "And pain and the potential for complications are minimized."

"Our highest priority is providing the best care for our patients," said Melissa Jue, a spokeswoman for the hospital, in an e-mailed statement responding to questions. "We respect the privacy of our patients and legally cannot discuss the specifics of their care."

Zarick said she didn't realize the robot might be at fault until she visited a new gynecologist last fall. He called her problem a "textbook" example of a side effect increasingly being seen with robot surgery, Zarick said in an interview.

"People are being wheeled into operating rooms every day without the full knowledge that they are putting their lives at risk in the hands of a robot," she said in an interview in the Los Angeles offices of her attorney, Mark J. Geragos.

### Allegations Denied

Intuitive Surgical "denies each and every allegation" in Zarick's lawsuit, the company said in a February court filing.

Zarick's injuries were caused by "events that were extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from Intuitive Surgical's conduct or control," the filing said.

Gilmore McCalla of the Bronx in New York, whose daughter Kimberley died at age 24 after robot surgery, said he didn't even know the machine was being used in Kimberley's case.

His daughter underwent the procedure at Montefiore Medical Center on Aug. 12, 2010 after being diagnosed with early-stage cervical cancer, the hotel maintenance worker said in a telephone interview. It was supposed to be a straightforward operation to remove her uterus and other reproductive organs that would get her out of the hospital a day later. She never left the hospital, he said.

### Lacerated Artery

Eleven days after the operation, she was rushed back into surgery, where doctors found a laceration of the iliac artery near the original operation, according to hospital documents provided by Rheingold, McCalla's attorney.

The doctors sewed the artery up, but it was too late. After two more emergency operations, Kimberley died on August 25 after suffering small bowel damage "incompatible with life," according to an operative report.

An autopsy found the death was a "therapeutic complication," resulting in hemorrhage and multi-organ failure.

In a product-liability lawsuit against Intuitive Surgical filed in Federal District Court in New York, McCalla contends the robot deserves blame. The suit contends the robot tools didn't have adequate insulation, which can result in electrical burns to surrounding tissue.

McCalla has also filed a separate malpractice lawsuit in New York state court contending that Montefiore and Kimberley's doctors failed to quickly recognize the problem.

### 'Useful, Desirable'

Intuitive, in court papers, rejects the charges. "Intuitive denies that the da Vinci Surgical System proximately caused Plaintiff's Decedent's alleged injuries, including her death," the company said in a court filing. "The medical device in question is useful and desirable, and any risk claimed by the Plaintiff with its use and the alleged injury, to the extent it exists, is unavoidable."

Montefiore "is unable to comment on any pending litigation," said Mariann Caprino, a spokeswoman for the hospital. The center, which has done thousands of procedures since 2005 with robotic equipment, performs less invasive operations widely as they are "safe, effective, and result in a faster and more comfortable recovery."

A 2011 study in the American Journal of Obstetrics & Gynecology, done in a laboratory, found that certain types of insulation failed on the robot at as much as four times the rate of conventional minimally-invasive surgery equipment.

### Real World

Intuitive, though, says the finding doesn't represent real-world practices. The voltages used "are well outside of anything that would be used clinically," said David Rosa, an Intuitive senior vice president, in a telephone interview.

Last August, researchers from Memorial-Sloan Kettering Cancer Center reported three cases of blood vessel burns caused by insulation failures with the robot, all of which were caught and fixed before they caused major complications.

Rare cases of burns from electrosurgical equipment are "nothing new that is specific to the robot," said Sloan-Kettering's Leitao, who was involved with the research. A key part of the insulation has been improved, he said.

"Everything we use in life doesn't work 100 percent of the time," Leitao said.

Many patients have been happy with their robot surgeries. Colleen Marasco, an ultrasound technician in Manalapan, New Jersey, sought out the robot in 2009 to treat uterine fibroids after reading about it on the Internet. She wanted to avoid the long recovery time and big scar she experienced with a previous earlier fibroid surgery.

'Easier Recovery'

She had a fertility-sparing robot operation at Hackensack University Medical Center in December 2009 and was home the next day. The pain was far less than the first surgery, and she gave birth to her first child less than two years later.

"It lived up to what they had promised," said Marasco, who gave birth to her first child less than two year later. "It was a much easier recovery."

Intuitive officials say the company isn't competing with doctors already comfortable with minimally invasive surgery. Instead, the robot helps to expand minimally invasive operations to new areas that are especially complex, said Sherry Wren, a Stanford University surgery professor who performed an early trial of the robot in gall bladder surgery.

Robot arms offer greater flexibility, Wren said.

"It really does shorten your learning curve," she said.

Zarick, meanwhile, said she believes she would have been better off without any robot surgery at all.

"If given the opportunity, I would take back all of the symptoms of the multiple fibroid tumors," she said. "If I could just have my life back it would be worth it."

The case is Zarick v. Intuitive Surgical, Inc., 12-cv-237723, Superior Court, Santa Clara County, California.

For Related News and Information:
Top Stories: TOP <GO>
Health stories from the U.S.: TNI US HEA BN <GO>
Stories on new research: TNI MEDICAL SCIENCE BN <GO>
Intuitive Surgical analysis: ISRG US <Equity> FA <GO>

--With assistance from Sharon L. Lynch in New York and David Voreacos in Newark. Editors: Reg Gale, Rick Schine.

To contact the reporter on this story:
Robert Langreth in New York at +1-212-617-1886 or
rlangreth@bloomberg.net

To contact the editor responsible for this story:
Reg Gale at +1-212-617-2563 or
rgale5@bloomberg.net

[TAGINFO]

ISRG US <Equity>
3400398Z US <Equity>

NI HOS
NI SCIENCE
NI EXCLUSIVE
NI HHS
NI UROILL

NI MINSURG
NI HCP
NI FDA
NI ROBOT
NI COS


#<602341.3448800.2.3.0.0.25>#
#<184845.409373.3.4.1.0.25>#



#<184845.409373.3.4.1.0.25>#
-0- Mar/05/2013 21:05 GMT


---------------------------======================-=----------------------------
                  Copyright (c) 2014, Bloomberg, L. P.


################################ END OF STORY 1 ###############################