KEKER & VAN NEST LLP
JOHN W. KEKER - # 49092
jkeker@kvn.com
MICHAEL D. CELIO - # 197998
mcelio@kvn.com
LAURIE C. MIMS - # 241584
lmims@kvn.com
CODY S. HARRIS - # 255302
charris@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendants INTUITIVE SURGICAL, INC.,
LONNIE M. SMITH, GARY S. GUTHART, and MARSHALL
L. MOHR

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE INTUITIVE SURGICAL SECURITIES LITIGATION | Case No. 5:13-cv-01920-EJD (HRL) |
| | **NOTICE OF MOTION AND MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | Date:     June 29, 2017<br>Time:     9:00 a.m.<br>Dept.:    Courtroom 4, 5th Floor<br>Judge:    Hon. Edward J. Davila |

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 29, 2017 at 9:00 a.m., or as soon thereafter as this matter may be heard in the courtroom of the Honorable Edward J. Davila, located at 280 S. First Street, San Jose, California 95113, Defendants will and hereby do move this Court for an Order dismissing Plaintiffs' Second Amended Class Action Complaint ("SACC").

This Motion is brought pursuant to the Private Securities Litigation Reform Act of 1995 and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the SACC fails to plead fraud with particularity and fails to state a claim upon which relief may be granted.  This Motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, all files and records in this action, oral argument, and such additional matters as may be judicially noticed by the Court or may come before the Court prior to or at the hearing on this matter.

### ISSUES TO BE DECIDED (Civil Local Rule 7-4(a)(3))

1.   Have Plaintiffs adequately specified "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" as required by 15 U.S.C. § 78u–4(b)(1)(B)?

2.   Have Plaintiffs sufficiently alleged that Defendants failed to disclose material information that they had a duty to report to investors?

3.   Have Plaintiffs alleged with particularity facts giving rise to a strong inference that Defendants acted with scienter as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4?

Dated:  February 9, 2017                          KEKER & VAN NEST LLP

By:   /s/ *Michael D. Celio*
                                                       JOHN W. KEKER
                                                       MICHAEL D. CELIO
                                                       LAURIE C. MIMS
                                                       CODY S. HARRIS

                                                       Attorneys for Defendants INTUITIVE
                                                       SURGICAL, INC., LONNIE M. SMITH,
                                                       GARY S. GUTHART, and MARSHALL L.
                                                       MOHR

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................................1

I.       INTRODUCTION ...............................................................................................................1

II.      BACKGROUND .................................................................................................................2

         A.       The Amended Complaint ..............................................................................2

         B.       The First Motion to Dismiss ........................................................................3

         C.       The Second Amended Complaint ..................................................................4

III.     LEGAL STANDARD..........................................................................................................8

IV.      ARGUMENT .......................................................................................................................9

         A.       Plaintiffs fail to allege actionable misstatements or omissions. .............9

                  1.       The SACC contains no actionable misstatements. ....................10

                           a.       Inactionable Statements of Opinion................................10

                           b.       Statements Unrelated to Intuitive or *da Vinci*................13

                           c.       Statements True Even in Hindsight ...............................14

                  2.       The SACC alleges no actionable omissions because Intuitive had no affirmative duty to disclose.........................16

         B.       Plaintiffs' scienter allegations are inadequate.......................................18

                  1.       The Reform Act sets an exacting pleading standard for scienter...............18

                  2.       Plaintiffs have failed to allege facts supporting a strong inference of scienter. ...............19

                           a.       Plaintiffs' scienter allegations regarding Lonnie Smith fail. .........20

                           b.       Plaintiffs' scienter allegations regarding Marshall Mohr fail.......21

                           c.       Plaintiffs' scienter allegations regarding Gary Guthart fail..........23

         C.       This action must be stayed while this motion is pending. ....................24

V.       CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Basic Inc. v. Levinson*
   485 U.S. 224 (1988)........................................................................... 10, 11, 16

*Brody v. Transitional Hosps. Corp.*
   280 F.3d 997 (9th Cir. 2002) ......................................................................... 17, 18

*Glazer Capital Mgmt., LP v. Magistri*
   549 F.3d 736 (9th Cir. 2008) ......................................................................... 20

*Gompper v. VISX, Inc.*
   298 F.3d 893 (9th Cir. 2002) ......................................................................... 19

*In re Cisco Sys. Inc. Sec. Litig.*
   2013 WL 1402788 (N.D. Cal. Mar. 29, 2013)............................................... 22

*In re Gilead Sciences Sec. Litig.*
   536 F.3d 1049 (9th Cir. 2008) ......................................................................... 8

*In re Lehman Bros. Sec. & ERISA Litig.*
   131 F. Supp. 3d 241, 251n.48 (S.D.N.Y. 2015)............................................ 11

*In re NVIDIA Corp. Sec. Litig.*
   768 F.3d 1046 (9th Cir. 2014) ......................................................................... 19

*In re Sanofi Sec. Litig.*
   87 F. Supp. 3d 510, 522 ................................................................................. 18, 24

*In re Silicon Graphics, Inc. Sec. Litig.*
   970 F. Supp. 746 (N.D. Cal. 1997) ............................................................... 21

*In re Splash Tech. Holdings, Inc. Sec. Litig.*
   2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ............................................. 21

*In re Tesla Motors, Inc. Sec. Litig.*
   ("*Tesla Motors*"), 75 F. Supp. 3d 1034 (N.D. Cal. 2014)............................... 9, 18

*In re Tibco Software, Inc.*
   2006 WL 1469654 (N.D. Cal. May 25, 2006) ............................................... 22

*In re Velti PLC Sec. Litig.*
   2015 WL 5736589 (N.D. Cal. Oct. 1, 2015)................................................. 11

*In re Worlds of Wonder Sec. Litig.*
   35 F.3d 1407 (9th Cir. 1994) ......................................................................... 22

*Matrixx Initiatives, Inc. v. Siracusano*
   563 U.S. 27 (2011)......................................................................................... 16

*McClain v. Iradimed Corp.*
   111 F. Supp. 3d 1293, 1302 (S.D. Fla. 2015) .............................................. 16

1145682

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*
    540 F.3d 1049 (9th Cir. 2008) ................................................................. 22

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*
    135 S. Ct. 1318 (2015)................................................................. 1, 11, 12, 13

*Ore. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*
    774 F.3d 598 (9th Cir. 2014) ................................................................. 20

*Petrie v. Elec. Game Card, Inc.*
    761 F.3d 959 (9th Cir. 2014) ................................................................. 24

*Plumbers and Pipefitters Local Union v. Zimmer*
    673 F. Supp. 2d 718 (S.D. Ind. 2009) ................................................................. 22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*
    759 F.3d 1051 (9th Cir. 2014) ................................................................. 4, 17, 19

*Ronconi v. Larkin*
    253 F.3d 423 (9th Cir. 2001) ................................................................. 8

*S. Ferry LP, No. 2 v. Killinger*
    542 F.3d 776 (9th Cir. 2008) ................................................................. 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308 (2007)................................................................. 8, 19, 21, 22, 24

*Tongue v. Sanofi*
    816 F.3d 199 (2d Cir. 2016)................................................................. 12, 13

*Wenger v. Lumisys, Inc.*
    2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................................. 9

**Federal Statutes**

15 U.S.C. § 78u-4(b) ................................................................. 8, 9, 24

21 U.S.C. § 337(a) ................................................................. 18

**Federal Rules**

Fed. R. Civ. P. 9(b) ................................................................. 8, 9

Fed. R. Civ. P 23(f)................................................................. 5

1145682

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs survived a previous motion to dismiss by relying on now discredited and withdrawn allegations.  The Court granted them leave to file a Second Amended Class Action Complaint ("SACC") that abandons those allegations in favor of a hodgepodge of out-of-context documents and deposition snippets obtained during fact discovery.  Yet even after years of discovery, Plaintiffs cannot adequately allege a cause of action for securities fraud against Defendants Intuitive Surgical, Inc. and its three top executives under the exacting pleading standards of the Private Securities Litigation Reform Act ("Reform Act").

Two things have changed since the Court's previous August 21, 2014 order permitting a portion of Plaintiffs' claims to proceed past the pleadings, and those changes require a different result.  *See* ECF 83.  **First**, the United States Supreme Court handed down its opinion in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, which holds that statements of opinion—which are at issue here—are not actionable simply because the speaker "knows, but fails to disclose, some fact cutting the other way."  135 S. Ct. 1318, 1329 (2015).  Plaintiffs have predicated their lawsuit on general statements of opinion on which no investor would rely, and which omit no material information that Intuitive was required to disclose.  *See, e.g.*, SACC ¶ 224 ("We believe that this new generation of surgery, which we call da Vinci Surgery, combines the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision, and dexterity of open surgery.").  Put simply, *Omnicare* cuts the legs out from Plaintiffs' liability theory.  **Second**, despite having taken full and complete discovery, Plaintiffs are unable to plead scienter with respect to any of the individual Defendants.

Lacking the necessary factual allegations for a securities fraud claim, the SACC tries to plead a products liability case.  It devotes page after page to allegations that Intuitive has litigated and defeated elsewhere and that have nothing to do with the allegedly misleading statements at the heart of this case.  As Magistrate Judge Lloyd recently reminded Plaintiffs, "[T]his is not a products liability case.  This is an action for alleged securities fraud in which the key issues are whether defendants knowingly made false and misleading statements and omissions about the

1145682

safety of the da Vinci system, whether the statements are material, and what impact (if any) resulted." ECF 176 at 3. Plaintiffs' inaccurate forays into unrelated lawsuits and unproven allegations bring them no closer to stating a securities fraud claim.

Defendants are aware that this Court previously reviewed Plaintiffs' allegations and allowed a portion of the case to proceed. But both the law, and Plaintiffs' allegations, have changed significantly in the meantime. Moreover, fact discovery has closed, and Plaintiffs have incorporated by reference hundreds of documents and deposition transcripts into the SACC, making this a rather unusual motion to dismiss. Defendants urge the Court to review the allegations with fresh eyes, and to compare the allegations to the actual statements that supposedly misled investors. Defendants submit that those statements cannot state a claim for securities fraud under the Reform Act's stringent pleading standards.

## II.    BACKGROUND

### A.    The Amended Complaint

This action, originally captioned *Abrams v. Intuitive Surgical, Inc.*, No. 5:15-cv-1920, was filed on April 26, 2013. ECF 1. On October 15, 2013, plaintiff Employees' Retirement System of the State of Hawaii ("Hawaii ERS") and additional named plaintiff Greater Pennsylvania Carpenters' Pension Fund ("Greater Pennsylvania") (collectively, "Plaintiffs") filed an Amended Complaint. Am. Class Action Complaint ("Compl."), ECF 48. On November 18, 2013, the Court retitled the case, appointed Hawaii ERS as Lead Plaintiff, and appointed Labaton Sucharow ("Labaton") lead counsel. ECF 50.

Defendant Intuitive Surgical, Inc. ("Intuitive") manufactures a state-of-the-art computer-assisted surgical system called the *da Vinci*. The Amended Complaint alleged that Intuitive made misleading statements that fell into four categories: "(1) statements regarding the general safety and efficacy of da Vinci surgery; (2) statements regarding Intuitive finances; (3) warning statements regarding the risks Intuitive may face from product-liability lawsuits, product defects, and product recalls; and (4) statements regarding the FDA regulations the company faces." Order Certifying Pl. Class ("Class Order") at 3, ECF 204. The gravamen of the Amended Complaint, however, was that the *da Vinci* suffered from an alleged "defect" in one of its accessories: the tip

cover, a small silicone sheath that sits atop an instrument called the Monopolar Curved Scissors ("MCS").  *See, e.g.*, Compl. ¶¶ 3–5, 11, 17, 41–61, 94–97, 100, 111–21, 183–85, 191, 196, 201, 206, 266–67, 269.  Plaintiffs alleged that this supposed defect could cause patient injuries, and that Intuitive's senior officers knew about and hid "adverse event reports" concerning the alleged problem.  Specifically, Plaintiffs alleged that Intuitive failed to submit Medical Device Reports ("MDRs") to the FDA concerning the tip cover accessory.  *See id.* ¶¶ 65–70.

To meet the Reform Act's heightened pleading requirement for scienter, the Amended Complaint included six paragraphs of allegations attributed to a confidential witness referred to as the "FP&A Manager."  The FP&A Manager was defined as a "former Intuitive Financial Planning and Analysis Manager in Sales and Marketing who worked at the Company from June 2006 until December 2012."  *Id.* ¶ 164.  Plaintiffs later identified this former Intuitive employee as Charles Endweiss.

### B.     The First Motion to Dismiss

Defendants moved to dismiss the Amended Complaint on December 16, 2013.  *See* ECF 53.  Opposing the motion, Plaintiffs assured the Court that the FP&A manager had personal knowledge that Defendants Smith and Guthart "closely monitored reports of adverse events . . . , discussed them frequently, and were able to recite the totals including ratios of adverse events to the FP&A Manager."  *See* ECF 58 at 23–24.  On August 21, 2014, the Court granted Defendants' motion to dismiss in part and denied it in part.  *See* ECF 83 ("MTD Order").  Specifically, the Court "dismissed plaintiffs' allegations as to the second, third, and fourth categories of statements" set forth above.  Class Order at 4.  That left in the case only the first category of alleged misrepresentations: "statements regarding the general safety and efficacy of da Vinci surgery."  *Id.* at 3.  In allowing allegations related to that category to proceed, the Court relied heavily on the statements attributed to the FP&A Manager.  MTD Order at 19–20.

In light of two intervening Ninth Circuit opinions concerning application of the Reform Act's pleading standard, Defendants sought and received leave to file a motion for reconsideration of the Court's MTD Order.  *See* ECF 92.  Defendants argued that the FP&A Manager's alleged statements were insufficient in light of the new Ninth Circuit law, since they

1145682

failed to allege the contents of the "adverse event reports" Plaintiffs claimed he had seen.  *See* ECF 93; *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.* ("*PRS*"), 759 F.3d 1051, 1063 (9th Cir. 2014) (requiring a plaintiff suing Intuitive to link "specific reports and their contents to the executives" who were the subject of the lawsuit).  Opposing reconsideration, Plaintiffs again highlighted the FP&A manager's alleged statements, and assured the Court that they had "demonstrate[d] both the FP&A Manager's personal knowledge and reliability."  ECF 96 at 5, 9 n.13.  Relying exclusively on the FP&A Manager's alleged statements, the Court denied the motion for reconsideration on December 15, 2014.  *See* ECF 98.

Defendants deposed the FP&A Manager—Mr. Endweiss—on July 28, 2015.  Mr. Endweiss flatly denied making the key statements attributed to him in the Amended Complaint, rejecting as inaccurate the Court's recitation of his supposed personal knowledge.  *See* Defs.' Mot. to Strike at 7–12, ECF 191.  In reality, he had no personal knowledge of adverse event reports, had never even seen one, and had no idea whether Defendants Guthart or Smith had either.  *See id.*  Defendants learned that Plaintiffs had made an audio recording of one of their interviews with Mr. Endweiss, but Plaintiffs later admitted to destroying that recording.  *See* ECF 195-8 at ¶ 19.

On October 11, 2016, Defendants sent Plaintiffs' counsel a Rule 11 letter and draft brief demanding that Plaintiffs withdraw the Amended Complaint.  Plaintiffs refused.  Plaintiffs' local counsel, however, withdrew their signatures from the Amended Complaint and associated opposition briefs, and left the case entirely.  *See* ECF 182.  Defendants thereafter moved to strike the Amended Complaint and associated opposition briefs from the record.  ECF 191.  The Court denied that motion without explaining its reasoning on January 25, 2017.  ECF 212 at 5.

### C.   The Second Amended Complaint

Plaintiffs sought leave to file a Second Amended Complaint.  *See* ECF 185.  The new complaint removed all references to Mr. Endweiss—the allegations on which this Court relied when allowing the case to proceed to discovery.  Instead, it now included references to documents and testimony obtained during fact discovery.  Although the Court noted that it found Plaintiffs' reliance on recanted statements and their spoliation of evidence "interesting" and "better suited to

a different motion," it nonetheless permitted Plaintiffs to amend their complaint.  ECF 212 at 4.[1]

The SACC's viability turns on the eight allegedly misleading statements at issue (the "Challenged Statements").[2]  For ease of reference, the statements can be grouped into three categories: (A) Statements in SEC filings reflecting the company's belief in *da Vinci* surgery's benefits; (B) Statements of belief regarding *da Vinci*'s benefits made by Intuitive CEO Gary Guthart; and (C) Intuitive's March 13, 2013 Press Release.  Each statement is discussed in turn:

**Category A: Statements in SEC filings reflecting the company's belief in *da Vinci* surgery's benefits.**

The bulk of Plaintiffs' allegations concern various prefatory statements found in SEC filings evincing the company's confidence in its own products.  All of these statements are found in the introductory "Company Background" section of the relevant filings.  None of the statements mentions the tip cover accessory that lies at the center of Plaintiffs' allegations.  On the contrary, most of the challenged statements reflect the company's belief that its one-of-a-kind robotic surgical system—the only such system the FDA had cleared for use—represents a "new generation of surgery" that provides "benefits" to patients.  The truth of these opinions is self-evident (how could a state-of-the-art robotic surgical system *not* be considered a new generation of surgery?) and supported by a multitude of published, peer-reviewed clinical studies.

Because Plaintiffs often truncate the Challenged Statements, the full statements are set forth below, with the portions that appear in the SACC highlighted in gray:

| Statement | Relevant Text | Source |
|---|---|---|
| A1 | "We believe that this new generation of surgery, which we call *da Vinci* Surgery, combines the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision, and dexterity of open surgery." | SACC ¶¶ 224(a) (quoting Intuitive's 2011 Form 10-K), 236 (quoting in part Intuitive's 2012 Form 10-K). |

---

[1] Additionally, on September 1, 2015, Plaintiffs moved to certify a class of investors who acquired Intuitive common stock between February 6, 2012 and July 18, 2013 (the "Class Period").  ECF 123.  The Court certified the proposed class on December 22, 2016.  ECF 204.  Defendants have sought permission from the Ninth Circuit to appeal the Court's order pursuant to Federal Rule of Civil Procedure 23(f).  That request remains pending.

[2] Accompanying this motion as **Attachment A** is a chart listing the Challenged Statements, along with the reasons why each one is inactionable.

5

1145682

| A2 | "The **da Vinci Surgical System enables surgeons to extend the benefits of MIS** to many patients typically receiving open surgery by using computational robotic and imaging technologies to overcome many of the limitations of conventional minimally invasive surgery." | *Id.* ¶ 224(b) (quoting Intuitive's 2011 Form 10-K) (emphasis Plaintiffs'). |
|---|---|---|
| A3 | "Intuitive designs, manufactures, and markets *da Vinci*® Surgical Systems and related instruments and accessories, which taken together, are advanced surgical systems that the Company believes represent a new generation of surgery. The Company believes that this new generation of surgery, which the Company calls *da Vinci* Surgery, combines the **benefits** of minimally invasive surgery ("MIS") for patients with the ease of use, precision, and dexterity of open surgery." | *Id.* ¶¶ 227 (quoting in part Intuitive's Q1 2012 Form 10-Q) (emphasis Plaintiffs'), 230 (quoting in part Intuitive's Q2 2012 Form 10-Q), 233 (quoting in part Intuitive's Q3 2012 Form 10-Q), ¶ 245(a) (quoting in part Intuitive's Q1 2013 Form 10-Q). |
| A4 | "Open surgery remains the predominant form of surgery and is used in almost every area of the body.  However, the large incisions required for open surgery create trauma to the patient, resulting in longer hospitalization and recovery times, increased hospitalization costs and additional pain and suffering relative to MIS, where MIS is available.  Over the past two decades, **MIS ha[d] reduced trauma to the patient** by allowing selected surgeries to be performed through small ports rather than large incisions, often **resulting in shorter recovery times, fewer complications** and reduced hospitalization costs." | *Id.* ¶ 236 (quoting in part Intuitive's 2012 Form 10-K) (emphasis and alteration Plaintiffs'). |
| A5 | "Recently, including during the first quarter of 2013, there have been articles published and papers written questioning patient safety and efficacy associated with *da Vinci* Surgery, the cost of *da Vinci* Surgery relative to other disease management methods, and the adequacy of surgeon training.  We believe that *da Vinci* Surgery continues to be a safe and effective surgical method, as supported by a substantial and growing number of scientific studies and peer reviewed papers, and that the training we provide to surgeons helps ensure that they are able to operate our systems with the requisite skill and expertise.  The recent negative press could delay or adversely impact procedure adoption and our revenue growth in future periods." | *Id.* ¶ 245(b) (quoting in part Intuitive's Form 10-Q from Q1 2013). |

**Category B: General statements of belief made by Gary Guthart.**

Plaintiffs point to similar opinion statements that Intuitive's CEO, Gary Guthart, made during conference calls with securities analysts.  None of Dr. Guthart's statements mentioned the tip cover accessory.  Again, because Plaintiffs truncate the statements, the full statements are set forth below, with the portions that appear in the SACC highlighted in gray:

| Statement | Relevant Text | Source |
|---|---|---|
| B1 | "We are pleased with our first quarter revenue and earnings growth.  Despite a concerted effort by vocal critics of robotic surgery, support remains strong among patients, surgeons and hospitals . . . . *da Vinci* Surgery has clinically proven benefits in offering a minimally invasive option to a broader group of patients than traditional technologies." | SACC ¶ 241 (quoting April 18, 2013 8-K). |
| B2 | "As you know, we are in the midst of a concerted effort by critics of robotic surgery, to challenge the benefited range of patients, the value it brings to the medical community and the quality of our organization.  While taking these allegations very seriously, we remain deeply committed to developing and providing products that are in the surgeon's hands, ease the burden of surgery for patients who can benefit from them.  We take pride in the benefits provided by our systems, demonstrated a [sic] numerous large scale population studies comparing *da Vinci* surgery to open surgery for several different procedures.  We are confident that those who invest their time in a serious review of the clinical literature on da Vinci will find ample evidence, and the benefit it brings to patients, surgeons, hospitals, and the medical community at large.  . . . In closing, ***da Vinci* Surgery has proven safety, efficacy, economic and ergonomic benefits** when compared to the open surgical procedures it is replacing.  We are steadfast in our conviction in the value that da Vinci has and will bring to medicine." | SACC ¶ 242 (emphasis Plaintiffs') (full conference call transcript is available at ECF 135-55). |

**Category C: Intuitive's March 13, 2013 Press Release**

Finally, Plaintiffs point to a press release that Intuitive issued on March 13, 2013, regarding its MDR reporting practices ("Statement C").  In full, the statement reads:

In response to general inquiries regarding a recent rise in Medical Device Reports (MDR) filed by Intuitive Surgical, the company explained that the noted rise does

7

not reflect a change in product performance but rather a change in MDR reporting practices.

In September 2012, Intuitive Surgical revised its MDR practices, resulting in increased reports of device malfunction MDRs, the vast majority of which were related to instruments and not to systems.  None of these device malfunction MDRs involved reportable injuries or deaths.

"We self-identified the reporting issue, notified the FDA and revised our practices," said Dave Rosa, Senior Vice President, Emerging Procedures and Technologies, Intuitive Surgical.

MDRs can be found in the FDA's MAUDE database, which is updated by FDA regularly.  The most common type of report filed under the company's revised MDR practices involves instrument cable breaks.  These cable breaks render the instrument non-functional and require an instrument change, which can be accomplished quickly.

The company also made an administrative change in how MDRs previously reported as adverse events were subcategorized.  This change has not increased the total number of adverse event reports.  This will result in an increase in events in the "serious injury" subcategory and a corresponding decrease in the "other" subcategory.  Total adverse event rates have remained low and in line with historical trends.

*See* Rosa 30(b)(6) Ex. 32 (March 13, 2013 Press Release) (incorporated by reference at SACC ¶ 100 n.79).  Because none of these statements is actionable under the Reform Act, the Court must dismiss the SACC.

## III.   LEGAL STANDARD

The Reform Act, drafted by Congress "to curb perceived abuses" in private securities class actions, sets a heightened pleading standard for an action such as this one brought pursuant to Section 10(b) and Rule 10b-5.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320–21 (2007).  Under that standard, a plaintiff alleging fraud must plead with particularity facts demonstrating: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks omitted); *see also* 15 U.S.C. § 78u-4(b); Fed. R. Civ. P. 9(b).  This pleading standard is the highest in the law, and "[i]n few other areas are motions to dismiss for failure to state a claim . . . so powerful." *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).

## IV.     ARGUMENT

The Court should dismiss the SACC for two independent reasons.  *First*, under *Omnicare*, Plaintiffs have failed to allege an actionable misstatement.  Most of the Challenged Statements are statements of opinion or belief, and there is no allegation, let alone any evidence, that Intuitive or Dr. Guthart did not honestly believe that the *da Vinci* represents a new generation of surgery that benefits patients.  Furthermore, Intuitive had no free-floating duty to disclose any of the allegedly omitted information, and Plaintiffs have failed to identify any statement that the alleged omissions rendered misleading to a reasonable investor.  *Second*, the SACC fails to plead the highly particularized allegations of scienter required by the Reform Act and by Rule 9(b) of the Federal Rules of Civil Procedure.  Having abandoned the Endweiss allegations, Plaintiffs fail to plead facts giving rise to a strong inference that Defendants made intentionally false statements.  Either of these flaws alone dooms the SACC; together they are insurmountable and incurable.

### A.     Plaintiffs fail to allege actionable misstatements or omissions.

The essential question in this case is whether Intuitive misled its investors, and the SACC's viability thus turns on what Intuitive and the individual Defendants actually said, or failed to say despite an obligation to speak.  The Reform Act requires Plaintiffs to identify specifically the statements they claim are false or misleading, and to then explain the reason *why* those statements are false or misleading.  15 U.S.C. § 78u–4(b)(1)(B).  Thus, a complaint must make "specific references to specific facts" that form the basis for every allegation of falsity.  *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1250 (N.D. Cal. 1998).

Despite the centrality of Defendants' statements, Plaintiffs bury them more than 200 paragraphs into the SACC—between paragraphs 224 and 246.  That's *93 pages* into the complaint.  This is no accident, for a close look at the Challenged Statements reveals that this case is not what Plaintiffs make it out to be.  This is ***not*** a case about product design.  As Judge Breyer recently put it when dismissing an analogous securities fraud case against Tesla Motors, "the issue is not the [product]'s design but rather the information provided to investors."  *In re Tesla Motors, Inc. Sec. Litig.* ("*Tesla Motors*"), 75 F. Supp. 3d 1034, 1047 (N.D. Cal. 2014), *aff'd sub nom. In re: Tesla Motors, Inc.*, 2016 WL 7384040 (9th Cir. Dec. 21, 2016).  In other words,

9

as much as Plaintiffs would like to turn this into a product liability action focusing on the tip

cover's design, the Court must focus on what the company actually told its investors.  Under

*Omnicare* and its progeny, the company's opinion statements regarding safety and efficacy were

not misleading as a matter of law.

### 1.     The SACC contains no actionable misstatements.

Plaintiffs' fundamental burden is to point to particular statements Intuitive made that were

"misleading as to a material fact."  *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988).  The

statements they have identified fail that test because they are (a) inactionable statements of

opinion; (b) statements that are not even about Intuitive or the *da Vinci*; or (c) statements that are

not false, even in hindsight.

### a.     Inactionable Statements of Opinion

The backbone of Plaintiffs' claims consists of statements couched as opinions expressing

the company's general belief that the *da Vinci* represents a "new generation of surgery" that

extends the "benefits of minimally invasive surgery (MIS)" to patients.  *See* SACC ¶¶ 224(a),

227, 230, 233, 236, 242, 245(a), 245(b).  Challenged Statements A1, A3, A5, and B2, at a

minimum, epitomize such expressions of confidence.  Under the Supreme Court's recent

*Omnicare* opinion, these broad—and sincerely held—statements of opinion cannot support a

fraud claim.

Statement A1 reads, "***We believe*** that this new generation of surgery, which we call *da

Vinci* Surgery, combines the benefits of minimally invasive surgery (MIS) for patients with the

ease of use, precision, and dexterity of open surgery."  SACC ¶ 224(a) (emphasis added).

Similarly, Statement A3 says that "***the Company believes***" that this "new generation of surgery"

provides those same benefits.  *Id.* ¶ 227 (emphasis added).  Statement A5 reads, "***We believe*** that

*da Vinci* continues to be a safe and effective surgical method," and references the peer-reviewed

papers that underlie that opinion.  *Id.* ¶ 245(b) (emphasis added).  Statement B2 likewise

expresses Dr. Guthart's opinion, backed up by hard science, that *da Vinci* "has proven safety,

efficacy, economic and ergonomic benefits when compared to the open surgical procedures it is

replacing."  *Id.* ¶ 242(b).  Dr. Guthart further expressed his belief that, if investors were willing

to slog through peer-reviewed studies, they would find his opinion well-supported:  "***We are***

***confident*** that those who invest their time in a serious review of the clinical literature on *da Vinci*

will find ample evidence, and the benefit it brings to patients, surgeons, hospitals, and the medical

community at large." *Id.* ¶ 242(a) (emphasis added).

These statements fail to pass muster under *Omnicare*.[3]  That case teaches that opinion

statements can serve as the basis of a securities fraud claim under only two circumstances. The

first is when the speaker did not "actually hold[] the stated belief."  *Omnicare*, 135 S. Ct. at 1326.

The second is that the opinion statement omitted a material fact that rendered it "misleading to an

ordinary investor," even if it was "literally accurate."  *Id.* at 1327–28.  Plaintiffs have failed to

allege actionable opinion statements under either of these two theories.

***First***, Plaintiffs nowhere allege that Intuitive or its officers did not actually believe that *da*

*Vinci* represents a "new generation" of surgery that confers "benefits" on patients, or that it is

"safe and effective."  Indeed, each of the individual defendants has affirmed under oath the

sincerity of those beliefs and opinions.[4]  Moreover, *Omnicare* holds that it is insufficient for a

plaintiff to allege that an honestly held belief simply turned out to be wrong.  *Id.* at 1327.  Indeed,

"a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless of

whether an investor can ultimately prove the belief wrong."  *Id.*  And here, Plaintiffs have never

alleged that Defendants' opinions turned out to be wrong: they never claim that the *da Vinci* is

not, in fact, a "new generation of surgery" that confers the "benefits of minimally invasive

---

[3] Although *Omnicare* was a Section 11 case, courts have consistently applied its holdings and reasoning to Section 10(b) cases.  *See, e.g.*, *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *33 (N.D. Cal. Oct. 1, 2015) (listing cases); *In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 251n.48 (S.D.N.Y. 2015) (holding that *Omnicare*'s "reasoning applies with equal force to . . . Section 10(b) . . . , which uses very similar language.").

[4] *See, e.g.*, Depo. Tr. of Gary Guthart, Aug. 31, 2016 ("Guthart Tr.") at 192:8–12 ("The data shows that the -10 tip cover is safe and effective and safer than the alternative of not using MCS with the tip cover or switching to other forms of surgery.") (incorporated by reference into the SACC at ¶ 202 n.118); Depo. Tr. of Marshall Mohr, Sept. 9, 2016 ("Mohr Tr.") at 361:10–12 ("[T]he version 10 was found to be both safe and effective when used in accordance with instructions.") (incorporated by reference into the SACC at ¶ 202 n.118); Depo. Tr. of Lonnie Smith, Aug. 30, 2016 ("Smith Tr.") at 259:15–18 ("I don't think there has ever been a question of the . . . safety of the product.  I mean, I'm talking about the whole system and instruments.") (incorporated by reference into the SACC at ¶ 207 n.144).

1145682

1  surgery (MIS)" on patients.[5]

2  **Second**, Plaintiffs fail to satisfy *Omnicare*'s requirement that, to be actionable, an opinion

3  statement must omit a material fact that renders it "misleading to an ordinary investor."  *Id.* at

4  1327–28.  Meeting that standard "is no small task for an investor."  *Id.* at 1332.  *Omnicare*

5  sensibly holds that a reasonable investor

> distinguishes between the sentences "we believe X is true" and "X is true."  And
> because she does so, the omission of a fact that merely rebuts the latter statement
> fails to render the former misleading.  In other words, a statement of opinion is not
> misleading just because external facts show the opinion to be incorrect.
> Reasonable investors do not understand such statements as guarantees . . . .

*Id.* at 1328.  Here, it is implausible to suggest that a reasonable investor read a sentence like, "We

believe that *da Vinci* continues to be a safe and effective surgical method," SACC ¶ 245(b), to be

a guarantee that no patient suffered, or might suffer, an adverse event during a *da Vinci* surgery.

Implausibility approaches impossibility when one considers the statement's "broader frame,"

including its "surrounding text, including hedges, disclaimers," and "the customs and practices of

the relevant industry"—all of which the reasonable investor takes into account.  *Omnicare*, 135 S.

Ct. at 1330; *see also Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).  Intuitive has repeatedly

warned its shareholders that patient injuries, or even deaths, are "inherent to the medical device

industry,"[6] that Intuitive's business could be affected "if the use of our products were to cause

injury or death," and that "defects in the design or manufacture of our products might necessitate

a product recall."[7]  Of course, the tip cover was **never** recalled, but Plaintiffs cannot allege that

Intuitive ever guaranteed its shareholders that "safe and effective" means infallible in the hands of

every surgeon who touches the device.  Obviously, no medical device could meet that standard.

Nor do Plaintiffs allege that Defendants' opinion statements conveyed facts "about the

speaker's basis for holding [his] view," when "the real facts were otherwise, but not provided."

---

[5] If Plaintiffs don't believe the Defendants, perhaps they will trust the market: this past year,
surgeons in more than 3,500 hospitals performed more than 650,000 *da Vinci* procedures
worldwide.  Surely, a great number of surgeons and patients share Defendants' opinions
regarding the *da Vinci*'s safety and efficacy.

[6] Intuitive Surgical, Inc., Form 10-Q at 25, Apr. 19, 2013 ("Q1 2013 Form 10-Q"),
https://www.sec.gov/Archives/edgar/data/1035267/000119312513162385/d508282d10q.htm.

[7] Intuitive Surgical, Inc., Form 10-K at 22, Feb. 4, 2013 ("2012 Form 10-K"),
https://www.sec.gov/Archives/edgar/data/1035267/000119312513036675/d445195d10k.htm.

1    *Omnicare*, 135 S. Ct. at 1328.  This theory may apply when, for instance, a speaker says, "We

2    believe our conduct is lawful," but the speaker never consulted a lawyer.  *Id.* at 1328–29.  Here,

3    by contrast, Defendants provided the bases for their opinions:  Dr. Guthart expressly referenced

4    the "clinical literature" supporting his opinions, and invited investors to review it.  SACC

5    ¶ 242(a).  Intuitive similarly referred investors to a "substantial and growing number of scientific

6    studies and peer reviewed papers," as well as their training program, as support for the company's

7    opinion.  Q1 2013 Form 10-Q at 16.  Simply put, no one at Intuitive has said—or would say—

8    that the *da Vinci* is "safe and effective" on a whim, or without the scientific data to back it up.

9        In their bid to turn generalized opinion statements into falsities, Plaintiffs present a list of

10   allegedly hidden facts about MDRs, safety issues, and defects.  *See, e.g.*, *id.* at ¶¶ 226, 237.  But

11   *Omnicare* holds that an opinion statement is not misleading just because the speaker "knows, but

12   fails to disclose, some fact cutting the other way."  *Id.* at 1329.  In fact, "[r]easonable investors

13   understand that opinions sometimes rest on a weighing of competing facts," and do *"*not expect

14   that *every* fact known to [a defendant] supports its opinion statement."  *Id*. (emphasis in original).

15   In other words, Defendants' belief that *da Vinci* is "safe and effective" is not misleading simply

16   because Intuitive chose not to expressly disclose a 0.003% adverse event rate involving one

17   accessory.[8]  *See* ISRGCL50126929 (Intuitive Surgical "Preliminary Product Inquiry Report") at 2

18   (incorporated by reference at SACC ¶ 71 n.50).  Defendants had ample basis to state their

19   sincerely held beliefs—beliefs they hold today and will swear to under oath—that *da Vinci* is in

20   fact a "new generation of surgery" that provides "benefits" to thousands of patients worldwide.

21       **b.     Statements Unrelated to Intuitive or *da Vinci***

22       Oddly, the SACC challenges statements that have nothing to do with Intuitive or the *da*

23   *Vinci* system, but instead discuss "minimally invasive surgery" (MIS) in general.  But MIS differs

24   from robotically-assisted surgery; MIS includes, for example, the non-robotic laparoscopic

25   surgery with which robotically-assisted surgery competes.  MIS is a method of surgery

26   distinguished from traditional open surgery, in which the body is cut open to provide the surgeon

27   _____

28   [8] As explained below, Intuitive had no independent obligation to disclose particular statistical information regarding individual products.  None of the Challenged Statements even mentions the tip cover accessory.

1145682

access to the relevant anatomy.  *See, e.g.*, 2012 Form 10-K at 4 (noting "the large incisions required for open surgery" as compared with MIS).

Statement A4 discusses (at a very general level) the reasons why surgeons and patients often prefer MIS to open surgery.  Although Plaintiffs omit the first two sentences of Statement A4, it begins:

> Open surgery remains the predominant form of surgery and is used in almost every area of the body.  However, the large incisions required for open surgery create trauma to the patient, resulting in longer hospitalization and recovery times, increased hospitalization costs and additional pain and suffering relative to MIS, where MIS is available.

2012 10-K at 4.  Apart from being undeniably true, this statement is ***not*** a reference to *da Vinci* or Intuitive's products.  This statement is a reference to the broader category of MIS, of which robotically-assisted surgery is but one part.  Indeed, the very next sentence (the sentence Plaintiffs challenge) makes clear that the statement could not possibly be about *da Vinci*.  It reads:  "***Over the past two decades***, ***MIS*** has reduced trauma to the patient by allowing selected surgeries to be performed through small ports rather than large incisions, often resulting in shorter recovery times, fewer complications and reduced hospitalization costs."  SACC ¶ 236 (emphasis added).  The reference to the "past two decades" is the giveaway: as Plaintiffs themselves allege, the *da Vinci* has not been available for two decades.  *Id.* ¶ 30.

Nor can there be any serious dispute that, compared to open surgery, MIS provides significant benefits to patients—a fact the SACC never contests.  At its most basic, the statement says that cutting small holes in the body during surgery rather than large ones can be better for patients.  This is so self-evident that it cannot possibly amount to fraud (and Plaintiffs never allege the statement is untrue).  Statement A4 could not have misled an investor about the safety of the *da Vinci* because it does not relate to the *da Vinci* in any way.  As a result, Plaintiff has not pleaded with particularity any facts proving that this statement was false, much less that it was intentionally so.

### c.    Statements True Even in Hindsight

The Challenged Statements are inactionable for another reason: they are true, even in hindsight.  For example, Statement A2 recites that "The *da Vinci* Surgical System enables

1    surgeons to extend the benefits of MIS to many patients typically receiving open surgery by using

2    computational robotic and imaging technologies to overcome many of the limitations of

3    conventional minimally invasive surgery."  SACC ¶ 224(b).  This statement is obviously true.

4    The *da Vinci* indeed uses computational robotic and imaging technologies.  And it plainly extends

5    the benefits of MIS to surgeries that could not be performed that way before *da Vinci* became

6    available.

7         Furthermore, nothing in the SACC suggests that this statement is false.  The SACC

8    focuses on the tip cover's safety profile and the fulsomeness of Intuitive's MDR reporting.

9    Intuitive vehemently denies those allegations, but even if there were any truth to them they would

10   not render Statement A2 misleading.  It would remain true that the *da Vinci* uses robotic and

11   imaging techniques; it would remain true that there are things that a robot can do that a human

12   cannot.  Such a statement cannot, therefore, form the basis of a fraud complaint.

13        Similarly, Statement A3 is not alleged to be false, even in hindsight.  The full statement is:

14        Intuitive designs, manufactures, and markets da Vinci® Surgical Systems and
          related instruments and accessories, which taken together, are advanced surgical

15        systems that the Company believes represent a new generation of surgery. The
          Company believes that this new generation of surgery, which the Company calls

16        da Vinci Surgery, combines the benefits of minimally invasive surgery ("MIS")
          for patients with the ease of use, precision, and dexterity of open surgery.

17

18   SACC ¶ 227.  This statement is true, even with the benefit of hindsight—and the SACC provides

19   no evidence to the contrary.

20        It cannot be disputed that Intuitive Surgical manufactures the *da Vinci*, nor can it be

21   credibly argued that it is not a "new generation" of surgery.  As discussed above, it was the first

22   FDA-cleared robotically-assisted surgical system.  It allows surgeons to do something never seen

23   before: operate on a patient while comfortably seated at a console, using state-of-the-art

24   instruments that translate their hands' micro-movements, without tremors or shaking, into

25   motions inside the patient.  If that is not a "new generation of surgery," then the word "new" has

26   lost all meaning.  Nor does the SACC contain information that would render false the statement

27   that *da Vinci* combines the benefits of MIS (for example, smaller incisions in the body) with the

28   ease of use and precision of open surgery.  The SACC focuses on alleged defects in a single

1145682

1  accessory—one not used *at all* in many surgeries—and on MDR reporting.  Even if those

2  allegations were true (they are not) they would not render this statement false.

3       Statement B1 fails for similar reasons.  There, Dr. Guthart stated, "Despite a concerted

4  effort by vocal critics of robotic surgery, support remains strong among patients, surgeons and

5  hospitals . . . . *da Vinci*  Surgery has clinically proven benefits in offering a minimally invasive

6  option to a broader group of patients than traditional technologies."  SACC ¶ 241.  There is no

7  doubt that "vocal critics of robotic surgery" were mounting a "concerted effort" to undermine

8  Intuitive's message; Plaintiffs cite these critics repeatedly.  *See, e.g., id.* ¶¶ 44, 46 n.5, 47.  The

9  SACC alleges no facts to contradict Dr. Guthart's statement that support for Intuitive's products

10  remained "strong among patients, surgeons, and hospitals"—a fact the rising procedure counts

11  bear out.  And, again, ample evidence supports Dr. Guthart's statement that *da Vinci* offers

12  "clinically proven benefits" to patients.  *Id.* ¶ 241.

13       Statement C is a press release explaining Intuitive's filing of medical device reports.

14  Nothing about that press release is false, even in hindsight.   It accurately disclosed that additional

15  MDRs were being filed and that some MDRs were being reclassified.  There is no allegation in

16  the SACC that those statements were untrue.  And it is worth pointing out that the press release

17  has nothing whatsoever to do with the tip cover.

### 2. The SACC alleges no actionable omissions because Intuitive had no affirmative duty to disclose.

20       As set forth above, nothing Intuitive actually said was false.  In light of that fact, the

21  SACC focuses its energy on what Intuitive did ***not*** say.  But "[s]ilence, absent a duty to disclose,

22  is not misleading under Rule 10b-5."  *Basic*, 485 U.S. at 239 n.17.  Thus, to allege fraud by

23  omission, Plaintiffs must identify a specific duty to disclose; a public company is under no

24  obligation to speak on every topic, and need not disclose a fact just because a "reasonable

25  investor might consider [it] material."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45

26  (2011).[9]  On the contrary, the Ninth Circuit has "expressly declined to require a rule of

___

[9] In the medical device context, "courts have recognized that companies do not have an absolute duty to disclose all FDA inspections, Form 483s, or even FDA warning letters."  *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1302 (S.D. Fla. 2015) (listing cases).  In this case, Intuitive immediately disclosed all such events, even absent a duty to do so.

completeness for securities disclosures because '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'" *PRS*, 759 F.3d at 1061 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  Thus, "[t]o be actionable under the securities laws, an omission must be misleading," meaning that it "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

This is precisely where the SACC's omissions theory falls flat.  It fails to identify any misimpression that Intuitive "affirmatively create[d]." *Id.*  Indeed, the SACC itself demonstrates the opposite.  Take, for example, Statement B2, in which Dr. Guthart directly addressed the fact the Intuitive was facing "a concerted effort by critics of robotic surgery, to challenge the benefited range of patients, the value it brings to the medical community and the quality of our organization."  SACC ¶ 242.  He provided no guarantees or promises, but instead invited investors to undertake a "serious review of the clinical literature on *da Vinci*." *Id.*  That clinical literature (by definition) provides a thorough scientific review.  Dr. Guthart expressed his opinion about how he reads that literature, but as stated above, such opinions are not actionable under *Omnicare*.  More importantly, the alleged omission could not have affirmatively created a misimpression because it invited the listener to judge for himself or herself based on peer-reviewed medical and scientific literature.  And the SACC nowhere alleges that the peer-reviewed literature was misleading, falsified, or inaccurate.

*               *               *

This case might be different had Intuitive made a statement like, "We have had zero complaints about our tip cover accessory"—if, in fact, the company had received such complaints and failed to disclose them.  But the Court would search the SACC in vain for any statement remotely close to that.  On the contrary, none of the Challenged Statements even mentions the tip cover, and—in fact—Intuitive has filed numerous MDRs regarding the tip cover over the years, which a simple, publicly available MAUDE search will reveal.  Simply put, none of the alleged facts Defendants failed to disclose—about MDRs, insurance claims, products liability suits, and

1   customer letters[10]—render any of the Challenged Statements misleading.[11]

2       Judge Breyer's recent opinion in *Tesla* is directly on point in this regard.  There, investors

3   sued Tesla over broad statements regarding Tesla's safety record—including that Tesla makes

4   "the Safest Car in America"—while failing to disclose tests showing that the cars' electric

5   batteries were defective and prone to catching fire.  *Tesla*, 75 F. Supp. 3d at 1044.  Judge Breyer

6   dismissed the complaint in its entirety.  Carefully reviewing each challenged statement one-by-

7   one, the court concluded that Tesla was under no obligation to disclose test results, even when the

8   company's CEO specifically discussed battery fires.  *See id.* at 1046.  Plaintiffs' allegations here

9   are even weaker than those in *Tesla*.  They accuse Intuitive of failing to disclose information

10  regarding tip cover incidents, even when the company ***never chose to speak about the tip cover***.

11  *Tesla* is on all fours with this case, and the same result—dismissal—is appropriate here.

12      **B.**    **Plaintiffs' scienter allegations are inadequate.**

13      In their initial complaint, Plaintiffs alleged scienter by pointing to just two things: (a) the

14  supposed statements of "confidential witness" Charles Endweiss, and (b) Defendants' stock sales.

15  As the Court has heard at length, Mr. Endweiss never made those statements, and Plaintiffs have

16  withdrawn their reliance upon them.  In their place, Plaintiffs cite documents produced in

17  discovery or snippets of the three named Defendants' depositions.  None of the cited evidence

18  provides a basis for Plaintiffs to overcome their burden.

19      **1.**    **The Reform Act sets an exacting pleading standard for scienter.**

20      The Reform Act requires that a complaint "state with particularity facts giving rise to a

---

[10] In the face of all available evidence, Plaintiffs continue to describe three October 2011 customer letters as "secret recalls."  *See, e.g.*, SACC ¶¶ 243, 246.  Regrettably, this Court has adopted the nomenclature.  ECF 204 at 19.  It is wrong.  The letters were never "secret": they were sent to the FDA, to thousands of hospitals, and to foreign regulatory agencies for posting.  As one court has observed while dismissing an FDA-related lawsuit, such information is "readily discovered by searching the websites of foreign regulatory agencies and other neutral third party-sources."  *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 522 n.5 (S.D.N.Y. 2015).

[11] Plaintiffs have also mounted an improper effort to privately enforce FDA regulations in plain contravention of federal law.  *See* 21 U.S.C. § 337(a) (stating that all proceedings to enforce the federal Food Drug and Cosmetic Act "shall be by and in the name of the United States").  Apparently believing that they know better than the FDA, Plaintiffs repeatedly allege that Intuitive "violated" FDA regulations regarding medical device reporting and recalls.  But the FDA has *never* taken any enforcement action against Intuitive, and federal law forbids Plaintiffs from usurping the FDA's authority through a civil lawsuit.

1145682

strong inference that the defendant acted with" scienter.  *PRS*, 759 F.3d at 1058 (internal

quotation marks omitted).  To adequately allege scienter, "the plaintiffs must show that

defendants engaged in *knowing* or *intentional* conduct."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d

776, 782 (9th Cir. 2008) (internal quotation marks omitted) (emphasis in original); *see also In re*

*NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1057 (9th Cir. 2014).  In this Circuit, a plaintiff must

demonstrate either actual intent or "deliberate recklessness"—a recklessness so egregious that it

"reflects some degree of intentional or conscious misconduct."  *Id.* at 1053, 1057 (internal

quotation marks omitted).  In other words, the complaint must allege particularized facts showing

that Defendants intended to mislead investors.

Plaintiffs must do more than allege facts supporting a *possible* inference of scienter.  The

Reform Act requires a "strong inference" of scienter, meaning that the inference "must be cogent

and compelling, thus strong in light of other explanations."  *Tellabs*, 551 U.S. at 324.  Unlike in a

typical motion to dismiss, the Court must __*not*__ take Plaintiffs' scienter allegations as true.  Instead,

the "court must consider plausible, nonculpable explanations for the defendant's conduct, as well

as inferences favoring the plaintiff."  *Id.*; *see also Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th

Cir. 2002) (holding that a court "must consider *all* reasonable inferences to be drawn . . . ,

including inferences unfavorable to the plaintiffs.").  Finally, the Supreme Court has explained

that "omissions and ambiguities count against inferring scienter."  *Tellabs*, 551 U.S. at 326.

### 2.    Plaintiffs have failed to allege facts supporting a strong inference of scienter.

Even after full fact discovery, Plaintiffs have failed to identify a single document or piece

of deposition testimony that suggests intentional wrongdoing.  This motion to dismiss is unusual

in that fact discovery has closed, and the individual Defendants have testified under oath for

hours and have produced hundreds of thousands of pages of documents.  Yet there is no

deposition admission, no smoking-gun email, and no whistleblower witness supporting the

Plaintiffs' scienter allegations.  After years of discovery, Plaintiffs' failure to identify any facts

supporting a strong inference of scienter at this late date indicates that they never will be able to

do so.

Plaintiffs identify only two sets of allegations that they claim give rise to an inference of scienter: allegations that the individual defendants (1) paid attention to *da Vinci*'s safety profile by attending meetings and reviewing reports, and (2) neglected to disclose to the public information contained in those meetings and reports.  These allegations come nowhere close to raising a strong inference of scienter.  Reviewing Plaintiffs' allegations defendant-by-defendant, as the law requires, *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008),[12] confirms that Plaintiffs have fallen far short of the required scienter showing.

### a.  Plaintiffs' scienter allegations regarding Lonnie Smith fail.

With respect to Intuitive Chairman Lonnie Smith, Plaintiffs allege only that he signed certain SEC filings and sold stock.  Neither of these two allegations meets Plaintiffs' burden.

Plaintiffs' first allegation is simply that Mr. Smith, who stepped down as the company's CEO more than two years before the Class Period, signed two annual SEC filings after receiving information about the company's products and processes.  SACC ¶¶ 33, 207.  Plaintiffs never allege that Mr. Smith himself said anything misleading.  *Compare id.* ¶¶ 31–32, *with id.* ¶ 33. Indeed, Mr. Smith made no statements in any of the conference calls described above at Category B.  *See id.* ¶ 33.  He is not alleged to have reviewed the press release described above at Category C.  *See id.* ¶¶ 239–40.  The *only* basis on which Mr. Smith is accused of liability is that he signed Intuitive's Forms 10-K for the years 2011 and 2012, which contain certain of the statements set forth in Category A above.  *Id.* ¶ 33.

Because they have identified no evidence of any kind that Mr. Smith intended to deceive investors when he signed those filings, Plaintiffs fall back on circular reasoning.  They note that, years before the Class Period, Mr. Smith received certain FDA communications in his capacity as CEO, and that, during the Class Period, Mr. Smith attended meetings and spoke with (or received emails from) executives in his capacity as a board member.  SACC ¶¶ 193, 207.  Relying on these undisputed facts, Plaintiffs argue that: (1) Mr. Smith's signature on forms that did not disclose the information he received show his effort to conceal it, and (2) Mr. Smith's effort to conceal the

---

[12] Plaintiffs have not advanced any allegations that would permit a "group scienter" analysis.  *See Ore. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607–08 (9th Cir. 2014).

1145682

1  information was wrongful because it was information that should have been disclosed.  This is

2  wholly circular, and there is an equally plausible explanation: Mr. Smith did not insist on adding

3  the information at issue to the forms he signed because he did not believe it needed to be

4  disclosed.  (Indeed, Mr. Smith testified repeatedly in the deposition referenced in the SACC that

5  he believes to this day that the forms were accurate.)  Plaintiffs' failure to overcome this inference

6  with particularized allegations is fatal to their first scienter allegation.  *Tellabs*, 551 U.S. at 324.

7      Plaintiffs' second allegation—Mr. Smith's stock sales—is insufficient as a matter of law.

8  Plaintiffs exhaustively catalog Mr. Smith's stock sales in an effort to show that the sales were

9  somehow unusual and thus are probative of scienter.  *See, e.g.*, SACC ¶¶ 11, 27, 103, 162.[13]  But

10  stock sales are relevant only if plaintiffs can identify *other* evidence of scienter—sales are "not

11  alone sufficient to raise a strong inference of fraud."  *In re Silicon Graphics, Inc. Sec. Litig.*, 970

12  F. Supp. 746, 768 (N.D. Cal. 1997); *see also In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000

13  WL 1727377, at *22 (N.D. Cal. Sept. 29, 2000) (holding that sales are merely "circumstantial

14  evidence").

15          **b.     Plaintiffs' scienter allegations regarding Marshall Mohr fail.**

16      Like Mr. Smith, Mr. Mohr is not accused of having actually said anything misleading.  As

17  the company's chief financial officer, he signed the challenged SEC filings but is not accused of

18  having had any particular role in making the alleged misstatements.

19      The scienter allegations against Mr. Mohr fail for the same reasons that they fail regarding

20  Mr. Smith: there is nothing alleged other than *knowledge*; there is no allegation of wrongful

21  intent.  The SACC alleges that Mr. Mohr knew that there were allegations that the tip cover

22  could, in some limited circumstances, be damaged during surgery.  What it does not allege is that

23  Mr. Mohr concealed such information in an intentional (or grossly reckless) attempt to deceive

24  investors.  Plaintiffs have deposed Mr. Mohr and have reviewed thousands of his emails from the

25

26  _____

[13] As explained in Defendants' first motion to dismiss, the sales were *not* unusual.  *See* ECF 53 at

27  20–23.  Additional evidence referenced in the SACC further explains those sales.  The few sales outside of Mr. Smith's 10b5-1 plan occurred after a new tip cover had been on the market for many months, and as Mr. Smith explained in his deposition, he sold outside of his plan because

28  he was stepping down as an employee of the company.  In light of the Court's previous rulings on this issue, ECF Nos. 83, 98, Defendants see no need to further develop their analysis here.

1    relevant period, and yet they cannot cite a single document that suggests that he intended to

2    deceive anyone.  That is, at its core, what the Reform Act requires—and that is what is missing.

3    All Plaintiffs can point to are Mr. Mohr's stock sales.  As explained above, that is not

4    enough.  Moreover, an additional fact undercuts Plaintiffs' scienter allegations regarding Mr.

5    Mohr: as the SACC concedes, all of Mr. Mohr's sales were made pursuant to a Rule 10b5-1 plan.

6    SACC ¶ 179.  By itself, that fact raises a competing inference of scienter with respect to those

7    sales.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427–28 (9th Cir. 1994) (sales based

8    on pre-determined trading plan tend to rebut inference of scienter); *Metzler Inv. GMBH v.*

9    *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008).

10    Moreover, Mr. Mohr (along with Mr. Smith) was the architect of a billion-dollar stock

11    repurchase plan, *see* SACC ¶ 205(l), which began prior to the class period.  Such a plan can

12    "actually *negate* a finding of scienter."  *In re Tibco Software, Inc.*, 2006 WL 1469654, at *21

13    (N.D. Cal. May 25, 2006) (emphasis in original).  Mr. Mohr arranged for Intuitive to repurchase

14    hundreds of millions of dollars of stock *before* the Class Period—that is, before the alleged

15    scheme to defraud began.  The logical inference is that he believed the price would rise.  This

16    undermines any inference of scienter; it would be illogical for Mr. Mohr to cause the company to

17    "repurchase[e] its shares had [he] been aware of facts that would indicate the price would fall."

18    *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013); *see also*

19    *Plumbers and Pipefitters Local Union v. Zimmer*, 673 F. Supp. 2d 718 (S.D. Ind. 2009), *aff'd* 679

20    F.3d 952 (7th Cir. 2012).  Indeed, given the length of time this case has been pending, the Court

21    may take judicial notice of a fact that validates Mr. Mohr's optimism: the stock price has risen

22    above where it stood before the Class Period.

23    In weighing the competing inferences under *Tellabs*, the question the Court must consider

24    is whether an inference of scienter is cogent and compelling in light of all other inferences.  As to

25    Mr. Mohr, an inference of wrongful intent is unwarranted.  He made no Challenged Statements,

26    stands accused by no witness, apparently never wrote an email that Plaintiffs can characterize as

27    nefarious, made the company millions by repurchasing its stock at a low price, guided the

28    company's stock to new heights, and sold stock only according to a pre-arranged trading plan.

1  After years of discovery, no inference of intentional wrongdoing arises, much less one that is

2  "cogent and compelling."

3             **c.**      **Plaintiffs' scienter allegations regarding Gary Guthart fail.**

4          Finally, no credible inference of intentional wrongdoing can be drawn against Dr. Guthart,

5  Intuitive's CEO.  The allegations against him mirror those against Mr. Mohr: he had knowledge

6  of the alleged issues with the tip cover, and he sold stock.  As with Mr. Mohr, what is remarkable

7  is what Plaintiffs *cannot* plead, even after extensive fact discovery.  They cannot point to a single

8  comment that Dr. Guthart said, publicly or privately, that evinces an intent to mislead anyone.

9  No witness accuses him of such intent, and no document suggests one.  Plaintiffs allege only that

10  Dr. Guthart monitored the safety performance of the *da Vinci* with the degree of care one would

11  expect from a CEO.  This cannot give rise to an inference of intentional misconduct.  What

12  Plaintiffs have alleged is *knowledge*, not scienter.  Dr. Guthart cared (and cares) about product

13  safety and stated that he believed (and still believes) Intuitive's products to be safe and effective.

14  *Nothing* in the SACC suggests that his belief was insincere, or that he tried to mislead anyone by

15  stating it.

16          Like Mr. Mohr, Dr. Guthart made all of his stock sales pursuant to a 10b5-1 plan.   Like

17  Mr. Mohr, he approved a stock repurchase plan prior to the class period, which tends to show that

18  he believed the share price would rise in the future.  Like Mr. Mohr, neither a single email he

19  wrote nor a piece of witness testimony gives rise to a strong inference that Dr. Guthart intended to

20  defraud anyone.  Plaintiffs' scienter allegations with respect to Dr. Guthart fail.

21                                   \*     \*     \*

22          In the end, rather than alleging particularized facts based on the discovery they have

23  obtained that could demonstrate Defendants' scienter, Plaintiffs invoke a circular argument.  They

24  claim that Defendants' intent to mislead can be shown because the information Plaintiffs claim in

25  hindsight should have been disclosed was not disclosed—and that, therefore, such nondisclosure

26  must have been motivated by an intent to mislead.  Not only is this a clear exercise in question

27  begging, but there is also an equally (or more) plausible inference: if information was not

28

1145682

disclosed,[14] it was because the individual defendants had no reason to believe that their statements were in any way inaccurate or misleading.

Facing a typical motion to dismiss, Plaintiffs could simply respond that the existence of competing inferences dooms Defendants' motion.  The Reform Act, however, *requires* the Court to weigh the competing inferences at the pleading stage, and the burden is on the Plaintiffs to show that their proffered inference is "cogent and compelling" in light of alternative explanations. *Tellabs*, 551 U.S. at 324.   Plaintiffs fail that stringent test.

Moreover, in assessing whether the individual defendants intended to mislead the public by withholding certain information about the *da Vinci*, the Court need not blind itself to the reality of the nearly four years that have passed since this action commenced.  *See In re Sanofi*, 87 F. Supp. 3d at 524 (noting that the FDA eventually cleared the drug at issue in the lawsuit, even though the approval post-dated the lawsuit).  The medical profession clearly agrees that the *da Vinci* is safe and effective: sales have skyrocketed and the number of procedures performed has grown exponentially.  The FDA clearly agrees that the *da Vinci* is safe and effective: it allows the device to be marketed, has never recalled any version of the tip cover accessory, and has *never taken any enforcement action against Intuitive*.  And investors clearly agree that the *da Vinci* is safe and effective: Intuitive's stock is now over $700 per share, almost double what it was at the end of the Class Period.  In short, there is simply no evidence from which a cogent and compelling inference of scienter may be drawn.

## C.     This action must be stayed while this motion is pending.

Pursuant to 15 U.S.C. § 78u-4(b)(3)(B), this action is and must be stayed until this motion is resolved.  *See Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 968 (9th Cir. 2014) ("[N]o discovery may proceed until the court has sustained the legal sufficiency of a complaint.").  As this Court previously recognized, the mandatory stay applies even if the Court has previously sustained a prior complaint.  *See* Order Continuing Case Management Conference, ECF 95.

---

[14] As the Court is aware, Defendants contend that they *did* disclose the allegedly omitted information in multiple ways, including through MDRs, SEC filings, customer communications, patent applications, and otherwise.

1

## V.   CONCLUSION

2      This lawsuit turns on the specific statements Intuitive and the individual Defendants made

3   to the market.  The Challenged Statements cannot support a securities fraud claim as a matter of

4   law.  If statements like this can support securities fraud liability, then any statement expressing a

5   company's belief in its product may be considered misleading if the company also fails

6   simultaneously to divulge every consumer complaint it has received and every aspect of its

7   product development activities.  No public company can function that way, and no other court has

8   ever held that a company must do so in order to comply with federal securities laws.  The SACC

9   should be dismissed with prejudice.

10
    Dated:  February 9, 2017                          KEKER & VAN NEST LLP

11

12
                                         By:   /s/ Michael D. Celio
13                                             JOHN W. KEKER
                                               MICHAEL D. CELIO
14                                             LAURIE CARR MIMS
                                               CODY S. HARRIS
15
                                               Attorneys for Defendants INTUITIVE
16                                             SURGICAL, INC., LONNIE M. SMITH,
                                               GARY S. GUTHART, and MARSHALL L.
17                                             MOHR

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT
Case No. 5:13-cv-01920-EJD (HRL)

1145682

*In re Intuitive Surgical Securities Litigation*, No. 5:13-cv-01920-EJD (HRL)

## ATTACHMENT A

Chart Summarizing Challenged Statements and Grounds Requiring Their Dismissal

| Statement | Relevant Text | Source | Reasons Why Inactionable |
|---|---|---|---|
| A1 | "We believe that this new generation of surgery, which we call *da Vinci* Surgery, combines the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision, and dexterity of open surgery." | SACC ¶¶ 224(a) (quoting Intuitive's 2011 Form 10-K), 236 (quoting in part Intuitive's 2012 Form 10-K). | - Inactionable statement of opinion under *Omnicare*. <br> - No scienter. <br> - Not alleged to be false, even in hindsight. <br> - No affirmative duty to disclose. |
| A2 | "The **da Vinci Surgical System enables surgeons to extend the benefits of MIS** to many patients typically receiving open surgery by using computational robotic and imaging technologies to overcome many of the limitations of conventional minimally invasive surgery." | *Id.* ¶ 224(b) (quoting Intuitive's 2011 Form 10-K) (emphasis Plaintiffs'). | - Inactionable statement of opinion under *Omnicare* <br> - No scienter. <br> - Not alleged to be false, even in hindsight. <br> - No affirmative duty to disclose. |
| A3 | "Intuitive Surgical, Inc. designs, manufactures, and markets *da Vinci*® Surgical Systems and related instruments and accessories, which taken together, are advanced surgical systems that the Company believes enable a new generation of surgery.[1] This advanced generation of surgery, which the | *Id.* ¶¶ 227 (quoting in part Intuitive's Q1 2012 Form 10-Q) (emphasis Plaintiffs'), 230 (quoting in part Intuitive's Q2 2012 Form 10-Q), 233 (quoting in part Intuitive's Q3 2012 | - Inactionable statement of opinion under *Omnicare*. <br> - No scienter. <br> - Not alleged to be false, even in hindsight. <br> - No affirmative duty to |

---

[1] For completeness, Defendants set forth the full statements in this chart. The portions highlighted in gray are the excerpts quoted in the SACC.

| Statement | Relevant Text | Source | Reasons Why Inactionable |
|---|---|---|---|
| | Company calls *da Vinci* Surgery, combines the **benefits** of minimally invasive surgery ("MIS") for patients with the ease of use, precision, and dexterity of open surgery." | Form 10-Q), ¶ 245(a) (quoting in part Intuitive's Q1 2013 Form 10-Q). | disclose. |
| A4 | "Open surgery remains the predominant form of surgery and is used in almost every area of the body.  However, the large incisions required for open surgery create trauma to the patient, resulting in longer hospitalization and recovery times, increased hospitalization costs and additional pain and suffering relative to MIS, where MIS is available.  Over the past two decades, **MIS ha[d] reduced trauma to the patient** by allowing selected surgeries to be performed through small ports rather than large incisions, often **resulting in shorter recovery times, fewer complications** and reduced hospitalization costs." | *Id.* ¶ 236 (quoting in part Intuitive's 2012 Form 10-K) (emphasis and alteration Plaintiffs'). | - Statement is unrelated to Intuitive or the *da Vinci*.<br>- No scienter.<br>- Not alleged to be false, even in hindsight.<br>- No affirmative duty to disclose. |
| A5 | "Recently, including during the first quarter of 2013, there have been articles published and papers written questioning patient safety and efficacy associated with  *da Vinci* Surgery, the cost of *da Vinci*  Surgery relative to other disease management methods, and the adequacy of surgeon training.  We believe that  *da Vinci* Surgery continues to be a safe and effective surgical method, as supported by a substantial and growing number of scientific studies and peer reviewed papers, and that the training we provide to surgeons helps ensure that they are able to operate our systems with the requisite skill and | *Id.* ¶ 245(b) (quoting in part Intuitive's Form 10-Q from Q1 2013). | - Inactionable statement of opinion under *Omnicare*.<br>- No scienter.<br>- Not alleged to be false, even in hindsight.<br>- No affirmative duty to disclose. |

| Statement | Relevant Text | Source | Reasons Why Inactionable |
|---|---|---|---|
| | expertise.  The recent negative press could delay or adversely impact procedure adoption and our revenue growth in future periods." | | |
| B1 | "We are pleased with our first quarter revenue and earnings growth.  Despite a concerted effort by vocal critics of robotic surgery, support remains strong among patients, surgeons and hospitals . . . . *da Vinci* Surgery has clinically proven benefits in offering a minimally invasive option to a broader group of patients than traditional technologies." | SACC ¶ 241 (quoting April 18, 2013 8-K). | - Inactionable statement of opinion under *Omnicare* <br> - No scienter. <br> - Not alleged to be false, even in hindsight. <br> - No affirmative duty to disclose. |
| B2 | "As you know, we are in the midst of a concerted effort by critics of robotic surgery, to challenge the benefited range of patients, the value it brings to the medical community and the quality of our organization.  While taking these allegations very seriously, we remain deeply committed to developing and providing products that are in the surgeon's hands, ease the burden of surgery for patients who can benefit from them.  We take pride in the benefits provided by our systems, demonstrated a [sic] numerous large scale population studies comparing *da Vinci* surgery to open surgery for several different procedures.  We are confident that those who invest their time in a serious review of the clinical literature on da Vinci will find ample evidence, and the benefit it brings to patients, surgeons, hospitals, and the medical community at large. <br><br> . . . In closing, ***da Vinci* Surgery has proven safety, efficacy, economic and ergonomic benefits** when compared to the open surgical | SACC ¶ 242 (emphasis Plaintiffs') (full conference call transcript is available at ECF 135-55). | - Inactionable statement of opinion under *Omnicare*. <br> - No scienter. <br> - Not alleged to be false, even in hindsight. <br> - No affirmative duty to disclose. |

| Statement | Relevant Text | Source | Reasons Why Inactionable |
|---|---|---|---|
| | procedures it is replacing.  We are steadfast in our conviction in the value that da Vinci has and will bring to medicine." | | |
| C | "In response to general inquiries regarding a recent rise in Medical Device Reports (MDR) filed by Intuitive Surgical, the company explained that the noted rise does not reflect a change in product performance but rather a change in MDR reporting practices.<br><br>In September 2012, Intuitive Surgical revised its MDR practices, resulting in increased reports of device malfunction MDRs, the vast majority of which were related to instruments and not to systems.  None of these device malfunction MDRs involved reportable injuries or deaths.<br><br>'We self-identified the reporting issue, notified the FDA and revised our practices,' said Dave Rosa, Senior Vice President, Emerging Procedures and Technologies, Intuitive Surgical.<br><br>MDRs can be found in the FDA's MAUDE database, which is updated by FDA regularly.  The most common type of report filed under the company's revised MDR practices involves instrument cable breaks.  These cable breaks render the instrument non-functional and require an instrument change, which can be accomplished quickly.<br><br>The company also made an administrative change in how MDRs previously reported as adverse events were subcategorized.  This | SACC ¶ 100 n.79 (full press release in Rosa Depo. Ex. 32) | - No scienter.<br>- Not alleged to be false, even in hindsight.<br>- No affirmative duty to disclose. |

| Statement | Relevant Text | Source | Reasons Why Inactionable |
|---|---|---|---|
| | change has not increased the total number of adverse event reports.  This will result in an increase in events in the 'serious injury' subcategory and a corresponding decrease in the 'other' subcategory.  Total adverse event rates have remained low and in line with historical trends." | | |