1   **KERR & WAGSTAFFE LLP**
    JAMES M. WAGSTAFFE (95535)
2   IVO LABAR (203492)
    101 Mission Street, 18th Floor
3   San Francisco, CA 94105–1727
    Telephone: (415) 371-8500
4   Fax: (415) 371-0500
    wagstaffe@kerrwagstaffe.com
5   labar@kerrwagstaffe.com

6   *Local Counsel for Plaintiffs and the Class*

7   **LABATON SUCHAROW LLP**
    MICHAEL W. STOCKER (179083)
8   JONATHAN GARDNER (*pro hac vice*)
    MARK S. ARISOHN  (*pro hac vice*)
9   SERENA P. HALLOWELL (*pro hac vice*)
    CHRISTINE M. FOX (*pro hac vice*)
10  THEODORE J. HAWKINS (*pro hac vice*)
    140 Broadway
11  New York, NY 10005
    Telephone: 212/907-0700
12  212/818-0477 (fax)
    mstocker@labaton.com
13  jgardner@labaton.com
    marisohn@labaton.com
14  shallowell@labaton.com
    cfox@labaton.com
15  thawkins@labaton.com

16  *Lead Counsel for Plaintiffs and the Class*

17                  UNITED STATES DISTRICT COURT

18                NORTHERN DISTRICT OF CALIFORNIA

19                        SAN JOSE DIVISION

20

21  IN RE INTUITIVE SURGICAL          Case No. 5:13-cv-01920-EJD (HRL)
    SECURITIES LITIGATION
22                                    CLASS ACTION

23                                    **PLAINTIFFS' OPPOSITION TO
                                      DEFENDANTS' MOTION TO DISMISS
24                                    THE SECOND AMENDED CLASS
                                      ACTION COMPLAINT**

25                                    Date:  June 29, 2017
                                      Time:  9:00 a.m.
26                                    Dept.:  Courtroom 4
                                      Judge:  Hon. Edward J. Davila
27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

I.  INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND ....................................................................................................... 3

  A.  The Motion to Dismiss Order ...................................................................... 3

  B.  The SACC ...................................................................................................... 3

    1.  Defendants Knew About da Vinci's Defect Since 2008 ........................ 4

    2.  Defendants Concealed Thousands of Legal Claims Against
        Intuitive ................................................................................................. 5

    3.  Defendants Knew About Thousands of MDRs That It
        Concealed From The FDA and the Public .............................................. 6

    4.  The FDA Form 483 Shows That Intuitive Hid Da Vinci's
        Defects ................................................................................................... 7

    5.  The Warning Letter Shows That Intuitive Knew About Da
        Vinci's Defects ...................................................................................... 8

    6.  The Individual Defendants Knew About Intuitive's Safety
        Problems ................................................................................................ 8

III.  STANDARD OF REVIEW .................................................................................... 10

IV.  PLAINTIFFS SUFFICIENTLY ALLEGE EXCHANGE ACT
     VIOLATIONS ........................................................................................................ 10

  A.  The Complaint Sufficiently Pleads Falsity ................................................ 11

    1.  The Court Already Ruled that Plaintiffs Have Alleged
        Material Misstatements and Omissions .............................................. 12

    2.  *Omnicare* Does Not Change the Court's Prior Holding that
        Plaintiffs Have Sufficiently Alleged Defendants Omitted
        Material Information ........................................................................... 13

  B.  The Complaint Alleges a Strong Inference Of Scienter ........................... 17

    1.  The Significant Evidence of Scienter Alleged in the SACC ................. 19

    2.  Defendants Knew About and Concealed Intuitive's Safety
        Problems .............................................................................................. 23

    3.  The Individual Defendants Made False and Misleading
        Statements ........................................................................................... 24

  C.  The Court Should Not Allow Defendants to Delay This Case ................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014)........................................................................25

*Amgen, Inc. v. Connecticut Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013)............................................................................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................................10

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009) .................................................................................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................10

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ......................................................................................11, 17, 22

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..................................................................................................11

*In re Am. Apparel, Inc. S'holder Litig.*,
2013 WL 10914316 (C.D. Cal. Aug. 8, 2013)........................................................................24

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .................................................................................22

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ..........................................................................................10, 18

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ..........................................................................14

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ..................................................................................................18

*George v. China Auto. Sys., Inc.*,
2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)..........................................................................22

*Hausler v. JP Morgan Chase Bank, N.A.*,
127 F. Supp. 3d 17 (S.D.N.Y. 2015).......................................................................................21

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) .................................................................................................24

*Illinois Union Ins. Co. v. Intuitive Surgical, Inc.*,
No. 13-cv-4863 (N.D. Cal.) ....................................................................................................22

*In re Immune Response Sec. Litig.,*
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................19

*In re Intuitive Surgical Sec. Litig.,*
    65 F. Supp. 3d 821 (N.D. Cal. 2014) ......................................................... *passim*

*Matrixx Initiatives, Inc. v. Siracusano,*
    131 S. Ct. 1309 (2011) .............................................................................. *passim*

*Medina v. Clovis Oncology, Inc.,*
    2017 WL 530344 (D. Colo. Feb. 9, 2017) ...........................................................14

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.,*
    2015 WL 2250472 (D.N.J. May 13, 2015) ..........................................................15

*Navigators Specialty Ins. Co. v. Intuitive Surgical, Inc.,*
    No. 15-cv-5801-JST (N.D. Cal.)............................................................................22

*No. 84 Emp'r- Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) ................................................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    135 S. Ct. 1318 (2015) .............................................................................. *passim*

*Pub. Pension Fund Grp. v. KV Pharm. Co.,*
    2013 WL 1831427 (E.D. Mo. Apr. 30, 2013) .....................................................19

*Reese v. Malone,*
    747 F.3d 557 (9th Cir. 2014) ................................................................................14

*Ronconi v. Larkin,*
    253 F.3d 423 (9th Cir. 2001) ................................................................................18

*S. Ferry LP, No. 2 v. Killinger,*
    542 F.3d 776 (9th Cir. 2008) ..........................................................................18, 22

*Schueneman v. Arena Pharm., Inc.,*
    840 F.3d 698 (9th Cir. 2016) ................................................................................14

*Seaman v. California Bus. Bank,*
    2013 WL 5890726 (N.D. Cal. Oct. 30, 2013)......................................................14

*Siracusano v. Matrixx Initiatives, Inc.,*
    585 F.3d 1167 (9th Cir. 2009), *aff'd,* 563 U.S. 27 (2011) .............................15, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)................................................................................... *passim*

*In re Tesla Motors, Inc. Sec. Litig.,*
    75 F. Supp. 3d 1034 (N.D. Cal. 2014) ..................................................................16

*Twinde v. Threshold Pharm., Inc.*,
  2009 WL 928132 (N.D. Cal. Apr. 3, 2009) ...................................................................24

*In re Velti PLC Sec. Litig.*,
  2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ...........................................................13, 18

*In re Verifone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ......................................................................................18

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ........................................................................................15

**Statutes**

15 U.S.C. §78j(b) ................................................................................................... 10-11

15 U.S.C. §78u-4(b)(1)(B) ..........................................................................................11

15 U.S.C. §78u-4(b)(2) ................................................................................................17

17 C.F.R. §240.10b-5(b) ..............................................................................................11

21 C.F.R. § 820 ..............................................................................................................8

# I.    **INTRODUCTION**

This Court upheld the sufficiency of Plaintiffs' falsity and scienter allegations in the Amended Complaint and denied Defendants' motion to dismiss when those allegations lacked the support of specific and detailed evidence that only became available during discovery[1]. The Second Amended Class Action Complaint ("SACC") repeats the same falsity and scienter allegations and now backs them up with documents from Defendants' files; testimony from Defendants' employees, including from the Individual Defendants; and admissions made by Defendants in public documents[2]. It is in this context that Defendants' present motion to dismiss the SACC, filed just before commencement of expert depositions and summary judgment briefing, can be seen clearly for what it is: a blatant attempt to delay this case from proceeding, courtesy of the Private Securities Litigation Reform Act of 1995 ("PSLRA") stay, that applies upon filing even a meritless motion to dismiss.  For the reasons set forth below, Plaintiffs respectfully request the prompt rejection of this baseless motion to dismiss. As this Court stated during the December 15, 2016 conference, "my hope in 2017 is to get this case back on track and get it done."[3]

Since the beginning of this case, Plaintiffs have alleged that Defendants deceived the investing public by concealing the safety risk profile of Intuitive Surgical Inc.'s ("Intuitive" or the "Complaint") flagship product, a robotic surgical system known as da Vinci Surgical System ("da Vinci"). Defendants knew for years that a key component of da Vinci—the "Tip Cover" of the Monopolar Curved Scissors tool ("MCS")—was defective and causing serious injuries to patients.  Yet they concealed this defect and made materially false and misleading statements and omissions regarding the safety of da Vinci, including failing to disclose: (i) that the Company had received tens of thousands of complaints and unreported adverse event reports of product malfunction and patient injury; (ii) that the Company was facing hundreds, and then thousands,

---

[1] *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 838-39 (N.D. Cal. 2014).

[2] The Individual Defendants include Gary S. Guthart, Lonnie M. Smith, and Marshall L. Mohr.

[3] Tr. of Trial Setting Conference, Dec. 15, 2016, at 3.

of claims concerning patient injuries from the Tip Cover and MCS, leading the Company to privately enter into tolling agreements with injured patients, which were not disclosed to investors for several months; and (iii) three "secret recalls" that took place just prior to the start of the Class Period.[4]

*Notably, the SACC does not add any new claims, defendants, or theories to the case.* Instead, the SACC, filed after the conclusion of fact discovery, adds substantial allegations developed through discovery evidencing that the Individual Defendants were acutely aware of the harm da Vinci caused patients, while Intuitive continued to tout da Vinci's safety benefits and downplay its risks.  Allegations previously attributable to a confidential witness (the "FP&A Manager" in the Amended Complaint)—that Defendants tracked metrics and information related to adverse events and trends related to adverse events—are now supported by documents and testimony.

Despite the stronger allegations of the SACC, Defendants nonetheless move to dismiss on the purported basis that "both the law, and Plaintiffs' allegations, have changed significantly" since the Court last assessed the sufficiency of Plaintiffs' allegations. Defs.' Br. at 2. This could not be further from the truth.  Nothing about the Supreme Court's 2015 decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318, 1329 (2015) undermines the sufficiency of the SACC.  Indeed, under *Omnicare,* the result is the same—Defendants' statements regarding safety were false and misleading for failing to disclose: (i) the numerous unreported adverse event reports the Company received; (ii) the number and nature of products liability claims brought against the company during the Class Period; and (iii) three "secret recalls" that took place in October 2011 which rendered Defendants' Class Period statements about the safety and efficacy of da Vinci false and misleading. And, Plaintiffs' scienter allegations, supported by documents and testimony establishing the Individual Defendants' actual knowledge of the material omitted facts, are strong and unrebutted.

---

[4] *See* SACC, ¶¶ 1-20. The "Class Period" is defined in the SACC as February 6, 2012 through and including July 18, 2013.

## II.   BACKGROUND

### A.   The Motion to Dismiss Order

Plaintiffs filed the Amended Complaint on October 15, 2013.   ECF No. 48.   On December 16, 2013, Defendants moved to dismiss the Amended Complaint.   On August 21, 2014, the Court issued an Order Granting in Part and Denying in Part Defendants' Motion to Dismiss ("MTD Order").   ECF No. 83. There, the Court addressed three categories of omissions, namely, Defendants' failure to disclose: (i) additional adverse event reports that were hidden from the FDA; (ii) the number and nature of products liability claims brought against Intuitive during the Class Period; and (iii) three "secret recalls" that took place in October, 2011. The Court held that all three of these omissions were sufficiently alleged to raise a plausible inference that Defendants' statements regarding the safety of Intuitive's sole product were misleading under the PSLRA.  *Intuitive,* 65 F. Supp. 3d at 834.

With respect to scienter, the Amended Complaint alleged actual knowledge coupled with substantial insider trading. On this issue, the Court held that:

> Plaintiff has pled facts that . . . show that Defendants knew that their statements regarding da Vinci's safety benefits were false or misleading when said, and that Defendants had financial motivation to maintain a misleading impression of da Vinci's safety. Taken together, these facts support a strong inference of scienter which remains cogent even in light of competing inferences. Therefore, Plaintiff has pled scienter with sufficient particularity to support their Section 10(b) and Rule 10b–5 claims as to statements made regarding da Vinci safety benefits.

*Id.* at 839.  Defendants subsequently filed a motion for reconsideration, which was denied on December 15, 2014.  Thereafter, Defendants answered the Amended Complaint and the parties engaged in fact discovery which concluded on September 30, 2016.

### B.   The SACC

Once fact discovery was completed, Plaintiffs sought leave of the Court to file the SACC to conform the pleading to the evidence gathered during discovery; to remove allegations that Plaintiffs were no longer relying upon; and to streamline the action for trial. Significantly, Plaintiffs did not add any new claims, defendants, or omissions to the Complaint, and did not change their theory of the case. Rather, Plaintiffs removed from the Complaint: (1) the

statements of two confidential witnesses, in favor of stronger evidence produced in this action demonstrating Defendants' knowledge of pervasive and serious safety issues[5]; and (2) allegations in the Complaint that the Court dismissed in the MTD Order. In addition, Plaintiffs supplemented their allegations with evidence: (1) gathered through discovery in this matter, including evidence from Intuitive's internal documents and the deposition testimony of Intuitive executives; and (2) gathered from the public domain since the filing of the Amended Complaint.

Intuitive manufactures only one product, da Vinci which generates all of the Company's revenues and profits. ¶ 39. During the Class Period, the Company engaged in a concerted effort to conceal da Vinci's internally known defects and the serious injuries and deaths it was causing patients.  Specifically, Defendants concealed the following categories of information: (1) an internally known defect in the device that Defendants knew was causing injury and death, as well as thousands of lawsuits and threats of lawsuits that the Company faced as a result of the defect; (2) thousands of adverse medical device reports ("MDRs"), including reports addressing serious injuries and deaths, from the FDA's "MAUDE" database that makes da Vinci's safety record publicly available; and (3) three secret recalls instituted by the Company in October 2011.

## 1.    Defendants Knew About da Vinci's Defect Since 2008

Da Vinci's most commonly used instrument is a pair of special scissors, the MCS, which can cauterize tissue by discharging electric current.  ¶¶ 44-45.  The MCS is used in more than ███████ of the most common procedures involving da Vinci.  ¶ 45.  To protect patients from electrical energy shooting out of the MCS unintended places during surgery, Intuitive developed a tip cover (the "Tip Cover"), an insulating sleeve placed over the tip of the MCS.  ¶¶ 44-45.  However, Intuitive's Tip Covers were defective because they failed to properly insulate the

---

[5] For example, in the SACC, Plaintiffs replaced certain allegations supplied by a confidential witness (the "FP&A Manager" in the Amended Complaint) with the testimony of the Defendants themselves and citation to internal documents demonstrating that the Individual Defendants knew about da Vinci related injuries, FDA violations, and the concealment of serious defects, and thus knew that their statements regarding the safety benefits of da Vinci were false or misleading.  ¶¶ 42-111, 223-47.  The cited evidence demonstrates that the Individual Defendants closely monitored adverse event reports and were acutely aware of the harm da Vinci caused to patients at the same time that Defendants touted da Vinci's safety benefits.

MCS, which allowed electricity—or sparks—to escape, an effect known as "arcing."  As a result of arcing events, patients suffered severe internal burns, internal bleeding, and even death. ¶¶ 48-50.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████  At that time, Defendants sent aletter to customers with suggestions regarding use of the Tip Cover.  The customer letter was an attempt to avoid public disclosure of Intuitive's Tip Cover problems while the Company quietly worked to replace the defective Tip Cover with a new version. *Id.*  Yet in these customer letters, Defendants brazenly failed to notify customers that the "Important Product Notification" was sent in response to complaints concerning arcing.  Indeed, the letter ***omitted*** all reference to "arcing," "burning," or associated "dangers" or "patient injuries" that occurred from use of the Tip Cover.  Two more customer letters followed in October 2011, including one sent to address defective "cannulas" (*i.e.*, tubes used to insert da Vinci instruments inside the body). ¶ 61.  The defective cannulas also contributed to damaging the Tip Covers and subsequent arcing.  None of the three letters were publicly disclosed.  ¶¶ 61-64. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  Upon discovery, the FDA classified these letters as "Class II Recalls" in the July 2013 FDA Warning Letter.  ¶ 63. ████████████████████

████████████████████████████████████████████████████

███

**2.**     **<u>Defendants Concealed Thousands of Legal Claims Against Intuitive</u>**

Intuitive also failed to disclose the rapid escalation in the number of personal injury and product liability claims resulting from injuries caused by da Vinci.  ¶¶ 79-80.  Defendants concealed that by the end of the first quarter in 2012, there had been eight da Vinci patient deaths

and at least five personal injury and/or product liability lawsuits filed against Intuitive. ¶ 79.  To deal with these claims, Defendants hired Skadden, Arps, Slate, Meagher & Flom LLP in early 2012 to confidentially secure tolling agreements for injured patients/claimants before they publicly filed suit against Intuitive. *Id*.  The first of thousands of these undisclosed tolling agreements was entered into in October 2012. ¶ 80.  By December 2012, hundreds of injured patients entered into confidential tolling agreements with the Company, and by April 2013, thousands. *Id*.  Indeed, documents and testimony confirm that as of December 31, 2012, there were 193 tolled claims and that the number continued to grow, reaching 328 tolled claims on January 31, 2013; 734 tolled claims on February 28, 2013; 864 tolled claims by late March, 2013; and 2,248 tolled claims by June 27, 2013. *Id*.

Intuitive later reported that the Company entered into confidential mediation with many of the claimants, whose approximately 3,000 claims covered the period from 2004 to 2013, resulting in the Company taking a $67 million charge against earnings.  *Id*.  This number grew by $15 million to $82 million by the end of 2014. ¶ 80 n.62.  Moreover, the vast majority of these private tolling agreements involved claims stemming from the MCS and Tip Cover.  ¶ 80.  Despite the legal and business risk involved with the receipt of hundreds, and then thousands of claims, Defendants failed to disclose its tolling agreement effort for several months, until Intuitive's April 19, 2013 Report on Form 10-Q.  *Id*.  However, even this disclosure omitted fundamental information as to how many tolling agreements had been entered into and the nature of the claims sufficient to allow investors to understand the gravity of the situation the Company faced as a result of the MCS and Tip Cover defect.  *Id*. Notably, Intuitive even hid this information from their products liability insurers while they were securing products liability coverage, according to lawsuits later filed by their insurance carriers.  *Id*.

### 3.   Defendants Knew About Thousands of MDRs That It Concealed From The FDA and the Public

Defendants failed to disclose thousands of MDRs to the public and the FDA.  Federal regulations required Intuitive to report MDRs to the FDA.   ¶¶ 91-92 (citing regulations). Similarly, hospitals and surgeons using da Vinci were required by regulation to report adverse

events to Intuitive as the manufacturer.  Intuitive then was obligated to issue reports to the FDA based on this information.  *Id*.  Defendants thus knew that Intuitive was the central information hub for all MDRs and that Intuitive controlled the information flow.  The SACC alleges that Intuitive underreported and misclassified thousands of MDRs so that it was impossible for anyone outside the Company to know the severity and extent of the safety dangers posed by da Vinci.  ¶¶ 7, 94-96.

████████████████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ Once Intuitive began to accurately report all MDRs in September 2012, the number of MDRs in the MAUDE database skyrocketed.  ¶ 104.  By the end of the Class Period, Intuitive had suppressed nearly half of all MDRs, so that the MAUDE database reflected only about half of the real injuries and adverse events.  ¶¶ 104-08.  Specifically, between 2000 and 2012, Intuitive filed 5,333 da-Vinci related MDRs.  ¶ 104.  But in the first nine months of 2013, this number grew by 3,117, to over 8,450 MDRs. *Id*.

Not only did the total number of MDRs dramatically increase, but so too did the severity of the injuries reported.  Until September 2012, Intuitive had misclassified many "serious injuries" under the misleading and innocuous label of "other."  ¶ 7.  After September 2012, however, "death" or "injury" related MDRs began to consistently increase monthly, nearly doubling from the low teens to more than twenty.  ¶¶ 107-108.

### 4.    The FDA Form 483 Shows That Intuitive Hid Da Vinci's Defects

The FDA learned that Intuitive had been concealing da Vinci's defects after inspecting Intuitive's headquarters between April 1 and May 30, 2013.  At the inspection's conclusion, the FDA issued a Form 483 addressed to Guthart (SACC, Ex. B) that listed the multiple instances in which Defendants concealed their actions from the FDA, including the October 2011 letters. ¶¶ 94-100; 123-29.

5.      **The Warning Letter Shows That Intuitive Knew About Da Vinci's Defects**

The FDA issued a Warning Letter to Intuitive on July 16, 2013.  ¶¶ 108-21; 137-50, Ex. A. "**Warning Letters are issued only for violations of regulatory significance**," according to the FDA's Regulatory Procedures Manual ("RPM") § 4-1-1.  ¶ 138.

The Warning Letter provides strong evidence that Intuitive knew in 2011 about the defects that posed a serious health risk, but concealed them.  ¶ 19, Ex. A.  The multiple instances of concealment constituted significant FDA violations.  First, and most importantly, Intuitive did not disclose its attempts to fix the defects in the Tip Covers in 2011.  These fixes were not minor, but were determined by the FDA to have risen to the level of a formal "Class II recall." ¶ 141.  In other words, Intuitive conducted a recall, and did so in secret.  Thus, Intuitive purposely avoided the negative publicity and FDA scrutiny that necessarily results from a Class II recall.   In addition, the Warning Letter concluded that, in light of the failure to notify the FDA of the defects Intuitive had identified and tried to correct in the Tip Covers and cannulas, they were "misbranded devices" under FDA regulations. ¶ 140. The Warning Letter also determined that the manufacturing process for the Tip Covers and cannulas violated Current Good Manufacturing Practice requirements.  21 C.F.R. § 820.  ¶ 149. The manufacturing process was defective because even though Intuitive knew that surgeons scraped instruments during surgery, causing Tip Cover damage, Intuitive never sought to fix the known design defect.  ¶¶ 144-49. The Warning Letter thus concluded that the Tip Covers and cannulas were "adulterated devices" under FDA regulations and that they did not conform with the "Current Good Manufacturing Practice (CGMP) requirements" for devices under 21 C.F.R. § 820.  ¶ 149.

6.      **The Individual Defendants Knew About Intuitive's Safety Problems**

In fact, the FDA's Warning Letter was addressed to Guthart in July 2013.  ¶ 196.

1

2

3

4

5

6

7

8

9

10

11

12 **III.    STANDARD OF REVIEW**

13      To survive a motion to dismiss, a plaintiff's allegations need only be "plausible." *Bell Atl.*

14 *Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff

15 pleads factual content that allows the court to draw the reasonable inference that the defendant is

16 liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must

17 "accept all factual allegations in the complaint as true" and "must consider the complaint in its

18 entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6)

19 motions to dismiss, in particular, documents incorporated into the complaint by reference, and

20 matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

21 551 U.S. 308, 322 (2007).  At the motion to dismiss stage, courts must construe the facts alleged

22 "in the light most favorable to plaintiffs." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1013 (9th Cir.

23 2005).

24 **IV.    PLAINTIFFS SUFFICIENTLY ALLEGE EXCHANGE ACT VIOLATIONS**

25      Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ,

26 in connection with the purchase or sale of any security . . . any manipulative or deceptive device

27 or contrivance in contravention of such rules and regulations as the Commission may prescribe

28 as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C.

§78j(b); *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011). Securities and Exchange Commission ("SEC") Rule 10b-5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b); *Matrixx*, 131 S. Ct. at 1317. To state a claim for securities fraud under Section 10(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen, Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1192 (2013); *Matrixx*, 131 S. Ct. at 1317. Whether plaintiffs "can ultimately prove their allegations" is "an altogether different question." *Matrixx*, 131 S. Ct. at 1325.   Defendants' motion challenges the sufficiency of Plaintiffs' falsity and scienter allegations.

### A.    The Complaint Sufficiently Pleads Falsity

Under the PSLRA, a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" 15 U.S.C. §78u-4(b)(1)(B). "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 985 (9th Cir. 2008).

For an omission to be misleading, "it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.,* 280 F.3d 997, 1006 (9th Cir. 2002).  A material omission is one that a reasonable investor would consider to significantly alter the total mix of information. *Matrixx,* 131 S. Ct. at 1318.  A duty to disclose exists "to make the statements . . . in light of the circumstances under which they were made not misleading." 17 C.F.R. §240.10b-5(b).

1.   **The Court Already Ruled that Plaintiffs Have Alleged Material Misstatements and Omissions**

Contrary to what Defendants argue, Plaintiffs' allegations concerning Defendants' statements regarding the safety and efficacy of da Vinci have not changed at all—let alone "significantly." Defs.' Br. at 2.   Indeed, the SACC leaves entirely unchanged the statements/omissions regarding da Vinci's safety and efficacy, which this Court has already held "are sufficient to state a claim under the PSLRA." *Intuitive*, 65 F. Supp. 3d at 833:

> These statements include (i) repeated assertions that it believes that da Vinci represents "a new generation of surgery" that "combines the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision, and dexterity of open surgery" (CAC ¶¶ 188, 133, 198, 213(a), Dkt. No. 48); (ii) a statement that despite questions posed by recent news articles, Intuitive believed "that da Vinci Surgery continues to be a safe and effective surgical method ..." and that "da Vinci surgery has proven safety, efficacy, economic and ergonomic benefits when compared to the open surgical procedures it is replacing" (*Id.* ¶ 213(a)); and "[a] statement that Intuitive was in the midst of a concerted effort by critics of robotic surgery, to challenge the benefitted range of patients" but that "[Intuitive was] confident that those who invest their time in serious review of the clinical evidence on da Vinci" will find ample evidence of the device's benefits (*Id.* ¶ 211).

*Id.*[6] The Court ruled that the above statements concerning da Vinci's safety and efficacy were false and misleading because they omitted the following material information: (1) that Defendants misclassified numerous adverse event reports of serious injury under the "other" category instead of in the "serious injury" category and categorically suppressed thousands MDRs by failing to report them to the FDA database; (2) the existence or the nature of the corrective letters (called "secret recall" letters in the SACC) sent out to da Vinci hospitals in October 2011; and (3) the failure to disclose specific information about the number and nature of product liability suits it faced during the Class Period. *Intuitive*, 65 F. Supp. 3d at 833-34.

---

[6] These same statements now appear at ¶¶ 100, 224, 227, 230, 233, 236, 241, 242, 245(a), 245(b) of the SACC.

2.      *Omnicare* **Does Not Change the Court's Prior Holding that Plaintiffs Have Sufficiently Alleged Defendants Omitted Material Information**

Defendants failed to convince this Court on their first motion to dismiss that their statements concerning the safety of da Vinci were mere corporate puffery.  *See* MTD Order at 14[7].  They now argue that the safety statements are instead immunized from liability as statements of opinion under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318, 1330 (2015).  In *Omnicare*, the Supreme Court made clear that an opinion is actionable when the opinion is subjectively disbelieved by the speaker or when the "issuer's basis for offering" the opinion is called into question.  135 S. Ct. at 1332.[8]

To allege adequately that a statement of opinion or belief is false under *Omnicare,* a plaintiff must plead facts that, if true, would be sufficient to show that either: (1) the opinion or belief itself "constitutes a factual misstatement" subjectively disbelieved by the speaker; ***or*** (2) the opinion or belief is "rendered misleading by the omission of discrete factual representations." *Id*. at 1325.  In the context of opinions, reasonable investors "understand [such statements] to convey facts about . . . the speaker's basis for holding that view."  *Id.* at 1328. Although a speaker's opinion may be sincerely held, the statement may nonetheless be actionable under 10b-5's omissions provision if: (i) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and (ii) "those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 1329.

Whether an omission makes a statement misleading always depends on context, and "an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Omnicare,* 135 S. Ct. at

---

[7] The Court rejected Defendants' corporate puffery argument, finding that "these statements plausibly exceed mere expressions of corporate optimism" and "***statements made regarding da Vinci's safety and benefits are sufficient to state a claim under the PSLRA pleading requirements.***" *Intuitive*, 65 F. Supp. 3d at 833-34. (emphasis added).

[8] The Supreme Court noted that its analysis of § 11's omission provision was "not unique to § 11." *Omnicare*, 135 S. Ct. at 1330.  At least one case in this district has applied the *Omnicare* analysis to a Section 10(b) claim.  *See In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *33 (N.D. Cal. Oct. 1, 2015).

1330.[9]   Indeed, the Supreme Court acknowledged in *Omnicare* that "[T]he recipient of an assertion of a person's opinion as to facts not disclosed may sometimes properly interpret it as an assertion . . . that the facts known to that person are not incompatible with his opinion." *Omnicare,* 135 S. Ct. at 1330 n.10, *citing* Restatement (Second) of Contracts § 168, p. 455 (1979).  This holding is based on the fact that a reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Id.* at 1329.  In other words, "*[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.*" *Id.* at 1332 (emphasis added).[10]

In this respect, the Supreme Court's *Omnicare* standard breaks no new ground and has been applied by courts in the Ninth Circuit and in other circuits long before the *Omnicare* decision.  *See, e.g.*, *Reese v. Malone,* 747 F.3d 557, 579 (9th Cir. 2014) (*quoting Kaplan v. Rose,* 49 F.3d 1363, 1375 (9th Cir. 1994) ("[a] statement of belief is . . . actionable under Section 10(b) if . . . the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy"); *Seaman v. California Bus. Bank*, 2013 WL 5890726, at *4 (N.D. Cal. Oct. 30, 2013)

---

[9] *See also Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698 (9th Cir. 2016) (at the same time a defendant made positive public statements about a drug's safety, it knew that rats receiving the drug were *getting* cancer.  The Ninth Circuit found that, while the company might not have had a stand-alone duty to disclose the rat study, by publicly touting the drug's safety and positive animal studies, its statements were misleading absent the disclosure of the rat study); *Flynn v. Sientra, Inc.,* 2016 WL 3360676, at *10 (C.D. Cal. June 9, 2016) (Plaintiffs' allegations regarding Sientra's disclosure of certain "risks" were more than plausibly misleading when viewed in conjunction with Plaintiffs' allegations that serious regulatory issues had already transpired by the time these statements were made and that defendants knew or recklessly disregarded the existence of these issues); *Medina v. Clovis Oncology, Inc.*, 2017 WL 530344, at *21 (D. Colo. Feb. 9, 2017) ("Nor does the Court believe that a reasonable investor would not find material a statement that a drug was safe, manageable, or tolerable, when, in reality, it was not. Although plaintiff will need to show that those metrics are objectively verifiable, and that the alleged statements fell outside the verifiable meaning of the words used, at this juncture, the Court will allow the claims to continue.").

[10] In *Omnicare*, the Court flagged a specific possible omission: that an attorney had warned the defendant about a particular legal exposure. 135 S. Ct. at 1333. The Court instructed the trial court on remand to examine the attorney's warning, with a focus on the attorney's "status and expertise" and the context of the statements. *Id.*

("[a]n opinion may still be misleading if it . . . knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1177 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.")[11].

Here, Plaintiffs easily satisfy the second prong of the *Omnicare* test because the SACC alleges material "facts going to the basis" of Defendants' opinion statements that a reasonable investor would want to know, but which Defendants never disclosed.  135 S. Ct. at 1332. Namely, Defendants never disclosed (1) "the existence of these numerous unreported MDRs," (2) "the circumstances behind the corrective letters," and (3) the numerous claims pending against Intuitive, "their growing number, and their severe nature."  *Intuitive*, 65 F. Supp. 3d at 833-34.  And critically, the Court already determined (1) that this information was material, as alleged, and (2) that a reasonable investor would want to know this information.  *Id.* Thus, under *Omnicare*, Plaintiffs alleged facts which "***call into question the [Defendants'] basis for offering [its] opinion[s].***" *Omnicare,* 135 S. Ct. at 1332 (emphasis added).[12]

The analysis under the second prong of *Omnicare* is the same analysis already performed by the Court on Defendants' prior motion to dismiss.  The Court examined each of the three categories of alleged omissions, compared them to the statements made by the Defendants at the time, and found that Plaintiffs had identified particular and material categories of facts known to

---

[11] *See also In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 244 (2d Cir. 2016) (finding that *Omnicare* did not establish an argument regarding the actionability of opinion statements that was previously unknown); *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2015 WL 2250472, at *20-21 (D.N.J. May 13, 2015) (finding that the Supreme Court's analysis in *Omnicare* squares with earlier holdings in the Third Circuit regarding statements of opinion).

[12] Plaintiffs do not concede that all of the safety statements at issue are statements of opinion or belief as the Court has already determined that certain of the statements "***could be objectively assessed through safety reports such as the MDRs or peer reviewed studies***" available to Defendants prior to and during the Class Period. *See Intuitive,* 65 F. Supp. 3d at 833-34 (emphasis added).  For those statements that are not statements of opinion or belief (such as those at ¶¶ 242 and 245(b)), *Omnicare* does not apply.

Defendants whose omission made Defendants' opinions about safety misleading to a reasonable person reading those statements in context.[13]  Specifically, the Court held:

> **[T]he court concludes that it is plausible that the reasonable investor would find the existence of these numerous unreported MDRs to significantly alter the total mix of information available** and that Defendants' statements created an impression of da Vinci's safety that materially differed from reality. Therefore, the omission of the MDRs plausibly rendered Defendants' statements as to the safety and efficacy of da Vinci false or misleading.
>
> \* \* \*
>
> **In the CAC, Plaintiff alleges with particularity the circumstances behind the corrective letters (the tip cover defect and serious injuries that resulted), and the circumstances stemming therefrom (namely, the FDA Warning Letter). Plaintiff has therefore plausibly alleged an omission that the reasonable shareholder may find to significantly alter the total mix of information available with regard to da Vinci's safety**. Intuitive's alleged failure to disclose these recalls gives rise to a plausible inference that the statements regarding da Vinci safety created an impression that differed materially from the one that actually existed.
>
> \* \* \*
>
> **Plaintiff plausibly alleges that these statements were misleading because they lacked specificity as to these lawsuits, their growing number, and their severe nature. See id.** ¶¶ 189, 194, 199, 204, 214. For similar reasons as with the previous two omissions, the court finds this omission, as alleged, sufficient to raise a plausible inference that Defendants' statements regarding Intuitive safety were misleading under the PLSRA."

*Intuitive*, 65 F. Supp. 3d at 833-34 (emphasis added).  Thus, contrary to what Defendants argue, the law has not changed "significantly" since the Court's last MTD Order.  Defs.' Br. at 2.[14]

---

[13] This Court has already rejected Defendants' recycled argument (Defs.' Br. at 13) that Intuitive had no affirmative duty to disclose the information Plaintiffs allege was omitted.  *See Intuitive*, 65 F. Supp. 3d at 833.

[14] *In re Tesla Motors, Inc. Securities Litigation,* 75 F. Supp. 3d 1034 (N.D. Cal. 2014) (Defs.' Br. at 18) is distinguishable.  In that case, Plaintiffs alleged the Company failed to disclose three battery "fire incidents" which occurred in the prototype battery design process for Tesla's Model S.  Subsequently, the Tesla battery pack caught fire during the class period. Plaintiffs alleged that Defendants should have disclosed the test results.  Here, Plaintiffs do not allege that negative testing results should have been disclosed to investors, but that what should have been disclosed were much more serious recalls demonstrating a potential Tip Cover defect, adverse events and thousands of potential claims from patients injured by the Tip Cover and MCS.  *See* ¶¶ 1-20.

Indeed, the analysis regarding the omissions undertaken by the Court is the same as would be done under the second prong of *Omnicare*.[15] Given this—and on the more developed record where Plaintiffs have actually strengthened the support for their allegations with Defendants' documents and testimony—there is no reason for the Court to alter its prior decision sustaining in part the allegations at issue here and no need to "review the allegations with fresh eyes." *Id*.[16]

## B.    The Complaint Alleges a Strong Inference Of Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). The scienter element requires plaintiffs to "state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987. Importantly, "courts must consider the complaint in its entirety . . . . The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310 (italics in original). "In making this determination, the court must review all the allegations holistically." *Matrixx*, 131 S.

---

[15] The Court considered each alleged category of omission in isolation and determined that a reasonable investor would find the existence of these facts to significantly alter the total mix of information available with respect to da Vinci safety. *See Intuitive*, 65 F. Supp. 3d at 833-34. Defendants' failure to disclose this material information makes its statements about da Vinci's safety false or misleading because it "calls into question the [Defendants'] basis" for offering its statements about da Vinci's safety profile. For example, a ***reasonable investor*** reading the statement "w[e] believe that *da Vinci* Surgery continues to be a safe and effective surgical method" would want to know that patients were being burned internally and suffering serious injuries because of a defect in Intuitive's Tip Cover—an accessory used in most da Vinci surgeries; that the Company had conducted a secret recall of the Tip Cover; that Intuitive was tolling thousands of legal claims against the Company related to this problem; and that Intuitive failed to publicly disclose MDR complaints about serious injuries due to the Tip Cover and malfunctions of the Tip Cover during or before surgery. These key facts concerning "the inquiry [Defendants] . . . conduct[ed]" and "the knowledge [they] . . . ha[d]" are exactly the kind of information the Supreme Court decided would make a statement of opinion "misleading to a reasonable person." *Omnicare*, 135 S. Ct. at 1332. Thus, the alleged omissions are more than just "some fact[s] cutting the other way." *Id*. at 1329; Defs.' Br. at 13.

[16] The Supreme Court's decision in *Omnicare* came down on March 24, 2015, approximately three months after this Court's December 15, 2014 order denying reconsideration of Defendants' original motion to dismiss, but before fact discovery began in earnest. If Defendants truly believed *Omnicare* justified reconsideration of the Court's MTD Order, Defendants could have sought reconsideration at that time instead of waiting almost two years, until after the completion of fact discovery, to make this argument.

Ct. at 1324. "Thus, *Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Accordingly, in assessing scienter, "the sum is greater than the parts." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 697 (9th Cir. 2012).[17]

A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. "In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry*, 542 F.3d at 784. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences"–the inference need only be equally plausible to any non-culpable inference. *Tellabs*, 551 U.S. at 324. Moreover, "where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008).

This Court has already determined that Plaintiffs alleged a strong inference of scienter in the Amended Complaint. Defendants' challenge to the SACC must fail because the scienter allegations in SACC are even stronger than those in the Amended Complaint.  The SACC cites evidence developed through discovery and publicly available from the Company's own post-Class Period disclosures and other lawsuits, demonstrating that Defendants knew about the safety problems affecting their sole product and intentionally or recklessly concealed it from

---

[17] The Ninth Circuit has observed that "falsity and scienter in private securities fraud cases are generally strongly *inferred* from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *Daou*, 411 F.3d at 1015 (emphasis added); *see also In re Velti PLC Sec. Litig.,* 2015 WL 5736589, at *33, *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

1   investors.   Notably, Defendants' motion omits reference to the vast majority of Plaintiffs'

2   allegations related to knowledge and intent detailed in the SACC. *See, e.g.*, ¶¶ 188-213.

3               **1.      The Significant Evidence of Scienter Alleged in the SACC**

4           There is overwhelming evidence of scienter alleged in the SACC, most of which is

5   completely ignored in Defendants' motion. ¶¶ 188-211.  Critically, the Court already determined

6   that the Amended Complaint pleaded scienter under the PSLRA, and the SACC only removes

7   confidential witness ("CW") allegations and replaces them with reference to actual evidence

8   supporting in more specific detail the information supplied by the CWs.  In fact, given the sheer

9   volume of evidence establishing that Defendants knew about the safety problems at issue,

10  Defendants do not and cannot dispute their actual knowledge. Defs.' Br. at 21, 23.

11          First, Defendants exchanged many detailed communications with the FDA discussing the

12  serious problems with and injuries resulting from the Tip Cover and the secret recalls the

13  Company undertook.[18]

14

15

16                                                                           This is

17  strong evidence of scienter. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022

18  (S.D. Cal. 2005) (finding scienter properly alleged when "[t]he Complaint . . . point[ed] to

19

20          [18] For example, the FDA reported in its July 2013 FDA Warning Letter to Guthart and
21  Intuitive that "[t]he FDA [ ] previously informed you of your firm's correction and removal
    violations in an untitled letter dated February 19, 2008, and FDA 483 Inspection Observations
22  issued on December 20, 2002." ¶¶ 188-89.  In addition, a February 19, 2008, "Untitled Letter"
    (the "2008 Untitled Letter") was addressed to Smith and cited Intuitive for failing to "submit a
23  written report to FDA . . . of any correction or removal of a device if the correction or removal
    was initiated to reduce the risk to health posed by the device . . ." ¶ 190. Thus, Defendants knew
24  of Intuitive's precise regulatory violations during the Class Period, including: (i) secretly issuing
    Class II Recalls; and (ii) failing to report reports of adverse events through the MDR mechanism.
25  *See Pub. Pension Fund Grp. v. KV Pharm. Co.*, 2013 WL 1831427, at *2 (E.D. Mo. Apr. 30,
    2013) (FDA complaint alleging defendants' actual knowledge supports strong inference of
26  scienter).

27

28

meetings and articles where such problems were discussed . . . . [a]llege[d] the existence of contemporaneous documentary or testimonial evidence corroborating their allegations of what Defendants knew" and showed that defendants "had access to contrary facts and specifically identify the reports or statements containing this information."). The allegations in the SACC, supported by unassailable evidence, demonstrate that all of the Individual Defendants were acutely aware of the harm da Vinci was causing patients. For example, ███████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

Third, ***Defendants actually admit their ongoing involvement with the Tip Cover accessory and MDR reporting issues*** in publicly filed court documents. ¶ 210. In a derivative action predicated on the same conduct alleged here, Defendants filed a statement of undisputed facts in which they admit their direct involvement in the issues surrounding the Tip Cover accessory and MDR reporting. For example, the document stated that (1) "at every Intuitive Board meeting, the Board discussed regulatory compliance, including FDA reporting practices;" (2) "the Board regularly discussed design and manufacturing issues, including the tip covers;" (3) "Intuitive's directors met in special sessions to address the issues;" (4) "Intuitive directors

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

1    received updates from Dr. Guthart, Intuitive's CEO, regarding the issues;" (5) "the directors and

2    officers oversaw Intuitive's decision to devote significant engineering resources to investigating

3    the issue;" (6) "Intuitive officers . . . came to believe that the company should classify certain

4    incidents involving da Vinci differently, thereby making them reportable;" and (7) "Dr. Guthart

5    notified the Directors of this determination, and kept [the Board] updated as Intuitive brought the

6    issue to the FDA's attention."  *Id.*  Because the Individual Defendants were officers and directors

7    of Intuitive (Smith also served as Chairman of Intuitive's Board) these admissions provide strong

8    evidence—of the kind typically submitted on summary judgment—that Defendants both ***knew***

9    about issues surrounding the Tip Cover accessory and MDR reporting, but intentionally or

10   recklessly failed to disclose these problems to investors.  *See Hausler v. JP Morgan Chase Bank,*

11   *N.A.*, 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015) ("a court may . . . consider a judicial admission as

12   evidence in another case").

13        Fourth, this Court already ruled that Plaintiffs' allegations regarding all of the

14   Defendants' suspicious stock sales during the Class Period were "cogent and give rise to a strong

15   inference of scienter." ECF No. 83 at 21. In *America West*, the Ninth Circuit found that scienter

16   had been adequately alleged based upon insider trading where, "[f]or each defendant, Plaintiffs

17   outlined the individual's holdings, his class period sales, when the sales occurred, the percentage

18   of owned shares that were sold, and the total proceeds that were generated from the sale."  *No.*

19   *84 Emp'r- Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920,

20   939 (9th Cir. 2003).  And this Court agreed that Plaintiff pleaded "facts sufficient to support a

21   strong inference of scienter under the *American West* factors."  ECF No. 83 at 20.  Defendants do

22   not challenge the Court's previous holding and Plaintiffs' insider trading allegations have not

23   changed.  Instead, Defendants raise an argument that the Court already rejected in Defendants'

24   first motion to dismiss—that Company's decision to repurchase stock negates any finding of

25   scienter. *See* Defs.' Br. at 22; *See* Defs' Motion To Dismiss Amended Class Action Complaint,

26   ECF No. 53 at 23 (making the same argument).  In addition, Defendants point to the fact that the

27   Individual Defendants traded pursuant to 10b-5 trading plans, Defs.' Br. at 21-23 but as

28   discussed in the SACC, Defendants terminated and manipulated their 10b-5 plans during the

1    Class Period. ¶¶ 177-87.[22]

2         Fifth, an Order issued in separate insurance litigation against Intuitive provides strong

3    evidence that the Individual Defendants (officers and directors of Intuitive) authorized the

4    Company to enter into hundreds of tolling agreements for undisclosed injury claims.  In *Illinois*

5    *Union Ins. Co. v. Intuitive Surgical*, *Inc.*, No. 13-cv-4863 (N.D. Cal.) and *Navigators Specialty*

6    *Ins. Co. v. Intuitive Surgical, Inc.*, No. 15-cv-5801-JST (N.D. Cal.), Intuitive's insurance carriers

7    both sought to rescind their insurance policies based on Intuitive's concealment of the tolling

8    agreements which Intuitive entered into with parties who alleged they were  injured by da Vinci.

9    In the "Undisputed Facts" section of the Court's Order Denying Illinois Union's Motion for

10   Summary Judgment, the Court specifically noted that "Intuitive authorized outside counsel to

11   enter into 'tolling agreements' with plaintiffs' attorneys for individuals who contacted Intuitive

12   regarding potential injury claims related to the da Vinci Surgery System" and "the number of

13   tolled claims continued to grow throughout the winter and spring of 2013, reaching . . . 2,248

14   tolled claims by June 27, 2013."  ¶ 211.  Yet, Intuitive did not notify Ironshore of the existence

15   of these agreements until March 21, 2013.  *Id.*

16        Sixth, the facts here involve pervasive safety issues with the sole product that generates

17   100% of Intuitive's revenue and the Individual Defendants are the top executives involved in

18   Intuitive's daily operations.  "[W]here the nature of the relevant fact is of such prominence that it

19   would be 'absurd' to suggest that management was without knowledge of the matter," scienter

20   may be inferred.  *S. Ferry*, 542 F.3d at 786; *see also Berson*, 527 F.3d at 987-89 (it would be

21   "absurd to suggest" that top management did not know facts involving loss of tens of millions of

22   dollars on the company's largest contract); *Siracusano*, 585 F.3d at 1181 (the "inference that

23

24        [22] *See Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal. 2009) (holding
     that notwithstanding "10b5–1 plans, Plaintiff's allegations that the Defendants amended their
25   10b5–1 plans to allow more stock sales based on their inside information coupled with the
     unusual pattern of sales supports an inference of scienter."); *In re Countrywide Fin. Corp.*
26   *Derivative Litig.*, 554 F. Supp. 2d 1044, 1068-69 (C.D. Cal. 2008) (finding that a CEO's
     "amendments of 10b5-1 plans at the height of the market" supported the inference of scienter
27   and "defeat[ed] the very purpose of 10b5-1 plan[]"); *George v. China Auto. Sys., Inc.*, 2012 WL
     3205062, at *9 (S.D.N.Y. Aug. 8, 2012) (trading plans "are not a cognizable defense to scienter
28   allegations on a motion to dismiss" when they were adopted or amended during the class period).

1  high-level executives . . . would know that the company was being sued in a product liability

2  action is sufficiently strong to survive a motion to dismiss"). Thus, Plaintiffs' core operations

3  allegations further strengthen the overwhelming inference of scienter in the SACC because it

4  would be absurd to suggest that the Individual Defendants were not aware of the severe safety

5  problems with Intuitive's sole product, and the resulting impact those issues would have on the

6  Company's profitability.

7  **2.** **Defendants Knew About and Concealed Intuitive's Safety Problems**

8  Without any legal support, Defendants argue that Plaintiffs have only alleged that

9  Defendants had *knowledge* of the safety problems at issue, but that "there is no allegation of

10  wrongful intent."   Defs.' Br. at 21.   However, Defendants completely ignore Plaintiffs'

11  allegations that Defendants took steps to actively investigate and conceal the safety problems at

12  issue.  In *Matrixx*, the Supreme Court found that Defendants alleged scienter when they made

13  false statements about their leading drug product because the defendants ***knew*** about safety

14  problems with the drug and took active steps to investigate and subsequently conceal the issues.

15  There, the defendants "hired a consultant to review the product," "convened a panel of

16  physicians and scientists," and then concealed the fact that Zicam caused anosmia by shutting

17  down the use of Zicam's name in a public presentation regarding anosmia. *Matrixx*, 131 S. Ct. at

18  1324. Similarly here, ███████████████████████████████████████████

19  █████████████████████████████████████████████████████████████████

20  ████████████████████████████ Then Defendants took steps to conceal the information, by:

21  (1) sending letters to hospitals to "correct" the defects in the Tip Covers, without actually

22  disclosing to the hospitals that patients were being burned internally, and knowing that the letters

23  should have been classified as recalls; (2) entering into secret tolling agreements to conceal

24  related legal claims; and (3) underreporting and mislabeling MDR complaints Intuitive was

25  obligated to report to the public.

26  Thus, the fact that ██████████████████████████████ while taking

27  affirmative steps to conceal the information gives rise to a strong inference of scienter. *Matrixx,*

28  131 S. Ct. at 1324-25 ("taken collectively, [the scienter allegations] give rise to a cogent and

1  compelling inference that Matrixx elected not to disclose the reports of adverse events not

2  because it believed they were meaningless but because it understood their likely effect on the

3  market."); *see also Twinde v. Threshold Pharm., Inc.*, 2009 WL 928132, at *12 (N.D. Cal. Apr.

4  3, 2009) (holding that the plaintiff alleged deliberate recklessness when he "plead that

5  Defendants ***knew*** of facts that would necessarily prevent or delay the regulatory approval or

6  marketing" of a drug) (emphasis added).

7             **3.    The Individual Defendants Made False and Misleading Statements**

8             Defendants also claim without support that Plaintiffs' scienter allegations concerning

9  Mohr and Smith—the former CEO and Chairman of the Board of Directors and the Chief

10  Financial Officer—should be disregarded because they only signed SEC filings containing false

11  or misleading statements. Defs.' Br. at 20.  This argument must fail because "numerous courts

12  have found that a director's signature on a misleading financial report is sufficient to demonstrate

13  control over the misrepresentation, because "[i]t ... comport[s] with common sense to presume

14  that a person who signs his name to a report has some measure of control over those who write

15  the report."  *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 10914316, at *36 (C.D. Cal. Aug.

16  8, 2013) (collecting cases) (alterations in original)*; Howard v. Everex Sys., Inc.*, 228 F.3d 1057,

17  1061-62 (9th Cir. 2000) ("Key corporate officers should not be allowed to make important false

18  financial statements knowingly or recklessly, yet still shield themselves from liability to

19  investors simply by failing to be involved in the preparation of those statements.").  The Court

20  should similarly reject Defendants' argument that Guthart—the CEO of the Company—did not

21  make any statements that "evince[d] an intent to mislead."  Defs.' Br. at 23.  Not only did

22  Guthart sign Intuitive's false and misleading SEC filings, but he also made affirmative

23  statements about da Vinci's safety and efficacy that the Court already held were false and

24  misleading in light of the critical information that was omitted.[23]  *See Intuitive*, 65 F. Supp. 3d at

25

26       [23] The Court should similarly reject Defendants' additional unsupported arguments
concerning Defendant Smith.  As discussed above, there is significant evidence—in addition to
27  Smith's massive stock sales ***(totaling more than $100 million in insider sales during the Class
Period)***—showing that Smith was aware of the safety problems at issue and either intentionally
28  or recklessly failed to disclose them.  ¶ 207.  Moreover, the unsupported notion that Smith "did

833 (listing the misstatements and holding that "all of the above alleged statements and omissions are sufficient to state a claim under the PSLRA"); *see also* SACC ¶¶ 31-33.

### C.     The Court Should Not Allow Defendants to Delay This Case

Defendants aim to use the PSLRA stay to further delay the resolution of this case which has been pending for approximately four years.  Before Defendants filed their motion to dismiss, this action was in the midst of expert discovery and on the eve of summary judgment.  As the Court recently acknowledged, it has "great concern about how long" the case has been ongoing and that it "is probably proper to marshal forward" and "to allow [the parties] to proceed in your case for the benefit of your clients."  Tr. of Trial Setting Conference, Dec. 15, 2016, at 4, 5. Plaintiffs respectfully request that the Court expeditiously dispose of Defendants' motion to dismiss and allow the case to proceed on the merits.

Dated: February 23, 2017

**LABATON SUCHAROW LLP**


By:  /s/ Serena P. Hallowell
MICHAEL W. STOCKER (179083)
JONATHAN GARDNER (*pro hac vice*)
MARK S. ARISOHN  (*pro hac vice*)
SERENA P. HALLOWELL (*pro hac vice*)
CHRISTINE M. FOX (*pro hac vice*)
THEODORE J. HAWKINS (*pro hac vice*)

*Lead Counsel for Plaintiffs and the Class*

**KERR & WAGSTAFFE LLP**
JAMES M. WAGSTAFFE (95535)
IVO LABAR (203492)
101 Mission Street, 18th Floor
San Francisco, CA 94105–1727
Telephone: (415) 371-8500
Fax: (415) 371-0500

*Local Counsel for Plaintiffs and the Class*

not insist on adding the information at issue to the forms he signed because he did not believe it needed to be disclosed," (Defs.' Br. at 21), is irrelevant because the Court must draw its inferences from Plaintiffs' allegations, which are presumed to be true on a motion to dismiss. *Tellabs,* 551 U.S. at 324.  Finally, the Court should reject the implication that Smith should somehow escape liability because he stepped down as CEO before the Class Period. *See Alpha Capital Anstalt v. New Generation Biofuels, Inc.,* 2014 WL 6466994, at *9 n.18 (S.D.N.Y. Nov. 18, 2014) (rejecting the argument that the chairman of the board can "escape liability for fraudulent statements . . . by resigning from their official role before a plaintiff invests in reliance on such previously-made fraudulent statements.").

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on February 23, 2017, I authorized the electronic filing of the

3 foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

4 such filing to all parties registered with the Court's CM/ECF system.  I certify under penalty of

5 perjury under the laws of the United States of America that the foregoing is true and correct.

6 Executed on February 23, 2017

7                                                                /s/ Serena P. Hallowell

8                                                                SERENA P. HALLOWELL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28