KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - #49092
jkeker@keker.com
MICHAEL D. CELIO - #197998
mcelio@keker.com
LAURIE C. MIMS - #241584
lmims@keker.com
CODY S. HARRIS - #255302
charris@keker.com
PHILIP J. TASSIN - #287787
ptassin@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendants
INTUITIVE SURGICAL, INC., LONNIE M. SMITH,
GARY S. GUTHART, and MARSHALL L. MOHR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE INTUITIVE SURGICAL SECURITIES LITIGATION | Case No. 5:13-cv-01920 EJD (HRL) |
| | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| | Date:        June 14, 2018 |
| | Time:        9:00 a.m. |
| | Dept.:       Courtroom 4, 5th Floor |
| | Judge:       Hon. Edward J. Davila |
| | Date Filed:  April 26, 2013 |
| | Trial Date:  November 16, 2018 |

1241499

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on June 14, 2018 at 9:00 a.m., or as soon thereafter as this matter may be heard in the courtroom of the Honorable Edward J. Davila, located at 280 South First Street, San Jose, California, Defendants will and hereby do move this Court for an order granting Defendants summary judgment on each of Plaintiffs' three causes of action.

Defendants make this motion pursuant to Rule 56(a) of the Federal Rules of Civil Procedure on the grounds that there is no genuine issue as to any material fact on the elements of loss causation and materiality. This motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Separate Statement of Undisputed Facts filed concurrently herewith, the Declaration of Philip J. Tassin in Support of Defendants' Motion, all files and records in this action, oral argument, and such additional matters as may be judicially noticed or may come before the Court prior to or at the hearing on this matter.

**Issues to Be Decided**

1.    Are Defendants entitled to summary judgment where there are no facts to support loss causation with respect to any of Plaintiffs' three alleged "corrective disclosures?"

2.    Alternatively, are Defendants entitled to summary judgment where the undisputed facts show that the allegedly concealed information was in fact disclosed to the market by the time the alleged misrepresentations were made?

Dated:  February 9, 2018

KEKER, VAN NEST & PETERS LLP

By:    */s/ Michael D. Celio*
JOHN W. KEKER
MICHAEL D. CELIO
LAURIE C. MIMS
CODY S. HARRIS
PHILIP J. TASSIN

Attorneys for Defendants
INTUITIVE SURGICAL, INC., LONNIE
M. SMITH, GARY S. GUTHART and
MARSHALL L. MOHR

1241499

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................................1

I.      INTRODUCTION ....................................................................................................................1

II.     RELEVANT FACTS ..............................................................................................................2

        A.      The Allegedly Misleading Statements and Allegedly Concealed
                Information ..................................................................................................................3

        B.      The Alleged "Corrective Disclosures"......................................................................4

III.    LEGAL STANDARD..............................................................................................................5

IV.     ARGUMENT ...........................................................................................................................6

        A.      Defendants are entitled to summary judgment because no facts support loss
                causation with respect to any of the alleged corrective disclosures......................6

                1.      The February 28, 2013 *Bloomberg* Headlines and Article .........................7

                2.      The March 5, 2013 *Bloomberg* Article .....................................................13

                3.      The July 18, 2013 Warning Letter Announcement....................................14

        B.      Defendants are independently entitled to summary judgment because the
                allegedly concealed information was in fact disclosed to the market....................17

                1.      The truth-on-the-market defense is properly considered on
                        summary judgment...................................................................................17

                2.      The information Plaintiffs allege was concealed was in fact
                        "credibly available to the market" before and during the Class
                        Period. .....................................................................................................19

V.      CONCLUSION.......................................................................................................................25

1241499

1

# TABLE OF AUTHORITIES

2
**Page(s)**

3
**Federal Cases**

4
*Acito v. IMCERA Grp., Inc.*
   47 F.3d 47 (2d Cir. 1995)................................................................... 24

5

6
*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*
   568 U.S. 455 (2013).......................................................................... 6

7
*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986)........................................................................... 5

8

9
*Basic Inc. v. Levinson*
   485 U.S. 224 (1988)...................................................................... 2, 13

10
*Brown v. Ambow Educ. Holding Ltd.*
   2014 WL 523166 (C.D. Cal. Feb. 6, 2014)...................................... 14

11

12
*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986)........................................................................... 5

13
*Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*
   660 F.3d 1170 (9th Cir. 2011) ................................................ 6, 17, 18

14

15
*Curry v. Matividad Med. Ctr.*
   2013 WL 2338110 (N.D. Cal. May 28, 2013) .................................. 5

16
*Dura Pharm., Inc. v. Broudo*
   544 U.S. 336 (2005)................................................................. *passim*

17

18
*Erica P. John Fund Inc. v. Halliburton Co.*
   563 U.S. 804 (2011) .......................................................................... 5

19
*Fosbre v. Las Vegas Sands Corp.*
   2017 WL 55878 (D. Nev. Jan. 3, 2017)............................................ 6

20

21
*In re Apple Comput. Sec. Litig.*
   886 F.2d 1109 (9th Cir. 1989) .............................................. 18, 19, 24

22
*In re Convergent Techs. Sec. Litig.*
   948 F.2d 507 (9th Cir. 1991) ...................................................... 18, 24

23

24
*In re Cypress Semiconductor Sec. Litig.*
   891 F. Supp. 1369 (N.D. Cal. 1995) ........................................... 10, 14

25
*In re Genzyme Corp. Sec. Litig.*
   754 F.3d 31 (1st Cir. 2014)............................................................. 23

26

27
*In re Kalobios Pharma., Inc.*
   258 F. Supp. 3d 999 (N.D. Cal. 2017) .......................................... 3, 17

28
*In re Maxim Integrated Prod., Inc. Sec. Litig.*
   639 F. Supp. 2d 1038 (N.D. Cal. 2009) ........................................... 9

ii

1241499

*In re Omnicom Grp., Inc. Sec. Litig.*
  597 F.3d 501 (2d Cir. 2010) ..................................................................... 13, 14

*In re Oracle Sec. Litig.*
  627 F.3d 376 (9th Cir. 2010) ....................................................................... *passim*

*In re Rigel Pharma., Inc. Sec. Litig.*
  697 F.3d 869 (9th Cir. 2012) ................................................................................. 3

*In re Sanofi Sec. Litig.*
  87 F. Supp. 3d 510 (S.D.N.Y. 2015) ................................................................... 24

*In re Take–Two Interactive Sec. Litig.*
  551 F.Supp.2d 247 (S.D.N.Y.2008) ..................................................................... 12

*In re Williams Sec. Litigation-WCG Subclass*
  558 F.3d 1130 (10th Cir. 2009) .................................................................... 12, 17

*Katyle v. Penn Nat. Gaming, Inc.*
  637 F.3d 462 (4th Cir. 2011) ........................................................................ 13, 17

*Larez v. City of Los Angeles*
  946 F.2d 630 (9th Cir. 1991) ................................................................................ 10

*Lloyd v. CVB Fin. Corp.*
  811 F.3d 1200 (9th Cir. 2016) ................................................................. 7, 9, 10, 12

*Loos v. Immersion Corp.*
  762 F.3d 880 (9th Cir. 2014) ............................................................................ 9, 10

*Meyer v. Greene*
  710 F.3d 1189 (11th Cir. 2013) ............................................................. 13, 14, 24

*Mineworkers' Pension Scheme v. First Solar Inc.*
  — F.3d —, 2018 WL 626948 (9th Cir. 2018) .............................................. 1, 7, 8

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*
  730 F.3d 1111 (9th Cir. 2013) ....................................................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*
  135 S. Ct. 1318 (2015) ........................................................................................... 3

*Provenz v. Miller*
  102 F.3d 1478 (9th Cir. 1996) .............................................................................. 18

*Puddu v. 6D Global Techs., Inc.*
  239 F. Supp. 3d 694 (S.D.N.Y 2017) .................................................................. 14

*Rok v. Indetiv, Inc.*
  2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ........................................................... 10

*Schueneman v. Arena Pharma., Inc.*
  840 F.3d 698 (9th Cir. 2016) .................................................................................. 3

iii

1241499

1

**Federal Statutes**

15 U.S.C. § 78u–4(b)(4) ................................................................................................. 6

Securities Exchange Act of 1934 § 10(b) ................................................... 5, 17, 21, 22

**Federal Rules**

Fed. R. Civ. P. 56.................................................................................................... 5, 10

Fed. R. Evid. 801(c)..................................................................................................... 10

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:13-cv-01920 EJD

1241499

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3
4
5
6
7
8
9
10
11
12
13
At the most basic level, plaintiffs bringing a securities fraud claim must prove that a company lied to investors, either affirmatively or by omission; the concealed truth was later revealed to the market; and the revelation of that material information caused the company's stock price to fall.  In the years that this case has been pending, the parties have fought almost exclusively about the first of those three issues: whether certain statements made by Intuitive Surgical Inc. ("Intuitive") and three of its executives (collectively, "Defendants") constitute legally actionable misrepresentations.  *See, e.g.*, Defs.' Mot. to Dismiss, ECF 215.  This motion, by contrast, focuses on the issues of loss causation and materiality, which this Court has never had the opportunity to adjudicate.  Because Plaintiffs can identify no triable issues of fact regarding these two essential elements of a securities fraud case, Defendants are entitled to summary judgment.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
*First*, no facts support Plaintiffs' loss causation theory.  Plaintiffs bear the burden of demonstrating that drops in Intuitive's stock price were caused by the market learning of and reacting to the revelation of purportedly concealed information.  But the undisputed facts show that the alleged "corrective disclosures" revealed nothing new about anything Plaintiffs claim was concealed.  According to Plaintiffs, Intuitive hid from the market that (1) a small, disposable surgical accessory known as the "tip cover" suffered from some type of defect, which injured patients and engendered multiple lawsuits against the company; (2) Defendants sent letters to their entire customer base in October 2011 (which Plaintiffs misleadingly call "secret recalls") to address the issue; and (3) Intuitive withheld or miscategorized medical device reports ("MDRs") it was required by regulation to submit to the FDA for publication in the FDA's "MAUDE" database.  *See* Pls.' Opp. to Defs.' Mot. to Dismiss at 4, ECF 220.  None of the alleged corrective disclosures, however, revealed any of this purportedly concealed information.  Instead, they either repeated old news or revealed new information that Plaintiffs nowhere accuse Defendants of hiding.  As a result, any drop in Intuitive's stock price corresponding with those disclosures could not, as a matter of law, have been caused by the supposed fraud.  The undisputed facts fatally

undermine Plaintiffs' loss causation theory, entitling Defendants to summary judgment.

*Second*, and independently, the undisputed facts establish that investors were aware of the allegedly "concealed" information before and during the Class Period, thereby negating the allegedly concealed information's materiality.  Plaintiffs have invoked the "fraud-on-the-market" presumption from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), to satisfy their burden of proving the essential element of reliance, which would otherwise be impossible to establish class-wide. By definition, a fraud-on-the-market case is premised on the ability of an efficient market to synthesize all available information, which is then reflected in the stock price.  Accordingly, if the allegedly concealed information was in fact publicly available before the alleged misrepresentations were made, then the alleged misrepresentations are immaterial as a matter of law.  In this case, the undisputed facts show that the allegedly concealed information was available to the market on the Internet, in analyst reports, in the press, or elsewhere.  With respect to the only two items of information that were even arguably nonpublic, Plaintiffs do not, and cannot, point to an associated corrective disclosure and corresponding decline in the stock price. These facts independently mandate summary judgment for Defendants.

For either of the two reasons explained above, Defendants are entitled to summary judgment on Plaintiffs' Section 10(b) claim and their claims under Sections 20(a) and 20A, which are derivative of the first.

## II.     RELEVANT FACTS

Having presided over this case for nearly five years, the Court is by now well familiar with the case's basic facts, and Defendants will not recapitulate them in any great detail here. Although Plaintiffs have long sought to transform this lawsuit into one about the tip cover accessory's safety record, or Intuitive's compliance with various FDA regulations, this is neither a products liability action nor an FDA enforcement action.  It is a securities fraud case.  *See* Order at 3, ECF 176 (Lloyd, M.J.) ("Plaintiffs contend that problems with the Scissors and Tip Covers, allegedly hidden from investors, are the very core of this lawsuit.  But, this is not a products liability case.  This is an action for alleged securities fraud . . . .").  Defendants' right to summary judgment therefore turns on two sets of facts that are entirely agreed-upon: (1) the statements and

1241499

omissions that Plaintiffs allege misled investors; and (2) the "corrective disclosures" that Plaintiffs claim revealed the allegedly concealed truth.  Neither of those items is disputed, and they are all the Court need consider to determine that summary judgment is appropriate.

### A.    The Allegedly Misleading Statements and Allegedly Concealed Information

Plaintiffs allege that Defendants made eight statements to investors between February 6, 2012 and April 19, 2013 that, according to Plaintiffs, were false or misleading because Defendants allegedly failed to disclose certain other items of information, as detailed below.[1]

The bulk of the allegedly misleading statements can be found in the introductory "Description of Business" or "Company Background" sections of Intuitive's routine SEC filings. *See* SAC[2] ¶¶ 224, 227, 230, 233, 245.  Each of these filings included an introductory section stating that Intuitive marketed the *da Vinci* surgical system, that the company "believes [*da Vinci*] represents a new generation of surgery," and that *da Vinci* "combines the benefits of minimally invasive surgery (MIS) for patients with the ease of use, precision, and dexterity of open surgery."  SAC ¶¶ 224(a), 227, 230, 233, 245(a).[3]

Other challenged statements came in press releases and an earnings call near the end of the Class Period.  On March 13, 2013, Intuitive issued a press release announcing, for the first time, that Intuitive had revised its non-injury device malfunction MDR reporting practices in September 2012, and that it had re-categorized a number of adverse event MDRs from "other" to "serious injury."  SAC ¶¶ 100, 110, 239.  On April 18, 2013, Intuitive issued a press release and held an earnings call in which it stated that "*da Vinci* Surgery has clinically proven benefits in offering a minimally invasive option to a broader group of patients than traditional technologies."

---

[1] Although they do not seek summary judgment on this basis, Defendants continue to submit that none of the statements at issue—nearly all of which are statements of opinion, and some of which do not even reference *da Vinci* surgery—is actionable.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015).  Moreover, because none of the statements at issue mentions the tip cover accessory directly or indirectly, the company had no general obligation to discuss it.  *See, e.g., Schueneman v. Arena Pharma., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016); *In re Rigel Pharma., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012); *In re Kalobios Pharma., Inc.*, 258 F. Supp. 3d 999, 1011–12 (N.D. Cal. 2017).

[2] "SAC" refers to Plaintiffs' Second Amended Class Action Complaint, ECF 214.

[3] MIS is distinguished from "open" surgery, which requires larger incisions into a patient's body. Robotic-assisted surgery is a subset of MIS.

SAC ¶¶ 241–242.  On the call, Intuitive's CEO, Gary Guthart, told listeners not to simply take Intuitive's word for it, saying, "[w]e are confident that those who invest their time in a serious review of the clinical literature on *da Vinci* will find ample evidence of the benefit it brings to patients, surgeons, hospitals and the medical community."  SAC ¶ 242(a).  The next day, Intuitive filed its Form 10-Q for the quarter, which contained similar remarks.  SAC ¶ 245.

Plaintiffs allege that these statements misled investors because the company allegedly failed to disclose that: (1) Intuitive had issued product notifications to customers in October 2011 regarding the tip cover accessory; (2) Intuitive had filed "a substantial number of MDRs," including death-related MDRs, and that Intuitive had received complaints about *da Vinci*; (3) Intuitive had categorized 78 adverse event MDRs under the category of "other" rather than "serious injury"; (4) Intuitive was, according to Plaintiffs, systematically underreporting non-injury device malfunction MDRs, and was considering changing its reporting criteria; (5) Intuitive had seen a "material increase" in the number of device malfunction MDRs in the period from 2012–2014; (6) several product liability lawsuits were filed against Intuitive between March 2010 and April 2013; (7) beginning in December 2012, Intuitive had entered into tolling agreements and confidential mediations with respect to some of the product liability claims it was facing; (8) there were, according to Plaintiffs, general "performance" or safety problems associated with the tip cover; and (9) the FDA had commenced an inspection of Intuitive on April 1, 2013.  SAC ¶¶ 223, 225–26, 228–29, 231–32, 234–35, 237–38, 240, 243–44, 246–47.[4]

## B.    The Alleged "Corrective Disclosures"

According to Plaintiffs, the allegedly concealed information was "revealed" to the market in a series of six "corrective disclosures."  SAC ¶¶ 216–21; Tassin Decl.[5] Ex. 1 ("Coffman Rep.") ¶¶ 57–90.  Plaintiffs alleged that with each of these disclosures, Intuitive's stock price declined as the "artificial inflation" caused by the allegedly misleading statements came out of the price, thereby damaging stockholders.  SAC ¶ 222.  In its order certifying the class, however, the Court

---

[4] Plaintiffs originally alleged that Defendants should have disclosed that the FDA had initiated a survey of surgeons in January 2013, SAC ¶¶ 237(d), 240(e), but Plaintiffs have since abandoned that allegation, *see* Tassin Decl., Ex. 2 (Coffman Dep. 108:15–109:1).

[5] "Tassin Decl." refers to the Declaration of Philip J. Tassin in Support of Defendants' Motion for Summary Judgment.

1  held that three of those disclosures could not, as a matter of law, be considered "corrective" of the

2  alleged fraud.  Order Certifying Pl. Class ("Class Cert. Order") at 26–27, ECF 204.[6]

3         This case therefore involves only three purported corrective disclosures: (1) a series of

4  *Bloomberg* headlines and an article published on February 28, 2013 describing an FDA survey of

5  doctors regarding *da Vinci*, (2) a March 5, 2013 *Bloomberg* article regarding MDRs and lawsuits

6  involving *da Vinci*, and (3) Intuitive CEO Gary Guthart's announcement during Intuitive's July

7  18, 2013 earnings call that Intuitive had received a Warning Letter from the FDA.  *See id.* at 24–

8  25, 27–28; SAC ¶¶ 216–17, 220.

9  **III.   LEGAL STANDARD**

10        The legal standard for adjudicating a motion for summary judgment is well known.  *See*

11  *Curry v. Matividad Med. Ctr.*, 2013 WL 2338110, at *1–2 (N.D. Cal. May 28, 2013) (Davila, J.)

12  (summarizing burden-shifting framework for summary judgment motions under Federal Rule of

13  Civil Procedure 56, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), and *Anderson v. Liberty*

14  *Lobby, Inc.*, 477 U.S. 242 (1986)).   So too are the elements of a cause of action under § 10(b) of

15  the Securities Exchange Act of 1934, and Rule 10b-5 thereunder: (1) a material misrepresentation

16  or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

17  omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

18  omission; (5) economic loss; and (6) loss causation (i.e., proximate or legal cause).  *Dura Pharm.,*

19  *Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).  Until now, the parties have focused their attention

20  on scienter and whether the alleged misrepresentations are actionable.  This motion, by contrast,

21  focuses exclusively on loss causation and materiality.

22        Importantly, this Court has never ruled on the issues presented here.  To the contrary, the

23  Court expressly declined to address loss causation when certifying the Plaintiffs' proposed class,

24  *see* Class Cert. Order at 17, and the Supreme Court has held that such an inquiry has no place at

25

26  _____
   [6] The Court denied Plaintiffs' motion to reconsider this aspect of the class certification order.
   Order at 9, ECF 237.  The same day as Defendants filed this summary judgment motion,
27  however, Plaintiffs sought permission to file yet another motion for reconsideration.  *See* Mot. for
   Leave, ECF 251.  Defendants will oppose Plaintiffs' duplicative motion in due course, but note
28  here that if Plaintiffs' motion is granted, Defendants may need to supplement their summary
   judgment motion, and significant revisions to the case schedule may be required.

1241499

the class certification stage.  *See Erica P. John Fund Inc. v. Halliburton Co.*, 563 U.S. 804, 812–13 (2011).  Courts may, however, properly consider loss causation on summary judgment, and grant summary judgment when the plaintiff's loss causation theory fails to hold water.  *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1123 (9th Cir. 2013); *see also Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878, at *8, *14, *18 (D. Nev. Jan. 3, 2017) (granting summary judgment for lack of a triable issue on loss causation).  Nor did the Court's class certification ruling address Defendants' truth-on-the-market defense, noting that such an analysis would be "improper to consider at the class certification stage."  Class Cert. Order at 19 (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 1194–95 (2013)).  It is, however, properly considered on summary judgment.  *See Conn. Ret. Plans & Trust Funds v. Amgen, Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011).

The distinction between class certification and summary judgment is crucial, because the legal standards governing the Court's analysis differ in case-dispositive respects.  In its order certifying the class, the Court evaluated Plaintiffs' alleged corrective disclosures in part by determining whether the information disclosed was merely "relevant" or "related" to the general safety of the *da Vinci* system.  *See* Class Cert. Order at 24–25, 26–27, 28.  On summary judgment, however, the standard is much higher: Plaintiffs must adduce evidence showing that the alleged corrective disclosures revealed, for the first time, the "very facts" that were allegedly concealed.  *Nuveen*, 730 F.3d at 1120.  Unlike at class certification, it is now insufficient for Plaintiffs to show that a corrective disclosure is merely relevant to, or "touches upon," the subject matter of the allegedly concealed misconduct.  *See Dura*, 544 U.S. at 343.

## IV.   ARGUMENT

### A.   Defendants are entitled to summary judgment because no facts support loss causation with respect to any of the alleged corrective disclosures.

Defendants are entitled to summary judgment because Plaintiffs cannot prove loss causation.  It is Plaintiffs' burden to prove loss causation, which is "a causal connection between the material misrepresentation and the loss."  *Dura*, 544 U.S. at 342 (quotation marks omitted); *see also* 15 U.S.C. § 78u–4(b)(4).  To do so, Plaintiffs "must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price,

1  thus creating an actual economic loss." *Nuveen*, 730 F.3d at 1119 (internal quotation marks

2  omitted).  It is not enough to show only that the stock's price was inflated on the date it was

3  purchased, because a subsequent price decline could result from a variety of causes, including

4  "changed investor expectations, new industry-specific or firm-specific facts, conditions, or other

5  events."  *Dura*, 544 U.S. at 342–43.

6        Securities plaintiffs typically try to establish loss causation by showing one or more

7  "corrective disclosures"—such as news reports or announcements to investors—that purportedly

8  revealed the company's prior statements to have been false or misleading and thereby caused the

9  company's stock price to drop soon thereafter.  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209

10  (9th Cir. 2016).  But the required link between the corrective disclosure and the allegedly

11  concealed information is a tight one: Plaintiffs must show that the market reacted negatively to

12  revelation of "the very facts" that a defendant purportedly concealed from the market.  *Nuveen*,

13  730 F.3d at 1120; *see also Mineworkers' Pension Scheme v. First Solar Inc.*, — F.3d —, 2018

14  WL 626948, at *2–3 (9th Cir. 2018) (explaining that revelation of the "underlying facts

15  concealed" must "affect the stock price").

16        As explained above, proving loss causation requires more than showing some general

17  relationship between a revelation and a stock drop, or showing that the revelation touched on the

18  same subject matter as the allegedly concealed information.  While such a link may suffice at

19  class certification, at summary judgment, loss causation is established only if the stock price's

20  decline is caused by revelation of the "underlying facts concealed by fraud."  *First Solar*, 2018

21  WL 626948, at *3.  If there is no evidence that an alleged "corrective disclosure" actually

22  revealed the allegedly concealed facts for the first time, the accompanying stock drop cannot, as a

23  matter of law, establish loss causation, and Defendants are consequently entitled to summary

24  judgment.  *See In re Oracle Sec. Litig.*, 627 F.3d 376, 392–93 (9th Cir. 2010).  As explained

25  below, that is exactly the case with respect to Plaintiffs' three alleged "corrective disclosures."

26        **1.**      **The February 28, 2013 *Bloomberg* Headlines and Article**

27        Five minutes before the market closed on February 28, 2013, *Bloomberg* published a

28  series of headlines reporting that surgeons were being surveyed by an unnamed U.S. regulator

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:13-cv-01920 EJD

1241499

concerning Intuitive's robotic system.  UF 1.[7]  After the market closed, *Bloomberg* published a more detailed article entitled "Intuitive Surgical Robots Probed by U.S. in Surgeon Survey." UF 2.  According to that article, the FDA was surveying surgeons at several hospitals regarding their training with *da Vinci*, "any complications they may have seen with Intuitive's robots," and "which surgeries the robots might be most and least suited for."  *Id.*

Nothing in this news corrected any alleged omissions regarding a purported product defect or supposed "secret recalls," and Plaintiffs do not argue otherwise.  Rather, Plaintiffs rely on this "corrective disclosure" only in connection with Intuitive's MDR reporting.  *See* Coffman Rep. ¶ 61.  Critically, however, Plaintiffs nowhere suggest that *Bloomberg*'s reporting actually revealed that Intuitive had changed its MDR reporting criteria, or was recategorizing certain MDRs from "other" to "serious injury."  *See* SAC ¶¶ 100, 110 (admitting that information regarding MDR reporting and categorization was first disclosed in a March 13, 2013 press release).  Instead, Plaintiffs argue that the revelation of the FDA's decision to conduct a survey[8] was a partial corrective disclosure because the survey was the "*direct result*" of (1) Intuitive's change in reporting criteria for non-injury device malfunction MDRs, and (2) Intuitive's recategorization of 78 MDRs from "other" to "serious injury."  Coffman Rep. ¶ 61 (emphasis added); Tassin Decl., Ex. 2 ("Coffman Dep.") 65:7–66:2; 66:11–67:1; 99:18–102:2; SAC ¶ 216.  This liability theory fails, for two main reasons.

**First**, the Ninth Circuit squarely rejected exactly this sort of loss causation theory in *Oracle*.  There, the plaintiffs alleged that the company fraudulently hid a product defect from the market.  *Oracle*, 627 F.3d at 392–93.  The plaintiffs further argued that the company's announcement that it missed its expected earnings goal qualified as a corrective disclosure regarding product quality because, according to the plaintiffs, the announcement revealed the

---

[7] Those headlines were: (1) "Intuitive Surgical's Robots Probed for Safety by U.S. Regulator," (2) "Doctors Surveyed About Safety of Intuitive's Robots for Surgery", (3) "Regulators Safety Review of Intuitive Revealed in Doctor Survey", and (4) "Intuitive Surgical's Robots Probed for Safety by U.S. Regulator."  *See* UF 1.  "UF" means "Undisputed Fact."  The number following "UF" corresponds to the undisputed facts set forth in the accompanying Separate Statement in Support of Defendants' Motion for Summary Judgment.

[8] The FDA referred to this and other such surveys as "small sample surveys" or "MedSun surveys," UF 3, not "safety probes," as Plaintiffs call it.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:13-cv-01920 EJD

1    "impact" of the alleged wrongdoing—namely, decreasing sales due to the defect.  *Id.* at 392.

2    Rejecting that approach, the Ninth Circuit held that in a securities case, the alleged corrective

3    disclosure must itself reveal the allegedly concealed fact (in that case, a product defect), not just

4    its purported "impact" or result.  *Id.* at 392–93.

5           Here, Plaintiffs make the same failed argument as the *Oracle* plaintiffs: they claim that

6    news of the FDA survey—or, as Plaintiffs' damages expert puts it, "increased FDA scrutiny"—

7    was a corrective disclosure because it was the "direct result" of Intuitive's purported wrongdoing

8    with respect to MDR reporting.  Coffman Rep. ¶ 61; Coffman Dep. 65:7–66:2; 66:11–67:1;

9    99:18–102:2.  Under *Oracle*, that attenuated chain of inferences cannot support loss causation.

10          Indeed, the Ninth Circuit has rejected the very chain of inferences Plaintiffs adopt, holding

11   that "the announcement of an investigation, standing alone, is insufficient to establish loss

12   causation."  *Loos v. Immersion Corp.*, 762 F.3d 880, 883 (9th Cir. 2014), *as amended* (Sept. 11,

13   2014).  As the court explained, the announcement of an investigation alone cannot be considered

14   corrective because "the market cannot possibly know what the investigation will ultimately

15   reveal."  *Id.*  "Consequently, any decline in a corporation's share price following the

16   announcement of an investigation can only be attributed to market speculation about whether

17   fraud has occurred," and "[t]his type of speculation cannot form the basis of a viable loss

18   causation theory."  *Id.*; *see also In re Maxim Integrated Prod., Inc. Sec. Litig.*, 639 F. Supp. 2d

19   1038, 1047 (N.D. Cal. 2009) (holding the same).  Even accepting Plaintiffs' claim that the survey

20   was an investigation (as opposed to routine information gathering), it fits squarely within the rule

21   announced in *Loos.*

22          The Ninth Circuit has recognized only two situations in which this rule does not apply,

23   neither of which is present here.  The first situation is when the "announcement contains an

24   express disclosure of actual wrongdoing," which could make the announcement corrective as to

25   that wrongdoing.  *Loos*, 762 F.3d at 890 n.3.  But in this case, the *Bloomberg* article contained no

26   such disclosure.  Indeed, the article revealed no new information about MDR reporting or any

27   other allegedly withheld facts, and Plaintiffs do not argue otherwise.  The second situation is

28   when wrongdoing pertinent to a previously-announced investigation is subsequently revealed.

1241499

1    *See Lloyd*, 811 F.3d at 1210.  But it is undisputed that the FDA survey led to no negative findings

2    or adverse regulatory actions.  The FDA's resulting report on the survey included no conclusion

3    that *da Vinci* was unsafe, UF 4, and Plaintiffs' own FDA expert testified that the survey had

4    nothing to do with the subsequent inspection of Intuitive that led to the Warning Letter, UF 5.  In

5    such cases, *Loos* retains its force.  *See Rok v. Indetiv, Inc.*, 2017 WL 35496, at *19 (N.D. Cal. Jan.

6    4, 2017) (distinguishing *Lloyd* where, as here, the plaintiff could not point to a subsequent

7    "bombshell disclosure" that "was directly contrary to [the company]'s earlier representation").

8        ***Second***, even if news of the "impact" or "result" of allegedly concealed wrongdoing could

9    legally be considered corrective, there is no evidence linking the news of the FDA survey to the

10   allegedly concealed information about Intuitive's MDR reporting practices.  To begin with, the

11   only evidence Plaintiffs' expert identifies purporting to explain the FDA's reason for initiating the

12   survey is a truncated statement attributed to a single FDA employee in the *Bloomberg* article

13   itself.  *See, e.g.*, Coffman Dep. 67:9–68:1, 100:3–101:15.  But "articles are inadmissible [hearsay]

14   and cannot be considered at summary judgment" for the truth of what they assert.  *In re Cypress

15   Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1374 (N.D. Cal. 1995); *see also Larez v. City of

16   Los Angeles*, 946 F.2d 630, 643 (9th Cir. 1991) (holding that a newspaper article offered to prove

17   that the defendant made a quoted statement was inadmissible hearsay); Fed. R. Evid. 801(c); Fed.

18   R. Civ. P. 56(c).  Moreover, even if the statements attributed to the FDA employee in the

19   *Bloomberg* article were admissible, they in no way suggest that the FDA initiated the survey in

20   response to Intuitive's change in non-injury MDR reporting practices or recategorization of 78

21   "serious injury" MDRs, as Plaintiffs contend.  The article says nothing whatsoever about

22   Intuitive's MDR reporting practices.  Rather, the article, quoting an FDA spokesperson, states

23   that "[w]hat the FDA is trying to determine with the survey is whether adverse event reports sent

24   to the agency are 'a true reflection of problems' with the robots, or the result of other issues."  UF

25   6.  The article noted that an early draft of the survey's cover letter said that "the survey was being

26   done because 'a recent review of medical device report data is showing an increase in patient

27   adverse event reports.'"  *Id.*  But the article quotes the FDA spokesperson as explaining that this

28   first draft was "sent out inadvertently" and was later revised to delete that language because it

1    "did not accurately characterize what assumptions can or should be made from the number of

2    reports in the FDA database." *Id.*[9]

3         Plaintiffs' damages expert, Chad Coffman, opined that the *Bloomberg* article's references

4    to a rise in "adverse events" suggested a connection to Intuitive's change in MDR reporting

5    criteria in late 2012.  Coffman Dep. 100:24–102:15.  But there is no evidence to justify the link

6    Mr. Coffman draws between the two events.  The article refers only to "adverse event" MDRs,

7    which, as Plaintiffs' FDA expert testified, are ***not*** the same as non-injury malfunction MDRs;

8    "adverse events" involve patient injury, while non-injury malfunctions do not.  UF 7.  It is

9    undisputed that Intuitive never changed its reporting criteria with regard to adverse events; the

10   2012 change in Intuitive's MDR reporting policies concerned ***non-injury*** malfunctions.  UF 8.

11   Accordingly, there is nothing in the *Bloomberg* article to suggest that the FDA survey was in any

12   way related to Intuitive's temporary change in non-injury MDR reporting criteria in 2012.

13        Likewise, nothing in the *Bloomberg* article supports Plaintiffs' claim that the FDA survey

14   was a reaction to Intuitive's recategorization of 78 adverse event MDRs from "other" to "serious

15   injury."  *See* Coffman Dep. 103:7–104:4.  To the contrary, the undisputed evidence shows that

16   Intuitive did not re-categorize those MDRs until *after* the FDA initiated the survey.  The FDA

17   first sent the survey to doctors on or before January 14, 2013, UF 9, but Intuitive was still

18   working with the FDA to re-categorize the 78 MDRs as of February 13, 2013, UF 10.  Thus, the

19   undisputed facts establish that the survey was not a response to the limited re-categorization

20   Intuitive later performed, and nothing in the *Bloomberg* article changes that.

21        Plaintiffs can point to no other evidence that the FDA initiated the survey in response to

22   Intuitive's changes in MDR reporting criteria or categorization.  Indeed, Plaintiffs' own FDA

23   expert expressed no opinion as to why the FDA initiated the MedSun survey, admitting that he

24   had no knowledge of the FDA's "decision-making process."  UF 11.  And the report that resulted

25   from the survey—which Plaintiffs ignore entirely—says nothing about Intuitive's MDR

26

27   _____

[9] The article also quoted the FDA spokeswoman as explaining that MDRs "can contain
incomplete, inaccurate, duplicative and unverified information."  UF 6.  Quoting a securities

28   analyst, the article added that "a rise in adverse events isn't necessarily alarming because the
number of surgeries done with the robot has been growing rapidly."  *Id.*

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:13-cv-01920 EJD

1241499

1    reporting.  UF 12.  Instead, it says that "[t]he FDA conducted the survey to speak with

2    experienced surgeons who use the da Vinci Surgical System in a variety of procedures to better

3    understand their perspectives on the different challenges raised when using the system interface to

4    perform surgery versus using conventional surgical procedures."  *Id.*  The FDA's own description

5    of the survey's purpose is consistent with what securities analysts understood from the *Bloomberg*

6    article—that the FDA survey was part of routine post-market surveillance.  UF 13.[10]

7            Lacking any evidence that the FDA survey was connected to Intuitive's MDR reporting

8    criteria, Plaintiffs resort to a circular argument—namely, that the stock drop following the

9    *Bloomberg* story itself proves the connection they seek to draw.  Plaintiffs' expert, Mr. Coffman,

10   observes that securities analysts "explicitly acknowledged that the market responded to the new

11   Intuitive Surgical-specific news" from February 28 to March 1.  Coffman Rep. ¶¶ 63–64.  That

12   observation misses the point.  Not all negative news about Intuitive is a corrective disclosure; the

13   new information must reveal what Plaintiffs allege was fraudulently concealed.  *See In re*

14   *Williams Sec. Litigation-WCG Subclass*, 558 F.3d 1130, 1142 (10th Cir. 2009) (faulting loss

15   causation expert for "his belief that all negative information about WCG was a revelation of the

16   fraud").  Without a revelation of allegedly concealed information, the market's reaction to news

17   of the FDA survey is irrelevant.  *See id.*; *Nuveen*, 730 F.3d at 1120; *Oracle*, 627 F.3d at 392–93.

18           Because Plaintiffs can point to no evidence that the FDA initiated its survey in response to

19   Intuitive's change in non-injury MDR reporting criteria or the recategorization of "serious injury"

20   MDRs, Plaintiffs' theory of loss causation with respect to the February 28 article falls apart.  As

21   Plaintiffs' damages expert candidly admitted, "if you could somehow prove that the FDA scrutiny

22   had absolutely nothing to do with what plaintiffs are alleging, then there would probably be no

23   loss causation or damages."  Coffman Dep. 74:3–8.  While Mr. Coffman mistakenly places the

24   burden on Defendants to prove the absence of loss causation (the burden to prove loss causation

25   lies with the Plaintiffs), he is half right: in the absence of evidence linking the FDA survey to

26   what Plaintiffs allege to be Defendants' wrongdoing, the February 28–March 1 stock drop cannot

27

28

---

[10] As the Ninth Circuit has explained, "investors' understanding of [a] disclosure is relevant" for
determining what that disclosure revealed to the market.  *Lloyd*, 811 F.3d at 1210 (citing *In re
Take–Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 285 (S.D.N.Y.2008)).

1241499

be the basis for loss causation and damages.

### 2.    The March 5, 2013 *Bloomberg* Article

Plaintiffs' second alleged corrective disclosure is another *Bloomberg* article, entitled "Robosurgery Suits Detail Injuries as Death Reports Rise," which was published on March 5, 2013.  SAC ¶ 217; Coffman Rep. ¶ 73.  The bulk of the article described allegations appearing in two personal-injury lawsuits that had been filed against Intuitive several months previously, and noted that at least 10 lawsuits had been filed against Intuitive in the preceding 14 months.  UF 14.  The article also included an analysis of publicly available MDRs filed between 2009 and 2012, and quoted a surgeon who "said he's concerned that some complaints may not reach the public because they're kept quiet by hospitals."  *Id.*  The article further reported on a personal injury lawyer who said he was "in the process of investigating other potential cases."  *Id.*

Plaintiffs do not even bother to argue that this article revealed any new facts that Defendants allegedly had concealed.  Indeed, Mr. Coffman admitted that the article just reported old news, testifying, "I don't think [the article] points to a specific thing that the defendants knew that was disclosed for the first time."  UF 15; *see also* Coffman Rep. ¶ 79 n.73 (admitting that the lawsuits and MDR data were all public before March 5, 2013).  And rightly so, as both the personal-injury lawsuits and the MDRs *Bloomberg* analyzed were public, and some were even evaluated by securities analysts.  UF 16.  That admission alone eliminates the March 5 article as a qualifying corrective disclosure.

Having argued at the class-certification stage that the market for Intuitive stock is efficient for purposes of the *Basic v. Levinson* presumption of reliance, *see* Class Cert. Order at 18, Plaintiffs cannot now argue that the market somehow failed to digest the publicly filed lawsuits or MDR data before March 5, 2013.  *See Meyer v. Greene*, 710 F.3d 1189, 1198–99 (11th Cir. 2013) ("The efficient market theory . . . is a Delphic sword: it cuts both ways.  [Plaintiffs] cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation."); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (plaintiff who invoked fraud-on-the-market theory "must concede that the numerous public reports on the Seneca transaction were promptly digested

1    by the market and reflected in Omnicom's stock price" (quotation marks and alterations

2    omitted)).  Because the March 5, 2013 article revealed nothing new to the market, the

3    accompanying stock drop cannot be evidence of loss causation.  *See Nuveen*, 730 F.3d at 1120;

4    *Oracle*, 627 F.3d at 392; *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011)

5    ("Corrective disclosures must present facts to the market that are new, that is, publicly revealed

6    for the first time.").

7        Attempting to circumvent the clear requirements for proving loss causation, Plaintiffs

8    argue that the March 5 article was nevertheless a corrective disclosure because it "provid[ed]

9    additional context and synthesiz[ed] information" that was already public.  Coffman Dep. 125:8–

10   11; Coffman Rep. ¶ 79.  But "[a] negative journalistic characterization of previously disclosed

11   facts does not constitute a corrective disclosure of anything but the journalists' opinions."

12   *Omnicom*, 597 F.3d at 512; *see also Meyer*, 710 F.3d at 1199 ("[T]he mere repackaging of

13   already-public information by an analyst or short-seller is simply insufficient to constitute a

14   corrective disclosure.").  Nor do the article's references to a surgeon who speculated that

15   hospitals might not be reporting all complaints, or to a plaintiff's lawyer who was investigating

16   possible claims, constitute corrective disclosures.  To begin with, both statements are

17   inadmissible hearsay and thus cannot be considered on summary judgment.  *See Cypress*, 891 F.

18   Supp. at 1374.  And even if they were admissible, speculation or allegations by third parties

19   cannot, as a matter of law, constitute corrective disclosures.  *See Puddu v. 6D Global Techs., Inc.*,

20   239 F. Supp. 3d 694, 708 (S.D.N.Y 2017) (holding that "unproven Government allegations" did

21   not "qualify as a corrective disclosure"); *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166,

22   at *10 (C.D. Cal. Feb. 6, 2014) ("The mere allegation of potential financial impropriety . . . is

23   insufficient for purposes of pleading loss causation.").

24        In sum, because the March 5, 2013 *Bloomberg* article offered the market no new factual

25   information that could qualify as a corrective disclosure, the accompanying stock drop cannot

26   serve as evidence of loss causation.

27             **3.**      **The July 18, 2013 Warning Letter Announcement**

28   Plaintiffs' final purported corrective disclosure is Intuitive's announcement during its July

18, 2013 earnings call that it had received a Warning Letter from the FDA.  SAC ¶ 220; Coffman

Rep. ¶ 113.[11]  But as explained below, the Warning Letter announcement revealed no information

that Defendants had allegedly concealed.  Accordingly, Plaintiffs cannot establish loss causation

based on the stock price movement on July 18–19, 2013.

It is undisputed—and indisputable—that the Warning Letter itself was *not* disclosed on

July 18, 2013.  Plaintiffs' complaint misleadingly alleges that Intuitive "disclosed an FDA

Warning Letter" on that date, and even quotes the Warning Letter at length as though it were

released or published that day.  SAC ¶¶ 18–19, 220.  Plaintiffs' misstatement appears to have led

the Court astray as well—in its order certifying the class, the Court asserted that "on July 18,

2013, Intuitive publically released a Warning Letter it had received two days earlier from the

FDA."  Class Cert. Order at 27; *see also id*. at 3–4.  Not so.  The Warning Letter itself was *not*

released on July 18, 2013.  It was first made publicly available when it was posted on the FDA's

website *after* the Class Period, on July 31, 2013.  UF 17.

The July 18 earnings call included only the following remarks regarding the Warning

Letter:

> During the quarter, FDA conducted an on-site audit of ISI and issued a set of four
> observations in a Form 483, previously reported in June.  Yesterday, we received a
> warning letter from FDA as a follow-on to these audit inspection findings asking
> for additional steps to resolve two of the observations.  These concerns are
> addressable and we are in the process of doing so.

UF 18.  During the Q&A portion of the call, Intuitive's CEO, Dr. Guthart, added:

> The content of the letter is really a reflection of the content that was in [the Form
> 483] that was issued in June.  There were four observations.  There are two
> mentions in the warning letter which will become public, but two mentions of
> things that they'd like additional insight into.  One of them had to do with the
> procedure by which recalls are classified and their participation in that
> classification, that was kind of the first bullet in that.  And the other bullet they
> want additional information on has to do with user input and design elements
> having to do with a particular product.

*Id.*  Dr. Guthart's only description of the Warning Letter was that it contained two of the four

---

[11] The Court has already held that the other disclosures on July 18, 2013 regarding the
Company's financial condition were not corrective.  Class Cert. Order at 26–27.  Therefore, as
Plaintiffs concede, Plaintiffs are limited to arguing loss causation on the basis of the Warning
Letter announcement alone.  *Id.*; *see also* Tassin Decl., Ex. 3 ("Coffman Supp. Rep.") at 2.

1    observations from the Form 483, all of which had already been published on the FDA's website

2    on June 25, 2013 and reported by CNBC the same day.  UFs 19, 20.

3           Thus, the only "new" information revealed on July 18, 2013 was the *existence* of a

4    Warning Letter.  *See* Class Cert. Order at 28.  Plaintiffs cannot rely on the Warning Letter's

5    contents, which were not public on July 18—they must point to what Dr. Guthart actually said.

6    And his disclosure cannot satisfy Plaintiffs' loss causation burden because the information he

7    revealed (the existence of the Warning Letter) *was never concealed*.  Indeed, Plaintiffs have never

8    even tried to allege that Defendants wrongfully concealed the fact that the company received a

9    Warning Letter.  Nor could they; the company indisputably disclosed that fact almost

10   immediately.  UF 21.  What's more, the market was already alert to the possibility that a Warning

11   Letter might follow the Form 483; a month earlier when the Form 483 was issued, one analyst

12   expressly noted that the FDA may take no further action, or that "a Warning Letter may be

13   issued" to Intuitive.  UF 22.[12]

14          Because Plaintiffs cannot allege that Intuitive concealed the existence of the Warning

15   Letter, and cannot allege that Intuitive concealed the possibility that a Warning Letter might be

16   issued, they instead contend that Defendants failed to disclose "the existence or the nature of

17   corrective letters sent out to hospitals in October of 2011" regarding the tip cover, which were the

18   subject of the observations in the Warning Letter and Form 483.  *See, e.g.*, SAC ¶¶ 4, 48–50, 53,

19   61–64.  But as Plaintiffs admit, and this Court has acknowledged, that information was disclosed

20   no later than June 25, 2013,[13] when the Form 483—which included the FDA's  belief that

21   Intuitive should have reported the letters as Class II recalls to the local FDA district office—was

22   published.  UF 23; *see also* UFs 19, 20; Class Cert. Order at 28.[14]  Plaintiffs further admit that in

23   ───────────────────────────

24   [12] The analyst was not concerned by this possibility, as he stated that even if a Warning Letter
     was issued, the FDA's observations "will not have any impact on" Intuitive's core business.  UF
     22.  Indeed, when the actual Warning Letter was released after the end of the class period, the
25   market did not react.

     [13] As explained in Part B below, the "existence and nature" of the customer letters was also
26   publicized as soon as they were sent in October 2011.

27   [14] It is undisputed that Intuitive's stock price did not react to the revelation of the Form 483, or
     the information it revealed, when it was published.  *See infra* at 19–20.  This lack of negative
28   market reaction is fatal to Plaintiffs' claim that they suffered losses from the alleged concealment
     of the "existence and nature" of the October 2011 letters.

1    light of the Form 483, the July 18 announcement contained no new information about the

2    existence or contents of the customer letters.  UF 24.

3            The absence of any revelation of allegedly concealed information on July 18, 2013 is fatal

4    to Plaintiffs' theory of loss causation.  The law is clear: a corrective disclosure must reveal, for

5    the first time, the "very facts" that Defendants purportedly hid.  *Nuveen*, 730 F.3d at 1120;  *see*

6    *also Katyle*, 637 F.3d at 473; *Williams*, 558 F.3d at 1141–42 (affirming the exclusion of

7    plaintiffs' expert testimony and summary judgment where the expert improperly assumed that

8    "all negative information about [the company] was a revelation of the fraud").  Because Dr.

9    Guthart's July 18 announcement that Intuitive had received the Warning Letter revealed nothing

10   new to the market other than the receipt of the letter itself—which Plaintiffs do not allege

11   Defendants ever concealed—the announcement cannot qualify as a corrective disclosure, and the

12   accompanying stock drop consequently cannot be a basis for proving loss causation or damages.

13           In sum, Plaintiffs can point to no admissible evidence showing a direct link between a

14   drop in Intuitive's stock price and the revelation of allegedly concealed information.

15   Accordingly, Plaintiffs cannot show a triable issue of fact on the issue of loss causation, entitling

16   Defendants to summary judgment on their Section 10(b) claim.  *See Nuveen*, 730 F.3d at 1122–

17   23; *Oracle*, 627 F.3d at 392–93.  Because Plaintiffs' Section 20(a) and 20A claims are derivative

18   of their Section 10(b) claim, Defendants are entitled to summary judgment on those claims as

19   well.  *See Oracle*, 627 F.3d at 394–95.

**B.    Defendants are independently entitled to summary judgment because the allegedly concealed information was in fact disclosed to the market.**

21           Plaintiffs' failure to raise a triable issue of fact relating to loss causation disposes of this

22   case entirely.  But Defendants are also entitled to summary judgment for the independent, but

23   related, reason that the information Plaintiffs allege was concealed was in fact publicly available

24   before and during the Class Period.

**1.    The truth-on-the-market defense is properly considered on summary judgment.**

27           This is a so-called "fraud-on-the-market" case—meaning that Plaintiffs' claims are "based

28   on the assumption that the price of a stock traded in an efficient market fully reflects all publicly

1   available information about the company and its business." *Kalobios*, 258 F. Supp. 3d at 1008

2   (quotation marks and brackets omitted).  Thus, any investor who purchased stock on the open

3   market at prevailing prices is "presumed to have relied on that price—and, by extension, each

4   piece of publicly available information it reflects—as a measure of the stock's value, even if the

5   [purchaser] never saw that information."  *Amgen*, 660 F.3d at 1173.

6        The flip side of the "fraud-on-the-market" theory is the "truth-on-the-market" defense,

7   which "is a method of refuting an alleged misrepresentation's materiality."  *Id.* at 1177 (emphasis

8   omitted).  Where, as here, the facts underlying the defense are uncontested, the defense is

9   properly raised on summary judgment.  *Id.*  Indeed, although materiality is typically a question

10  for the jury, "summary judgment may be granted in appropriate cases," such as those in which

11  defendants can establish the truth-on-the-market defense.  *In re Apple Comput. Sec. Litig.*, 886

12  F.2d 1109, 1113 (9th Cir. 1989).

13       The truth-on-the-market defense is straightforward: "If the market has become aware of

14  the allegedly concealed information, the facts allegedly omitted by the defendant would already

15  be reflected in the stock's price and the market will not be misled."  *In re Convergent Techs. Sec.*

16  *Litig.*, 948 F.2d 507, 513 (9th Cir. 1991) (citation and internal quotation marks omitted).

17  Accordingly, if Defendants show that the allegedly omitted information "has been made credibly

18  available to the market by other sources," then Defendants are entitled to summary judgment.

19  *Apple Comput.*, 886 F.2d at 1115.

20       When performing the truth-on-the-market analysis, the Court must focus on the precise

21  statements at issue.  "Plaintiffs may defeat summary judgment only by showing a genuine issue

22  of fact with regard to a particular statement by the defendant corporation or its insiders."

23  *Convergent*, 948 F.2d at 512.  Thus, in deciding this motion, the Court "must examine each false

24  or misleading statement allegedly made by defendants" and determine what information was

25  available to the market as of the date of each statement.  *Provenz v. Miller*, 102 F.3d 1478, 1484

26  (9th Cir. 1996); *see also Convergent*, 948 F.2d at 512 (noting that in *Apple Computer*, the court

27  "reviewed *in seriatim* sixteen allegedly misleading statements").

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:13-cv-01920 EJD

1241499

1

2.      **The information Plaintiffs allege was concealed was in fact "credibly available to the market" before and during the Class Period.**

2

3          Plaintiffs allege that the eight statements at issue were misleading because Defendants

4    omitted certain information regarding Intuitive's regulatory compliance and the tip cover's

5    performance.  SAC ¶¶ 223–47.  But as explained below, all of the allegedly material omitted facts

6    were already publicly available to the market when each statement was made.

7          ***October 2011 Letters***.  Plaintiffs claim that Defendants failed to disclose that Intuitive had

8    sent letters in October 2011 to all *da Vinci* customers regarding proper use of the tip cover and

9    other accessories.  But even though Plaintiffs refer to these customer letters as "secret recalls," the

10   letters were in fact widely publicized before the first allegedly misleading statement was made on

11   February 6, 2012.

12         To begin with, the letters were immediately posted on the websites of regulatory agencies

13   in some of the largest markets for the *da Vinci* system.  Specifically, it is undisputed that no later

14   than October 31, 2011—before the Class Period—the letters were posted on a weekly list of

15   "Field Safety Notices" on the website of the Medicines and Healthcare Product Regulatory

16   Agency ("MHRA"), the United Kingdom's equivalent of the FDA.  UF 25.  It is also undisputed

17   that, no later than November 16, 2011, the letters were posted on the website of Germany's FDA-

18   equivalent, the Federal Institute for Drugs and Medical Devices ("BfArM").  UF 26.  And by

19   April 16, 2012, the letters were posted on the website of Switzerland's regulatory agency.  UF 27.

20   Plaintiffs' own FDA expert admitted that these letters were available to the American public

21   through the MHRA and BfArM websites in 2011, before the Class Period.  UF 28.  He further

22   admitted that the letters were sent to every site that used a *da Vinci* system—well over 2,000 sites

23   at the time—and that nothing about the letters indicated they were confidential.  UF 29.  The

24   letters remained public throughout the Class Period.  Indeed, an MDR posted on the public

25   MAUDE website on March 23, 2012 referred to one of the letters.  UF 30.

26         The letters' broad dissemination, public posting, and online availability satisfy the truth-

27   on-the-market standard because the allegedly omitted information was "made credibly available

28   to the market by other sources."  *Apple Comput.*, 886 F.2d at 1115.  Moreover, information

regarding the customer letters was "transmitted to the public with a degree of intensity and

1241499

credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations." *Id.* at 1116.  The truth-on-the-market balancing test set forth in *Apple Computer* falls sharply in Defendants' favor because Defendants made no "one-sided representation" one way or the other about the customer letters, the tip cover accessory, or any of the other facts Plaintiffs claim were concealed.  Indeed, none of the allegedly misleading statements reference those matters in any way, shape, or form.

To the extent that Plaintiffs' theory is that Defendants hid the customer letters from the public by failing to classify them as "Class II" recalls, that information was also made public during the Class Period.  And when it was, the stock price suffered no statistically significant decline.  It is undisputed that on May 29, 2013, the FDA listed the October 2011 customer letters as "Class II recalls" on the FDA website.  UF 31.  There was no market reaction.  One analyst characterized the newly christened recalls as "entirely benign," UF 32, and—according to Plaintiffs' own expert—Intuitive's stock price suffered no statistically significant drop.  UF 33.  The FDA's view that the customer letters should have been classified as Class II recalls was again publicized to the market on June 25, 2013, when the Form 483 was published.  UF 34.  Again, analysts were fully aware of the FDA's findings, and remained unmoved, characterizing the FDA's observations as "benign," "handled," of "minor importance," a "non-event," and "not serious."  UF 35.  And again, Intuitive's stock price suffered no statistically significant drop.  UF 36.  These facts are fundamentally inconsistent with Plaintiffs' allegation that investors were misled concerning the October 2011 customer letters.

**Filed MDRs**.  Plaintiffs' assertion that Intuitive somehow concealed that it had received complaints and "fil[ed] a substantial number of MDRs," including death-related MDRs, also fails to withstand scrutiny.  *See, e.g.*, SAC ¶¶ 223, 225(b).  It is undisputed that MDRs Intuitive filed were available to the public on the FDA's "MAUDE" website before and during the Class Period.  UF 37.  It is further undisputed that a simple MAUDE search for MDRs involving the tip cover reveals over a hundred instances in which tip cover malfunctions were reported by Intuitive, hospitals, or other reporting entities, dating back to well before the Class Period.  UF 38.  Analysts tracking Intuitive stock reported on such MDR data.  UF 39.  Furthermore, as Plaintiffs'

1    FDA expert admitted, all medical device manufacturers receive complaints, and not all

2    complaints need be reported as MDRs.  UF 40.  In short, there was no concealment of the number

3    of filed MDRs.

4         Plaintiffs also make the remarkable claim that Defendants somehow concealed a "material

5    increase in device malfunction MDRs in 2012–2014 compared to prior years."  SAC ¶¶ 104–11,

6    225(b), 228(b), 231(b), 234(b).  Of course, even assuming that there was such a "material

7    increase"—and when the commensurate increase in procedures is properly accounted for, there

8    wasn't—Defendants could not have disclosed in *2012* and *2013* that there would be such an

9    increase in *2012–2014*; Defendants are not fortune-tellers.  In any event, Plaintiffs' own

10   complaint admits that any increase in MDRs would have been readily ascertainable from the

11   MAUDE website—indeed, Plaintiffs themselves used the MAUDE website to determine the

12   number of MDRs filed in that period.  *See* SAC ¶¶ 82, 87, 104–11; *see* UF 41.

13        ***Categorization and Reporting of MDRs***.  Plaintiffs' concealment allegations focus not

14   only on filed MDRs (which are by definition public), but also on the notion that Defendants

15   miscategorized or failed to report certain other events for which they claim MDRs *should* have

16   been filed.  These claims fail for several reasons.  As for the alleged miscategorization, Plaintiffs'

17   expert admitted that the 78 allegedly miscategorized MDRs were always publicly available on the

18   MAUDE website, and were always listed as "adverse-event" MDRs, meaning they involved some

19   sort of patient injury.  UF 42.  And as for alleged underreporting, it is undisputed that the FDA

20   never took any regulatory action—of any kind—against Intuitive regarding non-injury device

21   malfunction MDRs, or ever concluded that Intuitive was, in fact, under-reporting MDRs.  UFs

22   43–45.

23        But Plaintiffs' categorization and reporting claims fail for a more fundamental reason:

24   Plaintiffs identify no "corrective disclosure" or associated stock price decline linked to these

25   allegedly concealed facts.  *See Dura*, 544 U.S. at 347 (holding that a Rule 10b–5 plaintiff must

26   allege and prove that the company's "share price fell significantly after the truth became

27   known").  Indeed, Plaintiffs allege that Intuitive first announced that it was recategorizing 78

28   MDRs in its March 13, 2013 press release, SAC ¶ 110, but Plaintiffs have never identified that

1    press release as a corrective disclosure.  That makes no sense under Plaintiffs' theory: if the

2    alleged fraud was Intuitive's miscategorizing MDRs, then publicly recategorizing them should

3    have resulted in a measurable stock drop.  It didn't.  UF 46.

4         The same is true with respect to the claim that Defendants under-reported non-injury

5    device malfunction MDRs.  *See, e.g.*, SAC ¶¶ 98–101, 223.  According to Plaintiffs, Defendants

6    first revealed that they had changed their reporting criteria (pending in-depth discussions with the

7    FDA about those criteria) in the March 2013 press release.  *Id.* ¶¶ 100, 110.[15]  Again, this blows

8    apart Plaintiffs' fraud theory: if the alleged fraud was Intuitive's purported policy of

9    underreporting MDRs, then disclosing changes to correct that policy would have resulted in a

10   measurable stock drop.  It didn't.  UF 46.

11        ***Number of Product Liability Lawsuits***.  Plaintiffs next allege that Defendants concealed

12   the specific number of product liability lawsuits filed against the company between March 18,

13   2010 and the dates of the alleged misrepresentations.  *See, e.g.*, SAC ¶¶ 223, 225(c), 228(c),

14   231(c), 234(c).  But Plaintiffs concede that all these lawsuits were publicly filed, *id.* at 33 n.57,

15   and this Court has already ruled that Intuitive adequately disclosed the existence and risk of

16   products liability lawsuits, *see* Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss

17   at 17, Aug. 21, 2014, ECF No. 83.  Moreover, several press outlets covered the lawsuits in real

18   time, reporting on the number of lawsuits and their allegations.  UF 47.  Thus, information about

19   the number and nature of product liability lawsuits was fully available to the public.

20        In addition, even if the product liability lawsuits *were* somehow nonpublic, Plaintiffs fail

21   to identify any corrective disclosure or resulting stock-price decline.  *See Dura*, 544 U.S. at 347.

22   Nor could they—the company first reported the exact number of product-liability lawsuits in its

23   April 19, 2013 Form 10-Q, UF 48, and the Court has already determined that there was no

24   actionable stock price reaction to that disclosure.  Class Cert. Order at 26–27.

25        ***General Performance of the Tip Cover***.  Finally, as a sort of catchall allegation, Plaintiffs

26

27   _____
     [15] Plaintiffs do not contend that the February 28, 2013 *Bloomberg* article reporting on the FDA's
     MedSun survey actually revealed Intuitive's change in non-injury MDR reporting criteria or the
28   recategorization of the 78 "serious injury" MDRs.  *See supra* Part A.1.  Rather, Plaintiffs argue
     that the news was the "direct result" of those events.  Coffman Rep. ¶ 61.

1241499

1  claim that the statements at issue were misleading because Defendants did not disclose alleged

2  "performance problems" of the tip cover which "resulted in injury and death." *See, e.g.*, SAC

3  ¶¶ 223, 225, 235.  But as Mr. Knott admitted, MDRs reporting patient injuries or deaths,

4  including MDRs regarding the tip cover specifically, were always publicly available on the

5  MAUDE website.  UF 49.  There is also no evidence that Intuitive ever systematically

6  underreported injury or death MDRs.  Thus, the full "safety profile" of the *da Vinci* system, and

7  the tip cover in particular, was always available for everyone to see, including the FDA, academic

8  researchers, securities analysts, and investors.  Indeed, on December 19, 2012, one analyst, Citron

9  Research, published a report that listed and discussed recently-filed lawsuits, claims related to

10  "[b]urns resulting from unintended electrical discharge" or "damaged insulation," and even

11  included photos of alleged tip cover damage—the very allegations Plaintiffs allege were hidden

12  from the market.  UF 50.  On January 17, 2013, Citron Research published a "Part II" to its

13  report, which "databased every MAUDE (FDA) report on Intuitive," and directed readers to its

14  own online, searchable collection of Intuitive MDRs.[16]  UF 51.  This information was, and

15  always had been, publicly available and communicated to the market.

16      There are only two items of information that were even *arguably* undisclosed as of the

17  dates of the challenged statements, but neither of those alleged omissions can establish liability.

18  First, Plaintiffs fault Defendants for not disclosing that beginning in December 2012, Intuitive

19  had entered into tolling agreements and confidential mediations regarding certain product liability

20  claims.  SAC ¶¶ 238, 243(f), 246(f).  But even assuming that Defendants had a duty to disclose

21  such information (they did not), Plaintiffs have failed to identify a corrective disclosure and

22  resulting stock price decline, and therefore cannot establish loss causation with respect to this

23  alleged omission.  *See Dura*, 544 U.S. at 347.  Indeed, when the tolling agreements were first

24  announced in the company's April 19, 2013 Form 10-Q, UF 53, there was no statistically

25

26  [16] To be clear, Citron had Intuitive dead wrong.  It predicted a stock drop to $300 in 2013, which
it said would be "just the first stop" in a predicted stock slide.  In fact, Intuitive's stock never sank

27  below $355 in 2013, and averaged $449 for that year.  UF 52.  But Citron's hyperbolic doomsday
analysis needn't be accurate to undo Plaintiffs' fraud-on-the-market theory.  Citron's published

28  papers confirm that analysts were tracking and discussing the very issues Plaintiffs claim were
hidden from the market.

1     significant price reaction.  UF 54; Class Cert. Order at 26–27.

2          Second, Plaintiffs fault Defendants for not immediately announcing that the FDA had

3     commenced an inspection of Intuitive on April 1, 2013.  SAC ¶¶ 243(d), 246(d).  But as a matter

4     of law, manufacturers need not disclose the results of an FDA inspection, much less the

5     investigation's commencement.  *See, e.g.*, *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 41 (1st

6     Cir. 2014) (finding no duty to disclose the existence of an FDA inspection, where manufacturer

7     disclosed receipt of Form 483 four months after having received it); *In re Sanofi Sec. Litig.*, 87 F.

8     Supp. 3d 510, 541–42 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir.

9     2016) (listing cases); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52–53 (2d Cir. 1995)

10    (holding that results of inspections are immaterial and that it would be "unduly burdensome and

11    impractical to publicly disseminate" such results).  Even putting aside whether such routine

12    inspections must be announced publicly, the alleged failure to disclose the inspection cannot be

13    the basis for liability because Plaintiffs again cannot establish loss causation.  The inspection was

14    first publicized on June 25, 2013, the day when the Form 483 was posted on the FDA's website

15    and when CNBC reported on the inspection.  UF 55.  As Plaintiffs' own expert admits, there was

16    no stock price reaction that day or the day after, UF 56, so there can be no liability for the alleged

17    failure to disclose the inspection.  *See Oracle*, 627 F.3d at 392.

18         In short, the information Plaintiffs allege was concealed was in fact available to the

19    market and therefore, under Plaintiffs' theory of an efficient market, was already reflected in the

20    price of Intuitive's stock.  *See Convergent*, 948 F.2d at 513; *Meyer*, 710 F.3d at 1198–99.

21    Accordingly, Plaintiffs cannot establish the essential element of materiality, entitling Defendants

22    to summary judgment on all three causes of action.  *See Apple Comput.*, 886 F.2d at 1115.

23

24

25

26

27

28

1241499

1

**V.      CONCLUSION**

2          For the reasons stated above, Defendants respectfully request that the Court grant

3    summary judgment in their favor on all three causes of action.

4

     Dated:  February 9, 2018                              KEKER, VAN NEST & PETERS LLP
5
                                           By:     /s/ *Michael D. Celio*
6                                                  JOHN W. KEKER
                                                   MICHAEL D. CELIO
7                                                  LAURIE C. MIMS
                                                   CODY S. HARRIS
8                                                  PHILIP J. TASSIN

9                                                  Attorneys for Defendants
                                                   INTUITIVE SURGICAL, INC., LONNIE
10                                                 M. SMITH, GARY S. GUTHART and
                                                   MARSHALL L. MOHR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
Case No. 5:13-cv-01920 EJD

1241499